1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW MEXICO

3

   TERYSA M. WELCH,
4
                   PLAINTIFF,
5
           vs.                    NO:  CIV-11-0700 KG/SCY
6
   CITY OF ALBUQUERQUE, a New Mexico
7  Municipality, et al.,

8                  DEFENDANTS.

9

10

11       TRANSCRIPT OF OPENING STATEMENT OF MR. VILLA FROM

12            THE TRIAL PROCEEDINGS - VOLUME I

13          BEFORE THE HONORABLE KENNETH J. GONZALES

14            MONDAY, MAY 14, 2018; 8:48 A.M.

15                ALBUQUERQUE, NEW MEXICO

16

17

18       Proceedings recorded by mechanical stenography;
   transcript produced by computer.
19

20

21

22

23  Reported By:  Danna Schutte Everett, CRR, RPR, RMR, CCR 139
                  United States Court Reporter
24                100 N. Church Street, Las Cruces, NM  88001
                  Phone:  (575) 528-1656  Fax: (575) 528-1645
25                dannadawn@comcast.net

```
 1   FOR THE PLAINTIFF:

 2        THE LAW OFFICE OF RYAN J. VILLA
          2501 Rio Grande Boulevard, Northwest, Suite A
 3        Albuquerque, New Mexico  87104
          BY:  MR. RYAN J. VILLA and
 4             MS. RICHELLE ANDERSON

 5   FOR THE DEFENDANTS:

 6        WIGGINS, WILLIAMS & WIGGINS
          1803 Rio Grande Boulevard, Northwest
 7        Albuquerque, New Mexico  87104
          BY:  MS. PATRICIA WILLIAMS and
 8             MS. LORNA M. WIGGINS

 9   Also Present:  Ms. Terysa M. Welch
                    Ms. Trish Hernandez
10                  Mr. Trevor Wiggins
                    Ms. Elizabeth Paiz
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

2         (Opening statement of Mr. Villa.)

3              THE COURT:  All right.  Opening statements, Counsel.

4              MR. VILLA:  Thank you, Your Honor.

5              THE COURT:  Mr. Villa, I may have asked, do you need

6    a five-minute time warning?

7              MR. VILLA:  I think -- I'll be happy to take one, but

8    I'll keep my time also.

9              THE COURT:  All right.

10             MR. VILLA:  May it please the Court?

11             THE COURT:  Counsel.

12             MR. VILLA:  Ladies and gentlemen of the jury.  Good

13   morning.  Thank you for your time.

14             What I'm showing you now on your screen is a fitness

15   assessment of Terysa Welch's from May 2004, in which her

16   sergeant, her supervisor wrote on there on the left side "I

17   want to have children with you!"  Now, this wasn't an isolated

18   incident, ladies and gentlemen.  Her supervisor, the supervisor

19   over her unit, ROP unit throughout the time he was her

20   supervisor and later her lieutenant sexually harassed Terysa

21   Welch.  This is just one example of the beginning.

22             He constantly made comments about her, commented

23   about her looks, said things about the clothes she was wearing,

24   referred to her body as being tight as a drum, made comments or

25   sounds like ummm, looking at her body, especially in the
```

1   summertime when it was warm, and constantly told her -- or told

2   her on a number of different occasions that if he wasn't

3   married, he would be pursuing her.

4           And it got to the point that she was very

5   uncomfortable around him, tried to avoid him, realized that he

6   didn't do it when other detectives or other individuals in the

7   unit were around, and so she tried to have other people with

8   her when she was in contact with her sergeant and avoided him.

9   In fact, his cubical was close to an exit door, and she would

10  often avoid that exit door simply to avoid her sergeant, Robert

11  Smith.

12          And you have to understand the way it worked at the

13  time in this unit.  The ROP unit, the Repeat Offender Project,

14  was a group of detectives that went after the worst of the

15  worst in Albuquerque.  Repeat offenders.  That's why it's

16  called the Repeat Offender Project, or ROP.  It was within the

17  larger division of APD called SID, or the Special

18  Investigations Division.  And the sergeant at the time from

19  2004 to 2006, 2007 of ROP was Sergeant Robert Smith.  And he

20  had known Terysa.  They were detectives in the same unit

21  earlier in time, but she hadn't had this experience with him

22  yet.

23          And when Terysa got into ROP, it was an incredibly

24  competitive process.  There were about 15 individuals who were

25  applying for ROP.  They had to go through a fitness evaluation,

1   shooting, a written test, an oral test.  It was a coveted

2   position.  And Terysa coveted it since the day she went to the

3   Academy.  As a matter fact, since she was a young girl, she

4   wanted to be in law enforcement.  Her grandfather was a chief

5   of police in a small town in Montana, and ever since she was a

6   young girl, that's what she wanted to do.  And she was used to

7   playing with the boys, didn't have any problem with that,

8   understood that it was a male-dominated profession.  In fact,

9   there were only two women that graduated in her Academy in

10   1997.  And from the time she began to be a police officer at

11   the Academy when the ROP team came in, the ROP unit came in and

12   talked to them, she decided, That's what I want to be, that's

13   my goal, I want to be in the ROP unit.

14        When 2004 finally rolled around, she had already

15   applied for ROP previous times, went through the process that I

16   told you about, and made it in.  She was elated.  She loved the

17   job.  Unfortunately, she didn't know what was going to happen

18   with Sergeant Robert Smith.

19        Now, as I told you, Sergeant Smith got promoted

20   around 2006, 2007 and he became lieutenant.  Lieutenant in SID

21   isn't just in charge of ROP.  The lieutenant is in charge of

22   many different divisions in SID.  So Terysa didn't see

23   Lieutenant -- now Lieutenant Smith very often anymore, but he

24   still did the things I told you about, still made comments when

25   he had the opportunity.  But when he was the sergeant, he was

1   in charge of ROP he was.  That's who Terysa and everybody else

2   answered to, that's who controlled, that's who was the

3   supervisor.

4           And as you heard from the judge, in a lawsuit against

5   the City for sexual harassment, the supervisors are the City.

6           Terysa also has claims in addition to the sexual

7   harassment claims for discrimination and retaliation.  And

8   that's what this case is about, sexual harassment, sexual

9   discrimination, and retaliation.

10          Now, for harassment and discrimination, which she has

11  to prove, is that her sex or gender was a motivating factor in

12  the actions.  And what you'll hear about when she got to ROP is

13  there was hostility.  So sexual harassment is not just the

14  things that you saw Sergeant Smith doing, but also other

15  hostility that's based on her sex, based on her gender.  And

16  you'll hear that there were individuals in the unit, in the ROP

17  unit, like Kevin Gange who never really liked Terysa, they

18  never got on along, they always clashed.  There were other

19  individuals who were vocal about Terysa when she was selected

20  in the ROP unit.  They didn't want Terysa in the unit.  And

21  there were some that she got along just fine with and worked

22  well with and didn't have any problems.

23          But she experienced hostility from the beginning she

24  came into ROP, not only from her sergeant, but from her fellow

25  detectives.  One of the things that you'll hear about, when

1    you're in ROP, there always has to be a sergeant.  ROP is a

2    unit that can be activated at any time, so you'll always have a

3    detective on call, you'll have a secondary detective for on

4    call, and even the whole unit can sometimes be activated if

5    there's a high-profile situation, a dangerous fugitive, a

6    homicide, and so these detectives were essentially on call the

7    entire time.

8             They didn't wear uniforms.  They dressed in street

9    clothes so that people couldn't identify them as police.  They

10   drove around in vehicles.  They were not recognizable as police

11   vehicles.  And they needed to be ready even if they weren't at

12   the office to take a call and be activated at any time, and

13   because of that there always needed to be a sergeant.  And

14   sometimes the sergeant was on vacation or sick leave or taking

15   the day off and things like that, so there needed to be what's

16   called an acting sergeant, and an acting sergeant was typically

17   one of the detectives in the unit who when they became acting

18   sergeant essentially were the supervisor in charge of the unit

19   until the regular sergeant came back.

20            And throughout the time that Terysa was in ROP she

21   was never made an acting sergeant.  It was always somebody

22   else, one of the other men, and throughout the time she was in

23   ROP, she was the only female detective.  But when you are the

24   acting sergeant for longer periods of time, you get better pay,

25   and, of course, you're the supervisor, everybody must respond

1   to you.

2          Now, I told you that in 2007 Lieutenant Smith,

3   formerly Sergeant Smith became a lieutenant.  In 2007, Terysa

4   had a very traumatic incident occur in her life.  She was

5   dating a fellow police officer, David Maes, and David Maes --

6   and living with him, and they were engaged to be married, and

7   David Maes was somebody that kept who he really was from

8   Terysa.  It turned out he was not a good person.  He got

9   charged and arrested for having raped or having sex with a

10  person that he had in custody.  And this happened in about

11  October of 2007.

12         And Terysa was at work.  She didn't know about it,

13  she hadn't heard about it.  She got a call from Lieutenant Rob

14  Smith, and he was asking if she was there at the station.  She

15  said yes.  He came down, grabbed her hand, and said, "Let's go

16  out to the parking lot."

17         They go out to the parking lot.  He asks her if she

18  wants to have coffee or get breakfast.  She was very concerned.

19  She knew something was wrong, she just wanted to know what was

20  wrong.  And Lieutenant Rob Smith then grabbed her, hugged her

21  very, very tightly, still hadn't told her what was going on,

22  and Terysa insisted, you know, "I want to know what's going on.

23  Tell me what's going on," and he told her.

24         And during this time that he told her, he was very,

25  very pushy.  He said, "Let me take you home.  I'll take you

1  home.  I'll take care of you."  Almost in a sexual manner.  And

2  he repeated the statement to her that he had made many times,

3  that if she wasn't married -- excuse me -- if he wasn't

4  married, he would be pursuing her.  He said this to her during

5  this extremely traumatic period in her life.

6          And after he finally told her what was going on, she

7  took a week off, went to Montana to be with her family, and

8  during that period of time Lieutenant Smith called her every

9  day, and she continued to feel very uncomfortable by this

10  conduct of his.

11          Well, she got back, and as things had gone with the

12  ROP unit from the time she was there through about 2009, she

13  continued to have problems with some of the individuals in the

14  ROP unit.  Not all of them.  Kevin Gagne being one of them.

15  And the new sergeant, Sergeant David Hubbard.  They had

16  conflicts throughout the time that he became the sergeant once

17  Sergeant Smith, Rob Smith promoted to lieutenant.  And it was

18  certainly no secret that they didn't like each other.

19          In July of 2009, Terysa and another detective, Mike

20  Hill, were with Kevin Gagne, someone that Terysa had some

21  problems with, and at the time Kevin Gagne was the acting

22  sergeant, and they had just completed an operation, I believe

23  they arrested somebody, they were sitting around talking, and

24  Acting Sergeant Gagne told Detective Hill and Detective Welch

25  to be at the station tomorrow, the next day, to meet up, they

1  were going to meet up and then the whole ROP team was going to

2  go to the range.  A lot of times they would go to the shooting

3  range because they had to shoot and practice.  They were

4  qualifying and shooting all the time.

5          So following those orders Detective Welch, Terysa,

6  went to the main station, and Mike Hill was there, the other

7  detective that was with her, but she realized after doing some

8  time sheets and sort of waiting for everybody to show up, she

9  realized nobody was there, so she talked to Detective Hill.

10  Detective Hill decided to call Sergeant Hubbard, and they

11  realized that the ROP team was all out at the range.  They had

12  gone straight there.  They weren't meeting at the station.

13          And after that happened, Sergeant Hubbard gave Terysa

14  what we're going to call a punctuality memo.  And the

15  punctuality memo referred to her missing this training at the

16  range as well as to a previous incident that she missed a

17  briefing, but she had actually comped out or told at that time

18  a different acting sergeant that she had a personal

19  appointment, she was going to be comped out for this period of

20  time, and so she wasn't at a briefing.  But Sergeant Hubbard

21  put that in the memo, that missed briefing and the missed

22  training and gave her this punctuality memo, which would go in

23  his file.  And sergeants would keep files on their detectives

24  that they could pass along to the next sergeant or keep for

25  themselves as the way things go in the police department.

1          Well, at that point, Terysa had had it.  She had

2   enough.  She was a very punctual person, and took offense to

3   the fact that she was accused of this when, in her view, she

4   didn't do anything wrong.  She comped out for the briefing, she

5   followed the orders of Acting Sergeant Gagne to go to the

6   police station, and Detective Mike Hill didn't get a

7   punctuality memo.  So she was upset about that as well, and she

8   tried to address this with Sergeant Hubbard, and Sergeant

9   Hubbard didn't want to hear her.

10          And because the police department is a paramilitary

11   organization, what you must do in that situation is go up the

12   chain of command.  And next in the chain of command from

13   Terysa, from her sergeant was Lieutenant Smith.  So in order to

14   essentially challenge this memo, she had to go up the chain of

15   command.

16          So after trying to address it with Sergeant Hubbard

17   over the phone, essentially, she asked Lieutenant Smith if he

18   could meet -- she could meet with him about it, and he said

19   yes.

20          Well, that was in the morning of the day that they

21   went to the firing range, a different day, and then so the next

22   day she went to Lieutenant Smith's office, and walked in the

23   office, she had the memo, she had the comp slip for the

24   briefing that she missed ready to explain to him what happened,

25   and instead of Lieutenant Smith listening to Terysa tell what

1    happened, he immediately started talking about her performance,

2    her performance in ROP and whether she was up to snuff.

3           Now, these detectives get performance evaluations

4    every year and they also get monthly reports on their -- the

5    things they've done for the month, and throughout Terysa's

6    career she had never, ever received any bad marks on any

7    performance evaluation, nobody had ever said "Hey, you're not

8    performing the way we want you to."  This had never come up

9    before.  And Terysa was a bit taken aback.

10          And Lieutenant Smith during this meeting was being

11   very forceful and talking about these performance issues that

12   Terysa was not prepared to talk about.  And she quickly told

13   him that she might file a claim, an EEOC claim because she felt

14   like the treatment she was receiving at ROP, the memo that she

15   got was unfair.

16          And Lieutenant Smith, of course, knowing the history

17   they've had since 2004, said to her, "Well, I hope I've got

18   some loyalty coming my way."  And the comment referred to what

19   probably was, it was Smith in the end who wanted Terysa or

20   wanted a female in the ROP unit because he saw a female as an

21   asset to the ROP unit.  And I guess as you'll hear, he wanted

22   Terysa in the ROP unit for other reasons.

23          But he told her "I hope I have some loyalty coming my

24   way" and told her "You can't do it, you can't file an EEOC

25   claim, I won't let you."

1          Now, Lieutenant Smith's going to deny he said that.

2    He's going to admit that he wrote this, and he'll tell you

3    that, "Well, that's just my sense of humor, and Terysa and I

4    always engaged in playful banter and flitting and those sorts

5    of things," which you'll hear the evidence about and you decide

6    for yourself whether you think that's true.

7          One thing that Terysa did say to Sergeant Smith and

8    later Lieutenant Smith when he kept saying things to her about

9    "Gosh, if I wasn't married, I would be pursuing you" or other

10   things that he liked to talk about, Terysa to deflect would

11   often say "Maybe in the next life," you know, to get him to

12   stop talking about those types of things.

13         Now, after talking to Lieutenant Smith about the

14   memo, Terysa continued to follow the chain of command and went

15   to the next person up.  It used to be called the captain.  Now

16   it's called the commander.  But that's who's over Lieutenant

17   Smith, and that was Joseph Hudson.  And Joseph Hudson, who was

18   not mean or rude to Terysa the way Lieutenant Smith was, said,

19   you know, "Rob, Rob Smith, he's probably going to be the next

20   commander, so I'm not sure you want to do this.  I think you

21   should tell him that you were wrong and he was right and fall

22   on your sword.  You're not going to win your EEOC claim.  You

23   just shouldn't do it."  And after that meeting Terysa, of

24   course not being satisfied, ultimately decided she was going to

25   file an EEOC claim.

1    But before that happened, it wasn't certainly lost on

2  the ROP unit that Terysa had complained up the chain of command

3  about this punctuality memo and her treatment, and just a day

4  or so later, maybe two days later Sergeant Hubbard continued

5  with hostility towards Terysa and he did something that was

6  very, very dangerous.

7    One of the things that often happened in the ROP unit

8  was warrant packets would get handed out, and they would hand

9  them out to partners of two different detectives and say,

10 "Here's a subject who's wanted, you know, go find him and get

11 him."  And he handed a packet to Terysa without assigning her

12 backup or a partner, which is life-threatening.  And she asked,

13 "Well, what about backup?"  And he said, "Let me know if you

14 need anything."

15    And this, of course, solidified for Terysa that she

16 was not in a good place, she was not in a safe place, it was a

17 hostile environment, and she wasn't going to get relief from

18 her supervisor, so she filed an EEOC complaint on August 24th,

19 2009, with the EEOC, the federal EEOC, claiming a hostile work

20 environment, gender discrimination, and she also took that

21 complaint to a lieutenant, Lieutenant Doug West in Internal

22 Affairs hoping that Lieutenant West could also help.  And

23 Lieutenant West assured her that her complaint would stay

24 confidential, he would only tell the chief, Chief Schultz,

25 Chief Raymond Schultz, and that they would then look into it.

1   Well, it became very clear to Terysa within the next

2   few days that her complaint had not been kept confidential and

3   many, many people knew about it; people knew the number of

4   pages that it was she had written up, they knew details about

5   it more than just Chief Schultz and Lieutenant Doug West.

6   Now, the department did remove briefly Sergeant

7   Hubbard and Robert Smith from the ROP unit after the complaint

8   was filed, and none other than Kevin Gagne at the time became

9   the acting sergeant and announced over all of the ROP radio

10  that Smith and Hubbard were being moved.  This occurred in

11  about late August.

12  And it didn't last very long.  Both were brought back

13  to the unit within just a couple of months.  They had not --

14  The department, as you'll find out, had not addressed any of

15  Terysa's claims with them when they came back.  And Commander

16  Hudson, who was still overseeing this Special Investigations

17  Division was intent on disciplining Terysa.  As a matter of

18  fact, in November, this is just a couple of months after she

19  filed her Complaint, he wrote her a memo saying that Sergeant

20  Hubbard, who had now been back at the unit, and another

21  detective, Detective J.R. Potter, who Terysa had accused as

22  well in this EEOC complaint -- and he was an individual that

23  was friends with Robert Smith since they were 12 years old.

24  And as a matter of fact, you'll hear that during the

25  times that they were together in the unit, Detective Potter and

1    Robert Smith would talk often about the size of their penis in

2    front of Terysa Welch.  And they accused Terysa of not covering

3    them during an operation or dropping out of surveillance.  And

4    Commander Hudson wrote Terysa a memo making her respond to

5    these allegations.  And then shortly after that, because Smith

6    was back in the unit, Terysa was walking down the hall one time

7    going to the copy machine and Lieutenant Smith comes back,

8    walking down the hall toward her, and he walks down the hall

9    towards her like he's going to knock her over.

10              MS. WIGGINS:  Objection.  Argumentative.

11              MR. VILLA:  This is just what the facts will show,

12   Your Honor.

13              THE COURT:  Well, I guess if you just qualify it that

14   way.

15              I'll just remind the jury that the opening statement

16   is not evidence.  There will be opportunity for argument at the

17   close of evidence at the end of trial.

18              Mr. Villa, you may proceed.

19              MR. VILLA:  And Terysa will tell you that she had to

20   get out of the way and stand up against the wall to avoid

21   Lieutenant Smith.  That was the atmosphere in December of 2009.

22              She found in her box a blank transfer request form.

23   She doesn't know who put it there.  But that transfer request

24   form was of course to transfer out of the ROP unit.  And

25   because she was not feeling safe, because she was feeling

1   scared, she got in communication with Elizabeth Paiz, who was

2   the deputy chief at the time.  As a matter of fact, I think the

3   testimony will show that Deputy Chief Paiz reached out to

4   Terysa.  And because she didn't feel safe at work, Terysa was

5   transferred to Burglary, which is a different unit, and it's a

6   unit that's not as prestigious as ROP and a unit in which there

7   wasn't as much overtime available.

8        And throughout the time she was transferred to

9   Burglary, this is from about December 2009 through

10  approximately the end of 2012, it's a total period you'll hear

11  of about 18 months, she was hopeful that the situation at ROP

12  was going to get addressed and she would be able to come back,

13  but that didn't happen.  Lieutenant Smith was allowed to stay

14  there until the summer of 2010 when he retired.  Sergeant

15  Hubbard stayed there longer than that, and Kevin Gagne was also

16  still there.

17        And Burglary is not in the Special Investigations

18  Division.  The Special Investigations Division is part of a

19  separate unit, and, of course, Commander Hudson was still the

20  commander of the Special Investigations Division for a period

21  of time, as well.  So there's a long back and forth when

22  Terysa's trying to get back into ROP but doesn't feel safe

23  because nothing's being addressed to get -- with the situation

24  she has.  She doesn't want to go back without any changes being

25  made.  And throughout the time she spent in Burglary, she lost

1  out on about $27,000 worth of overtime compared to the overtime

2  that she made while she was in the ROP unit.

3          Now, I want to talk to you about October of 2010.

4  She's in Burglary at the time.  This is when this -- she's in

5  sort of this Purgatory position, and she happens to go to

6  Walgreen's.  Now, as I told you, when ROP detectives -- And she

7  was still using her same vehicle that she had as a ROP

8  detective.  They don't wear uniforms.  They have undercover

9  vehicles.  They're in their vehicles almost all the time

10 because they've got to be ready to respond to a call.

11         Terysa Welch was on her way to her house, she stopped

12 at a Walgreen's, bought a 12-pack of beer, and it just so

13 happened that Kevin Gagne was at that Walgreen's and saw her

14 buy this 12-pack of beer and saw her go then to her ROP

15 vehicle, and so he called his new lieutenant at the time --

16 this was Lieutenant Roseman, who took over for Lieutenant

17 Smith -- and said what he just saw, that he saw Terysa

18 transporting this alcohol in her car.  Well, that's a violation

19 of policy.  Officers aren't supposed to do that.  You're not

20 supposed to transport alcohol in a City vehicle.

21         And if you look at the policies for that violation,

22 there's different disciplinary ranges.  It goes 7 to 1.  7's

23 the least serious.  1 is the most severe.  This is a 6.  And

24 what a 6 calls for is a written reprimand.  And you'll hear

25 that there's testimony that that can be handled by the person's

1   most direct supervisor, so in that case the sergeant or maybe

2   the lieutenant can write a written reprimand and say, you know,

3   you violated policy, don't do it again.  That's not what

4   happened with Terysa.

5          What happened with Terysa was the lieutenant who got

6   the information about this alcohol violation then asked that an

7   Internal Affairs investigation be opened.  And this lieutenant

8   of course knew about Terysa's circumstance, knew that she was

9   trying to get back into SID, back into ROP, and none other than

10   Lieutenant Doug West had become the commander of SID.

11          Now, Lieutenant West was the one that Terysa

12   originally took her complaint to in Internal Affairs and he

13   promised her that it would stay confidential, and it didn't.

14   And Lieutenant West was also intimately involved in the EEOC

15   investigation and impacted whether he conducted an appropriate

16   investigation of Terysa's claims.

17          And so now he had become commander.  He was

18   overseeing SID.  And after Terysa went through three different

19   Internal Affairs interviews, not given a written reprimand,

20   three Internal Affairs interviews, Mr. West, Doug West,

21   recommended her termination.  He didn't recommend a written

22   reprimand.  He recommended her termination.  And of course he

23   knew all about Terysa's circumstances and the Complaint that

24   she had filed with the EEOC.  And it then got reviewed.

25          And let me just back up a minute.  What you'll hear

1    from the City is that, well, the reason that we recommended

2    termination and ultimately a more severe -- a less severe

3    sanction than that, but more severe than a written reprimand is

4    that Terysa was not honest in her Internal Affairs interviews.

5    What Terysa had said in her Internal Affairs was that she

6    didn't remember the day.  The Walgreen's is right by her house

7    in Rio Rancho.  When she was confronted about it, it was almost

8    three weeks later.  And she didn't deny that she went to the

9    that Walgreen's, she didn't deny that she would buy alcohol in

10   her City vehicle.  She just couldn't remember that specific

11   day.

12          And of course there was -- there was a video that APD

13   went out and got, receipts that they got that showed Terysa was

14   there.  She didn't deny that she was there.  She just didn't

15   remember which vehicle she was in.  And so that was the basis

16   for Lieutenant West's recommendation to terminate her.

17          Well, then it was reviewed by Deputy Chief Paiz --

18   excuse me -- Deputy Chief Feist, who had taken over for Deputy

19   Chief Paiz and was also dealing with the issue of whether

20   Terysa should be put back into ROP or stay in Burglary.  He

21   reviewed it and decided he wasn't going to sustain any findings

22   that Terysa had not been honest, but he did sustain the

23   findings that she had transported alcohol in her vehicle and

24   recommended not a termination, but an 80-hour suspension.

25   Again, Agent Feist answered to Chief Schultz, knew about

1   Terysa's situation and the EEOC complaint that she filed.

2           Well, the next step up after Deputy Chief Feist is

3   Chief Schultz.  And Chief Schultz looked at what Deputy Chief

4   Feist did and said, "I'll agree, we'll sustain for transporting

5   alcohol in the vehicle," and he imposed 40 hours' suspension,

6   which was the final suspension, but made her only serve 16

7   hours.

8           And what you'll hear, ladies and gentlemen, is you'll

9   hear from witnesses that did the same thing, transported

10  alcohol in the vehicle and got verbal counseling.  But Terysa

11  ultimately gets this suspension from Chief Schultz, who knew

12  about her EEOC complaint.

13          And then what Chief Schultz did was have Terysa's

14  findings in the Internal Affairs sent to the Law Enforcement

15  Academy.  And the Law Enforcement Academy carries all the

16  officers' certifications.  And so if you don't have a

17  certification, you can't be a law enforcement officer.

18          They sent that to the Law Enforcement Academy along

19  with a list of other APD officers who have been accused of much

20  more serious things, and that was published in the Albuquerque

21  Journal, in the newspaper.  So you can go online and see Terysa

22  Welch's name along with many other individuals accused of much

23  more serious charges.

24          And so that, ladies and gentlemen, forms the basis

25  for Ms. Welch's claims for sexual harassment, discrimination,

1   and retaliation.  And she's going to ask at the end of the

2   trial that you award -- you find that those three things

3   happened and that you award her damages for those overtime

4   hours that she missed, the emotional distress she suffered

5   during this period of time, loss of enjoyment of life, and

6   damage to her reputation.

7         But, ladies and gentlemen, although she's going to

8   ask you for that, I want you to understand that this case is

9   not about her being a victim.  It's about her being a survivor

10  because now she's a lieutenant at APD.  She didn't let them

11  terminate her.  She ultimately promoted to sergeant and later

12  to lieutenant, and that will tell you something a little bit

13  about her character.  And at the end of this trial we'll ask

14  that you find in favor of the plaintiff.

15        THE COURT:  Mr. Villa, you put an exhibit on the

16  ELMO.  And remind me which exhibit was that.

17        MR. VILLA:  166.

18        THE COURT:  And then during the course of your

19  statement you displayed another exhibit.  Was that also 166?

20        MR. VILLA:  Yes.

21     (End opening statement of Mr. Villa.)

22          * * * * * * * * * * * * * * * * * * * *

23

24

25

1                          C-E-R-T-I-F-I-C-A-T E

2    UNITED STATES OF AMERICA

3    DISTRICT OF NEW MEXICO

4

5         I, Danna Schutte Everett, RPR, CCR, CRR, Official

6    Court Reporter for the State of New Mexico, do hereby

7    certify that the foregoing pages constitute a true

8    transcript of proceedings had before the said Court held

9    in the city of Albuquerque, New Mexico, in the matter

10   therein stated.

11        In testimony whereof, I have hereunto set my hand on

12   this 20th day of May, 2018.

13

14        _____

15        DANNA SCHUTTE EVERETT
          Registered Professional Reporter
          Registered Merit Reporter
16        Certified Realtime Reporter
          NM Certified Court Reporter #139
17        100 Church Street
          Las Cruces, New Mexico  88001
18        Phone:  (575) 528-1656
          Fax:  (575) 528-1645
19        dannadawn@comcast.net

20

21

22   May 14, 2018, Welch vs. City of Albuquerque

23

24

25