1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF NEW MEXICO

3

TERYSA M. WELCH,

4
                    PLAINTIFF,

5
            vs.                      NO:  CIV-11-0700 KG/SCY

6
CITY OF ALBUQUERQUE, a New Mexico

7 Municipality, et al.,

8                    DEFENDANTS.

9

10

11             TRANSCRIPT OF TRIAL PROCEEDINGS – VOLUME I

12              BEFORE THE HONORABLE KENNETH J. GONZALES

13                MONDAY, MAY 14, 2018; 8:48 A.M.

14                   ALBUQUERQUE, NEW MEXICO

15

16

17      Proceedings recorded by mechanical stenography;
transcript produced by computer.

18

19

20

21

22

23 Reported By:  Danna Schutte Everett, CRR, RPR, RMR, CCR 139
               United States Court Reporter
24             100 N. Church Street, Las Cruces, NM  88001
               Phone:  (575) 528-1656  Fax: (575) 528-1645
25             dannadawn@comcast.net

```
 1   FOR THE PLAINTIFF:

 2         THE LAW OFFICE OF RYAN J. VILLA
           2501 Rio Grande Boulevard, Northwest, Suite A
 3         Albuquerque, New Mexico  87104
           BY:  MR. RYAN J. VILLA and
 4              MS. RICHELLE ANDERSON

 5   FOR THE DEFENDANTS:

 6         WIGGINS, WILLIAMS & WIGGINS
           1803 Rio Grande Boulevard, Northwest
 7         Albuquerque, New Mexico  87104
           BY:  MS. PATRICIA WILLIAMS and
 8              MS. LORNA M. WIGGINS

 9   Also Present:  Ms. Terysa M. Welch
                    Ms. Trish Hernandez
10                  Mr. Trevor Wiggins
                    Ms. Elizabeth Paiz
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                THE COURT:  All right.  Good morning, everyone.
 2   Please be seated.
 3                MR. VILLA:  Good morning.
 4                THE COURT:  Okay.  We have the jury I think already
 5   in the jury deliberation room.
 6                Let me just call the case formally.  This is Welch
 7   versus City of Albuquerque and Raymond Schultz, Civil Cause
 8   11-CV-700.
 9                May I have appearances.
10                MR. VILLA:  Ryan Villa and Richelle Anderson on
11   behalf of the plaintiff Terysa Welch.  Good morning, Your
12   Honor.
13                THE COURT:  Okay.  Good morning.
14                MS. WILLIAMS:  Good morning.  Patti Williams and
15   Lorna for the defendants Raymond Schultz and the City of
16   Albuquerque.  With us at counsel table are Retired Deputy Chief
17   Paiz and our legal assistants, Trevor Wiggins and Trish
18   Hernandez.
19                THE COURT:  All right.  And I'm sorry, you said
20   Mr. Schultz?
21                MS. WILLIAMS:  Chief Schultz is not here.
22                THE COURT:  He is not here.  Will he be here?
23                MS. WILLIAMS:  He will be here on Friday to testify,
24   but he is -- he is not going to sit for the entire trial
25   because of his job duties.
```

1          THE COURT:  Okay.  Well, good morning, everyone.

2          I had a few things to cover very briefly before we

3    call the jury in.  I don't want to keep them waiting very long.

4          I received a number of -- Well, I'd received the

5    trial briefs filed, I guess it was Friday, and there were a

6    number of issues or at least red flags brought up by counsel,

7    including, I guess, what was in document 474, and this related

8    to whether -- or asking whether there were any lay witnesses

9    that would be giving an opinion about motive and so forth.

10          Let me ask, Mr. Villa, do you anticipate any of your

11    lay witnesses to be opining as to motive or anything of that

12    nature in their testimony?

13          MR. VILLA:  I don't, Your Honor.  You mean motives

14    for other people's actions?

15          THE COURT:  Yes.

16          MR. VILLA:  No, I don't the anticipate that.

17          THE COURT:  Okay.  As I understand, Ms. Wiggins, that

18    was the concern.

19          MS. WIGGINS:  Yes, Your Honor, that was the concern.

20    To the extent that was intended to be offered, we wanted the

21    Court to be fully apprized of the topic.

22          THE COURT:  Of course.  Okay.  There was the document

23    425, and that was relating to the issue of double recovery.

24    Here, too, Mr. Villa -- And it may be helpful to the Court, as

25    I continue to work on jury instructions, I guess what I need

1    some clarity on is what damages you are seeking as to which

2    statute.  So under Title VII specifically what would be the

3    damages you're seeking, and then under the New Mexico Human

4    Rights Act which damages would you be seeking.

5            MR. VILLA:  Yes, Your Honor.  I filed the brief on

6    damages which I think sets out that, but the damages under

7    Title VII and the damages under the Human Rights Act to some

8    extent will overlap.  Our view of the double-recovery issue is

9    that it becomes an issue if and only if the jury returns

10   verdicts on two separate counts or claims that create a

11   double-recovery issue.

12           But as I briefed in the damages issue, the Section

13   1981A for Title VII, the 1991 amendment to the Civil Rights Act

14   allows for certain compensatory damages that are spelled out in

15   the statute as well as by case law.  The Human Rights Act also

16   allows for compensatory damages, which it doesn't specify like

17   the 1981A act does, but compensatory damages I think are all

18   the traditional damages allowed under New Mexico law, which I

19   cited to a few different sources in that damages brief.

20           THE COURT:  Okay.

21           MR. VILLA:  And that's -- We filed a response to the

22   double recovery.  That's document 433, our response.  And I can

23   get you the number for the 245 damages brief which we filed.

24   That was one of the ones you asked us to file by noon on

25   Friday.

```
 1              THE COURT:  I did.

 2              MR. VILLA:  That's 428, Your Honor.

 3              THE COURT:  428?  So just tell me what you think is

 4  the overlap between the two statutes and the damages.

 5              MR. VILLA:  Well, Your Honor, I think that the

 6  compensatory damages to some degree will overlap.  We do have

 7  different time frames.

 8              THE COURT:  Let me just ask you -- I apologize for

 9  interrupting -- if you can just be more specific as to the

10  compensatory damages.  In what form?

11              MR. VILLA:  Well, I think you have her wages, you

12  have her -- Those are the specific damages.  You have emotional

13  distress, you have, according to 1981, inconvenience, loss of

14  enjoyment of life, and other nonpecuniary damages.  I think we

15  clarified for the Court that the other nonpecuniary damage we

16  were seeking is damage to reputation.

17              THE COURT:  You did.  And so, again, where do you see

18  the overlap between the NMHRA and the Title VII?

19              MR. VILLA:  I think both statutes allow damages for

20  both.  I think that depending on how we ultimately word the

21  jury instructions, there may be, for instance, emotional

22  distress that's only associated with a particular claim.  But

23  generally speaking, I think they both overlap.  I think that

24  the claims are -- excuse me -- the elements might be a little

25  different, but the damages would in large part completely
```

```
1   overlap.
2         THE COURT:  Okay.  Well, and I think you're right,
3   and that's what we're working on, is the jury instructions,
4   too, I think draw any distinction and make clear what the
5   overlap may be.
6         It's a legitimate issue as to whether there can be
7   and there shouldn't be double recovery, so that's the -- that's
8   what we have to navigate.
9         MR. VILLA:  Yes, Your Honor.  And I think what I
10  would say is the way I read the law, even the law cited by the
11  defendants is, if the jury returns a verdict on Title VII and
12  the Human Rights Act that is different, plaintiff has to elect
13  her remedy.  She can't -- She can't collect both.
14        THE COURT:  Okay.  The next issue, and this is
15  brought up in document 426 relating to exhaustion of
16  administrative remedies relating specifically to the
17  retaliation claim.
18        Ms. Williams, did you have anything else to add on
19  that?
20        MS. WILLIAMS:  Well, Your Honor, I think there are
21  admissions in the brief that they did not exhaust that, but it
22  was an ancillary issue that came up during the proceeding, but
23  that is not where the exhaustion would come in.  It's what she
24  brought to the EEOC in the three EEOC complaints she filed, and
25  in that brief they say she did not bring it to the EEOC, that
```

1   the EEOC probed it a little and brought something up in the

2   determination, but that doesn't mean that she exhausted that

3   remedy through the process of making her Complaint.

4           THE COURT:  Okay.  I heard from counsel on this on

5   Thursday.  I don't want to exhaust this issue any more than

6   necessary, but, Mr. Villa, anything else on it?

7           MR. VILLA:  We did file a brief on Friday, Your

8   Honor, on that topic, which is 426, but I think that the issue

9   was brought to the EEOC, the EEOC investigated it, issued a

10  determination, offered conciliation to the City.  All of those

11  are what the Jones case in the Tenth Circuit says is needed to

12  exhaust on that issue.

13          THE COURT:  Okay.  So I looked at 426-3 and I looked

14  at 426-5.  One being the determination and the other being the

15  charge.  And so I see the box for retaliation being checked and

16  the language in the determination.  The way I view it is that

17  the EEOC addressed retaliation.  I'm going to find that

18  Ms. Welch exhausted her retaliation claim before the EEOC.  I

19  understand what the objection is.  And so that will be my

20  ruling.

21          The next issue is brought to the Court in 427,

22  document 427 on invited-error citations.  I understand both

23  parties have concerns about their position and their objections

24  and concerns about waiving their objections by even joining or

25  propounding a limiting instruction.  Certainly that being the

```
1    case, however, the Court will still prepare a limiting

2    instruction to at least guide the jury, if not instruct

3    outright, on what evidence they may be able to consider and

4    within what time frame.  So this was discussed, as well.  I'll

5    note the position of the parties.

6              Okay.  The next issue again relating to nonpecuniary

7    damages, that just was simply brought forward to the Court on

8    document 428.  I don't think there's anything else to bring up

9    on that.

10             Let me ask, the next issue, and that's relating to

11   what I brought up last week and that's what was a newspaper

12   article published in the Albuquerque Journal on May 9th.

13   Anything else from counsel in this regard?

14             Mr. Villa?

15             MR. VILLA:  Your Honor, are you talking about the

16   newspaper article from last week?

17             THE COURT:  I am.

18             MR. VILLA:  No, nothing further.

19             THE COURT:  All right.  Ms. Williams?

20             MS. WILLIAMS:  Your Honor, we'd like the jury to voir

21   dire.  I know that you instructed them not to read the paper

22   and see media, but sometimes you don't get full compliance.  So

23   it might be best if we ask if anyone's seen that, because it

24   definitely was biased.

25             THE COURT:  Okay.  That's kind of what I had in mind,
```

1  just, you know, out of an abundance of caution, perhaps.  But

2  let's just look down the road a little bit.  In the event that

3  a juror may have seen the article, what would be your proposal,

4  Ms. Williams?

5          MS. WILLIAMS:  Your Honor, because of the nature of

6  the opinions in the article and that it was a one-sided

7  article, we would ask that those jurors be excused for cause.

8          THE COURT:  Okay.  Well, that's -- I think it's a

9  fair area to inquire, and so what I would want to do is inquire

10  of the whole group and determine whether any of the members of

11  the jury have, notwithstanding Judge Yarbrough's instructions,

12  seen, read, or heard of any public newspaper, radio, television

13  accounts relating to this case by show of hands, and then what

14  I propose to do is recess and call each of those individual

15  jurors into the courtroom and to inquire further.  And then

16  counsel may -- I plan to handle the questioning, but I'll allow

17  counsel to ask anything that I don't ask.  Okay?  So that's the

18  plan as to that issue.

19          I'm assuming, just going down the list of items to

20  cover this morning, I'm assuming both parties would like the

21  rule invoked.

22          MS. WILLIAMS:  Yes, Your Honor.

23          MR. VILLA:  Yes, Your Honor.

24          THE COURT:  Okay.  That's fine.  And I'm going to

25  leave it to counsel to enforce that particular rule.  So that

```
1    will be up to you to guide that.
2           Okay.  That's all I had, and so if there's nothing
3    else we'll call in the jury.
4           MS. WILLIAMS:  Your Honor, we took your concern to
5    heart, that there were voluminous exhibits --
6           THE COURT:  Yes.
7           MS. WILLIAMS:  -- and we cut down our Exhibit A to
8    the first four pages, rather than the multiple pages after
9    that.  We have a substitute for your book if you want us to put
10   that in there or you can just literally pull out everything
11   after the first four pages.
12          THE COURT:  All right.  Let me take a look at that.
13          Okay.  Exhibit A being currently Terysa Welch's
14   handwritten notes on a calendar.  Why don't you go ahead and
15   tender what you have.  I'll just take out what I have, just
16   make a complete substitution.
17          Mr. Villa, have you seen this?
18          MR. VILLA:  I have, Your Honor.  Well, I have the
19   first four pages.  And I received notice from Ms. Williams on
20   Saturday that they intended to do that.
21          THE COURT:  Okay.  All right.  We're going to take a
22   two-minute recess just in time to line up the jury.  When
23   they're lined up, we'll reconvene, and then I'll call the jury
24   out.  Okay?
25
```

1        (Court stood in recess at 9:03 a.m. and resumed at

2        9:06 a.m. as follows:)

3            THE COURT:  I see that the jury's lined up.  We just

4     need to open the door and give them their green light.

5        (Jury in at 9:07 a.m.)

6            THE COURT:  Okay.  Good morning, everyone.  Please be

7     seated.  Let me just ask just as you've taken your place,

8     ladies and gentlemen, if I could just ask you to move this way

9     two seats.

10           All right.  Very well.  Well, good morning, everyone.

11    I'm Judge Gonzales, and I will be presiding over the remainder

12    of this trial.  I know you were assembled last week before

13    Judge Yarbrough, and I appreciate his assistance, and I

14    appreciate that you are here this morning.

15           Let me just pause right there and introduce a few

16    people to you.  First of all, I have a courtroom deputy, and

17    this is Theresa Hall.  Theresa will, as you may have met her

18    this morning already, Teresa keeps track of a lot of the things

19    going on in the courtroom during the course of this trial; she

20    helps me do my job, and she will attend to your needs as this

21    trial continues.  Theresa works with me in Las Cruces where I

22    preside normally.

23           This is Danna Schutte Everett.  Danna is our assigned

24    court reporter, and she also works in Las Cruces with me, and

25    she'll be reporting everything that we do in the trial for the

1    next several days.

2              Off to my far left is Chris Baca.  Chris is our staff

3    attorney, and she helps the Court manage through the legal

4    issues that come before the Court.

5              Okay.  So let me just pause again and just allow the

6    attorneys to introduce themselves as well as everyone at

7    counsel table.

8              Let's begin with plaintiff.

9              MR. VILLA:  Good morning, ladies and gentlemen.  My

10   name is Ryan Villa.  My co-counsel is Richelle Anderson, and

11   our client is Terysa Welch.

12             THE COURT:  All right, Ms. Williams.

13             MS. WILLIAMS:  Good morning.  I'm Patti Williams.  I

14   represent the City of Albuquerque and Retired Chief Ray

15   Schultz.  With me is my co-counsel Lorna Williams.  The

16   representative for the City is Retired Deputy Chief Elizabeth

17   Paiz.  Chief Schultz has a full-time job out of state.  He will

18   not be here at counsel table.  That doesn't mean he doesn't

19   care about the case.

20             With us are our legal assistants, Trevor Wiggins and

21   Trish Hernandez.

22             THE COURT:  Okay.  Thank you, counsel.

23             Ladies and gentlemen, let me just begin.  In a few

24   moments, I'm going to swear you all in.  You have not done that

25   yet.  I know you were sworn in for purposes of jury selection,

```
1    but in a minute I'll be swearing you in for purposes of this

2    trial.

3              Now, let me just acknowledge, I looked through the

4    questionnaires that each of you prepared I guess weeks ago.  I

5    know where you all are here from.  Some of you have traveled

6    from out of town, and I can appreciate that Monday morning

7    May 14th, you probably have other things that you would

8    probably be doing, prefer to be doing even today and through

9    the next several days, whether it's school, work, being with

10   family, or whatever the case may be.  Not necessarily

11   preferring to be here.

12             You know, Judge Yarbrough may have explained a little

13   bit about this to you when you assembled last Monday.  You

14   know, there's a couple of things that our country requires of

15   us in service to the country.  One is military duty, and it's

16   not necessarily voluntary, except I think right now it's an

17   all-volunteer military.  Jury service is not necessarily

18   voluntary.  You're here because you are required to be here.

19   That doesn't mean we don't appreciate or acknowledge how

20   difficult it may be to comply with this part of your duty.  So

21   we do appreciate it.

22             I hope and I appreciate that counsel does, as well,

23   that you may find this interesting, you may find it

24   educational, and by the end of this process you will have

25   looked at this experience as being altogether worthwhile.  It's
```

1    important that we have a jury that is fair and impartial, and

2    Judge Yarbrough and the attorneys last week, that's what they

3    set out to do, is assemble a jury that for purposes of the

4    issues in this case can decide them based on fairness,

5    impartiality, without any bias.  That's the whole point here.

6         All the while we seek to assemble a group of people

7    that can do exactly that, and then in some ways kind of looks

8    like our community.  It's a cross-section, people from

9    different backgrounds, people of different ages, and all kinds

10   of other sort of differences in each of you.  The common

11   denominator, the commonality is you are here and you all have

12   the same job to do.

13        I could sort of put it this way in terms of how you

14   might see yourself in this role here; that if we assembled a

15   jury of people with a lot of time on their hands, with probably

16   nothing better to do, that probably is unreasonable, not

17   necessarily something we can expect, and it is a group of

18   people that just wouldn't look like the community at all.  So

19   you all are here with differences, lots of things that you'd

20   like to be doing, I'm sure, but also we appreciate that you're

21   here.

22        We'll in the coming days be looking to you, and at

23   the end of the trial we'll be looking to you to render a

24   decision that is fair based on the law that I will give you and

25   based on the evidence that you will hear.  So thank you for

1    being here.

2            Now, I said I'm going to swear you in shortly, and

3    before I do that there is one item to cover with you in

4    addition.  Judge Yarbrough, you may recall, gave you a number

5    of instructions.  One instruction he may have given to you, I

6    expect that he did, is to avoid any public newspaper, radio,

7    television, Internet accounts that relate to this case.  You

8    were assembled last Monday, and so it's been a week, and so

9    just by show of hands, and I can appreciate that even though

10   there is that very clear instruction to avoid any newspaper,

11   television, radio, Internet accounts, sometimes you can't help,

12   because if you're reading the paper or listening to the radio,

13   it may just come up.

14           So let me just ask you, by show of hands, even with

15   the instruction that Judge Yarbrough gave to you last week, by

16   show of hands, has anybody had an opportunity or just even had

17   occasion to be privy to any sort of public account relating to

18   this case?

19           Okay.  I see one hand go up.  Any other?  Two.  I'll

20   ask you a little bit about it, but right now just by show of

21   hands, and that's fine.

22           Any other jurors who may have heard, seen, read

23   anything about the case?

24           Okay.  No other hands have gone up.

25           All right.  Two hands did go up.  So this is what I'm

1  going to do, folks.  I'm going to recess just for a few

2  minutes, and I'm going to inquire a little further on this

3  issue and allow the attorneys to just inquire a little further.

4  After we're done with that, we'll get started on this trial

5  just as soon as possible.  So please remain patient.  I'm going

6  to ask you to retire to the jury assembly room and just remain

7  there for a few minutes, and then I'll call you back in.

8         All right.  Please rise for the jury.

9     (Jury out at 9:15 a.m.)

10        THE COURT:  Okay.  You may be seated, counsel.

11        I see, and what you probably saw two hands go up.

12 One was Juror No. 7 and another was Juror Number 10, so my

13 intent is to call in Juror No. 7 and inquire of that juror as

14 to what the juror may have seen or read.  Any objections to

15 that?  We discussed this already.

16        No objections.

17        All right.  Theresa, will you call in Number 7.  Just

18 one at a time.

19        All right.  And as Number 7 comes in, would you

20 please rise for that member.

21     (Juror No. 7 entered the courtroom.)

22        THE COURT:  Ma'am, would you please just approach.

23 This is very informal.  Please be seated.

24        JUROR NUMBER 7:  Hi.

25        THE COURT:  All right, ma'am.  I had asked,

1  obviously, if any juror had seen any, read any, listened to any

2  accounts of this case.  So that would be my question to you

3  specifically.  What, if anything?

4  JUROR NUMBER 7:  Last Thursday I saw the headline and

5  immediately closed the paper and went back to my office.

6  THE COURT:  Okay.

7  JUROR NUMBER 7:  I did not read the article.  I saw

8  the headline (indicating) out.

9  THE COURT:  Nothing about the article?

10  JUROR NUMBER 7:  No.  Absolutely not.

11  THE COURT:  Okay.  Even with the headline, is there

12  anything, though, that what you did see --

13  JUROR NUMBER 7:  No, sir.

14  THE COURT:  -- however limited it may be, that may

15  cause you to have decided this case?

16  JUROR NUMBER 7:  No, sir, because it's the same stuff

17  that -- I mean, it's the same headline basically that we got

18  last Monday --

19  THE COURT:  Okay.

20  JUROR NUMBER 7:  -- just basically stating what the

21  case was.  It didn't say anything other than that, and that's

22  what the judge told us last week, so no, it doesn't change

23  anything at all.

24  THE COURT:  Okay.  All right.  Thank you.

25  Let me just ask the attorneys.

```
 1              Mr. Villa, do you have any questions?

 2              MR. VILLA:  No, Your Honor.

 3              THE COURT:  Ms. Williams?

 4              MS. WILLIAMS:  Do you think you can be fair and

 5   impartial --

 6              JUROR NUMBER 7:  Yes, ma'am.  Absolutely.

 7              MS. WILLIAMS:  -- even seeing the headline?  Thank

 8   you.

 9              THE COURT:  Okay.  Thank you.

10              JUROR NUMBER 7:  You bet.

11              THE COURT:  You may return.

12              By the way, does everybody have fresh water in their

13   pitchers?

14              MS. WIGGINS:  Yes, Your Honor.  Thank you.

15              MR. VILLA:  Yes, Your Honor.

16              THE COURT:  Okay.

17         (Juror Number 10 entered the courtroom).

18              THE COURT:  Okay.  Ma'am, would you please come

19   forward to the front of the stand.

20              JUROR NUMBER 10:  Here?

21              THE COURT:  That would be better.  Perhaps the

22   attorneys will see and perhaps hear a little better.

23              All right.  You may be seated.  Good morning once

24   again.

25              JUROR NUMBER 10:  Good morning.
```

```
1              THE COURT:  So I asked the question, ma'am, about

2    newspaper accounts or things of that nature and I saw your hand

3    go up.  Nobody's in trouble here.  We just wanted to inquire a

4    little further about what, if anything, you did hear or what

5    you may have seen or read.

6              JUROR NUMBER 10:  It was in Thursday's paper.  It was

7    on the front page.  I saw the headline, and I realized what it

8    was.  I did not read it.  I cannot tell you what was in it.  I

9    didn't even know what the name of the person was, so I still

10   don't, except that I heard it today.

11             THE COURT:  Okay.  Even with what you saw, if it was

12   just the headline, is there anything about what you read or saw

13   that may cause you to have judged, state an opinion to yourself

14   or even prejudge the case at all?

15             JUROR NUMBER 10:  I don't think so, because I can't

16   even tell you what the headline was right now, and I can't even

17   tell you who it was that wrote the article.

18             THE COURT:  Okay.  Ma'am, just a moment.  I'm going

19   to give the attorneys a chance to ask you any questions they

20   have.  All right?

21             JUROR NUMBER 10:  Sure.

22             MR. VILLA:  No questions, Your Honor.

23             MS. WILLIAMS:  No questions, Your Honor.

24             Thank you for your candor.

25             THE COURT:  All right.  Thank you, ma'am.  You may
```

```
 1   return, and in a moment I'll just call you all back in here.

 2                   JUROR NUMBER 10:  Okay.  Thank you.

 3        (Juror Number 10 left the courtroom.)

 4                   THE COURT:  All right.  Just for the time being, you

 5   may be seated.  Ms. Williams, Mr. Ryan, anything about the

 6   newspaper article relating to Number 7 or Number 10?  Is there

 7   anything that you want to bring up?

 8                   MR. VILLA:  No, Your Honor.

 9                   MS. WILLIAMS:  No, Your Honor.  Thanks for the

10   opportunity to talk to them.

11                   THE COURT:  You're welcome.  Okay.

12                   And I'm reminded to refer to plaintiff's counsel as

13   Mr. Villa, not Mr. Ryan.  I apologize.

14                   MR. VILLA:  That's okay, Judge.

15        (Jury in at 9:21 a.m.)

16                   THE COURT:  All right.  Please be seated.  All right.

17   Once again, thank you for your patience, ladies and gentlemen.

18                   Now, we have some days set aside for this trial, but

19   when Judge Yarbrough selected you he and the attorneys

20   estimated that it could be as many as ten days, so two weeks.

21   I can tell you the attorneys have assured this Court that they

22   will endeavor as much as possible to wrap this case up just as

23   soon as possible so that we're not using any more of your time

24   than absolutely necessary.  These things can take time, but in

25   everything they'll be attempting to be as efficient and
```

22

```
1    expedient and mindful of your time, as well.

2              So please rise.

3              All right.  Please raise your right hand.

4         (Jury sworn.)

5              THE COURT:  All right.  You may be seated.

6              All right.  Members of the jury, now that you have

7    been sworn, I will give you some preliminary instructions to

8    guide you during this trial.  You are the judges of the facts.

9    It will be your duty to find from the evidence what the facts

10   are.  You will then apply the law to the facts.  I will

11   instruct you on the applicable law later.  You must follow that

12   law whether you agree with it or not.

13             Nothing that I say or do is intended to indicate what

14   your verdict should be.  It is your duty to determine the

15   facts, and in doing so you must consider only the evidence I

16   admit in this case.  Now, the term "evidence" includes the

17   sworn testimony of the witnesses and the exhibits admitted into

18   the record.  The evidence from which you will find the facts

19   will consist of the testimony of witnesses, documents, and

20   other things received as exhibits, and any facts that the

21   lawyers agree to or that I instruct you to find.  You may

22   consider either direct or circumstantial evidence.

23             Now, direct evidence is the testimony of one who

24   asserts actual knowledge of a fact, such as an eyewitness.

25   Circumstantial evidence consists of proof of facts or
```

1   circumstances which give rise to a reasonable inference of the

2   truth of the fact sought to be proved.  The law makes no

3   distinction between the weight to be given to either direct or

4   circumstantial evidence.

5         Now, while you should consider only the evidence in

6   this case, you are permitted to draw such reasonable inferences

7   from the testimony and exhibits as you feel are justified in

8   the light of common experience.  In other words, you may make

9   deductions and reach conclusions which reason and common sense

10  lead you to draw from the facts which have been established by

11  the testimony and the evidence in this case.  Now, certain

12  things are not evidence and must not be considered by you.  For

13  example, statements, arguments, and questions by lawyers are

14  not evidence.  Also, objections to questions are not evidence.

15  Lawyers have an obligation to their clients to object when they

16  believe evidence being offered is improper under the Rules of

17  Evidence.  You should not be influenced by the objection or by

18  my ruling on it.  If the objection is sustained, ignore the

19  question.  If I instruct you that some item of evidence is

20  received for a limited purpose only, you must follow that

21  instruction.  Also, testimony that I have excluded or tell you

22  to disregard also is not evidence and must not be considered.

23  Anything that you may have seen or heard outside the courtroom

24  is not evidence and must be disregarded.  You are to decide the

25  case solely on the evidence presented here in court.  It will

1   be up to you to decide which witnesses to believe, which

2   witnesses not to believe, and how much of any witness's

3   testimony to accept or reject.

4          When determining the weight to be given to the

5   testimony of a witness, you may consider the witness's

6   interest, if any, in the outcome of the case; the witness's

7   relationship to the parties; the witness's manner while

8   testifying; any bias or prejudice the witness may have; and

9   whether the testimony of the witness was impeached by proper

10  statements the witness made or by other evidence.

11         Now, this is a civil case involving alleged sex

12  discrimination, employment discrimination, and retaliation.

13  Plaintiff, Terysa Welch, has the burden of proving every

14  essential element of her claims by a preponderance of the

15  evidence.  Now, this means that Ms. Welch has to produce

16  evidence which, considered in light of all the facts, leads you

17  to believe that Ms. Welch's claims are more likely true than

18  not.  Evenly balanced evidence is not sufficient.

19         Now, in this civil case Ms. Welch brings the

20  following claims for compensatory damages.  First, sexual

21  harassment, sex discrimination, and retaliation claims against

22  defendant City of Albuquerque, or what we'll refer to as "the

23  City," brought under federal law, specifically Title VII of the

24  Civil Rights Act of 1964, and under the New Mexico Human Rights

25  Act; and sex discrimination and retaliation claims against

1  defendant Raymond Schultz brought under the New Mexico Human

2  Rights Act.

3          Ms. Welch's claims arise from her employment as a

4  detective in the Albuquerque Police Department, and we'll just

5  refer to that as APD, in the Repeat Offender Project, known as

6  ROP, and thereafter.  Mr. Schultz was the Chief of APD and in

7  Ms. Welch's chain of command.  In this case the actions of a

8  City supervisor are the actions of the City.

9          Ms. Welch's first claim against the City is for

10  sexual harassment by her supervisors and coworkers in violation

11  of Title VII.  This alleged sexual harassment occurred between

12  May 2004 and 2012.  Ms. Welch has the burden to prove by a

13  preponderance of the evidence that the supervisors or coworkers

14  subjected her to unwelcome harassment; that the harassment was

15  based on her sex; and that a reasonable person would find the

16  harassment hostile or abusive, and Ms. Welch perceived it to be

17  so.  She also has the burden to show by a preponderance of the

18  evidence that the harassment was sufficiently severe or

19  pervasive so as to alter the conditions of her employment and

20  create an abusive working environment.

21          Ms. Welch must further show by a preponderance of the

22  evidence that the City or management-level City employees knew

23  or should have known of the harassment by her coworkers, but

24  failed to take prompt and remedial action.

25          Ms. Welch's second claim against the City is for sex

1    discrimination in violation of Title VII.  The alleged sex

2    discrimination occurred between October 2004 -- excuse me --

3    October 24th, 2008, and 2012.  To succeed on this claim,

4    Ms. Welch must prove by a preponderance of the evidence that

5    her sex was a motivating factor in the City's decision to take

6    an adverse employment action against her.

7           Ms. Welch's third claim against the City is for

8    retaliation in violation of Title VII.  The alleged retaliation

9    occurred between October 24th, 2009, and 2012.  To succeed on

10   to claim, Ms. Welch must prove by a preponderance of the

11   evidence that she engaged in protection -- excuse me --

12   protected opposition to discrimination; that the City took an

13   adverse action against her; and that a causal connection exists

14   between the protected opposition and the adverse action.

15          Ms. Welch's fourth claim against the City is for

16   sexual harassment under the New Mexico Human Rights Act.  Like

17   the Title VII claim for sexual harassment, the alleged sexual

18   harassment occurred between May 24 -- May 2004 -- excuse me --

19   and 2012.  To succeed on this claim, Ms. Welch must prove by a

20   preponderance of the evidence that the harassment was based on

21   sex; that she was subject to a hostile environment in which the

22   offensive conduct had the purpose or effect of unreasonably

23   interfering with Ms. Welch's work performance or creating an

24   intimidating, hostile, or offensive working environment; and

25   that a reasonable person would find that -- the work

1   environment hostile or abusive, and that Ms. Welch did perceive

2   the work environment as being hostile or abusive.

3          Ms. Welch's fifth claim against the City is for sex

4   discrimination in violation of the New Mexico Human Rights Act.

5   Ms. Welch also brings a claim against Mr. Schultz for sex

6   discrimination, in violation of the New Mexico Human Rights

7   Act.  As with the Title VII sex discrimination claim, the

8   alleged New Mexico Human Rights Act sex discrimination claims

9   occurred between October 24th, 2008, and 2012.  To succeed on

10  both of these claims, Ms. Welch must prove by a preponderance

11  of the evidence that she was otherwise qualified in November

12  2011 to be promoted to an APD Sergeant; that the City and

13  Mr. Schultz took an adverse employment action against her; and

14  that Ms. Welch's sex was a motivating factor in the City and

15  Mr. Schultz's decision to take an adverse employment action

16  against her.

17         Ms. Welch's sixth and final claim against the City is

18  for retaliation in violation of the New Mexico Human Rights

19  Act.  Ms. Welch's second claim against Mr. Schultz is also for

20  retaliation in violation of the New Mexico Human Rights Act.

21  The alleged retaliation, like the Title VII retaliation claim,

22  occurred between August 24th, 2009, and 2012.

23         To succeed on these claims, Ms. Welch must prove by a

24  preponderance of the evidence that she engaged in protected

25  activity; that she suffered an adverse employment action by the

1   City and Mr. Schultz; and that there is a causal connection

2   between the protected activity and the adverse employment

3   action.

4          Defendants deny what Ms. Welch says about sexual

5   harassment, sex discrimination, and retaliation, and denies her

6   contentions.

7          Defendants assert that Ms. Welch was not subject to

8   sexual harassment by her supervisors or coworkers.  Defendants

9   also contend that they did not take any adverse employment

10  action against Ms. Welch.  Defendants maintain that nothing

11  they did regarding Ms. Welch was done in retaliation for

12  engaging in protected opposition to discrimination.  Moreover,

13  defendants maintain that Ms. Welch's sex was not a motivating

14  factor in any decision they made.

15         Now, during trial, it may be necessary for me to talk

16  with the lawyers out of the hearing of the jury either by

17  having a bench conference here while the jury is present in the

18  courtroom or by calling a recess.  Now, the purpose for these

19  conferences is to decide how certain evidence is to be treated

20  under the rules of evidence and to avoid confusion and error.

21         Now, during the trial and until you have rendered a

22  verdict, do not discuss this case with anyone or permit anyone

23  to discuss it with you or even in your presence.  This rule

24  about not discussing the case includes discussions even with

25  members of your family or your friends.  This rule also

1   includes electronic communications.  So, you may not

2   communicate with anyone about the case on your cell phone,

3   through e-mail, BlackBerry, iPhone, any text messaging, or on

4   any social networking website, including Facebook, Myspace,

5   LinkedIn, YouTube, and things of that nature.  If any person

6   attempts to talk to you or communicate with you about this

7   case, either in or out of the courthouse, you should

8   immediately report that to me.

9           The attorneys and parties are not supposed to talk to

10  the jurors even to say hello.  So, if you happen to see them

11  outside the courtroom, they will not speak to you.  Please do

12  not be offended by this.  They will only be acting in

13  accordance with my instructions.

14          And also, until you retire at the end of this case to

15  begin your deliberations, please do not talk about this case

16  with each other.  That is very important.  Your deliberations

17  are only supposed to be after the case is given to you for

18  deliberation.  That will be after all of the evidence.

19          You may not consider anything you may have read or

20  heard about this case outside the courtroom.  During trial, you

21  must avoid any news accounts about this case, whether it is on

22  television, the radio, or the Internet or in the newspaper.  If

23  you happen to see or hear anything in the news about this

24  trial, please let a member of my staff know and we'll determine

25  what the steps are from there.

1          Now, please do not attempt any steps, research, or

2     experiments, and do not visit any location involved in this

3     case.  It would be difficult or impossible to duplicate

4     conditions showed by the evidence; therefore, your results

5     would not be reliable.  Such conduct would also run contrary to

6     the rule that your verdict must be based solely on the evidence

7     presented to you in this courtroom.  You also must not conduct

8     any independent research about the case, the matters in the

9     case, and the individuals or municipality involved in this

10    case.  In other words, you should not consult dictionaries,

11    reference materials, search the Internet, any website, blogs,

12    or use any other electronic tools to obtain information about

13    this case or to help you decide the case.  Nevertheless, in

14    your deliberations, you need not ignore your background,

15    including professional, vocational, and educational experience.

16         Please keep an open mind until the entire case has

17    been completed and submitted to you.  Your special

18    responsibility as jurors requires that throughout the trial you

19    exercise your judgment impartially and without regard to any

20    sympathy, bias, or prejudice.

21         Now, if you wish, you may take notes during the

22    trial.  And I think notebooks have been provided to you, as

23    well as pencils.  Your notes, however, should not take the

24    place of your independent memory of the evidence.  When taking

25    notes, please remember the importance of paying close attention

1    to the trial.  Listening to and watching witnesses during their

2    testimony will help you to assess their appearance, behavior,

3    memory, and whatever else bears on their believability.

4            At each recess, please take the notes with you to the

5    jury room.  At the end of the day, please leave your notes in

6    the jury room.  The courtroom deputy will store your notes and

7    return them to you when trial resumes.  The notes are for your

8    own personal use.  They are not to be read or given to anyone

9    else before or during deliberations.  And at the end of the

10   trial, the notes will be collected and then destroyed.

11           Now, even though the court reporter is making a

12   report of these proceedings, a copy of the transcript will not

13   be available to you for your use during deliberations.  The

14   exhibits will be available to you, however, during your

15   deliberations.

16           And one final point.  Both parties, of course, are

17   entitled to a fair trial.  Fairness requires your complete

18   attention throughout this trial.  You must listen carefully to

19   all the testimony, carefully observe witnesses and see the

20   evidence.  Now, this is essential for your deliberation at the

21   end of this trial when the case is in your hands.  I, of

22   course, want each of you to feel comfortable and we will take a

23   midmorning break, we'll take a lunch break, and then we'll take

24   an afternoon break.  My goal here is to recess for the day as

25   close to 5:00 as possible.  It may depend on where we happen to

1   be with a witness.  It may run a little bit long.  I just ask

2   you to be patient.  But we'll see if we can get that done each

3   day by 5:00.

4         I also invite you during the course of the day as you

5   need to, to stand up and stretch.  You know, it's natural and

6   reasonable, I think, to expect, especially after lunch, for

7   everyone, including yourselves, to feel a little sleepy.  I

8   think that may be a good time to just remember what I've

9   suggested, is if you need to, we have provided water to you,

10  stretch, move out if you need to.  That's fine.  I would just

11  ask that as you do so, please be mindful of the jurors sitting

12  behind you, particularly so they can continue to see and hear

13  the evidence as necessary.

14        Now, this concludes my preliminary instructions.  The

15  trial will begin at this time.  First, each party will give an

16  opening statement.  About the opening statement.  It is not

17  evidence and it is not argument.  It is simply an outline that

18  the parties will provide, and it's offered to help you follow

19  the evidence.

20        Next, Ms. Welch will present her witnesses and her

21  exhibits.  Then defendants will also present their witnesses

22  and their exhibits.  Each side may cross-examine witnesses

23  presented by the other side.  And after, I will give you the

24  instructions on the law and the lawyers will make their closing

25  arguments to summarize and interpret this evidence for you.

1    That will be at the conclusion of this case.

2          I'll remind you that if my final instructions differ

3    from these instructions, you must follow the final

4    instructions.

5          THE COURT:  All right.  Opening statements, Counsel.

6          MR. VILLA:  Thank you, Your Honor.

7          THE COURT:  Mr. Villa, I may have asked, do you need

8    a five-minute time warning?

9          MR. VILLA:  I think -- I'll be happy to take one, but

10   I'll keep my time also.

11         THE COURT:  All right.

12         MR. VILLA:  May it please the Court?

13         THE COURT:  Counsel.

14         MR. VILLA:  Ladies and gentlemen of the jury.  Good

15   morning.  Thank you for your time.

16         What I'm showing you now on your screen is a Fitness

17   Assessment of Terysa Welch's from May 2004, in which her

18   Sergeant, her supervisor wrote on there on the left side "I

19   want to have children with you!"  Now, this wasn't an isolated

20   incident, ladies and gentlemen.  Her supervisor, the supervisor

21   over her unit, ROP unit throughout the time he was her

22   supervisor and later her Lieutenant sexually harassed Terysa

23   Welch.  This is just one example of the beginning.

24         He constantly made comments about her, commented

25   about her looks, said things about the clothes she was wearing,

1    referred to her body as being tight as a drum, made comments or

2    sounds like ummm, looking at her body, especially in the

3    summertime when it was warm, and constantly told her -- or told

4    her on a number of different occasions that if he wasn't

5    married, he would be pursuing her.

6           And it got to the point that she was very

7    uncomfortable around him, tried to avoid him, realized that he

8    didn't do it when other detectives or other individuals in the

9    unit were around, and so she tried to have other people with

10   her when she was in contact with her Sergeant and avoided him.

11   In fact, his cubicle was close to an exit door, and she would

12   often avoid that exit door simply to avoid her Sergeant, Robert

13   Smith.

14          And you have to understand the way it worked at the

15   time in this unit.  The ROP unit, the Repeat Offender Project,

16   was a group of detectives that went after the worst of the

17   worst in Albuquerque.  Repeat offenders.  That's why it's

18   called the Repeat Offender Project, or ROP.  It was within the

19   larger division of APD called SID, or the Special

20   Investigations Division.  And the Sergeant at the time from

21   2004 to 2006, 2007 of ROP was Sergeant Robert Smith.  And he

22   had known Terysa.  They were detectives in the same unit

23   earlier in time, but she hadn't had this experience with him

24   yet.

25          And when Terysa got into ROP, it was an incredibly

1   competitive process.  There were about 15 individuals who were

2   applying for ROP.  They had to go through a fitness evaluation,

3   shooting, a written test, an oral test.  It was a coveted

4   position.  And Terysa coveted it since the day she went to the

5   Academy.  As a matter fact, since she was a young girl, she

6   wanted to be in law enforcement.  Her grandfather was a Chief

7   of Police in a small town in Montana, and ever since she was a

8   young girl, that's what she wanted to do.  And she was used to

9   playing with the boys, didn't have any problem with that,

10  understood that it was a male-dominated profession.  In fact,

11  there were only two women that graduated in her Academy in

12  1997.  And from the time she began to be a police officer at

13  the Academy when the ROP team came in, the ROP unit came in and

14  talked to them, she decided, That's what I want to be, that's

15  my goal, I want to be in the ROP unit.

16        When 2004 finally rolled around, she had already

17  applied for ROP previous times, went through the process that I

18  told you about, and made it in.  She was elated.  She loved the

19  job.  Unfortunately, she didn't know what was going to happen

20  with Sergeant Robert Smith.

21        Now, as I told you, Sergeant Smith got promoted

22  around 2006, 2007 and he became Lieutenant.  Lieutenant in SID

23  isn't just in charge of ROP.  The Lieutenant is in charge of

24  many different divisions in SID.  So Terysa didn't see

25  Lieutenant -- now Lieutenant Smith very often anymore, but he

1   still did the things I told you about, still made comments when

2   he had the opportunity.  But when he was the Sergeant, he was

3   in charge of ROP he was.  That's who Terysa and everybody else

4   answered to, that's who controlled, that's who was the

5   supervisor.

6          And as you heard from the judge, in a lawsuit against

7   the City for sexual harassment, the supervisors are the City.

8          Terysa also has claims in addition to the sexual

9   harassment claims for discrimination and retaliation.  And

10  that's what this case is about, sexual harassment, sexual

11  discrimination, and retaliation.

12         Now, for harassment and discrimination, which she has

13  to prove, is that her sex or gender was a motivating factor in

14  the actions.  And what you'll hear about when she got to ROP is

15  there was hostility.  So sexual harassment is not just the

16  things that you saw Sergeant Smith doing, but also other

17  hostility that's based on her sex, based on her gender.  And

18  you'll hear that there were individuals in the unit, in the ROP

19  unit, like Kevin Gagne who never really liked Terysa, they

20  never got on along, they always clashed.  There were other

21  individuals who were vocal about Terysa when she was selected

22  in the ROP unit.  They didn't want Terysa in the unit.  And

23  there were some that she got along just fine with and worked

24  well with and didn't have any problems.

25         But she experienced hostility from the beginning she

1    came into ROP, not only from her Sergeant, but from her fellow

2    detectives.  One of the things that you'll hear about, when

3    you're in ROP, there always has to be a Sergeant.  ROP is a

4    unit that can be activated at any time, so you'll always have a

5    detective on call, you'll have a secondary detective for on

6    call, and even the whole unit can sometimes be activated if

7    there's a high-profile situation, a dangerous fugitive, a

8    homicide, and so these detectives were essentially on call the

9    entire time.

10          They didn't wear uniforms.  They dressed in street

11   clothes so that people couldn't identify them as police.  They

12   drove around in vehicles.  They were not recognizable as police

13   vehicles.  And they needed to be ready even if they weren't at

14   the office to take a call and be activated at any time, and

15   because of that there always needed to be a Sergeant.  And

16   sometimes the Sergeant was on vacation or sick leave or taking

17   the day off and things like that, so there needed to be what's

18   called an Acting Sergeant, and an Acting Sergeant was typically

19   one of the detectives in the unit who when they became Acting

20   Sergeant essentially were the supervisor in charge of the unit

21   until the regular Sergeant came back.

22          And throughout the time that Terysa was in ROP she

23   was never made an Acting Sergeant.  It was always somebody

24   else, one of the other men, and throughout the time she was in

25   ROP, she was the only female detective.  But when you are the

1    Acting Sergeant for longer periods of time, you get better pay,

2    and, of course, you're the supervisor, everybody must respond

3    to you.

4            Now, I told you that in 2007 Lieutenant Smith,

5    formerly Sergeant Smith became a Lieutenant.  In 2007, Terysa

6    had a very traumatic incident occur in her life.  She was

7    dating a fellow police officer, David Maes, and David Maes --

8    and living with him, and they were engaged to be married, and

9    David Maes was somebody that kept who he really was from

10   Terysa.  It turned out he was not a good person.  He got

11   charged and arrested for having raped or having sex with a

12   person that he had in custody.  And this happened in about

13   October of 2007.

14           And Terysa was at work.  She didn't know about it,

15   she hadn't heard about it.  She got a call from Lieutenant Rob

16   Smith, and he was asking if she was there at the station.  She

17   said yes.  He came down, grabbed her hand, and said, "Let's go

18   out to the parking lot."

19           They go out to the parking lot.  He asks her if she

20   wants to have coffee or get breakfast.  She was very concerned.

21   She knew something was wrong, she just wanted to know what was

22   wrong.  And Lieutenant Rob Smith then grabbed her, hugged her

23   very, very tightly, still hadn't told her what was going on,

24   and Terysa insisted, you know, "I want to know what's going on.

25   Tell me what's going on," and he told her.

1          And during this time that he told her, he was very,

2    very pushy.  He said, "Let me take you home.  I'll take you

3    home.  I'll take care of you."  Almost in a sexual manner.  And

4    he repeated the statement to her that he had made many times,

5    that if she wasn't married -- excuse me -- if he wasn't

6    married, he would be pursuing her.  He said this to her during

7    this extremely traumatic period in her life.

8          And after he finally told her what was going on, she

9    took a week off, went to Montana to be with her family, and

10   during that period of time Lieutenant Smith called her every

11   day, and she continued to feel very uncomfortable by this

12   conduct of his.

13         Well, she got back, and as things had gone with the

14   ROP unit from the time she was there through about 2009, she

15   continued to have problems with some of the individuals in the

16   ROP unit.  Not all of them.  Kevin Gagne being one of them.

17   And the new Sergeant, Sergeant David Hubbard.  They had

18   conflicts throughout the time that he became the Sergeant once

19   Sergeant Smith, Rob Smith promoted to Lieutenant.  And it was

20   certainly no secret that they didn't like each other.

21         In July of 2009, Terysa and another detective, Mike

22   Hill, were with Kevin Gagne, someone that Terysa had some

23   problems with, and at the time Kevin Gagne was the Acting

24   Sergeant, and they had just completed an operation, I believe

25   they arrested somebody, they were sitting around talking, and

1   Acting Sergeant Gagne told Detective Hill and Detective Welch

2   to be at the station tomorrow, the next day, to meet up, they

3   were going to meet up and then the whole ROP team was going to

4   go to the range.  A lot of times they would go to the shooting

5   range because they had to shoot and practice.  They were

6   qualifying and shooting all the time.

7          So following those orders Detective Welch, Terysa,

8   went to the main station, and Mike Hill was there, the other

9   detective that was with her, but she realized after doing some

10  time sheets and sort of waiting for everybody to show up, she

11  realized nobody was there, so she talked to Detective Hill.

12  Detective Hill decided to call Sergeant Hubbard, and they

13  realized that the ROP team was all out at the range.  They had

14  gone straight there.  They weren't meeting at the station.

15         And after that happened, Sergeant Hubbard gave Terysa

16  what we're going to call a punctuality memo.  And the

17  punctuality memo referred to her missing this training at the

18  range as well as to a previous incident that she missed a

19  briefing, but she had actually comped out or told at that time

20  a different Acting Sergeant that she had a personal

21  appointment, she was going to be comped out for this period of

22  time, and so she wasn't at a briefing.  But Sergeant Hubbard

23  put that in the memo, that missed briefing and the missed

24  training and gave her this punctuality memo, which would go in

25  his file.  And Sergeants would keep files on their detectives

1    that they could pass along to the next Sergeant or keep for

2    themselves as the way things go in the Police Department.

3         Well, at that point, Terysa had had it.  She had

4    enough.  She was a very punctual person, and took offense to

5    the fact that she was accused of this when, in her view, she

6    didn't do anything wrong.  She comped out for the briefing, she

7    followed the orders of Acting Sergeant Gagne to go to the

8    police station, and Detective Mike Hill didn't get a

9    punctuality memo.  So she was upset about that as well, and she

10   tried to address this with Sergeant Hubbard, and Sergeant

11   Hubbard didn't want to hear her.

12        And because the Police Department is a paramilitary

13   organization, what you must do in that situation is go up the

14   chain of command.  And next in the chain of command from

15   Terysa, from her Sergeant was Lieutenant Smith.  So in order to

16   essentially challenge this memo, she had to go up the chain of

17   command.

18        So after trying to address it with Sergeant Hubbard

19   over the phone, essentially, she asked Lieutenant Smith if he

20   could meet -- she could meet with him about it, and he said

21   yes.

22        Well, that was in the morning of the day that they

23   went to the firing range, a different day, and then so the next

24   day she went to Lieutenant Smith's office, and walked in the

25   office, she had the memo, she had the comp slip for the

1    briefing that she missed ready to explain to him what happened,

2    and instead of Lieutenant Smith listening to Terysa tell what

3    happened, he immediately started talking about her performance,

4    her performance in ROP and whether she was up to snuff.

5           Now, these detectives get performance evaluations

6    every year and they also get monthly reports on their -- the

7    things they've done for the month, and throughout Terysa's

8    career she had never, ever received any bad marks on any

9    performance evaluation, nobody had ever said "Hey, you're not

10   performing the way we want you to."  This had never come up

11   before.  And Terysa was a bit taken aback.

12          And Lieutenant Smith during this meeting was being

13   very forceful and talking about these performance issues that

14   Terysa was not prepared to talk about.  And she quickly told

15   him that she might file a claim, an EEOC claim because she felt

16   like the treatment she was receiving at ROP, the memo that she

17   got was unfair.

18          And Lieutenant Smith, of course, knowing the history

19   they've had since 2004, said to her, "Well, I hope I've got

20   some loyalty coming my way."  And the comment referred to what

21   probably was, it was Smith in the end who wanted Terysa or

22   wanted a female in the ROP unit because he saw a female as an

23   asset to the ROP unit.  And I guess as you'll hear, he wanted

24   Terysa in the ROP unit for other reasons.

25          But he told her "I hope I have some loyalty coming my

1  way" and told her "You can't do it, you can't file an EEOC

2  claim, I won't let you."

3          Now, Lieutenant Smith's going to deny he said that.

4  He's going to admit that he wrote this, and he'll tell you

5  that, "Well, that's just my sense of humor, and Terysa and I

6  always engaged in playful banter and flitting and those sorts

7  of things," which you'll hear the evidence about and you decide

8  for yourself whether you think that's true.

9          One thing that Terysa did say to Sergeant Smith and

10 later Lieutenant Smith when he kept saying things to her about

11 "Gosh, if I wasn't married, I would be pursuing you" or other

12 things that he liked to talk about, Terysa to deflect would

13 often say "Maybe in the next life," you know, to get him to

14 stop talking about those types of things.

15          Now, after talking to Lieutenant Smith about the

16 memo, Terysa continued to follow the chain of command and went

17 to the next person up.  It used to be called the Captain.  Now

18 it's called the Commander.  But that's who's over Lieutenant

19 Smith, and that was Joseph Hudson.  And Joseph Hudson, who was

20 not mean or rude to Terysa the way Lieutenant Smith was, said,

21 you know, "Rob, Rob Smith, he's probably going to be the next

22 Commander, so I'm not sure you want to do this.  I think you

23 should tell him that you were wrong and he was right and fall

24 on your sword.  You're not going to win your EEOC claim.  You

25 just shouldn't do it."  And after that meeting Terysa, of

1    course not being satisfied, ultimately decided she was going to

2    file an EEOC claim.

3            But before that happened, it wasn't certainly lost on

4    the ROP unit that Terysa had complained up the chain of command

5    about this punctuality memo and her treatment, and just a day

6    or so later, maybe two days later Sergeant Hubbard continued

7    with hostility towards Terysa and he did something that was

8    very, very dangerous.

9            One of the things that often happened in the ROP unit

10   was warrant packets would get handed out, and they would hand

11   them out to partners of two different detectives and say,

12   "Here's a subject who's wanted, you know, go find him and get

13   him."  And he handed a packet to Terysa without assigning her

14   backup or a partner, which is life-threatening.  And she asked,

15   "Well, what about backup?"  And he said, "Let me know if you

16   need anything."

17           And this, of course, solidified for Terysa that she

18   was not in a good place, she was not in a safe place, it was a

19   hostile environment, and she wasn't going to get relief from

20   her supervisor, so she filed an EEOC Complaint on August 24th,

21   2009, with the EEOC, the federal EEOC, claiming a hostile work

22   environment, gender discrimination, and she also took that

23   Complaint to a Lieutenant, Lieutenant Doug West in Internal

24   Affairs hoping that Lieutenant West could also help.  And

25   Lieutenant West assured her that her Complaint would stay

1    confidential, he would only tell the Chief, Chief Schultz,

2    Chief Raymond Schultz, and that they would then look into it.

3           Well, it became very clear to Terysa within the next

4    few days that her Complaint had not been kept confidential and

5    many, many people knew about it; people knew the number of

6    pages that it was she had written up, they knew details about

7    it more than just Chief Schultz and Lieutenant Doug West.

8           Now, the Department did remove briefly Sergeant

9    Hubbard and Robert Smith from the ROP unit after the Complaint

10   was filed, and none other than Kevin Gagne at the time became

11   the Acting Sergeant and announced over all of the ROP radio

12   that Smith and Hubbard were being moved.  This occurred in

13   about late August.

14          And it didn't last very long.  Both were brought back

15   to the unit within just a couple of months.  They had not --

16   The Department, as you'll find out, had not addressed any of

17   Terysa's claims with them when they came back.  And Commander

18   Hudson, who was still overseeing this Special Investigations

19   Division was intent on disciplining Terysa.  As a matter of

20   fact, in November, this is just a couple of months after she

21   filed her complaint, he wrote her a memo saying that Sergeant

22   Hubbard, who had now been back at the unit, and another

23   detective, Detective J.R. Potter, who Terysa had accused as

24   well in this EEOC Complaint -- and he was an individual that

25   was friends with Robert Smith since they were 12 years old.

1            And as a matter of fact, you'll hear that during the

2    times that they were together in the unit, Detective Potter and

3    Robert Smith would talk often about the size of their penis in

4    front of Terysa Welch.  And they accused Terysa of not covering

5    them during an operation or dropping out of surveillance.  And

6    Commander Hudson wrote Terysa a memo making her respond to

7    these allegations.  And then shortly after that, because Smith

8    was back in the unit, Terysa was walking down the hall one time

9    going to the copy machine and Lieutenant Smith comes back,

10   walking down the hall toward her, and he walks down the hall

11   towards her like he's going to knock her over.

12           MS. WIGGINS:  Objection.  Argumentative.

13           MR. VILLA:  This is just what the facts will show,

14   Your Honor.

15           THE COURT:  Well, I guess if you just qualify it that

16   way.

17           I'll just remind the jury that the opening statement

18   is not evidence.  There will be opportunity for argument at the

19   close of evidence at the end of trial.

20           Mr. Villa, you may proceed.

21           MR. VILLA:  And Terysa will tell you that she had to

22   get out of the way and stand up against the wall to avoid

23   Lieutenant Smith.  That was the atmosphere in December of 2009.

24           She found in her box a blank transfer request form.

25   She doesn't know who put it there.  But that transfer request

1    form was of course to transfer out of the ROP unit.  And

2    because she was not feeling safe, because she was feeling

3    scared, she got in communication with Elizabeth Paiz, who was

4    the Deputy Chief at the time.  As a matter of fact, I think the

5    testimony will show that Deputy Chief Paiz reached out to

6    Terysa.  And because she didn't feel safe at work, Terysa was

7    transferred to Burglary, which is a different unit, and it's a

8    unit that's not as prestigious as ROP and a unit in which there

9    wasn't as much overtime available.

10           And throughout the time she was transferred to

11   Burglary, this is from about December 2009 through

12   approximately the end of 2012, it's a total period you'll hear

13   of about 18 months, she was hopeful that the situation at ROP

14   was going to get addressed and she would be able to come back,

15   but that didn't happen.  Lieutenant Smith was allowed to stay

16   there until the summer of 2010 when he retired.  Sergeant

17   Hubbard stayed there longer than that, and Kevin Gagne was also

18   still there.

19           And Burglary is not in the Special Investigations

20   Division.  The Special Investigations Division is part of a

21   separate unit, and, of course, Commander Hudson was still the

22   Commander of the Special Investigations Division for a period

23   of time, as well.  So there's a long back and forth when

24   Terysa's trying to get back into ROP but doesn't feel safe

25   because nothing's being addressed to get -- with the situation

1   she has.  She doesn't want to go back without any changes being

2   made.  And throughout the time she spent in Burglary, she lost

3   out on about $27,000 worth of overtime compared to the overtime

4   that she made while she was in the ROP unit.

5          Now, I want to talk to you about October of 2010.

6   She's in Burglary at the time.  This is when this -- she's in

7   sort of this Purgatory position, and she happens to go to

8   Walgreen's.  Now, as I told you, when ROP detectives -- And she

9   was still using her same vehicle that she had as a ROP

10  detective.  They don't wear uniforms.  They have undercover

11  vehicles.  They're in their vehicles almost all the time

12  because they've got to be ready to respond to a call.

13         Terysa Welch was on her way to her house, she stopped

14  at a Walgreen's, bought a 12-pack of beer, and it just so

15  happened that Kevin Gagne was at that Walgreen's and saw her

16  buy this 12-pack of beer and saw her go then to her ROP

17  vehicle, and so he called his new Lieutenant at the time --

18  this was Lieutenant Roseman, who took over for Lieutenant

19  Smith -- and said what he just saw, that he saw Terysa

20  transporting this alcohol in her car.  Well, that's a violation

21  of policy.  Officers aren't supposed to do that.  You're not

22  supposed to transport alcohol in a City vehicle.

23         And if you look at the policies for that violation,

24  there's different disciplinary ranges.  It goes 7 to 1.  7's

25  the least serious.  1 is the most severe.  This is a 6.  And

1    what a 6 calls for is a written reprimand.  And you'll hear

2    that there's testimony that that can be handled by the person's

3    most direct supervisor, so in that case the Sergeant or maybe

4    the Lieutenant can write a written reprimand and say, you know,

5    you violated policy, don't do it again.  That's not what

6    happened with Terysa.

7              What happened with Terysa was the Lieutenant who got

8    the information about this alcohol violation then asked that an

9    Internal Affairs investigation be opened.  And this Lieutenant

10   of course knew about Terysa's circumstance, knew that she was

11   trying to get back into SID, back into ROP, and none other than

12   Lieutenant Doug West had become the Commander of SID.

13             Now, Lieutenant West was the one that Terysa

14   originally took her Complaint to in Internal Affairs and he

15   promised her that it would stay confidential, and it didn't.

16   And Lieutenant West was also intimately involved in the EEOC

17   investigation and impacted whether he conducted an appropriate

18   investigation of Terysa's claims.

19             And so now he had become Commander.  He was

20   overseeing SID.  And after Terysa went through three different

21   Internal Affairs interviews, not given a written reprimand,

22   three Internal Affairs interviews, Mr. West, Doug West,

23   recommended her termination.  He didn't recommend a written

24   reprimand.  He recommended her termination.  And of course he

25   knew all about Terysa's circumstances and the Complaint that

1   she had filed with the EEOC.  And it then got reviewed.

2           And let me just back up a minute.  What you'll hear

3   from the City is that, well, the reason that we recommended

4   termination and ultimately a more severe -- a less severe

5   sanction than that, but more severe than a written reprimand is

6   that Terysa was not honest in her Internal Affairs interviews.

7   What Terysa had said in her Internal Affairs was that she

8   didn't remember the day.  The Walgreen's is right by her house

9   in Rio Rancho.  When she was confronted about it, it was almost

10  three weeks later.  And she didn't deny that she went to the

11  that Walgreen's, she didn't deny that she would buy alcohol in

12  her City vehicle.  She just couldn't remember that specific

13  day.

14          And of course there was -- there was a video that APD

15  went out and got, receipts that they got that showed Terysa was

16  there.  She didn't deny that she was there.  She just didn't

17  remember which vehicle she was in.  And so that was the basis

18  for Lieutenant West's recommendation to terminate her.

19          Well, then it was reviewed by Deputy Chief Paiz --

20  excuse me -- Deputy Chief Feist, who had taken over for Deputy

21  Chief Paiz and was also dealing with the issue of whether

22  Terysa should be put back into ROP or stay in Burglary.  He

23  reviewed it and decided he wasn't going to sustain any findings

24  that Terysa had not been honest, but he did sustain the

25  findings that she had transported alcohol in her vehicle and

1   recommended not a termination, but an 80-hour suspension.

2   Again, Agent Feist answered to Chief Schultz, knew about

3   Terysa's situation and the EEOC Complaint that she filed.

4           Well, the next step up after Deputy Chief Feist is

5   Chief Schultz.  And Chief Schultz looked at what Deputy Chief

6   Feist did and said, "I'll agree, we'll sustain for transporting

7   alcohol in the vehicle," and he imposed 40 hours' suspension,

8   which was the final suspension, but made her only serve 16

9   hours.

10          And what you'll hear, ladies and gentlemen, is you'll

11  hear from witnesses that did the same thing, transported

12  alcohol in the vehicle and got verbal counseling.  But Terysa

13  ultimately gets this suspension from Chief Schultz, who knew

14  about her EEOC Complaint.

15          And then what Chief Schultz did was have Terysa's

16  findings in the Internal Affairs sent to the Law Enforcement

17  Academy.  And the Law Enforcement Academy carries all the

18  officers' certifications.  And so if you don't have a

19  certification, you can't be a law enforcement officer.

20          They sent that to the Law Enforcement Academy along

21  with a list of other APD officers who have been accused of much

22  more serious things, and that was published in the Albuquerque

23  Journal, in the newspaper.  So you can go online and see Terysa

24  Welch's name along with many other individuals accused of much

25  more serious charges.

1        And so that, ladies and gentlemen, forms the basis

2    for Ms. Welch's claims for sexual harassment, discrimination,

3    and retaliation.  And she's going to ask at the end of the

4    trial that you award -- you find that those three things

5    happened and that you award her damages for those overtime

6    hours that she missed, the emotional distress she suffered

7    during this period of time, loss of enjoyment of life, and

8    damage to her reputation.

9        But, ladies and gentlemen, although she's going to

10   ask you for that, I want you to understand that this case is

11   not about her being a victim.  It's about her being a survivor

12   because now she's a Lieutenant at APD.  She didn't let them

13   terminate her.  She ultimately promoted to Sergeant and later

14   to Lieutenant, and that will tell you something a little bit

15   about her character.  And at the end of this trial we'll ask

16   that you find in favor of the plaintiff.

17           THE COURT:  Mr. Villa, you put an exhibit on the

18   ELMO.  And remind me which exhibit was that.

19           MR. VILLA:  166.

20           THE COURT:  And then during the course of your

21   statement you displayed another exhibit.  Was that also 166?

22           MR. VILLA:  Yes.

23           THE COURT:  All right.  Thank you.

24           Folks, I have afforded each side equal time for an

25   opening statement.  Ms. Williams.  Ms. Wiggins.

1          MS. WIGGINS:  Thank you, Your Honor.  May it please

2    the Court?

3          THE COURT:  Counsel.

4          MS. WIGGINS:  Members of the jury.  Your Honor, and

5    counsel.  Good morning.

6          As you know, Ms. Williams and I have the privilege of

7    representing the City of Albuquerque and its former Chief of

8    Police Chief Raymond Schultz.  The City and Chief Schultz agree

9    that it's not right to base decisions on an officer's sex, it's

10   not right to harass someone on account of their sex, and it's

11   not right to retaliate against an officer who comes forward

12   with complaints.  But that's not what happened here.  The

13   evidence will show that Lieutenant Welch was treated legally

14   and fairly during her assignment to ROP.  She was never the

15   subject of any negative evaluation.  She was never demoted.

16   Her pay was never decreased.  Her duties as a detective were

17   never stripped from her, and she was never pushed out of the

18   police force.

19          There have, however, been changes to Lieutenant

20   Welch's rank, and those changes are the result of the City

21   promoting her.  First to the position of Sergeant, and then to

22   the position of Lieutenant.  And there have been changes to her

23   pay, as well, and those changes are the result of her receiving

24   wage increases, pay raises.

25          You'll hear during this trial directly from the

Danna Schutte Everett
Official United States Court Reporter
100 N. Church, Las Cruces, New Mexico  88001
(575)528-1656

1    members of the Repeat Offenders Project, what we call ROP, they

2    work in a very high-stress profession.  They are undercover

3    cops, after all.  As you heard, they wear plain clothes; they

4    do not drive marked vehicles.  ROP is considered a specialized

5    unit.  Its mission is to hold high-rate or repeat offenders

6    accountable for their criminal behavior.  They are considered

7    by all accounts some of Albuquerque's worst of the worst career

8    criminals.

9         You'll also hear about Lieutenant Welch's employment,

10   her job history, and her assignments during her career.  You'll

11   hear from her initial supervisor, Lieutenant Rob Smith, that he

12   worked with her before her assignment to ROP and that he very

13   much wanted Lieutenant Welch in ROP.  She was a detective

14   investigator, and he felt she would be an asset in ROP.

15        Now, at the time there was opposing philosophy.  Some

16   felt that ROP needed tactically trained Special Weapons and

17   Tactics officers, or SWAT officers, officers trained in SWAT.

18   Not investigators.  And others thought, no, we need

19   investigators.  Lieutenant Smith felt that detective

20   investigators who were tactically sound were the ideal choice.

21   And he selected Lieutenant Welch and Detective Mike Hill

22   because they both have strong investigative skills, and he made

23   clear to the other officers in ROP that they had earned their

24   spots in the unit.

25        Now, you'll hear that sometimes in a high-stress

1   environment such as ROP, officers occasionally joke around.

2   There's no question.  And you saw one example of Lieutenant

3   Smith's joking around.  His congratulatory language to

4   Lieutenant Welch on her fitness exam results was he wanted to

5   have children with her.  As you saw, that was written next to

6   the words "You Rock."

7           Lieutenant Smith also joked about his chain of

8   command.  You'll hear that officers who were senior to his rank

9   he'd sometimes refer to as Daddy, and officers junior to his

10  rank he'd refer to himself as Daddy.  He was, in fact, the

11  class clown, and he joked with everyone.

12          You'll also hear testimony that these jokes would not

13  detrimentally affect a reasonable person in Lieutenant Welch's

14  position.  You will also hear that Lieutenant Welch never told

15  Lieutenant Smith not to joke with her.  She never told him she

16  was offended by his jokes or by any of the other jokes that

17  were told in her presence.

18          In fact, as Mr. Villa has acknowledged, you will hear

19  testimony that Lieutenant Welch told Lieutenant Smith that she

20  got him in her next life.  She also told Lieutenant Smith he

21  was hot, and she told him that they were going to have

22  great-looking children together.

23          You will hear from Lieutenant Welch's coworkers and

24  supervisors about the environment in ROP, and as newcomers how

25  she and Detective Mike Hill were treated.  And the testimony

1   will be they were treated alike.  And at first those who

2   disagreed with their selection into ROP, those who wanted the

3   SWAT-trained officers were not particularly welcoming.  You'll

4   also hear about personality conflicts in ROP, and you'll hear

5   testimony that Lieutenant Welch's sex, her gender, played no

6   role in the environment in ROP or in any of the other incidents

7   that she testifies to.

8        Now, you'll hear that in July of 2009 Lieutenant

9   Welch and other detectives of ROP were scheduled to attend a

10  mandatory training at the shooting range, but she and officer

11  Mike Hill never showed up for the training.  Lieutenant Welch

12  never contacted her immediate supervisor, Sergeant Hubbard, to

13  say that she wouldn't be there.  You'll hear testimony that

14  Sergeant Hubbard issued her a memo, which we've called the

15  punctuality memo, and instructed her to contact him in the

16  future if she wasn't going to be at a training.  It was a

17  reminder.  It was not discipline.

18       You'll also hear that Lieutenant Welch became irate

19  and started yelling when she was handed the punctuality memo.

20  Lieutenant Welch complained that Detective Mike Hill should

21  also have gotten a punctuality memo since he didn't attend that

22  training either, but you will hear from Detective Hill that he,

23  unlike Lieutenant Welch, had called Sergeant Hubbard that

24  morning to say that he was going to participate in a foot chase

25  that was ongoing.  You'll also hear that he called after and

1    asked if he should still report to the shooting range for

2    training or whether it was too late because the training was

3    almost over.  That's why Detective Hill did not get a

4    punctuality memo.  It wasn't because he was male.

5            It was after Lieutenant Welch got the punctuality

6    memo that she complained about harassment and discrimination in

7    ROP.  The evidence will show that in August of 2009 after her

8    punctuality memo Lieutenant Welch claimed for the first time

9    that she had been subject to sexual harassment since 2004,

10   harassment that she took five years to report.

11           And she filed a Complaint with the federal agency

12   known as the Equal Employment Opportunity Commission, or the

13   EEOC.  After that she and her lawyer took her Complaint to

14   Lieutenant Doug West in Internal Affairs.  You'll hear she

15   cited several examples of what she said was sexual harassment

16   and disparate or different treatment on account of her gender.

17   One example was the punctuality memo.  Another example was the

18   joking around in ROP.

19           She also reported that Sergeant Hubbard and

20   Lieutenant Smith failed to follow some of the rules or the

21   operating procedures to the letter.  And then another example

22   was what she said happened when the man she was engaged to

23   marry was arrested for rape.  And she will tell you that she

24   was engaged to Officer David Maes in 2007, and that while they

25   were living together he was, as you heard from Mr. Villa,

1   arrested for sexually assaulting a woman he had in his custody.

2          Lieutenant Welch complained that she was never told

3   that Officer Maes was under investigation.  You'll hear

4   testimony that detectives do not inform a suspect's wife,

5   husband, girlfriend, boyfriend, or fiancée if their significant

6   other is under investigation, because you'll hear that to do so

7   could seriously compromise an investigation.

8          You'll also hear that on the day that Officer Maes

9   was arrested, it was Lieutenant Smith's duty to tell her of the

10   news.

11          He asked her to go outside so they would have some

12   privacy, and he told her about the arrest.  You'll hear that he

13   tried to console Lieutenant Welch.  He put his arm around her,

14   and at another point he held her hand.  She wanted to go home,

15   understandably so.  He offered to take her there so she could

16   retrieve her belongings and her animals.

17          Lieutenant Welch said this was harassing.  You'll

18   hear testimony, however, that Lieutenant Smith never touched

19   Lieutenant Welch at this time or at any other time in a sexual

20   fashion.  And you'll hear that a reasonable person would not

21   consider his efforts to console her sexual in nature.

22          After Lieutenant Welch came forward with her

23   Complaint, you will hear that the City removed both subject

24   Hubbard and Lieutenant Smith from ROP and that Lieutenant Doug

25   West of APD's Internal Affairs conducted an investigation.  He

1    conducted an internal investigation.  Lieutenant West was a

2    veteran officer.  He had a great deal of experience.  He knew

3    how to conduct an investigation.  He will testify that he

4    listened to Lieutenant Welch, he met with her and her lawyer.

5    He took the 16-page Complaint that she had written and studied

6    it.  He determined which witnesses should be interviewed, and

7    he interviewed eight to nine witnesses.  And after that he

8    prepared a report of his investigation.

9         The City did not find sufficient evidence to sustain

10   a finding that Lieutenant Welch was treated differently on

11   account of her sex or was the victim of harassment.  The City

12   did, however, substantiate Lieutenant Welch's allegations that

13   Sergeant Hubbard and Smith violated the rules pertaining to

14   signing Criminal Complaints in person and reporting vehicle

15   accidents no matter how minor.  And you will hear that the City

16   disciplined both Sergeant Hubbard and Sergeant Smith because of

17   the matters that Lieutenant Welch raised.

18        You'll hear that as another remedial measure the City

19   required every member of Lieutenant Welch's division at APD to

20   attend another training section -- session, rather, on

21   retaliation, harassment, and discrimination.  The City held

22   three separate trainings and required, said it was mandatory

23   for every officer to attend.  The training was designed to

24   ensure that everyone knew what behaviors were acceptable, what

25   behaviors were not acceptable, and everyone understood what the

1    expectations in the law was.

2              Lieutenant Welch claimed the training was punitive

3    and retaliatory.  You'll also hear at about the same time

4    Lieutenant Welch sought an assignment outside of ROP and she

5    did so from Deputy Chief Beth Paiz.  When employees transfer to

6    a different position, typically there needs to be an opening

7    that they can transfer into.  You will hear that in this

8    situation Lieutenant Welch was permitted to go into Burglary

9    even though there was no opening in Burglary at the time.

10   You'll also hear that she was asked several times if she wanted

11   to go back to ROP, an offer that she declined each time even

12   after there had been a change of command and Sergeant Hubbard

13   and Lieutenant Smith were no longer in ROP.

14             You'll hear testimony from Lieutenant Welch that she

15   was upset that someone packed up her belongings while she was

16   tasked to Burglary and that when she returned them, some items

17   that did not belong to her were among the items returned.  For

18   example, in a bin that did not have her name on it, unlike the

19   boxes of her personal belongings that was returned at the same

20   time, Lieutenant Welch found a photograph of herself waiving to

21   the camera.  That was on top of her belongings.  She felt that

22   that was a message to her.  She also reported that she found an

23   item in the bin, not in the boxes with her name, but in a bin

24   that was tied in a knot and in a fashion that she felt looked

25   like a noose.  You will hear that a noose, in fact, at the time

1  was the logo for ROP, and that people will testify that the

2  reason this symbol was selected for ROP was because of, number

3  one, a noose is made out of a rope, and, number two, if you

4  give offenders enough rope, they will hang themselves.

5        Lieutenant Welch will also say that she was treated

6  differently than male officers because of the way the incident

7  involving her purchase of alcohol was handled.  And as you

8  heard, Detective Gagne was the Detective who witnessed the

9  purchase of alcohol at the Walgreen's.  You'll hear that unlike

10 other officers who were accused of the same thing, during the

11 Internal Affairs investigation that was handled by a man named

12 Cecil Knox, Lieutenant Welch was evasive, she was

13 uncooperative, and it was for these reasons that she was

14 appropriately disciplined more severely than the other officers

15 who've readily admitted their mistake.

16        Lieutenant Welch says she can't be subject to

17 discipline after she came forward with her harassment

18 allegations without it being retaliation.  The City disagrees.

19 The City believes that she can.

20        That's the evidence that we expect that you will hear

21 about Lieutenant Welch's claims against the City.  But as you

22 know, Lieutenant Welch has also brought claims against Chief

23 Schultz.  And as Ms. Williams noted, Chief Schultz is employed

24 elsewhere, and so his time with us in the courtroom will be

25 somewhat limited, but you will hear that Lieutenant Welch's

claim arises from her 2011 application to participate in what's
called the promotional process at the City.  That was a
promotional process for the rank of Sergeant.  An officer at
APD must successfully complete the promotional process to be
considered for a promotion.  And the first part of the test is
a written exam, and then it is followed by an assessment of
skills.

          To be eligible to participate in the promotional
process, an officer can't have been subject to discipline
within the prior 12 months, and because of the alcohol in the
City vehicle issue, technically under the rules Lieutenant
Welch wasn't eligible to test for Sergeant, and so she was
told, if you want an exception made for you, you need to
communicate the reasons why you should be an exception to the
rule to Chief Schultz.  And so she did that.  She wrote a memo,
and Chief Schultz said, "That's fine, you may test, you may
participate in the promotional process."

          You will hear that after he decided she could
participate in the process Chief Schultz had nothing further to
do with the promotional process.  His involvement had ended.

          You'll also hear that Chief Schultz did report APD
officers who had been subject to a certain level of discipline
to the New Mexico Law Enforcement Academy.  Those were officers
who had more than 40 hours in discipline, just like Lieutenant
Welch.  And in March of 2011, Lieutenant Welch's discipline was

1   reported to the Law Enforcement Academy.  Her name was reported

2   along with 31 other officers.  And those were 31 other officers

3   from APD.  Many other officers from around the state of

4   New Mexico were also reported.  This report had simply nothing

5   to do with Lieutenant Welch's gender or her earlier complaints

6   of harassment or discrimination.

7           I mentioned earlier that you would hear about

8   personality conflicts, and you will.  You will hear that

9   Lieutenant Welch never liked Detective Gagne, and the feeling

10  was mutual.  She did not like Detective J.R. Potter because he

11  was, frankly, fat.  She was not happy with Detective Hill

12  because of his relationship with her sister-in-law, and she did

13  not like Sergeant Hubbard or Lieutenant Smith because they

14  didn't follow the rules to the letter as she expected.

15          And as you're hearing the evidence, we ask that you

16  think about and focus on whether Lieutenant Welch's sex had

17  anything to do with the personality conflicts in her unit or

18  her work environment, whether it had anything to do with the

19  decisions that were made regarding her assignments to Burglary

20  and ROP, and whether she was retaliated against for making any

21  complaints.

22          After you hear the evidence, your job will be to

23  determine whether the City decided, among other things, to hold

24  three sexual harassment refresher trainings, requiring 70

25  employees and officers to attend as a means of punishing or

1   retaliating against Lieutenant Welch.  You'll be asked to

2   decide whether her gender or her sex played any role in any of

3   the other instances she complains about.  And we are confident

4   that you will conclude, as did the City, that Lieutenant Welch

5   was not a victim of harassment, discrimination, or retaliation

6   by either the City or Chief Schultz.

7          Thank you.

8          THE COURT:  All right.  Thank you, Ms. Wiggins.

9          Ladies and gentlemen, it is just about 10:37 or so,

10  according to our clock on the wall.  You arrived about 8:15,

11  8:30.  Let me just ask you before we start our evidence, any

12  members of the jury, would you like to take a break at this

13  time for about ten minutes?

14         Yes.  I see some hands going up.  So we'll do exactly

15  that.  We'll be in recess, and then please be back ready to

16  line up within about ten, ten minute's time.

17         All right.  We'll be in recess.  Please rise for the

18  jury.

19     (Jury out at 10:37 a.m.)

20         THE COURT:  All right.  Counsel, is there anything to

21  take up at this time?

22         MR. VILLA:  No, Your Honor.

23         THE COURT:  Your first witness will be, Mr. Villa?

24         MR. VILLA:  Ms. Welch.

25         THE COURT:  Okay.  If you can have Ms. Welch in the

```
 1   witness stand and we'll convene and begin at that time.
 2                MR. VILLA:  Yes, Your Honor.
 3                THE COURT:  Okay.  Thank you.
 4        (Court stood in recess at 10:38 a.m. and resumed at
 5        10:49 a.m. as follows:)
 6                THE COURT:  Please rise for the jury.
 7        (Jury in at 10:49 a.m.)
 8                THE COURT:  All right.  Please be seated.
 9                Ms. Welch, please remain standing.  Raise your hand
10   to be sworn.
11        (Plaintiff sworn.)
12                MS. HALL:  If you don't mind stating your name, and
13   spell your first and last name.
14                THE WITNESS:  Yes, ma'am.  Terysa Welch.
15   T-E-R-Y-S-A, and the last name is W-E-L-C-H.
16                   PLAINTIFF'S WITNESS TERYSA WELCH,
17        after having been first duly sworn under oath,
18        was questioned and testified as follows:
19                        DIRECT EXAMINATION
20   BY MR. VILLA:
21   Q.   Good morning, Ms. Welch.
22   A.   Good morning.
23   Q.   Can you tell the jury how you're currently employed?
24   A.   I'm currently employed as a Lieutenant with the
25   Albuquerque Police Department.
```

Direct Examination - Terysa Welch

1  Q.    When did you become a Lieutenant?

2  A.    At the end of August of 2017.

3  Q.    Are you married?

4  A.    I am.

5  Q.    What's your husband's name?

6  A.    Jason Bowie.

7  Q.    Do you have any children?

8  A.    I have a stepson, 11 years old.

9          THE COURT:  Mr. Villa, just -- I apologize to

10 interrupt, but just so you have a sense, and you'll have plenty

11 of time to conduct your examination, can you give me an

12 estimate of how long the direct will take?

13         MR. VILLA:  At least a couple of hours, Your Honor.

14 Maybe three.

15         THE COURT:  Okay.  I just needed a rough timeline.

16 Please proceed.

17         MR. VILLA:  Yes, Your Honor.

18 Q.    (By Mr. Villa)  Where do you live with your husband?

19 A.    In Rio Rancho.

20 Q.    Now, let me ask you this.  Can you tell the jury just

21 briefly, where were you born and raised?

22 A.    I was born and raised in Montana.

23 Q.    Do you have any siblings?

24 A.    I do.  I have three siblings, older twin sisters and a

25 younger brother.

Direct Examination - Terysa Welch

1    Q.    Do you have any family in law enforcement?

2    A.    I do.  My baby brother's a law enforcement officer here

3    with APD.

4    Q.    And what about your grandfather?

5    A.    My grandfather was a Chief of Police in a little town

6    called Libby, Montana.

7    Q.    When did you become a police officer?

8    A.    In 1997 I joined the APD Academy.

9    Q.    Why did you join the Academy?

10   A.    Oh, I wanted to be a police officer since I was a little

11   girl.

12   Q.    How come?

13   A.    I looked up to my grandfather, who I called Papa, and he

14   was a big influence in my life, and I respected him and wanted

15   to be like him.

16   Q.    Now, you grew up in Montana.  Did you go to high school

17   there?

18   A.    I did.

19   Q.    What year did you graduate?

20   A.    In 1992.

21   Q.    Did you go to college after that?

22   A.    I did.  Also in Montana in a town called Missoula,

23   Montana.

24   Q.    What did you study?

25   A.    I received my degree in sociology.  I had a minor in

Direct Examination - Terysa Welch

```
1    psychology and an emphasis in criminology.
2    Q.    Now, you testified that you started the Academy in 1997.
3    A.    Correct.
4    Q.    Do you remember what class that was?
5    A.    78th.
6    Q.    What year did you graduate the Academy?
7    A.    '98.
8    Q.    And of your Academy class, how many women were in that
9    class?
10   A.    We started with seven and ended up with three.
11   Q.    Now, we know at some point in time in 2004 you joined the
12   ROP unit.  Right?
13   A.    Correct.
14   Q.    Or I guess ROP.  Was there anything that took place in the
15   Academy that led you to end up in ROP?
16   A.    Yes.
17   Q.    Tell the jury about that.
18   A.    So when you're a cadet in the Academy, you have multiple
19   units come in and do a presentation for you, and when the ROP
20   unit came in, I was a bright-eyed cadet, and they put a
21   presentation on, and there was some video involved, and I just
22   thought those guys were the coolest unit, and it was that day
23   that I set my sights on the ROP unit, and I knew that, man, I
24   had -- that was my spot, I had to be in that unit, that was --
25   I was born to be in that unit.  And I think the reason was
```

1    because I knew I wanted to be an investigator, and I knew I

2    loved the tactical side, and I got sort of the best of both

3    worlds in that unit, and I -- so from that day on everything

4    that I did was to try to get to that unit.  And I took every

5    training opportunity I could.  I think I counted 29 extra

6    training classes that I didn't have to take to try to help

7    myself get prepared to be in that unit.

8    Q.   Let me stop you there for a minute.  Why can't you just go

9    from the Academy to the ROP unit?

10   A.   Oh, because it's a highly coveted -- you know, some people

11   never make it to the ROP unit.  You know, there's only a few

12   select spots, and a lot of people compete for those spots.  I

13   think there's only been two women ever on the ROP team in the

14   history of the ROP team.  Ever.

15   Q.   And can a rookie police officer, if you will, who's coming

16   right out of the Academy go to a detective unit?

17   A.   No.

18   Q.   Why not?

19   A.   Well, because you need experience to be a detective.  You

20   need to know how to do interviews.  You need to know how to

21   write search warrants and arrest warrants.  You don't want just

22   a rookie being a detective.  You know, those are felony cases

23   and it requires experience.  You start out -- You climb the

24   ladder.  You start out as a patrolman first, and you get

25   experience with misdemeanors and car stops and how to do the

Direct Examination – Terysa Welch

1   basics first.  And then that's something you progress into.

2   Q.   When you graduated in 1998, what was your first

3   assignment?

4   A.   You go into OJT, and then my first assignment was just a

5   patrol officer in Valley day shift.

6   Q.   OJT is on-the-job training?

7   A.   Correct.

8   Q.   When you say Valley day shift, is the City divided up

9   regionally by names that are associated with that region?

10  A.   Correct.  There are six area commands.  The city is broken

11  up into those area commands.  Each area command would have a

12  Commander and its own chain of command and its own set of

13  patrol officers taking calls for service as the citizens need

14  help.

15  Q.   And I think you testified that that would have occurred in

16  1998.

17  A.   Yes.

18  Q.   At what point in time -- Well, was there a point in time

19  that you became a detective?

20  A.   There was.

21  Q.   When did that happen?

22  A.   It was around 2001.

23  Q.   And what sort of detective did you become?

24  A.   I became a Northeast Impact detective.  It's a general --

25  generalist detective where you -- at the time, all felony

1  crimes within the Northeast Area Command would be investigated

2  by a Northeast Impact detective.

3  Q.   Now, again, I think you explained this, but why not just

4  go from patrol, skip over Impact, and go right to ROP?

5  A.   They would have never taken me.

6  Q.   Why not?

7  A.   I wouldn't have the proper experience.

8  Q.   So the Northeast Impact would have been your first

9  assignment as a detective?

10  A.   Correct.

11  Q.   How is being a detective different than being a patrolman?

12  A.   Well, you would write search warrants.  You would

13  investigate in-depth felony crimes.  You would do interviews.

14  You would -- You know, the patrolman does more of the immediate

15  calls for service; whereas the detective follows up on those

16  calls for service if that is necessary.

17  Q.   When you were a detective in Northeast Impact, did you

18  meet Robert Smith?

19  A.   I did.

20  Q.   How did you meet him?

21  A.   He was the Sergeant of that unit?

22  Q.   The same Sergeant that was ultimately your first Sergeant

23  in ROP?

24  A.   Correct.

25  Q.   Did you have any problems with Sergeant Smith while you

Direct Examination - Terysa Welch

1   were at the Northeast Impact?

2   A.   No, I did not.

3   Q.   Any issues with sexual harassment?

4   A.   No.

5   Q.   What was your assignment after the Northeast Impact?

6   A.   I applied for a position in Special Investigations

7   Division, and the unit was called the Crisis Intervention Team.

8   Q.   Let me stop you there.  What is the Special Investigations

9   Division?

10  A.   It's a division all its own, and it comprises -- at that

11  time, it comprised of the Crisis Intervention Team, which

12  specializes in mental health issues, and then also included in

13  Special Investigations would be Gangs, Narcotics, Intel unit,

14  Vice.  I'm missing one.  I might be missing one unit in there,

15  but those are all included in Special Investigations Division.

16  Q.   And ROP is, as well?

17  A.   ROP, yes.

18  Q.   So what was it about CIT, or Crisis Intervention, that

19  made you want to go there?

20  A.   To be honest with you, it was my way into the division so

21  that I could get into ROP.

22  Q.   When you say "into the division," you mean the Special

23  Investigations Division?

24  A.   Correct.

25  Q.   Why did you want to get into the Special Investigations

Direct Examination – Terysa Welch

1   Division?

2   A.   Because once you've got your foot into the door of Special

3   Investigations, which was difficult to even get into the

4   division, then it was easier to transfer within the division to

5   ROP, and so I took that position.  Not that I wasn't interested

6   in Crisis Intervention Team, but my ultimate goal, as I stated

7   before, was to get into the ROP unit.

8   Q.   Now, I take it, then, that the division that you were in

9   for Northeast Impact is not the Special Investigations

10  Division.

11  A.   No, it is not.

12  Q.   What is the umbrella, I guess, that's over the Northeast

13  Impact?

14  A.   That is under Field Services.

15  Q.   Okay.  So Field Services, that would encompass patrol and

16  some detective positions?

17  A.   Correct.

18  Q.   But not the detective positions for SID?

19  A.   No.

20  Q.   Okay.  Are there any other divisions, if you will, within

21  the Albuquerque Police Department?  You talked about Field

22  Services and Special Investigations Division.  What else is

23  there?

24  A.   Sure.  There's Tactical, there's Criminal Investigations,

25  which is going to include things like, you know, you have

1   Robbery, you have Property Crimes.  There's -- It kind of --

2   Things can shuffle around depending on the Chief, and it's

3   changed probably, you know, five or six times since Chief

4   Schultz left, so it often gets reorganized under different

5   mayors and different administrations.

6   Q.   So referring to a specific unit, the Northeast Impact or

7   CIT, who is in charge of those units?

8   A.   Well, there's a Commander in charge, or it was a Captain

9   back then.  Now they call them Commanders.  There's a

10  Lieutenant, and then there's a Sergeant, and then you have

11  either the detectives or the officer below that.

12  Q.   So, for instance, Northeast Impact, who's the direct

13  supervisor for the detectives in Northeast Impact?

14  A.   The Sergeant, and that would have been Rob Smith at the

15  time.

16  Q.   And the Sergeant's supervisor is the Lieutenant?

17  A.   Correct.

18  Q.   And the Lieutenant, does that Lieutenant have more duties

19  than just overseeing the Northeast Impact?

20  A.   Yes.

21  Q.   So give the jury an idea, what other duties would a

22  Lieutenant have in that position?

23  A.   For Field Services Lieutenant, we have a number of teams

24  that would be uniformed officers and Sergeants running those

25  uniformed teams.  It's pretty extensive.

1          THE COURT:  Mr. Villa, let me just ask, is everybody

2   on the jury able to hear the witness as well as counsel?

3          Yes.  Okay.

4          Mr. Villa.

5          MR. VILLA:  Thank you, Your Honor.

6   Q.  (By Mr. Villa)  Now talking about, say, Crisis

7   Intervention Team, is the Crisis Intervention Team serviced by

8   a Sergeant?

9   A.  Yes, it is.

10  Q.  And above the Sergeant is Lieutenant?

11  A.  Correct.

12  Q.  So now we're in SID.  What would the Lieutenant's role be

13  in SID?  Is it just over the Crisis Intervention Team or other

14  tears?

15  A.  No.  The Lieutenant of SID is over the entire division of

16  all of SID.

17  Q.  So they have more duties than just dealing with one

18  specific unit or team?

19  A.  Correct.

20  Q.  Is that true throughout the Department structure?

21          MS. WILLIAMS:  Objection, Your Honor.  This line of

22  questioning is leading.  And it's not background.

23          THE COURT:  I recognize, but it's somewhat

24  foundational, so see if you can restructure your questions, but

25  I'll be flexible on this.  It is foundational.

1   Q.   (By Mr. Villa)  Let me ask this question.  When you were

2   in CIT and later ROP, was there a Sergeant over each of the

3   units within the SID?

4   A.   That's correct.  There's a Sergeant over Vice, there's a

5   Sergeant over ROP, there's a Sergeant over Narcotics, there's a

6   Sergeant over Intel, there's a Sergeant over each specific team

7   within SID, and then there's one Lieutenant over each of all

8   the teams and one Captain over the entire division.

9   Q.   Now, you testified a little while ago that it was hard to

10  get your foot in the door in SID, at least at the time you did.

11  Why is that or why was that?

12  A.   Because they're very competitive spots and there's a lot

13  of people that want them.

14  Q.   Now, once you were in CIT, what was the next assignment

15  you had after that?

16  A.   Well, after I went to ROP.

17  Q.   Do you remember when you got into ROP?

18  A.   In July of 2004.

19  Q.   Before July of 2004, had you tried to apply to ROP?

20  A.   Yes, I did.

21  Q.   How many times?

22  A.   Two -- At least two previous times, I tried to get into

23  ROP.

24  Q.   And when you ultimately got in, do you remember how many

25  applicants were attempting to get into the position?

Direct Examination - Terysa Welch

1    A.    There was approximately 15.

2    Q.    What was the application process or testing you had to do?

3    A.    It was a two-day process.  We did a physical fitness test,

4    which was the normal department physical fitness test, which I

5    believe at the time -- I don't remember if it was push-ups or a

6    bench press, it was one or the other, and there was sit-ups, a

7    one-and-a-half mile run, and I believe a leg press, and then a

8    flexibility test also.

9    Q.    Did you have to do any sort of physical fitness test to

10   get into either Northeast Impact or the CIT?

11   A.    No.

12   Q.    And other than -- What was the other testing process for

13   ROP?

14   A.    There was a written test, an oral interview, and then

15   there was a series of six different shooting tests that we had

16   to perform in front of the ROP team.

17   Q.    Were the other -- the Northeast Impact or CIT, did you

18   have to do shooting tests?

19   A.    No.

20   Q.    What about written tests or oral interview?

21   A.    I don't recall one.

22   Q.    Were there other women applying to the ROP unit at the

23   time you applied and got in?

24   A.    No, there was not.

25   Q.    And when you got in, did you get in with any other

1    applicants?

2    A.    I did.  There was two positions available, and myself and

3    Detective Mike Hill both achieved the spots.

4    Q.    Now let me ask you this.  I'm going to show you

5    Exhibit 166.  Have you seen that exhibit before?

6    A.    Yes, I have.

7    Q.    Now, can you tell the jury what it is?

8    A.    That's the results of one of my Physical Fitness

9    Assessments.

10   Q.    Now, it's dated in May of 2004, May 19th, 2004.  Do you

11   see that right there?

12   A.    Yes.

13   Q.    Okay.  This was actually before you made it into ROP.  Is

14   that right?

15   A.    Yes.

16   Q.    Was this part of the testing process?

17   A.    I'm not sure if this was part of the ROP testing process.

18   I believe we had to do an additional test the day of, so this

19   wouldn't have been the testing process.

20   Q.    Okay.  Now, it has some writing there on the bottom.  It

21   says "I want to have children with you!  Very Impressive!

22   Rob."  Do you know who wrote that?

23   A.    That would have been Rob Smith.

24   Q.    And then it says in red "You Rock!"  Do you know who wrote

25   that?

Direct Examination – Terysa Welch

1    A.    I believe Rob Smith.

2    Q.    When did you receive this exhibit with the writing on it?

3    A.    When I was in ROP.

4    Q.    Do you remember the month or the year?

5    A.    It was shortly after I achieved my position.  It was in my

6    cubicle at my desk.

7    Q.    Now, when you were in ROP, was it required that you do

8    Physical Fitness Assessments?

9    A.    Yes.  Once a year.

10   Q.    And have you had to do Physical Fitness Assessments prior

11   to being in ROP?

12   A.    You didn't have to.  Well, you had to show up.  It's a

13   hard answer.  You have to physically show up to what we call

14   MOE's, mandatory -- It's Maintenance of Effort.  It stands for

15   Maintenance of Effort.  MOE.  And every police officer has to

16   have yearly training with the Albuquerque Police Department,

17   and part of that yearly training includes a physical fitness

18   test.  They can't make you run unless you're in a specialized

19   unit, and the specialized unit can require you to do things

20   like a physical fitness test.  Not all of them do, but ROP was

21   one that did require that.

22   Q.    So every year before you got into ROP, did you do a

23   Physical Fitness Assessment?

24   A.    I did a Physical Fitness Assessment every year of my

25   20-year career.

1    Q.    Do those Physical Fitness Assessments -- Before you were

2    promoted -- we'll talk about that later -- to a Sergeant, who

3    did the Physical Fitness Assessments go to?

4    A.    They go to the physical fitness coordinator who's a person

5    at the Academy.

6    Q.    So would your Physical Fitness Assessment have gone to

7    Sergeant Smith, the one that I'm showing you here?

8    A.    I don't know why this one would have, because it was

9    before I actually took a position in ROP, but he had it for

10   some reason.  I started in ROP in July.  After July, I would

11   have handed them in to my Sergeant, because you get an

12   incentive.  You'll see the bottom of the page, it says

13   "INCENTIVE 16 hours," so you get 16 hours of comp time, it's

14   called.  You get 16 hours of off time as an incentive of doing

15   that well on the physical fitness test.

16   Q.    Do you know if Sergeant Smith wrote on anybody else's

17   Physical Fitness Assessment at that time?

18   A.    Not to my knowledge.

19   Q.    Now, was that the only time that Sergeant Smith ever told

20   you while you were in ROP that he wanted to have children with

21   you?

22   A.    I had a conversation with Sergeant Smith at the Police

23   Academy.  We were catching up.  It had been a little while

24   since I had seen him.  In the interim between Northeast Impact

25   and my ROP time, and we were working out.

1    Q.    Now, at the time were you in the ROP unit?

2    A.    Yes.

3    Q.    But you were both at the Academy to do a workout or

4    something?

5    A.    Yes.

6    Q.    Okay.  Go ahead.

7    A.    So we were catching up, and I was familiar with his two

8    sons, and without going into more personal information about

9    his boys, I was asking him how one of his sons was progressing.

10   He had been a little behind physically for personal reasons.

11   And he was talking about how he -- You know, he's a large --

12   larger-statured man, and he was telling me how he's from Viking

13   decent, and that's kind of Rob's personality, and he was

14   telling me how his grandfather was even larger and that his

15   bloodline is -- is being sort of depleted size-wise, and --

16            I feel a little mean telling this story.

17   Q.    That's okay.  I understand that it's difficult.  But what

18   did he say to you about having children with you?

19   A.    So he -- he was talking about how this -- one of the boys

20   was smaller than the other boy, and he referred to his wife as

21   a pygmy, and he was saying how she had bred out the size of his

22   bloodline and was calling his wife a pygmy, and he had referred

23   to me as "If I had bred with you, I wouldn't have the same

24   problem."

25            And it was -- I felt two things.  I felt awkward that

Direct Examination - Terysa Welch

1   he made the comment about breeding with me because I hadn't had

2   that -- I didn't know how to handle the comment.  And then I

3   felt bad for Shannon, his wife, because I knew Shannon.  She

4   was a victim advocate supervisor for us, and she does very

5   important work for us, and I appreciate the work that she does,

6   and I've -- you know, been around her and respect her, and I

7   just know how I would feel as a wife if I knew my husband was

8   talking about me like that, even in a joking manner.  It felt

9   it was --

10           MS. WILLIAMS:  Objection, Your Honor.  This is

11   nonresponsive.

12           THE COURT:  Well, I'll overrule it.

13   A.    I felt it was disrespectful, and I --

14   Q.    (By Mr. Villa)  So let me ask you this.  Did you say to

15   him at that point in time that you thought they would have

16   great-looking children together?  That you and Rob?

17   A.    Absolutely not.

18   Q.    Did you ever say that to him?

19   A.    No, I did not.

20   Q.    When you got Exhibit 166, the fitness evaluation, did you

21   tell him that?

22   A.    No, I did not.

23   Q.    Now, in both these instances he was your Sergeant?

24   A.    Yes.

25   Q.    Why not go complain right then and there to the

1   administration?

2   A.   Because I loved my job.

3   Q.   Explain that to me.  So if you -- What would happen or

4   what did you feel would happen if you complained with respect

5   to your job?

6   A.   That I would be removed from my job.

7   Q.   Why did you think that?

8   A.   Rob is a very well-connected influential person in the

9   Police Department.  His personality is not the kind of

10  personality that is approachable in that way.  He's an

11  intimidating person both physically and personality-wise.  That

12  is -- As you'll hear in my later testimony, I was not even able

13  to approach him when I was unhappy with an issue with Sergeant

14  Hubbard.  He was not a person that you could go to with an

15  issue and he be open-minded about a complaint about the work

16  environment.  What he said goes.  And --

17  Q.   So let me ask you this.  Let's talk some other things.

18  Did he ever make comments to you about your looks?

19  A.   Yes, he did.

20  Q.   Tell the jury about that.

21  A.   Rob would make a sound to me as he would look me up and

22  down, and it was an ummm as he would look all the way down my

23  legs.  And to further explain, ROP was a unit that often had to

24  do surveillance, lengthy surveillance, and we would be out in

25  the summertime in front of people's residences, and we had to

1   have the trucks turned off.  You couldn't be in residential

2   neighborhoods with vehicles running, with the air conditioner

3   running.  And for that reason we had to dress very lightly, so

4   our attire would be shorts and a light T-shirt and then our gun

5   belt.  It wasn't a uniform.  It was -- It was a plain gun belt,

6   a gun, handcuffs, flashlight, magazines, and such, and then I

7   would -- we would throw a shirt on top of that to cover all

8   that stuff so we would blend in in the community.

9        And when we were on surveillance, we had to turn the

10  vehicles off.  It wasn't about our comfort.  We had to -- The

11  trucks were very dark tinted, and if you had the vehicle

12  running, people could tell you were in it, so we would put a

13  sunshade up, and in order to make yourself more comfortable,

14  you would sweat profusely anyway, but that is what we had to

15  wear in order to be out on these long surveillances.

16       And so, yes, you showed more of your body as a

17  result.  And he would look me up and down and he would ummmm.

18  He would say things like "Tight as a drum."  He would -- He

19  would ask me "Have you changed your workouts?  It's working."

20  Comments like that.

21  Q.  Now let me stop you there just for a minute.  Did you ever

22  try to approach Sergeant Smith and say, you know, "You need to

23  stop making these comments," you know, "What you wrote on my

24  evaluation's not appropriate," anything like that?

25  A.  No, I did not.

1    Q.    Why not?

2    A.    Again, I liked my job.  I did things to try to make

3    people -- have people around me, because he would not do it

4    when I was -- unless I was alone with him.  He wouldn't -- He

5    wouldn't do this when I had people around.  He took the

6    opportunity when I was alone.  I did things -- Like later on

7    when he was a Lieutenant, his office was right next to one of

8    the doors.  I went completely around and I used a different

9    door so I just wouldn't have to see him.  I took steps like

10   that, just, look, completely avoid this guy so I don't even

11   have to -- he just became the creepy guy that I didn't want to

12   see him.  He made my stomach turn.

13   Q.    Let me stop you there for a minute.  As the Sergeant

14   before he became the Lieutenant, how often would you interact?

15   A.    As the Sergeant, I had to see him every day.

16   Q.    And you testified just a minute ago that he would make

17   these comments or say these things when you were alone.

18   A.    Yes.

19   Q.    How often did that happen, if you know?

20   A.    Every chance that he got that we were -- that I was alone

21   with him.

22   Q.    Did you ever hear him make comments to male detectives in

23   ROP about their looks?

24   A.    No.

25   Q.    Did you ever hear him make comments to male detectives

1    about their workouts in respect to their body?

2    A.    No.

3    Q.    And then as a Lieutenant, you saw him less?

4    A.    I did see him less.

5    Q.    Why is that?

6    A.    He had more responsibilities.  There was no daily

7    interaction.  A Sergeant had to go out with us.  A Sergeant had

8    a direct role with us, and so, you know, I didn't have to hear,

9    you know, the -- you would -- We would generally meet up in the

10   Sergeant's office, you know, and that's when I would hear the

11   comments like the comments about the description of his

12   genitals, and --

13   Q.    So let's get into that, but let me ask you about, when he

14   was a Lieutenant, he was still a Lieutenant in SID?

15   A.    Yes, he was.

16   Q.    So the Sergeant of ROP would report to him?

17   A.    Yes.

18   Q.    Okay.  Now, let me ask you about the comments about his

19   genitals.  What sort of comments did he make?

20   A.    He described his penis as fat as a tuna can.

21   Q.    And he said that to you?

22   A.    Yes, he said that in front of me in my presence.  Him and

23   Detective Potter would both be sitting there, and both of them

24   have this thing about it's fat as a tuna can, and they would

25   start laughing.

1   Q.   Now, they would do that together in front of you?

2   A.   Yes.

3   Q.   And who is Detective Potter?

4   A.   He became a member of the ROP team.  He was also in the

5   Northeast Impact unit when I was working that unit as well.

6   Q.   Was he in the ROP team before or after you came in?

7   A.   After.

8   Q.   Do you know if he has any kind of relationship with Robert

9   Smith outside of work?

10  A.   Yes.  They make it well-known they're very close.  They

11  call each other brothers.  They've known each other since they

12  were 12 years old.

13  Q.   Did you ever complain, say to Detective Potter that you

14  didn't want them talking about their penises in front of you?

15  A.   That issue, I would say "You guys are gross" and walk out.

16  It was just, you know, you can't -- it's hard to not react to

17  that description.

18  Q.   Did Detective Potter ever say anything else to you that

19  you found inappropriate along these lines?

20  A.   Detective Potter would make comments about joining him and

21  his wife in sexual activity.

22  Q.   Did you respond to that?

23  A.   "No thanks."

24  Q.   Did you ever flirt with Detective Potter?

25  A.   No.

1   Q.   Did you ever flirt with Sergeant Smith?

2   A.   No.

3   Q.   What about when he became a Lieutenant?

4   A.   No.

5   Q.   Did you ever joke around with them about sexual matters or

6   sexual body parts?

7   A.   No.

8   Q.   Why not?

9   A.   Because it's not appropriate in the workplace.

10  Q.   Now, did Sergeant Smith ever say to you anything about

11  whether you guys could be married?

12  A.   Can you repeat the question?

13  Q.   Sure.  It's probably not a very good question.  Did he

14  make comments to you about wanting to be married to you?

15  A.   He made -- on three or four occasions made comments to me

16  about "If I wasn't married, I would be pursuing you."

17  Q.   And what did you take that to mean when he said "pursuing

18  you"?

19  A.   Trying to date you, trying to have a relationship with

20  you.

21  Q.   Did you ever say that back to him?

22  A.   No.

23  Q.   What did you say to him?

24  A.   I was afraid to offend Rob, and I wanted to keep things on

25  a good keel with him.  You don't want to make your boss mad.

Direct Examination - Terysa Welch

1   And I would say, "Next life."  That was the nicest way that I

2   could think of to blow my boss off without offending -- He's a

3   prideful person.  He's a -- I would almost describe him as

4   having an arrogance about him.  That was the best way I could

5   think of to tell -- Because I don't believe there's going to be

6   a next life, that was the best way that I could think of to

7   tell him no.

8   Q.   And I think I may have glossed this over, but -- so let me

9   go back.  You said one of the reasons that you didn't want to

10  say anything is because you loved your job.  I don't think I

11  asked you.  Tell the jury a little bit about what ROP does.

12  A.   ROP -- ROP is tasked with apprehending, watching, tracking

13  the most violent repeat offenders in Albuquerque.  You know, I

14  can give you an example of one of my most favorite arrests.  We

15  had a group of people that were targeting ladies in grocery

16  store parking lots, and they would find a lady walking out of

17  the grocery store with her purse strapped over her shoulder,

18  and they would drive up, the passenger would reach out and grab

19  the lady's purse strap and they would floor the car and they

20  would drag the lady through the parking lot, often breaking a

21  hip or something like that, and these are the types of people

22  that ROP got to go and apprehend, and so you might understand

23  why I loved being able to go and arrest these types of people.

24  They're -- They're out there preying on some of the best people

25  in Albuquerque.  And it was such a satisfying feeling for me to

1  go and arrest those kinds of people.  And that's the kind of
2  work that ROP did every day.
3  Q.   Now, what was it like going to ROP?  Did you have to wear
4  a police uniform?
5  A.   No.  We dressed in plain clothes.
6  Q.   You testified about what you wore for surveillance.  So
7  like the shorts you were wearing, what kind of shorts would
8  those be?
9  A.   Cargo shorts.
10 Q.   And is that the times when Sergeant Smith or later when he
11 was Lieutenant Smith would make comments about your clothing
12 and your body?
13 A.   Yes.
14 Q.   Okay.  If you weren't doing surveillance and that sort of
15 thing, you still didn't have to wear a uniform?
16 A.   No, we never wore a uniform.
17 Q.   Why not?
18 A.   Because we had to blend.  We didn't know where we would
19 end up and have to, you know, jump out into a mall to try to
20 follow somebody.  It could be anywhere in Albuquerque that we
21 would need to be able to blend in with our community.
22 Q.   What kind of cars did you drive?
23 A.   We had one minivan at one point.  Most of them were pickup
24 trucks.
25 Q.   Were these marked police cars?

Direct Examination - Terysa Welch

1    A.    No.

2    Q.    Did they have lights on the top?

3    A.    No.  The lights were hidden, usually in the grille and in

4    the taillights.  You turn them on when you needed to do an

5    apprehension, but very, very dark tint.  You couldn't see in

6    the vehicle at all.

7    Q.    While you were in ROP, how often did you work?

8    A.    Monday through Friday.

9    Q.    What was your work schedule like?

10   A.    Oh, our hours varied.  We were on call 24/7 365 days a

11   week.  If there was a homicide, there was a primary and a

12   secondary that would go out, and then if the rest of the team

13   needed to go out, if we had a lead on who the offender was, the

14   whole team would go out and work it.

15   Q.    So was there a lot of overtime?

16   A.    There was a lot of overtime.

17   Q.    What generated a lot of the overtime?

18   A.    Homicides generate a lot of the overtime.

19   Q.    Now, in APD there is a homicide unit, isn't there?

20   A.    There is.

21   Q.    So why does -- why does ROP get called out to homicides?

22   A.    Because when there's a homicide, the detectives start

23   working the case and the scene, and then ROP ordains --

24   actually starts doing the apprehension, and they start really

25   looking for the offender and trying to get the offender in

1    custody.

2    Q.    Did you often have to work overtime to surveil a suspect

3    or arrest a suspect?

4    A.    Yes.

5    Q.    Why is that?

6    A.    Because surveillance is very manpower-intensive.  It's not

7    possible to do it with just one or two people.  You know,

8    people that have committed a violent crime are often very

9    suspicious of their surroundings.  They're looking behind them.

10   They're -- You know, they will pay attention and they will

11   notice that the same two cars are behind them all the time, so

12   it requires multiple vehicles constantly switching out so that

13   they don't know that you're behind them.  And the safest way to

14   apprehend somebody who's basically schizophrenic in that moment

15   is to overwhelm them and to take them usually on foot or in a

16   vehicle so they can't cause a vehicle chase or endanger the

17   community further.

18   Q.    And these individuals that ROP is targeting, are they

19   available Monday through Friday from nine to five?

20   A.    No.

21   Q.    Okay.  So did you always -- Did you work odd hours?

22   A.    Yes.  We worked a lot of nights, a lot of weekends.

23   Q.    Now, let's talk about when you came into the ROP unit.

24   We'll put Sergeant Smith aside.  What was the demeanor like

25   from some of the detectives who were working then?

1  A.   It was not welcoming.

2  Q.   Now, sometimes when you're the new person on the -- on the

3  unit, you get a little bit of hazing or something.  Is that

4  what you're talking about?

5  A.   There was some of that.  I believe some of that was just

6  because we were the new people and -- And I will agree that

7  there was a little bit of that going on, but there was some of

8  it that was specifically because individuals that had been on

9  that ROP team for a very long time were part of the good ol'

10 boys club and they did not want a female in their team.

11 Q.   And you came on the team with Detective Mike Hill?

12 A.   Correct.

13 Q.   Did you guys work together throughout the time you were in

14 ROP?

15 A.   Yes.

16 Q.   Okay.  How was Detective Mike Hill and your relationship?

17 A.   Fine.

18 Q.   Did you-all get along?

19 A.   We got along fine.

20 Q.   Did you ever have any reason not to like him or have

21 conflict with him?

22 A.   No.

23 Q.   What is an Acting Sergeant?

24 A.   An Acting Sergeant is somebody that is upgraded while the

25 Sergeant is on vacation or away on leave for some reason.

Direct Examination – Terysa Welch

1   Q.    Before you got to ROP, had you ever been an Acting

2   Sergeant?

3   A.    Yes, I have.

4   Q.    When was that?

5   A.    As early as 2000.

6   Q.    Was that when you were in Field Services or the Northeast

7   Impact?

8   A.    When I was still in uniform, I was upgraded to Acting

9   Sergeant.

10  Q.    Okay.  And what about when you were an Impact detective?

11  A.    No.  That -- That unit had much, much more senior people

12  in that unit than me, and people retired out of that unit when

13  I was there.  So I don't think I was Acting in Northeast

14  Impact.

15  Q.    Who choose the Acting Sergeant?

16  A.    The Sergeant does.

17  Q.    Okay.  Throughout the time you were in ROP, were you ever

18  made Acting Sergeant?

19  A.    I was not.

20  Q.    Okay.  And I think we're going to get there in a little

21  bit, but when did you ultimately leave ROP?

22  A.    Officially or physically?

23  Q.    Physically.

24  A.    Left at the end of 2009.

25  Q.    Okay.  So for the period of time from 2004 when you got in

```
 1    to 2009 you were never made the Acting Sergeant?

 2    A.   No.

 3    Q.   Okay.  Were people that had come in to the ROP unit after

 4    you made Acting Sergeant while you were there?

 5    A.   Yes.

 6    Q.   Was there somebody in the ROP unit when you came in named

 7    Kevin Gagne?

 8    A.   Yes, there was.

 9    Q.   What was your relationship like with Kevin Gagne?

10    A.   Very rocky.

11    Q.   Can you tell the jury why it was rocky?

12    A.   Kevin Gagne was not a fan of a female coming into ROP, and

13    he made that very clear.

14    Q.   How did he make that clear?

15    A.   He mentioned to a friend of mine that --

16            MS. WILLIAMS:  Objection, Your Honor.  This is

17    hearsay.

18            MR. VILLA:  Your Honor, it's a party opponent.

19            THE COURT:  Please approach.

20        (Bench conference on the record.)

21            MS. WILLIAMS:  They're going to try to attribute

22    statements of officers and detectives to be admissions of a

23    party opponent that does not fit the definition of what an

24    admission of a party opponent can be for the City of

25    Albuquerque.  The City cannot be responsible for the statements
```

1   of every garbage collector, police officer, IT person at the

2   City.  That is an impossible burden and not going to be

3   something that would -- being an employee is not something that

4   makes it an admission of a party opponent.

5           MR. VILLA:  Well, right, Your Honor, I think it's

6   just an employee, but I briefed the Court on this issue, I

7   briefed the Court on this issue that I filed either Friday or

8   Saturday, that the test in the Tenth Circuit is if they're an

9   employee, they make the statement while they're in the scope of

10  their employment and it's related to the matters at hand, that

11  it meets the 801(d) exception for either agents or employees of

12  the City.

13          THE COURT:  Let me just note -- All right.  So the

14  question was "How did he," meaning Gagne, "make that clear?"

15  And I guess part of the answer was "he mentioned to a friend of

16  mine that --" I don't know what the statement is going to be.

17  Can you proffer what the answer will be?

18          MR. VILLA:  Yes.  And the friend he told it to was

19  also a APD police officer, Sergeant John Sullivan, but the

20  statement was that, you know, "We got fucked; we had to take a

21  skirt."  So he's making it to another police officer while

22  they're in the course of their business.  We're not talking

23  some unrelated issue.

24          THE COURT:  And remind me.  Gagne is the person

25  originally who was part of the -- I'm trying to keep it down --

1  so Gagne had originally been named in the Complaint as a

2  defendant?

3          MR. VILLA:  He had -- She was testifying about the

4  hostility that she experienced from Gagne.

5          MS. WILLIAMS:  Your Honor, they had put the person

6  that she -- he made that statement to on their witness list

7  originally.  They're not calling him.  It is a classic

8  out-of-court statement offered for the truth of the matter

9  asserted, and that is not allowed.

10         MR. VILLA:  And the reason not to call the other

11  witness is because he's also a City employee and supervisor, in

12  fact, and he --

13         THE COURT:  Let me just ask you, are you going to

14  move on?  Are you going to ask additional questions relating to

15  what Mr. Gagne may have said to this witness, just say in the

16  next 20 minutes?

17         MR. VILLA:  Your Honor, we can address it at lunch if

18  that's what you're trying to say.

19         THE COURT:  Let's do that.  And I'll look at your

20  brief.  If you can cover other territory, and then I'll make a

21  ruling on this issue.

22         MR. VILLA:  Sure.

23         THE COURT:  Because it will -- it's bound to recur.

24  I think this is going to be an issue to deal with in our trial.

25  So if you can just set it aside and move on to another area,

1   and I'll give you a ruling as to this particular objection.

2            MR. VILLA:  Okay.  Thank you.

3        (Open court.)

4   Q.  (By Mr. Villa)  Due to some technical issues I'm going to

5   come back to that.  But let's just talk about your

6   interactions with Kevin Gagne.  What were they like?

7   A.   You know, just generally he just -- you're not -- you know

8   when you're not welcome.  I -- not specifically Kevin, but I

9   wasn't given equipment when I first came to the team that I

10  know Mike Hill was, because Mike told me he got equipment that

11  I didn't get.

12  Q.   Throughout the years that you worked with Kevin Gagne, did

13  the relationship ever soften up a little?

14  A.   I tried a few things after some time.

15  Q.   What did you try?

16  A.   I had a pink ROP shirt made just to try to, Hey, it's

17  okay.  I'm -- you know -- you know, I put a ROP symbol on my

18  shirt and it was pink and -- to try to make him smile a little

19  bit.

20  Q.   Why did you make it pink?

21  A.   Because I'm a girl.

22  Q.   And you thought that would help break some of the ice with

23  Mr. Gagne?

24  A.   Yeah.  I had a pink lunch box, and I put it on his truck

25  and I took a picture of it and sent it to him and just -- you

1    know, trying to get the guy to lighten up a little bit.  You

2    know, a lot of time had gone by, and he was really the only

3    one, you know, at that time that was left that was still, I

4    felt, really being stubborn about it.  He just, God, I need

5    this guy to lighten up with me, you know.  He was just was so

6    hard to get through to Kevin.  I'm trying to be part of the

7    team.  I'm not trying to be a threat to you.  You know, just

8    let it go.

9    Q.   So Kevin Gagne was there throughout the time that you were

10   at ROP 2004 to 2009?

11   A.   The whole time.

12   Q.   Were there other detectives that were there early on that

13   ultimately left that you had similar issues with?

14   A.   Yes.

15   Q.   About how many, if you know?

16   A.   Well, there was Dan Wolfe and Rich Lewis that were there

17   and left right away, they retired -- they retired right away

18   out of there within, oh, a couple of months of me being there.

19   There was an individual by the name of Ryan Buckner that really

20   gave me a hard time.  He took me in the truck within my first

21   week, in his truck, "Come on you're riding with me," and I

22   thought, Okay, this is nice, somebody's going to take me under

23   their wing and show me a few things.

24        And he said, "I'm going to show you some dope houses

25   and things that we're working."

Direct Examination - Terysa Welch

1          So when we got into the truck, he said -- excuse my

2    language -- "What the F are you doing here?"  And I looked at

3    him kind of waiting for a smile or some indication that he was

4    joking, and he was not joking.  He was dead serious.  And I

5    wasn't sure really how to react to that, but I thought, Man,

6    you better stand up for yourself here and let this guy know

7    that this is not okay, and I said, "I earned my spot," you

8    know, I said, "What do you mean?  I earned my spot.  What are

9    you doing here?"

10          Because I had known that Ryan was a lateral that came

11   over from State Police, and, you know, there's a little bit of

12   controversy about what was he doing in ROP so soon, and so I

13   thought, Man, what do I do?  Do I -- Do I try to take a hard

14   line here, or I wasn't really sure how to react to that.  And

15   then he proceeded to sort of quiz me throughout the drive, you

16   know, gave me scenario questions and "What do you do if this

17   happens?  And what do you do if that happens?"  And so I tried

18   to answer scenario questions.  He didn't seem to be happy with

19   any of my answers.  Okay.  He's not the Sergeant.  I guess he

20   doesn't have to be happy with my answers.  He was pretty --

21   pretty rough day for me.  You know, you make it to your dream

22   spot and then that's your first week.  I wasn't really sure how

23   to take that.  But that was my first week with Ryan Buckner.

24   Q.   Did Mr. Buckner ever slack up on you or relax a little

25   bit?

Direct Examination - Terysa Welch

1   A.   You know, it took some time, but I have to be honest.  I

2   think with Ryan maybe he just was a jerk to new people.  I have

3   to maybe concede that, yeah, maybe with Ryan, maybe just --

4   maybe he does that to new people.  I don't necessarily think

5   that it was because I was a girl.  I think Ryan's just a jerk

6   to new people.

7   Q.   Did you have issues with anybody else in the unit?

8   A.   I did with the -- with the guys that were first there that

9   left.  Lou Heckroth was one of the guys that were there.  He

10  was very quiet, but -- and he never said anything to me

11  directly, but there was just these rumblings that I heard about

12  the original crew --

13          MS. WILLIAMS:  Objection.  Hearsay.

14          THE COURT:  Hold on.  There's an objection.  Please

15  stopping answering.

16  Q.   (By Mr. Villa)  We don't have to get into rumors and

17  things like that right now.  We'll address that a little bit

18  later.  But with respect to his behavior towards you, how was

19  Mr. Heckroth?

20  A.   I'll just have to leave it as not welcoming.

21  Q.   Okay.  Did he ever lighten up before he left?

22  A.   No.

23  Q.   Were there individuals, besides Detective Hill, in the ROP

24  unit throughout the time that you were there that were

25  welcoming or nice to you?

Direct Examination - Terysa Welch

1    A.    Sure.

2    Q.    And who were those individuals?

3    A.    Danny Garcia, some of the people that came after I was

4    there; you know, there was Ron Baca, Randy Robichaud that came

5    afterward.  You know, these people were my partners in there

6    and we took care of each other and we made a lot of arrests and

7    we got a lot of work done.

8              MR. VILLA:  May I approach the witness, Your Honor?

9              THE COURT:  You may.

10             MS. WILLIAMS:  Your Honor, this is one of the

11   exhibits that's the subject of a motion in limine that you have

12   in abeyance, and so we would object to an attempt to use it.

13             THE COURT:  Okay.  Which exhibit is it?

14             MR. VILLA:  167, Your Honor.

15             THE COURT:  All right.  You may proceed, Mr. Villa.

16   Q.    (By Mr. Villa)  Ms. Welch, I've shown you a copy of a

17   document marked Exhibit 167.  Is that right?

18   A.    Yes.

19   Q.    And is this a document that you received or came to you in

20   some way?

21   A.    Yes, it is.

22   Q.    Okay.  Who is it from?

23   A.    It's from Rob Smith.

24   Q.    And where did you find this or where did you get this

25   document?

1    A.    This was pinned in my cubicle on my cubicle wall.

2    Q.    And you had a cubicle in ROP?

3    A.    Correct.

4    Q.    Okay.  Do you remember when it was pinned in your cubicle

5    wall?

6    A.    It was around 2005.

7    Q.    Okay.  And how do you know that it's from Rob Smith?

8    A.    Because there's a note to me from somebody signed with an

9    "R."

10   Q.    Okay.  And is there a picture on that document?

11   A.    Yes, there's a picture of Rob Smith.

12   Q.    Okay.

13            MR. VILLA:   Your Honor, we would move to admit

14   Exhibit 167.

15            THE COURT:  Same objection?

16            MS. WILLIAMS:   Your Honor, I object.  It's hearsay

17   and lacks foundation.

18            THE COURT:  Well, I would agree that it does include

19   hearsay, Mr. Villa.  Do you have another theory?

20            MR. VILLA:  Well, I think that what's written on

21   there from Mr. Smith is not hearsay for the reasons we've

22   discussed, and it's also offered to show that it was given by

23   Mr. Smith to Ms. Welch.

24            MS. WILLIAMS:  Lack of foundation, Your Honor.

25            THE COURT:  All right.  As to foundation, Mr. Villa,

Direct Examination - Terysa Welch

1   I'll give you a little bit more room to try to establish that

2   foundation.  I don't know, we haven't heard where this document

3   is from, when it was published, or anything of that nature.

4   Without testifying or asking the witness to testify as to the

5   contents, you can try to establish more foundation.

6   Q.   (By Mr. Villa)  Well, let me ask you this, Ms. Welch.

7   There's a note written on there to you, correct?

8   A.   Yes.

9   Q.   And it purports to be from Mr. Smith?

10  A.   That's correct.

11  Q.   Okay.  Did he often give you notes?

12  A.   Yes.

13  Q.   Is this a note that was related to some work that you were

14  doing?

15  A.   This is a note from Rob addressed to me, something he

16  often called me, and this is -- this is a fundraiser that he

17  did.

18          MS. WILLIAMS:  Objection, Your Honor.  This goes into

19  the content.

20          THE COURT:  It does get into the content.

21  Q.   (By Mr. Villa)  Let me ask you this.

22          THE COURT:  Try it again.

23          MR. VILLA:  Sure, Your Honor.

24  Q.   (By Mr. Villa)  Was the note romantic or sexual in

25  nature?

Direct Examination - Terysa Welch

1    A.    Yes.

2    Q.    Why do you say that?

3    A.    Because there's a heart written on it, and it suggests

4    that we have memories together.

5          MS. WILLIAMS:  Objection, Your Honor.  She is reading

6    the thing I'm objecting to that lacks foundation.

7          THE COURT:  I understand.  All right.  Mr. Villa,

8    there is additional information on this exhibit beyond the

9    note.  Are you offering the entire document in addition to what

10   is the testimony to the note?

11         MR. VILLA:  Well, Your Honor, if she can read the

12   note, then I think that's -- that's fine.  I don't think the

13   document has anything to do with what's on the note one way or

14   another.  And Mr. Smith -- for purposes of authentication, we

15   can prove it up later -- Mr. Smith will agree that he wrote

16   that note on this letter.

17         THE COURT:  All right.  I'll allow you to question

18   the witness as to the note itself.  The Exhibit 167 will be

19   excluded.

20         MR. VILLA:  Okay.

21         THE COURT:  Okay.  You may proceed that way.

22   Q.    (By Mr. Villa)  Ms. Welch, what is the note that

23   Mr. Smith wrote to you?

24   A.    It says "To T - Thanks for the memories.  Heart R."

25   Q.    Okay.  Thank you.

1      MR. VILLA:  May I approach?

2      THE COURT:  You may.

3 Q.  (By Mr. Villa)  So you testified that you found this in

4 your cubicle?

5 A.  That's correct.

6 Q.  Where was it in your cubicle?

7 A.  It was pinned to the soft wall of my cubicle.

8 Q.  And do you know how it got there?

9 A.  I don't know how it got there.  I assume that Rob pinned

10 it there.

11 Q.  When you saw it pinned up on your cubicle, what did you do

12 with it?

13 A.  I took it down.

14 Q.  Did you ever make copies of that document before it was

15 written on to hand out to the ROP unit?

16 A.  No, I did not.

17 Q.  Do you know where that document came from that that note

18 was written on?

19 A.  No, I do not.

20 Q.  Do you know why he gave you that note?

21 A.  I don't know why he gave me that note.

22 Q.  Had he left you other notes like that before or since

23 then?

24 A.  The one that you had already --

25 Q.  Well, I guess notes that are -- that you would

1    characterize as -- Well, let me ask you this.  Did you

2    characterize the note as work-related?

3              MS. WILLIAMS:  Objection, Your Honor.  This is

4    continued leading.  It's not foundational.  We object.

5              THE COURT:  All right.  Just rephrase the question,

6    Mr. Villa, as to what else may have occurred by way of notes or

7    things of that nature.

8              MR. VILLA:  Sure.

9    Q.  (By Mr. Villa)  Did he give you notes that were related

10   to work?

11   A.   He did give me notes related to work.

12   Q.   Did he give you notes that you thought were not related to

13   work?

14   A.   He gave me notes that I thought were somewhat crossing the

15   line.

16   Q.   Like that note?

17   A.   Absolutely.

18   Q.   And why did you think that note crossed the line?

19   A.   Because it -- it's like a love note.  It's got a heart on

20   it and he's calling me "T."  And, you know, "Thanks for the

21   memories" is something that's inappropriate for a supervisor to

22   write to a subordinate.  It doesn't belong in the workplace.

23   Q.   Did you ever see him write notes like that to the other

24   detectives in ROP?

25   A.   No.

108
Direct Examination - Terysa Welch

1   Q.   Now let's talk about October of 2007.  By then Robert
2   Smith is a Lieutenant now, right?
3   A.   Correct.
4   Q.   Were you dating somebody named David Maes?
5   A.   Yes, I was.
6   Q.   Can you tell the jury just at little bit about that?
7   A.   I was engaged to a man named David Maes who was a police
8   officer with the APD.
9   Q.   Did you-all live together?
10  A.   Yes, we did.
11  Q.   Okay.  Regarding that, did you ever get a phone call from
12  Lieutenant Smith?
13  A.   Yes.
14  Q.   What did Lieutenant Smith tell you in that phone call?
15  A.   He asked me if I was at the office.
16  Q.   And what did you say?
17  A.   I was.
18  Q.   Did he tell you why he was calling?
19  A.   "I need to talk to you."
20  Q.   And then what happened?
21  A.   And he said, "Stay there.  I'm on the way."
22          He arrived at SID and came to my cubicle where I was
23  working on something.  He walked in and he grabbed my hand and
24  led me out of the building by my hand.
25  Q.   At that point in time did he tell you why he was doing

1  that?

2  A.    No.

3  Q.    Did you ask him?

4  A.    No.  It was very quick.  Just grabbed my hand and took me

5  out of the doors.

6  Q.    What happened once you were outside?

7  A.    He pulled me in very tight, my face was pushed here in his

8  chest and was very, very, very tight, and I remember, I

9  couldn't breathe.  My nose was smashed.  I couldn't breathe.

10  And I started becoming very fearful, because my brother was out

11  of town and I thought something has happened to him.  And he --

12  I sort of pushed away, and I'm -- I said, "What's wrong?"  And

13  he says, "Do you want to go have coffee or lunch -- breakfast?

14  Breakfast or coffee?"

15        I said, "No.  What's wrong, what is wrong?"

16        And he says, "Let's go sit in my car."

17        So we get into the car, and he holds my hand.  And

18  I'm thinking, this is -- you know, is extremely awkward.  And

19  he says, "They have David down at IA."

20  Q.    Now, what's IA?

21  A.    Internal Affairs.

22  Q.    Okay.  And you knew he was talking about David Maes?

23  A.    David Maes, yes.  And I said "For what?  For what?"

24        And he says, "He raped a prisoner."

25        And I said "What?"

1          And he says, "Yes, he raped a prisoner five days
2   ago."
3          And, you know, your mind is going through a million
4   things, and I'm thinking, Oh, I need to get my things.  I don't
5   want to see him.  I have got to get home and beat him home.  I
6   didn't know, would he be arrested, you know, what is going to
7   happen to him.  Trying to think of what to do first, you know,
8   who do I need to call.  It's embarrassing.  And Rob at that
9   moment proceeded to tell me at that moment that, again, "If I
10  was not married, I would be pursuing you."
11         I'm thinking, that is not making me feel better.  Why
12  are you telling me that?  That is the last thing I want to hear
13  right now.  You know --
14  Q.   And you thought that.  Did you tell him that?
15  A.   No.  I -- All I wanted to do was beat him home.  That was
16  number one in my mind, was who's going to help me get my stuff.
17  Q.   You're talking about beat Mr. Maes home?
18  A.   Yes.
19  Q.   Now, at this point in time, you didn't know if he was
20  arrested and in jail or anything like that?
21  A.   Just knew that he was at IA.
22  Q.   Okay.
23  A.   And, you know, then Rob proceeds to tell me details about
24  the victim.
25  Q.   And you don't necessarily have to get into the details

Direct Examination - Terysa Welch

1   about the victim, but did you learn at some point when APD knew

2   about this incident with Mr. Maes?

3   A.   Yes.

4          MS. WILLIAMS:  Objection.  Calls for speculation.

5   Q.   (By Mr. Villa)  Well, how did you learn about it?

6          THE COURT:  Well, I'll sustain the objection.  Just

7   rephrase, Mr. Villa.

8          MR. VILLA:  Sure.

9   Q.   (By Mr. Villa)  At some point did you come to know when

10  APD found out that Mr. Maes had done this?

11  A.   I did.

12  Q.   How did you find that out?

13  A.   Because I asked Rob, "Are you -- Are they sure that he did

14  this?"

15  Q.   And what did Rob say?

16  A.   "Yes.  David admitted it five days ago."

17  Q.   I'm sorry, he said what?

18  A.   "David admitted to this five days ago."

19  Q.   Okay.  Five days from the time he was having this

20  conversation with you in the car?

21  A.   Correct.

22  Q.   Okay.  What did you think about that?

23  A.   I was horrified.  I had been living in the same house with

24  this man who knew that he admitted to his supervisors what he

25  had done, and especially in the ROP unit, knowing what people

Direct Examination - Terysa Welch

```
 1   are capable of when they're facing those kinds of possible

 2   charges.  You know, ROP is often tasked with arresting police

 3   officers that have gone bad or police officers that are accused

 4   of things that are horrible crimes.  It sometimes happens in

 5   our profession, unfortunately, and ROP is the unit that has to

 6   go and pick up police officers.  I've had to arrest people that

 7   are my colleagues.  And that is one of the unfortunate tasks

 8   that ROP has to do.  It is not a fun assignment, but I'm one of

 9   the people that was trusted with having that confidential

10   information the whole time I was in ROP.  And now my own

11   department couldn't even tell me.  You know, I didn't expect

12   them to tell me, Hey, this, that, and the other about the

13   investigation, but David already admitted to it.  There was no

14   secret.  At least tell me, "Hey, get away from this weirdo.  Go

15   stay with your brother."

16           I'm the only one that didn't know.  David knew.  He

17   already confessed to it apparently five days earlier.  You

18   know, what if he decided, Hey, I don't want to go through this,

19   I'll just do a murder-suicide or something of the such.  What

20   if I was exposed to something of a sexual nature?  I mean, all

21   these horrible things on my mind on top of dealing with Rob

22   Smith's creepy way of consoling me.  I wasn't crying even at

23   the moment.  I just was overwhelmed and was trying to accept it

24   all in my mind, and I had Rob Smith now saying, "Let me take

25   you home."
```

Direct Examination - Terysa Welch

1    Q.   Let me -- Let me -- Let's talk about that.  You testified

2    that he said, you know, "If I wasn't married, I'd be pursuing

3    you."  What did he say after that?

4    A.   Well, after that it was "Let me take you home.  Let me --"

5    Q.   So he was offering to take you home?

6    A.   Yes, he offered several times, very insistent about it.

7    "Let me take you home.  Let me help you get your stuff."

8    Q.   What did you say?

9    A.   I said, "No, that's okay.  I'll call Michelle, I'll call

10   my friend, Michelle, she'll help me get my stuff."

11        "Please, let me just take you.  I can help you.  Let

12   me just drive you.  I'll have them hold him at IA until we're

13   done."

14        "No thanks.  Let me just go.  I'll just -- Michelle

15   will help me."

16        "Just let me just help you with this.  Just let me

17   help you."

18        "No."

19        You know, you don't want your boss in that moment

20   anyway, and then you don't want your boss at your house.  I'm

21   sorry, no offense.  Let me just go handle this, you know.  I --

22   Especially after you're making comments.  I don't know why you

23   think that's going to make me feel better in that comment, but

24   it wasn't.  It was making it worse.

25        THE COURT:  Mr. Villa, I just see the time.

1          MR. VILLA:  This is a good time to take a break, Your

2     Honor.

3          THE COURT:  Okay.  We will do that.  Ladies and

4     gentlemen, it's just about lunchtime.  We'll take a lunch

5     break.  We'll recess, and then if you can be ready in the

6     deliberation room at 1:00, we'll call you in just as soon as

7     possible.  I may take a few more minutes just to cover a few

8     issues with counsel if necessary to do that.  Please remain

9     patient.  We'll call you in just as soon as possible.

10          All right.  Please rise for the jury.

11       (Jury out at 12:02 p.m.)

12          THE COURT:  All right.  Ms. Welch, you may step down

13     from the stand.  I'm going to instruct you, however, Ms. Welch,

14     I'm going to instruct you not to discuss your testimony at all

15     during the break.  All right?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Okay.  Mr. Villa, as to the objection

18     that Ms. Williams stated originally, I think it was about the

19     conversation with Mr. Gagne, you mentioned a brief that you

20     submitted to the Court during the weekend.

21          MR. VILLA:  Yes, Your Honor.  I'll get you that.  I

22     believe it's 432.  I'm going to confirm that right now, Your

23     Honor.  But it essentially sets out the Tenth Circuit's test

24     for statements of a party opponent when you're dealing with the

25     employer or a municipality like the City and cites to some

1    Title VII cases along those lines.  It is document 432.  That's

2    correct.  And there's a three-part test that's discussed.  I

3    believe that comes from Fischer v. Forestwood, 525 F.3d 984.

4    That's not --

5              THE COURT:  Let me just ask you.

6              MR. VILLA:  Sure.

7              THE COURT:  I tried to summarize the question that

8    was asked during the break -- or during the bench conference.

9    So the question was -- Let me just summarize here.  Can you

10   tell the jury why it was rocky?  This is the relationship with

11   Kevin.  The answer:  "Kevin Gagne --"  It's not altogether

12   here.  Then the next question is:  "How did he make that

13   clear?"  And the answer began:  "He mentioned to a friend of

14   mine that . . ."

15             Now, the answer suggests that it's something that

16   Mr. Gagne said to somebody other than Ms. Welch.

17             MR. VILLA:  Yes, Your Honor.

18             THE COURT:  Okay.  And the Tenth Circuit case law

19   will address that?

20             MR. VILLA:  Well, I think it can be applied.  So I

21   agree that there's two levels of hearsay, what Mr. Gagne told

22   to -- it's Sergeant John Sullivan, and I can lay that

23   foundation with Ms. Welch through her testimony and what

24   Sergeant John Sullivan told to Ms. Welch.  But if you apply the

25   Tenth Circuit test to both of those layers, you can get to the

1    result that that statement is a party admission under

2    801(d)(2)(D).

3           And the test is essentially -- Well, I guess it's

4    more two parts, but it's, you know, the party seeking to admit

5    the statement must establish the existence of and employment

6    relationship independent of the declarant's statements.  So

7    Ms. Welch can testify, and already has, about Kevin Gagne's

8    employment relationship as well as Sergeant Sullivan's.  And

9    then second, that the statement must be made during the

10   existence of the declarant's agency or employment.  And

11   finally, there is the third:  The statement must concern a

12   matter within the scope of the declarant's employment.

13          And so all of those three factors can be applied to

14   both of the statements at issue with Mr. Gagne's statement

15   about having to take a skirt.

16          THE COURT:  All right.  Ms. Williams, same objection?

17          MS. WILLIAMS:  Yes, Your Honor.  This statement does

18   not fall within the scope of the 802 exception at all.  It was

19   not a statement made within the scope of the employment

20   relationship between Lieutenant Welch and Detective Gagne.  He

21   was not her Sergeant.  He may have upgraded on occasion to an

22   acting Sergeant, but that does not put him in the relationship

23   of being able to control, as the case law requires, in

24   employment decisions regarding Ms. Lieutenant Welch.  So we

25   don't believe it falls within this exception.

Direct Examination – Terysa Welch

1          Also, the person who heard the statement is available

2     and was on their witness list and they've chosen not to call

3     him.  They can't use that to make it so that we can't

4     cross-examine regarding that statement, if it was made, when it

5     was made, who, what were the circumstances.  We believe it was

6     made at a barbecue.

7          THE COURT:  Okay.  I've got docket 432.  I'll look at

8     that over the break, and then I'll give you a ruling.  For now

9     we'll be in recess.  Please get back so we can get started at

10    1:00.  Okay.  Thanks everyone.

11         (Court stood in recess at 1:09 p.m. as follows:)

12         THE COURT:  Folks, we have a juror who, because I

13    had -- I asked you if I should ask if they can hear.  They all

14    say they can hear.  Though there's one who sounds like she is

15    having trouble seeing the witness from her vantage point.  I

16    think this would be Number 10, who sits in the back row all the

17    way to the left.  So I think it's just because there are other

18    members of the jury that sit in front of her right in the way,

19    and so the first thought that occurred to me is just ask her if

20    she -- if it would be better if she can just move down to the

21    front row.  The chairs in the jury box are stationary, so you

22    can't wheel around at all to get a better angle.  This does

23    kind of change the numbering, but we know who she is and that

24    she's Number 10.

25         Mr. Villa, any objection if we did that?

1          MR. VILLA:  I don't, Your Honor.

2          THE COURT:  Okay.  Ms. Williams?

3          MS. WILLIAMS:  Your Honor, I think we can keep track

4    of ten of them.  They're a whole bunch --

5          THE COURT:  Yes, sure.  We'll allow Number 10 to move

6    down to the front row.  I guess it would be on the sixth chair

7    from the witness stand.  Okay.

8          MR. VILLA:  One thing I was going to ask for Your

9    Honor whenever it's convenient, is a copy of the seating chart.

10   I know it will change now.

11         THE COURT:  Sure.  You should have that.  We'll get

12   you an official list.  We'll get an official seating chart.

13         Now, let me just say before we brought the jury in, I

14   had a chance -- before we bring the jury in, I had a chance to

15   look at the brief that's document 432.  It was filed on

16   May 12th.  I guess that was Saturday.

17         MR. VILLA:  I apologize.  Saturday.

18         THE COURT:  That's all right.  It's in front of me,

19   and I have looked at the rule and looked at some of the law

20   provided to me, and I'll agree that the standard is the

21   three-part test that, Mr. Villa, you've indicated in your

22   brief, and that the Court inquires of a number of different

23   things, including whether the party seeking to admit the

24   statement must establish the existence of an employee -- or

25   rather an employment relationship independent of the

1    declarant's statement offered as evidence and that the

2    statement must be made during the existence of the declarant's

3    agency or employment, and then finally that the statement must

4    concern a matter within the scope of the declarant's

5    employment.

6          So in the first instance there was an objection to I

7    guess what Mr. Gagne would have said to another individual, and

8    that was commenting on Ms. Welch's employment in the ROP and

9    words to the effect of the skirt to describe Ms. Welch.

10         Now, I don't see, but -- Ms. Williams, I don't see

11   whether there's an issue within this three-part inquiry as to

12   the statement itself.  Rather, as to the person making the

13   statement.  That being Mr. Gagne.

14         MS. WILLIAMS:  That's my understanding.

15         THE COURT:  Okay.  I need more context.  When was the

16   statement made?

17         MR. VILLA:  Sure.  The statement by Mr. Gagne was

18   made early in 2004 when Ms. Welch made it in the ROP team.

19   Ms. Welch was told the statement many years later by Sergeant

20   John Sullivan, who said to her that Kevin Gagne upon finding

21   out that she was at ROP -- forgive my French -- "We got F'd.

22   We had to take a skirt."

23         THE COURT:  When you say many years later, tell me

24   when.

25         MR. VILLA:  I believe it was 2009 when all of the

 1   issues were taking place with Ms. Welch's employment.

 2             THE COURT:  When did Mr. Gagne leave the Police

 3   Department, if he did at all?

 4             MR. VILLA:  I believe he left in 2010.  Maybe 2011.

 5   So the statement was made in 2004.  Ms. Welch found out about

 6   it in about 2009.  Mr. Gagne left, I think he retired about a

 7   year or so later.

 8             MS. WILLIAMS:  He retired December 17th, 2011.

 9             MR. VILLA:  Excuse me.  2011.

10             THE COURT:  Okay.  So if there's -- if it fits within

11   the exception in the first instance, that is, if it's made by

12   Mr. Gagne, I -- it's my -- it would be my judgment that it fits

13   within the exception as also hearsay within hearsay or an

14   exception to that particular rule, that it qualifies within the

15   three-part test that is provided in Fischer v. Forestwood.

16   That's 525 F.3d 984, 385, Tenth Circuit, 2008, cited in the

17   brief.  My examination of the rule supports that ruling.

18             Ms. Welch, by the way, you may retake the witness

19   stand.

20             So I'm going to allow the statement.  Now, here's my

21   concern.  Because your brief relates to a number of other

22   exhibits, and this is where I cautioned counsel when we had a

23   pretrial conference on Thursday, that counsel consider what of

24   the exhibit is most relevant, is most probative, is

25   noncumulative, and is -- well, wouldn't result in a waste of

Direct Examination – Terysa Welch

1    time.  These are all factors that I would consider under

2    Rule 403.  So as we go down this road and as you seek to elicit

3    testimony as to statements that you would purport or you would

4    argue to fit within this exception, where I will be most

5    interested in hearing from counsel is an exhibit that contains

6    that statement but contains other statements --

7              MR. VILLA:  Got it.

8              THE COURT:  -- that don't necessarily fit within any

9    exception and that nevertheless may be hearsay.  These are just

10   some of the concerns that I have with offering an exhibit with

11   many, many statements that may or may not be relevant or

12   probative.  That's my, I think, cautionary words to counsel at

13   this particular time.

14             As to the exhibits that you've included in your

15   brief, Mr. Villa, and that remain subject to an objection by

16   the defense --

17             MS. WILLIAMS:  Your Honor, may I make a record on

18   this one?

19             THE COURT:  You may.

20             MS. WILLIAMS:  I believe the evidence will show that

21   Detective Gagne was not involved in the decision-making process

22   affecting an employment action.  As a detective, he did not

23   make the decision regarding any of Lieutenant Welch's

24   employment, so I don't believe he falls under that first part

25   of the test.  If he does -- And I understand your ruling, but I

Direct Examination - Terysa Welch

1    believe the evidence that's going to come in today will

2    indicate that that is not the case.  So I will object to the

3    admission because I think it misses one of the prongs.

4           If you find that it found all three of the prongs,

5    then we would do a 403 balancing, and she doesn't learn of it

6    until five years after the statement was made from someone who

7    heard it we don't know when or where, and the probative value

8    of that remote statement compared to the prejudicial value to

9    the defendants in this action, that balancing test weighs in

10   favor of the defendants and excluding the statement that she

11   heard after she filed her EEO, after she filed two EEO's, that

12   people are then talking with her about this.  And so we would

13   say that there's two reasons it should be excluded.  I

14   understand your first, and I don't know that you've done a 403,

15   and you can rule on that.

16          THE COURT:  Okay.  Let me just push the pause button

17   right there.  Does this statement go to a particular claim,

18   Mr. Villa?

19          MR. VILLA:  Well, I think it fits probably all three,

20   because Kevin Gagne is integrally involved in all three claims,

21   discrimination, the harassment and the retaliation.  He gets

22   involved as you've heard already the testimony from the

23   beginning, and then he's involved in the disciplinary action as

24   well, and he's also involved in the punctuality memo.  He's the

25   Acting Sergeant at the time that ordered Terysa Welch to go to

Direct Examination - Terysa Welch

1    the station when she was supposed to go to the firing range.

2              THE COURT:  Well, the claims include actions or

3    statements made by supervisors and coworkers.

4              MR. VILLA:  Yes.

5              THE COURT:  Well, okay.  So that was the one question

6    I didn't ask, but having heard the answer to that question and

7    with Ms. Williams's arguments, I think even within 403 I will

8    find it's sufficiently probative to admit the statement even in

9    view of what is argued to be unfairly prejudicial.

10             Now, the weight to be assigned to this statement,

11   that's going to be up to the jury.  The five years in time,

12   that's going to be, I think, for the jury to decide whether or

13   to what extent it goes to the claims ultimately.  So that's my

14   ruling, and then we'll reconvene with the jury.

15             MR. VILLA:  Your Honor, just quickly.  I showed it to

16   the jury in opening.  We already used it.  I want to make sure

17   the record is clear Exhibit 166 is admitted.  That's the

18   fitness evaluation.

19             THE COURT:  That's my notes.  I admitted it in

20   pretrial.

21             MR. VILLA:  I remember that as well, Your Honor.

22   Thank you.

23             THE COURT:  Okay.  All right, then.  Please rise, and

24   we'll get the jury in here.

25        (Jury in at 1:20 p.m.)

Direct Examination - Terysa Welch

1           THE COURT:  Okay.  Welcome back, everyone.  Please be

2  seated.

3           All right.  I see all our members are present with

4  some reordering, trying to accommodate everybody.

5           Folks, as you can see, the chairs are stationary in

6  the jury box.  The layout of the courtroom is what it is.

7  We'll just have to do our best with what we have, but insofar

8  as maybe everybody -- Let me just ask.  Can you see the witness

9  now from where you sit?

10           Okay.  I see everybody's head nodding.

11           All right, Mr. Villa.

12           MR. VILLA:  Thank you, Your Honor.

13  Q.   (By Mr. Villa)  And, Ms. Welch you might want to pull the

14  microphone over.  There you go.

15           When we left off before lunch, you were talking about

16  a conversation you had with then-Lieutenant Smith in your

17  car -- in his car about Mr. Maes.  Can you tell the jury

18  approximately how many times you think Mr. Smith asked you to

19  take you home -- that he would take you home?

20  A.   Four to five.

21  Q.   Ultimately did he take you home?

22  A.   No, he did not.

23  Q.   Why not?

24  A.   Because I continued to tell him no.

25  Q.   Now, after this incident occurred with Mr. Smith and

1    Mr. Maes, what did you do?

2    A.   I went to my house and I grabbed as many quick belongings

3    as I could, my animals, and I went to my girlfriend's house,

4    and then I -- I took a -- I called my family and I -- I went

5    home to Montana.

6    Q.   How long were you in Montana?

7    A.   I don't recall exactly.  Seven days maybe.

8    Q.   While you were in Montana, did you get contacted by

9    anybody that you worked with?

10   A.   I did.  I got contacted daily by Rob Smith.

11   Q.   How did he contact you?

12   A.   Telephone call every day.

13   Q.   What was he saying to you when he called you?

14   A.   "What are you thinking?  How are you feeling?"  You know,

15   just questions like that.

16   Q.   Did he make any other statements about pursuing if he

17   weren't married or things along those lines concerning those

18   phone calls?

19            MS. WILLIAMS:  Objection, Your Honor.  Leading.

20            THE COURT:  Sustained.

21   Q.   (By Mr. Villa)  Did he make inappropriate statements to

22   you during those phone calls?

23   A.   No.  I kept the conversations fairly short.

24   Q.   Did you appreciate getting the calls every day?

25   A.   I didn't.

1            MS. WILLIAMS:  Objection.  This is also leading.  At
2  some point it's not foundational.
3            THE COURT:  Sustained.  Sustained.  Just rephrase
4  Mr. --
5  Q.   (By Mr. Villa)  Did you ever indicate to Mr. Smith that
6  you wanted him to call you?
7  A.   No.
8  Q.   How did you feel about receiving the phone calls on a
9  daily basis?
10  A.   I felt they were invasive.
11  Q.   Okay.  So now let's fast forward a bit in time to 2009.
12  We know that Lieutenant Smith had been promoted to Lieutenant
13  from Sergeant.  Who was the Sergeant then at that point in time
14  of ROP?
15  A.   David Hubbard.
16  Q.   How was your relationship with David Hubbard in 2009?
17  A.   It was fine for a while, just neutral.
18  Q.   Did you ever have any issues or problems with him as a
19  Sergeant?
20  A.   Not directly, no.
21  Q.   Okay.  So I want to talk to you about July of 2009.  Was
22  there a time when you received an order from Mr. Gagne, Kevin
23  Gagne, when he was the Acting Sergeant?
24  A.   Yes, there was.
25  Q.   Okay.  And again, Kevin Gagne, you were testifying about

1  him earlier this morning and we were asking -- I was asking you

2  about his feelings towards you and you were going to testify

3  about a statement that you heard Kevin Gagne made.  Do you

4  remember that?

5  A.   Yes.

6  Q.   Who told you that Kevin Gagne made the statement?

7  A.   Sergeant Sullivan.

8  Q.   And who is Sergeant Sullivan?

9  A.   He was a Sergeant at the time of Burglary.

10 Q.   Okay.  When did Sergeant Sullivan tell you about this

11 statement?

12 A.   I don't recall exactly.  I believe it was around 2009.

13 Q.   And what did Sergeant Sullivan tell you that Kevin Gagne

14 said?

15 A.   He stated to Sergeant Sullivan that -- excuse my language

16 again -- "We got F'd.  We had to take a skirt."

17 Q.   And when did Kevin Gagne make that statement?

18 A.   When I got accepted on to the ROP team.

19 Q.   Is that the way Sergeant Sullivan told you "We got F'd,"

20 or did he use the word?

21 A.   He used the word.

22 Q.   Okay.  When he told you that statement in 2009, was that

23 consistent or inconsistent with Kevin Gagne's attitudes toward

24 you?

25 A.   That was very consistent.

Direct Examination – Terysa Welch

1    Q.    So, now let's talk about the order that Kevin Gagne gave

2    you.  Do you recall why he was Acting Sergeant in July of 2009?

3    A.    I don't specifically know the reason.  Sergeant Hubbard

4    was off for some reason so he was Acting Sergeant.

5    Q.    Was Mr. Gagne Acting Sergeant often?

6    A.    Very often.

7    Q.    And when he's Acting Sergeant, do you have to treat him

8    the same as you would a Sergeant?

9    A.    Exactly the same.

10   Q.    So tell us about the order he gave you.

11   A.    We had finished an arrest.  I don't remember the subject's

12   name.  It was a hot summer day, and we went to grab a drink at

13   a Sonic there off of Eubank, and Kevin received a phone call

14   from Sergeant Hubbard instructing him to tell the team, the

15   following workday that we were to arrive at SID, our work

16   building, and we were to do time sheets at 9:30 in the morning

17   and then we were going to go to the tac range, which is a

18   nearby range that SID uses to practice our shooting.

19   Q.    You say the "tac range."  Is that for tactical?

20   A.    Tactical range, yes.

21   Q.    Okay.  So you were with Mr. Gagne following this arrest.

22   Was anybody else with you?

23   A.    I believe Detective Potter and Detective Hill.

24   Q.    Okay.  And so what was the order that Mr. Gagne gave you?

25   To go to SID at 9:30?

Direct Examination - Terysa Welch

1  A.   Yes, and meet at 9:30, do our time sheets, get the

2  paperwork out of the way, and then walk over, do our shooting

3  training.

4  Q.   And that was for the next day?

5  A.   The next workday.

6  Q.   Tell us what you did the next workday.

7  A.   I got to SID about 9:20 in the morning, did my time

8  sheets.  I noticed Hubbard's door was open.  Didn't see anybody

9  else.  A short time later Detective Hill shows up.  I said,

10 "Where is everybody?"  Detective Hill says, "I don't know."

11        He started doing time sheets.  He raised Sergeant

12 Hubbard on the radio on our ROP channel, and he says, "Hey,

13 we're at the office.  Where's everybody at?"  Sergeant Hubbard

14 responds "We're at the tac range and we have about 20 minutes

15 left."  And it's probably a ten-minute drive at least out to

16 the tac range from our SID office.  So it wasn't worth the

17 drive to drive ten minutes to only shoot for ten minutes, so

18 Detective Hill and I went out looking for some of our suspects.

19 We just went to work.

20 Q.   Now, after that, after you went to work, did you get a --

21 have a conversation with Sergeant Hubbard about the training at

22 the tac range?

23 A.   I did.

24 Q.   Tell us about that.

25 A.   He got me on my Nex telephone, and I said, "Good morning,

1   Sarge."  He said, "Where were you?"  He had a bit of an

2   irritated tone.  I could tell right away.  And I said "Hey,

3   look, I had different instructions from Kevin Gagne.  He told

4   us to be at the office at 9:30 and we were going to go do the

5   training afterward."

6           "No, you weren't.  You were told to be at training."

7           I said, "Look, Sarge, I don't want to get sideways

8   with you.  Can you check with Mike, because he heard the same

9   thing?"

10  Q.   And who is Mike?

11  A.   Mike Hill.

12  Q.   Mike Hill.  Okay.

13  A.   And he says, "We'll talk about it later."  And that was

14  again the conversation.  We worked until midnight that night.

15  We didn't talk about it anymore.  And three days later I

16  received a memo from him.

17          MR. VILLA:  May I approach, Your Honor?

18          THE COURT:  You may.

19  Q.   (By Mr. Villa)  Ms. Welch, I'm showing you what's been

20  marked as Plaintiff's Exhibit 46.  Is that the memo that you

21  received?

22  A.   Yes, it is.

23          MR. VILLA:   Your Honor, I move to admit Exhibit 46.

24          THE COURT:  Any objection?

25          MS. WILLIAMS:  No objection, Your Honor.

1        THE COURT:  46 is admitted.

2        (Plaintiff's Exhibit 46 admitted into evidence.)

3        MR. VILLA:  May I publish?

4        THE COURT:  You may publish.

5   Q.  (By Mr. Villa)  So there's the exhibit number.  I'll

6   below it up a little bit.

7        How did you receive the memo?

8   A.  We first had a briefing that morning, a team briefing in

9   Sergeant Hubbard's office, and then he excused the remainder of

10  the team, he and I were alone, he shut the door, and he handed

11  me this memo.

12  Q.  Okay.  And the first paragraph talks about this incident

13  on July 17th, 2009, about a briefing that had occurred on

14  Monday, July the 13th.

15  A.  Yes.

16  Q.  And then the second paragraph is the July 24, 2009,

17  training day scheduled at the tac range, right?

18  A.  Yes.

19  Q.  Okay.  So let me ask you first about the July 13th, 2009,

20  briefing.  Were you at that briefing?

21  A.  I was not at that briefing.

22  Q.  How come you weren't at the briefing?

23  A.  I was comp'd off that day for a couple hours.

24  Q.  What's comp'd off mean?

25  A.  It's the same as vacation time.  It just comes from a

Direct Examination - Terysa Welch

1   different bank, time-off bank.

2   Q.   When you get comp'd off, do you have paperwork?

3   A.   Yes.

4   Q.   Did you have the paperwork for that comp time?

5   A.   I did.

6   Q.   Did you, when you received the memo from Sergeant Hubbard,

7   attempt to talk to him about that?

8   A.   I did.  I pointed it out to him that I was com'p off for

9   that date and that he had signed that comp slip authorizing the

10  time off, that I had also called in that day, on July 13th, to

11  the Acting Sergeant who I believed was Mike Hill, and I

12  notified Mike Hill that I wouldn't be at that briefing for a

13  personal appointment.

14  Q.   So you just testified that you think at that time Mike

15  Hill was the Acting Sergeant?

16  A.   That's what I believed.

17  Q.   Had Mike Hill been made Acting Sergeant previous to this

18  time?

19  A.   Yes.  It was usually Mike Hill or Kevin Gagne.

20  Q.   Okay.  So you and Mr. Hill, you testified earlier, both

21  came in to ROP at the same time, correct?

22  A.   Correct.

23  Q.   And you think he had been made Acting Sergeant on multiple

24  occasions?

25  A.   He alternated usually between Mike Hill and Kevin Gagne.

Direct Examination - Terysa Welch

1    Q.   Okay.  As an Acting Sergeant, do you get higher pay?

2    A.   Yes.

3    Q.   Just for the time that you're acting?

4    A.   Correct.

5    Q.   Okay.  So what did Sergeant Hubbard say when you told him

6    that you had been comp'd out and had paperwork for that?

7    A.   He wasn't receptive to the conversation.  He didn't want

8    to talk about it.  He just wanted me to receive the memo.  He

9    got a phone call in the middle of the conversation and he

10   walked out of the office.

11   Q.   Now, he says in here at the very first sentence "As you

12   recall on July 17...I advised you verbally."  Did you recall

13   having conversation with Sergeant Hubbard where he advised you

14   verbally about letting him know when you were going to be

15   missing a briefing with regard to this July 17th briefing?

16   A.   No.

17   Q.   Was there a conversation?

18   A.   I don't recall any conversation about that.

19   Q.   And then what about for July 24th?  Did you attempt to

20   talk to Sergeant Hubbard about the reason why you were at the

21   SID office and not at the range?

22   A.   Yeah.  I asked him to talk to Mike and so that Mike could

23   confirm that we were in fact told by Acting Sergeant Gagne to

24   be at the office.  Mike understood the same instructions that I

25   understood and that's why Mike was at the office at the same

Direct Examination - Terysa Welch

1   time that I was.

2   Q.   And what did Sergeant Hubbard say to you about that?

3   A.   He wouldn't talk to Mike.

4   Q.   Did he tell you whether he had tried to talk to Mike?

5   A.   I know that he didn't talk to Mike Hill because I checked

6   with Mike Hill.

7   Q.   Now, the memo is also cc'd to Lieutenant R. Smith.  Is

8   that Rob Smith?

9   A.   That's correct.

10   Q.   After receiving this memo, did you try to talk to

11   Lieutenant Smith about it?

12   A.   Yes, I did.

13   Q.   Why did you want to talk to Lieutenant Smith about this

14   memo?

15   A.   Well, for several reasons.  Usually before somebody

16   receives a written memo that's going to go into their personnel

17   file, you would make sure you have your facts straight before

18   you're going to go to this level.  The facts were not accurate.

19   I had a comp slip showing that the first incident that he's

20   documenting in the punctuality memo was not in fact true, the

21   facts were not accurate in his memo.  Secondly, I asked him to

22   simply talk to the other detective involved in the same

23   incident.  It seems like a simple request to make.  He wouldn't

24   even do that.  Mike Hill's a available; he works the same hours

25   that we work.  What is the harm in talking to Mike Hill, who

Direct Examination – Terysa Welch

1    could clarify what we were told by the Acting Sergeant?  I

2    mean, that seemed like a reasonable thing for somebody to ask

3    you to do.

4    Q.   Before these issues arose, did you have any problems with

5    your punctuality?

6    A.   No.  SID is a place that we don't -- we don't run a time

7    clock, first of all.  A lot of the luxury of Special

8    Investigation is that there is a lot of freedom to that

9    division.  That being said, you know what's expected of you and

10   when there are certain appointments that you must be at.  I

11   think anybody would agree that an employee that has punctuality

12   problems, it follows them, those sorts of habits come up

13   repeatedly.  I've never been cited for punctuality problems.

14   Before this or after this.

15   Q.   Now, up to that point, had you ever had any problems with

16   your performance?

17   A.   No.  Never.

18   Q.   Did you receive performance evaluations?

19   A.   Every year.

20   Q.   And on those performance evaluations, is that where you

21   can be -- problems with performance can be addressed?

22   A.   That's where they are addressed.

23   Q.   And had you ever had any problems cited to you about your

24   performance?

25   A.   Never before and never since.

Direct Examination - Terysa Welch

1    Q.    Now, I've been asking you these questions about Acting

2    Sergeant, and I guess I didn't ask this question.  Did you ever

3    want to be the Acting Sergeant?

4    A.    Sure.

5    Q.    Why is that?

6    A.    Oh, it's kind of fun to get to run the show and make the

7    decisions.  I don't know.

8    Q.    Did you ever want to be a supervisor within SID?

9    A.    I think, yes, when I -- you know, as you -- as you go on

10   through your career and promote, that's your ultimate -- that's

11   the next step, is the supervisor in SID.  Absolutely.

12   Q.    Okay.  So did you ask Lieutenant Smith if you could talk

13   to him about the punctuality memo?

14   A.    I did.

15   Q.    When did you ask?

16   A.    Shortly after I received the punctuality memo.

17   Q.    Did Lieutenant Smith agree to meet with you?

18   A.    Yes, he did.

19   Q.    When in relation to the time you asked him did you meet

20   with Lieutenant Smith?

21   A.    Within a couple of days.

22   Q.    Did you tell Lieutenant Smith the reason why you wanted to

23   meet him?

24   A.    I don't know if I specifically told him when I made the

25   meeting appointment.

1    Q.    Okay.  You don't remember?

2    A.    I don't remember if I did.

3    Q.    Where did you meet with -- Did you ultimately meet with

4    him?

5    A.    I did at his office at SID.

6    Q.    Would you tell the jury about that meeting?

7    A.    I went into his office and we closed the door, and I told

8    Lieutenant Smith that I was feeling a bit stressed, having a

9    hard time concentrating because I felt like this punctuality

10   memo, you know, was -- was not factual and that, you know,

11   Sergeant Hubbard was not being reasonable about it, and I felt

12   that it was a simple thing that could be cleared up by talking

13   to Detective Hill, and that I wanted to file an official EEOC

14   Complaint on Sergeant Hubbard.

15   Q.    So you used the words "EEOC Complaint"?

16   A.    Yes.

17   Q.    What did Lieutenant Smith say?

18   A.    He said no, and he started talking to me about my

19   performance.

20   Q.    When you say your performance, what do you mean?

21   A.    He started asking me about what had I done in ROP for the

22   last four years.  I felt like he was going off on a tangent,

23   and I didn't understand why he was bringing that up on the day

24   that I was trying to file a complaint about my Sergeant, and so

25   I asked him, "Why are you bringing up my performance when

138

1   you've never brought up my performance before?"

2   Q.   What did he say?

3   A.   He said, "I haven't had a chance."

4            And I said, "You haven't had a chance to bring up my

5   performance before now?"

6            And he said, "No."

7            And I said, "Look, I'm not here to talk about my

8   performance.  I need your help with the Complaint."

9            And he said again, "No."

10           And I said, "I don't think you can tell me no."

11           And he says, "Well, I'm telling you no."

12   Q.   So what did you say?

13   A.   He asked me -- The conversation digressed off a few

14   tangents, and it's difficult to remember every detail, but he

15   did ask me if I thought that every employee should be

16   disciplined the same.  And I answered him that I'm not a

17   supervisor, which I wasn't at the time, I was just a detective,

18   but I said, "Well, I think that every employee involved in the

19   exact same incident should be disciplined the same."

20           And he said, "I disagree."

21           And I began to get the feeling that I wasn't going to

22   get anywhere in the meeting, and so I stood up to go, and he

23   raised his voice and he said, "Sit down.  You're not

24   dismissed."  And he's never raised his voice to me before.

25           And I sat down because he leaned forward in his chair

1    as he said it.  I sat down, and at this point I have both feet

2    on the floor and I'm just looking at him, and I'm waiting.  I

3    don't know what's happening.  I don't know what to do next.

4    I'm just waiting because he told me "Sit down," I'm not

5    dismissed.

6             And so a couple awkward seconds go by, and I'm

7    slightly afraid because -- this is a new situation for me with

8    him, and I'm a bit intimidated, admittedly, and --

9    Q.   Why were you intimidated?

10   A.   Oh, because, look, Rob is -- it's known Rob is set to be

11   the next Commander, he's in line for that position at the time.

12   Look, I'm feeling like my job is on the line and now I've made

13   this man mad.  He's angry at me.  He -- I've already shown my

14   card that I want to file this complaint on my Sergeant.  It's

15   made him unfavorable to me now.  What's going to happen next?

16   I don't know how to gauge this situation.

17   Q.   So what did happen?

18   A.   I said, "Is that everything?"

19            And he leaned back in his chair and he put his hands

20   behind his head and he looked up at the ceiling and he took a

21   breath in and he says, "Let me think."

22            And I sat waiting, and it seemed -- I'm sure it

23   wasn't very long, but it seemed like forever, and he says, "I

24   guess so."

25            And I got up and I went out the door, and he was

Direct Examination - Terysa Welch

1  right behind me and went into -- he went into the Captain's

2  office at that point.

3  Q.  Before he got up to -- and you walked out of the office,

4  did he say anything else to you about the situation?

5  A.  Yes.  He said to me, "I sure hope I have some loyalty

6  coming my way."

7  Q.  Do you know what he meant by that?

8  A.  To me, that means --

9        MS. WILLIAMS:  Objection, Your Honor.  Calls for

10  speculation.

11        THE COURT:  Sustained.

12  Q.  (By Mr. Villa)  Well, not necessarily what you thought it

13  meant, but did you have any idea -- when he told it to you,

14  did he explain what he meant?

15  A.  He didn't explain what he meant.

16  Q.  Okay.  That's fair.  And then you saw him walk into -- did

17  you say the Captain's office?

18  A.  Yes.

19  Q.  And who was the Captain?

20  A.  Captain Hudson.

21  Q.  What's Captain Hudson's first name?

22  A.  Joseph.

23  Q.  Now, you had talked a minute ago about your performance

24  evaluations.  Do you remember that?

25  A.  Yes.

1          MR. VILLA:  May I approach, Your Honor?

2          THE COURT:  You may.

3    Q.   Ms. Welch I'm showing you what I've marked for

4    identification as Plaintiff's Exhibit 62.  Is that one of your

5    performance evaluations.

6    A.   Yes, I believe so.

7    Q.   Is that the form that they came in when they were done on

8    an annual basis?

9    A.   Yes.

10   Q.   And from what year was that performance evaluation?

11   A.   It appears to be from 2009.

12   Q.   Does it have a date range on the front that it indicates?

13   A.   From 3/31/08 to 4/30/09.

14   Q.   And did you sign that performance evaluation?

15   A.   It has my name on it, but this actually is not my

16   signature.

17   Q.   Okay.  Well, I'll talk to you about that in a little bit.

18   Is the performance evaluation also signed by Sergeant Hubbard?

19   A.   Yes.

20   Q.   Okay.

21          MR. VILLA:  Your Honor, I would move to admit

22   Plaintiff's 62.

23          MS. WILLIAMS:  I understand that this may have been

24   stipulated.

25          MR. VILLA:  Okay.

1          MS. WILLIAMS:  The two exhibits you've moved, we've

2     stipulated to.

3          MR. VILLA:  It sounds like there's no objection.

4          THE COURT:  I don't have it one way or the other, but

5     at the same time are you stipulating, Ms. Williams?

6          MS. WILLIAMS:  Yes, Your Honor.

7          THE COURT:  Okay.  It's admitted without objection.

8     (Plaintiff's Exhibit 62 admitted into evidence.)

9          MR. VILLA:  May I publish?

10          THE COURT:  You may.

11   Q.   (By Mr. Villa)  So, Ms. Welch, this performance

12   evaluation of yours shows here on the left side four different

13   expectations.  Are those the expectations that you saw in your

14   previous performance evaluations as well as this one?

15   A.   Yes.

16   Q.   And it indicates here that they were all met?

17   A.   That's correct.

18   Q.   And when you did this performance evaluation, did anybody

19   bring to your attention that there were problems with your

20   performance?

21   A.   No.

22   Q.   Now, you said that on the second page the signature

23   there -- here's Sergeant Hubbard's signature and then there's a

24   signature there.  That's not your signature?

25   A.   That's not my signature.

Direct Examination - Terysa Welch

1    Q.   Okay.  Do you know how it was that it got signed by

2    somebody else?

3    A.   I think maybe the Sergeant got behind and just if -- it

4    looks like the same date almost.

5            MS. WILLIAMS:  Objection, Your Honor.  Calls for

6    speculation.

7            THE COURT:  Sustained.

8    Q.   (By Mr. Villa)  You don't know what happened?

9    A.   I don't.

10   Q.   Do you remember receiving this employment evaluation?

11   A.   I don't remember receiving it, no.  It's in my file,

12   though, in my personnel file.

13   Q.   Now, after the meeting with Lieutenant Smith, what did you

14   do?

15   A.   I left the building to get a breather and try to calm

16   down, and then I met Detective Hill for lunch.

17   Q.   And what happened during lunch?

18   A.   I had to walk into the same restaurant as Rob Smith and

19   the Commander.

20   Q.   So what did you do?

21   A.   I was not expecting to see him when I walked in the

22   building, and I turned around and walked straight back out, and

23   I probably had quite a reaction to seeing Rob Smith so soon

24   after that meeting, and, admittedly, probably didn't look so

25   good to the Commander at the time for me to walk in and walk

Direct Examination – Terysa Welch

1   right back out.  He wasn't privy to how that meeting made me

2   feel with Rob Smith.

3   Q.   And then after that point in time, did you ever meet with

4   Commander Hudson?

5   A.   Yes, I asked him for a meeting the following day, I

6   believe.

7   Q.   Tell the jury what happened during that meeting.

8   A.   I met with Captain Hudson, and he was very open to hearing

9   what I had to say, although he told me right away that I

10  shouldn't file my EEOC.  He told me that I wouldn't win,

11  although he told me that he would deny telling me that if he

12  was asked later.  He said that he has seen good EEOC cases not

13  win, and he told me that he had a suggestion for me for how I

14  could fix the situation with Lieutenant Smith.

15  Q.   What was the suggestion?

16  A.   Well, he told me that I could fall on my sword and that I

17  go tell Lieutenant Smith that he was right and I was wrong, and

18  that that would probably make Lieutenant Smith feel better, and

19  that, you know, he said that Lieutenant Smith was really good

20  at meetings when he had them rehearsed.  And he said when they

21  don't go the way that Rob Smith plans for them to go, that he

22  doesn't do well with situations like that.

23        Captain Hudson didn't tell me that he --

24        MS. WILLIAMS:  Your Honor, this is all hearsay, and I

25  object.

1           THE COURT:  I will sustain that.  Mr. Villa, this is

2    a little bit beyond the scope of the question asked.

3           MR. VILLA:  Sure, as to that, Your Honor, I can

4    certainly break it up with questions.

5           THE COURT:  Would you please.

6           MR. VILLA:  You're not ruling necessarily on the

7    hearsay, were you?  These are statements by Captain Hudson.

8           THE COURT:  Well, just a moment.

9           Okay.  It's hearsay, and so I'll sustain it insofar

10   as it is.

11          But, Mr. Villa, Ms. Williams, would you please

12   approach.

13      (Bench conference on the record.)

14          MR. VILLA:  So, Your Honor, if I may.  This goes

15   along with the three-part test for the Tenth Circuit.  Captain

16   Hudson is a supervisor.  He's one of the people integrally

17   involved in the retaliation claims, and so his statements, I

18   think, meet the party opponent exception.  Certainly as to the

19   narrative, I can break these up a little more with questions.

20          THE COURT:  Yeah.  I've been pretty flexible about

21   allowing her to testify because this goes to her view and

22   interpretation about what she perceives or is experiencing, and

23   it all goes to what she reasonably believed about an

24   environment and how she's being treated.  So I've been flexible

25   about it.  But she'll go beyond, I think, the scope of the

Danna Schutte Everett
Official United States Court Reporter
100 N. Church, Las Cruces, New Mexico  88001
(575)528-1656

Direct Examination - Terysa Welch

1     question, so if you'll just steer that a little closer.

2             MR. VILLA:  Sure.  Absolutely.

3             THE COURT:  That's my concern.  As to the hearsay

4     statement, so this is the trickier part about this because

5     she -- he is the supervisor at the time.  It's a conversation

6     she is having with the supervisor.  Correct?

7             MR. VILLA:  Yes, about filing an EEOC Complaint and

8     her meeting with Lieutenant Smith.

9             MS. WILLIAMS:   Your Honor, it has to be an

10    admission.  It can't just be everything that someone said.  It

11    has to be an admission of an element that they have to prove.

12    It doesn't mean that they can say anything that anyone in a

13    supervisory capacity ever spoke.

14            THE COURT:  Well, and see, I read the rule to be as

15    to statements, not just to admissions.  So I can look at the

16    rule again.

17            MR. VILLA:  You know, the last part of that

18    three-part test is that the statement concerns a matter within

19    the scope of the declarant's employment.  So these statements

20    by Captain Hudson are within the scope of his employment as the

21    supervisor.

22            THE COURT:  So I understand it used to be that it was

23    an admission.  The rule is much broader now, allowing for

24    statements.

25            Ms. Williams.

1              MS. WILLIAMS:  I don't think it can be any -- This

2      witness -- Hudson will be here, and any statement uttered by a

3      supervisor cannot be in as a back door to having that person

4      testify.  That can't be the scope of the rule even though it's

5      been loosened up some from being an admission, which is, I

6      think -- plaintiffs might have perceived as too limiting.  It

7      still doesn't mean that anything the person said that doesn't

8      have to do with their employment is now admissible because she

9      heard it.

10             THE COURT:  Well, but I think that's the three-part

11     test.

12             MS. WILLIAMS:  Yes.

13             THE COURT:  As long as it meets the three parts, it

14     wouldn't be just any statement, and so I see this as being one

15     of the three parts of the test.  It's within the course of the

16     employment, it was made by somebody who is certainly in the

17     chain of her command.

18             But my question to you, Mr. Villa, is that the claims

19     are also as to what she experienced from coworkers.  So that's

20     where I'm a little bit more broad in my interpretation of how

21     to apply this rule.  So that's where I am.

22             So I'll let you continue to proceed with this

23     questioning, but we may have to deal with them one at a time if

24     you'd like to do it that way, Ms. Williams.

25             MS. WILLIAMS:  We'll stay on top of it.

1          THE COURT:  All right.  Thanks.

2       (Open court.)

3   Q.   (By Mr. Villa)  So, Ms. Welch, after Captain Hudson told

4   you these things that you just testified about to the jury,

5   what did you do?

6   A.   I got up to leave the office.

7   Q.   Okay.  And I was remiss in asking you.  Do you remember

8   the date that you met with Captain Hudson?

9   A.   At the end of July, 2009.

10  Q.   All right.  Now, before that time but after you received

11  the punctuality memo, was there an issue with Sergeant Hubbard

12  and him assigning you warrant packets?

13  A.   Yes.

14  Q.   Okay.  Tell the jury, what's a warrant packet?

15  A.   From time to time SID would do what's called a warrant

16  roundup, and we'd have a stack of felon -- felony warrants, and

17  they would give you a stack of people that had outstanding

18  felony warrants, and we would try to go pick those people up

19  and arrest them for these outstanding felony warrants.

20          So Sergeant Hubbard had given two of my fellow

21  detectives one packet together and he gave me a packet alone,

22  and I said, "You want me to go look for these guys by myself?"

23  And he goes, "Let me know if you need anything."

24  Q.   Let me ask you this.  When he gave it to you alone, how

25  did he convey to you that you were doing it alone as opposed to

1  with a partner?

2  A.   We're all in the office, and he says, "This one's for you

3  guys," and he hands them one packet, and he says, "This one's

4  for you."  He hands me one packet by myself.

5  Q.   And did this occur after you had the meeting with

6  Lieutenant Smith?

7  A.   Yes.

8  Q.   Had Sergeant Hubbard ever previously requested you do a

9  warrant without at partner or backup?

10  A.   No.

11  Q.   How did you feel when he asked you to do that?

12  A.   I felt like he's crazy.

13  Q.   Why is that?

14  A.   It's absurd.  You don't send somebody to pick up a felon

15  by yourself.  Nobody -- Nobody arrests somebody with a felony

16  warrant by themselves.  These people are often armed.  That is

17  not a reasonable request for a detective to go and make an

18  arrest of somebody with a felony warrant, especially of the

19  caliber that we would be searching for.  That's dangerous.

20  That's putting my life in danger.

21       MS. WILLIAMS:  Objection, Your Honor.  This is not

22  responsive.

23       THE COURT:  Mr. Villa.

24       MR. VILLA:  I think that's responsive to the question

25  about how she felt about it.

Direct Examination – Terysa Welch

1          THE COURT:  All right.  You may continue.

2    Q.   (By Mr. Villa)  Well, and I think, Ms. Welch, you

3    answered the question now.  So let me ask you now about a

4    little bit later in time, shortly after your meeting with

5    Captain Hudson.  In early August, did you have an issue

6    related to calling for backup?

7    A.   Yes, I did.

8    Q.   Okay.  Can you tell the jury about that.

9    A.   I received a call from an informant that told me one of my

10   suspects that I'd been looking for for a very long time was at

11   an apartment complex off of Montgomery.

12   Q.   He was an informant?

13   A.   An informant is somebody who you may ask for help that's

14   willing to -- say you're looking for somebody and -- they're a

15   willing -- a willing party -- that's willing to help you out on

16   a case that you might be working.

17   Q.   So like a civilian, not a police officer?

18   A.   They're civilian, yes.

19   Q.   Okay.  So the informant notifies you about a suspect.  And

20   what do you do?

21   A.   The stalking unit had been looking for this person who was

22   threatening the life of a female juvenile.  We thought the

23   person was out of state.  We lost track of him for a very long

24   time.  The informant calls me and says, "He's here right now."

25          I run up there to make sure we have a positive

1  identification on this person.  In fact, it is my suspect.  I

2  get on --

3  Q.   When you positively identify the suspect, what do you do?

4  A.   I get on ROP air and I say, "I need -- I need backup.  I'm

5  at this apartment complex on Montgomery.  Can I get somebody to

6  start?"

7  Q.   And did anyone respond?

8  A.   Sergeant Hubbard acknowledged my transmission on the

9  radio, and I got nobody else to say that they were on the way.

10 Q.   Now, was that unusual?

11 A.   Yeah, it was unusual.

12 Q.   Had that happened to you before this issue came up with

13 the punctuality memo?

14 A.   No.

15 Q.   How long did it take for somebody to respond?

16 A.   I waited an approximate ten minutes.  I started -- I

17 actually checked on Northeast air to see if I could get marked

18 units.

19 Q.   When you say you checked on Northeast air to get units,

20 what does that mean?

21 A.   It means I switched over to the air that the uniform guys

22 wear or that the uniform guys use.  The units were all busy on

23 calls.

24 Q.   So you were calling for --

25 A.   Anybody.

Direct Examination - Terysa Welch

1    Q.   -- a marked unit because no one from the ROP team was

2    responding?

3    A.   Correct.

4    Q.   All right.  So then what happened after that?

5    A.   I got on my phone and I called Danny Garcia, who's an ATF

6    task force guy.  He's not always on ROP air because he has an

7    ancillary duty.  He answers his phone.  He says, "Hey, I can

8    start, but I'm from a long ways off.  I'm at Sunport and I-25."

9    Q.   Now, let's stop there because you said a bunch of things.

10   You told Danny Garcia.  Was he a detective in the ROP unit?

11   A.   Yes.

12   Q.   You said he's not always on ROP air?

13   A.   That's correct, because he's got -- he's got sort of a

14   side job at the same time.  He's an ATF task force liaison.

15   Q.   What is ATF?

16   A.   That's -- He's assigned to the ATF, which is a federal --

17   Q.   Is it Alcohol, Tobacco and Firearms?

18   A.   That's correct.

19   Q.   Okay.  So what you're saying is sometimes he would be

20   working with them and not be on the ROP air?

21   A.   Correct.

22   Q.   Okay.  And why did you call -- I mean, other than that,

23   was there any other reason why you called Danny Garcia?

24   A.   I needed help.  I didn't -- I was about to go out with

25   this suspect by myself if I couldn't get anybody else to back

1  me up.

2  Q.   Did Danny Garcia ultimately come?

3  A.   He did.

4  Q.   How long did it take him?  Do you remember?

5  A.   From Sunport and I-25 to Montgomery, I don't know.  I'm

6  estimating he was hurrying for me.  It probably took him six to

7  eight minutes.

8  Q.   Within that time period, did anybody from the rest of the

9  ROP team show up?

10  A.   No.

11  Q.   Were you able to apprehend the suspect?

12  A.   Yes, I was.

13  Q.   Were you concerned about the fact that nobody else from

14  the ROP team showed up to back you up?

15  A.   Yes.

16        MS. WILLIAMS:  Objection.  Leading, Your Honor.

17        THE COURT:  Sustained.

18  Q.   (By Mr. Villa)  Okay.  How did you feel about no one from

19  the ROP team coming to back you up?

20  A.   I felt awful.

21  Q.   Why?

22  A.   Because when you need help from your team and you can't

23  get anybody to come, it's an empty feeling.

24  Q.   Had you had that feeling before these issues came up with

25  the punctuality memo and your meetings with the Lieutenant and

Direct Examination - Terysa Welch

1    Captain?

2    A.    No.

3    Q.    Now, a little bit later in the month of August of 2009,

4    was there a meeting with members of the ROP team and you?

5    A.    Can you repeat that?

6    Q.    Sure.  A bit later in August, after this incident, was

7    there a meeting with members of the ROP team and yourself?

8    A.    Yes, there was.

9    Q.    And who was in that meeting?

10   A.    J.R. Potter and Kevin Gagne.

11   Q.    Anybody else?

12   A.    Mike Hill.

13   Q.    Okay.  How was it that that meeting got called?

14   A.    J.R. Potter called me on the phone and asked me to meet

15   them back at SID.

16   Q.    Did you?

17   A.    I did.

18   Q.    What happened at that meeting?

19   A.    We sat in the office, in the Sergeant's office and --

20   Q.    Was the Sergeant there?

21   A.    No.

22   Q.    Okay.  You were just using his office?

23   A.    Correct.

24   Q.    What was J.R. Potter and Kevin Gagne's demeanor like?

25   A.    It was -- I don't know how to describe it.  It was very

1    inquisitive.

2    Q.    How about Detective Hill?

3    A.    Detective Hill didn't know what was going on, just like

4    me.  We were in the dark.

5    Q.    Okay.  What did -- What was said during the meeting?

6    A.    Detective Potter and Detective Gagne were asking me what

7    was going on with me.

8    Q.    What did you say?

9    A.    And I -- I --

10           MS. WILLIAMS:  Objection, Your Honor.  This is

11   hearsay.

12           THE COURT:  Okay.  Overruled.

13   Q.   (By Mr. Villa)  What did you say?

14   A.    I didn't know what they were talking about.  I said, "I'm

15   not sure what you guys mean."

16           And they said, "Well, you didn't say good morning

17   back the other morning."

18           And I said, "Well, I'm sorry.  I didn't hear you say

19   good morning.  I'm not a rude person.  If I would have heard

20   you say good morning, I would have said good morning back."  It

21   seemed a little odd to me.

22           But they said, "Well, you seem different lately."

23   And I -- I was different.  I was, you know, considering filing

24   the Complaint, and --

25   Q.    Now, at this point in time, you hadn't filed the

1    Complaint, right?

2    A.    No.

3    Q.    You had just talked to the Lieutenant and Captain?

4    A.    Uh-huh.

5    Q.    Okay.  So they told you "You seem different."

6          And then what happened next?

7    A.    I asked them, "Look, guys, let's just -- let's just work.

8    I can't talk to you about these things.  I'm sorry if I've been

9    seeming that way, but we just need to do our jobs, we just need

10   to go to work.  Okay?  And let this other stuff stay out of our

11   jobs."

12   Q.    How did they react?

13   A.    They were angry.

14   Q.    How do you know they were angry?

15   A.    Oh, they were angry.  Their demeanors, they started

16   attacking, "Well, if you're not going to tell us, then we're

17   done," is what they said to me.

18   Q.    And not telling them, why didn't you want to tell them?

19   A.    Because it -- it's private.  It's my private business.

20   It's not team business.  I have to keep those things to myself.

21   I have to be confidential.  I was advised to stay confidential.

22   Q.    Okay.  At any point during that meeting, were you asked

23   about -- Well, let me ask you this.  Did Detective Potter or

24   Detective Gagne ask you anything else in that meeting?

25   A.    Oh, Detective Potter made reference to "How do I know

1   you're going to back me up?"

2            MS. WILLIAMS:  Objection, Your Honor.  Hearsay.

3            THE COURT:  Well, I haven't heard -- It's a question.

4   Overruled.  Go ahead.

5   Q.  (By Mr. Villa)  I'm sorry.  What did Detective Potter ask

6   you?

7   A.  He asked me "How do I know if you're going to back me up?"

8   Q.  And what did you say?

9   A.  I was offended by the question.  I would never not back up

10  a police officer.  Ever.  For any reason.

11  Q.  How long had you known Detective Potter at that point?

12  A.  Since 2001.

13  Q.  And at this point in time and during this meeting, he was

14  part of the ROP team?

15  A.  Correct.

16  Q.  Okay.  Had he ever asked you before questions about being

17  able to back him up?

18  A.  No.

19  Q.  Okay.  After that meeting, what happened next?

20  A.  They stormed out of the -- out of the office and slammed

21  the door and cussed and left, and I'm sort of left wondering

22  what just happened, and that was the end of the meeting.

23  Q.  And you had not -- Well, let me ask you this.  At that

24  point in time, had you filed any EEOC Complaint?

25  A.  No.

1  Q.   After that, did you?

2  A.   I did.

3  Q.   And when did you file the EEOC Complaint?

4  A.   In August, I believe, of 2009.

5  Q.   Why did you file it?

6  A.   I filed it because I needed help.

7  Q.   Let me ask you this.  In your EEOC Complaint, what did you

8  put in there?

9  A.   In my EEOC Complaint, I outlined all the reasons that I

10  was being treated differently than everybody else in the ROP

11  team and in my chain of command.  There had been numerous

12  instances of egregious policy violations by the guys that were

13  just let go and undocumented, but then I have a so-called

14  punctuality memo which I dispute and I'm called out and put a

15  written notice in my employee file.  It just -- I could see it

16  was the beginning of discipline coming for me for somebody that

17  had it out for me because I'm a female.  I mean --

18  Q.   Let me ask you this question.  Did you put in the EEOC

19  Complaint a hostile work environment?

20  A.   Yes, I did.

21  Q.   Did you talk in there specifically about the sexual

22  harassment that you've testified about earlier from Rob Smith?

23  A.   No, I did not.

24          MS. WILLIAMS:  Objection, Your Honor, leading.

25          THE COURT:  Sustained.

Direct Examination – Terysa Welch

1    Q.   (By Mr. Villa)  Okay.  What, if anything, did you put in

2    the EEOC Complaint about the testimony you gave us earlier

3    about the comments and statements that Robert Smith made to

4    you over the years?

5    A.   I didn't put those in there.

6    Q.   And why not?

7    A.   Because I had already gone through every level of my chain

8    of command and tried to get relief, and I got no help with even

9    filing my Complaint from my Lieutenant, my Commander.  Nobody

10   helped me.  And so why would I now trust that anybody at APD

11   would help me with anything like that.  I already had made my

12   Lieutenant angry at me just for complaining about a Sergeant's

13   behavior.  Now I'm going to complain about the Lieutenant

14   sexually harassing me?  No way.  No way am I going to -- I'm

15   for sure done with my job and my career if I do that.

16   Q.   Did you have any other concerns about making those claims

17   against Mr. Smith?

18   A.   Yes, I did.  I feared for my safety.  I had already not

19   been able to get backup.  I'm exposed to danger by the Sergeant

20   himself.  I don't know how far up that order is possibly given

21   up my chain of command to do things like that to me.  Look, I'm

22   scared at that point.

23   Q.   Now, when you filed your Complaint with the EEOC, that was

24   the federal EEOC, right?

25   A.   Yes, and that's why I chose to go outside of my department

1    and outside of my City government, is because I didn't trust

2    anybody to do the right thing.

3    Q.    Did you also take that Complaint to the Internal Affairs?

4    A.    Yes.

5    Q.    Okay.  Tell us about that.  How did you do that?

6    A.    I took a copy of the Complaint that I dropped off to the

7    federal EEOC office and I took it to the IA office, to

8    Lieutenant West.

9    Q.    And who is Lieutenant West?

10    A.    Lieutenant Doug West.

11    Q.    Why did you take him a copy of the Complaint?

12    A.    I believe the EEOC office instructed me to do so.

13    Q.    Okay.  What did Lieutenant Doug West tell you he would do

14    with your Complaint?

15    A.    He told me that he would keep it confidential; that he

16    would only share it with the Chief of Police Ray Schultz.

17    Q.    And what was the date that you filed your Complaint with

18    the EEOC and -- Well, let's start there.  With federal EEOC,

19    what was the date you filed your Complaint?

20    A.    I believe it was August 24th, 2009.

21    Q.    And when did you give it to Lieutenant Doug West?

22    A.    I think it was the same day.

23    Q.    And you said you'd outlined your Complaint.  How long was

24    your Complaint?

25    A.    Sixteen pages, typed.

Direct Examination - Terysa Welch

1  Q.   Now, what about with the Complaint with the EEOC, the

2  federal EEOC on August 24th, 2009, why not include the things

3  in there about Mr. Smith and the performance evaluation and

4  that kind of stuff?

5  A.   To the federal EEOC?

6  Q.   Yes.

7  A.   I didn't have any direction.  I didn't know what I was

8  doing at the time.  I've never filed an EEOC before.  I didn't

9  trust anybody at the time.  And I was still -- as I said, I was

10  scared.  I just didn't feel comfortable.  I was afraid to do

11  it.

12  Q.   This morning you testified that you knew Mr. Smith's wife.

13  A.   Yes.

14  Q.   And I think you testified this morning it's because she

15  did some work with the Department.

16  A.   Yes.

17  Q.   Okay.  Did that have a factor in your decision whether or

18  not to report his harassment?

19  A.   Yes, it did.

20  Q.   Tell the jury about that.

21  A.   As a woman, you know, hearing about your husband behaving

22  that way at work, it's -- that is going to have an effect on a

23  marriage and on a woman's self-esteem.  I didn't necessarily

24  want to put Shannon through that.  I didn't want to -- Look, I

25  didn't want to ruin Rob Smith.  It wasn't my intention of -- I

1   just wanted to do my job and to keep my job that I loved and

2   for him to knock it off.  And for somebody to hold them

3   accountable the way that they should be held accountable for

4   behaving the way that they were behaving.

5           And, you know, I did have a degree of guilt about

6   doing that to Shannon.  I mean, that's not something that is an

7   easy thing to do to another woman, is to, "Hey, your husband is

8   doing this behind your back at work -- while he's at work."

9   Q.   Did you ultimately tell the federal EEOC about the exhibit

10  that we showed you earlier, the Fitness Assessment?

11  A.   Yes, I did.

12  Q.   As well as the note that you read this morning to the

13  jury?

14  A.   Yes.

15  Q.   So eventually you told the federal EEOC?

16  A.   Yes.

17  Q.   Okay.  After August 24th, you filed the EEOC Complaint,

18  you gave it to Lieutenant Doug West and Internal Affairs.  Did

19  you then go back to continue working at ROP?

20  A.   Yes, I did.

21  Q.   Okay.  Do you know one way or another whether your

22  Complaint was kept confidential after you gave it to Doug West?

23  A.   It was not.

24  Q.   How do you know?

25  A.   Because within two days of giving the Complaint to Doug

Direct Examination - Terysa Welch

1    West I returned to work and I was immediately asked about

2    details in my Complaint.

3    Q.    Who asked you about details?

4    A.    Maureen O'Brien had -- the Vice office was right --

5          MS. WILLIAMS:  Objection, Your Honor, hearsay.

6          MR. VILLA:  Well, it's just the fact that she asked

7    about it.  That's as far as I need to go, Your Honor.

8          THE COURT:  Okay.  Otherwise sustained.

9    Q.    (By Mr. Villa)  So without getting into Maureen O'Brien's

10   statements, she asked you about it?

11   A.    She did.

12   Q.    And Maureen O'Brien, who was that?

13   A.    She was the only other female detective in Special

14   Investigations.

15   Q.    Was she in ROP?

16   A.    She was in Vice.

17   Q.    In Vice.  Okay.  Did anybody else ask you about the

18   Complaint?

19   A.    Yes.

20   Q.    Who was that?

21   A.    People in Intel, which is also in Special Investigations.

22   Q.    Intel is Intelligence?

23   A.    Yes.

24   Q.    Okay.  Anybody else?

25   A.    It was on a blog.

Direct Examination - Terysa Welch

1    Q.    Okay.  On an Internet blog?

2    A.    Yes.

3    Q.    Now, after you filed the Complaint, did something happen

4    to Sergeant Hubbard and Lieutenant Smith?

5    A.    It did.

6    Q.    What happened?

7    A.    They were removed?

8    Q.    And was somebody made the Acting Sergeant in Sergeant

9    Hubbard's place?

10   A.    Kevin Gagne.

11   Q.    Kevin Gagne was?

12   A.    (Nodded head.)

13   Q.    Did you name Kevin Gagne in your Complaint?

14   A.    Yes, I did.

15   Q.    When Kevin Gagne -- How did you find out that Kevin Gagne

16   became Acting Sergeant?

17   A.    He announced over ROP air that he was Acting Sergeant.

18   Q.    Okay.  Was somebody else brought over in Kevin Gagne's

19   place during this period of time that Sergeant Hubbard left?

20   A.    Yes.

21   Q.    Who was that?

22   A.    Lou Heckroth.

23   Q.    And you testified about Lou Heckroth earlier this morning.

24   Who was he?

25   A.    He was one of the original members of ROP when I first

1    came to ROP in 2004.

2    Q.   Okay.  And was there another Lieutenant that was assigned

3    to oversee SID while Lieutenant Smith was moved?

4    A.   Yes.   Lieutenant Shawn O'Connell.

5    Q.   Okay.  Did you speak to Lieutenant O'Connell about

6    Heckroth being brought over to the ROP team?

7    A.   I spoke with the union president about Sergeant Heckroth

8    being brought over.

9    Q.   Okay.  What did you tell the union president?

10   A.   I told him that I was concerned about Sergeant Heckroth

11   being left as Sergeant in the interim; that he was part of the

12   original ROP team and I was concerned that there may be a bias

13   there.

14   Q.   Okay.  Now, after this happened, again, we're talking late

15   August, did you have a conversation with Sergeant John

16   Sullivan?

17   A.   Yes.

18   Q.   And you testified about him a little bit earlier, that

19   Sergeant John Sullivan was in charge of Burglary?

20   A.   Correct.

21   Q.   How did you know Sergeant Sullivan?

22   A.   I just had known him through my time at APD.

23   Q.   Okay.

24   A.   Acquaintance.

25   Q.   This is something I don't think I've brought up yet.   In

1    ROP, did you have a liaison with a particular other unit within

2    the Department?

3    A.   Yes, Burglary.

4    Q.   Okay.  Explain what that means, that you had this liaison?

5    A.   So each ROP detective was assigned a liaison unit sort of

6    to improve communications throughout the Department.  My

7    liaison unit was Burglary, so at least once a week I would

8    check in with the Burglary unit and see if they had any

9    suspects that they thought were active in burglarizing

10   commercial buildings or residential addresses that they were

11   concerned about or any active burglars that they needed help in

12   apprehending from -- with -- from the ROP team.

13   Q.   So had you worked with Sergeant Sullivan before in your

14   capacity as a liaison?

15   A.   Yes, regularly.

16   Q.   Did Sergeant Sullivan know what was going on at that point

17   in time with you filing the Complaint?

18   A.   Not that I --

19        MS. WILLIAMS:  Objection, Your Honor.  Calls for

20   speculation.

21        THE COURT:  Sustained.

22   Q.   (By Mr. Villa)  Okay.  Did Sergeant Sullivan say anything

23   to you when you had a conversation with him after you had

24   learned about your Complaint being leaked?

25   A.   He stated that he had had a conversation with Sergeant

1    Heckroth about my Complaint.

2    Q.    Okay.  What's the next thing that happened after that?

3    Well, let me ask you this.  Did you ever have a conversation

4    with Doug West, who you had taken your Complaint to at Internal

5    Affairs, about the Complaint getting out?

6    A.    Yes, I did.

7    Q.    And tell me about that.

8    A.    I asked to speak with him.  Told him that I was concerned

9    about the details being leaked; that it was causing me issues

10   at work.  He asked me what would help with what was going on,

11   and I told him, you know, that, you know, that he had given me

12   his word that only Chief Schultz would get that information and

13   that that hadn't been the case.

14   Q.    Did he ever explain how that happened?

15   A.    No, he did not.

16   Q.    Did you talk to him at all about whether you should stay

17   or leave ROP?

18   A.    Yes.  I actually offered, you know, as a way to sort of

19   keep the peace because it was getting very awkward for me, that

20   I would go over to Intel until his investigation was done.

21   Q.    That's Intelligence, right?

22   A.    Yes, in the Intelligence unit.  It's still in my division.

23   You know, I was trying every effort to, Look, I understood the

24   impact that this was having on my ROP team, and I -- I felt, in

25   a way, you know, responsible for this, and I was trying to,

1    like I said, help keep the peace at the time, but he wouldn't

2    let me go.  He made me stay there.

3    Q.   Okay.  After that point in time, what happened next?

4    A.   We continued to work.  I had to take a week off right

5    then.  And I was uncomfortable being alone with Sergeant

6    Heckroth.  Potter and Gagne were the only ones working, and I

7    was not comfortable being alone with those three.  I took that

8    week off of work until the rest of my team came back so that I

9    was sure I had some backup if I needed it.

10   Q.   When you say the rest of the team came back, what other

11   members are you talking about?

12   A.   Mike Hill, Danny Garcia.  The guys I knew I could count on

13   if I needed them.

14   Q.   And do you remember when that week off was?

15   A.   It was right -- right when Sergeant Heckroth assumed the

16   Sergeant role.

17   Q.   And do you remember the exact week or the time?

18   A.   Would have been right at the end of August or beginning of

19   September in 2009.

20   Q.   Okay.  Now, at some point in time did -- Do you know

21   whether Lieutenant Doug West conducted an Internal Affairs

22   investigation into your Complaint?

23   A.   He said he did.  I don't know the details of any of it.

24   Q.   Did you ever do an interview with him?

25   A.   I did do an interview with him.

Direct Examination - Terysa Welch

1   Q.   Okay.  And at any time in the month of December --

2   September, I know that Sergeant Hubbard was gone.  Did you

3   cross paths with him?

4   A.   Yes, I did.  I ran into him at the main police station.

5   Q.   What happened then?

6   A.   Several ROP members and I had to go pick up new phones,

7   updated phones, and he shook everybody's hand and greeted

8   everybody, completely disregarded me, which was telling of his

9   feelings of me.

10  Q.   Did he shake your hand?

11  A.   No.

12  Q.   Did he say hello to you?

13  A.   No.

14  Q.   Okay.  At some point in time, did Mr. Hubbard come back?

15  A.   He did.

16  Q.   Do you remember when that was?

17  A.   November.

18  Q.   Okay.  So that this occurred in September where he didn't

19  shake your hand.  He comes back in November?

20  A.   Correct.

21  Q.   During that period of time, who was your supervisor that

22  you reported to?

23  A.   Lou Heckroth.

24  Q.   Were you ever told to report to anyone else who was a

25  supervisor?

Direct Examination - Terysa Welch

1   A.   No.

2   Q.   Around the time that you had this incident with Sergeant

3   Hubbard where he wouldn't shake your hand, did anything happen

4   at your office at ROP, or I guess your cubicle?

5   A.   Other than finding coffee or soda sprayed all over my

6   cubicle.

7   Q.   Okay.  Tell the jury about that.

8   A.   I came back from being gone from my cubicle and I -- there

9   was brown something, coffee or soda it looked like, sprayed all

10  over the wall of my cubicle.

11  Q.   Had that been there since the last time that you were

12  there?

13  A.   No.

14  Q.   I take it you didn't see how that happened?

15  A.   No.

16  Q.   Did you know a detective by the name of Brett

17  Lampiris-Tremba?

18  A.   Yes, I did.

19  Q.   Did you have a conversation with him at some point in time

20  in October in the parking lot?

21  A.   Yes.

22  Q.   Will you tell the jury about that.

23        MS. WILLIAMS:  Objection, Your Honor.  Hearsay.

24        THE COURT:  Okay.  Why don't you come on forward.

25      (Bench conference on the record.)

1          MR. VILLA:  Your Honor, this is similar to the Kevin

2     Gagne statement.  Detective Brett Lampiris-Tremba was an SID

3     detective who Captain Hudson told that somebody in ROP was

4     going to be disciplined out of the unit, and so the statement

5     is from Captain Hudson to Brett Lampiris-Tremba, and

6     Lampiris-Tremba tells this to Detective Welch.

7          MS. WILLIAMS:  It's triple hearsay.  It's by a

8     coworker.  It's not admissible.

9          MR. VILLA:  I think it's just double hearsay.  It's

10     two layers.  Hudson to Lampiris-Tremba and there's

11     Lampiris-Tremba to Welch, and it's the same as it is with John

12     Sullivan.  John --

13          MS. WILLIAMS:  And there's this other layer of

14     hearsay where he then says, "I think it's going to be you."

15          THE COURT:  Well, that's part of what I wanted to

16     visit with you.  What do you expect she's going to say as a

17     result of this?

18          MR. VILLA:  Brett Lampiris-Tremba found her in the

19     parking lot and told her that he just had a meeting with

20     Captain Hudson about leaving SID, and Captain Hudson told him

21     to sit tight because somebody's going to be disciplined out of

22     the unit.

23          MS. WILLIAMS:  And he assumed -- made the leap that

24     it was her.  That is not something that Hubbard told him.

25          MR. VILLA:  Hudson.

1          MS. WILLIAMS:  Hudson.

2          THE COURT:  This is probably an example of where it

3    becomes a little attenuated, so --

4          MR. VILLA:  Perhaps his conclusion "that it's you"

5    might be subject to the attenuation, but I think the statement

6    before that I think is the same analysis that you undertook

7    with Kevin Gagne.

8          THE COURT:  Okay.  That --

9          MS. WILLIAMS:  This is part of our lay witness brief,

10   too.

11         THE COURT:  Tell me again what the statement is.

12         MR. VILLA:  "I just had a meeting with Captain Hudson

13   about leaving SID.  He told me to stay put, someone's going to

14   be disciplined out of the unit."  And we can stop it there if

15   you think that the next statement "I think that it's you" is

16   too attenuated.

17         THE COURT:  Well, it leaves an unclosed inference.

18         MR. VILLA:  I think that's what the jury's job is, to

19   you know why did Mr. Lampiris-Tremba tell Detective Welch, and

20   that's for the closing argument.

21         THE COURT:  Well, I disagree.  I think it gets

22   into -- I'm going to limit it, but if I limit it, it becomes

23   almost irrelevant, so I'm going to exclude it.  That particular

24   statement will be excluded.  All right.  That's my ruling.

25       (Open court.)

1            THE COURT:  I made a ruling under 401 to the extent

2    it is to the statement relevant, I'll also articulate that

3    applying 403, would rule that it is insufficiently probative

4    and therefore will not be admitted.

5            All right, counsel.

6    Q.   (By Mr. Villa)  Ms. Welch, let me ask you about -- Were

7    you notified when Sergeant Hubbard was coming back to ROP?

8    A.   I was.

9    Q.   And is that also true with Lieutenant Smith?

10   A.   Yes.

11   Q.   How were you notified?

12   A.   Lieutenant O'Connell notified me.

13   Q.   Okay.  What, if anything, did you tell Lieutenant

14   O'Connell when he notified you that they were coming back?

15   A.   I asked him if Chief Schultz was aware that there was an

16   ongoing EEOC, and he stated that he was aware.

17   Q.   Okay.  Were you -- Can you say whether the EEOC

18   investigation was still ongoing at that time?

19   A.   It was still ongoing.

20   Q.   Okay.  Do you remember the date that Sergeant Hubbard came

21   back?

22   A.   I don't know the exact date.  It was in November.

23   Q.   Okay.  And at that point in time the EEOC investigation

24   was still ongoing?

25   A.   Yes, it was.

Direct Examination - Terysa Welch

1    Q.    When Sergeant Hubbard came back, what happened?

2    A.    There were balloons and signs all over his and Rob Smith's

3    door, and he called a team meeting in his office for ROP.

4    Q.    And what did he say in the team meeting?

5    A.    He opened his team meeting with a phrase that -- he didn't

6    identify who the phrase came from, but he said "A famous man

7    once said, it's been a little unpleasant for me, but it's going

8    to be far worse for you."

9    Q.    And who was he saying that to?

10   A.    The whole team.

11   Q.    Okay.  What did he say after that?

12   A.    He gave us a set of new rules that we had to abide by, and

13   they were very restrictive.  They --

14   Q.    What were the rules?

15   A.    Oh, things like we had to communicate with him in writing.

16   We had to give him copies of all of our court subpoenas.  We

17   had to clear all of our suspects through him before we worked

18   on them.  We weren't allowed to ride two men anymore in a

19   vehicle, which is a surveillance technique which is very useful

20   and helpful for us.  The on-call rotation was changed to where

21   we weren't working with the same people anymore.  We had an

22   arrest log that we kept in the office, and ROP was never a

23   stat-driven unit, and now it was going to be kept track of.

24   Only one detective could write down who arrested the person

25   even though the whole team had to be involved in every single

1    arrest.

2    Q.    So before Sergeant Hubbard had left, you still had this

3    arrest log?

4    A.    Correct.

5    Q.    And what would you put in the arrest log when you made an

6    arrest?

7    A.    ROP team.

8    Q.    And with the new rule, what was supposed to be put in

9    there?

10   A.    One detective's name.

11   Q.    How did you feel about that change to the arrest log?

12   A.    Honestly, I felt like I was at a disadvantage.

13   Q.    Why would you be at a disadvantage?

14   A.    Because I was assigned to be a Burglary liaison.  I didn't

15   have any choice in that liaison assignment.  And when we set

16   out for the day to hunt for or to search for our suspects,

17   whoever found their suspect, the whole team would then converge

18   and help that person, but it was also priority driven.  So if a

19   homicide took place, homicide would obviously trump a burglary,

20   or a robbery would trump a burglary.  A violent crime would

21   trump my property crime assignment every time because I'm a

22   property crime liaison.  I'm basically at the bottom of the

23   stack through no choice of my own.

24          So I believed it was now becoming a stat-driven unit

25   and the deck is stacked against me out of my own control.  So I

1    felt like they were going to start setting me up to show that I

2    wasn't contributing as much to the team stats, if you will,

3    because I'm assigned to this Burglary unit.  I felt stuck.

4    Q.    After that meeting, were there any other team meetings?

5    A.    Well, I wasn't finished with all the expectations.  He was

6    going to make us debrief at the end of each day.

7    Q.    I'm sorry.

8    A.    It was very inconvenient to everybody.  Whether we need a

9    reason to or not.  Everybody wants to get home at the end of

10   the day, but we all had to converge at whatever site he decided

11   to meet him for no particular reason.  Just an inconvenience

12   for everybody.

13   Q.    Were there any other rules that he put in play?

14   A.    We now had to comp out or vacation out for any personal

15   appointments, where before that was never a requirement.

16   That's pretty much it.

17   Q.    Okay.  During this team meeting, what was the general

18   demeanor of the team as they were told these new rules?

19   A.    A lot of sighs, a lot of -- you know, not a happy mood.

20   Q.    Okay.  Were there any other meetings that took place after

21   that with the team?

22   A.    With Danny Garcia.

23   Q.    Were you present for that meeting?

24   A.    I was -- Well, there was a meeting that Danny held on his

25   own.  He was sort of our senior detective.

 1    Q.    Okay.  Did you attend that meeting?

 2    A.    No.

 3    Q.    But you knew that Danny Garcia had held a meeting?

 4    A.    Yes.

 5    Q.    After the new rules meeting?

 6    A.    Yes.

 7    Q.    Got it.  Now --

 8              MR. VILLA:  Your Honor, may I approach?

 9              THE COURT:  You may.

10    Q.    (By Mr. Villa)  Ms. Welch, I'm showing you what is marked

11    for identification as Plaintiff's Exhibit 42.  Is that a memo?

12    A.    Yes, it is.

13    Q.    What's the date on that?

14    A.    November 25th, 2009.

15    Q.    And who is the memo from?

16    A.    Commander Joseph Hudson.

17    Q.    And who is it to?

18    A.    Me.

19    Q.    How did you receive that memo?

20    A.    I received this memo in my mailbox at SID.

21    Q.    And did you receive it at about the time that it's dated?

22    A.    I believe so.

23              MR. VILLA:  Your Honor, I'd move to admit Exhibit 42.

24              THE COURT:  As to 42?

25              MS. WILLIAMS:  Your Honor, we object.  It's

1    irrelevant.

2              MR. VILLA:  Can we approach, Your Honor?

3              THE COURT:  You may.

4         (Bench conference on the record.)

5              THE COURT:  Okay.  Let me see it.

6              MR. VILLA:  Your Honor, the relevance of this memo is

7    that it's from Captain Hudson to Terysa Welch.  He's not

8    directly in her chain of command.  And the memo conveys that on

9    two separate occasions, in October 2009 and November of 2009,

10   when she was accused by Detective Gagne and Potter as well as

11   Sergeant Hubbard of essentially not doing her job, and so the

12   memo goes to show the retaliation that was beginning against

13   Ms. Welch with these two specific incidents.

14             THE COURT:  The retaliation being specifically?

15             MR. VILLA:  That these detectives who are named in

16   her Complaint, all three of them, Potter, Gagne, and Hubbard,

17   were accusing her of not doing her job and that Captain

18   Hudson –– Commander Hudson wrote a note to Ms. Welch and made

19   her respond to it.

20             MS. WILLIAMS:  Your Honor, I'm going to object.

21   Those individuals were not named in any EEOC Complaint.  That's

22   why you gave them qualified immunity.  And he keeps saying that

23   to the jury.  And I object to that characterization.  They were

24   not named in the Complaint.

25             MR. VILLA:  Yes, they were.  They were in the

1    attachment that she gave --

2              THE COURT:  Hold on.  Just to be clear, we're talking

3    about the EEOC?

4              MS. WILLIAMS:  Yes, sir.

5              MR. VILLA:  In the EEOC Complaint, she attached a

6    16-page Complaint to both of those documents, and these three

7    individuals were all named in those -- in that 16-page

8    Complaint.

9              THE COURT:  Okay.  Do I have to go back and look at

10   the 16-page Complaint to --

11             MR. VILLA:  I don't think so.  Because you ruled on

12   this when it came to the exhaustion.  But the qualified

13   immunity was because the Court found not enough evidence for a

14   1991 conspiracy.  It didn't have anything to do with what she

15   put in her Complaint or not.

16             MS. WILLIAMS:  You gave them qualified immunity under

17   all the federal claims, and they weren't related to the State

18   claims, that's how I recall, but they weren't named in the EEO.

19   You specifically addressed that in your exhaustive order.

20             Now, there's a set of exhibits here, 42, 43, 44, in

21   which there are Complaints and an Answer to a Complaint.  No

22   discipline ensues.  Nothing happens to her.  Her coworkers are

23   unhappy with her.

24             THE COURT:  Okay.  Let's do this.  It's 2:45.  Let me

25   release the jury just for a break.

1          MS. WILLIAMS:  Sure.  Sure.

2          THE COURT:  This may take a little while because

3    we're dealing with additional --

4          MS. WILLIAMS:  Yes.

5          MR. VILLA:  Your Honor, I don't necessarily intend

6    to admit her responses to these, because it's just her

7    defending herself, and we can -- you know, that will

8    short-circuit things.

9          THE COURT:  What do you mean "her responses"?

10         MR. VILLA:  So that the next two exhibits are her

11   responses to this memo.

12         THE COURT:  And which are those?

13         MR. VILLA:  43 and 44, and then 44 has attachments.

14   I don't plan to get into those.  I plan to get into this

15   because it shows their intent to accuse Ms. Welch of not doing

16   her job and Captain Hudson's intent to start documenting that,

17   and this has never happened in the five years she's been in

18   ROP.

19         THE COURT:  All right.  All right.

20         MS. WILLIAMS:  Then I can respond to that a little

21   bit.

22         THE COURT:  All right.

23      (Open court.)

24         THE COURT:  All right.  Ladies and gentlemen, as I

25   see, we're getting close to, I guess, 2:45, probably a good

1    time to take a break.  Ten minutes.  Fifteen minutes.  And then

2    at that time we'll reconvene.

3              All right.  Please rise for the jury.

4         (Jury out at 2:43 p.m.)

5              THE COURT:  All right.  I think you still have

6    Exhibit 43 or 42 in your possession, but I'm getting my copy.

7              Ms. Williams.

8              MR. VILLA:  I do, Your Honor, and Exhibit 9, which

9    we're not intending to admit, but that's the attachment to both

10   the EEOC Complaint and the Internal Affairs Complaint that she

11   testified was provided and was subsequently leaked.  And all of

12   these individuals are named in that 16-page Complaint.

13             THE COURT:  Okay.  And, Ms. Williams.

14             MS. WILLIAMS:  Your Honor, as you noted in your

15   qualified immunity order, these individuals were not named in

16   the -- in the EEOC Complaint as -- excuse me -- in the EEOC

17   Complaint itself.  This is an addendum, and it goes from --

18   That's not my main problem with these.  My main problem with

19   these is that they're irrelevant.  They don't end up -- An

20   investigation is done, and nothing happens to Ms. Welch.

21   Lieutenant Welch does not experience discipline, she doesn't

22   experience anything except the having to respond to her

23   coworkers' complaints.

24             THE COURT:  Okay.  Anything else with regard to

25   relevance, Mr. Villa?

1          MR. VILLA:  So, with respect to relevance, Your

2    Honor, there doesn't have to be discipline to make it relevant.

3    The relevance is whether these individuals subsequent to her

4    making a Complaint were now accusing her of not doing her job,

5    and that goes to show that -- their intent to retaliate, their

6    motives, those sorts of things we have to prove.  Just because

7    it didn't end up in discipline doesn't mean it's not relevant.

8          With respect to your qualified immunity, again, that

9    had nothing to do with what was mentioned in the EEOC Complaint

10   or not.  Your opinion on exhaustion with respect to the Human

11   Rights Act held that these individual defendants weren't going

12   to be named defendants, not because she didn't name them in

13   this Complaint, she did, but because the Human Rights Division

14   didn't issue a decision, and that's why there wasn't exhaustion

15   of the Human Rights decision.

16         We're complaining about a bunch of different issues,

17   but when we just get it down to relevancy, these individuals

18   are now targeting Ms. Welch and complaining about her work

19   performance.  And Captain Hudson, who's way up in the chain of

20   command, is issuing memos to Terysa Welch, which again I think

21   gets back to the Brett Lampiris-Tremba statement that right

22   before -- a month before this, the statement that the Court

23   excluded was that he was intending to discipline someone,

24   Hudson was, out of the ROP unit.  And so I think this starts to

25   build up to what ultimately becomes Ms. Welch being moved from

1    the unit and later being disciplined.

2              THE COURT:  So that is at least in part because of

3    the Complaint she filed against them, allegedly.

4              MR. VILLA:  Yeah.

5              THE COURT:  How would they be privy to that to be

6    able to report or complain about her?  What's the causal

7    connection between the Complaint that Ms. Welch filed and what

8    they set out to do to her?  At least your position.

9              MR. VILLA:  Well, that's what we have to prove.  We

10   have to prove that because she filed a Complaint, they start

11   complaining about her work performance.

12             THE COURT:  Okay.  So I guess my question is, how

13   would you proffer they knew about what she put in her Complaint

14   about them?

15             MR. VILLA:  Well, I think that one of the things that

16   the defense conceded when we were fighting about whether to

17   introduce the EEOC documents, is that they were aware of the

18   EEOC Complaint.  We will be able to show through other

19   witnesses, including Lieutenant West, that he interviewed these

20   individuals as part of his IA investigation into Terysa Welch's

21   compliant.

22             Ms. Welch testified that even though she was told her

23   Complaint would be kept confidential, that within a couple of

24   days individuals within the SID knew about the Complaint and

25   that it was on a blog.  And so the jury can draw the inference

1  or not that these individuals knew about Terysa's Complaints

2  against them.

3          She also testified about the August 20th meeting in

4  which Detective Potter and Detective Gagne brought her in and

5  asked her what was going on and became angry.  This was after

6  she complained to her supervisors about the punctuality memo.

7          And Sergeant Hubbard, who's one of the people in this

8  memo, Exhibit 42, that's accusing Terysa Welch of not doing her

9  job was removed from the unit after she filed her EEOC

10 Complaint.  So there's no question that he knew about the EEOC

11 Complaint, because he was removed from the unit.

12         THE COURT:  Let's take a recess.  We'll be back and

13 give you at least a ruling or a partial ruling on this.  We'll

14 be in recess.

15     (Court stood in recess at 2:49 p.m. and resumed at

16     3:05 p.m. as follows:)

17         THE COURT:  All right.  Please be seated.

18         All right.  So Exhibit 42 is where we left off.

19         MR. VILLA:  Yes, Your Honor.  And there was one other

20 thing that -- this will come in through -- I think through

21 perhaps two other witnesses, or at least Joe Hudson, is there's

22 an e-mail that I'm showing you.  This is from Exhibit 51,

23 second page, between Sue Neal, who's the HR person for APD, and

24 Joe Hudson on November 23rd, 2009, just two days before this

25 memo is issued in which she's talking to him about, you know,

1    whether he should provide her a memo.  And I don't necessarily

2    think it's the same memo.  I guess it's unclear.

3          But she's essentially saying to Joe Hudson, Don't do

4    this.  I predict that she will perceive this as retaliation for

5    her Complaint.  And so the fact that he then sent this other

6    memo, the memo that she and Mr. Hudson are talking about, I

7    think are different memos, but the fact that he sent this other

8    memo again goes to show his retaliation toward her.

9          THE COURT:  Are you going to offer this Number 51

10   for -- we're on 51 -- through Ms. Welch?

11         MR. VILLA:  I don't think so, Your Honor.  I was

12   planning to do it through Mr. Hudson or Ms. Neal.

13         THE COURT:  Okay.  Back to 42.  We'll get there, but

14   back to 42.  I am finding it's relevant in that it would at

15   least speak to what, if anything, occurred after Ms. Welch

16   filed her EEOC Complaint and how that could have been as a

17   result of that protected activity and anything that resulted

18   that were of an adverse nature.

19         This speaks to complaints, this describes complaints

20   that at least two people had about Ms. Welch, founded or

21   unfounded.  That's what we have in this exhibit.  Whether these

22   two individuals are named in the EEOC Complaint or an

23   attachment to the Complaint, is it your position, Mr. Villa,

24   that they were aware that they were named in the Complaint?

25         MR. VILLA:  Yes, Your Honor.  And --

Direct Examination - Terysa Welch

1          THE COURT:  Is that critical to your position, that

2    they are aware of that Complaint and that they were named in

3    the Complaint?

4          MR. VILLA:  I think with respect to retaliation it is

5    because of the Nassar case, which requires the "but for"

6    causation between the retaliation -- or the filing of the

7    Complaint and the retaliation.

8          THE COURT:  Okay.  Well, I'm going to find it is

9    relevant.  I've thought about this in the break, and

10   considering how or whether or to what extent it is sufficiently

11   probative under 403, I'm going to admit that.  Also, because I

12   find that it does fit within 801(d)(2)(D) and the exception

13   that applies.  So I will admit Number 42, so you can continue

14   your examination on that, Mr. Villa.

15         MR. VILLA:  Yes, Your Honor.

16      (Plaintiff's Exhibit 42 admitted into evidence.)

17         THE COURT:  All right.  Please rise for the jury.

18      (Jury in at 3:09 a.m.)

19         THE COURT:  Okay.  Please be seated.

20         All right.  Folks, as you are on your break, I say

21   ten or 15 minutes and it turns out to be more like 20 minutes

22   or so, so I can tell you we're using the time wisely, we're

23   sorting out a lot of evidentiary issues critical to the

24   parties, so as we do that, it does take a little more time, so

25   I appreciate the time that you spend in the back and waiting

1   for us to reconvene.  So, anyway, thanks.  We're back.

2            Mr. Villa.

3            MR. VILLA:  Yes, Your Honor.  Thank you.

4   Q.  (By Mr. Villa)  Ms. Welch, when we took a break, we were

5   talking about Plaintiff's Exhibit 22 [sic], the memo you

6   received from Commander Hudson.

7            MR. VILLA:  Your Honor, may I publish that to the

8   jury?

9            THE COURT:  You may.

10  Q.  (By Mr. Villa)  There's Exhibit 42.  Detective Welch,

11  this memo indicates that there were two issues that came to

12  Captain Hudson's attention recently and he wanted to hear your

13  side of the story.  The first was an incident on October 21st,

14  2009.  Do you see that there?

15  A.   Yes.

16  Q.   It involved Detective Potter and Detective Gagne.  Is that

17  correct?

18  A.   Right.

19  Q.   And both of those were the subject of your Complaint to

20  the EEOC and Internal Affairs?

21  A.   Yes.

22  Q.   And it indicates here that you failed to cover Detective

23  Potter?

24  A.   Correct.

25  Q.   Okay.  Let me ask you this.  Do you remember this incident

Direct Examination - Terysa Welch

1   of October 21st, 2009?

2   A.   Yes, I did.

3   Q.   After that incident, did anybody come to you and say, you

4   know, "What happened here?  You failed to cover Detective

5   Potter"?

6   A.   Not until I received this memo.

7   Q.   So you hadn't heard from Detective Potter or Detective

8   Gagne?

9   A.   No, I had not.

10  Q.   Was that unusual?

11  A.   Very.

12  Q.   Why was that unusual?

13  A.   Because in a -- in a unit like ROP, after you have an

14  operation like this, if there's an issue that somebody wants to

15  bring up, you do it immediately after you're finished with

16  whatever the incident is.

17  Q.   And in the past have Detectives Gagne and Potter done that

18  with you?

19  A.   Yes.

20  Q.   And why do you want to bring it up immediately after the

21  incident?

22  A.   Well, for several reasons.  Number one, it's fresh in

23  everybody's mind.  Number two, especially with this sort of an

24  issue, which is an allegation of a big officer-safety issue,

25  you can't let this go for over a month with it reoccurring.  It

1    has to be addressed immediately and it has to stop immediately

2    if that's what, in fact, would have taken place.

3    Q.    Let's talk about the second incident.  That occurred on

4    November 16th.  Do you see that there?

5    A.    Yes.

6    Q.    Okay.  And it said that ROP detectives were conducting

7    some surveillance and one of the detectives involved was

8    Detective Gagne?

9    A.    Correct.

10   Q.    And Sergeant Hubbard?

11   A.    Yes.

12   Q.    And, though, this is, oh, a couple of weeks or so after

13   Sergeant Hubbard came back.  Is that right?

14   A.    Yes.

15   Q.    And it talks about that you made an obvious and conscious

16   decision to leave Sergeant Hubbard by himself in the course of

17   this surveillance.  Do you see that there?

18   A.    That's what it says.

19   Q.    Now, do you remember this November 16th surveillance

20   operation you guys were doing?

21   A.    I don't remember it now.  I responded to the memo at the

22   time.

23   Q.    Okay.  Let me ask you this.  After -- Immediately after

24   this surveillance operation, did Sergeant Hubbard debrief with

25   you after the incident?

Direct Examination - Terysa Welch

1    A.    No, he did not.

2    Q.    What about Detective Gagne?

3    A.    Nobody debriefed it.

4    Q.    Before you got this memo, did anybody come to you and ask

5    you "What happened with the surveillance?"

6    A.    No, they did not.

7    Q.    And it indicates here that you would like -- the Captain

8    would like -- or I guess it says "Commander."  They changed the

9    term from Captain to Commander; is that right?

10   A.    They did.

11   Q.    Okay.  This is the same Joseph Hudson that you met with

12   after you met with Lieutenant Smith regarding your wanting to

13   file an EEOC Complaint.

14   A.    Correct.

15   Q.    He asked you to file a written response on December 1st,

16   2009?

17   A.    Correct.

18   Q.    And you just testified you did that?

19   A.    I did that.

20   Q.    Okay.  After you filed the written response, did anything

21   else become of this?

22   A.    No.

23   Q.    Were you disciplined in any way?

24   A.    No.

25   Q.    Now, that was November 25, 2009.  In early December, did

1   you have any chance to run into Lieutenant Smith?

2   A.   Yes, I did.

3   Q.   Can you tell the jury about that.

4   A.   I was working at my cubicle at SID and I had printed

5   something from my desk.  The copier was way at the other end of

6   the building.  So I turned the cubicle to come out to the

7   hallway to go down to the copier and pick up my document, and I

8   could see Rob Smith coming head-on with me from the other

9   direction, and I almost turned back around and just waited for

10  him to pass by, but I told myself It's fine, just go, just go

11  get your document.

12  Q.   What kind of hallway is this?  How large is the hallway?

13  A.   Oh, it's about the same width as this space right here

14  between the defense table and the beginning of the jury box.

15  Q.   And since we don't have that for our record, how many feet

16  would you estimate that is?

17  A.   I don't know.  Ten, ten feet.

18  Q.   Okay.  So you didn't turn around?

19  A.   I didn't turn around.  I just told myself, Just it's fine,

20  just go, just go get it.

21         And I kept going towards the copier, and as I got

22  closer to Lieutenant Smith, he kept encroaching upon my space.

23  I was against the wall and I had a coat on.  It was wintertime.

24  I had a coat on.  And as I got closer to him, he got like this

25  to me (indicating), he bowed his chest out and his face out to

1   me, he gave me a very mean look, and I had to go like this

2   (indicating) up the wall.  I heard my coat scrape up the wall

3   as I turned sideways, and it just -- I just -- it was -- just

4   was a horrible confrontation.  And he didn't actually make

5   contact with my body, but if I had not turned sideways like

6   this (indicating) we would have -- I have no doubt in my mind

7   our bodies would have contacted.  And he just --

8   Q.   Now let me ask you this.  Did he say anything to you?

9   A.   No, nothing.

10  Q.   Did you say anything to him?

11  A.   "Really, Rob?"  (Indicating).

12  Q.   Did he respond to that?

13  A.   No.  He kept walking.

14  Q.   Now, around this time, did you receive anything else in

15  your mailbox or your in box that you have there?

16  A.   I did.

17  Q.   What did you receive?

18  A.   I received a blank transfer request form.

19  Q.   What is a transfer request form?

20  A.   That's what you fill out when you want to leave your

21  position and go to another position.

22  Q.   Had you put that transfer request form there?

23  A.   No.

24  Q.   Had you asked anyone to provide you a transfer request

25  form?

1   A.   No.  Absolutely not.

2   Q.   In early December, did you come to have an occasion to

3   have conversations with Former Deputy Chief Elizabeth Paiz?

4   A.   Yes, I did.

5   Q.   Can you tell the jury about that.

6   A.   Sure.  I called Deputy Chief Paiz and I had confided in

7   her some of the things that were going on at SID.

8   Q.   Let me stop you for just a minute.  So we know there's a

9   ROP unit, a ROP unit has a Sergeant, there's a Lieutenant who

10  oversees that unit and other units in SID, the Captain or

11  Commander Hudson is above --

12        MS. WILLIAMS:  Your Honor, counsel's testifying, and

13  I don't think it's his job.

14        MR. VILLA:  It's already been testified to.  I'm just

15  trying to get there a little bit faster.

16        THE COURT:  Well, you may proceed.  It's mostly

17  foundational, so I'll allow it.

18  Q.   (By Mr. Villa)  So the Commander is above the Lieutenant.

19  Who's above the Commander?

20  A.   Deputy Chief Paiz.

21  Q.   Okay.  So the next thing in the chain is the Deputy Chief?

22  A.   Correct.

23  Q.   And who's above the Deputy Chief?

24  A.   The Chief.

25  Q.   Okay.  So you just testified this you told Deputy Chief

1    Paiz about some of the things that were going on.  Is that

2    right?

3    A.   That's correct.

4    Q.   And do you remember when you first contacted Deputy Chief

5    Paiz?

6    A.   It was right around that time she had taken the place of

7    the previous Deputy Chief.

8    Q.   Okay.  Let me show you an exhibit that I believe's already

9    been stipulated to.

10          MR. VILLA:  This is Exhibit 4, Your Honor, which it's

11   admission has been stipulated.  May I publish?

12          THE COURT:  You may publish.

13   Q.   (By Mr. Villa)  There's Exhibit 4, Ms. Welch, and I'm

14   showing you -- I'll represent to you this has been stipulated

15   to by the parties.  These are notes from Deputy Chief Paiz.

16   And it says in here that on December 4th you guys had a call.

17   Does that sound about the time frame?

18   A.   That seems about accurate.

19   Q.   Okay.  And it said in here that Ms. Welch told you -- told

20   her that "she was grateful for the call, as no one had ever

21   called her."  Do you remember that?

22   A.   I would go with that.

23   Q.   Okay.  And she indicated:  "My primary concern was her

24   safety and to see what issues were resolved and which were

25   pending."  Do you remember that?

Direct Examination - Terysa Welch

1  A.   I don't specifically remember that, but that's probably

2  the gist of the conversation.

3  Q.   Okay.  And I can get into some more of this a little bit

4  later, but did you have a conversation with Deputy Chief Paiz

5  about whether to transfer?

6  A.   When I called -- When I spoke with Deputy Chief Paiz, I

7  told her my concerns about the hallway incident and the

8  transfer request form.  She --

9  Q.   And you had more than one conversation with Deputy Chief

10  Paiz in the month of December.

11  A.   Probably so, yes.

12  Q.   Okay.  So go ahead.  I'm sorry.  You had you told Deputy

13  Paiz your concerns about these incidents?

14  A.   Correct.

15  Q.   And then what?

16  A.   And she replied to me that "I can't have you working in

17  conditions like that.  I need some time to make some changes."

18  And up to that point she was the only person that gave the

19  appearance that she was going to help me.  And she seemed

20  genuinely concerned for me.  And I just -- I grabbed on to that

21  and I believed her.

22  Q.   Now, after you told her about your concerns and your

23  safety, like we talked about, did you guys have a conversation

24  about transferring?

25  A.   Yes.  She said, "Where can I put you until I can figure

1    out what to do?"

2    Q.   Did you want to transfer from ROP?

3    A.   Not particularly, no.  It's my job that I loved.

4    Q.   Did you want to stay in ROP under the conditions that

5    you've just told the jury about?

6    A.   At that point it had come to a physical -- almost a

7    physical altercation with my Lieutenant, and I was afraid.  So

8    under those conditions, I became extremely worried for myself,

9    and I wasn't getting backup, I was starting to become very

10   concerned, admittedly.  She asked me to cooperate in going

11   somewhere until she could make some changes.

12   Q.   How was your emotional well-being at this time?

13   A.   Very, very poor.

14   Q.   Give me an idea of what was going on with you emotionally.

15   A.   Well, I wasn't sleeping well.  I was starting to not trust

16   people that I was working with.  I was suspicious of people

17   that I before depended on protecting my life, and now I

18   mistrusted my own supervisors.  Yeah, my eating wasn't well.  I

19   was losing weight.  These kinds of things.

20   Q.   So you just testified that Ms. Paiz told you she needed

21   some time and you talked about a transfer.

22   A.   Yes.

23   Q.   Did you talk about where you might transfer to?

24   A.   Yes, we did.

25   Q.   And where was that?

Direct Examination - Terysa Welch

1  A.   The Academy was my first choice.

2  Q.   Okay.  And now, before -- Well, why was the Academy your

3  first choice?  I'm sorry.

4  A.   I don't know.  I -- I just threw it out there.  I couldn't

5  stay at SID because Rob Smith was there.  He was in charge of

6  everything at SID.

7  Q.   Now, before any transfers, did you attend any kind of

8  training in December 2009?

9  A.   Yes.

10  Q.   What was that training?

11  A.   That was an EEOC mandatory training for all of SID.

12  Q.   And do you remember when you attended that training?

13  A.   October, October 10th, something like that.

14  Q.   Let me see.  So a minute ago I was asking you if this was

15  in the December time frame.  Do you think it was October or

16  December?

17  A.   It may have been December.

18  Q.   Let me show you a document that's already been stipulated

19  to, Your Honor.

20         MR. VILLA:  May I -- It's Exhibit 114.  May I publish

21  that?

22         THE COURT:  All right.  Just one moment.  114, you

23  say?

24         MR. VILLA:  Yes, Your Honor.

25         THE COURT:  Okay.  Go ahead.

 1              Ladies and gentlemen, some of these exhibits were

 2    pre-admitted pretrial, so no ruling necessary at this time.

 3              Mr. Villa.

 4              MR. VILLA:  Yes, Your Honor.

 5    Q.   (By Mr. Villa)  Ms. Welch, I'm showing you Exhibit 114,

 6    and at the top it says it's an "EEO Training (4 hours),"

 7    December 10th, 2009.

 8    A.   Yes.

 9    Q.   Does that sound like the time when you went to the

10    training?

11    A.   Yes.

12    Q.   Okay.  And it's got a sign-in here, and I'm marking it for

13    the jury.  Is that your name where you signed in?

14    A.   Yes, it is.

15    Q.   And below that you see the name of Maureen O'Brien?

16    A.   Correct.

17    Q.   Do you remember if Maureen O'Brien was present at that

18    training?

19    A.   Yes, she was.

20    Q.   And who put on that training?

21    A.   Sue Neal.

22    Q.   Who's Sue Neal?

23    A.   I understood her to be an HR director or some kind of a

24    manager.

25    Q.   Is HR, is that Human Resources?

Direct Examination - Terysa Welch

1   A.   Yes, sir.

2   Q.   Now, you testified that the training was for all of SID.

3   Is that right?

4   A.   Yes.

5   Q.   Do you know why -- Well, let me ask you this.  Do you know

6   if anyone outside of SID attended the training?

7   A.   Not to my knowledge.

8   Q.   Okay.  And it indicates on here some of the other

9   individuals present.  Kevin Gagne, Jerry Potter, Mike Hill.  Do

10   you remember them being there?

11   A.   Not specifically.

12   Q.   Okay.  Tell me what happened at that training.

13   A.   The training was very awkward and unprofessional.

14   Q.   What do you mean by awkward?

15   A.   It was -- I don't know Ms. Neal well, but she -- she was

16   swearing heavily.  She was divulging a lot of people's personal

17   experiences that I felt was inappropriate.

18   Q.   What do you mean, "people's personal experiences"?

19   A.   Sex changes, using people's names.

20   Q.   When you say "people" what people?

21   A.   People within the City, City employees.

22   Q.   Okay.  What else was awkward about it?

23   A.   She called the training punitive training multiple times.

24   Q.   And when she said the word "punitive," what did you take

25   that to mean?

1   A.   Well, she stated it was as a result of the EEOC Complaints

2   that had been filed at SID.

3   Q.   Okay.  And I'm going to show you again what I already

4   showed you earlier, Exhibit 4, Ms. Paiz's notes where she

5   indicates right here that "Terysa texted me and told me that

6   the EEOC training given by Sue Neal was 'punitive' and Sue

7   cited recent EEOC complaints caused the mandatory training."

8          Is that what you're talking about?

9   A.   Yes.

10  Q.   Okay.  What else happened at the training?

11  A.   Well, Maureen O'Brien and I were the only two females in

12  the division of SID and we were both sitting in the training

13  and everyone in the training was told that they were there

14  because of the two EEOC Complaints filed at SID.  And being the

15  only two people responsible for filing those Complaints, we

16  felt responsible for making them sit through four hours of

17  training which they didn't want to sit through.  So Maureen

18  particularly became very, very physically uncomfortable.

19         MS. WILLIAMS:  Objection, Your Honor.  I don't

20  believe this witness can testify about Detective O'Brien's

21  state or --

22         MR. VILLA:  She's just talking about what she

23  observed, Ms. O'Brien's demeanor, not statements or anything

24  like that.

25         THE COURT:  Well, I think the jury can decide how

1   much reliability or weight to put to this testimony.  It does

2   kind of get to some speculation on the witness's part, but if

3   you -- I'll let you go ahead based on only her -- the witness's

4   perceptions.

5   Q.   (By Mr. Villa)  So, Ms. Welch, let me ask you, what did

6   you see Maureen O'Brien doing physically?

7   A.   Fidgeting, moving about in her chair.  She was sitting

8   right next to me.  She -- Her face turned red.  She -- Her

9   sighs, things like that.  She was obviously uncomfortable with

10  what Sue Neal was saying in the lecture.

11  Q.   And was it after that lecture that you then texted Deputy

12  Chief Paiz about it?

13  A.   Yes, it was.

14  Q.   Okay.  Now, after this training, what's the next thing

15  that happened?  Did you stay -- Well, what happened at the

16  training?

17  A.   Again, I let Deputy Chief Paiz know about it, searching

18  for help again from her, and I believe it was a short time

19  later that I was removed from SID.

20  Q.   Okay.  So let me show you the second page to Exhibit 4.

21  It says at the top here, "at 1730 hours, I received a text from

22  Terysa, stating she did not feel safe in ROP any longer and was

23  wondering if she could TDY any earlier."

24          Do you see that there?

25  A.   Uh-huh.

Direct Examination - Terysa Welch

1   Q.   What does TDY mean?

2   A.   Temporary duty assignment.

3   Q.   Was that referring to a transfer?

4   A.   That was referring to a transfer.

5   Q.   Okay.  It also talks about here the issue with Lieutenant

6   Smith and the transfer request.  You told Deputy Chief Paiz

7   about those?

8   A.   I did.

9   Q.   Okay.  Where did you get transferred to?

10  A.   I ultimately got transferred to the Burglary unit.

11  Q.   And do you know if there was an open spot there in

12  Burglary or why you got transferred to the Burglary?

13  A.   I don't think there needs to be an open spot for a TDY.

14  Q.   Okay.  The Burglary unit, that's the unit you liaisoned

15  with when you were with ROP?

16  A.   Correct.

17  Q.   All right.  Talk to me a little bit about what's the

18  differences between being a detective in Burglary versus being

19  a detective in ROP.

20  A.   Well, it's huge.  Burglary is -- It's a very bland, I

21  would describe it, detective unit.  You usually get a report.

22  It's taken from a field officer that states, you know, these

23  people had their home broken into, maybe some latents were

24  picked up, and there may be some follow-up evidence that would

25  help you identify who a possible suspect was.  You might be

1   able to write an arrest warrant and go pick up the offender way

2   down the road.  But there's -- there's nothing like the level

3   of -- I don't want to downplay a Burglary detective's

4   importance, because when somebody has their home broken into,

5   that is, of course, the most important thing to them in the

6   world, but as opposed to the level of criminals that ROP deals

7   with, it is almost worlds apart.  ROP criminals are homicide

8   offenders, sexual predators, robbery offenders.  You know, it's

9   just a huge step down from a ROP detective's job.  ROP

10  detectives are on the spot.  You have a lot of in-progress

11  arrests, is the best way for me to describe that.

12  Q.   Is the Burglary unit in the Special Investigations

13  Division?

14  A.   No, it is not.

15  Q.   So it's in a different division?

16  A.   Yes.

17  Q.   Do you know which division?

18  A.   That would be under Property Crimes.  I believe it would

19  be under Criminal Investigations.

20  Q.   How many hours do you work in Burglary compared to ROP?

21  A.   Unless you're on call, you would be 40 hours a week.

22  Q.   What about overtime?

23  A.   Unless you're on call, there's no overtime.

24  Q.   And compared to ROP, how much more overtime was there --

25  or, excuse me -- how much more overtime was there in ROP

Direct Examination – Terysa Welch

1   compared to Burglary?

2   A.    Oh, there's way more overtime in ROP because of the

3   homicides that are unpredictable and constantly ongoing, and

4   then even if you're not on call in ROP, you still need the team

5   to assist you with the arrest and the surveillance and the

6   operations that we have to go out on.

7   Q.    So was there more team activity with ROP than there was

8   with Burglary?

9   A.    Everything in ROP is a team activity.  Nothing in ROP is

10   individual.  Everything is team activity.

11   Q.    When you first were transferred to Burglary, how long did

12   you anticipate the temporary transfer to be?

13   A.    Temporary transfers are 45 days maximum.

14   Q.    Okay.  So when the 45 days came up for the transfer, did

15   you have a discussion with Chief Paiz, Deputy Chief Paiz about

16   transferring back to ROP?

17   A.    She stated she needed more time.

18   Q.    Okay.  Let me show you the second page of Exhibit 4 again.

19   Deputy Chief Paiz's notes.  And it says right here on

20   January 28th, I think that's supposed to be 2010, she "was

21   contacted by Joe Hudson, who was asking when Terysa's 45 days

22   were up," and she said "February 8th she would be going back to

23   ROP.  He then asked for a meeting with [her] and all of the

24   guys from ROP to see what their 'options' were."

25              Do you see that?

Direct Examination - Terysa Welch

1    A.    I see that.

2    Q.    The next sentence says, at 1830 hours, she called you and

3    told you that you would be going back to ROP.  It says, "she

4    would have to go back to ROP on February 8th."  And she asked

5    you how you felt about that.  And you said that you did not

6    want to go back if nothing had changed.

7              Do you remember that conversation?

8    A.    I don't remember that conversation.

9    Q.    Okay.  Do you remember feeling that you didn't want to go

10   back if nothing had changed?

11   A.    Why would I want to go back if nothing had changed?

12   Q.    So let me ask you that.  Do you know, is Sergeant Hubbard

13   still there in the ROP unit?

14   A.    He would have still been there in the ROP unit.

15   Q.    What about Lieutenant Smith?

16   A.    Yes.

17   Q.    Okay.  So ultimately did you go back to ROP after

18   February 8th, 2010?

19   A.    No.

20   Q.    And so let me ask you also now about other things in

21   Burglary.  What were you doing while you were in Burglary

22   during this temporary time?

23   A.    Nothing.

24   Q.    What do you mean, "nothing"?

25   A.    They wouldn't give me a caseload because they didn't know

Direct Examination - Terysa Welch

1   how long I was going to be there.

2   Q.   So what did you have to do?

3   A.   Honestly, I did nothing.  I looked at some AFIS cases,

4   which are cases where a fingerprint was picked up at a scene

5   and they run the fingerprint through an Automatic Fingerprint

6   Information System, AFIS, Automatic Fingerprint System, and

7   because the crime lab is so backed up, most of those cases were

8   way after the Statute of Limitations of being able to still

9   charge somebody with a burglary, so they were worthless.

10        The few that were still active and I could write an

11   arrest warrant for somebody for breaking into somebody's home

12   and finding their fingerprints in there and stealing from them,

13   I write an arrest warrant and go ahead and enter the warrant

14   into our NCIC system and have an active warrant out there for

15   somebody to be arrested for that.  That was my only job in

16   Burglary.

17   Q.   Now let me show you another note from Ms. Paiz's notes.

18   Here on February 1st, 2010, she discusses a meeting she had

19   with -- I think that's supposed to say Gagne, Wycoff, Potter,

20   Hill, Hubbard, Stephensen and Smith.  And everyone said how

21   they feel uncomfortable about you returning to the team and

22   that she didn't think it was fair to bash a person when they

23   weren't there to defend themselves.

24        But ultimately she told you that you were free to

25   request an extension of your TDY to Burglary, you know, the

1   choice was yours.  So did you ultimately extend that -- Was the

2   temporary assignment to Burglary ultimately extended?

3   A.    Yeah.  My TDY was extended for 14 months.

4   Q.    When did the TDY actually end?

5   A.    Sometime in 2011.

6   Q.    Okay.  Now, this talks in -- July 9th, 2010, is the next

7   note from Deputy Chief Paiz.  Before that time period and after

8   the February time period, did she tell you anything with

9   respect to whether Sergeant Smith -- excuse me -- Lieutenant

10  Smith and Sergeant Hubbard were going to remain in the ROP

11  unit?

12  A.    Deputy Chief Paiz told me that she had done her own

13  investigation, and she told me that she recommended the removal

14  of the supervisors, but that Chief Schultz told her no, that he

15  wanted those supervisors to be able to save face.  That was her

16  wording, that he wanted them to be able to save face and allow

17  them to retire out of the unit.

18  Q.    So now let's fast forward to July.  And it talks about

19  here in July a meeting between yourself, Commander Prudencio,

20  Commander West, and Deputy Chief Paiz about you coming back now

21  that there was a new chain of command.  Do you remember this

22  discussion about this meeting?

23  A.    I remember Deputy Chief Paiz asking me to attend a

24  meeting, which I agreed to come to, and then she canceled it.

25  Q.    And in July do you recall whether you had -- whether you

208
Direct Examination - Terysa Welch

1    had the opportunity to go back to ROP after there was this new

2    chain of command?

3    A.   I was given ten days to decide to go back to ROP or to

4    accept a permanent position in Burglary or go to the field.

5    That's what my decision ultimately came down to, decide in ten

6    days.

7    Q.   Okay.

8            MR. VILLA:  Your Honor, I'd like to show Ms. Welch

9    Exhibit 6, which is stipulated, I believe.  May I publish?

10           THE COURT:  It's stipulated.  No objection,

11   Ms. Williams?

12           MS. WILLIAMS:  Yes, sir.

13           THE COURT:  Okay.  You may publish.

14   Q.   (By Mr. Villa)  So I'm showing you what we've marked as

15   Exhibit 6.  This is an e-mail between yourself and Deputy

16   Chief Paiz.  Is that right?

17   A.   Yes, sir.

18   Q.   Okay.  And the e-mail starts actually down here, July 9th.

19   It says, "Terysa, I am so sorry this meeting took on a bigger

20   meaning for everyone than was intended.  I simply wanted your

21   input to see if you wanted to go back to SID.  You earned your

22   spot on the team and since the Lieutenant and Commander are new

23   people, I just wanted to know if you wanted to go back.  That

24   was it.  If you want to stay in Burglary until Dave retires

25   (rumor has it in September), then that is fine too.  I just

Direct Examination - Terysa Welch

1   wanted to check on ya.  Sorry for the circus!"

2             Do you see that?

3   A.   Yes.

4   Q.   Do you know who she's referring to as Dave?

5   A.   That's Dave Hubbard.

6   Q.   So in July of 2010 Sergeant Hubbard is still there?

7   A.   Still there.

8   Q.   Now, fast forwarding to September of 2010, were you still

9   in communication with Deputy Chief Paiz about your status in

10  going back to ROP?

11  A.   I don't know if I'm directly in communication anymore.  I

12  don't recall.

13  Q.   Okay.  Let me show you a document.

14             MR. VILLA:  May I approach, Your Honor?

15             Okay.  My understand is that Exhibit 8 is also

16  stipulated, Your Honor.

17             THE COURT:  Any objection to Exhibit 8, Ms. Williams?

18             MS. WILLIAMS:  No, Your Honor.

19             THE COURT:  All right.  Exhibit 8 is admitted.  No

20  objection.

21        (Plaintiff's Exhibit 8 admitted into evidence.)

22  Q.   (By Mr. Villa)  Ms. Welch, I know this is a long time

23  ago, so let me show you Exhibit 8.  Is this a memo to Deputy

24  Chief Paiz from you September 10th, 2010?

25  A.   Yes.

210
Direct Examination - Terysa Welch

1    Q.   Okay.  And it indicates here that in this first paragraph

2    you're responding to Deputy Chief Paiz.  "As you know a federal

3    investigation into APD's treatment of me as an employee is

4    underway."

5            So do you remember the EEOC was still investigating

6    at this point in time?

7    A.   Yes.

8    Q.   Okay.  And you talked about how comfortable you were

9    returning to ROP now that Sergeant Hubbard is retired or

10   retiring?

11   A.   Yes.

12   Q.   Okay.  And in your paragraph here you state that you feel

13   that it's absurd you've been displaced from the your rightfully

14   earned position in ROP over 11 months because of the

15   discriminatory and retaliatory behavior.  Do you remember that?

16            THE COURT:  Ms. Williams.

17            MS. WILLIAMS:  Objection, Your Honor.  The witness

18   needs to testify.  Not the attorney.

19            THE COURT:  If can you just walk her through the

20   letter, Mr. Villa.  It's admitted as an exhibit, so in that way

21   it's for the jury to see already.  I'll sustain the objection.

22   This is somewhat cumulative.  Just ask the question.

23            MR. VILLA:  Certainly, Your Honor.

24   Q.   (By Mr. Villa)  So let's try it this way, Ms. Welch.  Can

25   you explain why you felt it was absurd that you'd been

1  displaced from your position in ROP?

2  A.   Yes.  Because I'm the complainant that filed the Complaint

3  about the EEOC, but I'm -- I'm removed for as long as I was

4  removed for.  It appears that I'm the one that's done something

5  wrong.  They're just left to stay at ROP as if there's no

6  consequence.  No changes are made over there.  There's no

7  remedy for the EEOC Complaint.  There's no -- It makes it

8  appear that I've done something wrong.

9  Q.   Let me ask you about this statement you say here, that

10  removing you caused you damage to your reputation at the height

11  of your career.  What do you mean by that?

12  A.   This is exactly what I'm talking about.  You remove me,

13  and people -- Look, I can't talk about -- I'm not supposed to

14  talk about the Complaint in IA or my EEOC Complaint.  I'm

15  removed.  People think that I've done something wrong by that

16  very act.  They don't -- They don't get to hear my side of

17  what's happened.  They just assume that, Well, she must have

18  done something really bad.  She was taken out of her position

19  and she's been put over in Burglary.  She must have really

20  messed up.  That's damaging to me.

21       MS. WILLIAMS:  Objection, Your Honor.  This is

22  speculative what she thinks other people are thinking, and we'd

23  ask that it be stricken.

24       THE COURT:  Mr. Villa.

25       MR. VILLA:  Your Honor, I think that she can testify

 1   about that with respect to her employment position because

 2   she's familiar with it.  They can explore that on

 3   cross-examination.

 4           THE COURT:  Well, I think part of what we have here

 5   is what she experienced and how she interpreted the

 6   circumstances.  So I'll allow it.  I'm going to overrule the

 7   objection.  The jury can consider the testimony against the law

 8   that I provide them in this particular area.

 9           Mr. Villa.

10   Q.   (By Mr. Villa)  Now, in the final paragraph, you said

11   that you wanted to have your attorney essentially communicate

12   regarding these issues.  Why did you want your attorney to

13   communicate regarding these issues?

14   A.   Because I didn't feel that APD had my interests at all in

15   mind.  They made that clear by leaving all the supervisors, all

16   the actors in ROP just where they were to continue on just fine

17   at ROP.  Nobody had my interests in mind.  Did anybody check on

18   me in Burglary?  "How are things down here?  How are things

19   going?"  No, not one time.

20   Q.   Let me ask you about another issue.  At some point in

21   time, you said you were asked to make a decision whether to go

22   back to -- you were given ten days, you said Burglary, ROP, or

23   the field.  What did you ultimately decide to do?

24   A.   I stayed in Burglary.

25   Q.   And was there a point when you got your property that you

Direct Examination - Terysa Welch

1  had in ROP returned back to you?

2  A.    Yes, there was.

3  Q.    Can you tell the jury about that?

4  A.    I was asked to return the remainder of the ROP property

5  that I had, so I took the time to box it up, a lot of it in its

6  original boxes, returning it nicely and professionally back to

7  the ROP team.

8  Q.    Now, what about, did you have property that was in your

9  cubicle at ROP?

10 A.    Yes, I did.

11 Q.    And how did you get that property back?

12 A.    I sent the ROP property that I had to return with my

13 Sergeant back to SID, and I asked him to grab my property at

14 SID and bring it back to me.  And he did.  He brought back

15 three boxes.  He brought it back to me at Burglary.

16 Q.    Was there anything unusual about the way the property was

17 when you got it?

18 A.    There was.

19 Q.    Can you tell the jury about that.

20 A.    It was just carelessly thrown into boxes and bins, and

21 there was even a piece of wood in there.  There was pieces of

22 metal, broken radios.  There was a piece of string that was

23 tied into a noose.  There was a picture of me waiving good-bye.

24 And it was very carelessly thrown into these boxes and returned

25 to me in a purposeful fashion, and I took offense to it.

214
Direct Examination - Terysa Welch

1   Q.   Now, you talk about a picture of you waiving good-bye.  Do

2   you know where that picture came from?

3   A.   It was from a -- I don't know where it came from.  It was

4   from a trip, a work trip that we had taken, but I don't know

5   where it came from.

6   Q.   Now, there was a -- I think you testified about a noose

7   being in there.

8   A.   Correct.

9   Q.   What's the significance of the noose?

10  A.   Well, it could mean a lot of things to a lot of people,

11  but to me it was put in there for a reason.  It wasn't mine.

12  It wasn't my property.

13  Q.   That noose wasn't yours?

14  A.   No.

15  Q.   Now, was the noose the symbol or the logo for the ROP

16  unit?

17  A.   Well, I'm sure that's what they're going to say.  It was a

18  symbol at one time.

19          MS. WILLIAMS:  Objection, Your Honor.  She's

20  speculating.

21          THE COURT:  I'll sustain that.

22  Q.   (By Mr. Villa)  Okay.  Let me ask you this.  While you

23  were in the ROP unit, did you guys use the noose as a logo?

24  A.   We were instructed to stop doing that.

25  Q.   Okay.  Before you got instructed to stop doing that, was

1    it being used in ROP?

2    A.    Some people used that in ROP.

3    Q.    And were you instructed to stop before or after you left

4    ROP?

5    A.    I don't recall the timeline.

6    Q.    Okay.  And so now that you were leaving the ROP unit and

7    staying in Burglary, in your property was a noose?

8    A.    Correct.

9    Q.    And that wasn't yours?

10   A.    No.

11            MR. VILLA:  May I approach, Your Honor?

12            THE COURT:  You may.

13            MR. VILLA:  Your Honor, I believe -- I stand

14   corrected.  I believe these are stipulated exhibits.  This is

15   87, 87a, b, d, and l.

16            THE COURT:  Ms. Williams, any objection?

17            MS. WILLIAMS:  No, Your Honor.  We -- No.

18            THE COURT:  All right.  87a, 87b, 87d, and 87l are

19   admitted without objection.

20       (Plaintiff's Exhibits 87a, 87b, 87d, and 87l  admitted

21       into evidence.)

22   Q.    (By Mr. Villa)  Ms. Welch, I'm showing you Exhibit 87.

23   Is that a photograph?

24            THE COURT:  I'm sorry --

25   Q.    (By Mr. Villa)  Can you see --

1    THE COURT:  -- I listed 87, a, b, c, d, and l.  I

2    didn't list 87.  Is that also included?

3    MR. VILLA:  There's also 87.

4    MS. WILLIAMS:  Yes, we didn't object to these.  We

5    objected to duplicates that were included, but --

6    THE COURT:  Okay.  I just wanted to be clear.

7    Exhibit 87 is admitted.

8    (Plaintiff's Exhibit 87 admitted into evidence.)

9    Q.  (By Mr. Villa)  Is that a picture of that box?

10   A.  Yes.

11   Q.  Do you know what's in that box?

12   A.  That's part of my belongings.

13   Q.  Let me show you a picture of 87l.  That's 87l right there.

14   I'm going to rotate it.  What is that a picture of?

15   A.  That's the picture of me waiving good-bye.

16   Q.  And it appears to be inside something.  Was it inside the

17   box that's in 87?

18   A.  Yes.

19   Q.  Is that how you got it when you found it?

20   A.  Yes.

21   Q.  And then 87a, is that just a close-up picture of that

22   picture of you waiving good-bye?

23   A.  Correct.

24   Q.  Okay.  And 87b, just so we have the context, that's in

25   this photo album, right?

1    A.    Correct.

2    Q.    And where was this photo album, if you know, before you

3    got your property returned?

4    A.    It was on my desk.

5    Q.    Was it left open to this picture of you waiving good-bye

6    when you left it on your desk?

7    A.    No.  I don't know where that picture came from.

8    Q.    And finally 87d, what's this a picture of?

9    A.    That's the random piece of wood that they threw in there

10   and then the noose.

11   Q.    Okay.  And what's the significance to you of the noose

12   being put in your box?

13   A.    I just think it was an immature thing for them to throw in

14   there.  Threatening, in a way.

15   Q.    Okay.  Now, I want to change the subject a little bit.

16   Let's talk about October of 2010.  Did you have an occasion to

17   be contacted about some disciplinary stuff?

18   A.    Yes.

19   Q.    Okay.  Tell the jury how you found out about the

20   disciplinary thing.

21   A.    Sergeant Knox came to my office at Burglary.

22   Q.    Who is Sergeant Knox?

23   A.    He's an IA, Internal Affairs Sergeant.

24   Q.    Is this still the time period when you're on the temporary

25   status?

Direct Examination – Terysa Welch

1   A.   Yes.

2   Q.   And did you still have your ROP equipment and ROP vehicle?

3   A.   Yes, I did.

4   Q.   Okay.  So Sergeant Knox came to your office in Burglary.

5   And what did he say?

6   A.   He said -- He asked me what kind of truck I drove, work

7   truck that I drove.  And then he stated that he had an Internal

8   Affairs case in which I was the target and he needed me to come

9   to the Internal Affairs office and sign for a target letter.

10  Q.   Okay.

11          MR. VILLA:  May I just have a moment, Your Honor?

12          THE COURT:  You may.

13  Q.   (By Mr. Villa)  Did he tell you the nature of the

14  violation?

15  A.   Yes.

16  Q.   What did he tell you?

17  A.   Somebody saw me buy beer.

18  Q.   And in what context did they see you buying beer?

19  A.   At the Walgreen's in Rio Rancho.

20  Q.   Okay.  Is that against policy?

21  A.   Well, not specifically, but he said that I was in my work

22  vehicle.

23  Q.   Okay.  So is there a policy against buying beer in your

24  work vehicle?

25  A.   There is.

Direct Examination - Terysa Welch

1   Q.   All right.  Had you ever bought beer in your work vehicle

2   before?

3   A.   I have.

4   Q.   Okay.  Can you tell the jury why?

5   A.   Well, because when you're in ROP and you're on call

6   24/7/365, you do everything in your ROP vehicle.

7   Q.   So when you heard from Sergeant Knox that that was the

8   accusation against you, what did you tell Sergeant Knox?

9   A.   That I would be over to sign for my target letter.

10  Q.   I'm sorry?

11  A.   That I would be over to sign for my target letter.

12  Q.   Okay.  Did you -- Well, let me show you Exhibit 21.  This

13  has been stipulated to.  This is -- There's Exhibit 21.  This

14  is an Albuquerque Police Department general order.  Can you

15  read what that General Order is?

16  A.   The numbers?

17  Q.   Sure, the 1-04-7.  Would you just read that for the jury.

18  A.   Sure.  It's a sanction 6.  That's what the numbers in the

19  bracket mean.  And it says, "Personnel shall not bring into any

20  police facility or city vehicle, alcoholic beverages, for any

21  purpose, except in the performance of their official duties."

22  Q.   Okay.  You mentioned something about a sanction 6.  What

23  is a sanction 6?

24  A.   So in our disciplinary system, we have a sanction chart,

25  it's called.  The most severe discipline sanction is a 1, and

220
Direct Examination - Terysa Welch

1   that would be an offense that you would be terminated for, and

2   the lowest level on the sanction list would be a sanction 7.

3   So this would be a sanction 6, between a 1 and a 7 on that

4   chart.  It's according to the seriousness of the offense.

5   Q.   So what does a sanction 6 call for in terms of discipline?

6   A.   Well, without factoring in any progressive discipline,

7   that would be usually a written reprimand.

8   Q.   What is a progressive discipline?

9   A.   Progressive discipline is if you've done it multiple

10  times.

11  Q.   And when you say "a written reprimand," what do you mean?

12  A.   A written reprimand, you know, they write you -- it's a

13  letter, basically, that outlines what you've done wrong.  It

14  goes in your permanent employee file, and if you violate that

15  again, well, then it gets a lot more serious for you.

16  Q.   Did you have any discussion with Sergeant Knox about

17  whether you would receive a written reprimand?

18  A.   When I went in to sign for my target letter, I told him I

19  would just sign for the written reprimand at the time that I

20  signed for the target letter.

21  Q.   When you say you'll just sign for the written reprimand,

22  what does that mean?

23  A.   Meaning I'll just take it -- take my hit, take my

24  spanking.

25  Q.   Why were you willing to accept it?

1    A.    Because it's a sanction 6.  It's not even grievable.  It's

2    not even -- It's not -- Basically, to me, you know, that's not

3    worth fighting about, it's not worth the stress of going

4    through an IA interview.  Why are they sending it to IA in the

5    first place.  This is just to get it over with, you know.

6    Q.    And Sergeant Knox, he was in IA?

7    A.    Yes, he was.

8    Q.    And when you told Sergeant Knox that you would accept the

9    written reprimand, what did he say?

10   A.    He said, "No, no, that's not the way it works.  The

11   investigation is ordered from the top.  And you have to go

12   through the formalities."

13   Q.    He said the investigation was ordered from the top?

14   A.    Yes.

15          MS. WILLIAMS:  Objection, Your Honor.  Hearsay.

16   Q.    (By Mr. Villa)  Well, I think that's -- Again, Your

17   Honor, this is a Sergeant in APD saying this.

18          THE COURT:  Well, it is hearsay.  Are you offering it

19   for the truth of the matter asserted, Mr. Villa?

20          MR. VILLA:  I think I'm offering it as an admission

21   of a party opponent, Your Honor, so it would be defined out of

22   hearsay.

23          THE COURT:  Okay.  I'll admit it.

24   Q.    (By Mr. Villa)  So did he explain to you what he meant

25   when he said it was ordered from the top?

Direct Examination - Terysa Welch

1    A.    No.  I didn't ask.

2    Q.    All right.  And you're now -- being a Lieutenant, have you

3    been trained in how to give -- whether you're able to give

4    written reprimands for level 6 violations for people you

5    supervise?

6              MS. WILLIAMS:  Objection, Your Honor.  Relevance.

7              THE COURT:  What was the objection?

8              MS. WILLIAMS:  Relevance.  I don't know if the

9    training's trained or not.

10             THE COURT:  Mr. Villa.

11             MR. VILLA:  Well, the relevance, Your Honor, is to

12   how it was handled as going through IA as opposed to a written

13   reprimand.

14             THE COURT:  Okay.  I'll overrule it.

15   Q.    (By Mr. Villa)  Have you been trained in how to give

16   written reprimands when you were either a Sergeant or a

17   Lieutenant?

18   A.    Yes.

19   Q.    Are those things that have to go through Internal Affairs

20   according to your training?

21   A.    No, those don't go through Internal Affairs.

22   Q.    So if you were a Sergeant or a Lieutenant, are you, I

23   believe, able to issue a written reprimand?

24   A.    I have issued those.

25   Q.    Now, during this conversation with Sergeant Knox, did he

1  tell you how it was that it came to pass that you'd been

2  accused of this?

3  A.   Very briefly.

4  Q.   Did he tell you who accused you?

5  A.   He did.

6  Q.   Who was it?

7  A.   He said that Kevin Gagne saw me buy beer.

8  Q.   That Kevin Gagne said it?

9  A.   Uh-huh.

10  Q.   And --

11         THE COURT:  Is that a "yes"?

12  Q.   (By Mr. Villa)  -- did he tell you where he had seen you?

13         THE COURT:  Is that a "yes," Ms. Welch?

14         THE WITNESS:  Yes, sir.

15  Q.   (By Mr. Villa)  Sorry about that.  Did he tell you where

16  you were seen buying beer?

17  A.   At the Walgreen's in north Rio Rancho.

18  Q.   What's the significance of that Walgreen's to you?

19  A.   It's the last stop before my house.  I stop there for

20  miscellaneous goods.

21  Q.   Okay.  You'd been to that Walgreen's before?

22  A.   Yes, lots of times.

23  Q.   So, you then are given a target letter, you said, from

24  Sergeant Knox regarding this alcohol violation.

25  A.   Correct.

1          MR. VILLA:  Your Honor, I'm going to show Exhibit 98,

2   which has been stipulated.

3          THE COURT:  All right.  You may proceed.  It's been

4   stipulated.

5   Q.   (By Mr. Villa)  Ms. Welch, this is Plaintiff's Exhibit

6   98, dated October 26, 2010, indicating it was hand-delivered.

7   Is this the target letter that you're talking about?

8   A.   Yes, it is.

9   Q.   Now, it says it's issued by Raymond Schultz, but it's

10  signed by Lieutenant Mike Miller and signed by you, but I think

11  you said it was Sergeant Knox who gave it to you.

12  A.   He's just the representative that handed it to me in IA.

13  Q.   Okay.  Got it.  Okay.  Now, did you attend an interview

14  conducted by Sergeant Knox for this Internal Affairs

15  investigation?

16  A.   I attended three interviews.

17  Q.   Okay.  Let's talk about the first interview.  Tell us

18  about what happened.

19  A.   He asked me a series of questions about if I had

20  remembered a specific date, which was almost three weeks prior.

21  I had looked at my calendar at work to try to recall anything

22  particular on that date, if I had, you know, court that day or

23  something like that.  I didn't remember anything particular

24  about the date that he said it happened on.  Nothing stood out

25  in my mind about that date, prior to going into the interview.

Direct Examination - Terysa Welch

1    And I stated that in my interview.

2            He had told me that he had video and photographs of

3    the incident, but he wouldn't show them to me, which was

4    confusing for me.  It caused me to be cautious and wondered why

5    he -- why he would not just show that to me.  And so the whole

6    feeling of what was going on started causing me to be very

7    concerned and a little suspicious about what really is

8    happening here, what is the purpose of this.  This is not --

9    Something's wrong.

10   Q.   Were you at all concerned about the fact that he told you

11   Kevin Gagne had reported you?

12   A.   I was very concerned.

13   Q.   Why were you concerned?

14   A.   Well, because Kevin doesn't like me, and he has reason to

15   cause me trouble.

16   Q.   Was he still in the ROP unit at this time?

17   A.   Oh, yeah.

18   Q.   At any point during that first interview with Sergeant

19   Knox, did you lie to him?

20   A.   I did not lie to him.

21   Q.   Okay.  Were you able to remember the incident of buying

22   alcohol?

23   A.   No.

24   Q.   Why not?

25   A.   Because I am not new at buying alcohol.  There's nothing

1    exciting to me about buying alcohol.  There's just -- It's not

2    a memorable event for me.  You know?

3    Q.   In that first interview, did you discuss at all whether

4    you had done it previously in your ROP vehicle?

5    A.   I told him I had done that previously.  I told him I'd

6    done that before.  "I admit that that was probably me.  I don't

7    particularly remember that date.  I've tried to find something

8    that could refresh my memory.  May I see the video?  May I see

9    the photographs that you say you have?"

10          "No."

11   Q.   Now, why were you asking him all these questions?

12   Couldn't you just provide your answers and be done with it?

13   A.   I tried to provide my answers and be done with it.  He

14   kept pushing me, and he started questioning if there was

15   something wrong with my memory and have I testified in court

16   and do I have problems testifying.  And I started feeling as if

17   he thought I was lying, but I was actually refusing to lie to

18   him and say I remembered something that I didn't remember.

19   Q.   Now, you said there was a second interview.  Do you

20   remember when the second interview occurred?

21   A.   They were all about a month apart, roughly.

22   Q.   Okay.

23   A.   One was in October, one was in November, one was in

24   December.

25   Q.   Aside from these interviews, did Sergeant Knox do anything

Direct Examination - Terysa Welch

1   else unusual in the course of this investigation?

2   A.   He did.

3   Q.   What did he do?

4   A.   He got into an argument with my union rep who had pointed

5   out to him that he was using the wrong ground rules.  We

6   have -- We have ground rules for civilian interviews, and we

7   have ground rules for sworn officer interviews.  And my union

8   rep was doing his job and pointed out to Sergeant Knox that you

9   can't -- "You're using civilian ground rules, Sergeant Knox,"

10  and it angered him and maybe embarrassed him, I don't know, and

11  he told him that he wasn't allowed to interrupt anymore.  By

12  the end of the interview, he had thrown him out of his office.

13  Q.   And then outside of the interview process, did Sergeant

14  Knox do anything unusual?

15  A.   Yeah.  He continued to come up physically to the Burglary

16  floor to tell me he wanted an additional interview, which was

17  causing me embarrassment because everybody knows he's an IA

18  Sergeant, and, look, it's my personal business if I'm in

19  trouble at work.  Okay.  I get it.  I'll be responsible for the

20  things that I do wrong, but you don't need to advertise it to

21  my coworkers, you know.  I asked him to stop doing it.  "You

22  have my phone number, correct, Sarge?"

23          "Yes."

24          "Please call me."

25          He kept coming up to the Burglary floor and finding

Direct Examination - Terysa Welch

1    me in my office.  You know, I don't need that happening.  "You

2    know my Burglary Sergeant's number, you know my cell phone

3    number.  Please call me.  I'll answer the phone.  I'll come

4    in."  He kept coming up.

5    Q.   What's the normal way that you get notified about an

6    Internal Affairs meeting?

7            MS. WILLIAMS:  Objection.  Lack of foundation.

8    Q.   (By Mr. Villa)  Had you ever been -- I'll strike the

9    question.

10           THE COURT:  I'll sustain the objection.

11   Q.   (By Mr. Villa)  Had you ever been notified before that

12   you needed to do an Internal Affairs interview?

13   A.   Yes.

14   Q.   And how were you notified in those processes?

15   A.   Either by certified letter and then you call in or just by

16   a phone call.

17   Q.   Now, you said the three interviews were about three months

18   apart.  So one was in October.  The next one was when?

19   A.   November.

20   Q.   And the third one?

21   A.   At the end of December, around Christmas.

22   Q.   Around Christmastime.  Were the -- Did the other two

23   interviews go any differently than the first?

24   A.   No.  It was the same tone, almost the same questions.  The

25   third interview he finally showed me a still photo of what

1  looked like a store surveillance video and a receipt.

2  Q.   And that was related to the purchase of alcohol at

3  Walgreen's?

4  A.   Correct.

5  Q.   Okay.  During any of these interviews, did you ever lie to

6  him?

7  A.   Did I ever?

8  Q.   Lie to him.

9  A.   No.

10  Q.   Did you ever admit that you transported alcohol in your

11  ROP vehicle?

12  A.   I told him it was absolutely possible, and I would take

13  the responsibility for that.  I had no problem at any point

14  taking the responsibility for the violation.

15  Q.   Now, later in the course of this Internal Affairs

16  investigation, were you accused of other violations of policy?

17  A.   Yes.

18  Q.   And let me show you what's already been stipulated.

19       MR. VILLA:  And I'll publish to the jury, Your Honor,

20  Exhibit 94.

21       THE COURT:  As to 94, no objections, Ms. Williams?

22       MS. WILLIAMS:  Yes, Your Honor, we have stipulated.

23       THE COURT:  All right.  It's admitted.  No objection.

24     (Plaintiff's Exhibit 94 admitted into evidence.)

25  Q.   (By Mr. Villa)  So this is 94.  And I'll show you the

```
 1   top.  It's the PERSONNEL CODE OF CONDUCT.  I'm going to flip

 2   over to W.  This says "Personnel shall truthfully answer all

 3   questions specifically directed to them," correct?

 4   A.   Correct.

 5   Q.   So were you accused of this after you'd gone through these

 6   interviews with Sergeant Knox?

 7   A.   I was.

 8   Q.   And that, of course, is a sanction of what level?

 9   A.   1.

10   Q.   And what's the discipline called for for a sanction 1?

11   A.   Termination.

12   Q.   And I'm turning to the next page, 1-04-6.  Were you

13   accused of this, "Personnel shall not knowingly interfere with

14   a criminal or administrative investigation"?

15   A.   Yes, I was.

16   Q.   And was that related to the interviews that you gave with

17   Sergeant Knox?

18   A.   Yes, it was.

19   Q.   And this has a sanction level of what amount?

20   A.   A 5.

21   Q.   What does a 5 call for?

22   A.   Well, it's a days off, but when you combine it with

23   everything else, it puts it way up there.

24   Q.   Following your --

25            THE COURT:  Let me just interrupt.  Mr. Villa, how
```

Direct Examination - Terysa Welch

1    many pages are associated with 94?

2              MR. VILLA:  Three, Your Honor.

3              THE COURT:  All right.  Would you please staple those

4    so that they stay together.

5              MR. VILLA:  Sure, Your Honor.

6              THE COURT:  As well as the other exhibits that have

7    been admitted.  If they're multi-page, make sure they're

8    attached.

9              MR. VILLA:  We'll make sure they're stapled, Your

10   Honor.

11             THE COURT:  The items that are admitted, are they

12   going on the table in front of the bench?

13             MR. VILLA:  Yes, they are.

14   Q.  (By Mr. Villa)  Now, the other thing I just want to show

15   you, this is part of the original violation, Plaintiff's

16   Exhibit 95.  It's already been stipulated to.

17             MS. WILLIAMS:  Yes.  We have already stipulated.

18             MR. VILLA:  That is a three-page document, Your

19   Honor, and it is the assigned take-home vehicle policy.

20             THE COURT:  All right.  95 is admitted without

21   objection.

22        (Plaintiff's Exhibit 95 admitted into evidence.)

23   Q.  (By Mr. Villa)  I'm going to show you part B, "Unmarked

24   vehicles are for official purposes only."  That is part of the

25   accusation for using the vehicle to buy alcohol, right?

Direct Examination – Terysa Welch

1   A.    Yes.

2   Q.    Now, once Sergeant Knox had prepared his findings from the

3   Internal Affairs, do you know who first reviewed his findings?

4   A.    I believe it was Doug West.

5   Q.    And that's the same Doug West that you originally reported

6   your Complaint to back in 2009, your EEOC Complaint?

7   A.    Correct.

8   Q.    Okay.  And do you know what Doug West's recommendations

9   were?

10  A.    Yes.  He recommended that I be terminated.

11  Q.    Okay.  Did you challenge that recommendation?

12  A.    No.  No.

13  Q.    Was it reviewed subsequently by another Deputy Chief?

14  A.    It was.  Deputy Chief Paul Feist.

15  Q.    Okay.  And in Lieutenant West's recommendation, did he

16  recommend your termination based on the fact that you had not

17  answered questions truthfully?

18  A.    He did not find that I did not answer truthfully.

19  Q.    And I'm talking specifically about Lieutenant West, not

20  Chief Feist.  So Lieutenant West, who recommended your

21  termination, did he make findings about whether you answered

22  truthfully?

23  A.    Yes.  He sustained that.

24  Q.    So he found that you had answered not truthfully?

25  A.    Correct.

Direct Examination - Terysa Welch

1    Q.    Okay.  And that's -- Again, that's the same Lieutenant

2    West who told you you were going to keep your EEOC claim

3    confidential?

4    A.    That's right.

5              MR. VILLA:  May I approach, Your Honor?

6              THE COURT:  You may.

7    Q.   (By Mr. Villa)  Ms. Welch, I'm going to show you a copy

8    of Exhibit 99 and just ask you, is that, as far as you know,

9    Lieutenant West's findings on your case?

10   A.    Yes.

11   Q.    Okay.  Thank you.

12             MR. VILLA:  Your Honor, I'm not offering it at this

13   time.  It's just for future use.

14             THE COURT:  Well, it's not admitted.  Then you may

15   retrieve it from the table.

16             MR. VILLA:  Oh, sure.

17   Q.   (By Mr. Villa)  Now, then it got reviewed by Deputy Chief

18   Feist, correct?

19   A.    Correct.

20   Q.    And did Deputy Chief Feist sustain the finding that you

21   had been untruthful?

22   A.    No, he did not.

23   Q.    What was his recommendation with respect to your

24   discipline?

25   A.    I believe he recommended to Chief Schultz an 80-hour

1    suspension and loss of take-home vehicle for 14 days.

2    Q.   Okay.  So let's go a little bit forward and -- well, a

3    little bit backwards in time.  Was Deputy Chief Feist -- what

4    was his position at the time that he reviewed your Internal

5    Affairs investigation?

6    A.   He was then my current Deputy Chief.

7    Q.   Okay.  So had he taken over for Deputy Chief Paiz?

8    A.   I'm not sure, but I believe so.  It was either that or he

9    was in charge of Property Crimes.

10   Q.   Okay.

11   A.   I'm confused about that.

12             THE COURT:  Mr. Villa, just one moment.

13             MR. VILLA:  Yes.

14             THE COURT:  You may discuss with counsel.

15             Ladies and gentlemen, we're 20 minutes after four.

16   We still have some ways to go, but I would invite you to just

17   stand and stretch as you like as we sort of push through this

18   phase.  As a matter of fact, I think I will stand.

19             Mr. Villa, just a rough estimate about how much

20   longer with this witness?

21             MR. VILLA:  I think that I'm just about done, Your

22   Honor.  We're pretty close.  Maybe 20 more minutes.

23             THE COURT:  All right.  Again, just as a rough

24   estimate.

25             MR. VILLA:  Thank you, Your Honor.

1          THE COURT:  You may continue.

2          MR. VILLA:  So may I approach the witness?

3          THE COURT:  You may.

4    Q.   (By Mr. Villa)  I'm going to show you what I've marked as

5    Plaintiff's Exhibit 75.  Is that Deputy Chief Feist's

6    recommendations on your discipline?

7    A.   Yes.

8    Q.   Have you seen that before?

9    A.   I believe so.

10   Q.   Will you look at the back page and see what it says about

11   what he recommended for your discipline?

12   A.   80 hours' suspension and a 14-day suspension --

13         THE COURT:  Well, before --

14         MR. VILLA:  I'm sorry?

15         THE COURT:  Read it to yourself.  Well, hold on.

16         Ms. Williams, as to this exhibit?

17         MS. WILLIAMS:  We do not stipulate to this exhibit,

18   Your Honor, and we would move that her answer be stricken until

19   it's -- this is one you held in abeyance.

20         THE COURT:  And this is 75?

21         MS. WILLIAMS:  Excuse me?

22         MR. VILLA:  75.

23         THE COURT:  75?  Right.  So, ladies and gentlemen,

24   you heard at least some testimony describing what's in this.

25   I'll just ask you to disregard what you heard to the best that

Direct Examination - Terysa Welch

1  you can until the item is admitted, if it's admitted.

2  Q.   (By Mr. Villa)  You saw this document before?

3  A.   Yes, I have.

4  Q.   Okay.  And --

5        MR. VILLA:   Your Honor, I won't offer it at this

6  time.  I'll use it with another witness.

7  Q.   (By Mr. Villa)  Ultimately, was your -- did Chief Schultz

8  review Deputy Chief Feist's recommendation?

9  A.   I believe he did, yes.

10  Q.   And did he decide to impose discipline on you?

11  A.   He did.

12  Q.   Okay.  And this is -- Do you remember what time this

13  occurred?  What month?  What year?

14  A.   2010.  I'm not sure of the month.

15  Q.   Okay.  Let me show you Exhibit 100.

16        MR. VILLA:   Your Honor, this one's stipulated to,

17  Exhibit 100.

18        THE COURT:  No objection, Ms. Williams?

19        MS. WILLIAMS:  No, Your Honor.  We stipulated before

20  trial.

21        THE COURT:  100 is admitted.

22    (Plaintiff's Exhibit 100 admitted into evidence.)

23  Q.   (By Mr. Villa)  Ms. Welch, is this the notice that you

24  received from Chief Schultz regarding your final discipline?

25  A.   It's his prediscipinary notice, so this would have been

1    before my Loudermill with him.

2    Q.    Okay.  And that was January 20th, 2011?

3    A.    Yes.

4    Q.    And you had a hearing with the Chief February 5th, 2011?

5    A.    Yes.

6    Q.    And was it after that point in time that he ultimately

7    imposed the discipline that you talked about?

8    A.    Correct.

9    Q.    Okay.  What was the discipline that he imposed?

10   A.    He imposed a 40-hour suspension and a two-week loss of

11   take-home car, and then I had to serve actually 16 hours of

12   that.  He held the rest in abeyance.

13   Q.    Okay.  And at that point in time, was the Chief aware of

14   the EEOC investigation?

15   A.    Yes, he was.

16   Q.    Okay.

17         MR. VILLA:  Your Honor, these are stipulated to.

18   This is Exhibits -- Plaintiff's Exhibits 102 and 103.

19         THE COURT:  Ms. Williams, no objection?

20         MS. WILLIAMS:  No, Your Honor.  We stipulated prior

21   to trial.

22   Q.    (By Mr. Villa)  So, Ms. Welch I'm showing you

23   Exhibit 102.  This is the discipline from February 10th, 2011.

24   Is that right?

25   A.    Yes.

1   Q.   Okay.  And turn to the last page here, and it talks

2   about -- Let's see.  Oh, it's signed by you and dated

3   February 22nd, 2011.  Correct?

4   A.   Yes.

5   Q.   And so now let me show you 103.

6          THE COURT:  Just as to 102, how many pages are there?

7          MR. VILLA:  Two pages, Your Honor.

8   Q.   Exhibit 103 is the FINAL DISCIPLINE TO BE IMPOSED.

9   Correct?

10  A.   Correct.

11  Q.   And it says -- Well, excuse me.  This is signed, printed

12  by Raymond Schultz as Chief, right?

13  A.   Yes.

14  Q.   Okay.  And it talks about a hearing held on February 2nd,

15  2011.  That was the one with him, right?

16  A.   Correct.

17  Q.   Okay.  And he says, "I find that officer" -- right here --

18  "I find that officer Welch did in fact violent department

19  operating procedures by purchasing alcohol on October 12th,

20  2010, while in her assigned vehicle."  Right?

21          MS. WILLIAMS:  Objection, Your Honor.  Leading.

22          MR. VILLA:  I'm just going over the exhibit, Your

23  Honor.

24          THE COURT:  I understand.  Just walk it through with

25  the witness.

1          MR. VILLA:  Okay.

2          THE COURT:  The exhibit is admitted.  The jury will

3  be able to read it.

4  Q.  (By Mr. Villa)  Okay.  In here did he determine anywhere

5  that you had lied in the Internal Affairs investigation?

6  A.  No, he did not.

7  Q.  All right.  And the final discipline, you actually did

8  serve the 16-hour suspension?

9  A.  I did.

10 Q.  Okay.  Now, did you file a grievance with the City to

11 challenge this discipline?

12 A.  I did.

13 Q.  Do you know whether your discipline was reported to the

14 New Mexico Law Enforcement Academy?

15 A.  It was reported.

16         MR. VILLA:  Your Honor, I'm going to show Ms. Welch

17 Defendant's Exhibit E, which the parties have stipulated to.

18         THE COURT:  Which exhibit is that again?

19         MR. VILLA:  Defendant's Exhibit E.

20         THE COURT:  E.  All right.  E is admitted.  No

21 objection.

22     (Defendant's Exhibit E admitted into evidence.)

23 Q.  (By Mr. Villa)  Ms. Welch, I'm showing you a letter of

24 March 25th, 2011, to Michael Valverde of the NMLEA.  Is that

25 correct?

1    A.    Correct.

2    Q.    And what is the NMLEA?

3    A.    New Mexico Law Enforcement Academy, which is the entity

4    which is responsible for giving police officers their license

5    to be police officers.

6    Q.    It says here on the second page that the letter was issued

7    by Chief Schultz, but it's signed by Lieutenant Miller,

8    correct?

9    A.    Correct.

10   Q.    Okay.  And in the first page on Exhibit -- excuse me --

11   paragraph 1 here it says that these violations were sustained.

12   "Personnel shall obey, and to the best of their abilities,

13   protect the rights of the people as provided in the

14   Constitution of the United States."

15            Do you see that?

16   A.    I see that.

17   Q.    Were you ever accused in the Internal Affairs process of

18   this paragraph 1?

19   A.    Never.

20   Q.    Was this paragraph 1 ever sustained in the Internal

21   Affairs process that you went through?

22   A.    Never.

23   Q.    Do you have any idea why they would send a letter saying

24   you violated this to the NMLEA?

25   A.    I have no idea.

Direct Examination - Terysa Welch

1    Q.   Now, number 2, "Personnel shall not commit or omit any

2    such acts which constitute a violation of the rules," and they

3    found you violated the rules, right, for transporting alcohol?

4    A.   Correct.

5    Q.   The next one is what I showed you earlier, "Personnel

6    shall not knowingly interfere with criminal or administrative

7    investigations."  When that was going through the review

8    process, did Deputy Chief Feist sustain that violation?

9    A.   He did not sustain that.

10   Q.   So he reviewed it and didn't sustain it?

11   A.   Nope.

12   Q.   And Chief Schultz didn't sustain it either, did he?

13   A.   No, he did not.

14   Q.   So do you have any idea why they would send a letter to

15   the Law Enforcement Academy after Chief Schultz's imposition of

16   discipline that accused you of doing something that wasn't

17   sustained?

18   A.   It is not accurate.

19   Q.   And you don't know why it was sent?

20   A.   I don't.

21        MS. WILLIAMS:  Your Honor, there's a lack of

22   foundation here and we're going to object for that.

23        THE COURT:  Objection, foundation?

24        MR. VILLA:  Well, I've asked if she, knows and she

25   said she doesn't know.

1        THE COURT:  We're on Exhibit E?

2        MR. VILLA:  Yes, Your Honor.

3        THE COURT:  This has been admitted.

4        MR. VILLA:  It has.  It's a defendant's exhibit.

5        THE COURT:  Without objection?

6        MR. VILLA:  Without objection.

7        MS. WILLIAMS:  The line of questioning about what is

8   reported, there's a lack of foundation to that question.

9        THE COURT:  To the extent the witness knows,

10  Mr. Villa, you can establish that, but I think she already has

11  testified that she doesn't know.

12        MR. VILLA:  I think I agree, Your Honor, she doesn't

13  know, so I'm going to move on to my next question.

14        THE COURT:  All right.  Just move on.

15  Q.   (By Mr. Villa)  Now, number 4, "Personnel shall not bring

16  into any police facility...alcohol."  That was sustained,

17  right?

18  A.   Yes.

19  Q.   And number 5, employees shall not drive an unmarked

20  vehicle except for official purposes.  That was sustained?

21  A.   Yes.

22  Q.   Okay.  So this is the letter that got sent to the NMLEA?

23  A.   Yes.

24  Q.   And --

25        MR. VILLA:  Your Honor, I'm going to show Ms. Welch

243

1    Exhibit F, which is been stipulated by all parties.  It's

2    Defendant's Exhibit F.

3            THE COURT:  All right.  No objection.  It's admitted.

4        (Defendant's Exhibit F admitted into evidence.)

5    Q.   (By Mr. Villa)  Ms. Welch, is this a letter you received

6    from the NMLEA in response to the letter that I just showed

7    you?

8    A.   It is.

9    Q.   And tell the jury what the letter indicates.

10   A.   It indicates that the previous document that you just

11   showed along with this letter is part of my permanent file and

12   it always will be.

13   Q.   Did the NMLEA ultimately take action on your license?

14   A.   They didn't, but it will be considered if anything else

15   were to happen with me.

16   Q.   And do you know whether your name was submitted along with

17   other APD officers to the NMLEA at this time?

18   A.   It was.

19   Q.   Did the Albuquerque Journal publish an article regarding

20   that?

21   A.   Yes, it did.

22           MR. VILLA:  Your Honor, I want to show the jury

23   Exhibit 11, which I believe the Court has admitted pretrial.

24           MS. WILLIAMS:  Your Honor, that's true, it was

25   admitted over objection in a motion in limine.

Direct Examination - Terysa Welch

1      THE COURT:  It was admitted over objection, so you

2  may proceed, Mr. Villa.

3  Q.  (By Mr. Villa)  I'm showing you Exhibit Number 11.  Is

4  that the article that refers to the list of officers who were

5  sent to NMLEA?

6  A.  Yes.

7  Q.  And were you included on that list as a result of the

8  letters I just showed you?

9  A.  I was.

10  Q.  And do you know if this article was available online?

11  A.  Yes, it was.

12  Q.  And was there something that -- was there any links to the

13  online article?

14  A.  Yes, there were links.

15      MR. VILLA:  May I approach the witness, Your Honor?

16      THE COURT:  You may.

17  Q.  (By Mr. Villa)  I'm showing you what I've marked as

18  Plaintiff's Exhibit 97.  Is that document a list of officers?

19      THE COURT:  Mr. Villa, I'll ask you not to describe

20  the contents of the exhibit until it's been admitted.

21      MR. VILLA:  Oh, sure, Your Honor.

22      THE COURT:  Has this been admitted?

23      MR. VILLA:  It has not yet been admitted.

24      THE COURT:  Okay.  Please go through the steps.

25  Q.  (By Mr. Villa)  Ms. Welch, can you tell me whether there

Direct Examination - Terysa Welch

1   was a link on the online Albuquerque Journal article to what

2   is in Exhibit 97?

3   A.   There was.

4   Q.   Okay.

5           MR. VILLA:  And, Your Honor, I would move to admit

6   Exhibit 97.

7           THE COURT:  Ms. Williams?

8           MS. WILLIAMS:  Your Honor, we object.  That's just

9   one page of the list of 115 officers, so I don't know -- so

10  it's not complete, and I -- I don't know that there's a

11  foundation.  The article doesn't show a link.

12          THE COURT:  All right.

13          MS. WILLIAMS:  Foundation and the other objections

14  that we made in motions hearings.

15          THE COURT:  Okay.  Now, as to the foundation

16  objection, Mr. Villa, you can try and see if you can establish

17  the foundation through this witness.

18  Q.   (By Mr. Villa)  Ms. Welch, did you access the link that

19  led to a portion of what you see there on Exhibit 97?

20  A.   Yes, I did.

21  Q.   Okay.  And so does Exhibit 97 fairly and accurately

22  represent at least the first page of the link that you accessed

23  to the online article?

24  A.   It does.

25          MR. VILLA:  Your Honor, I think based on that I would

Direct Examination - Terysa Welch

1   argue the foundation's been established.

2           THE COURT:  Well, okay.  As to completeness or

3   incompleteness about the document and its association with the

4   link itself?

5           MR. VILLA:  Well, I think she testified it's -- it is

6   the link.  The reason we didn't attach the full list is just to

7   reduce the number of pages, and the relevant portion is on that

8   first page.

9           THE COURT:  All right.  97 is admitted.

10      (Plaintiff's Exhibit 97 admitted into evidence.)

11  Q.   (By Mr. Villa)  Ms. Welch, is that 97 a list of officers,

12  part of the 115 officers on this sanction list that's

13  discussed in the article?

14  A.   Yes, it is.

15  Q.   Is your name on that list?

16  A.   It is.

17  Q.   And are there other APD officers on that list, as well?

18  A.   There are other names, yes.

19  Q.   Including, as the article points out here, Levi Chavez?

20  A.   Yes.

21  Q.   Now, after the disciplinary process that you went through

22  at around March of 2011, what happened with respect to your

23  position in Burglary or ROP?

24  A.   You mean what was the final outcome?

25  Q.   Yes.  Not with respect to the discipline, but I mean with

Direct Examination - Terysa Welch

1   whether you stayed in Burglary or went back to ROP.

2   A.   I ultimately stayed in Burglary.

3          MR. VILLA:  Your Honor, I'm going to show the jury

4   what's already been stipulated to, Exhibit 82 and Exhibit 84.

5          THE COURT:  All right.  Ms. Williams, no objection as

6   to these two exhibits?

7          MS. WILLIAMS:  No, Your Honor.  We stipulated them

8   for trial.

9          THE COURT:  Okay.  They're admitted.

10     (Plaintiff's Exhibits 82 and 84 admitted into evidence.)

11  Q.   (By Mr. Villa)  Ms. Welch, this is a letter from -- a

12  memo from Deputy Chief Feist to you dated March 14th, 2011,

13  correct?

14  A.   Correct.

15  Q.   And what is the memo saying?

16  A.   It's telling me that I'm going to be transferred from my

17  TDY in Burglary to ROP.

18  Q.   And did you ultimately respond to Deputy Chief Feist about

19  that?

20  A.   Yes, I did.

21  Q.   Okay.  Let me show you 84.  There's 84.  Is this an e-mail

22  from Deputy Chief Feist to you?

23  A.   Yes, it is.

24  Q.   What does this e-mail say?

25  A.   It's from Deputy Chief Feist to me telling me that I have

1  ten days to make a choice whether I want to remain in Burglary

2  to be my permanent assignment or return to ROP or go to the

3  field, which means put a uniform back on.

4  Q.   And what did you ultimately decide to do?

5  A.   I decided to stay in Burglary.

6  Q.   And why did you decide to stay in Burglary and not go back

7  to ROP?

8  A.   For a number of reasons.  I didn't feel like I could

9  recover with my teammates at that point.  I had been gone for

10  well over a year.  There had been opinions that had been made

11  clear through other people about my return, that there were new

12  people over there that didn't know me anymore that had come in

13  since my absence.  I felt that by the Department removing me

14  for that amount of time it made it look like I had done

15  something wrong, and I didn't feel like I would have a fair

16  opportunity over there to return.

17  Q.   So once you made the decision, then, to stay in Burglary,

18  did you seek to promote to Sergeant?

19  A.   I went back to Burglary, and then I eventually did decide

20  that, you know, with some encouragement, to find a different

21  path, so, yeah, I decided to start taking the path of

22  promotion.

23  Q.   Did you ultimately succeed and get promoted to Sergeant?

24  A.   Ultimately, I did.

25  Q.   When was that?

1   A.    That was in 2013.

2   Q.    So getting back to some of your testimony from this

3   morning, was it your ultimate goal -- Well, let me ask you this

4   way.  I should have asked you this question first.  I'm getting

5   a little tired.  When you got promoted to Sergeant, what

6   position were you a Sergeant in?

7   A.    The field.  Field Services.  Uniform.

8   Q.    Okay.  So you were over patrol officers?

9   A.    Correct.

10  Q.    Was that what your ultimate goal was when you got into

11  ROP?

12  A.    No.

13  Q.    In order to promote to Sergeant, go through the process,

14  did you have to write a letter to Chief Schultz?

15  A.    Yes, I did.

16  Q.    I'm going to show you what has already been stipulated as

17  Exhibit 105.

18          THE COURT:  No objection?

19          MS. WILLIAMS:  No, sir.

20          THE COURT:  105's admitted.

21      (Plaintiff's Exhibit 105 admitted into evidence.)

22  Q.    (By Mr. Villa)  This is Exhibit 105.  Is this the letter

23  that you wrote to Chief Schultz in order to promote to

24  Sergeant -- or to start the process?

25  A.    Yes, it was.

250
Direct Examination - Terysa Welch

1   Q.   Why did you have to write a letter to Chief Schultz in

2   order to be able to start the Sergeant testing process?

3   A.   Because of the discipline that I had received.

4   Q.   The discipline that we just talked about with the alcohol

5   violation?

6   A.   Correct.

7   Q.   And if you had received a written reprimand for the

8   alcohol violation, would you have to write this letter?

9   A.   No.

10  Q.   Why not?

11  A.   Because it wasn't -- wouldn't have been serious enough.

12  Q.   Can you tell the jury a little bit, what's involved in the

13  promotion process for a Sergeant?

14  A.   Sure.  You begin with a written test.  If you score a 70

15  percent or higher on the written test, then you go to what's

16  called an Assessment Center.  And at the Assessment Center, you

17  have a panel of people brought in from outside of APD that

18  don't know you.  Your name is never divulged.  You go through a

19  series of scenarios that change every time.  You don't know

20  what they're going to be ahead of time.  And they -- the panel

21  of people, they grade you on how you do in these different

22  scenarios.  It can be anything from, say, a critical incident

23  to how well you organize paperwork, to how well you write

24  memos, to, you know, how well you counsel a subordinate, things

25  like that.  Things that a Sergeant would have to do in their

1  duties.

2  Q.   And so you then became a Sergeant in the field.  I think

3  you said March 7, 2013.  Then did you go through the Lieutenant

4  promotional process?

5  A.   Yes, I did.

6  Q.   What did you have to do to promote to Lieutenant?

7  A.   Same sort of process.  You start with a written test.  If

8  you pass that, then you go to an Assessment Center also, but

9  it's a much higher level Assessment Center with Lieutenant

10  level assessment tests, and then you're ranked according to how

11  well you did.  You compare to similar people you test against.

12  Q.   When did you ultimately promote to Lieutenant?

13  A.   August 31st, 2017.

14  Q.   And what position were you put in as a Lieutenant?

15  A.   I am a Lieutenant at the Aviation Sunport.

16  Q.   And you've been in that position ever since through today?

17  A.   Correct.

18  Q.   Okay.  Let me ask you a little bit about getting back to

19  the time period when this was going on with ROP and these

20  issues.  You said you had some emotional problems?

21  A.   Yes.

22  Q.   Did you seek any counseling?

23  A.   I did.

24  Q.   Can you tell the jury about that?

25  A.   Yes.  Not something I ever thought that I would do, but it

Direct Examination - Terysa Welch

1  became very overwhelming for me, and so I sought out some

2  professional help, saw a doctor by the name of Joan Scott, and

3  then she had a counterpart there in her office that handled

4  medication.

5  Q.   Did you try taking medication?

6  A.   Oh, I did.

7  Q.   Did it work?

8  A.   No.  It did not work for me.

9  Q.   Did you keep taking the medication?

10  A.   I think I tried four, four or five different medications,

11  had a lot of pretty horrible side effects.

12  Q.   Had you ever been on medication for emotional problems

13  before?

14  A.   No.

15  Q.   Had you ever sought counseling for emotional problems

16  before?

17  A.   No.

18  Q.   When did you seek this counseling?

19  A.   Excuse me.  In 2010.

20  Q.   How many sessions did you go to?

21  A.   I think I saw the doctor for about four months.

22  Q.   Why did you stop going?

23  A.   The doctor crossed a professional boundary that wasn't

24  okay with me, so I stopped my sessions.

25  Q.   Okay.  Now that you've made it to Lieutenant, what's the

1   next step up in terms of rank for promotional purposes?

2   A.   After Lieutenant at APD it's no longer in your hands.

3   It's all political, if you will.  There's no more testing.  The

4   Chief has to basically like you or take notice of you, somehow.

5   Q.   So for Sergeant and Lieutenant you can go through a

6   testing proses, but for -- What's the next step up?  Captain?

7   A.   It's called Commander now.

8   Q.   I'm sorry, Commander?

9   A.   Yeah.

10  Q.   Are you able to do a testing process?

11  A.   No, no more testing for me.

12  Q.   Would you -- If you were able, could you go back to SID?

13  A.   No.  That's -- That's an invitation-only sort of a place.

14  Q.   When you say "invitation-only sort of a place," what do

15  you mean?

16  A.   Those are very highly coveted positions, and they require

17  a high degree of trust, a high degree of popularity, if you

18  will, and due to my experiences and what has happened and my

19  filing of an EEOC, that won't -- that won't happen for me.

20  Q.   Well, let me ask you this.  Since you ultimately made the

21  decision and got promoted to Sergeant, did you ever get an

22  invitation from SID to be a Sergeant over there?

23  A.   No.

24  Q.   Since your promotion to Lieutenant, have you gotten an

25  invitation by SID to be a Lieutenant there?

1    A.    No.

2              MR. VILLA:  May I have just a moment, Your Honor?

3              THE COURT:  You may.

4              MR. VILLA:  I'll pass the witness, Your Honor.

5              THE COURT:  All right.  Well, it's ten minutes till

6    5:00.

7              Ms. Williams, I imagine it will take longer than ten

8    minutes.

9              MS. WILLIAMS:  It absolutely will, Your Honor.  I

10   have a lot to cover with Lieutenant Welch.

11             THE COURT:  It was a lengthy direct examination.

12             So, ladies and gentlemen, we'll just pause for the

13   day at this time.  So I wouldn't be doing my job if I released

14   you without giving you an instruction.  This kind of goes along

15   with what we talked about earlier today.

16             All right.  So you'll hear this instruction probably

17   multiple times as we go forward.  Now, we'll be recessing for

18   the day, and during the recess, do not discuss the case with

19   anyone other than yourselves.  And then only in the jury room

20   when all of you are present.  Do not attempt to decide the

21   outcome of the case before you begin the final deliberations.

22             Please continue to wear your jury badges while in and

23   around the courthouse.  Obviously, at the end of the day, you

24   may leave those in the jury deliberations room.

25             If someone other than your fellow juror happens to

Direct Examination - Terysa Welch

1    discuss the case in your presence, please report that at once,

2    as soon as you can anyway, to the staff of my court.  If you

3    happen to see or hear any news accounts of this trial, also,

4    please report that to my staff, as well.

5              Okay.  So that will be it for the day.  Let me just

6    ask, did anybody have any trouble getting to the courthouse

7    this morning?  Just by show of hands.  All right.  It may take

8    a little while, so I would ask that you're in the jury

9    deliberation room as close to 8:30 tomorrow morning, and we'll

10   get started just as promptly as we can.

11             Okay.  Until then, please have a restful evening, and

12   we'll see you in the morning.

13             Please rise for the jury.

14      (Jury out at 4:50 p.m.)

15             THE COURT:  All right.  You may be seated.

16             Ms. Welch, you may step down.

17             All right.  Let me just ask.  Mr. Villa, is there

18   anything that I should cover now at this time before we recess

19   for the day?

20             Same question for Ms. Williams.

21             MR. VILLA:  I don't think so, Your Honor.  I just

22   wanted to say, you know, I think this is clearly the longest

23   witness that we intend to have.  I think the others will go

24   more quickly, and I do think that we still have communicated

25   very well about dual purposing, for lack of a better word,

1    these witnesses that we'll be calling, many of the individuals

2    you've heard about, and so that the defense and plaintiff will

3    be covering both their cases at the same time.  And so I think

4    that to some degree, even though it's been a long day, we're

5    still working on trying to cover that.  I'll let Ms. Williams

6    speak on it, as well.

7              MS. WILLIAMS:  Your Honor, some of the witnesses

8    we've chosen to call back in our case-in-chief and not do our

9    direct while we're here, but some are out of the town and have

10   other jobs and aren't able to do that.  We have tried to finish

11   witnesses -- agree to finish witnesses in plaintiff's

12   case-in-chief, but there are some that we need to call back.

13             THE COURT:  Okay.  Can you give me an idea,

14   Mr. Villa, of what your plan is for tomorrow, who you would

15   call?

16             MR. VILLA:  Sure.  I was just writing that down, Your

17   Honor.

18             THE COURT:  Okay.  Not that I would hold you to the

19   minute, Ms. Williams, but how long would you expect?

20             MS. WILLIAMS:   Your Honor --

21             THE COURT:  I understand this is an art form.

22             MS. WILLIAMS:  It is an amorphous art, but I told

23   Mr. Villa before he started that I had two hours, and I have a

24   lot of stickies that have come up since then, so between two

25   and three, I think.

Direct Examination - Terysa Welch

1          THE COURT:  Okay.  With that idea, what would be the

2    plan for tomorrow, Mr. Villa?

3          MR. VILLA:  Your Honor, we would be planning to call

4    Robert Smith, Danny Garcia, Dr. Bill Foote, who is only

5    available Tuesday afternoon, so we'll need to get him on.  If

6    there's additional time, we can also call Jason Bowie, and I

7    think -- I'm just double-checking on subpoenas, but Nick

8    Laskar.

9          MS. WILLIAMS:  Your Honor, Ryan, we made Hudson

10    available tomorrow.  He came from out-of-state and so he has to

11    go tomorrow.

12          MR. VILLA:  Yes.  Well, Tuesday or Wednesday morning,

13    right.

14          MS. WILLIAMS:  Is that right?

15          MR. VILLA:  Yes.  So Hudson's the other one.  The

16    agreement we have amongst the parties, he's one of the ones

17    from outside of town that I think we are double purposing so

18    that he'll be here tomorrow afternoon and available Wednesday,

19    as well, so my thinking was he would probably be going on at

20    the end of the day Tuesday.

21          THE COURT:  Tuesday or early Wednesday?

22          MR. VILLA:  Yeah.  I think that would probably cover

23    tomorrow.

24          THE COURT:  Okay.

25          MR. VILLA:  So some of these folks, like Mr. Garcia

Direct Examination – Terysa Welch

1  and Jason Bowie, they're here all week, so I may not use them

2  if we end up taking the time to get Mr. Hudson out of here on

3  Tuesday and Dr. Foote out of here on Tuesday, as well.

4         THE COURT:  Okay.  My instruction is just fill the

5  trial day, maximize the time we have with the jury.  It sounds

6  like you have planned for that.

7         MR. VILLA:  Yes, Your Honor.

8         THE COURT:  Okay.  Ms. Williams, is there anything

9  that you think I should take up?

10         MS. WILLIAMS:  No, Your Honor.  I think we're in a

11  good shape.

12         THE COURT:  Okay.  We'll get a copy of the jury

13  seating chart to you this evening if you don't have it already.

14  We'll get it to you before you leave.

15         MS. WIGGINS:  All right.  It was given to us earlier

16  today.

17         THE COURT:  All right.  We'll be in recess.  I'm just

18  going to assemble things here, but you may continue on.  All

19  right.

20      (Court stood in recess at 4:54 p.m.)

21

22

23

24

25

Danna Schutte Everett
Official United States Court Reporter
100 N. Church, Las Cruces, New Mexico  88001
(575)528-1656

1                          I N D E X

2        EXAMINATION                                    PAGE

3    PLAINTIFF'S WITNESS TERYSA WELCH

4        Direct Examination by Mr. Villa                 65

5                          I N D E X

6

7    EXHIBITS                            IDENTIFIED/ADMITTED

     Defendant's Exhibit E admitted                     239
8    Defendant's Exhibit F admitted                     243
     Plaintiff's Exhibit 8 admitted                     209
9    Plaintiff's Exhibit 42 admitted                    186
     Plaintiff's Exhibit 46 admitted                    131
10   Plaintiff's Exhibit 62 admitted                    142
     Plaintiff's Exhibits 82 and 84 admitted            247
11   Plaintiff's Exhibits 87a, 87b, 87d, and 87l  admitted   215
     Plaintiff's Exhibit 87 admitted                    216
12   Plaintiff's Exhibit 94 admitted                    229
     Plaintiff's Exhibit 95 admitted                    231
13   Plaintiff's Exhibit 97 admitted                    246
     Plaintiff's Exhibit 100 admitted                   236
14   Plaintiff's Exhibit 105 admitted                   249

15

16

17

18

19

20

21

22

23

24

25

1                   C-E-R-T-I-F-I-C-A-T E

2   UNITED STATES OF AMERICA

3   DISTRICT OF NEW MEXICO

4

5       I, Danna Schutte Everett, RPR, CCR, CRR, Official

6   Court Reporter for the State of New Mexico, do hereby

7   certify that the foregoing pages constitute a true

8   transcript of proceedings had before the said Court held

9   in the city of Albuquerque, New Mexico, in the matter

10  therein stated.

11      In testimony whereof, I have hereunto set my hand on

12  this 15th day of June, 2018.

13

14            _____

15            DANNA SCHUTTE EVERETT
              Registered Professional Reporter
16            Registered Merit Reporter
              Certified Realtime Reporter
17            NM Certified Court Reporter #139
              100 Church Street
18            Las Cruces, New Mexico  88001
              Phone:  (575) 528-1656
19            Fax:  (575) 528-1645
              dannadawn@comcast.net

20

21

22  May 14, 2018, Welch vs. City of Albuquerque

23

24

25