1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW MEXICO

3

TERYSA M. WELCH,

4

                PLAINTIFF,

5

        vs.                    NO:  CIV-11-0700 KG/SCY

6

CITY OF ALBUQUERQUE, a New Mexico

7 Municipality, et al.,

8              DEFENDANTS.

9

10

11        TRANSCRIPT OF TRIAL PROCEEDINGS - VOLUME II

12          BEFORE THE HONORABLE KENNETH J. GONZALES

13          TUESDAY, MAY 15, 2018; 8:40 A.M.

14             ALBUQUERQUE, NEW MEXICO

15

16

17      Proceedings recorded by mechanical stenography;
   transcript produced by computer.

18

19

20

21

22

23 Reported By:  Danna Schutte Everett, CRR, RPR, RMR, CCR 139
              United States Court Reporter
24            100 N. Church Street, Las Cruces, NM  88001
              Phone:  (575) 528-1656  Fax: (575) 528-1645
25            dannadawn@comcast.net

```
 1   FOR THE PLAINTIFF:

 2        THE LAW OFFICE OF RYAN J. VILLA
          2501 Rio Grande Boulevard, Northwest, Suite A
 3        Albuquerque, New Mexico  87104
          BY:  MR. RYAN J. VILLA and
 4             MS. RICHELLE ANDERSON

 5   FOR THE DEFENDANTS:

 6        WIGGINS, WILLIAMS & WIGGINS
          1803 Rio Grande Boulevard, Northwest
 7        Albuquerque, New Mexico  87104
          BY:  MS. PATRICIA WILLIAMS and
 8             MS. LORNA M. WIGGINS

 9   Also Present:  Ms. Terysa M. Welch
                    Ms. Trish Hernandez
10                  Mr. Trevor Wiggins
                    Ms. Elizabeth Paiz
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Okay.  Good morning, again.  Please be

2    seated.

3          Okay.  Back on the record, continuing the jury trial

4    in 11-CV-700.  I see all counsel are present, as is Ms. Welch.

5          All right.  Mr. Villa, before we call the jury in, is

6    there anything that I need to take up?

7          MR. VILLA:  Nothing significant, Your Honor.  The

8    only thing I was going to ask is, I appreciate the Court

9    asking, you know, how much time is left.  I'm just wondering if

10   maybe we can do that outside the presence of the jury so they

11   don't really blame it on me if I go too long.  I suppose

12   Ms. Williams may have the same issue as she does her

13   cross-examinations.

14         THE COURT:  Uh-huh.  I'll consider that.

15         MR. VILLA:  Thank you, Your Honor.

16         THE COURT:  All right.  Let me just -- Ms. Williams,

17   is there anything from your side?

18         MS. WILLIAMS:  No, Your Honor.

19         THE COURT:  Okay.  Let me just remind counsel.  I

20   know you're working diligently with your exhibits.  Some of

21   them have been stipulated.  Even -- Bear with me, because even

22   though they're stipulated, I still have to make a record that

23   they're admitted, so we'll go through the paces and make a

24   record that way.

25         Let me just remind counsel.  As you're working with

```
 1    exhibits that have not yet been stipulated or have not been
 2    stipulated and have not yet been admitted, please avoid
 3    publishing the contents of the exhibit before it's actually
 4    been admitted.  As you're working with your exhibit and as the
 5    witness is testifying as to that exhibit, also just seek to
 6    avoid the witness publishing in testimony what is contained in
 7    the exhibit.  So the substance of the exhibit I guess is what
 8    I'm getting to.  Once it's admitted, if it's admitted, then, of
 9    course, publish it as you need to.  Put it on the ELMO.
10              In this way also, to the extent we're endeavoring to
11    save time, I guess do what you need to do without having to
12    just repeat what is already in evidence and in front of the
13    jury.
14              Those are just my suggestions as we move forward.
15              Okay.  Any questions about that, Mr. Villa?
16              MR. VILLA:  No, Your Honor.
17              THE COURT:  Okay.  Ms. Williams?  Ms. Wiggins?
18              MS. WIGGINS:  Yes, Your Honor.  Is it the Court's
19    preference that we ask each time that we publish this to the
20    jury?
21              THE COURT:  No, it's not necessary.  That's a good
22    question.  Some of the judges do prefer that and then some
23    don't.  Once it's admitted, feel free to do what you need to
24    with the item.
25              Okay.  If there's nothing else, then --
```

```
 1              Are they all lined up?

 2              Okay.  Let's get started.

 3              MR. VILLA:  Would you like Ms. Welch to resume --

 4              THE COURT:  Definitely.

 5              Ms. Welch, you may have water in the pitcher.  Feel

 6  free to -- Is there water in there?

 7              THE WITNESS:  Thank you, Your Honor.

 8              THE COURT:  Let me just warn you, because it's

 9  happened before, where as you're pouring it, the lid pops up

10  just sort of suddenly, and then in one instance we had water

11  all over the desk.

12              THE WITNESS:  Okay.

13              THE COURT:  So just a warning --

14              THE WITNESS:  Okay.  Thank you.

15              THE COURT:  -- to avoid that.

16              All right.  Ms. Hall.

17         (Jury in at 8:44 a.m.)

18              THE COURT:  Okay.  Good morning, everyone.  Please be

19  seated.

20              All right.  We're resuming trial.  I hope everyone

21  had a restful night.  I know some of you are not in your own

22  beds, but nevertheless, I hope that it was restful.

23              So day two, and we're resuming with testimony.

24              Ms. Welch, I'll remind you, you're under oath just as

25  yesterday, so we'll get started.
```

Cross-Examination - Terysa M. Welch

1        Ms. Williams.

2        MS. WILLIAMS:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4   BY MS. WILLIAMS:

5   Q.   Good morning, Lieutenant Welch.

6   A.   Good morning.

7   Q.   Let's talk about your APD career to start with.  You went

8   to the Academy in 1997/'98 correct?

9   A.   Correct.

10  Q.   And you graduating class had 26 officers?

11  A.   Yes, ma'am, I believe so.

12  Q.   Three of them were female?

13  A.   Correct.

14  Q.   One of your field training officers was female.  Is that

15  correct?

16  A.   Yes, ma'am.

17  Q.   When you were recruited to go to Northeast Impact, you

18  were recruited by Rob Smith, right?

19  A.   I was recruited by a male detective and then Rob Smith.

20  Q.   And he was the sergeant at Northeast Impact?

21  A.   Correct.

22  Q.   The detective didn't have the ability to hire you into or

23  select you into Northeast Impact.  It had to be the sergeant.

24  A.   Correct.

25  Q.   Sergeant Smith specifically wanted you in this unit.

Cross-Examination - Terysa M. Welch

1   A.   In Northeast Impact?

2   Q.   Yes, ma'am.

3   A.   He didn't know me, but he was the sergeant in Northeast

4   Impact.

5   Q.   How many members were in Northeast Impact?

6   A.   Approximately seven.

7   Q.   And Detective J.R. Potter, who later joined you at ROP,

8   was also at Northeast Impact with you.

9   A.   That's correct.

10  Q.   Sergeant Smith was an active sergeant, correct?

11  A.   Yes, he was very active.

12  Q.   He took a direct operational role in the unit?

13  A.   That's right.

14  Q.   You never told Sergeant Smith that you thought he was

15  doing his job incorrectly.

16  A.   No.

17  Q.   But you had criticisms of how he was running the Northeast

18  Impact unit.

19  A.   No.

20  Q.   You didn't have any criticisms of Sergeant Smith at

21  Northeast Impact?

22  A.   No, I did not have any criticisms.

23  Q.   Okay.  You and Sergeant Smith as part of your job would

24  disguise yourselves as a couple to work undercover sometimes,

25  correct?

Cross-Examination – Terysa M. Welch

1    A.    Very rarely, but yes, a couple of times that did happen.

2    Q.    And you also had to disguise yourself as a couple with

3    other teammates, like Jerry Hicks.

4    A.    He was my partner.  Correct.

5    Q.    Under Sergeant Smith's hands-on leadership, Northeast

6    Impact was very successful; wasn't it?

7    A.    Yes, it was.

8    Q.    And there were no other women detectives in Northeast

9    Impact when you were there?

10   A.    Correct.

11   Q.    You didn't mention to Sergeant Smith when you went to

12   Northeast Impact, that your goal was to eventually go to ROP.

13   A.    We did have, eventually, that discussion.

14   Q.    Eventually, but not when he recruited you?

15   A.    No.

16   Q.    Sergeant Smith transferred out of ROP while you were still

17   in Northeast Impact?

18   A.    Correct.

19   Q.    And how long did you stay in Northeast Impact after

20   Sergeant Smith left?

21   A.    I don't recall exactly.  I came to Northeast Impact in

22   2001 and went to CIT in 2003, so I would estimate less than a

23   year.

24   Q.    Okay.  You never reported any issues with Sergeant Smith

25   while you were at Northeast Impact.

Cross-Examination - Terysa M. Welch

1   A.   No, ma'am.

2   Q.   Northeast Impact was a close-knit group.

3   A.   Yes.

4   Q.   You probably knew more about each other than you should've

5   because you work all the time together.

6   A.   I wouldn't agree with that.

7   Q.   You didn't share personal details, you didn't joke around,

8   you didn't treat each other like family members?

9   A.   Oh, sure, we joked around.

10  Q.   Close-knit group?

11  A.   Yes.

12  Q.   Knew details of your personal lives?

13  A.   We knew each other's personal lives.  We knew each other's

14  families.

15  Q.   Being a police officer, a police detective is a

16  high-pressure job, isn't it?

17  A.   It can be.

18  Q.   And people joke to relieve stress, don't they?

19  A.   Yes, they do.

20  Q.   People use foul language --

21  A.   Sure.

22  Q.   -- regularly in law enforcement?

23  A.   Sure, they do.

24  Q.   Including you?

25  A.   I do.

Cross-Examination - Terysa M. Welch

1   Q.   You become comfortable around your teammates, right?

2   A.   Yes.

3   Q.   Comfortable enough to joke about personal issues or make

4   comments that you might not make to this jury, for example?

5   A.   I would agree with that.

6   Q.   You stayed in Northeast Impact until you applied to SID,

7   Special Investigations unit, correct?

8   A.   Correct.

9   Q.   And you went to CIT in roughly 2002?

10  A.   '3.

11  Q.   '3?  Okay.  Thank you.  Transferring to Crisis

12  Intervention Team was your second detective job, right?

13  A.   Correct.

14  Q.   It wasn't a promotion?

15  A.   No.  It's not considered a promotion at APD.

16  Q.   Because under the union contract which covered your

17  employment, a detective's a detective?

18  A.   Correct.  It's not a pay raise.

19  Q.   Same job description?

20  A.   It's not the same job description, but it's not a pay

21  raise --

22  Q.   Okay.

23  A.   -- which --

24  Q.   Same job duties?

25  A.   Not the same job duties.

1    Q.    In what way do the job duties differ?

2    A.    From Northeast Impact to CIT?

3    Q.    Yes.  On the job description that governs a detective

4    position.

5    A.    Okay.  So it's just a different set of responsibilities.

6    Northeast Impact detectives would be responsible for

7    investigating felony crimes, whereas CIT detectives are

8    responsible for a caseload of people who are suffering from

9    mental illness.

10   Q.    And, in fact, in APD an officer's job description and --

11   is the same as the detective's.  It's the same rate of pay and

12   same job description.  Maybe not the same day-to-day duties,

13   but the same job description, correct?

14   A.    I disagree it's the same job description.

15   Q.    Do you know where the job descriptions are published?

16   A.    I believe that would be down at Payroll.

17   Q.    Okay.  And do you think that there's different job

18   descriptions for officers and detectives?

19   A.    Yes.

20   Q.    Okay.  You had no issues with Sergeant Smith while you

21   were at CIT.  You didn't cross paths there, correct?

22   A.    No, I did not.

23   Q.    Okay.  And then he asked you to join his team at ROP?

24   A.    He encouraged me to put in for the position.

25   Q.    It took you seven years to get into ROP, correct?

Cross-Examination - Terysa M. Welch

1    A.    Approximately, yes.

2    Q.    Okay.  How many times did you TDY, which is -- What does

3    TDY mean?  Can you tell the jury?

4    A.    TDY is where you would go temporarily for however much

5    time you could get permission from your current supervisor, and

6    go spend a short period of time with whatever unit you were

7    trying to transfer to.

8    Q.    How many times did you TDY to ROP before you tested?

9    A.    I think I might have gotten two TDY's.

10   Q.    And how long were those and when?

11   A.    I don't know when they were.  I believe they were maybe a

12   week at a time.

13   Q.    Who was the sergeant at ROP when you TDY'd to ROP?

14   A.    I believe the sergeant was Ron Brown, and I may have -- I

15   don't remember if I got a TDY when Rob Smith was the sergeant

16   or not.

17   Q.    Okay.  You tested for ROP three times?

18   A.    At least two times prior to going there.

19   Q.    Two times and then the successful time?

20   A.    I believe so.

21   Q.    Okay.  Tell me when you tested for ROP the first time.

22   What year?

23   A.    I don't recall a year, ma'am.

24   Q.    While it was -- While you were at Northeast Impact or

25   while you were at CIT?

Cross-Examination – Terysa M. Welch

1   A.   I think it was when I was in the field, to be honest with
2   you.
3   Q.   Okay.  So it would have been before 2001?
4   A.   I believe so.
5   Q.   Who was the sergeant at ROP then?
6   A.   Ron Brown.
7   Q.   How many people applied when you applied the first time?
8   A.   I don't recall.  It was several.  It's always a
9   competitive testing process to get into ROP.
10  Q.   The second time, tell me what year you tried to test into
11  ROP.
12  A.   I don't recall the year.
13  Q.   Were you at Northeast Impact or CIT?
14  A.   I wasn't in either.  I think they were both while I was in
15  the field.
16  Q.   Was Ron Brown the sergeant the second time you tested?
17  A.   I believe both times were when Ron Brown was the sergeant.
18  Q.   And how many people were in the process with you?
19  A.   I don't recall exactly either time, but it was more than
20  ten people.
21  Q.   Do you recall if any other women were in the process the
22  first time you tried?
23  A.   Neither time did any women try for the position.
24  Q.   And the third time you tested, Rob Smith was the sergeant?
25  A.   Yes, ma'am.

Cross-Examination - Terysa M. Welch

1    Q.   And that was in 2004?

2    A.   Yes.

3    Q.   Okay.  And no women were involved in the process?

4    A.   No.

5    Q.   There were two open positions at that time, correct?

6    A.   Correct.

7    Q.   And you did an interview with the entire ROP team.

8    A.   I don't know if it was the entire ROP team, but it was the

9    majority.

10   Q.   Okay.  At the time of your interview, Mick Rael was in the

11   group -- was he involved in the group?

12   A.   I don't recall if Mick -- he was on his way out, so I'm

13   not sure if he was there or not.

14   Q.   How about Dan Wolfe, was he involved in the interview?

15   A.   I believe so.

16   Q.   How about Lou Heckroth?

17   A.   I believe so.

18   Q.   How about Rich Lewis?

19   A.   I believe so.

20   Q.   How did Kevin Gagne?

21   A.   I believe so.

22   Q.   How about Ryan Buckner?

23   A.   I believe so.

24   Q.   And Sergeant Smith?

25   A.   Yes, ma'am.

Cross-Examination - Terysa M. Welch

1   Q.   So you remember everyone but Mick Rael, who was on his way

2   out, being involved in the interview with you?

3   A.   Mick was transferring to SWAT during that time, and I'm

4   not sure if he was there or not.

5   Q.   So you finally got into ROP in July of 2004?

6   A.   Correct.

7   Q.   Okay.  This wasn't a promotion.  You're still a detective

8   for the third time, third assignment?

9   A.   It was not a promotion as in the definition of a pay rise.

10  Q.   Okay.  You're still a City detective.

11  A.   Yes, ma'am.

12  Q.   Still paid as a detective under the union contract.

13  A.   Correct.

14  Q.   Sergeant Smith ran the testing for ROP, didn't he?

15  A.   I believe so.

16  Q.   And with the two openings available, you and Mike Hill

17  were hired.

18  A.   Yes.

19  Q.   Or selected.

20  A.   Yes, ma'am.

21  Q.   The detectives you were competing against were some people

22  who had SWAT experience, right?

23  A.   I have no idea.  I believe one person had some SWAT

24  experience, yes.

25  Q.   You believe one person had SWAT experience?

1    A.    (Nodded head.)

2    Q.    Neither you nor Detective Hill had SWAT experience?

3    A.    No.

4    Q.    You became aware that some of the ROP team wanted people

5    with SWAT training instead of you and Hill?

6    A.    I did not have that knowledge.

7    Q.    You did not.  Okay.  You weren't aware that Rael, Gagne,

8    Lewis, and Wolfe wanted detectives from SWAT --

9    A.    I did not --

10   Q.    -- instead of you and him.

11   A.    I'm sorry.  I did not have that knowledge.

12   Q.    Now, you're aware that two women had been in ROP before

13   you, correct?

14   A.    I was aware that one woman had been in ROP before me.

15   Q.    And who is that person's name?

16   A.    That's Lorraine Sadler-Lopez [sic].

17   Q.    Were you aware that Cheryl Paloni had also been a ROP

18   detective?

19   A.    I did not.

20   Q.    Do you know her?

21   A.    I don't.

22   Q.    That was before your time?

23   A.    Yes, ma'am.

24   Q.    The ROP team was allowed input into who they wanted to

25   fill the positions on their team, but the decision was Sergeant

1   Smith's, wasn't it?

2   A.   I'm not sure whose the decision was.  It was according to

3   our ranking and our scores, was my understanding.

4   Q.   And he chose you and him based on your ranking and scores?

5   A.   It would appear that we scored the highest and that's how

6   we were in the positions.

7   Q.   You testified yesterday that Detective Hill got equipment

8   that you didn't get.  What did he get that you did not get?

9   A.   He made the statement to me that he got equipment --

10  Q.   I'm going to ask you what you know Detective Hill got that

11  you didn't get.

12  A.   Okay.

13  Q.   I don't want you to tell me any hearsay.  That's not how

14  this works.

15  A.   Okay.  I know that he got a tac vest, which is how we mark

16  ourselves up when we take down a suspect so that they know that

17  we're a police officer.  Binoculars.  And beyond that, I didn't

18  ask.

19  Q.   Okay.  Now, you had your bulletproof vest that's issued by

20  the City before you went ROP, correct?

21  A.   Yes.  That's custom fit and it stays with me.

22  Q.   And the tac vest is the one that has the ROP patches on

23  it, right?

24  A.   ROP, Police, like that, yes, ma'am.

25  Q.   And you didn't have a tac vest at CIT or any of your

1    previous positions?

2    A.    No.  I had marking -- different markings, but it's

3    according to what unit you're in what is necessary.

4    Q.    So you are saying that he got a tac vest that had the ROP

5    marking on it instead of just plain Police or just another

6    unit?

7    A.    A ROP tac vest has different compartments in it that allow

8    you to put a weapon, say, OC spray, a TASER, different things

9    like that.  It's a different sort of a vest than you would wear

10   in, say, CIT.  CIT, we threw a police-marked windbreaker on.

11   Q.    Okay.  Now, how do you understand that Hill got his vest?

12   He got it from someone who was leaving, correct?  He got Mick

13   Rael's vest?

14   A.    No.  I got Mick Rael's vest eventually.

15   Q.    You got Mick Rael's vest eventually.  How long did it take

16   for you to get Mick Rael's vest?

17   A.    I'd say a month.

18   Q.    Do you know how long it took for Detective Hill to get his

19   vest?

20   A.    Right away.

21   Q.    How do you know that?

22   A.    Because Mike Hill told me that.

23   Q.    Okay.  And did he tell you how he got that vest?  Was it

24   from someone who was leaving?

25   A.    No.

1    Q.    Or was it a vest that was already in existence?

2    A.    Because somebody on the team gave it to him.

3    Q.    Okay.  And you said he got binoculars.  Were those

4    standard issue to every ROP team member?

5    A.    Again, somebody on the team gave him the equipment when he

6    got there.

7    Q.    And that's not the question I asked you.  Are binoculars

8    standard equipment for a ROP detective?

9    A.    Well, they weren't -- I don't know.  They weren't for me.

10   Q.    Okay.  So you don't know if somebody just gave those as a

11   favor and -- because they knew him, and they didn't give them

12   to you for that same reason?

13   A.    You're right, I don't know.

14   Q.    Okay.  Did you ever ask for your tac vest?

15   A.    I did eventually ask.

16   Q.    And what were you told?

17   A.    I went to a Property person and I got a tac vest myself.

18   Q.    Okay.  And you were eventually issued a tac vest?

19   A.    Yes.

20   Q.    Okay.  Was there a tac vest your size when you joined ROP

21   that did not already have an owner?

22   A.    Mick Rael was my size.

23   Q.    And was he still performing the duties of a ROP officer

24   where he needed his own tac vest?

25   A.    No.  He was gone.

Cross-Examination – Terysa M. Welch

1   Q.   He was gone.  And how did you get his vest?  Did he give

2   it to you or was it issued by Property?

3   A.   It had been in Property from the time I had been there.

4   Q.   Okay.  Now, Rael transferred soon after you joined the

5   team to SWAT.

6   A.   No.  I believe he left prior to my going to ROP.

7   Q.   Okay.  And Heckroth transferred too?

8   A.   Heckroth was there for a considerable amount of time.

9   Q.   What does that mean?

10  A.   He promoted out of ROP.

11  Q.   After a month?  After six weeks?  After two months?  Do

12  you recall?

13  A.   I don't remember.  He was there for I would say at least a

14  year.

15  Q.   Okay.  And Detectives Wolfe and Lewis retired soon after

16  you joined the ROP team.

17  A.   Yes, ma'am.

18  Q.   You believe they retired because you joined ROP.

19  A.   I believe that had part -- a part in their decision to

20  leave.

21  Q.   Do you know how long it takes to process retirement

22  paperwork at APD?  Can you do it in a day or a month?

23  A.   I'm not sure.

24  Q.   When you joined ROP, you were unsure about whether you

25  were given a hard time because you were new or because you were

Cross-Examination - Terysa M. Welch

1   female, correct?

2   A.    I'm sorry?

3   Q.    When you joined ROP, you were unsure whether you were

4   given a hard time because you were a new person on the team or

5   because you were a woman.

6   A.    No, I was not unsure.  I knew that some people gave me a

7   hard time because I was a female.

8   Q.    Do you remember having your deposition taken in this case?

9   A.    Yes, ma'am, I do.

10  Q.    Let me find this for you.  And you were under oath that

11  day?

12  A.    Yes, I was.

13  Q.    And I asked you a bunch of questions, and you answered

14  them.

15  A.    You asked me a lot of questions.

16  Q.    Great.  And you don't recall being asked the question that

17  you were unsure about whether you were being treated

18  differently because you were a woman or because you were -- or

19  because you were new.

20  A.    It depends on which individual you were talking about.

21  Q.    Okay.  Let me show you.  Let's start on page 88.  Do you

22  recall being asked the question -- Do you see it on the bottom

23  here?  Do you see page 87, line 23 there, Lieutenant Welch?

24  Can you read the question that I asked you.  It's right here.

25  A.    Okay.  You're specifically talking about a range incident

1    in that question.

2    Q.   Okay.  And that's -- But that's where the question starts.

3    I want you to then go down and let's look at this -- this

4    question here.  This question here:  "They were a team

5    environment.  You had to prove yourself."  Do you see that?

6    A.   No, I'm not tracking where you're referring to.

7    Q.   Go to the bottom.  See right here, see that question I

8    asked you?  "And there is, in a team environment like this, a

9    period where you have to prove yourself.  Is that fair to say?"

10           MR. VILLA:  Your Honor, I'm going to object.  This

11   isn't related to the question that I think Ms. William is

12   attempting to impeach with.

13           MS. WILLIAMS:  It is.  I had to start with the

14   question before.

15           THE COURT:  Well, why don't you bring up the

16   deposition and I'll take a look at it.

17           MS. WILLIAMS:  Sure.

18      (Bench conference on the record.)

19           THE COURT:  The question is whether she recalled.

20           MS. WILLIAMS:  Because she was new because --

21           MR. VILLA:  The question she was showing her was

22   whether she had to prove herself in a team environment, and

23   that's why I objected.

24           MS. WILLIAMS:  And then we get to specifically here.

25           THE COURT:  So you're just establishing foundation.

1          MS. WILLIAMS:  Yes, I'm just establishing foundation.

2  So she doesn't know, then, if she was proving herself because

3  she was the new person or proving herself because she was a

4  girl.

5          THE COURT:  Let me suggest, just read to her the

6  question.

7          MS. WILLIAMS:  Okay.

8          THE COURT:  Just ask her if she remembers.  And --

9          MS. WILLIAMS:  Put it on the screen?

10          THE COURT:  Leave it off the ELMO for now.

11          MR. VILLA:  It was my concern whether the jury sees

12  things that aren't relevant.  In one spot it had Mr. Aguilar's

13  name, and we know the City is trying to keep that out.

14          THE COURT:  Are you offering this under 801.

15          MS. WILLIAMS:  No.  It's refreshing recollection.

16          THE COURT:  Okay.  So let's try this.  If she doesn't

17  recall, show her the item --

18          MS. WILLIAMS:  Okay.

19          THE COURT:  -- give her a moment to review it, ask

20  her if after she reviewed it she now --

21          MS. WILLIAMS:  I'm happy to do that.  I think it was

22  impeachment rather than refreshing, but I'm happy to help do

23  that.

24          THE COURT:  It makes a difference --

25          MS. WILLIAMS:  Yeah.

Cross-Examination - Terysa M. Welch

```
1            THE COURT:  -- as to whether --
2            MS. WILLIAMS:  Okay.  I can do that.
3        (Open court.)
4  Q.   (By Ms. Williams)  Lieutenant Welch, do you recall me
5  asking you the question in your deposition "How do you know it
6  wasn't proving yourself because you're a new person as opposed
7  to proving yourself because you're a girl?"  Do you recall me
8  asking you that question?
9  A.   I don't recall the context of that question.
10           MS. WILLIAMS:  May I approach the witness, Your
11 Honor?
12           THE COURT:  You may.
13 Q.   (By Ms. Williams)  Would looking at your deposition
14 refresh your recollection?
15 A.   Yes, it might.  Thank you.
16 Q.   See, this is your question and this is your answer.
17 A.   May I look back a little further?
18 Q.   Of course.
19 A.   Thank you.
20 Q.   It's the question we just went over.
21 A.   Thank you.
22 Q.   Do you recall your answer on whether you had worked out,
23 whether you were being treated differently because you were a
24 woman or because you were new?
25 A.   Ms. Williams, the context of the question in that line of
```

Cross-Examination - Terysa M. Welch

1   questioning wasn't referring to the ROP team.  It was referring
2   to me being the only girl on a soccer team or in my past
3   experiences in life.  It didn't have anything to do with being
4   on the ROP team.  I was explaining to you how I had been the
5   only girl through a lot of experiences in my life and that I
6   would give it time and I would work through those experiences
7   and the guys would always come around and know that I --
8   Q.   We'll work through this a little bit, because it will come
9   up again.  Thank you for looking at that for me.
10             Now, you never had issues with Heckroth or Wolfe,
11  correct?
12  A.   I did have issues with Heckroth and Wolfe.  They were part
13  of the original ROP team that was very unwelcoming to me, and I
14  believed it was because I was a female.  There were comments
15  made.  Rob Smith himself told me --
16  Q.   I don't want you to do hearsay.  I asked you.  Tell me
17  this.  Tell me something that Heckroth said to you that you
18  took issue with.
19  A.   Nothing he said to me.
20  Q.   Okay.  Tell me something that Heckroth did to you that you
21  took issue with.
22  A.   Just his general unwelcoming demeanor.
23  Q.   Is that the same answer for Wolfe?
24  A.   Yes, ma'am.
25  Q.   Nothing in particular they said or did that you just

Cross-Examination – Terysa M. Welch

1    didn't think that they were welcoming to you?

2    A.    No.  They didn't speak to me at all.

3    Q.    Okay.  How long does it take for you to acclimate in the

4    team setting?  You in particular.

5    A.    Not long.

6    Q.    Okay.  Now, you had an incident on the firing -- during a

7    firing drill with Detective Buckner, didn't you?

8    A.    Yes, I did.

9    Q.    He was a range master.

10   A.    No, he wasn't a range master.

11   Q.    He was not a range master?

12   A.    No.  It was during a team shooting day.

13   Q.    Are you aware that he is a team master?

14   A.    He's a firearms instructor.

15   Q.    Okay.  Detective Buckner had you do an exercise that

16   involved turning around and engaging multiple targets, didn't

17   he?

18   A.    The team was engaged in that drill.

19   Q.    Okay.  And he had an issue with the way you were pivoting.

20   A.    He did.

21   Q.    And you were resistant?

22   A.    I disagree.

23   Q.    You disagreed with him or you disagree with me?

24   A.    I disagree with the statement.

25   Q.    Okay.  Detective Buckner wanted to video record your pivot

1    at the range so you could see the problem he was noting.

2    A.    That's not exactly how the sequence went.

3    Q.    Did he ask to -- Did he say he wanted to videotape your

4    pivot?

5    A.    Detective Buckner asked me to step differently about three

6    different times, and I tried to step differently as he was

7    instructing me to step, exactly like he was instructing me to

8    step, and I continued to do what he was asking -- what I

9    thought he was asking me to do.

10   Q.    And then he said it would be helpful to videotape you,

11   didn't he?

12   A.    No, ma'am.  He said, "Don't make me go get a video

13   camera."

14   Q.    Okay.  Did you ever consider -- You assumed that he wanted

15   to videotape you to embarrass you, correct?

16   A.    He was embarrassing me.

17   Q.    And you think that the video would have been an

18   embarrassing tool for you?

19   A.    That's what he intended.

20   Q.    How do you know that?

21   A.    Well, this is --

22   Q.    How do you know of somebody else's intent, Lieutenant

23   Welch?

24   A.    This is the same man that asked me "What in the hell are

25   you doing here?" in my first week of employment.

Cross-Examination - Terysa M. Welch

1    Q.    Did you ever consider the video was a valuable training

2    tool to help you become a better ROP member?

3    A.    And I invited him to go get it.

4    Q.    So you did consider it was a helpful tool rather than a

5    tool to embarrass you?

6    A.    Well, he didn't go get it.

7    Q.    You were aware that Detective Buckner thought you were

8    arrogant?

9    A.    I think that was a mutual opinion of each other.

10   Q.    You eventually developed a good working relationship with

11   Detective Buckner after six or eight months?

12   A.    I don't know if it was a good working relationship, but it

13   is now.

14   Q.    You learned that he was an extra hard critic.

15   A.    What I learned about Detective Buckner is that he likes to

16   haze new people.

17   Q.    Regardless of their gender?

18   A.    I would agree with that.

19   Q.    Okay.  You observed Detective Buckner being a jerk to men.

20   A.    I have.

21   Q.    Now, you and Detective Gagne had a personality conflict

22   that never resolved.

23   A.    We had a conflict.  I don't think it was because of

24   personality.

25   Q.    Did you like him?

Cross-Examination - Terysa M. Welch

```
1   A.   No, of course I didn't like him.

2   Q.   And you don't think he liked you.

3   A.   I -- I was there to do my job.

4   Q.   That's not the answer to my question.

5   A.   I don't know what he thought of me.

6   Q.   Okay.  Now, you heard five years after you were in ROP

7   that someone had heard Gagne say something about you five years

8   before.  Correct?

9   A.   Correct.

10  Q.   And the person -- You didn't hear that comment yourself?

11  A.   No.  I was told about the comment.

12  Q.   By who?

13  A.   John Sullivan.

14  Q.   John Sullivan is in Albuquerque, isn't he?

15  A.   Yes, he is.

16  Q.   And how did that comment come up five years after the

17  comment was made?

18  A.   He was warning me.

19  Q.   About what?

20  A.   About being concerned for me over in ROP.

21  Q.   And this is in 2009, correct?

22  A.   Correct.

23  Q.   About a comment that was made in 2004.

24  A.   Correct.

25  Q.   And he hadn't talked with you in the five years between
```

1   2004 and 2009 about this comment he heard from someone.

2   A.   Was that a question?

3   Q.   Yes, it is.  He had not warned you in the five years you

4   had been in ROP.

5   A.   He was concerned for me in ROP at that time and warned me

6   about the comment.

7   Q.   Was the part -- Was the comment made at work or off work?

8   A.   I don't recall.

9   Q.   Did you go talk to Gagne?

10  A.   No, I did not.

11  Q.   Sullivan could be here today, couldn't he?

12  A.   I don't know if he could be here today.

13  Q.   Gagne's one of the people who wanted a SWAT officer on the

14  team instead of you and Hill, right?

15  A.   I don't know, ma'am.

16  Q.   You tried to joke with Detective Gagne, you testified

17  yesterday, correct?

18  A.   I testified that I tried to get him to lighten up after a

19  period of time, yes, ma'am.

20  Q.   And you did that by putting a pink lunch box in his truck

21  and taking pictures of it?

22  A.   I set it on the hood of his truck.

23  Q.   And what did you do with those pictures?

24  A.   Showed it to him.

25  Q.   And you got a pink ROP shirt made?

Cross-Examination - Terysa M. Welch

1   A.   I did.

2   Q.   Did it have a noose on it, similar to ROP unit?

3   A.   It may have, yes.

4   Q.   So you wore the insignias that had the noose on it,

5   correct?

6   A.   I may have worn that, yes.

7   Q.   Okay.  But Gagne didn't think that your humor was

8   endearing, did he?

9   A.   He -- He smiled.  Not a -- probably a genuine smile, but

10  yes, I got a smile out of him.

11  Q.   Did you ever consider that your behavior could be

12  antagonistic toward him?

13  A.   It wasn't intended to be.

14  Q.   Now, during your surveillance -- You do surveillance in

15  ROP, correct?

16  A.   Yes, a lot of surveillance.

17  Q.   And in surveillance you're stuck in a truck.  You

18  described that yesterday.

19  A.   Yes.

20  Q.   And you can't leave to go to the bathroom.

21  A.   No.

22  Q.   So you have to pee in a cup if necessary?

23  A.   You do.

24  Q.   And when you're stuck in a car or surveillance, you're

25  stuck in a car or surveillance with a male officer, right, a

1   male detective?

2   A.   That can happen.

3   Q.   And they go in front of you?

4   A.   Not -- Not exactly.

5   Q.   Well, describe that to me.  You're both in a car.

6   Somebody has to urinate.  What happens?

7   A.   It actually happened only one time with my partner, Mike

8   Hill, and it was a very lengthy surveillance where we were

9   stuck on what's called the "eye."  So you're in the car that

10  has the actual suspect's house, vehicle, whatever it was that

11  we were having to keep track of, and I think that particular

12  surveillance went more than 12 hours, and my car was in for

13  maintenance, so I'm in the passenger's seat, Mike's in the

14  driver's seat, and eventually he has to go, and so we took the

15  sun visor and we put it down the middle of the truck and he --

16  the guys had a urinal much like you would use in a hospital

17  setting, and we turned the radio up and put the sun visor

18  across so that nothing could be seen, and he relieved himself,

19  and that's how that happened.

20  Q.   And that's just part of the job, nothing sexual about

21  that?

22  A.   Oh, no, it's -- No, there's nothing sexual about that.

23  Q.   Okay.  You testified that you worked with Sergeant Smith

24  for over nine years all told, correct?  If you add up the

25  Northeast Impact time and the ROP time.

1  A.    I think it's more like seven, but okay.

2  Q.    You testified that over that period of time you heard

3  Smith and Potter joke about their genitals five or six times.

4  A.    Probably three or four times.

5  Q.    Three or four times.  You said that you never told them to

6  stop joking about their genitals in front of you.

7  A.    I told them it was gross.

8  Q.    That's not the same as "Stop it," is it?

9  A.    It's not encouraging it.

10  Q.    Not the same as telling them to stop it, is it?

11  A.    No, it's not the same as telling them to stop.

12  Q.    You testified that Sergeant Smith hugged you too tightly

13  when he informed you that your fiancé was arrested as a rapist.

14  A.    Yes, I testified that it was very, very hard.

15  Q.    Did you complain about him or shove him away or tell him

16  to stop?

17  A.    I pushed away.

18  Q.    Okay.

19  A.    I couldn't breathe.

20  Q.    Now, you never directly experienced discrimination from

21  Chief Schultz, did you?  You didn't deal with Chief Schultz,

22  did you?

23  A.    Indirectly.  I dealt with his decisions.

24  Q.    Okay.  But did Chief Schultz, ever look at you and

25  discriminate against you in a way that you described as

1    inappropriate?

2    A.    I disagree.  I believe he sent my discipline to the NMLEA

3    board.

4    Q.    I'm not asking what you believe.  I'm asking what you

5    observed.

6    A.    He did send my discipline to the NMLEA board, which was

7    inaccurate, untruthful, and it's in my permanent employee file

8    for the rest of my law enforcement career.  I did get

9    discriminated by Chief Schultz, and it's still having a lasting

10   effect on my career.

11   Q.    Do you remember me asking you the question "Did you ever

12   experience discrimination by conduct of Chief Schultz?"

13             MR. VILLA:  May I have a page, Your Honor?

14             MS. WILLIAMS:  It is page 118, counsel, line 6.

15   Q.    (By Ms. Williams)  Do you remember me asking that

16   question?

17   A.    I do.

18   Q.    Do you remember your answer?

19   A.    I think I told you no.

20   Q.    Thank you.  Now, let's go to the physical assessments,

21   which is something that you're -- you talked about yet,

22   Exhibit 166?

23             MR. VILLA:  Your Honor, I'd ask counsel to correct

24   that.  That wasn't the answer in the deposition.

25             MS. WILLIAMS:  I'm refreshing her memory.  She states

1    what she says.

2              THE COURT:  Well, address to the Court.

3              MS. WILLIAMS:  Excuse me.

4              THE COURT:  Mr. Villa, you'll have an opportunity on

5    redirect.

6              MR. VILLA:  Sure.

7    Q.   (By Ms. Williams)  Physical assessments are required

8    every year for every APD officer, correct?

9    A.   And as I explained before, you're required to physically

10   show up.

11   Q.   Okay.  Physical assessments, you have to show up for the

12   assessment every officer every year?

13   A.   But you don't have to participate.

14   Q.   Okay.  And then once you have your scores, they're given

15   to you, correct?

16   A.   You are given a copy, yes.

17   Q.   And then you don't share that copy unless you want comp

18   time, right?

19   A.   Correct.  You wouldn't have a result if you didn't

20   participate.  If you had comp time to turn in, you would give

21   it to your supervisor.

22   Q.   And in May of 2004 Sergeant Smith was not your supervisor,

23   was he?

24   A.   No.

25   Q.   Did you show your assessment to Sergeant Smith to show him

1  how well you did?

2  A.    No, I don't recall doing that.

3  Q.    You don't recall doing that?  Who was your supervisor in

4  May 2004?

5  A.    A gentleman by the name of Sergeant Jan Olstead.

6  Q.    Okay.  Let's look at Exhibit 166.  Do you know how this

7  came to have the comments on it?  Tell me how you got this.

8  A.    I explained that I found it on my desk at my cubicle at

9  SID.

10 Q.    Okay.  And do you know who wrote "You Rock!"?

11 A.    Rob Smith.

12 Q.    And how do you know that?

13 A.    Because that's something that Rob Smith commonly writes on

14 notes.

15 Q.    Okay.  And it also says, "I want to have children with

16 you!  Very Impressive! Rob."  Correct?

17 A.    Correct.

18 Q.    Isn't "I want to have your baby" a thing that Rob Smith

19 said commonly?

20 A.    No.  No, I don't recall.

21 Q.    You don't recall that.  You don't recall him saying that

22 to men in the ROP unit?

23 A.    No.

24 Q.    You don't recall him saying that to men at Northeast

25 Impact?

Cross-Examination - Terysa M. Welch

1    A.    No.

2    Q.    You don't recall that that's a way that he gave somebody

3    an attaboy?

4    A.    No.

5    Q.    Now, is this physical assessment on May 19th, 2004,

6    relating to testing for ROP or was it the annual testing?

7    A.    No.  I believe that was the annual testing.  We did a

8    specific physical test for the ROP testing, which was in July.

9    Q.    Did you ever talk to Rob Smith because you were just going

10   to be joining his unit, about your physical assessment in May

11   of 2004?

12   A.    No.

13   Q.    Okay.  Did you give Rob Smith a copy of that document?

14   A.    Of the document you just displayed?

15   Q.    Yes.  Before it was written on.  Yes.

16   A.    No.

17   Q.    Okay.  You testified yesterday that you found that comment

18   to be offensive.

19   A.    I did.

20   Q.    Did you ever discuss that comment with Rob Smith?

21   A.    No.

22   Q.    Or his supervisor?

23   A.    No.

24   Q.    Or his supervisor's supervisor?

25   A.    No.

Cross-Examination - Terysa M. Welch

1  Q.    You and Sergeant Smith would tease and kid around in the

2  course of your employment.

3  A.    I occasionally kid around with everybody.

4  Q.    You didn't work in a strict environment.

5  A.    No.

6  Q.    And you would tell Rob Smith that you would get him in

7  your next life.

8  A.    No, not exactly that wording.

9  Q.    What would you tell him?

10 A.    "Next life."

11 Q.    Did you mean anything sexual with that comment?

12 A.    No, I did not.

13 Q.    You told him that he was hot on occasion?

14 A.    I did not tell him that.

15 Q.    Now, how many processes did you see get done to have new

16 members come into ROP while you were in ROP?

17 A.    Several.

18 Q.    Okay.  Let's talk about them.  The first process after you

19 were selected, when was that?

20 A.    Ma'am, I don't know.  There was a lot of people that came

21 in and out of ROP after I came to ROP.

22 Q.    Okay.  Do you recall how many applicants for the next

23 process after you applied?

24 A.    I don't.

25 Q.    Do you recall the testing requirements?

1   A.   I can say that I never saw a two-day intensive process

2   like Mike Hill and I went through after I came to ROP.

3   Q.   Okay.  Do you know what the required testing was at any

4   time after you were tested?

5   A.   I know that initially we had a shooting test, at least a

6   shooting test like the same qualification that officers would

7   do every year, and usually there was an oral interview.  At

8   least those two things.

9   Q.   And you participated in those oral interviews?

10  A.   No, I did not.  Never.

11  Q.   You were never someone who participated in these

12  application processes?

13  A.   Never was asked to.

14  Q.   Okay.  Now, do you recall Sergeant -- I mean Lieutenant

15  J.R. Potter coming into the ROP unit?

16  A.   Yes.

17  Q.   Where did he come from?

18  A.   Gangs.

19  Q.   That was in SID?

20  A.   It was.

21  Q.   How many people came into ROP at the same time that Potter

22  did?

23  A.   Nobody else.

24  Q.   How many openings were there?

25  A.   One.

Cross-Examination – Terysa M. Welch

1   Q.   Whose opening was it?  Who was leaving?

2   A.   That may have been Sergeant Heckroth's opening.

3   Q.   Okay.  Do you know if there was a test process?

4   A.   I don't believe there was a test process.

5   Q.   Do you know how many applicants there were for Heckroth's

6   spot?

7   A.   He was a lateral transfer over into ROP.

8   Q.   Who was?

9   A.   J.R. Potter.

10  Q.   Okay.  So if you're already in SID, you can transfer among

11  SID units, correct?

12  A.   I was in SID.  That didn't happen for me.

13  Q.   Okay.  Are you aware if there was a written test or

14  physical test at the time Potter applied?

15  A.   There wasn't that I was ever aware of.

16  Q.   And you're not aware of how many applicants there were for

17  the one position?

18  A.   There was no other applicants.  We had a discussion ahead

19  of time with Rob about that.

20  Q.   Now, ROP detectives liaison with at least one other APD

21  unit, correct?

22  A.   Yes.

23  Q.   You had Burglary?

24  A.   I did.

25  Q.   How many APD units are there?

Cross-Examination - Terysa M. Welch

1   A.    I have no idea.  There's dozens.

2   Q.    And how many -- how many detectives are there in ROP?

3   A.    It depends.  Changes.

4   Q.    Not dozens?

5   A.    No.

6   Q.    So you could have more than one unit that you could be the

7   liaison for, correct?

8   A.    Yes.  I had more than one unit.

9   Q.    Okay.  What other units were you liaison for?

10   A.    I had an impact unit that I was the liaison for.

11   Q.    And who else did you have a liaison with?

12   A.    It was an Impact unit, Northeast Impact.

13   Q.    So you were a liaison for Burglary and for Northeast

14   Impact.

15   A.    Uh-huh.

16   Q.    Any other liaison units that you had?

17   A.    No.  That was it.

18   Q.    Did you liaison with Rio Rancho Police Department?

19   A.    Not specifically.

20   Q.    Could you have liaisoned for more than those two

21   departments -- units in the departments since there were dozens

22   of units that needed liaisons?

23   A.    Yes.  As I explained yesterday, I helped the stalking unit

24   with a suspect that they were trying to find.

25   Q.    Now, is that the same as being the liaison to help them

1   out on a case?

2   A.   No.  I'm not -- I wasn't a liaison for them.  There was no

3   liaison, so when those other units need help, they just would

4   call and whichever detective they would get ahold of, you were

5   responsible to help them and follow through.

6   Q.   So there's a difference between being a liaison and being

7   a person that picks up a call from another unit?

8   A.   Sure.

9   Q.   So what did does it mean to be the liaison?

10  A.   It means that you keep consistent communication with them

11  and help them with their needs, that they need more -- they

12  have more regular needs from ROP.

13  Q.   And what were the regular needs of Northeast Impact that

14  they needed ROP involvement with?

15  A.   Honestly, I didn't get called from them very often.

16  Q.   What did you do to further that relationship so that they

17  would want to call you?

18  A.   They did their own work.  If they had somebody of a higher

19  level threat, then occasionally they would call for greater

20  assistance from ROP, but honestly, they did their own warrants,

21  they -- they went after their own suspects, so . . .

22  Q.   And what kind of needs did Burglary have from the ROP

23  unit?

24  A.   Burglary didn't have the same resources that ROP had, so

25  they would call for those suspects that they needed

1  surveillance on.  They worked, say, shift Monday through

2  Friday.  If they needed help with, you know, surveillance from

3  us, they would call, but often I wouldn't be able to help them

4  because we had higher-priority targets.

5  Q.  Now, there's a lot of burglaries in Albuquerque, aren't

6  there?

7  A.  There are.

8  Q.  And there have been the entire time you were in the ROP

9  unit?

10  A.  That's correct.

11  Q.  And you could have developed arrest warrants and arrests

12  for Burglary as a ROP detective trying to get the worst of the

13  worst off the street, correct?

14  A.  I did all that I was allowed to do.

15  Q.  What does that mean?

16  A.  As I explained yesterday, as a Property Crime liaison, my

17  cases were bumped to the bottom of the stack as a lower

18  priority.  The other ROP suspects were of higher priority

19  naturally, being violent offenders.

20  Q.  We have way more burglaries in Albuquerque in a day than

21  we have homicides, correct?

22  A.  We have about a hundred residential burglaries in

23  Albuquerque every week.  That's just residentials.  That

24  doesn't count commercials.

25  Q.  Okay.  And how many homicides in a week?

1    A.    We had 70-some homicides last year.  That was last year.

2    I don't remember what it was back then.

3    Q.    So one and a half a week, obviously not spread out that

4    way, correct?

5    A.    Correct.

6    Q.    So there's a lot of work that could be done to catch

7    burglars in Albuquerque.

8    A.    If you have the resources, but we didn't.

9    Q.    Who's "we"?  The Burglary unit or the ROP unit?

10   A.    Both.

11   Q.    And ROP, you were supposed to be a resource for the

12   Burglary unit to help them make arrests and capture the worst

13   of the worst, right?

14   A.    That's right.

15   Q.    Did you ever volunteer to help them with that job?

16   A.    I would have loved to.

17   Q.    And what kept you from doing that?

18   A.    As I just explained, the other subjects that ROP was

19   responsible for, homicides, robberies, we're responsible for

20   bank robberies, homicides, sexual predators.  That is ROP's

21   responsibility also.

22   Q.    Okay.  And you as the Burglary liaison have the ability to

23   develop confidential sources, to develop your cases, and to try

24   to arrest burglars, right?

25   A.    That's correct.

1    Q.    Now let's talk about the difference between being on call

2    and being on call-out.  All right?

3    A.    All right.

4    Q.    Tell me what on call means at ROP.

5    A.    On call means you have to be willing to go out the door,

6    be available for an emergency at any time.

7    Q.    And you are on an on-call list, correct?

8    A.    Correct.

9    Q.    That's created by your chain of command?

10   A.    Correct.

11   Q.    And there's a primary person who's on call?

12   A.    Primary and a secondary.

13   Q.    Okay.  And when you're on call, what are your duties?

14   A.    Your duties are to respond to any homicide call-out 24/7.

15   Q.    Okay.  So you can't be drinking if you're on call.

16   A.    That's right.

17   Q.    You can't be out of the jurisdiction or more than 20

18   minutes away?

19   A.    No.  You can go home.  You can be a regular person.  You

20   just have to be ready to respond.

21   Q.    Right.  And that means that you can't go to Santa Fe for

22   dinner, for example?

23   A.    Right.

24   Q.    Now, if you're on a call-out, that's different, isn't it?

25   A.    I'm not sure --

Cross-Examination – Terysa M. Welch

1   Q.   As a ROP member who is not the primary or secondary person

2   on call, you might get a call-out.

3   A.   Yeah, you could get a call-out.

4   Q.   And what is a call-out?

5   A.   A call-out is when the primary or secondary person needs

6   the team's assistance, and they call whoever's available that

7   could respond to help them with whatever the emergency was.

8   Q.   And if you were not the primary or secondary, you don't

9   have to go on the call-out?

10  A.   You don't have to, but you were strongly encouraged to try

11  to be available as much as possible.

12  Q.   But you don't have to go on the call-out if you've been

13  drinking, for example?

14  A.   Well, of course not.

15  Q.   If you're at dinner in Santa Fe.

16  A.   You're in Santa Fe.  No.  You would come as soon as you

17  could, but no.

18  Q.   And those are different.  You could be disciplined for not

19  going to a call if you're on call.

20  A.   Yes.

21  Q.   But if you didn't show up for a call-out, there won't be

22  disciplinary consequences?

23  A.   Right.

24  Q.   Okay.  You don't have an obligation under the union

25  contract to work 24 hours a day 7 days a week 365 days, do you?

1   A.   No, you don't.

2   Q.   Okay.  You have two days off a week.

3   A.   Yes.

4   Q.   And your overtime is capped at 20 hours a pay period

5   without prior approval from a Commander, correct?

6   A.   Not in ROP.  That did not apply to ROP.

7   Q.   Okay.  You don't think that applied to ROP?

8   A.   It did not apply to ROP.

9   Q.   Okay.  Now, at ROP, the ATF liaison was Danny Garcia.  Is

10  that correct?

11  A.   Yes, ma'am.

12  Q.   So he was gone a lot, wasn't he?

13  A.   Well, he wasn't at the office a lot, but he was available.

14  Q.   He wasn't at the office.  He wasn't at ROP full-time.

15  A.   Right.

16  Q.   He had duties elsewhere much of the time.

17  A.   Yes.  He had another responsibility.

18  Q.   Let's talk about people in your life and how that fits in

19  at this time period.  You began dating Mr. Bowie in 2011.

20  A.   Might have been a little before that.  I don't exactly

21  know the date.  We've known each other since 2002.

22  Q.   And you married Jason Bowie in 2013?

23  A.   Yes.

24  Q.   After five years, you're still happily married?

25  A.   Yes.

1    Q.    Your husband's a police officer.

2    A.    He's a captain.

3    Q.    Okay.  At Rio Rancho?

4    A.    Yes, ma'am.

5    Q.    And before that who did you live with?

6    A.    Before that I lived with David Maes.

7    Q.    Didn't you live with Commander Michelle Campbell for a

8    period of time?

9    A.    Yes.  I thought we were talking about relationships.  Yes,

10   I'm sorry, I did live with Michelle, yes.

11   Q.    Yes.  So you lived with Commander Campbell before you

12   moved in with Mr. Bowie.

13   A.    Yes.

14   Q.    Okay.  And she's a police officer, as well.

15   A.    She is.

16   Q.    You met her in the Academy?

17   A.    I did.

18   Q.    And you lived with David Maes before that.

19   A.    Yes.

20   Q.    2006?  2007?

21   A.    Yes.

22   Q.    David Maes was a police officer?

23   A.    Yes.

24   Q.    You lived with your brother before you lived with your

25   fiancé David Maes.

Cross-Examination – Terysa M. Welch

1   A.   Yes.

2   Q.   He's also a police officer?

3   A.   Yeah.

4   Q.   Okay.  You and your brother are really close.

5   A.   We're very close.

6   Q.   Before you lived with your brother, you lived with a

7   live-in boyfriend Abel Aragon.

8   A.   Yes, ma'am.

9   Q.   Abel Aragon's a police officer.

10  A.   Uh-huh.  Yes.

11  Q.   Thank you.  And you were married to Agent Johnson, Kendal

12  Johnson, correct?  Is that his first name?

13  A.   A long time ago, yes, ma'am.

14  Q.   1994 to 2000?

15  A.   Yes.

16  Q.   And he was also a law enforcement officer.

17  A.   Federal.  Yes, ma'am.

18  Q.   You have two sisters that don't live here.

19  A.   Correct.

20  Q.   Neither of them ever lived in New Mexico.

21  A.   No.

22  Q.   Your father moved to New Mexico in 2010.

23  A.   Sounds about right, yes, ma'am.

24  Q.   You're close with your father.

25  A.   Very close.

Cross-Examination - Terysa M. Welch

1   Q.    Your brother lives in New Mexico, and you see your dad and

2   your brother weekly.

3   A.    Yes.

4   Q.    You don't see your sisters as much as you'd like to.

5   A.    No.

6   Q.    Okay.  And you don't socialize much outside your family.

7   A.    Like, I don't have time to.  They -- You know, the little

8   bit of time that I have for my free time, I like to spend with

9   my family.

10  Q.    Okay.  You're protective of your family.

11  A.    That's fair to say.

12  Q.    Okay.  And you're aware that Detective Hill on your ROP

13  team was having an affair with your brother's wife during the

14  time you were both at ROP.

15  A.    Unfortunately, that happened.

16  Q.    Did that create tension between you and ROP team members,

17  including Hill?

18  A.    Naturally, that was something I had to work through with

19  Detective Hill.  He was my partner in ROP.

20  Q.    Okay.  You chose not to share that information with your

21  brother.

22  A.    My brother's aware of that.

23  Q.    He is?  Okay.  In 2007, Maes was your fiancé.

24  A.    Yes.

25  Q.    You lived with him.

1   A.    Yes.

2   Q.    He was arrested.

3   A.    Correct.

4   Q.    And Sergeant Smith was the person who had to tell you that

5   he had been arrested and about the allegations, correct?

6   A.    Correct.

7   Q.    Sergeant Smith asked you first -- called you first and

8   asked you if you were in the office.

9   A.    Yes.

10  Q.    You testified that you gave a smart-mouth answer to him

11  when he gave you the call.

12  A.    I -- Yeah.  I said -- I said, "Am I in trouble?"

13  Q.    Okay.  And when he continued to talk with you, you started

14  to freak out because you thought something had happened to your

15  brother.  Correct?

16  A.    He was traveling, so I thought -- yes, I thought something

17  may have happened to him.

18  Q.    Sergeant Smith sat you in his car and held your hand and

19  he told you your fiancé had been arrested for raping a prisoner

20  and was in IA.

21  A.    Correct.

22  Q.    You were relieved that that discussion wasn't about your

23  brother.

24  A.    I was.

25  Q.    Okay.  You asked Sergeant Smith if he was sure a couple of

1    times.

2    A.    I did.

3    Q.    About the allegations.

4    A.    I did.

5    Q.    He hugged you outside the car?

6    A.    Yes.

7    Q.    He told you, you wanted -- You told him you wanted to go

8    to your house and get your animals and get your stuff.

9    A.    He told me that, yes, several times.

10   Q.    Okay.  And he offered to take you home to do that?

11   A.    He did.

12   Q.    And he didn't want you to go alone.

13   A.    Yes.  I had told him I had other people to take me.

14   Q.    Okay.  You finally called Commander Campbell, your

15   ex-roommate, and told her to get your stuff?

16   A.    Right.

17   Q.    For the week that you left after that incident to Montana,

18   you testified that your sergeant called you every day.

19   A.    Yes.

20   Q.    You were on vacation?

21   A.    It wasn't much of a vacation, but yes, ma'am, I was --

22   Q.    Well, you had to take vacation time.  I understand it

23   probably was not as good as it could have been.  You didn't

24   have to take those calls, did you?

25   A.    I didn't know why he was calling, so I felt I should take

1  the calls.

2  Q.   Was he calling to see if you were okay?

3  A.   It felt like he knew that I was with my family and my

4  support system.

5  Q.   After that, after you returned, you moved in with Michelle

6  Campbell and never saw your fiancé again?

7  A.   Well, I had to see him again for -- I still had things in

8  the house.  I still had to occasionally cross paths with him,

9  unfortunately, so not for any reason other than those issues,

10  but yes.

11  Q.   You never sought counseling to deal with this betrayal by

12  your fiancé.

13  A.   No.  I didn't feel I needed counseling for that issue.

14  Like I said, I have a strong family support system.  I don't

15  feel I have any lasting issues from that.

16  Q.   Okay.  You're aware that sergeants sometimes assist their

17  subordinates with personal issues.

18  A.   Of course.

19  Q.   In fact, when you broke up with Abel Aragon, his sergeant

20  was there at your home to make sure that that move-out went

21  smoothly, right?

22  A.   His sergeant did show up at my home, yes.

23  Q.   And you called J.R. Potter to help you in that situation.

24  A.   I did call J.R. Potter.

25  Q.   So the sergeant was there to make sure that everyone

1   remained calm, correct?

2   A.   I guess so.

3   Q.   And that their subordinates didn't get into trouble?

4   A.   Apparently, yes.

5   Q.   You experienced that.

6   A.   He was at my home, yes.

7   Q.   Okay.  In 2009, you started keeping notes on your team

8   members in a notebook, correct?

9   A.   I've always kept notes.

10  Q.   Is this the notebook you had in 2009?

11  A.   Yes, it is.

12  Q.   A copy.

13  A.   Uh-huh.

14  Q.   You noted criticisms of your team members, correct?

15  A.   I noted all kinds of things.  My arrests, my stats.  I had

16  to fill out a monthly at the end of every month and that helped

17  me to complete that.

18          MS. WILLIAMS:  This is already admitted, correct,

19  stipulated?

20          MR. VILLA:  The first four pages.

21          MS. WILLIAMS:   Your Honor, I believe this is

22  stipulated to, this exhibit.

23          THE COURT:  Is it A?

24          MS. WILLIAMS:  Yes, sir.

25          THE COURT:  It is admitted.

Cross-Examination - Terysa M. Welch

1          MS. WILLIAMS:  May I publish?

2          THE COURT:  You may.

3   Q.   (By Ms. Williams)  Is that your handwriting, Detective?

4   A.   Yes, it is.

5   Q.   Okay.  Can you read the July 10th entry.

6   A.   Referring to Kevin Gagne "Primary-on-call," "Received

7   call-out for homicide - Went back to sleep - Did not show to

8   callout."

9   Q.   Are you referring to Kevin Gagne receiving a call and

10  going back to sleep?

11  A.   Correct.

12  Q.   Why did you note that?

13  A.   Because a short time later I received a punctuality memo

14  from my sergeant, and I think I actually went back and noted

15  this call-out.

16  Q.   So these notes weren't created contemporaneously.  You

17  recreated them.

18  A.   I don't recall specifically about that, no.

19  Q.   Did you record this note before you got the punctuality

20  memo two weeks later?

21  A.   I don't recall.

22  Q.   So you were carrying a record?

23  A.   Yes, ma'am.

24  Q.   Okay.  Not for your own use on day-to-day work, but for

25  your lawsuit or a complaint?

1   A.    I was creating it so that I could remember it.

2   Q.    Now take a look at this note on July 13th.  Can you read

3   that to the jury and explain that?

4   A.    "Notified 841," who was Mike Hill, "of House appointment.

5   Thought he was Acting Sergeant.  Comped off first two hours.

6   - 840," who is Sergeant Hubbard, "signed comp slip on 7/17/09."

7   Q.    Did you create this after you got the punctuality memo or

8   before?

9   A.    I don't recall.

10  Q.    Why did you record it?

11  A.    Because I wanted to remember it.

12  Q.    Read the next note.

13  A.    "Note Gagne," referring to Kevin, "missed 0930 brief.

14  840," meaning Sergeant Hubbard, "pickled him."  That's a

15  feature on Nextel phone where you could reach each other.  "I

16  didn't know we had briefing.  I'm on the westside."

17  Q.    Okay.  Is that quote a quote that you're referring to

18  Gagne?

19  A.    Yes.

20  Q.    Did you take this -- Did you make this note on the 13th or

21  did you make it after you got the punctuality memo?

22  A.    Again, I'm not sure.

23  Q.    Which is more likely?

24  A.    I'm not sure, ma'am.

25  Q.    Were you recording issues that you didn't like about your

1   team members before you got the punctuality memo or not?

2   A.   I don't know.  I recorded the issues because I thought it

3   was not fair for all of these things to be happening in

4   relation to what I was being called out on.

5   Q.   What were you called out on?

6   A.   A punctuality memo that was not actually accurate.

7   Q.   And that was given to you July 24th, correct?

8   A.   Correct.

9   Q.   So these notes were all kept -- were all made on dates

10  before July 24th, correct?

11  A.   I'm not sure.  It was all around the same time frame, and

12  I may have recollected them and put them in so that I could

13  remember them at a later time.

14  Q.   Okay.  And you don't recall if you were writing notes

15  about whether Gagne was missing meetings or not before you got

16  the punctuality memo and before you had been, as you say,

17  called out for any reason.

18  A.   I'm not sure.

19  Q.   Okay.  Let's take a look at this next note.  Can you see

20  what's highlighted on July 24th?

21  A.   "Convicted felon in possession of firearms." I'm not sure

22  what the 14 is.  "Signal 7" means a stolen vehicle.  "Search

23  warrant."  842 was J.R. Potter, at the "Motel 6 [at] Avenida

24  and I-25."

25  Q.   Now, was that the day you got the punctuality memo?

1    A.    Yes, it was.

2    Q.    Was the punctuality memo regarding training that happened

3    on July 23rd?

4    A.    I don't recall.  I think it was.

5    Q.    And what did you note in your notes on July 23rd?

6    A.    "Payday."  We arrested a James Eubanks on a felony warrant

7    for a probation violation.  His date of birth, looks like, is

8    right there.  He had some drugs, possession of drugs.  I don't

9    know about this Robin McFarland person and their date of birth.

10   Q.    Did you note that you were supposed to be at training at a

11   range that day?

12   A.    No, I didn't.

13   Q.    Did you note what time you come into work that day?

14   A.    No.

15   Q.    And that's the day that you got a punctuality memo saying

16   that you didn't get to a training?

17   A.    There's no note about it.

18   Q.    And do you note the day before that you need to go to the

19   office or where you should report for duty the next day?

20   A.    There's no note on there.

21   Q.    No, there isn't.

22              MR. VILLA:  Objection to counsel's sidebar.

23              MS. WILLIAMS:  There is not a note.  It's a fact.

24              THE COURT:  Well, would you please approach.

25         (Bench conference on the record.)

1          THE COURT:  Okay.  I didn't understand the objection.

2          MR. VILLA:  And Ms. Williams said, No, there isn't,

3   so I was objecting to the sidebar.

4          THE COURT:  Okay.  Well, I guess commenting on the

5   evidence other than the testimony typically we try to avoid.

6          Let me just be clear, though.  Exhibit A, it's four

7   pages.

8          MS. WILLIAMS:  Correct.

9          THE COURT:  Okay.  And I recall we discussed that,

10  where we took out a number of pages --

11         MS. WILLIAMS:  Correct.

12         THE COURT:  -- from what it was originally.  So at

13  that time it was both your positions that four pages of

14  Exhibit A would be admitted.

15         MS. WILLIAMS:  Yes, sir.

16         MR. VILLA:  Yes, Your Honor.

17         THE COURT:  Okay.  I just wanted to be clear.

18         MS. WILLIAMS:  Thank you.

19         THE COURT:  All right.

20         MS. WILLIAMS:  Thank you.

21     (Open court.)

22  Q.  (By Ms. Williams)  Lieutenant Welch, the copy that I have

23  is hard to read, but I think the top Monday is July 27th.  Can

24  you read that entry?

25  A.   It says I had a meeting with Sergeant Hubbard.  I think it

1  says "Memo done at beginning - Mike not getting one."  I

2  requested that he talk to Mike Hill, 841.

3  Q.   Is the memo you're referring to the punctuality memo?

4  A.   Yes.

5  Q.   Okay.  And do you know if you wrote this the day that it's

6  on the calendar or sometime after?

7  A.   I'm not sure.

8  Q.   Okay.  And then on Tuesday you have a note about a

9  qualification shoot.

10 A.   That's correct.

11 Q.   What does that mean?

12 A.   The qualification shoot is a yearly shoot that

13 everybody -- APD officer has to go through for a State mandate.

14 Q.   And is that a range activity?

15 A.   Yes, ma'am.

16 Q.   And so you note some range activities on your calendar,

17 but not all range activities?

18 A.   Well, I noted this one because it was the day that I

19 requested the meeting with Lieutenant Smith.

20 Q.   And Lieutenant Smith, 840?

21 A.   Yes, ma'am.

22 Q.   Okay.  Thank you.

23          Your coworkers knew that they you were keeping notes

24 on them, didn't they?

25 A.   I don't know.

Cross-Examination - Terysa M. Welch

1  Q.   You didn't make it a secret that you were writing things

2  down in your book when they were coming to work or what they

3  were missing.

4  A.   I had the calendar.  It wasn't a secret.  I left it laying

5  around.  It was not a problem.

6  Q.   They told you they didn't like you taking notes on them,

7  didn't they?

8  A.   No, they did not.

9  Q.   Sometimes they'd ask you to put something in your notebook

10  when they did something well to tease you, correct?

11  A.   No, I don't recall that.

12  Q.   You don't recall that.  Did that make you aware -- Did

13  people make comments about you keeping notes on them?

14  A.   No.  At the end of the month, sometimes Mike would ask me

15  for a certain date on an arrest we made so that we could put it

16  on the monthly.

17  Q.   You acknowledge that this practice might make your team

18  members distrustful of you.

19  A.   No.  Why would it?

20  Q.   Why would it?  You noted in your testimony yesterday that

21  coffee and soda was sprayed in your office on a date.

22  A.   On my cubicle wall.

23  Q.   Okay.  What did you do about that?

24  A.   There was nothing I could do about that.

25  Q.   Did you report it to your sergeant?

```
 1   A.    No.

 2   Q.    Did you report it to your lieutenant?

 3   A.    No.

 4   Q.    Did you report it to your commander?

 5   A.    No.

 6   Q.    Did you go to HR?

 7   A.    No.

 8   Q.    Did you talk to your team members about that?

 9   A.    No.

10   Q.    Did you clean the coffee or tea or soda or whatever it was

11   yourself?

12   A.    No.  It's a cloth wall.  There's no way you can get that

13   off.

14   Q.    Okay.  So you didn't report the incident to anyone?

15   A.    No.

16           MS. WILLIAMS:  Let's look at Exhibit 46, counsel.

17           THE COURT:  Has this been admitted?

18           MS. WILLIAMS:  I believe it's stipulated, Your Honor.

19           MR. VILLA:  It was admitted yesterday.

20           THE COURT:  Okay.

21   Q.    (By Ms. Williams)  You've had a chance to review this,

22   Lieutenant Welch?

23   A.    Yes.

24   Q.    On July 23rd, 2009, you believed Detective Hubbard was the

25   Acting Sergeant?
```

1   A.   Yes.

2   Q.   Now, are shoots and range activities posted on a

3   Whiteboard in the ROP office?

4   A.   Not that I remember.

5   Q.   You don't remember that?  Okay.  Now, an Acting Sergeant

6   cannot hire or fire another detective or sergeant, can they?

7   A.   No, that's not part of their responsibilities.

8   Q.   And they don't discipline their team members.

9   A.   They could.

10  Q.   They could discipline them without going through the

11  sergeant?

12  A.   They would be part of that discipline.

13  Q.   So if you did something on a day that an Acting Sergeant

14  was in charge, they would -- they could note that discipline --

15  that activity and then it would go through a process?

16  A.   You could be insubordinate to an Acting Sergeant.

17  Q.   Okay.  Now, Hubbard was your sergeant at the time here --

18  A.   Correct.

19  Q.   -- on this day, because Sergeant Smith was promoted and

20  out of the unit.

21  A.   Correct.

22  Q.   Okay.  Potter, Hill, Gagne, and you all met at the Sonic

23  after an arrest on the 23rd.

24  A.   That's correct.

25  Q.   While you were at the Sonic, you recall Gagne telling you

Cross-Examination - Terysa M. Welch

1  that the plan for the next day was to do time sheets in the

2  office.  Did you not do your time sheets on a daily basis?

3  A.   No.  It was a weekly basis.

4  Q.   Okay.  And then go to the tactical range.

5  A.   Yes.  He received a phone call while we were at the Sonic,

6  from Sergeant Hubbard.

7  Q.   If Sergeant Hubbard is not there, why was he calling?  Do

8  you know?

9  A.   To give instructions to Acting Sergeant Gagne about the

10  following workday.

11  Q.   If he's the sergeant, then isn't he the sergeant and

12  there's no Acting Sergeant?

13  A.   But it was about the following workday when he was going

14  to be back.

15  Q.   Okay.  I understand.  So the next day you said you showed

16  up at the office to do time sheets at 9:30.

17  A.   Yes.

18  Q.   And you also testified that your workday was eight to

19  five.

20  A.   That next workday we worked until midnight.

21  Q.   Did you note that on your calendar?

22  A.   I don't believe I noted it on my calendar.  We just looked

23  at it.

24  Q.   Right.  How do you recall that you worked until midnight

25  if you didn't note it on your calendar?

Cross-Examination - Terysa M. Welch

1    A.    I wrote it on something else, I believe.  I just know that

2    we worked late that day because Sergeant Hubbard had called me

3    and I remember that being in late-late day, because he had

4    every opportunity to talk to Detective Hill that day and he

5    didn't.

6    Q.    What day?  The 23rd?

7    A.    Yes.

8    Q.    But the 23rd is the day -- I think we're miscommunicating.

9    I want to make sure we're clear.  The 23rd is the day that you

10   received the instruction to go to the office on the 24th,

11   correct?

12   A.    The day of the training is the day that I'm speaking

13   about.

14   Q.    Correct.  And that would be the 24th?

15   A.    Okay.

16   Q.    23rd.  Right?  I just want to make sure we're on the same

17   page.

18   A.    Okay.

19   Q.    The 23rd Gagne said "Tomorrow," the 24th, "we're going to

20   go to do time sheets."

21   A.    Right.

22   Q.    And go to the range is what you heard?

23   A.    Yes.

24   Q.    So on the 24th you come to the office at 9:30.  Do you

25   know why?

1    A.    Do I know why?

2    Q.    Yes.

3    A.    Because I was told to.

4    Q.    If your workday is eight to five, why are you reporting to

5    work at 9:30?

6    A.    Because that's what we were told to do.

7    Q.    So he also told you the times that you were supposed to

8    and the places?

9    A.    Yes.

10   Q.    Okay.  And you testified that Sergeant Hubbard's office

11   was open.

12   A.    Correct, and the light was on.

13   Q.    But you didn't see Sergeant Hubbard?

14   A.    No.

15   Q.    You believed that Detective Hill was in the office

16   already.

17   A.    He was there.  No, he got there shortly after I got there.

18   Q.    Okay.  And no one else was in the ROP office?

19   A.    No.

20   Q.    You recall Detective Hill called Sergeant Hubbard?

21   A.    On the radio.

22   Q.    On the pickle?

23   A.    No.  The radio, the actual police radio.

24   Q.    So you have a couple of different ways to communicate with

25   each other as ROP detectives, correct?

1    A.    Yes.

2    Q.    One is a telephone?

3    A.    Uh-huh.

4    Q.    One is your personal telephone to other people.  You have

5    a ROP telephone, correct?

6    A.    Yes.

7    Q.    And then the regular telephone.

8    A.    If you had one.

9    Q.    And then the pickle?

10   A.    That's the same thing as a telephone.  Just a feature of

11   it.

12   Q.    Okay.  And then ROP air?

13   A.    Yes.

14   Q.    Tell me what ROP air is.

15   A.    ROP air is the police radio that you would use to call

16   dispatch.  Same thing.  Just a different channel.

17   Q.    But -- And the channel just communicates with other ROP

18   members, not the people in Northeast Area Command or Crimes

19   Against Children or anything like that?

20   A.    It's a secure air for ROP.

21   Q.    Now, you believe that Detective Hill called Sergeant

22   Hubbard on ROP air.

23   A.    I heard him do that.

24   Q.    Okay.  You believe that Detective Hill mentioned your name

25   in the call.

1    A.    Yes.

2    Q.    You didn't call Sergeant Hubbard yourself that morning,

3    did you?

4    A.    No.  I stood next to Mike -- Mike's desk while he called

5    Sergeant Hubbard.  I heard the conversation over the radio.

6    Q.    And you didn't call anyone else on the team that morning?

7    A.    No.

8    Q.    After Detective Hill called Sergeant Hubbard, Sergeant

9    Hubbard called you to find out why you weren't at the tac

10   range, correct?

11   A.    Later in the morning, he called me.

12   Q.    It was clear he didn't know that you were in the office,

13   right?

14   A.    No, he didn't.

15   Q.    When he handed you the punctuality memo, Sergeant Hubbard

16   mentioned a briefing in the same pay period that you missed,

17   correct?

18   A.    He did.

19   Q.    And it's mentioned in the memo.

20   A.    Yes.

21   Q.    And that briefing was on the 13th, correct?

22   A.    It was.

23   Q.    And we just looked at your notes for the 13th, didn't we?

24   A.    I believe so.

25   Q.    And you didn't note a briefing there.

1   A.   I noted a personal appointment, and then I contacted

2   Acting Sergeant Mike Hill.

3   Q.   And you told him that you had comp time, therefore, that

4   you didn't go to the Monday briefing.

5   A.   Correct.

6   Q.   Now, you do time sheets once a week, correct?

7   A.   I believe so, yes.

8   Q.   And you do them on Fridays?

9   A.   I don't recall, ma'am.  It's a long time ago.

10  Q.   Well, you knew on this day that you were supposed to do

11  time sheets on July 24th, correct?

12  A.   Uh-huh.  Yes.

13  Q.   Thank you.  And do you turn in your comp slips before you

14  turn in your time sheets or when you turn in your time sheets?

15  A.   I don't recall what the system was back then.

16  Q.   Okay.  So you may -- he may not have known that you had

17  comp on the Friday or the preceding Monday because you hadn't

18  turned in your time sheets and your comp slips, right?

19  A.   He signs the comp slips.

20  Q.   Does he sign them after you turn them in with your time

21  sheets or before you take the time off?

22  A.   I can't honestly remember what the system was back then.

23  I'm sorry.

24  Q.   So it could have been that you gave him that after you got

25  the punctuality memo.  The comp slip for him to sign.

1   A.   I don't recall.  I'm sorry.

2   Q.   Okay.  You became irate and yelled at your sergeant when

3   he gave you the memo.

4   A.   I did not yell at my sergeant.

5   Q.   How would you describe that interaction?

6   A.   I'd describe the interaction as some frustration with him

7   for not -- I asked him to ask Mike Hill about what we were told

8   the previous night.

9   Q.   And you were mad because Mike Hill didn't get a

10  punctuality memo.

11  A.   Of course I wasn't mad.  I don't want my partner to get a

12  punctuality memo either.  It was totally unnecessary.  The

13  whole situation was unnecessary.

14  Q.   You believed that Detective Hill didn't get a punctuality

15  memo because he was a male and you were he a female.

16  A.   I don't know why he didn't get a memo.  I don't know why I

17  got a memo.

18  Q.   Do you know that he called Sergeant Hubbard before he went

19  into the office?

20  A.   I don't know what Mike did.

21  Q.   You didn't ask him what he did?

22  A.   I asked him if he got spoken to by Sergeant Hubbard after

23  I asked Sergeant Hubbard to simply ask Mike what we were

24  instructed to do.

25  Q.   Now, the memo is not discipline, is it?

Cross-Examination - Terysa M. Welch

1   A.   I disagree.

2   Q.   Under the union contract which governs your employ, it is

3   not discipline, is it?

4   A.   It's the beginning of discipline.

5   Q.   You can't grieve it, can you?  And you can grieve

6   discipline.

7   A.   I tried to grieve it.

8   Q.   You tried to grieve the punctuality memo?

9   A.   I tried to grieve the facts of the memo, because they're

10  not accurate.

11  Q.   And you couldn't because it's not discipline, correct?

12  A.   They -- They wouldn't -- They wouldn't do a reasonable

13  request for me in the -- as a result of the memo.

14  Q.   That memo was a direction or an instruction, correct?

15  A.   The memo is a -- is a documentation.

16  Q.   The memo asks that in the future advise your sergeant if

17  you're not going to be present at an APD activity that you're

18  expected to attend, correct?

19  A.   That's what the memo says.

20  Q.   That's all it informs you of.

21  A.   Well, that's not all it informs me of, Ms. Williams.

22  Q.   That's the expectation that you have -- your Sergeant has

23  based on this memo, correct?

24  A.   That's included in the memo.  I'll agree with you.

25  Q.   Okay.  You filed a Complaint with the EEO soon after you

1   received the punctuality memo.

2   A.   After I took it through my chain of command, yes, I did.

3   Q.   You hired your lawyer around this time.

4   A.   Yes, I did.

5   Q.   Now, other people on the 23rd besides Hill who were at the

6   Sonic and heard the information were J.R. Potter and Gagne.

7   A.   Yes, ma'am.

8   Q.   Okay.  And they were both at the range?

9   A.   J.R. Potter and Gagne were at the range.

10  Q.   Okay.  At this time, July 24th, 2009, Sergeant Smith had

11  been promoted to the rank of lieutenant?

12  A.   Correct.

13  Q.   And you asked to see the lieutenant about the punctuality

14  memo.

15  A.   I did.

16  Q.   He started talking to you about your performance and

17  things he was hearing from your team and you didn't like that.

18  A.   I don't think he was hearing things from my team, but he

19  did start talking to me about my performance.

20  Q.   Okay.  If he wasn't with you all the time, where do you

21  think he would have gotten that information?

22  A.   I don't know.

23  Q.   You were only prepared to discuss the memo.

24  A.   That's the reason I asked him for the meeting.

25  Q.   Describe your demeanor during that meeting.  Did you sit

1  down?

2  A.   I did sit down.  It was a chair against the wall.

3  Q.   Did you kick back?

4  A.   No, I did not.

5  Q.   Did you put your feet on his desk?

6  A.   Absolutely not.  Never put my feet on anybody's desk in my

7  life.

8  Q.   Tell me how you started the conversation.

9  A.   I started by telling him how I was very stressed at work,

10 I was having a hard time concentrating on my job, and that I

11 wanted to file a Complaint, an EEOC Complaint about Sergeant

12 Hubbard.

13 Q.   Now, this is the man that you have identified as a person

14 who has been harassing you, correct?

15 A.   That's correct.

16 Q.   But he's the person that you went to to ask for help?

17 A.   He's the next person in my chain of command.

18 Q.   And at the City you can go to anyone to discuss issues of

19 harassment, discrimination, or retaliation, correct?

20 A.   Well, I know that now, yes.

21 Q.   Lieutenant Smith said he had given Sergeant Hubbard

22 permission to write the corrective action memo, didn't he?

23 A.   Yes, he did.

24 Q.   And you complained about Commander Hudson to Lieutenant

25 Smith immediately after this meeting?

1   A.    I complained about Commander Hudson?

2   Q.    To Commander Hudson about Lieutenant Smith.

3   A.    I spoke to Commander Hudson after Lieutenant Smith, yes.

4   Q.    And did you complain about Lieutenant Smith?

5   A.    I complained about the memo and this process, yes, I did.

6   Q.    And you filed your complaint shortly after receiving the

7   memo?

8   A.    I did.

9   Q.    Let's look at Exhibit B.

10        MS. WILLIAMS:  Exhibit B. Your Honor, we stipulated

11   to the admission of Exhibit B.

12            THE COURT:  B as in boy?

13            MS. WILLIAMS:  B as in boy.

14            THE COURT:  Okay.  B is admitted.

15            MS. WILLIAMS:  Thank you.

16        (Defendant's Exhibit B admitted into evidence.)

17   Q.    (By Ms. Williams)  Have you seen what's been marked as

18   Exhibit B before, Lieutenant?

19   A.    Yes, I have.

20   Q.    And what is it?

21   A.    It's a memo outlining team expectations and guidelines.

22   Q.    And what's the date?

23   A.    July 24th, 2009.

24   Q.    Is that the date you got the punctuality memo?

25   A.    Exact same date.

1   Q.   Okay.  And this memo goes to the entire ROP team, doesn't

2   it?

3   A.   Yes, it does.

4   Q.   And one of the first things it talks about under the

5   subject line of Team Expectations and Guidelines is "Show up on

6   time.  Be logged in."  What's the next sentence?

7   A.   "If you are going to be late or absent advise me via radio

8   or telephone."

9   Q.   Isn't that exactly the same thing that was told to you in

10  the punctuality memo issued the same day?

11  A.   It is.

12  Q.   Do you consider this to be discipline to the entire ROP

13  team?

14  A.   It's a team expectation and guideline memo.

15  Q.   And the punctuality memo outlined the same team

16  expectations and guidelines to you, correct?

17  A.   That's correct.  It was contained in the memo.

18  Q.   Okay.  It went to every ROP member.  Correct?

19  A.   Yes, ma'am.

20  Q.   It's more detailed and inclusive than the memo to you,

21  right?  It has other expectations and things that you should be

22  doing as a ROP team member from your sergeant?

23  A.   Yes, ma'am.

24  Q.   And it advised you of the same expectations as in

25  Exhibit 46?

1    A.    Yes, ma'am.

2    Q.    Did you consider this reminder to be discipline to the

3    entire team?

4    A.    No.

5    Q.    When Hubbard became the sergeant, he changed some ROP

6    practices, didn't he?

7    A.    I'm not sure what you're asking.

8    Q.    Well, he changed the way arrests went into the logbook,

9    correct?

10   A.    No.  He had been a sergeant for a while.  He didn't -- The

11   arrests were logged as the ROP team.

12   Q.    When he came in, he made some changes, didn't he?

13   A.    I don't recall him making changes for --

14   Q.    He gave you other team expectations.

15   A.    I don't recall that.

16   Q.    You don't?  Okay.  You were no longer allowed under

17   Sergeant Hubbard to write more than one detective in the arrest

18   log, correct?

19   A.    When issues started arising with me, he made changes.

20   Q.    Despite the fact that no detective ever makes an arrest by

21   themselves, correct?

22   A.    Correct.

23   Q.    The person whose case it was is the person whose name went

24   in the logbook.

25   A.    That's what he changed.

Cross-Examination - Terysa M. Welch

1    Q.    Not all the backup detectives that assisted?

2    A.    That's what he changed eventually.

3    Q.    Okay.  And you felt this was an unfair way to keep track

4    of statistics?

5    A.    I did.

6    Q.    You felt you were being set up for failure due to these

7    new rules because you were assigned to Burglary?

8    A.    I did.

9    Q.    Did you ever ask to be assigned to be a liaison to any

10   other unit?

11   A.    There was -- There was no -- No, it wasn't up to me who

12   was assigned to what.

13   Q.    Did you ever ask to be assigned to be a liaison for any

14   other unit?

15   A.    No.

16   Q.    You have a responsibility to develop your own cases as a

17   detective, correct?

18   A.    Right.

19   Q.    And going back to Exhibit B before I move on to these, did

20   any ROP team member challenge your expectation to Hubbard when

21   the entire ROP team got the expectation memo that's Exhibit B?

22   A.    Yes, Danny called a meeting, Danny Garcia.

23           THE COURT:  Ms. Williams, I apologize for

24   interrupting --

25           MS. WILLIAMS:  No.

```
1              THE COURT:  -- midstream.  So it's just about 15, 16

2    minutes after 10:00.  I'm going to call a break at this time.

3    It's about midmorning, so you can pick up right where you left

4    off --

5              MS. WILLIAMS:  Yes, sir.

6              THE COURT:  -- when we reconvene.  15 minutes' time.

7              Please rise for the jury.

8         (Jury out at 10:16 a.m.)

9              THE COURT:  Okay.  Please be seated.

10             Ms. Wiggins.

11             MS. WIGGINS:  Yes.  Thank you, Your Honor.

12             THE COURT:  Yes, ma'am.

13             MS. WIGGINS:  I have an issue I would like to address

14   with the Court, and I'm guessing that it is because of where I

15   am seated in the courtroom that I can be aware that Juror

16   Number 3 has his phone on and it has buzzed at least two,

17   perhaps three times, and he is actually reading or looking at

18   the phone.  It seems to be a distraction that I wanted to call

19   to the Court's attention.

20             THE COURT:  And, I'm sorry, how long have you

21   observed this going on?

22             MS. WIGGINS:  It's been this morning.  I don't know

23   if anyone else has noted it.

24             THE COURT:  Not yesterday?

25             MS. WIGGINS:  Not yesterday.  But I, frankly, am able
```

1   to tell that it's buzzing and I'm able to see Juror Number 3

2   respond to the buzzing.

3           THE COURT:  Okay.  And once again, how many times,

4   then, have you seen this?

5           MS. WIGGINS:  At least twice, and I believe three

6   times.  And I'm looking at the court reporter, who I think has

7   also, perhaps, been aware of it, as well.

8           THE COURT:  Okay.  Ms. Wiggins, as to that and this

9   juror, though, do you have any particular objection to the

10  juror other than bringing it to my attention?

11          MS. WIGGINS:  I think, Your Honor, a reminder that

12  cell phones should be off and in pockets and purses and out of

13  the way would be appropriate.  I don't want to single Juror 3

14  out, but I think that can be distracting for jurors.

15          THE COURT:  Indeed.  All right.  Mr. Villa.

16          MR. VILLA:  I think that's fine.

17          MS. WIGGINS:  Thank you.

18          THE COURT:  Okay.  We'll do that when we reconvene.

19  Can I just remind counsel, when you're utilizing your exhibits,

20  if they've been admitted, please utilize the exhibit that's

21  been admitted.

22          MS. WILLIAMS:  Thank you.  I apologize.

23          THE COURT:  And it would be helpful.  If you do

24  utilize an exhibit, indicate as you're reaching for it whether

25  that exhibit has been admitted or at that point whether it's

1    simply identified.  And if it's by stipulation, just move for

2    admission --

3              MS. WILLIAMS:  Thank you.

4              THE COURT:  -- without objection, and I'll exercise

5    that.

6              MS. WILLIAMS:  Thank you.  I apologize.

7              THE COURT:  That's all right.

8              Anything else before we recess?

9              MR. VILLA:  No, Your Honor.

10             THE COURT:  Okay.

11        (Court stood in recess at 10:18 a.m. and resumed at

12        10:33 a.m. as follows:)

13             THE COURT:  Okay.  It looks like we are getting lined

14   up.  You may be seated in the meantime.

15             So what I propose to do, Ms. Wiggins, because I think

16   it's a legitimate concern, what I was going to ask without

17   singling anybody out is just remind everybody in the courtroom

18   to reach for their cell phones at this moment and ensure

19   they're off.  Would that be fine?

20             MS. WIGGINS:  Yes, Your Honor.

21             THE COURT:  Mr. Villa?

22             MR. VILLA:  That's fine, Your Honor.

23             THE COURT:  Okay.  Please rise for the jury.

24        (Jury in at 10:34 a.m.)

25             THE COURT:  Okay.  Please be seated.

1          Ms. Williams, before you resume your examination --

2          MS. WILLIAMS:  Yes, sir.

3          THE COURT:  -- let me just remind -- because I

4    just -- I think I failed to raise this earlier.  If I can just

5    ask everybody in the courtroom, including the gallery, counsel,

6    the jury, the importance of keeping your cell phones in the off

7    mode.  So let's just take a moment right now, if you do have a

8    cell phone on you, if you could just reach for that, take a

9    look at it, double-check, ensure that it's off, and that way we

10   will not have any distractions during the remainder of the

11   trial.

12         Okay.  All right.  Thanks for doing that.

13         Ms. Williams.

14         MS. WILLIAMS:  Thank you, Your Honor.

15   Q.   (By Ms. Williams)  Lieutenant Welch, we were talking

16   about Sergeant Hubbard's change in some team expectations and

17   guidelines before we took the break.  Do you recall?

18   A.   Yes, ma'am.

19   Q.   And he had changed the way that things were going to be

20   entered in the arrest log, correct?

21   A.   Yes.

22   Q.   And you felt that was unfair because you were assigned to

23   Burglary.

24   A.   Yes.

25   Q.   And you have a responsibility to develop your own cases in

1   Burglary, don't you, and in ROP generally?

2   A.   Yes.

3   Q.   And there's many less homicides in a year than burglaries,

4   stuff by repeat offenders, correct?

5   A.   I would agree with that.

6   Q.   Okay.  You and two male team members complained to

7   Sergeant Hudson that two of your coworkers weren't passing the

8   fitness standards before you filed your Complaint, too, right?

9   A.   There was a concern on the team about that issue.

10  Q.   Okay.  And that was before you filed your Complaint?

11  A.   It had been an ongoing issue, yes, ma'am.

12  Q.   Yes.  And you and two male members of the team complained

13  about specifically Potter and Gagne to Sergeant Hubbard.

14  A.   It was more than two members of the team.

15  Q.   Who complained?

16  A.   Detective Hill, Detective Baca, Detective Robichaud,

17  myself, Detective Garcia.

18  Q.   And based on that complaint, Sergeant Hubbard described

19  team expectations on fitness, didn't he?

20  A.   Sergeant Hubbard stated that he was not going to address

21  Detective Potter on the issue.

22  Q.   Okay.  What about Detective Gagne?

23  A.   I don't think the issue at hand was Detective Gagne.

24  Q.   Oh, you don't.  You were just complaining about Potter?

25  A.   Detective Potter was the person that we were addressing.

1   Q.   How did you address that?

2   A.   We asked Sergeant Hubbard to address it with him.

3   Q.   Did you talk to Potter himself?

4   A.   We did.

5   Q.   And what did he tell you?

6   A.   We tried to help Detective Potter.

7   Q.   What did you tell him?

8   A.   "Let us help you work out, let us help you with your diet.

9   Come work out with us before the team workout so that we can

10  customize something for you."

11  Q.   And on the ROP team, people have an awareness of fitness,

12  correct?

13  A.   Absolutely.

14  Q.   And you talk with each other about workout routines and

15  diet, don't you?

16  A.   We work out together in the mornings.

17  Q.   And you talk about diet things that are working for you

18  and workout strategies that are working for you.

19  A.   Well, everybody else was keeping, in general, awareness of

20  themself.

21  Q.   And you thought Potter was falling down in that aspect?

22  A.   Yes.

23  Q.   Okay.  You had a team meeting.  You talked about it a

24  little bit yesterday.

25  A.   I'm not sure which meeting you're referring to.

Cross-Examination - Terysa M. Welch

1    Q.   The meeting Detective Potter called.

2    A.   Yes.

3    Q.   Is that before or after you told him that he was not fit

4    enough to be in ROP?

5    A.   It was after.

6    Q.   The meeting was after you had raised the concern with him?

7    A.   Yes, that was after.

8    Q.   And who at that meeting attended?

9    A.   Detective Gagne, Detective Potter, myself, and Detective

10   Hill.

11   Q.   Okay.  And Detective Potter asked you what was going on

12   with you and said you weren't being very friendly at work,

13   correct?

14   A.   Something to that effect.

15   Q.   And you felt your team member was angry at you because you

16   weren't talking to them or telling you anything, correct?

17   A.   Well, they had used a couple of examples sort of along

18   those lines.

19   Q.   And in that meeting, you declined to discuss issues that

20   you might be having with them -- with them, correct?

21   A.   I did.

22   Q.   Okay.  And Potter accused you of being a wedge in the unit

23   at that time, correct?

24   A.   I believe that, yes.

25   Q.   Mike Hill said that there were cliques in the ROP unit in

1    that meeting, didn't he?

2    A.    Yes.

3    Q.    You agreed with him?

4    A.    Yes.

5    Q.    Do you believe that you and Mike and Garcia and Baca were

6    a clique?

7    A.    No, I don't think it was a clique.

8    Q.    So who were you describing as being in a clique if it

9    wasn't the people that you hung out with?

10   A.    My point in bringing up the clique was to point out to

11   J.R. and Gagne that they team up by themselves and it's hard to

12   become friendly with them when they're off by themselves all

13   the time.  That was my point of bringing that up.

14   Q.    And that meeting didn't go well.

15   A.    No, it did not go well.

16   Q.    Okay.  And you refused to participate in a second meeting

17   when J.R. Potter asked for a second meeting?

18   A.    Of course I did.

19   Q.    And this didn't assist the proposition that team members

20   are there to help each other out.

21   A.    I didn't believe their intentions were to make things

22   better.

23   Q.    Okay.  And that's your belief?

24   A.    That was my belief.

25   Q.    And at that meeting, J.R. Potter said he had concerns

1   about whether you would back him up.

2   A.   He did.

3   Q.   And you didn't like that?

4   A.   It was offensive to me.

5   Q.   Okay.  Now, do you recall discussing a warrant roundup

6   yesterday?

7   A.   With Sergeant Hubbard?

8   Q.   Just -- Yes, the warrant roundup that Sergeant Hubbard

9   handed out the warrants.

10  A.   Yes, ma'am.

11  Q.   Okay.  The date of that warrant roundup was July 29th

12  according to Exhibit A.  Do you need to see that again?

13  A.   It may help me.

14  Q.   Okay.

15          MS. WILLIAMS:  May I approach the witness, Your

16  Honor?

17          THE COURT:  You may.  This is Exhibit A?

18          MS. WILLIAMS:  Yes.  And it's in the first three

19  pages.  Should I just put it on the screen?

20          THE COURT:  Okay.  I just want to make sure it's the

21  actual Exhibit A that's been admitted.

22          MS. WILLIAMS:  It is, Your Honor.  I can put it up,

23  what's in Exhibit A.

24          THE COURT:  Well, okay.  So we have Exhibit A on the

25  table --

Cross-Examination – Terysa M. Welch

1           MS. WILLIAMS:  I will do this --

2           THE COURT:  -- which I think is four pages.

3           MS. WILLIAMS:  Yes, sir.

4           THE COURT:  Okay.

5           MS. WILLIAMS:  But it's not up there.

6           THE COURT:  Okay.  We had an Exhibit A that was

7    admitted --

8           MS. WILLIAMS:  Yes, sir.

9           THE COURT:  -- and I just need to know where -- Where

10   is the item?

11          MS. WILLIAMS:  I believe that this will be it.  It

12   does not have the blue sticker on it, but I will put it up

13   there.

14          THE COURT:  Is this a photocopy or the actual --

15          MS. WILLIAMS:  This is a photocopy.  Do you have the

16   original?  We'll sort that out, Your Honor.

17          THE COURT:  Okay.  If you can just make sure

18   Mr. Villa gets to see what we have here.

19          All right.  Let's do this.  Just if you would take

20   the four-page item that is marked and it's been admitted as A,

21   just staple that altogether.

22          MS. WILLIAMS:  Yes, sir.

23          THE COURT:  Okay.  Just so we can manage the

24   document.

25          MS. WILLIAMS:  This is Exhibit A, four pages.

1          THE COURT:  Okay.  You're good.  Thank you.

2     Q.   (By Ms. Williams)  Do you see on July 29th, Lieutenant,

3     that the warrant roundup has stars around it on your calendar?

4     A.   I do.

5     Q.   Is that the date that the warrant roundup that you

6     referred to yesterday occurred?

7     A.   It appears to be, yes.

8     Q.   And what did you note that date?

9     A.   I noted that 42/49 would be J.R. Potter and Danny Garcia

10    are given one packet together and 45 would be me, "given one

11    alone by 840," Sergeant Hubbard.  Quote "Let me know if you

12    need 82," which is backup.

13    Q.   Does this indicate to you that there were just three ROP

14    detectives that day on duty?

15    A.   It would.

16    Q.   And so when you get a packet, what does that mean?  What

17    does that comprise of?

18    A.   It's an envelope containing your suspect information.

19    Q.   Does it include a felony warrant?

20    A.   It includes the felony warrant and the address and the

21    date of birth, the suspect's background maybe, some -- whatever

22    background information we know about the subject that we would

23    be looking for.

24    Q.   Do you know when you go out on a warrant roundup if you're

25    going to find the felon?

1   A.   You usually find at least one person in your packet.

2   Q.   Okay.  And you had one packet?

3   A.   One packet.

4   Q.   Now, how often did Garcia participate in warrant roundups?

5   A.   Often.

6   Q.   Okay.  And if there's only three detectives working that

7   day, did you think that you could only do one team?

8   A.   We could've worked altogether.

9   Q.   Okay.  You could've.  And does that create efficiency

10  problems?

11  A.   I don't understand your question.

12  Q.   If all of you are traveling in a group, that means you can

13  do less work in a period of time, correct?

14  A.   That would be the safest way to do the objective.

15  Q.   You didn't do that felony pickup that day, did you?

16  A.   No, I did not.

17  Q.   And Sergeant Hubbard had told you that if you needed

18  backup, you could call out.

19  A.   And I had called for backup previously and didn't receive

20  any.

21  Q.   Did you -- That's not answering my question, Lieutenant.

22  A.   I understand.

23  Q.   Did you look for that felon that day?

24  A.   I did not.

25  Q.   Okay.  You didn't, then, know if you would have found

1   him --

2   A.   No.

3   Q.   -- based on the information in the packet?

4   A.   No.

5   Q.   Did you tell Sergeant Hubbard that you weren't going to

6   participate in the warrant roundup?

7   A.   I don't recall.

8   Q.   Felony warrants don't expire, do they?

9   A.   No.

10  Q.   So when you go out on a warrant roundup and the person

11  isn't at the places that the packet might indicate they would

12  be at, you just go on, correct?

13  A.   Correct.

14  Q.   And if the felon happens to be at one of those locations,

15  you can call for backup, right?

16  A.   But I don't think you understand how that works.

17  Q.   I think I understand that if you need backup, you can call

18  for backup.  Correct, Lieutenant Welch?

19  A.   If I knock on a door and the subject answers the door, I

20  can't say, "Time out.  Can you suddenly start to back me up?"

21  Q.   I absolutely understand that.  But before you go knock on

22  the door, you might sit and surveil to see if the person is

23  there or their car is there or some other indication that the

24  felon might be there, correct?

25  A.   Possibly.

1    Q.    And at that point you can, if your surveillance indicates

2    that the person might be there, you can call for backup.

3    A.    I didn't do that.

4    Q.    And in APD, if you can't execute a warrant safely, you're

5    trained not to execute the felony warrant.

6    A.    I didn't execute the felony warrant.

7    Q.    That's not the answer to my question, Lieutenant Welch.

8    If you can't execute a warrant safely, you're trained not to

9    execute the warrant.

10   A.    Correct.

11   Q.    You are not supposed to go knock on the door by yourself

12   if you don't have the appropriate measures put in place.

13   A.    Correct.

14   Q.    Let's talk about August 3rd, because I think that's where

15   you're talking about a time that you didn't get backup to

16   arrest a felon.  Right?

17   A.    Correct.

18   Q.    Okay.  You stated that you tried to call for backup to

19   arrest a felon and you claim that nobody responded.

20   A.    I said Sergeant Hubbard responded on the radio.

21   Q.    Okay.  And was he en route?

22   A.    No.

23   Q.    What did he tell you?

24   A.    I don't remember what he told me exactly.  He acknowledged

25   my transmission.

1  Q.   And he told you that he could start in ten minutes from a

2  distant location?

3  A.   He told me he could start in ten minutes from Tramway and

4  Central after Danny Garcia was arriving.

5  Q.   Okay.  And Danny Garcia arrived.

6  A.   Eventually, yes.

7  Q.   Now, did he hear you call out on ROP air?

8  A.   No.

9  Q.   How did he hear you?

10  A.   I called him on his cell phone.

11  Q.   Okay.  Did you also call your husband on the cell phone?

12  A.   No.

13  Q.   You don't recall calling your husband and telling him that

14  you weren't getting backup and he said that he would send

15  someone from Rio Rancho if you needed that?

16  A.   No, I don't.

17  Q.   Okay.  Did you call out on Northeast air?

18  A.   I did.

19  Q.   And what were you told?

20  A.   Nobody was available.  They were -- Units were on calls.

21  Q.   Now, if you can't execute a warrant safely, what are you

22  supposed to do?

23  A.   Stand by.

24  Q.   Okay.  And did you do that?

25  A.   I did.

1    Q.    And did you get a response?

2    A.    Eventually I did.

3    Q.    And you were able to execute the warrant?

4    A.    Eventually I did.

5    Q.    Because you followed the procedure that was in place to

6    safely execute a felony warrant.

7    A.    Eventually I did.

8    Q.    Okay.  So you did get backup; you just didn't get it as

9    quickly as you would have liked.

10   A.    I did.

11   Q.    Okay.  Every badge is your backup on a call-out, isn't it?

12   A.    Yes.

13   Q.    Now, let's talk about your Complaint.  You walked your

14   EEOC Complaint -- You filed your EEOC Complaint, correct?

15   A.    Yes, I did.

16   Q.    With the EEOC?

17   A.    Right.

18   Q.    And then you walked that Complaint over to the Internal

19   Affairs Department, correct?

20   A.    Yes.

21   Q.    And you had delivered it to Commander Doug West?

22   A.    Lieutenant Doug West.

23   Q.    He was a Lieutenant then.  I apologize.  You're right.

24         Your lawyer went with you?

25   A.    No.  I didn't have a lawyer yet.

Cross-Examination - Terysa M. Welch

1   Q.   You didn't have a lawyer yet?

2   A.   I don't believe so.

3   Q.   Okay.  Is there something that would refresh your

4   recollection on whether you had a lawyer or not on the date

5   that you filed your Complaint?

6   A.   I don't know what would refresh --

7   Q.   Would it be in your notes, not Exhibit A but the notes

8   that you took that are not part of the exhibit?

9   A.   I don't know.

10  Q.   Do you recall the date you filed your Complaint?

11  A.   August 24th, 2009.

12  Q.   August 24th?

13  A.   Yes, ma'am.

14  Q.   Okay.  And do you recall -- Let me find this for you.

15         MS. WILLIAMS:  May I approach the witness to refresh

16  her recollection?  This is not an exhibit.  It's just to

17  refresh.

18         MR. VILLA:  May I just see what you're showing her?

19         MS. WILLIAMS:  Sure.

20         THE COURT:  You may approach.

21         MS. WILLIAMS:  Thank you.

22     (A conference was held between the witness and

23     Ms. William.)

24  Q.   (By Ms. Williams)  I'll ask you a question.  Is your

25  recollection refreshed?

1    A.    Nothing there about an attorney on that date.

2    Q.    Okay.  Lieutenant Welch, based on your review of your

3    notes, did that refresh your recollection on when you hired an

4    attorney?

5    A.    No, it did not.

6    Q.    Okay.  So you don't believe that your lawyer went over to

7    IA with you.

8    A.    Now, my lawyer went with me to the IA interview.

9    Q.    But not to deliver the Complaint?

10   A.    I don't recall if he went with me to do that.

11   Q.    Okay.  Thank you.

12         Who do you remember mentioning in your Complaint as

13   people you were complaining about?

14   A.    Sixteen pages long.  I remember Lieutenant Smith,

15   Commander Hudson, Kevin Gagne, I believe J.R. Potter.  Pretty

16   much the whole ROP team is mentioned in my Complaint.

17   Q.    Okay.  When you took your complaint to IA, you were aware

18   that every person you mentioned in your Complaint would get a

19   target letter, correct?

20   A.    I don't think they got a target letter.  They may have

21   been witnesses.

22   Q.    Right.  But they would be made aware of the fact that you

23   had made a Complaint.

24   A.    Eventually.

25   Q.    Okay.  Now, who did you tell about the Complaint before

Cross-Examination - Terysa M. Welch

1   you filed it?

2   A.   I had spoken to a gentleman by the name of Richard

3   Campbell.

4   Q.   And that's Michelle Campbell's father?

5   A.   Correct.

6   Q.   Did you tell Michelle Campbell?

7   A.   I did.

8   Q.   Did you tell your -- any lawyer?

9   A.   Again, I'm not sure -- I obtained a lawyer around that

10  time, but I don't -- it wasn't prior to my Complaint.

11  Q.   Okay.  Did you tell your brother you were going to file a

12  Complaint?

13  A.   I don't recall talking to him about that prior.

14  Q.   Even though he's in APD.  You didn't seek his advice?

15  A.   No.  He's much younger.  He's not -- He wouldn't have -- I

16  tried to shield him from things like that.  I may have talked

17  to him periodically about parts of things going on just so that

18  he's aware and basically warned about things like that.

19  Q.   Did you talk to other family members?

20  A.   I probably did talk to my dad.

21  Q.   Did you talk to your boyfriend, now husband, Jason Bowie?

22  A.   I don't recall.

23  Q.   Did you talk to Danny Garcia?

24  A.   I don't believe I talked to Danny about the Complaint.

25  Q.   Did you talk to Mike Hill?

1    A.    No.

2    Q.    Did you talk to Maureen O'Brien about filing an EEOC

3    Complaint before you filed it?

4    A.    I knew Maureen had filed a Complaint, but I don't know

5    what her Complaint was about, and she had filed a different

6    way.

7    Q.    Did you -- My question is, did you talk to her before you

8    filed your Complaint about filing a Complaint?

9    A.    Not about filing my Complaint, no.

10   Q.    You talked to her about filing your Complaint?

11   A.    Not about filing my Complaint.

12   Q.    You talked to her about filing her Complaint?

13   A.    I think I asked her about how she filed her Complaint, the

14   process.

15   Q.    After your Complaint was filed, who did you talk to about

16   the filing of the Complaint?

17   A.    Nobody.

18   Q.    You didn't tell --

19   A.    My attorney.

20   Q.    -- your lawyer?  You didn't --

21   A.    Of course my attorney.

22   Q.    And you gave it to Commander West, Lieutenant West at the

23   time?

24   A.    Correct.

25   Q.    And you'd taken it to the EEOC?

1    A.    Federal.

2    Q.    Federal.  Okay.  After you filed your Complaint, Sergeant

3    Hubbard and Lieutenant Smith were administratively removed from

4    ROP pending the IA investigation of your allegations, correct?

5    A.    Correct.

6    Q.    What was the team told about the reason that they were

7    administratively removed from ROP?

8    A.    I don't know what all of the team was told.  I know that

9    Kevin Gagne was left as Acting Sergeant and he announced over

10   ROP radio simply that he was acting, that Sergeant Hubbard had

11   been removed, and that Lieutenant Smith had been removed.

12   Q.    I do want to go back to this acting a little bit.  There's

13   a difference between the procedure of someone acting as a

14   sergeant while the sergeant is at a hearing or a meeting or

15   something like that and being acting for a period of time, for

16   like a vacation, correct?

17   A.    There's -- There's no difference.  There's still -- They

18   have the same authority.

19   Q.    But you don't get an upgrade until there's a period of

20   time that you're appointed to be Acting Sergeant, correct?

21   A.    Okay.  That's eight hours or more.

22   Q.    Eight hours or more.  And it's not a week or more?

23   A.    No.  It's eight hours or more.

24   Q.    Okay.  So when Sergeant Hubbard left, you thought Mike

25   Hill in charge on July 13th when you asked him for comp time.

Cross-Examination - Terysa M. Welch

1  Do you know if he was in that position for the whole day or

2  just part of the day?

3  A.   I'm not sure.

4  Q.   And when Gagne was Acting Sergeant on July 23rd before the

5  punctuality memo tac range thing, was he Acting for the whole

6  day or just part of the day?

7  A.   The whole day.  He may have been more than that day, but I

8  know at least that day he was Acting Sergeant.

9  Q.   And there's paperwork that has to be filled out to get the

10 upgrade to be the sergeant, correct?

11 A.   Correct.

12 Q.   And if a sergeant is just going to be gone for a hearing

13 or something like that, they don't do that paperwork if they're

14 just going to be gone for a couple hours?

15 A.   I wouldn't guess so.

16 Q.   Well, now that you're a lieutenant, you know, right, how

17 to appoint somebody to be Acting Lieutenant --

18 A.   Yes.

19 Q.   -- when you're gone?

20        And if you're at a hearing for an hour, do you do the

21 paperwork to make a person Acting Lieutenant?

22 A.   I wouldn't guess so, and processes may have been different

23 back then than now.

24 Q.   Okay.  Well, what do you do now?

25 A.   Now you do an upgrade memo and --

Cross-Examination - Terysa M. Welch

1    Q.   If you're gone for an hour?

2    A.   No, no, no.  You wouldn't leave an acting for an hour.

3    That wouldn't make any -- That wouldn't make any sense.

4    Q.   Okay.  Who's in charge if the lieutenant is in court and

5    something happens if there's not somebody acting?

6    A.   I don't leave an acting for an hour.  There's always

7    another person in the chain of command that's there.

8    Q.   Okay.  Now, in your Complaint, you complained that

9    Sergeant Hubbard had been lax in enforcing and following rules,

10   correct?

11   A.   Yes.

12   Q.   You complained, among other things, that he was not

13   enforcing or following rules for signing felony warrants.

14   A.   He wasn't signing complaints.

15   Q.   And that was in your Complaint?

16   A.   It was in my Complaint.

17   Q.   He wasn't following rules.

18   A.   It was in my Complaint.

19   Q.   Okay.  And Sergeant Hubbard was placed on administrative

20   leave while IA investigated your complaints that he wasn't

21   following rules.

22   A.   He was transferred.  I don't know if it was administrative

23   leave.

24   Q.   Correct.  And I apologize.  He was put in a different

25   position outside of ROP so that you didn't deal with him?

Cross-Examination - Terysa M. Welch

1    A.    Correct.

2    Q.    He let people take time off without submitting comp

3    paperwork.

4    A.    It's my understanding, yes.

5    Q.    And like you said, he allowed detectives to sign felony

6    warrants for him after hearing facts on the telephone?

7    A.    I don't know if he heard the facts on the telephone.  I

8    know he allowed people to sign for him?

9    Q.    And he didn't debrief at the end of every day.

10   A.    No.

11   Q.    Okay.  And you understand that he was disciplined as a

12   result of your complaints that he wasn't following rules.

13   A.    I don't know that.

14   Q.    You don't know that?  Okay.

15         You also complained, among other things, that

16   Lieutenant Smith had not reported an accident in the City

17   parking lot between his vehicle and Danny Garcia's vehicle,

18   right?

19   A.    There were two accidents that weren't reported.

20   Q.    And you put both of those in your Complaint?

21   A.    Yes, I did.

22   Q.    Okay.  Did you know that Lieutenant Smith was disciplined

23   or not as a result of the investigation of your complaints?

24   A.    No idea.

25   Q.    After the investigation by Internal Affairs of your

Cross-Examination – Terysa M. Welch

1    Complaint, both Sergeant Hubbard and Lieutenant Smith were

2    returned to ROP, right?

3    A.    They were.

4    Q.    And you were still there?

5    A.    I was still there.

6    Q.    And when they came back after you had complained that he

7    wasn't following all the rules, he said he's going to be

8    following all the rules from now on, didn't he?

9    A.    He gave us different rules.

10   Q.    He gave you the rules that were already spelled out in APD

11   policies and procedures and were expectations of the

12   Department, correct?

13   A.    Okay.  I'll go with that.  Fair enough.

14   Q.    Is that true?

15   A.    That's true.

16   Q.    Thank you.

17          Now, when he returned to ROP, he let you know that he

18   was going to be following the rules and that you might not like

19   it.

20   A.    He didn't use those exact words.  He --

21   Q.    Is that the gist of what he was telling you?

22   A.    He laid out the rules, yes, he did.

23   Q.    Okay.  Every team member was present for what he said?

24   A.    Yes.

25   Q.    And every rule was going to apply for every person in ROP?

Cross-Examination - Terysa M. Welch

1    A.    That's right.

2    Q.    But you took that information as a threat directed at you?

3    A.    It was the wording that he used.

4    Q.    And you talked about that yesterday?

5    A.    I did.

6    Q.    Requiring you -- What did he say?

7    A.    "It's been a little unpleasant for me, but it's going to

8    be far worse for you."

9    Q.    And he said that to the entire ROP team, didn't he?

10   A.    Yes, he did.

11   Q.    He didn't call you into his office and tell you that?

12   A.    He called us all into his office.

13   Q.    He didn't just call you into his office to tell you that?

14   A.    No, ma'am.

15   Q.    You felt that was discriminatory because you were a woman?

16   A.    I thought that was threatening.

17   Q.    Because you were a woman?

18   A.    I thought that was threatening.

19   Q.    And you can't explain why you thought that was threatening

20   to this jury right now?

21   A.    I think the language was threatening because he had just

22   come back, the very first sentence he says on his very first

23   day back.

24   Q.    And that language was directed to every single detective

25   in ROP regardless of gender?

Cross-Examination – Terysa M. Welch

```
 1   A.   Just because of the people in the room doesn't mean it's
 2   not directed at me.
 3   Q.   Did you ask him whether that was directed toward him?
 4   A.   No, I didn't.
 5   Q.   Or toward you, I mean.
 6        The application of the operational rules applied
 7   equally to every person in ROP.
 8   A.   They applied to everybody.
 9   Q.   Sergeant Hubbard was responding to the discipline imposed
10   on him.
11   A.   I don't know what he was responding to.
12   Q.   Because you never asked him, did you?
13   A.   No, I didn't.
14   Q.   And you felt that this was gender discrimination?
15   A.   I did.
16   Q.   The operational rules you believe were discriminatory or
17   strictly enforced existing rules, correct?
18   A.   Can you repeat the question?
19   Q.   The operational changes you believe were discriminatory
20   toward you because you're a woman were strictly enforcing
21   existing rules of APD.
22   A.   I thought they were retaliatory.
23   Q.   Okay.  Let me rephrase my question, then, Lieutenant
24   Welch.  The operational changes that you believe were
25   retaliatory were strictly enforcing the existing rules of APD.
```

Cross-Examination - Terysa M. Welch

1   A.   Yes, they were.

2   Q.   Changes included providing court appearance requests in

3   writing instead of just calling your sergeant, correct?

4   A.   Correct.

5   Q.   They consisted of him requiring you to comp out for all

6   appointments instead of just giving him a call and telling him

7   you had an appointment to see a house, correct?

8   A.   Correct.

9   Q.   And they consisted of having a debriefing at the end of

10   every day.

11   A.   Correct.

12   Q.   Okay.  And two detectives in the same vehicle were no

13   longer allowed without authorization.

14   A.   That's not an APD rule.

15   Q.   But that was a -- that was an expectation that Sergeant

16   Hubbard put in place because you each have your own vehicles,

17   correct?

18   A.   That's correct.

19   Q.   There's not a partner system, where people ride in the

20   same cars as an APD rule, as you said, correct?

21   A.   It's a surveillance technique.

22   Q.   Okay.  And this doesn't say that you can't surveil.  It

23   just says that you need authorization to be -- have riding two

24   detectives in one car, correct?

25   A.   Correct.

Cross-Examination - Terysa M. Welch

1    Q.   Every change that he made applied to every detective.

2    A.   That's correct.

3    Q.   Other ROP officers liked the looser imposition of rules,

4    didn't they?

5    A.   I'm sorry?

6    Q.   Other ROP officers preferred the looser imposition of

7    rules, didn't they?

8    A.   Absolutely.

9    Q.   And you know some people talked to Sergeant Hubbard about

10   that.

11   A.   I don't know if they did or not.

12   Q.   Okay.  But he made it clear to you in the public meeting

13   that he would be strictly enforcing the existing rules since he

14   was -- since he was returning.

15   A.   He made the expectations clear.

16   Q.   All right.  Now let's talk about your discipline.

17   October 12th, 2010.

18   A.   Uh-huh.

19   Q.   You became aware that on that date Detective Gagne

20   reported to his chain of command that he saw you buying alcohol

21   and transporting it in your City vehicle, correct?

22   A.   He saw me buying alcohol, correct.

23   Q.   You don't know if he looked out the door and saw you drive

24   away in your City vehicle, correct?

25   A.   I don't know.

Cross-Examination - Terysa M. Welch

1    Q.    Okay.  And an IA investigation was started?

2    A.    That's correct.

3    Q.    At this point, who's your chain of command?

4    A.    John Sullivan is my sergeant.

5    Q.    Because you're at Burglary?

6    A.    That's right.

7    Q.    And who's your lieutenant?

8    A.    I don't recall if it was Harold Medina or Harold

9    Prudencio.

10   Q.    When you see a violation of an SOP at APD, do you call

11   your chain of command or the person who you observed's chain of

12   command?

13   A.    You're talking about current day?

14   Q.    No.  At this time.  Thank you for the clarification.

15   A.    I would call the person's current chain of command.

16   Q.    Not your own chain of command?

17   A.    No.

18   Q.    Okay.  Now, this was the third IA investigation in which

19   you were a target, correct?

20   A.    I don't recall.

21   Q.    You don't recall?  Do you recall discussing that in your

22   deposition?

23          MR. VILLA:  Your Honor, may we approach?

24          THE COURT:  You may.

25       (Bench conference on the record.)

Cross-Examination - Terysa M. Welch

1              MR. VILLA:  Your Honor, I don't think that her prior

2    Internal Affairs is relevant, and whatever relevance that there

3    may be, I think it's outweighed by the danger of unfair

4    prejudice.

5              THE COURT:  Okay.

6              MS. WILLIAMS:  It goes to her understanding of the

7    procedure, and that's going to be really important.  They've

8    made it clear that she didn't know that you could have three

9    interviews.  She didn't know you had a target letter.

10             MR. VILLA:  That's not true.

11             THE COURT:  Tell me about the two prior or total

12   three complaints.

13             MS. WILLIAMS:  One was unsustained.  It's about the

14   process.  I'm not going to go into the details of the

15   complaint.  It's about the process.

16             THE COURT:  Okay.

17             MR. VILLA:  She can ask her what she knew about the

18   process without giving her the prior Internal Affairs.

19             THE COURT:  You can ask about the other Internal

20   Affairs complaints where she was a target.

21             MS. WILLIAMS:  And my next question is, the first one

22   wasn't sustained, correct?  And the next one, whatever

23   happened; and then the next one; and she was a witness in one.

24             THE COURT:  Uh-huh.  And how does it establish that

25   she was aware of the process, those questions by themselves?

Cross-Examination - Terysa M. Welch

1          MS. WILLIAMS:  Because she knows about security

2   warnings, and she knows about getting union representation, she

3   knows about whether you should bring a lawyer or not, and she

4   knows the process and the options available to her.

5          THE COURT:  Why don't we do this.  You can ask her

6   these questions specifically, and then depending on her answer,

7   you may ask her about the other instances just to establish

8   whether she knows --

9          MS. WILLIAMS:  Okay.

10         THE COURT:  -- the process.  Okay.

11         MS. WILLIAMS:  Thank you.

12      (Open court.)

13  Q.   (By Ms. Williams)  Your first IA investigation,

14  Lieutenant Welch, was not sustained, correct?

15  A.   I don't recall my first.  I would agree with that.

16  Q.   You don't know -- You don't recall IA investigations that

17  you participated in as either a target or as a witness?

18         MR. VILLA:   Your Honor, I don't think that was the

19  Court's ruling.

20         MS. WILLIAMS:  Well, I think we're at a different

21  place because -- Should we approach?

22         THE COURT:  Please approach.

23      (Bench conference on the record.)

24         THE COURT:  I wasn't clear, so I think what I am

25  allowing you to do is to ask what she knows about the specific

 1  processes, for example, whether to call a lawyer and the

 2  different parts of the process.

 3          MS. WILLIAMS:  I'm sorry about that.

 4          THE COURT:  So I think you can ask her what she's

 5  aware of as far as the procedure.

 6          MS. WILLIAMS:  Okay.

 7          THE COURT:  All right.  Okay.  And depending on her

 8  answer to those questions, if she maintains that she doesn't

 9  know, for example, then I'll allow you to go further into the

10  three other complaints.

11          MS. WILLIAMS:  Okay.  Thank you.  Thank you.  I'm

12  sorry, I didn't get to think about that.

13      (Open court.)

14          THE COURT:  I'm trying to tighten the microphone so

15  it's not loose.

16          All right.  Ms. Williams.

17          MS. WILLIAMS:  Yes, sir.

18  Q.  (By Ms. Williams)  Before you got a target letter, which

19  I think we looked at yesterday, in October of 2010, had you

20  had experience with the IA process?

21  A.   Yes.

22  Q.   So what do you understand about the IA process after you

23  get a target letter?

24  A.   You -- After you get a target letter, you set up an

25  appointment to have an interview with an investigator.

1   Q.   Now, in this case, did you know that you could have

2   resources and people available during the process under the

3   union contract?

4   A.   Yes.

5   Q.   And did you take advantage of that resource?

6   A.   Yes, I did.

7   Q.   In what way?

8   A.   I had my attorney present as well as a union rep.

9   Q.   When you set up your appointment for the IA interview?

10  A.   When I attended the IA interview.

11  Q.   Okay.  All right.  So you had an attorney present and a

12  union rep present.  What's your understanding of what the

13  attorney's role in the process would be?

14  A.   The attorney's role is to just be present for my -- for my

15  rights.

16  Q.   And what was the union rep's role in the IA interview?

17  A.   The union rep takes more of a role with regard to the City

18  contract.

19  Q.   Are you familiar with a Garrity warning?

20  A.   Yes.

21  Q.   And what is a Garrity warning?  Can you tell the jury?

22  A.   A Garrity warning is something you read into the record

23  which basically states that as a condition of your employment,

24  as sworn officer, you are -- you must answer all the questions

25  in IA truthfully or you can face termination as a result.

Cross-Examination - Terysa M. Welch

1    Q.    And what's the purpose of IA?  It's to self-police police,

2    isn't it?

3    A.    Correct.

4    Q.    And so truthfulness and cooperation in that process is

5    essential to the public's ability to trust officers, isn't it?

6    A.    That's right.

7    Q.    Okay.  So you took your attorney and you took your union

8    representative.

9    A.    I did.

10   Q.    And who is the IA investigator assigned to your case?

11   A.    Sergeant Cecil Knox.

12   Q.    And did you know Cecil Knox before this?

13   A.    No.  I knew of him.  Did not know him personally.

14   Q.    What did you know of Cecil Knox?

15   A.    I just knew that he had been a field officer prior to

16   promoting.  That's it.

17   Q.    And do you now know that Sergeant Knox passed away during

18   this litigation?

19   A.    I do know that.

20   Q.    Okay.  And so he's not available to testify about what

21   went on between you two.

22   A.    I'm aware of that.

23   Q.    Okay.  Now, you didn't like Cecil Knox.

24   A.    I don't know Cecil Knox.  I have no reason to not like

25   Cecil Knox.

Cross-Examination - Terysa M. Welch

1   Q.   But you had three interviews with Cecil Knox.

2   A.   That's correct.

3   Q.   And you had your attorney at each of those interviews?

4   A.   Yes, I did.

5   Q.   And you had a union rep at each of those interviews?

6   A.   Yes, I did.

7   Q.   And those interviews were all recorded, weren't they?

8   A.   Yes.

9   Q.   And you've listened to those recordings since they've

10  occurred?

11  A.   I may have listened to parts of those --

12  Q.   Okay.

13  A.   -- interviews.

14  Q.   And Cecil Knox in the first interview said, did you --

15  "Would you admit that you bought alcohol and transported it in

16  your City vehicle?"  He asked you to admit that?

17  A.   Something along those lines, yes, ma'am.

18  Q.   Under Garrity?

19  A.   Yes.

20  Q.   And you said you did not recall.

21  A.   I said that I had done that before, that I didn't recall

22  the specific date that he was asking me, which had occurred

23  about three weeks prior.

24  Q.   Did you ever hear yourself or your attorney or the union

25  representative admit to Cecil Knox in the tapes that you had

1    done that before and that you wanted a written reprimand?

2    A.   I admitted to Sergeant Knox that I had done that before

3    more than one time.

4    Q.   Did you hear that on the tapes when you listened to them?

5    A.   I don't remember.  It's been a long time since I listened

6    to the tapes.

7    Q.   The IA investigator called you in three times, correct?

8    A.   Yes, ma'am.

9    Q.   The first time he just asked you if you would admit it,

10   buying alcohol on October 12th, 2010.  Correct?

11   A.   Correct.

12   Q.   The second time he called you in, he had a receipt and a

13   video from the Walgreen's.

14   A.   He told me he had those things every time I came in, I

15   believe, but he didn't show me until the final interview.

16   Q.   And after the -- in the first interview, you asked him if

17   he had video or proof, didn't you?

18   A.   I wanted to jog my memory.  Yes, I believe I asked him to

19   see things to help.

20   Q.   And Sergeant Knox told you that IA doesn't work that way,

21   you don't get to ask the questions, right?

22   A.   I think he did tell me something like that.

23   Q.   Yeah.  And you admitted to grocery shopping in your

24   vehicle because you claim you do everything in your ROP

25   vehicle.  Right?

Cross-Examination - Terysa M. Welch

1    A.    I did do a lot of things in my ROP vehicle.

2    Q.    You said you didn't remember buying alcohol and

3    transporting it in your City vehicle on that date.

4    A.    I told him I didn't remember that date, period.

5    Q.    And the fact that you violated an SOP was not memorable

6    because you did that so often.

7    A.    I disagree with that statement.

8    Q.    You just told me you transported alcohol in your City

9    vehicle often enough that this did not stand out in your mind,

10   correct?

11   A.    I didn't remember the specific date that he was asking me

12   about.

13   Q.    Okay.  And it was not memorable because you did it often.

14   A.    It wasn't memorable because it just wasn't memorable.  I

15   didn't remember the date, anything specific about that date

16   that was memorable to me.

17   Q.    So you didn't have anything go through your mind that

18   said, I could get popped for doing this, but I'm going to do it

19   anyway?

20   A.    If I had backed into a vehicle in the parking lot at that

21   date, I probably would have remembered that date.  If something

22   significant happened on that date, other than things that I do

23   normally.

24   Q.    And buying alcohol and transporting it in your City car is

25   something that you normally did?

1   A.   I did do that, yes, ma'am.

2   Q.   You didn't tell Sergeant Knox that you couldn't remember

3   transporting alcohol in your City vehicle on that day because

4   you did it so regularly.

5   A.   I did a lot of things regularly in my ROP vehicle.  You're

6   concentrating on one thing.

7   Q.   Yes, I am.  You're right.  We're talking about a

8   particular incident on a particular day that was the subject of

9   a particular Internal Affairs investigation.

10  A.   Okay.  Fair enough.

11  Q.   And you have said you do not remember buying beer --

12  consistently said you do not remember buying beer on that date

13  even though Cecil Knox had a receipt, had surveillance video

14  from Walgreen's of you doing it, of buying beer that day?

15  A.   And I didn't deny it.

16  Q.   That's not the same under Garrity, is it?  If you don't

17  admit -- If you don't deny something, it's not the same as

18  admitting it, is it?

19         MR. VILLA:  Objection, Your Honor.  Garrity is a

20  legal question.

21         THE COURT:  Calls for a legal conclusion, so I'll

22  sustain the objection.

23         MS. WILLIAMS:  Okay.

24  Q.   (By Ms. Williams)  As a police officer, if a suspect does

25  not deny something, that's not the same as them admitting it,

Cross-Examination – Terysa M. Welch

1   is it?

2   A.   I admitted that I had done it before.  I admitted it was

3   me in the video.  I admitted that was my receipt.

4   Q.   And you did not admit that you bought beer and transported

5   it in your car that day, did you?

6   A.   I didn't remember the date.  Simple as that.

7   Q.   Okay.  You filed a union grievance of the discipline,

8   didn't you?

9   A.   It's not a union grievance.  It's a grievance about the

10  discipline I received.

11  Q.   Under the Albuquerque Police Officers Association.  Is

12  that correct?

13  A.   My attorney represented me in the grievance.

14  Q.   That was filed under the union contract, correct?

15  A.   I don't know that the union was involved in it, but yes, I

16  did file a grievance with the City.

17  Q.   Let's look at Exhibit 13.

18       MS. WILLIAMS:  Is that one previously admitted?  13A,

19  B, and C?

20     (A conference was held between Ms. Williams and

21     Mr. Villa.)

22       THE COURT:  13 by my notes has not been admitted.

23       MS. WILLIAMS:  That is true, Your Honor, and we're

24  getting the original for you.

25  Q.   (By Ms. Williams)  Lieutenant Welch, I'm showing you

 1  what's been admitted as Exhibit 13.  Can you recognize it from

 2  this first page or do you need to see more pages?

 3          THE COURT:  Well, Ms. Williams, would you please for

 4  the moment remove it from the ELMO.

 5          MS. WILLIAMS:  Yes, sir.

 6          THE COURT:  It has not been admitted.  Is it being

 7  offered for admission?

 8          MS. WILLIAMS:  Yes, Your Honor, and we stipulated.

 9          THE COURT:  Okay.  There's no objection.  13's

10  admitted.  You may publish.

11          MS. WILLIAMS:  I'm sorry.

12      (Plaintiff's Exhibit 13 admitted into evidence.)

13  Q.   (By Ms. Williams)  Can you tell from this first page or

14  should I hand it to you, Lieutenant Welch, so you can identify

15  it?

16  A.   It's a letter that I wrote to Chief Schultz.

17  Q.   Okay.  And what was the purpose of this letter?

18  A.   I believe it was for my Loudermill hearing.

19  Q.   And what's a Loudermill hearing?

20  A.   A Loudermill hearing is a hearing that you have with the

21  Chief of Police, and it is your opportunity to state your

22  last-minute facts between the predisciplinary -- you receive a

23  predisciplinary set of what your discipline is going to be, and

24  then you have an opportunity to talk to the chief before your

25  final discipline is handed down.  So you attend a meeting.  And

Cross-Examination - Terysa M. Welch

1    I elected to hand the chief this letter during that Loudermill

2    hearing with the chief.

3    Q.   Now, in this letter, if you look at the last -- Let me see

4    how to do this.  I want to make it easier for you guys to see

5    the whole thing.

6         Do you see this bottom paragraph?  What did you tell

7    Chief Schultz?

8    A.   It says, "I have been cooperative and completely truthful

9    throughout each of the three interviews that I was ordered to

10   participate in, despite the fact [that] Sergeant Knox asked me

11   almost the same questions in each interview."

12   Q.   Sergeant Knox gave you three chances to tell the truth

13   about whether you bought alcohol on October 12th of 2012,

14   didn't he?

15   A.   And I told the truth.

16   Q.   Okay.  You explained you did not remember, is what you

17   told Chief Schultz, right?

18   A.   Would you like me to continue to read?

19   Q.   Yes, please.

20   A.   "While there and per my rights as an employee and an

21   accused, I asked for copies of the evidence, or simply to see

22   the evidence, that he told me he had supporting the policy

23   violation, as I had explained I did not remember October

24   12th, . . . or the violation that was being accused of.  As I

25   explained to Sergeant Knox, if he had photographs of me the

Cross-Examination - Terysa M. Welch

1   photographs might jog my memory.  Sergeant Knox advised me that

2   this evidence existed, but he refused to let me see it."

3   Q.   I'll turn the page.  It says, "I still have not . . ."

4   A.   "I still have not been provided with that evidence, nor

5   have I been permitted to see it.  Additionally, in Sergeant

6   Knox's proposed findings, he did not reference or include

7   copies of these photographs.  I am left to believe that such

8   photographs do not exist."

9   Q.   Do you tell Chief Schultz in this letter where you're

10  explaining your position whether you admitted that you would

11  accept a written reprimand because you did it -- the SOP

12  violation frequently?  It's not in here, is it, if you'll read

13  the whole thing if you'd like?

14  A.   No, it's not in there.

15  Q.   Sergeant Knox told you that as part of an IA interview,

16  that you -- investigation, you can't confront other witnesses

17  in the IA investigation, correct?  You know that?

18  A.   Yes, I know that.

19  Q.   Okay.  And he specifically told you that you shouldn't

20  confront the person who saw you, Detective Gagne.

21  A.   Yes.

22  Q.   Okay.  You testified yesterday that Sergeant Knox told you

23  the investigation was ordered from the top.

24  A.   That's right.

25  Q.   Do you know what he meant by that.  What he meant by that.

Cross-Examination - Terysa M. Welch

1   A.   I can tell you what I thought he meant by that.

2   Q.   That's not my question.

3   A.   Well, then, I don't know.

4   Q.   Okay.  Because you didn't know what he meant by that and

5   you didn't ask him?

6   A.   I didn't ask him.

7   Q.   And your attorney didn't ask him what he meant by that?

8   A.   No.

9   Q.   And your union rep didn't ask him what he meant by that?

10  A.   No.

11  Q.   Okay.  And he didn't tell you what he was referring to?

12  A.   I've already answered no, that I did not.

13  Q.   So you got a predisciplinary notice and you had a

14  Loudermill hearing.  You said this was a 15-minute hearing with

15  the chief.

16  A.   Approximately.

17  Q.   About?

18  A.   Approximately, yes.

19  Q.   And that was your first interaction between you and Chief

20  Schultz individually, was the predetermination hearing, right?

21  A.   Yes, our first formal interaction, yes.

22  Q.   You had seen him at events and graduations and things like

23  that but had never spoken to him face to face.

24  A.   That's correct.

25  Q.   Okay.  So he didn't really know you?

Cross-Examination - Terysa M. Welch

1   A.   No.

2   Q.   Okay.  The final discipline held was 40 hours' suspension,

3   correct?

4   A.   Correct.

5   Q.   With 16 hours served?

6   A.   Correct.

7   Q.   And the rest held in abeyance?

8   A.   Correct.

9   Q.   Can you tell the jury what it means to hold disciplinary

10  hours in abeyance?

11  A.   Sort of like being on probation.  If you don't get in

12  trouble again, they forgive that time.  You mess up again, then

13  you serve that time.

14  Q.   And you didn't mess up again, did you?

15  A.   No, I didn't.

16  Q.   So you only served the 16 hours --

17  A.   Correct.

18  Q.   -- of the 40-hour suspension?

19  A.   Correct.

20  Q.   And your take-home vehicle was lost for 14 days.

21  A.   That's right.

22  Q.   Okay.  You aggrieved that discipline.

23  A.   That's right.

24  Q.   And you had a separate hearing where you put on evidence

25  and IA put on evidence.

1   A.   I put on evidence.  I didn't put on evidence.  I put on

2   evidence, and then it goes to the panel that the City chooses.

3   Q.   Okay.  And Doug West presented the City's case?

4   A.   That's correct.

5   Q.   Okay.  Now, five charges were sustained against you,

6   correct?

7   A.   Ultimately, I would need to see the final form.

8   Q.   Okay.

9        (A conference was held between Ms. Williams and

10       Mr. Villa.)

11       MS. WILLIAMS:  Excuse me, Your Honor, we're trying to

12   sort out a glitch in the exhibits.

13       Your Honor, this is Exhibit 153k, and the parties

14   have stipulated to its admission.  It's not on your list

15   because there was a numbering error, but we've stipulated.

16       THE COURT:  153k.  Objection, Mr. Villa?

17       MR. VILLA:  No, Your Honor.

18       THE COURT:  All right there.  And this is a one-page

19   item?

20       MS. WILLIAMS:  Yes, sir.

21       THE COURT:  153k.  And you're offering it for

22   admission?

23       MS. WILLIAMS:  Yes, sir.

24       THE COURT:  It will be admitted.

25       (Plaintiff's Exhibit 153k admitted into evidence.)

Cross-Examination - Terysa M. Welch

1    Q.   (By Ms. Williams)   Thank you.   Lieutenant Welch, does

2    this help refresh your memory of what allegations were

3    sustained against you in your discipline?

4    A.   I don't know what those . . .

5    Q.   Your attorney went over them with you yesterday.   I can

6    repeat them if you want.   But does this -- does this refresh

7    your memory of the allegations?

8    A.   It's a status sheet.   It's not my final discipline sheet,

9    but -- because I don't know what these SOP sections are and the

10   charges on the SOP sheet.   It all sustained on there, but I

11   don't know who -- who signed this form.   Is that from Chief

12   Schultz?

13   Q.   Well, according to this form, five different SOP

14   violations were sustained, correct?

15   A.   I understand that.   But Lieutenant West and the deputy

16   chief disagreed.

17   Q.   But this describes the final discipline that was imposed

18   on you, doesn't it?

19   A.   It appears --

20          MR. VILLA:   Objection, Your Honor.   I think that

21   misrepresents what her testimony is.

22          MS. WILLIAMS:   Well, I can go through that, Your

23   Honor.

24          THE COURT:   Well, why don't you just go through it --

25          MS. WILLIAMS:   Sure.

Cross-Examination - Terysa M. Welch

1          THE COURT:  -- using this Exhibit 153k.

2          MS. WILLIAMS:  Excuse me.

3          THE COURT:  I'll overrule the objection, but just go

4    through it -- the actual exhibit.

5          MS. WILLIAMS:  Thank you.

6    Q.   (By Ms. Williams)  In the discipline section, it says

7    that you were disciplined with a 40-hour suspension, doesn't

8    it?

9    A.   Yes, ma'am?

10   Q.   And it says that you received 16 hours served and 24 hours

11   held in abeyance for six months; is that right.

12   A.   That's right.

13   Q.   Is that the final discipline you received?

14   A.   That is.

15   Q.   And then also as a decision a 14-day suspension from

16   Department vehicle take-home privileges.

17   A.   Yes, ma'am.

18   Q.   That was the final discipline imposed, isn't it?

19   A.   Yes, ma'am.

20   Q.   And it shows in this section that you had four different

21   SOP charges sustained, correct?

22   A.   That's indicating five.

23   Q.   Five.  Excuse me.  I misspoke.  And those were all

24   sustained, correct?

25   A.   That's correct.  I just don't recognize this sheet as

Cross-Examination - Terysa M. Welch

1   being a final discipline.

2   Q.   Right.

3   A.   I've never seen that before.

4   Q.   And as you sit here today, you have no reason to question

5   that that's the final discipline you received and that five

6   different charges of violations of code of conduct were

7   sustained in order to reach that discipline?

8   A.   Okay.  I can't speak to the accuracy of those specific

9   SOP's, but I agree that this description of the final

10  discipline is accurate.

11  Q.   And you testified to those SOP's that you were charged

12  with violating yesterday, didn't you?

13  A.   Yes.

14  Q.   And those will go to the jury and they can see that.  I

15  don't think we need to take their time redoing that.  But I

16  understand that you don't remember the parts.

17          Okay.  Exhibit 13.

18          MS. WILLIAMS:  Can I see if this has been admitted,

19  Your Honor?  I think that it has.

20  Q.   (By Ms. Williams)  In your letter to Chief Schultz,

21  Exhibit 13, you indicated that Detective Gagne was following

22  you, didn't you?  I can put this up here if you'd like.  Do

23  you remember that?

24  A.   I'd like to see it.

25  Q.   It's a three-page, single-spaced.  Let me see if I can

Cross-Examination - Terysa M. Welch

1    find it.

2              This is in actually 13a.

3              MS. WILLIAMS:  Do you object to 13a?

4              I would like to move the subparts of 13, Your Honor,

5    at the same time so that we don't have to keep doing this

6    exercise.

7              Your Honor, we've stipulated to the admission of 13a.

8              THE COURT:  All right.

9              MS. WILLIAMS:  I move for admission.

10             THE COURT:  Any objection, Mr. Villa?

11             MR. VILLA:  No, Your Honor.

12             THE COURT:  Okay.  13a is admitted.  Is this a

13   one-page item?

14             MS. WILLIAMS:  Yes, sir.

15        (Plaintiff's Exhibit 13a admitted into evidence.)

16             THE COURT:  Okay.

17   Q.   (By Ms. Williams)  Detective -- Lieutenant Welch, can you

18   see on -- can you tell me what this exhibit is?

19   A.   It's a letter to Deputy Chief Feist.

20   Q.   Is it signed by you?

21   A.   Yes, it is.

22   Q.   Was it drafted by you?

23   A.   Yes.

24   Q.   And in the second paragraph, do you see where we've

25   indicated that -- with the highlighting, that you alleged,

Cross-Examination - Terysa M. Welch

1    "Simply put, I do not feel safe around Kevin Gagne due to his

2    repeated harassment.  On at least several occasions Detective

3    Gagne has followed me"?

4    A.    I see that.

5    Q.    Do you see that?  Do you remember making that allegation?

6    A.    Yes, ma'am.

7    Q.    Okay.  And do you know if you lived near Detective Gagne

8    at that time?

9    A.    Generally.

10   Q.    Do you recall your address on that date?

11   A.    I do recall my address.

12   Q.    What was your address on that date?

13   A.    3309 Shiloh Road in Rio Rancho.

14   Q.    And is that in the far north of Rio Rancho?

15   A.    Yes.

16   Q.    Do you know if other ROP detectives live nearby?

17   A.    Mike Hill.

18   Q.    How do you know he lived nearby?

19   A.    Because I've been to his house.

20   Q.    Okay.  Would it help you to describe to the jury where you

21   live if I show you on a map?

22          MS. WILLIAMS:  This will just be for demonstrative,

23   Your Honor, not an exhibit.

24          Do you object?

25          MR. VILLA:  May we approach, Your Honor?

Cross-Examination - Terysa M. Welch

1          THE COURT:  Okay.

2       (Bench conference on the record.)

3          MR. VILLA:  I don't have a problem with her talking

4   about the general location of where she lives, but if she's

5   trying to elicit for public record where Lieutenant Welch

6   lives, that concerns me a little bit.  So if she wants to know

7   if she's a few blocks from the Walgreen's or a few blocks from

8   Gagne, she can ask those questions, but giving out her

9   address --

10          MS. WILLIAMS:  This isn't where she lives, right?

11   She doesn't live there now.

12          THE COURT:  I'm wondering, how is this within the

13   scope of direct?

14          MS. WILLIAMS:  Because it goes to the -- Yeah, it's

15   going to be dual.  She's a dual-purpose witness.  We're not

16   calling her back.

17          THE COURT:  Who?  Ms. Welch?

18          MS. WILLIAMS:  Yes.  In our case-in-chief.  So

19   we've -- Remember, Mr. Villa told you we're going to try to

20   move through those folks.  So it is a dual purpose.  It also

21   goes to the location of Gagne's house, which he will testify

22   to, and her house, so it's just establishing a foundation for

23   this witness.

24          THE COURT:  It's not disclosing --

25          MS. WILLIAMS:  She doesn't live at this address

1    anymore, and I can ask her that.

2              THE COURT:  What about any of the other officers?

3              MS. WILLIAMS:  No, none of them live there, none of

4    these officers live at these addresses anymore.

5              MR. VILLA:  If she's doing dual purpose, obviously,

6    this is taking more time, so as the days go on, I'll just ask

7    the Court to keep that this mind while plaintiff presents her

8    case, because we never previously discussed Ms. Welch being

9    double purpose.  I don't object to that on this issue.  I don't

10   understand why she can't just ask --

11             THE COURT:  One at a time, please.  One at a time.

12   And you address the Court.

13             MR. VILLA:  I don't understand why the questions

14   can't just be How many blocks did you live from Mr. Gagne, or

15   how close did you live to Mr. Gagne.

16             THE COURT:  It's demonstrative.  So see what you can

17   do without it.  If she can't remember, you can utilize the

18   exhibit.

19             MS. WILLIAMS:  Okay.

20             THE COURT:  Please identify it for identification.

21             MS. WILLIAMS:  Mark it for identification as a

22   letter?

23             THE COURT:  As an exhibit.

24        (Open court.)

25   Q.   (By Ms. Williams)  Detective Welch, do you recall -- You

```
 1   don't live at 3309 Shiloh anymore, do you?

 2   A.   No.

 3   Q.   And you haven't lived there for some years.

 4   A.   No.

 5   Q.   Do you recall how much distance there is between

 6   3309 Shiloh and any addresses on where Stony Meadows is?

 7   A.   I don't know where that's at.

 8   Q.   Would seeing a map help you describe to the jury the

 9   locations?

10   A.   I don't know that it would tell me how far that is on a

11   map.

12   Q.   Okay.  Well, let's see if it works.

13   A.   Okay.

14   Q.   I think that's terribly tiny, so . . .

15            Do you see the pinpoint for 3309 Shiloh Road --

16   A.   I do.

17   Q.   -- Lieutenant Welch?

18   A.   Yes, ma'am.

19   Q.   And do you see that on the right side of the map is Unser

20   Boulevard?

21   A.   Yes, ma'am.

22   Q.   Is Unser Boulevard the location of the Walgreen's at issue

23   on October 14th, 2010, where you were alleged to have bought

24   the alcohol?

25   A.   Unser at Northern Boulevard.
```

Cross-Examination - Terysa M. Welch

1    Q.    And Northern would be farther to the south on this map?

2    A.    That's correct.

3    Q.    Because north is the top of every map, like we learned in

4    fourth grade.

5          Okay.  So, to get to your home, you would come up

6    from the Walgreen's.  It's not on this map, correct?

7    A.    No.

8    Q.    Should I make it bigger for you to see?  I don't know if

9    it's going to help.  Does that help you?

10   A.    It depends on what you're going to ask me.

11   Q.    I'm going to ask you if Northern is off the map on the

12   bottom?

13   A.    Okay.

14   Q.    Is that true?

15   A.    Yes, I believe so.

16   Q.    Okay.  And so on this -- When you -- When you purchased

17   alcohol, you're going to start from a point off the map, come

18   up Unser, correct?

19   A.    Yes.

20   Q.    And then to get to your home, would you come on King

21   Boulevard?

22   A.    Yes.

23   Q.    And it doesn't look like there's very many -- It doesn't

24   look like there's very many choices for getting to 3309 Shiloh

25   from Unser, correct?

Cross-Examination - Terysa M. Welch

1   A.    Right.

2   Q.    So you would have to go down King, you come down King and

3   then turn onto Shiloh right here off of King to get to your

4   home?

5   A.    That's right.

6   Q.    Okay.  Did Mike Hill live in the area that's depicted on

7   this map?

8   A.    That's correct.

9   Q.    You can note on the map with the equipment in front of

10  you.

11          MS. WILLIAMS:  Can I show her, Your Honor?

12          THE COURT:  It's a touch screen, so if you need to

13  locate anything on the map, you can just touch the screen.

14  A.    Okay.  So Mike Hill's home would be this way.  Somewhere

15  off in this area.

16  Q.    Somewhere in there?

17  A.    Somewhere in there.

18  Q.    This looks like a little windy road, but it's not too far?

19  A.    It not actually very far, no.

20  Q.    Is it like a mile?

21  A.    Something like that.

22  Q.    Do you know where Kevin Gagne lived in relation to your

23  home at 3309 Shiloh?

24  A.    Not a clue.

25  Q.    Now, Mike Hill would also have to come down King Boulevard

Cross-Examination - Terysa M. Welch

1    to get to his home --

2    A.    Yes.

3    Q.    -- off of Unser?

4    A.    Yes.

5    Q.    And anyone to the left of your house would also have to

6    come on King, too, like the people all in this area?

7    A.    Yes, unless they came in the back way off of Northern.

8    Q.    There's a back way?

9    A.    Yes.

10   Q.    Okay.  All right.  So there's two ways to get into this

11   neighborhood?

12   A.    There are.

13   Q.    And you would use those two ways yourself?

14   A.    No.  I -- It's so convenient off of Unser and King.

15   Unless there's an accident, I would never use the --

16   Q.    But there's not a lot of options to get to this

17   neighborhood?

18   A.    No.

19   Q.    From 10.  Okay.  Thank you.

20             THE COURT:  And this is marked for identification

21   only.

22             MS. WILLIAMS:  As Exhibit H, yes, Your Honor.

23             THE COURT:  You're not offering it --

24             MS. WILLIAMS:  I'm not offering it.

25             THE COURT:  -- into evidence?  Okay.

1         MS. WILLIAMS:  Not at this time.

2   Q.   (By Ms. Williams)  All right.  In October of 2010, you

3   would have reported to work at the same time and the same

4   place as Detective Gagne, correct?

5   A.   No.

6   Q.   You weren't working in the same building?

7   A.   No.  I was working in Burglary.

8   Q.   Okay.

9   A.   I was working at the main.

10  Q.   Okay.  And when you're leaving this area, you have two

11  different routes that you can take to go to work.

12  A.   There's all kinds of routes to take to go to work, but I

13  generally take the same route.

14  Q.   Okay.  Now, you reported to work at eight?

15  A.   No.  I don't -- I don't really remember back then.  Eight

16  or nine.  I don't remember which.  8:30.

17  Q.   Okay.  Do you know what time the ROP officers reported to

18  work?

19  A.   ROP usually worked out -- If you were working out, you

20  would work out at eight in the morning at the Academy.

21  Q.   Okay.  Now, after you got your target letter regarding

22  alcohol in a City vehicle, you called some other officers,

23  didn't you?

24  A.   When I got my target letter?

25  Q.   Well, at some point in the process, you called Nick

1    Laskar, didn't you, to find out what was going on with

2    something that he was investigated for, correct?

3    A.   Yes, I did, way down the road, yes.

4    Q.   Okay.  And did you talk to someone else named Gene

5    Marquez?

6    A.   Yes, I did.

7    Q.   You called them to see if they had been disciplined for

8    violating the take-home car policy, correct?

9    A.   Somebody in the Burglary unit knew of them having the same

10   policy violation, and --

11   Q.   Who was that?

12   A.   Vicente Alvarado.

13   Q.   Okay.  And do you know how Mr. Alvarado knew that?

14   A.   He knew of -- I don't know how he knew of it.  He just

15   knew of them violating that policy.  I'm not sure how he knew.

16   Q.   Okay.  And did you call those gentlemen?

17   A.   I did.

18   Q.   And you talked to them?

19   A.   Yes, I did.

20   Q.   It's because you got their names from Vicente Alvarado?

21   A.   Yes.

22   Q.   You complained about J.R. Potter's fitness before the

23   memos that have been marked as Exhibit 42 and 43 admitted into

24   evidence, correct?

25          MR. VILLA:  Not 43.

1          MS. WILLIAMS:  Okay.

2          (A conference was held between Ms. Williams and

3     Mr. Villa.)

4  Q.   (By Ms. Williams)  This is an exhibit that's previously

5  been admitted, Lieutenant Welch.  It's dated November 25th,

6  2009.

7               THE COURT:  This is 42 or 43?

8               MS. WILLIAMS:  Yes, 42, Your Honor.

9               THE COURT:  Okay.

10  Q.   (By Ms. Williams)  You complained about Sergeant Gagne

11  and Potter's fitness before this, correct?

12  A.   Complained about Detective Potter's fitness.

13  Q.   But not Detective Gagne's fitness?

14  A.   Complained about Detective Potter's fitness.

15  Q.   Okay.  And before this memo was written, you testified

16  that Potter expressed doubts that you would cover him in the

17  July 2009 meeting, didn't he?

18  A.   He expressed that in a meeting that he called.

19  Q.   Okay.  And your coworkers are complaining about your skill

20  base in this memo.  Is that fair to say?

21  A.   He -- Repeat your question.

22  Q.   Your coworkers are complaining to their Commander about

23  your skill base, your abilities to do the job of a detective at

24  this point, aren't they?

25  A.   Potter's accusing me of not covering him.

Cross-Examination - Terysa M. Welch

1  Q.   Okay.  And that's a skill that a detective would have, how
2  to cover a coworker?
3  A.   That's backing him up.  That's in the middle of a search.
4  Q.   Okay.  Now, after you got this, Commander Hudson gave you
5  a chance to provide your side of the story, correct?
6  A.   I gave a written response to the memo.
7  Q.   And you received no discipline?
8  A.   No, I didn't.
9  Q.   And you were not referred to IA?
10  A.   No, I wasn't.
11  Q.   So nothing came of this allegation except that they were
12  investigated and found to not involve a problem for you?
13  A.   Nothing else -- I heard nothing else more after this.
14  Q.   Okay.  Let's talk about your transfer in December of 2009.
15  You talked about some yesterday, so I don't want to cover the
16  same ground because I know this jury has lots of other
17  witnesses to hear.
18       On Friday, December 4th, Deputy Chief Paiz called to
19  see how you were doing, correct?
20  A.   I don't recall, but that's what's in her notes.
21  Q.   You talked about them yesterday.  Would it help you to see
22  them today?
23  A.   No.  I saw them.
24  Q.   Okay.  So you can't answer my question?
25  A.   I don't recall the specific date of the phone call.

1  Q.  Okay.

2  A.  But that was in her notes.

3  Q.  Okay.  So you agree that the date December 4th, 2009, are

4  in Deputy Chief Paiz's notes, that that's the date that she

5  called to see how you were doing?

6  A.  We spoke around then.

7  Q.  Okay.  And you agree that that conversation happened?

8  A.  I agree that we spoke around then, yes.

9  Q.  And you were grateful for the call, you testified

10  yesterday.

11  A.  Yes, I was grateful for the call.

12  Q.  And you met with her the day that she talked to you.

13  A.  I believe so.

14  Q.  And she called you.  You had not called her or reached out

15  to her at all, correct?

16  A.  I believe I did reach out to her around that time.  I

17  believe we were back and forth.

18  Q.  The first conversation you had with Detective Paiz was,

19  she calling you or you calling her on December 4th?

20  A.  I don't recall.

21  Q.  You told Deputy Chief Paiz you were not enjoying work and

22  hated to go.

23  A.  I don't recall putting it that way.  I wasn't enjoying

24  aspects of my work that I've described.

25  Q.  At that time, you told her that you felt safe with your

1    teammates with the exception of working with Detective Potter

2    because you felt he wasn't fit enough to back you up.

3    A.    I don't recall that conversation.

4    Q.    Is that something that you believed on December 5th?

5    A.    I did believe that his physical fitness was a safety issue

6    at that point, yes.

7    Q.    And Detective Paiz -- I mean, Deputy Chief Paiz --

8            MS. WILLIAMS:  Sorry.

9    Q.    -- asked you what you wanted to do.

10   A.    I'm not sure which conversation we're on now.

11   Q.    We're talking about the conversation on December 4th,

12   2009.

13   A.    Okay.  I don't remember a specific date of December 4th.

14   Q.    Would the notes refresh your recollection?

15   A.    No, because those are her notes.

16   Q.    I understand that, but do they refresh your recollection?

17   A.    I can try.

18   Q.    Okay.

19           MS. WILLIAMS:  These have been previously marked,

20   Your Honor.

21           THE COURT:  As what?

22           MS. WILLIAMS:  And been admitted.

23           THE COURT:  As what?

24           MS. WILLIAMS:  And been admitted.

25           THE COURT:  Yes.  What exhibit?

1          MS. WILLIAMS:  4.

2          THE COURT:  Thank you.

3   Q.  (By Ms. Williams)  Did you keep notes contemporaneous at

4   this time?

5   A.  I always kept notes in ROP.  I have notes dating back to

6   prior to 2005.

7   Q.  Do you have notes for December 4th, 2009, that you checked

8   or could check?

9   A.  Possibly.

10  Q.  Let's see.  Because do you have any reason to believe that

11  Detective Paiz's notes are incorrect?

12  A.  I don't know -- I think they're her perception of the

13  phone call.  I . . .

14          MS. WILLIAMS:  Your Honor, may I approach --

15  Q.  (By Ms. Williams)  Would your notes refresh your

16  recollection, Lieutenant Welch --

17  A.  Possibly.

18  Q.  -- on whether you kept notes that day?

19          THE COURT:  Has Mr. Villa seen this item?

20          MS. WILLIAMS:  Yes.

21          MR. VILLA:  Which day?

22          MS. WILLIAMS:  The 4th that we were talking about.

23          THE COURT:  And is this Exhibit 4?

24          MS. WILLIAMS:  No, Your Honor, this is not Exhibit 4.

25          THE COURT:  Is this marked?

 1              MS. WILLIAMS:  Exhibit 4 is a portion of this.  This

 2    is just to refresh her recollection.

 3              THE COURT:  The remaining -- okay.

 4              MS. WILLIAMS:  The remaining notes.

 5    A.   We're still talking about the 4th?

 6    Q.   (By Ms. Williams)  Yes.

 7    A.   This just indicates that I had a meeting at the main,

 8    which I assume was with Deputy Chief Paiz.

 9    Q.   But you don't have telephone notes from this date?

10    A.   Not -- Not in that notebook, I don't.

11    Q.   Can you take a look on other pages to see if around that

12    date you had a call?

13              THE COURT:  If the question is does she remember and

14    she is not recalling, you may give her a chance to review the

15    document to refresh her recollection and then retrieve the

16    document and you may ask the question.

17              MS. WILLIAMS:  Thank you.  Thank you.  I will do

18    that.

19    Q.   (By Ms. Williams)  Take your time.

20    A.   I don't have anything in my notes for that phone call.

21    I'm sorry.

22    Q.   Okay.  Lieutenant Welch, you've had an opportunity to

23    review the notes that you kept in December of 2009, correct?

24    A.   Around the 4th yes, ma'am.

25    Q.   Did they refresh your recollection of whether you had a

Cross-Examination - Terysa M. Welch

1  phone call from Deputy Chief Paiz on December 4th of 2009?

2  A.   There's nothing in my notes about a phone call.  It says

3  that I had a meeting with her at the main.

4  Q.   Okay.  You said it refreshed your recollection that you

5  had a meeting that day?

6  A.   Yes.

7  Q.   Okay.  You met with her.  And did you discuss options for

8  yourself in that meeting or in that phone call?

9  A.   I don't have any notes reference the phone call or the

10  meeting, but I -- if this is about -- if this is after the --

11  if this is after the EEOC class and that discussion that we're

12  talking about, I do have a recollection of that.

13  Q.   Did you tell Deputy Chief Paiz when she asked you what you

14  wanted to do, that you were ready for a change or thinking of

15  moving on?

16  A.   No.

17  Q.   Did you tell her you were thinking about the Academy

18  because you always wanted to go there?

19  A.   No.

20  Q.   And that your friend and former roommate, Commander

21  Campbell, told you it was a great place to work?

22  A.   No.  I don't know that Michelle was there at that time.

23  Q.   And in that meeting or in that phone call Deputy Chief

24  Paiz agreed to help you transfer?

25  A.   There was a discussion that "I need time to make some

1    changes."

2              "I can't have you in the environment that you're in,"

3    because it had gotten nearly physical, and she asked me "Where

4    can I put you?"  I need some time.

5    Q.   And you chose the Academy?

6    A.   And I told her the Academy would be okay, and then it got

7    changed to the Burglary unit.

8    Q.   Okay.  Because she asked you if you would consider other

9    assignments other than the Academy, didn't she?

10   A.   Yes.

11   Q.   And she gave you the weekend to think about that?

12   A.   She -- It didn't work out when I met with the Academy

13   staff, and so I called her and I said, this isn't going to work

14   here.  I chose the Burglary unit.

15   Q.   Did she send you to Burglary for a day on the Monday

16   following this discussion?

17   A.   I don't recall.

18   Q.   You don't recall calling her and telling her that you

19   wanted to go to Burglary after being assigned there for a day?

20   A.   I chose the Burglary unit after the Academy choice because

21   I didn't have a good meeting with the Academy staff.  There

22   was -- They weren't going to let me do anything at the Academy

23   that was -- They weren't going to let me even interact with

24   cadets at the Academy.

25   Q.   Okay.  When did you meet with the Academy staff?

1    A.    Shortly after the meeting, after we --

2    Q.    On that Friday?

3    A.    I don't recall the date, ma'am.

4    Q.    Okay.  It was agreed that your TDY would start around

5    January 1st, 2010, to give some time for personnel changes.

6    A.    That's accurate, yeah.  I would agree.

7    Q.    But on December 12th you texted Deputy Chief Paiz and told

8    her that you needed to transfer sooner?

9    A.    I don't recall that.  Maybe.

10         MS. WILLIAMS:  Your Honor, this is a good breaking

11   spot, and I know that these folks are probably hungry.

12         THE COURT:  Well, it is, and I noted it's just about

13   noon, so we'll take a recess.  Ms. Williams you can pick up

14   where you left off.

15         Ladies and gentlemen of the jury, as with any other

16   recess, I have to instruct you not to discuss the case between

17   yourselves or anybody while we're on recess.  So that is my

18   strict instruction.  So please reconvene in the jury

19   deliberation room in time so that we can get started again by

20   1:00.  All right.

21         Please rise for the jury.

22      (Jury out at 12:01 p.m.)

23         THE COURT:  All right.  Please be seated.

24         Ms. Welch, you may step down.  During this break,

25   Ms. Welch, I'll instruct you not to discuss your testimony, as

Cross-Examination - Terysa M. Welch

1  well.

2        THE WITNESS:  Yes.  Sure.

3        THE COURT:  Before we break, is there anything to

4  take up?

5        MR. VILLA:  Could we just leave the exhibits that

6  have been admitted just so I can review them at lunchtime, the

7  ones Ms. Williams has admitted this morning?

8        THE COURT:  Well, I think they should all remain on

9  the table.

10        MR. VILLA:  Okay.

11        MS. WILLIAMS:  These are ones that I've pulled off of

12  here and admitted today, so I don't know.

13        MR. VILLA:  I understand she might want to look at

14  them, too, over lunch.  I was just hoping we can keep them up

15  here.

16        THE COURT:  Well, that's the instruction, to keep

17  them at the table.

18        MS. WILLIAMS:  I was going to place them back there.

19        THE COURT:  Okay.

20        MR. VILLA:  That's all I have, Your Honor.

21        THE COURT:  Okay.  Ms. Williams anything else?

22        MS. WILLIAMS:  No, Your Honor.

23        THE COURT:  Okay.  We'll get started again at 1:00.

24      (Court stood in recess at 12:02 p.m. and resumed at

25      1:08 p.m. as follows:)

 1              THE COURT:  Before we call them in, let me just ask a

 2   question.  You may be seated.  Just one thing I noted, this

 3   is -- Mr. Villa, I'm looking at your Certificate of Service.

 4   This is document 368 relating to Brian McDonald.

 5              MR. VILLA:  Yes, Your Honor.

 6              THE COURT:  Okay.  There was a notice of taking a

 7   video deposition.

 8              MR. VILLA:  Yes.

 9              THE COURT:  Is it your intension to present a video

10   deposition of Dr. McDonald?

11              MR. VILLA:  Yes, Your Honor.  And this particular

12   video deposition also has the transcript so the jury on the

13   screen will see both.

14              THE COURT:  Okay.

15              MR. VILLA:  And that was the -- Objections were taken

16   up with Judge Yarbrough, he ruled on those.  I don't think

17   there are any issues with respect to that video deposition.

18              THE COURT:  And that's what he did for me, is sort

19   out a lot of the deposition objections.  But I guess insofar as

20   the video, is there anything that you need to have done or that

21   you need to do to ensure that the video runs without any

22   glitches?

23              MR. VILLA:  It will play on my computer, Your Honor,

24   and I can -- I have tested my computer on the system.

25              THE COURT:  Okay.

1          MR. VILLA:  When I play it on my computer, it will

2     play on this, at least so far.

3          THE COURT:  And I can't remember, did Judge Yarbrough

4     order that any of the deposition be excluded?

5          MR. VILLA:  In Dr. McDonald, no.

6          THE COURT:  Okay.  So no redactions.

7          MR. VILLA:  That's right.  The whole thing in total.

8     It's direct, cross, redirect.  It's about 50 minutes or so.

9          THE COURT:  Okay.  And, Ms. Williams, Ms. Wiggins,

10    did you have a chance to review this video in its entirety, at

11    least what's going to be presented?

12         MS. WILLIAMS:  We have not, Your Honor.  I just don't

13    think we have the time to look at it.  I trust that Mr. Villa

14    has not redacted anything that should be in there or put

15    anything in that shouldn't be in there.  I mean, I was at the

16    deposition.

17         THE COURT:  Okay.

18         MR. VILLA:  I did make the offer.  I understand

19    there's time --

20         MS. WILLIAMS:  Yes, he offered.

21         MR. VILLA:  -- there's time constraints.

22         THE COURT:  Yeah, time constraints, but the time

23    limitations become more so when we have the jury, so if you

24    have no objections at this point, then whenever the video is

25    presented, we'll just assume that the video will be presented

Cross-Examination - Terysa M. Welch

1   in its entirety without any interruption.

2           MS. WILLIAMS:  That's my understanding based on Judge

3   Yarbrough's rulings, Your Honor.

4           THE COURT:  Okay.

5           MS. WILLIAMS:  I haven't seen what the transcript

6   thing looks like, but you said you've used that before.

7           MR. VILLA:  And I'm happy to show Ms. Williams.

8           MS. WILLIAMS:  He can show us.

9           THE COURT:  Why don't you do that by the time -- you

10  can both look at it at the same time.

11          MR. VILLA:  With respect Mr. Gagne, it's a video.  It

12  doesn't have the transcript showing.  There's a couple more

13  things that have to be cut out based on Judge Yarbrough's

14  rulings.  But the same offer stands.  I can provide that to --

15          MS. WILLIAMS:  Maybe over the weekend.

16          MR. VILLA:  -- Ms. Williams or Ms. Wiggins.  I think

17  the issue might be whether we wrap up our case this week or

18  not.  We need to play that for the jury.  Mr. Gagne's is just

19  slightly over an hour, so it doesn't take a terribly long time

20  to watch.

21          THE COURT:  Okay.  Sure.  If you can do that as soon

22  as possible.  If somehow you have to present that this week

23  just to fill trial time --

24          MR. VILLA:  Yeah, that's my plan in terms of the

25  offer.  The offer's been made, and it could be made available

1    at any time for defense counsel.

2            MS. WILLIAMS:  And, Your Honor, we've read the

3    transcript and we've argued the transcript, of what's in and

4    out, so I don't think that -- and I was at that deposition, so

5    I don't think that there's going to be anything odd --

6            THE COURT:  Okay.

7            MR. VILLA:  We actually caught a few things that the

8    editor didn't edit out that are being edited out this morning

9    as we speak.  So we've tried very diligently to make sure that

10   all of Judge Yarbrough's rulings are complied with.

11           THE COURT:  That's the idea of reviewing ahead of

12   time for both parties, to be sure it's correct and there's no

13   delay.  So that's my suggestion.

14           Okay.  If there's nothing else, Mr. Villa --

15           MR. VILLA:  No, nothing else, Your Honor.

16           THE COURT:  Ms. Williams?

17           MS. WILLIAMS:  No thank you, Your Honor.

18           THE COURT:  Okay.  Please rise for the jury.

19       (Jury in at 1:13 p.m.)

20           THE COURT:  All right.  Welcome back.  Please be

21   seated.

22           Ms. Williams.

23           MS. WILLIAMS:  Thank you, Your Honor.

24   Q.   (By Ms. Williams)  Lieutenant Welch, right before we

25   broke for lunch, you were talking about an interview that you

1    had at the Academy to determine if you were going to TDY there

2    or to Burglary.  Do you remember?

3    A.    Yes, ma'am.

4    Q.    Who did you interview with at the Academy?

5    A.    It was -- It was just a discussion.  Sergeant Whisonant.

6    Q.    And you're not sure when that happened?

7    A.    No, I'm not.

8    Q.    Was it on the phone or in person?

9    A.    It was in person.

10   Q.    You went out to the Academy?

11   A.    Yes.

12   Q.    Okay.  And based on that discussion you decided you'd

13   rather go to Burglary?

14   A.    Yes.

15   Q.    Okay.  So between December 12th and January 1st, where you

16   were going to TDY to Burglary, an incident occurred that you

17   described yesterday.  Correct?  You said that Sergeant Smith or

18   Lieutenant Smith passed you in the hall in an aggressive

19   retaliatory manner.

20   A.    Yes, ma'am.

21   Q.    Okay.  He didn't touch you or speak to you, correct?

22   A.    No, he did not.

23   Q.    And you called Beth Paiz after that incident, correct?

24   A.    I did.

25   Q.    But you never talked to Lieutenant Smith about your

1   perception of the incident?

2   A.   No, I did not.

3   Q.   Okay.  And Deputy Chief Paiz agreed to facilitate your

4   transfer immediately and for you to report to Property Crimes

5   on Monday.  Do you recall that?

6   A.   I recall moving shortly after.  I don't recall exactly how

7   soon it was.

8   Q.   Well, you were TDY to Burglary on December 14th or 15th,

9   within two days of that call.

10  A.   Okay.  I would go with that.  It sounds about right.

11  Q.   Okay.  And you're testifying to that?

12  A.   It sounds about right, ma'am.  I'm not sure of the date.

13  Q.   Okay.  You worked under Commander Prudencio at Property

14  Crimes?

15  A.   Yes, I did.

16  Q.   Did he check on you while you were at Burglary to make

17  sure that you had what you needed?

18  A.   No.  I didn't see much of Commander Prudencio.

19  Q.   Did you ever complain to him that you didn't have work or

20  that you weren't doing anything?

21  A.   I didn't see Commander Prudencio very often.

22  Q.   Okay.  You were still a detective while you were TDY.

23  A.   That's correct.

24  Q.   Now, when you go to TDY, is it your obligation to secure

25  your personal property at your other position?

Cross-Examination - Terysa M. Welch

1    A.   I left SID in a hurry and I didn't know when I was coming

2    back.

3    Q.   Okay.  So you didn't secure your personal property?

4    A.   My cubicle was still there.  I had a desk there, and I

5    assumed I would be back.

6    Q.   So at Burglary you had the same salary and benefits?

7    A.   I did have the same salary.

8    Q.   Are you aware that your father e-mailed Deputy Chief Paiz

9    on December 16th, 2010?

10   A.   I'm aware of an e-mail.  I don't know the date.

11   Q.   Were you aware at the time or did you become aware of that

12   later?

13   A.   I became aware of that later.

14   Q.   And so on February 8th, 2010, your 45-day TDY was up?

15   A.   Correct.

16   Q.   At the end of January, Deputy Chief Paiz called and told

17   you that you would go back to ROP on February 8th.

18   A.   I don't recall if it was an e-mail or a phone call.

19   Q.   And you told her -- e-mailed her that you didn't want to

20   return to ROP if nothing had changed.

21   A.   Correct.

22   Q.   And Deputy Chief Paiz asked what your preference would be.

23   You said you wanted to return to ROP, but with a new team and a

24   new chain of command.

25   A.   I don't recall that response.

Cross-Examination - Terysa M. Welch

1   Q.   You don't?  Were you willing to return to ROP without a

2   new team or a new chain of command?

3   A.   I didn't have a problem with my own whole team.  I didn't

4   ask for a whole team, a whole new team.

5   Q.   Okay.  Your second choice was to stay at Burglary because

6   you had a caseload and lots of work to do.  Do you remember

7   telling her that?

8   A.   No, I don't.

9   Q.   You extended your TDY.

10  A.   The TDY was extended.

11  Q.   A new chain of command was established in ROP in the

12  spring of 2010, correct?

13  A.   I know at some point Sergeant Sullivan left and I believe

14  Sergeant -- Mizel Garcia?

15  Q.   I'm talking about ROP, Lieutenant Welch.

16  A.   Okay.

17  Q.   In 2010, the spring, after your second TDY, a new

18  lieutenant was over ROP, correct?

19  A.   Okay.  Was that Lieutenant West, I believe you're talking

20  about?

21  Q.   Well, I'm not testifying, so you need to tell me what --

22  A.   I wasn't in ROP anymore.  I don't know who -- when

23  somebody was replaced.  I don't know -- I can't testify to

24  that.

25  Q.   And you weren't talking with people in ROP division?

1   A.   No, ma'am.

2   Q.   And you weren't trying to evaluate the terms under which

3   you would return to ROP?

4   A.   No, ma'am.  I wasn't talking with anybody in ROP.

5   Q.   Okay.  So you weren't talking to Mike Hill, you weren't

6   talking to Danny Garcia, you weren't talking to Ron Baca?

7   A.   No.  Ron Baca wasn't in ROP, and I wasn't talking to Mike

8   Hill or Danny Garcia.

9   Q.   Okay.  So you were unaware that there was a new lieutenant

10  in ROP?

11  A.   I was not aware of when anybody transferred in or out.

12  Q.   Were you aware that there was a new Commander at SID?

13  A.   No, I was not.

14  Q.   Okay.  On July 9th, 2010, Deputy Chief Paiz asked you to

15  return to ROP, didn't she?

16  A.   I'm not sure about the date, and I'm not sure about the

17  conversation.

18  Q.   Do you remember her calling you in for a meeting that was

19  later canceled when you insisted on having your lawyer attend

20  that meeting to discuss your placement?

21  A.   I do remember a meeting request and I do remember it

22  getting canceled.

23  Q.   Okay.  Do you recall discussing the fact that you didn't

24  want to return to ROP until Sergeant Hubbard retired, rumored

25  to be in September 2010?

1    A.    She asked me if I would be comfortable going back to ROP

2    and that the rumor was that Sergeant Hubbard would be retiring

3    in September of 2010.  I still had the issue of Kevin Gagne

4    still being in ROP.

5    Q.    On these dates when you were asked if you wanted to return

6    to ROP, you indicated that you didn't want to go back if things

7    had not changed, correct?

8    A.    I still had my concerns over there, yes, ma'am.

9    Q.    And if you weren't talking to anyone at ROP, how did you

10   know that things hadn't changed?

11   A.    The same people were still there.  I knew that some of the

12   same people were there.

13   Q.    Some of the same detectives?

14   A.    Kevin Gagne was still there.

15   Q.    Okay.  And you refused to return to ROP if Kevin Gagne was

16   still in ROP?

17   A.    I hadn't had any remedy to the situation.  There was no

18   mediation offered.  There was no --

19   Q.    Did you ask for mediation, Lieutenant Welch?

20   A.    The EEOC had a mediation that was never --

21   Q.    Did you ask for mediation?

22   A.    No, I did not.

23   Q.    Okay.  That's my question.  Thanks.

24         At some point, Deputy Feist replaced Deputy Chief

25   Paiz, correct?

Cross-Examination - Terysa M. Welch

1    A.    I believe so.

2    Q.    Do you know when she retired and when that happened?

3    A.    No.

4    Q.    But at some point you had to deal with Deputy Chief Feist

5    instead of Deputy Chief Paiz?

6    A.    That's correct.

7    Q.    Do you recall getting an e-mail on March 14th, 2011, from

8    Deputy Chief Feist that ordered you back to ROP?

9    A.    I'm not sure about the date, but I recall a series of

10   e-mails with Deputy Chief Feist, yes, ma'am.

11   Q.    And you refused to return to ROP, saying nothing had

12   changed?

13   A.    I brought some concerns to his attention so that he would

14   be caught up and aware.

15   Q.    And then he offered you after you responded to him, three

16   choices, correct?

17   A.    This is the e-mail you're referring to where I had a

18   ten-day timeline to decide?

19   Q.    Yes, that is exactly the e-mail I'm referring to.

20   A.    Okay.

21   Q.    When he offered you a choice to return to ROP, your actual

22   position, to say in Burglary and it would become a permanent

23   assignment, or to go to the field, correct?

24   A.    Yes, ma'am.

25   Q.    And you chose to remain in Burglary.

158

1    A.    That's correct.

2    Q.    Okay.  You were still a detective?

3    A.    That's correct.

4    Q.    Still at the same rate of pay?

5    A.    That's correct.

6    Q.    Same benefits?

7    A.    That's correct.

8    Q.    Okay.  Same job description as a detective.  You were

9    still a detective job description?

10   A.    We're going to disagree on the job description.

11   Q.    Okay.  So we need to determine what is different in a job

12   description for a detective in each unit.  Is that described in

13   the personnel policies and procedures or in the hiring

14   guidelines for APD on what a detective does?

15   A.    It's described in the job opening of a Burglary detective

16   versus a ROP detective.

17   Q.    Okay.  You're aware that TDY's get extended beyond 45 days

18   all the time, aren't you?

19   A.    Actually, I believe it's in the policy that they're not

20   supposed to go beyond 45 days.

21   Q.    It's in the union contract, correct?

22   A.    I'm not sure if it's in the City rules and regs or the

23   union contract.

24   Q.    Now, that is not the answer to the question that I asked

25   you.  You're aware that TDY's are extended beyond 45 days all

Cross-Examination - Terysa M. Welch

1  the time, aren't you?

2  A.   I'm not aware of that.

3  Q.   You remember that your brother Jacob, an APD officer,

4  injured himself in an off-duty accident, correct?

5  A.   He injured himself on duty.

6  Q.   Well, you were aware that he was TDY'd to Property Crimes

7  for over a year, aren't you?

8  A.   No.  He was placed at RTC on injured duty.  He couldn't

9  work because of an injury.

10  Q.   He returned -- Are you aware that he returned to Property

11  Crimes for a year TDY so that he could work?

12  A.   No, I'm not aware of that.  He was sent to the field.

13  Q.   Okay.  Who believes and has told you that ROP detectives

14  are more elite than detectives in other units?

15  A.   I don't know if they're more elite.  They're different.

16  It's a specialized unit.

17  Q.   Well, you describe ROP as elite most of the time you

18  discuss ROP, don't you?

19  A.   Some people would say they're elite.  I guess elite.  It's

20  a coveted position.

21  Q.   So the question I asked you was, who believes and has told

22  you that ROP detectives are more elite than other detectives in

23  other units?

24  A.   Nobody has told me that.

25  Q.   Okay.  Has your brother told you that your assignment was

Cross-Examination - Terysa M. Welch

1    more elite than his?

2    A.   We haven't discussed that.

3    Q.   Okay.  Let's go to the retrieval of your personal

4    property.  You left personal property in your cubicle at ROP

5    when you were TDY'd correct?

6    A.   Correct.

7    Q.   You testified yesterday that you were doing nothing for

8    the 14 months that you were TDY'd to Burglary; is that correct?

9    A.   No, I didn't say I was doing nothing.  I said I had

10   minimal work.

11   Q.   Minimal work.  Okay.  But you were collecting your full

12   salary while you were at Burglary; is that correct?

13   A.   That's correct.

14   Q.   And did the sergeant at Burglary have a caseload of duties

15   at the time that you were there?

16   A.   Did the sergeant have a caseload --

17   Q.   Yeah, Sergeant Garcia.  Was he busy at Burglary when you

18   were TDY'd there?

19   A.   Yeah, he was the sergeant.  He had sergeant duties.

20   Q.   And you had Sergeant Garcia deliver your equipment back to

21   ROP.

22   A.   That's correct.

23   Q.   After you chose to stay at Burglary permanently, correct?

24   A.   That's correct.

25   Q.   What equipment did you deliver back to ROP or have

Cross-Examination - Terysa M. Welch

1    Detective Garcia deliver back to ROP?

2    A.   I don't remember everything.  I had a tac vest.  I think a

3    rifle, things like this, things in my toolbox that I had,

4    miscellaneous pieces of equipment.  I don't recall everything.

5    Q.   Yesterday you said that you boxed particular things up in

6    their original packaging and had Sergeant Garcia deliver them.

7    What was that, that you were referring to?

8    A.   Again, ma'am, I don't recall everything.  Different things

9    that were used for ROP that were issued to me.  I think there

10   was an optic that was used on the rifle.  There was a

11   flashlight.  I don't really recall at this time.

12   Q.   Okay.  Did you give that stuff to Sergeant Garcia in a

13   box?  How did it get back?  How much was it in volume?

14   A.   I think I gave it to him in a bin to carry.

15   Q.   In a bin.  Was it a green bin?

16   A.   I don't remember.

17   Q.   Okay.  You had Sergeant Garcia when he was delivering your

18   ROP equipment back to ROP fetch your belongings instead of

19   going to get them yourself, correct?

20   A.   Yes.

21   Q.   Did you give him an inventory of the belongings that you

22   thought were still at ROP?

23   A.   No.

24   Q.   Why not?

25   A.   I didn't remember everything that was over there, to be

Danna Schutte Everett
Official United States Court Reporter
100 N. Church, Las Cruces, New Mexico  88001
(575)528-1656

Cross-Examination - Terysa M. Welch

1    honest with you.

2    Q.   And you hadn't secured your personal belongings before you

3    left because you didn't know how long you were going to be

4    gone?

5    A.   That's correct.

6    Q.   Okay.  Your personal belongings were already boxed up in

7    your cubicle when Sergeant Garcia arrived there.  Correct?

8    A.   I don't know.

9    Q.   What did he tell you about the retrieval of the documents?

10   A.   I don't know that he told me anything.  He just gave me

11   the three boxes.

12             MS. WILLIAMS:  Is Exhibit 86 in?

13             MR. VILLA:  I don't believe it is.

14        (A discussion was held between Ms. Williams and

15        Mr. Villa.)

16             MS. WILLIAMS:  Your Honor, we move the admission of

17   Exhibit 86 as stipulated.

18             THE COURT:  All right.  No objection, Mr. Villa?

19             MR. VILLA:  No, Your Honor.

20             THE COURT:  All right.  And how many pages are in 86?

21             MS. WILLIAMS:  Two.

22             THE COURT:  All right.  86 is admitted.

23        (Plaintiff's Exhibit 86 admitted into evidence.)

24   Q.   (By Ms. Williams)  Lieutenant Welch, do you remember

25   writing a memo about your return of personal property after

1  you received the boxes that Sergeant Garcia brought back to

2  you?

3  A.    I do.

4  Q.    Okay.  Is this memo that memo that you wrote?

5  A.    Yes, ma'am.

6  Q.    And who did you address it to?

7  A.    Deputy Chief Feist.

8  Q.    So you were aware that he was the deputy chief over the

9  unit at that point?

10  A.    Yes.

11  Q.    Okay.  And you complained in this exhibit that the

12  property was not returned to you in the fashion that you

13  expected it to be returned.  Correct?

14  A.    Yes.

15  Q.    Okay.  Let's look at this paragraph where it says,

16  Sergeant Garcia advised me that there were 4 boxes that

17  Sergeant Heckroth had given to him with items belonging to you,

18  correct?

19  A.    Yes, that's what it says.

20  Q.    And what did you see when you went into your office at

21  Burglary after Sergeant Garcia delivered the boxes to you?

22  A.    Would you like me to read the paragraph?

23  Q.    You can tell me or you can read it.

24  A.    Okay.  It says, "I observed three white boxes with lids on

25  them labeled Welch.  In addition, there was a green plastic tub

Cross-Examination - Terysa M. Welch

1   that did not have a lid.  When I looked in the bin, I could

2   immediately see two radios, one badly broken, random pieces of

3   metal that I had never seen before, crumbled up empty plastic

4   sack, and a large piece of wood."

5   Q.   Okay.  Would you describe that green bin as a garbage bin

6   with garbage in it?

7   A.   No, but it's a bin meaning a bin like a plastic bin.

8   Q.   And your name wasn't on that bin, was it?

9   A.   No, I don't believe so.

10  Q.   Your name was on three boxes that had lids that had your

11  personal belongings in them?

12  A.   Correct.

13  Q.   And the green bin had nothing that belonged to you in it,

14  correct?

15  A.   It says two radios, one badly piece of --

16  Q.   I understand what it says, but that's not my question.  My

17  question is, was there anything in the bin that belonged to

18  you, or was it garbage?

19  A.   I don't know why Sergeant Garcia would have brought me

20  garbage.  I don't specifically recall what was in the bin.

21  Q.   Okay.  Well, you say in this that -- Let's look at it.

22  When you looked in the bin, what do you say you saw?

23  A.   I indicate that there was broken radios.

24  Q.   Were either of those radios yours?

25  A.   No.

1   Q.   Okay.  What's the next thing you saw in the bin?

2   A.   Metal, random pieces of metal.

3   Q.   That you'd never seen before, so they're not yours, right?

4   A.   Crumbled-up empty sack and a large piece of wood.

5   Q.   Okay.  Was the wood yours?

6   A.   No.

7   Q.   Was the crumpled-up sack yours?

8   A.   No, it wasn't.

9   Q.   Is it fair to describe the bin as a garbage bin full of

10  garbage?

11  A.   There's items in there that were garbage-like material,

12  yes.

13  Q.   What in that bin was not garbage?

14  A.   I don't recall.  I would need to see the photographs.

15  Q.   Well, let's do that.  That's Exhibit 87.  Is this what the

16  three boxes --

17          THE COURT:  Has 87 been admitted?

18          MS. WILLIAMS:  Yes, sir.  I'm sorry.  It's previously

19  been admitted.

20          THE COURT:  All right.

21          MS. WILLIAMS:  87, 87a, b, c, d, and e have been

22  admitted and I'll be using them.

23  Q.   (By Ms. Williams)  So there were three boxes like this

24  box in Exhibit 87 with your name on it, correct?

25  A.   Correct.

Cross-Examination - Terysa M. Welch

1   Q.   Did you take a picture of the bin?

2   A.   I don't recall.  I believe I did.

3   Q.   Okay.  So I haven't seen that.  Now, there's a picture of

4   you here.  Were those photos in your personal property at ROP

5   when you were there?

6   A.   I don't recall this photo.  I don't know where it came

7   from.

8   Q.   And you say that this looks like you're waiving good-bye

9   even though you're walking toward the camera.

10  A.   That's what it appears to me.

11  Q.   Do you recall when this photo was taken?

12  A.   I recall it being a work trip of some kind of training.

13  Q.   Who were you waiving to?

14  A.   I don't know.

15  Q.   Oh, sorry.  Doesn't that make that easier to see?

16       Who took the picture?

17  A.   I don't know.

18  Q.   Were you coming back from a trip or leaving for a trip

19  here?  Are you returning or leaving?

20  A.   I don't know, ma'am.  That's SID's parking lot, but I

21  don't recall the details of the photograph.

22  Q.   Okay.  And this was in a frame, wasn't it?

23  A.   It was placed in my photo frame.

24  Q.   What other photos were in this frame?  Photos of you?

25  A.   Family photos, things that I had on my desk for --

Cross-Examination - Terysa M. Welch

1    Q.   Do you remember -- I'm sorry.  Were you finished?

2    A.   They were my personal family photos and things for myself.

3    Q.   And you don't recall that this photo was in this frame

4    when you were at ROP?

5    A.   I don't recall seeing this photo before it was returned to

6    me.

7    Q.   Now, here are the things that you said were in the bin,

8    correct?

9    A.   Correct.

10            THE COURT:  And this is Exhibit?

11            MS. WILLIAMS:  This is Exhibit 87d, Your Honor.

12   Q.   (By Ms. Williams)  And none of those belong to you?

13   A.   No, they don't.

14   Q.   Okay.  But coupled with the photo and this shoelace, you

15   saw a message from the ROP team to you.

16   A.   The noose in particular was concerning to me.

17   Q.   What makes this a noose?

18   A.   It's tied like a noose.

19   Q.   I thought nooses came with multiple rings around the knot,

20   not just one knot like a shoelace knot.

21   A.   They can.  I'm not a knot expert.

22   Q.   Well, can you tell if this is a slipknot or not?  Do you

23   ever tie things with a paracord as a detective?

24   A.   I can't see the photo well enough, but to me that looks

25   like a noose.

Cross-Examination - Terysa M. Welch

1   Q.   And it was in a bin with other garbage?

2   A.   It was in the green bin.

3   Q.   Okay.

4           MS. WILLIAMS:  This is 87e, Your Honor.

5   Q.   Is this the picture of the contents of one of the boxes?

6   A.   You can't tell what box or bin it came out of.

7   Q.   Did you take these pictures?

8           THE COURT:  Ms. Williams.

9           MS. WILLIAMS:  Yes, sir.

10          THE COURT:  Has 87e been admitted?

11          MS. WILLIAMS:  I picked it up from up there, Your

12  Honor.  I think it has.

13          MR. VILLA:  I think it's Exhibit 1.  Bad handwriting.

14          MS. WILLIAMS:  I apologize.  I thought it was e.

15  Q.   (By Ms. Williams)  Is that the contents --

16          MS. WILLIAMS:  Are we straightened, Your Honor?

17          THE COURT:  I'm straightened, if you're straightened.

18          MS. WILLIAMS:  I'm straightened.

19          THE COURT:  We'll proceed with Exhibit 1.  87l.  If

20  you would just identify as you're utilizing the exhibit that

21  it's been admitted --

22          MS. WILLIAMS:  Okay.

23          THE COURT:  -- that would be helpful.

24          MS. WILLIAMS:  I'm happy to do that.

25  Q.   (By Ms. Williams)  So was this the contents of one of the

Cross-Examination - Terysa M. Welch

1   boxes that was labeled with your name?

2   A.   Either one of the boxes or the bin.

3   Q.   Were all of the -- Well, wait.  You said what was in the

4   bin in the letter to Chief Feist, and you didn't mention a

5   stirry bottle or a photo album, did you?

6   A.   All of these items were returned to me at the same time.

7   Q.   Okay.  I understand that.  But some were in white boxes

8   with your name and some, which you've gone through in great

9   detail, were in a green bin without your name on it.  Correct?

10  A.   That's correct.

11  Q.   So these things were in a box that had your name on it,

12  correct?

13  A.   I don't know which these things came out of.

14  Q.   But they came out of a box, not the bin, because you

15  already inventoried what was in the bin for us.  Correct?

16  A.   But I didn't specifically inventory these items in my

17  menu -- in my memo.

18  Q.   Correct.  That's not my question.  Did your memo to Chief

19  Feist accurately and completely describe what was in the bin

20  that you were complaining about?

21  A.   Because I was concerned about those items, yes.

22  Q.   Was it a complete inventory of those items which were in

23  the bin as opposed to those items that were in the boxes

24  labeled with your name?

25  A.   I don't know if it was a complete inventory.

Cross-Examination - Terysa M. Welch

1   Q.   And you can't remember today --

2   A.   No, I can't.

3   Q.   -- whether it was a box?  Does it look like it's in a box?

4   A.   I don't know.  These photographs were taken at my

5   attorney's office.

6   Q.   So did your attorney take those photos or did you take

7   those photos?

8   A.   My attorney took the photos.

9   Q.   Okay.  Were you there?

10  A.   I was there, yes.  I don't recall taking the photos.  He

11  took the photos.

12  Q.   Who put the pen by the photograph?

13       MS. WILLIAMS:  And we're looking at 87b, Your Honor,

14  which has been previously admitted.

15  Q.   Is that your idea or your attorney's idea?

16  A.   My attorney's idea.

17  Q.   Do you know when this got photographed?

18  A.   The same day it was delivered to me.

19  Q.   Okay.  Was there anything that you did not have returned

20  that you complained to Chief Feist about that you expected to

21  have returned?

22  A.   I don't believe I complained about anything not being

23  returned.

24  Q.   And you saw a death threat in the shoelace in the tub,

25  that you describe as a noose, combined with the photo in a

Cross-Examination – Terysa M. Welch

1    separate box that you describe as you waiving good-bye,

2    correct?

3              MR. VILLA:  Objection.  Mischaracterization of the

4    evidence.  Nobody described --

5              THE COURT:  Well, please approach, Ms. William and

6    Mr. Villa.

7         (Bench conference on the record.)

8              THE COURT:  Okay.  The objection is mischaracterizing

9    the evidence.  So there's no objection as to the cumulative

10   nature or the argumentative nature --

11             MR. VILLA:  Well, I think we're --

12             THE COURT:  -- of the questioning.  I'm hearing

13   enough to be alerted to what may be cumulativeness or even

14   argumentativeness --

15             MR. VILLA:  I would add -- Sorry.

16             THE COURT:  -- and what I would consider to be

17   compound questions.  So please break it down.  Rephrase your

18   questions.  No argument.  No cumulative questions.  Get to the

19   point.

20             MS. WILLIAMS:  Okay.

21             THE COURT:  And please let the witness answer the

22   question.  If she doesn't answer a question, restate the

23   question.

24             MS. WILLIAMS:  Okay.  This does say "This is a level

25   of implied threat to my life."  That's a death threat, and I

Cross-Examination – Terysa M. Welch

1    think this is a fair question.

2             THE COURT:  Is that in evidence?

3             MS. WILLIAMS:  That is the exhibit we're talking

4    about.

5             THE COURT:  Exhibit 86?

6             MS. WILLIAMS:  Yes, sir.

7             THE COURT:  It's in evidence already.  You may

8    utilize the exhibit with your witness, but I'll caution you

9    about what I would consider cumulativeness if it's already in

10   evidence already.

11            MS. WILLIAMS:  Okay.

12            THE COURT:  Ask her the question.  It's in evidence.

13   Move on.

14            MS. WILLIAMS:  Thank you.

15      (Open court.)

16   Q.   (By Ms. Williams)  The question pending, Lieutenant

17   Welch, is that you saw a death threat in the shoelace in the

18   tub, which you describe as a noose, combined with the photo in

19   a separate box that you described as you waiving good-bye.

20   A.   And, you know, I never used the word "death threat."

21   Q.   Okay.  Well, let's look at Exhibit 86, which is the

22   exhibit that we're talking about.  Correct?

23            Can you look at the top of page 2?  Have you had a

24   chance to look at that?

25   A.   Okay.  Which portion are you referring to?

Cross-Examination - Terysa M. Welch

1    Q.   Do you see the part "It is scary for me to know that these

2    same individuals who harassed me followed me home numerous

3    occasions...and now they are sending me a picture of a noose

4    along with a picture of me waiving goodbye"?  Do you see that?

5    A.   I see that.

6    Q.   Do you see that "I was treated with hostility from these

7    same individuals, the behavior which has now risen to a level

8    of implied threats to my life"?  So you put these things

9    together to see a death threat, right?  That's another way of

10   saying "implied threats to my life"?

11   A.   That's your interpretation of that.

12   Q.   What did you mean when you wrote "have now risen to a

13   level of implied threats to my life"?

14   A.   When you're being followed near your home and you have

15   people calling you in meetings who are armed and being hostile

16   in their behavior and in their language -- Okay.  When you have

17   conflicts with normal coworkers who aren't armed, that's

18   something different.  When you're now having conflicts as I'm

19   having conflicts with people who are armed with guns on their

20   hips, that takes a total different meaning.

21   Q.   You are also armed in all the meetings in which you are

22   with the other armed individuals on your team, correct?

23   A.   That's correct.

24   Q.   Okay.  Great.  Let's move on to training.  You received

25   gender discrimination retaliation in the Police Academy, didn't

Cross-Examination - Terysa M. Welch

1   you?

2   A.   I don't recall.

3   Q.   You received a book of APD policies and City policies that

4   deal with all the issues at the City, correct?

5   A.   I may have.

6   Q.   During your employment with the City, you had video

7   training on gender discrimination and retaliation?

8   A.   I'm sorry, can you repeat the last one?

9   Q.   During your employment at the City, you had video training

10  on gender discrimination and retaliation?

11  A.   In the totality of my career?

12  Q.   Yes.

13  A.   Yes, I may have received video training, yes.

14  Q.   Along with every other APD officer.

15  A.   Yes, ma'am.

16  Q.   During your employment at the City, you had in-training --

17  in-person training on gender discrimination, retaliation,

18  didn't you?

19          MR. VILLA:  Your Honor, I'm going to object.  I guess

20  I fail to see the relevance of the training that Ms. Welch had.

21          THE COURT:  Ms. Williams.

22          MS. WILLIAMS:   Your Honor, it goes to the Faragher

23  defense.

24          THE COURT: All right.  Sustained.  Move on.

25  Q.   (By Ms. Williams)  You had -- And you testified yesterday

1   about your training session and EEOC refresher training.  Do

2   you remember that?

3   A.   Are you referring to the training by Ms. Neal?

4   Q.   Yes, in December 2009.

5   A.   I recall her class, yes.

6   Q.   Okay.  You viewed that training as punitive rather than

7   corrective, correct?

8   A.   Those were her words.

9   Q.   That's not the question I asked you.  Did you view the

10  training as punitive or as corrective?

11  A.   Punitive.

12  Q.   You didn't know if Sue Neal knew you were in that training

13  or not.

14  A.   I don't know if she knew I was in the training.

15  Q.   She didn't know you ahead of time, did she?

16  A.   I don't know.

17  Q.   There were three training sessions to include the whole of

18  the Special Investigations Division, right?

19  A.   I don't know.  I was in the first session.

20  Q.   You attended the session on December 10th, and you think

21  that was the first session?

22  A.   Yes.

23  Q.   Okay.  You were critical of Ms. Neal's language during the

24  EEOC training.

25  A.   Yes.

1    Q.    You felt older ladies would be offended by Ms. Neal's

2    language.

3    A.    I felt it was unprofessional language.

4    Q.    That's not my question.  Did you -- Did you believe that

5    older ladies would be offended by Ms. Neal's questions?

6    A.    Yes, I did.

7    Q.    Did you talk to any older ladies about whether they were

8    offended by that training?

9    A.    No.

10   Q.    No older ladies spoke up with a criticism of the training,

11   did they?

12   A.    No, they didn't.

13   Q.    And you didn't say anything?

14   A.    No.

15   Q.    Swearing's not uncommon at SID, is it?

16   A.    Among the detectives, no, it's not.

17   Q.    Okay.  Now let's talk about the sergeant's exams.  You

18   took the sergeant's exams three times, correct?

19   A.    I did.

20   Q.    When -- When's the first time you took the sergeant's

21   exam?  What month and year?

22   A.    I don't recall.  2010 maybe.

23   Q.    2010, were you at Burglary?

24   A.    No.  Yes, maybe I was.

25   Q.    Where were you?

Cross-Examination - Terysa M. Welch

1   A.   I don't recall.  I might have been transitioning between

2   ROP and Burglary.

3   Q.   Okay.  And you did pass that test?

4   A.   No.

5   Q.   When did you take it the second time?

6   A.   I don't remember the date.  2011, I think.

7   Q.   Did you pass that test?

8   A.   No.

9   Q.   You were disciplined between the first time you took the

10  sergeant's exam and the second, correct?

11  A.   Yes.

12  Q.   And this was the exam, the second exam that you had to

13  write the letter to the chief to get an exception to take the

14  exams since you'd been disciplined within the year.

15  A.   Sounds possibly accurate.  I'm not sure.

16  Q.   Do you recall that or not?

17  A.   I recall writing a letter to ask for permission to take

18  the test.  I don't recall if it was the first or the second

19  time.

20  Q.   But it was after you were disciplined?

21  A.   Of course.

22  Q.   And the chief allowed you to sit for the exam, correct?

23  A.   Yes.

24  Q.   And the third time you took the sergeant's exam you passed

25  it.

Cross-Examination - Terysa M. Welch

1   A.   I did.

2   Q.   And you were promoted to sergeant soon after?

3   A.   I was promoted in 2013.

4   Q.   Okay.  Let's look at Exhibit 11.

5        MS. WILLIAMS:  It's already been admitted, Your

6   Honor.

7   Q.   (By Ms. Williams)  You had a chance to look at

8   Exhibit 11, haven't you?

9   A.   Yes.

10  Q.   And you've looked at both pages?  I'll put the second page

11  because I think we looked at the first page quite a bit

12  yesterday.  Your name is not mentioned in that article, is it?

13  A.   I don't know.  That's a little difficult to read.

14  Q.   Well, do you recall if your name was mentioned in that

15  article?

16  A.   I don't recall.  It's mentioned in the link that's

17  attached to that article.

18  Q.   Who told you that they looked at the link?

19  A.   Nobody told me they looked at the link.

20  Q.   Okay.

21  A.   This is the newspaper.

22  Q.   Your name is not in this newspaper article, is it?

23  A.   No.  My name -- I don't know if it's in the article.  It

24  can't read it.  But it's in the link for sure.

25       MS. WILLIAMS:  We'll try to get a better exhibit,

1    Your Honor.  I don't know what we do about this, because I

2    can't cross-examine her if a plaintiff's exhibit is not

3    readable.  Maybe it is -- it is in person.  Can I show it to

4    her, Your Honor?

5              THE COURT:  It's admitted.  You may show it to her.

6              MS. WILLIAMS:  Thank you.

7    Q.   (By Ms. Williams)  Take a look at that.  Let me know when

8    you're done.

9              THE COURT:  Mr. Villa, is the name in the article?

10             MR. VILLA:  Your Honor, my recollection is it was

11   only in the link, the online link.

12             THE COURT:  Can you stipulate that it's not in the

13   article?

14             MR. VILLA:  We'll stipulate.

15             MS. WILLIAMS:  I am happy to have that stipulation,

16   Your Honor.  Thank you.

17   Q.   (By Ms. Williams)  You were not sanctioned by the NMLEA,

18   were you?

19   A.   Sanctioned as in -- I have a letter in my file from NMLEA.

20   But not other than that.

21   Q.   Not other than that?  Thank you.

22             Did anyone ever tell you that they specifically

23   looked at this article and then looked at the link?

24   A.   Not -- Not that I can specifically name right now, no.

25   Q.   So you can't list anyone who's looked at the article,

1  looked at the link, and saw that your name was reported to

2  NMLEA?

3          MR. VILLA:  Objection.  Asked and answered.

4          THE COURT:  Sustained.

5  Q.   (By Ms. Williams)  Do you know whether CID has a larger

6  overtime budget than ROP?

7  A.   I have no idea.

8  Q.   Once ROP spends its overtime budget, Detective, hours get

9  shifted, don't they, at the time you were there?

10  A.   I don't know.

11  Q.   You have the same overtime opportunities at Burglary as

12  you had at ROP.

13  A.   No.

14  Q.   In Burglary, you had the opportunity to work Chief's

15  Overtime, didn't you?

16  A.   I disagree.

17  Q.   You did not have the opportunity to work Chief's Overtime

18  while you were at Burglary?

19  A.   It wasn't safe for me to do so.

20  Q.   You felt it wasn't safe for you to do so.  Why is that?

21  A.   Because if I was going to return to ROP in an undercover

22  capacity, I can't put a uniform on myself and identify myself

23  as a police officer and then expect to return to an undercover

24  capacity and be safe.

25  Q.   Do you have the opportunity to do bait car overtime?

Cross-Examination - Terysa M. Welch

1   A.   I wasn't part of the bait car program.

2   Q.   You still can do bait car overtime even if you're not in a

3   bait car program, correct?  They are looking for officers to do

4   that surveillance?

5   A.   It was not offered to me at the time.

6   Q.   Did you ask for it?

7   A.   No, I did not ask for it.

8   Q.   There's other tac plan overtime as well, correct?

9   A.   There was no overtime offered to me at the time.

10  Q.   Did you seek overtime?

11  A.   There was no overtime other than Chief's Overtime that was

12  available to me at the time.

13  Q.   Did you do DUI overtime?

14  A.   Same thing.  I would have had to put a uniform on.

15  Q.   Did you do night team overtime for Burglary?

16  A.   I wasn't on the night team.

17  Q.   You could have volunteered to do overtime with the night

18  team, right?

19  A.   No.  I was not part of the night team.

20  Q.   There are grant projects that provide overtime for

21  detectives, correct, like the exile guns grant that Danny

22  Garcia got?

23  A.   I don't believe that was available at the time, ma'am.

24  Q.   Did you ever ask for overtime while you were at Burglary?

25  A.   There were small bits of overtime that I took.

Cross-Examination - Terysa M. Welch

1    Q.   Did you ever ask for overtime?

2    A.   Yes.

3    Q.   And were you given that overtime?

4    A.   Small bits of overtime.

5    Q.   After you got the small bits of overtime, did you ask for

6    more overtime?

7    A.   Yes, I did.

8    Q.   And were you denied overtime?

9    A.   I took what there was.  I wasn't denied overtime.  I took

10   what I could get.

11   Q.   Okay.  You described your monetary -- nonmonetary damages

12   as weight loss, sleep loss, and loss of reputation, correct?

13   A.   Partially, yes, those three things.

14   Q.   What else?

15   A.   I suffer from severe migraine headaches that have

16   increased drastically.

17   Q.   You have migraines, and you take medications for that?

18   A.   I get injections every three months.

19   Q.   Your claim is you had no issues related to the arrest and

20   conviction of your fiancé in 2007, including migraines?

21   A.   Correct.  They increased later.

22   Q.   You said your migraines started getting worse in 2009,

23   correct?

24   A.   Yes.

25   Q.   They got worse after you were moved out of ROP?

1    A.   Yes, they did.

2    Q.   And they got worse after you were promoted to sergeant?

3    A.   They've gradually gotten worse.

4    Q.   And they got worse after you were promoted to lieutenant?

5    A.   No.   They've stayed -- They've actually gotten less since

6    I started receiving my injections.

7    Q.   So you have started a new treatment regime that involves

8    BOTOX?

9    A.   Yes.

10   Q.   Okay.   And those have been helping?

11   A.   They have helped.

12   Q.   And that has happened -- that treatment option has

13   happened since you were a lieutenant?

14   A.   Before then.

15   Q.   Okay.   And you went to counseling for about four months.

16   A.   Yes.

17   Q.   How many visits?

18   A.   Two times a week, I believe.

19   Q.   And you're unaware if you were ever diagnosed with any

20   mental illness, like an anxiety disorder or depression or

21   post-traumatic stress disorder, in your counseling?

22   A.   I believe I was diagnosed with some -- a bout of

23   depression.

24   Q.   You stopped seeing your counselor when you decided she

25   violated the law, correct?

Cross-Examination - Terysa M. Welch

1    A.    Yes.

2    Q.    And you haven't seen a counselor for many years?

3    A.    No.

4    Q.    You didn't report your counselor for violating a law.

5    A.    No, I didn't.

6    Q.    And you think you've become more short-tempered since the

7    events complained about in your lawsuit, correct?

8    A.    That's correct.

9    Q.    These events all happened before your marriage in 2013,

10   correct?

11   A.    Yes.

12   Q.    They all happened before you started dating your husband

13   in 2011.

14   A.    That's right.

15   Q.    You haven't taken advantage of the APD peer support team

16   counseling or help that's offered.

17   A.    No, ma'am.

18   Q.    You've never taken advantage of the free employee

19   assistance counseling offered by the City.

20   A.    No.

21   Q.    And you feel like you've been able to do your job well

22   your entire career?

23   A.    I've been able to do my job.

24   Q.    Well?

25   A.    Yes, well.

Cross-Examination – Terysa M. Welch

1    Q.    Okay.  You've been able to retire for some time?

2    A.    I hit 20 years here in March, I believe.

3    Q.    And your husband's also been able to retire for some time?

4    A.    At the 20-year mark.  We can go to the 25-year mark.

5    Q.    You were angry, had hurt feelings, and were frustrated

6    when no one handed you a tac vest and you had to go to Property

7    to get one, right?

8    A.    I think that's an exaggeration, that I was angry.

9    Q.    Did you have hurt feelings?

10   A.    No.  I just needed some equipment so I could do my job.

11   Q.    Were you angry, frustrated, and hurt that you found an

12   empty blank transfer -- a blank transfer form in your

13   belongings?

14   A.    I think anger is a mischaracterization of my emotions.

15   Q.    Did you have hurt feelings?

16   A.    I think that I was more fearful at that time.

17   Q.    Did you have hurt feelings when the boxes of your personal

18   belongings weren't packed the way you wished?

19   A.    I felt it was disrespectful.

20   Q.    Did you have hurt feelings?  Were you angry?

21   A.    No.  I felt it was disrespectful.

22   Q.    Were you angry or had hurt feelings that a photo of you

23   smiling and waiving was placed on top of your belongings in the

24   box?

25   A.    Unprofessional and disrespectful.

1    Q.   No hurt feelings?  No anger?

2    A.   Hurt feelings is fine.  I don't feel anger is accurate.

3    Q.   Did you have hurt feelings when no one at the City called

4    you after you filed your EEOC Complaint?

5    A.   It felt, again, that I was devalued as an employee, but I

6    don't think anger is an accurate representation.

7    Q.   Were you angry or have hurt feelings after Detective

8    Buckner chastised you regarding your pivot at the range and

9    offered to videotape you?

10           MR. VILLA:  Objection.  I think this has been asked

11   and answered.

12           THE COURT:  Overruled.  I'll allow this one.

13   A.   I took Ryan Buckner as a challenge that I was used to all

14   my life.

15   Q.   Hurt feelings or anger related to that incident?

16   A.   No.  It was more of a -- Like I said, he was more of a

17   challenge that I was used to.

18   Q.   Did you have hurt feelings or anger when you got the

19   punctuality memo?

20   A.   Frustration.

21   Q.   Were you frustrated or hurt or angry when the City

22   required an EEOC training refresher course after you filed your

23   EEOC Complaint?

24   A.   I was embarrassed.

25   Q.   Were you angry, frustrated, or have hurt feelings when you

1  felt you didn't get appropriate backup or respect from your

2  team?

3  A.   I was extremely scared in that moment.

4          MS. WILLIAMS:  I have no more questions for the

5  witness.

6          Thank you, Lieutenant Welch.

7          THE COURT:  Okay.  Thank you, Ms. Williams.

8          Mr. Villa, redirect.

9          Ms. Williams, all the exhibits that have been

10  admitted and that you utilized, are they back on the table?

11          MS. WILLIAMS:  I don't know, Your Honor.  I'd be

12  happy to do that housekeeping.

13          THE COURT:  Ladies and gentlemen, feel free to stand

14  and stretch if you'd like.

15          All right, Mr. Villa.

16          MR. VILLA:  Thank you, Your Honor.

17                    REDIRECT EXAMINATION

18  BY MR. VILLA:

19  Q.   Good afternoon, Ms. Welch.

20  A.   Good afternoon.

21  Q.   You were asked some questions about letters that you wrote

22  to Deputy Chief Feist, so let me talk to you about those.  You

23  wrote a letter first on March 16, 2011.  It's Exhibit 13a

24  that's already been admitted.  I'm going to show you that.

25  There's 13a.  What was the purpose of this letter?

1   A.   I wanted him to know my concerns about returning to ROP.

2   Q.   Okay.  And in the letter that Ms. Williams had admitted

3   during your cross-examination, can you tell the jury what you

4   told Deputy Chief Feist right here, this last couple sentences.

5   A.   I was letting him know that there was an EEOC

6   investigation that had been completed and that there was a

7   finding of probable cause of discrimination.

8            MS. WILLIAMS:  Okay, Your Honor, this is subject to a

9   motion in limine, and you ruled on this, and it's a problem.

10  It's in front of the jury now.

11           THE COURT:  Hold on.  Come on forward.

12      (Bench conference on the record.)

13           THE COURT:  Do you have the exhibit?

14           MR. VILLA:  Ms. Williams admitted this, not me, Your

15  Honor.

16           THE COURT:  Tell me what we're looking at here.  This

17  is from Ms. Welch to Deputy Feist.

18           MR. VILLA:  Which Ms. Williams offered during

19  Ms. Welch's --

20           THE COURT:  One at a time.

21           MR. VILLA:  And this is the provision that the jury

22  has already seen when Ms. Williams went over this letter in

23  great detail.  She offered it.  I didn't offer it.  And so now

24  I'm asking Ms. Welch on redirect about this letter.  It's

25  Ms. Williams' motion in limine.  She chose to offer this

1    letter.  I didn't.

2            THE COURT:  Okay.  And your question to Ms. Welch is

3    what?

4            MR. VILLA:  Is what she was telling Mr. Feist about

5    in this section here, which had to do with the EEOC's findings

6    and why she had concerns going back to ROP.  Ms. Williams

7    opened the door.

8            THE COURT:  Okay.  And then what?  How far do you

9    want to --

10           MR. VILLA:  I just want to ask her if this was part

11   of the reason she was concerned about going back to ROP.

12           THE COURT:  The finding of probable cause by the

13   EEOC?

14           MR. VILLA:  Yes, and the second EEOC retaliation

15   complaint.

16           MS. WILLIAMS:  Sorry.

17           MR. VILLA:  I mean, I -- I didn't offer this exhibit,

18   so I'm just following up now on redirect.

19           THE COURT:  Okay.  It's in the exhibit.

20           MR. VILLA:  And the jury's already seen it.

21           THE COURT:  I understand.  13a is admitted.  I guess

22   how far behind this letter do you want to get into?

23           MR. VILLA:  I just wanted to point out that that was

24   the purpose of Ms. Welch telling Deputy Chief Feist this.

25           MS. WILLIAMS:  Your Honor, my concern, if it's my

Redirect Examination - Terysa M. Welch

1   turn to talk, is that after the rulings on that -- they were

2   supposed to redact these exhibits before they were given to us,

3   and I assumed that the things that were supposed to be taken

4   out of the exhibits pursuant to the e-mails were out.  I was

5   dealing with other portions of this letter.  Not this.

6           THE COURT:  This was is where I cautioned everyone to

7   be thinking about what parts of the exhibits you really need

8   and what you do not need and how we may have information in

9   here that we really don't need or want, and so that was my

10  caution to both parties, and here we are.  I did rule on a

11  motion in limine to exclude basically the findings and the

12  ultimate ruling of the EEOC investigation.  This exhibit

13  includes references to findings of probable cause of

14  discrimination.

15          MR. VILLA:  And I didn't offer this exhibit, Your

16  Honor.  And I didn't for that reason, to honor your motion

17  in limine.  But if the defense changes their mind about what

18  they want to offer, I don't -- I don't control that.

19          THE COURT:  Remind me, Ms. Williams.  Did you inquire

20  about the EEOC findings?

21          MS. WILLIAMS:  Not at all.

22          THE COURT:  Okay.  I'm going to sustain the

23  objection, Mr. Villa.  I understand your position that the

24  door's been opened, here it is, the exhibit.  It's been

25  admitted.  But I think anything more than that -- And if the

1   jury is confused, I guess at this point I would rule to

2   mitigate any confusion that the jury may develop as a result of

3   this particular exhibit.  It's not redacted.  It's in black and

4   white.  So that's my ruling.  I'm sustaining the objection.

5          MR. VILLA:  So can I ask any more questions about

6   this letter?  You just don't want me to ask about that?

7          THE COURT:  We'll stay away from the area regarding

8   the EEOC claims.

9          MR. VILLA:  Okay.  But the evidence is there in

10  evidence.

11         MS. WILLIAMS:  We'd have to redact it at this point

12  to mitigate.  I thought that they were mitigated.  They are

13  exhibits on the exhibit list.

14         THE COURT:  You are utilizing this?

15         MS. WILLIAMS:  I did utilize it.

16         THE COURT:  It's plain to me it's not redacted, the

17  entirety of the exhibit.

18         MR. VILLA:  It's highlighted.  I didn't put these

19  highlights on.  This is what Ms. Williams offered.  She clearly

20  reviewed this letter.  It's not my --

21         THE COURT:  Okay.  Just one moment.

22         MS. WILLIAMS:  Just probably before --

23         MR. VILLA:  I mean, you could certainly give a

24  limiting instruction, Your Honor, but I think redacting an

25  exhibit that the jury has already seen is inappropriate.

1          THE COURT:  Okay.  What else did you intend to do

2    with this exhibit at this time?

3          MR. VILLA:  I think that was my -- my questions of

4    Ms. Welch, was the purpose for providing the letter, and then I

5    was going to ask her whether Deputy Chief Feist responded to

6    her concerns that she set out in the letter.

7          THE COURT:  Okay.

8          MS. WILLIAMS:  I already asked her --

9          THE COURT:  And did that response from Deputy Feist

10   include directly relating to the finding of the EEOC?

11         MR. VILLA:  The answer that I anticipate is that

12   Deputy Chief Feist did not respond to the concerns in the

13   letter.

14         THE COURT:  Okay.  So my ruling, I'll instruct the

15   parties to redact this Exhibit 13a to mitigate any confusion

16   that may have developed.  The exhibit's been published.  To the

17   extent it is going to continue to be used and ultimately go

18   back for jury deliberations, I'll instruct the parties to

19   together redact the portion of the letter that begins in the

20   second paragraph "As I told you in our conversation, the EEOC

21   investigation was completed in December 2010 and a finding of

22   probable cause of discrimination was returned on numerous

23   counts, including Detective Gagne's behavior/actions."

24         Now, that's as much as I see that pertains to my

25   ruling on the motion in limine.

1          MR. VILLA:  And, Your Honor, just for the record, I

2    would note my objection to redacting the exhibit.

3          THE COURT:  Yes, sir.  Okay.  All right.  That's all

4    I'm referring to on the motion in limine.

5          (Open court.)

6    Q.  (By Mr. Villa)  Ms. Welch, you just testified that the

7    purpose of Exhibit 13a was to tell Chief Feist your concerns

8    returning to ROP.  Did Deputy Chief Feist address all of the

9    concerns in this letter?

10   A.    No.

11   Q.    And the purpose of Exhibit 86, the letter regarding your

12   personal property that you wrote, can you tell the jury, did --

13   what was the purpose of this letter?

14   A.    To keep him apprized of the continued unprofessional and

15   what I viewed as retaliatory behavior that continued to go on

16   even when I was not in the ROP unit anymore.

17   Q.    Did Deputy Chief Feist address your concerns in

18   Exhibit 86?

19   A.    Not to my knowledge.

20   Q.    Okay.  Let's just back up a little bit.

21          Ms. Williams asked you about when you were in the

22   Northeast Impact with Rob Smith.  Do you remember that?

23   A.    Yes.

24   Q.    And he was the sergeant at the time?

25   A.    Yes.

Redirect Examination - Terysa M. Welch

1   Q.   And she asked you about disguising yourself as a couple --

2   A.   Yes.

3   Q.   -- for operations?

4   A.   Correct.

5   Q.   Is there anything unusual about that?

6   A.   There was -- It was unusual because he's a sergeant, and

7   although sergeants are over watching, they don't normally take

8   a direct role.

9   Q.   What sort of direct role would he take in those operations

10  where you disguised yourselves as a couple?

11  A.   He would hold my hand and walk as a couple holding hands.

12  Q.   He did that while he was a sergeant?

13  A.   Yes.

14  Q.   Had you -- Did you experience that with other sergeants?

15  A.   No.

16  Q.   Ms. Williams asked about jokes.  You said you guys joked

17  about issues sometimes that you might not joke about, say, with

18  a stranger.

19  A.   Sure.

20  Q.   Did you ever make sexual jokes with your coworkers?

21  A.   No, not that I recall.

22  Q.   Did your coworkers ever make sexual jokes toward you?

23  A.   Yes.

24  Q.   Now, you joked around with -- Did you ever joke around

25  with Sergeant Smith when he was a sergeant?

Redirect Examination - Terysa M. Welch

1    A.   Sure.

2    Q.   Did the jokes that you did with your sergeant, were they

3    different than with your coworkers?

4    A.   No.

5    Q.   When you make jokes with your sergeant, were they sexual?

6    A.   No.

7    Q.   Now, you were asked questions about job descriptions, the

8    Northeast Impact, Burglary, and ROP.  When you hear the term

9    "job description," are you thinking of what's written over at

10   City Personnel or what you actually do as the detective?

11   A.   Well, both, but specifically what I actually do.

12   Q.   And there are other differences in the job descriptions

13   among these different detective groups?

14   A.   The differences are huge.

15   Q.   And I think you were asked if Sergeant Smith wanted you at

16   the ROP unit.  Do you remember that?

17   A.   Yes.

18   Q.   And what was -- Did he want you there?

19   A.   I believe he did.

20   Q.   Did he encourage you to go there?

21   A.   He did.

22   Q.   I'm going to fast forward to 2009.  You were asked

23   questions about what Sergeant John Sullivan told you that Kevin

24   Gagne had said when you got into ROP.  Do you remember that?

25   A.   Yes.

Redirect Examination - Terysa M. Welch

1   Q.   And you said it was a warning?

2   A.   Yes.

3   Q.   Why was he warning you?

4   A.   He told me he was concerned for me.

5        MS. WILLIAMS:  Objection, Your Honor.  Calls for

6   speculation and it's hearsay.

7        THE COURT:  Are you establishing foundation,

8   Mr. Villa?  I would sustain the objection.

9   Q.   (By Mr. Villa)  When Sergeant Sullivan gave you the

10  warning, where were you?

11  A.   I don't recall exactly where I was.

12  Q.   Let me ask this.  Were you guys on duty or off duty?

13  A.   On duty.

14  Q.   Was he talking to you about something in the scope of your

15  employment?

16  A.   Yes.

17  Q.   Was he an employee of APD?

18  A.   Yes.

19  Q.   And as a sergeant, was he a supervisor?

20  A.   He was.

21  Q.   Okay.  So tell us if -- Do you know why he was warning

22  you?

23  A.   Yes.

24  Q.   How do you know why he was warning you?

25  A.   Because he told me he was worried --

 1          MS. WILLIAMS:  Objection, Your Honor.  Calls for

 2   speculation.

 3          THE COURT:  Well, I think he's establishing some

 4   foundation.

 5          So you may continue, Mr. Villa.

 6   Q.   (By Mr. Villa)  Go ahead, Ms. Welch.

 7   A.   He knew I had filed a complaint and he was worried about

 8   me being over in ROP.  He specifically said, "I'm worried about

 9   you over there," that Kevin Gagne had made this comment, "We

10   got fucked.  We had to take a skirt."  He was encouraging me to

11   get away from them -- or him, to get out of the environment,

12   that he was worried for my -- for my concern -- he was

13   concerned for me.

14   Q.   Now, you were asked questions by Ms. Williams about

15   whether you had been discriminated by Mr. Schultz, about being

16   asked that at your deposition.  Do you remember that?

17   A.   Yes.

18   Q.   And do you remember the answer you gave to Ms. Williams

19   about you were discriminated by Mr. Schultz?

20   A.   The answer that I gave today?

21   Q.   Yes.

22   A.   Was no.

23          MR. VILLA:  May I approach, Your Honor?

24          THE COURT:  You may.

25          MR. VILLA:  Page 118.

Redirect Examination - Terysa M. Welch

```
1           MS. WILLIAMS:  Pardon?

2           MR. VILLA:  Line 6.

3           MS. WILLIAMS:  This is going to be an improper

4  refreshing of what she says she remembers.

5           MR. VILLA:  It's impeaching, Your Honor.

6           THE COURT:  Hold on a second.

7           Well, I don't think it's been made clear that the

8  witness does not remember.

9           MR. VILLA:  It's not refreshing, Your Honor.  It's

10 impeaching.  The answer at the deposition was different.

11          THE COURT:  Well, all right.  Please come forward.

12      (Bench conference on the record.)

13          THE COURT:  Okay.

14          MR. VILLA:   Your Honor, she testified on

15 cross-examination if Chief Schultz had ever discriminated

16 against her and she said no.  The answer in her deposition was

17 "Not directly."

18          THE COURT:  So the question is -- are you offering

19 this for the truth of the matter asserted or simply to

20 establish that she said something different before?

21          MR. VILLA:  Simply to establish that she said

22 something different before for impeachment purposes.

23          THE COURT:  Okay.  Ask her about it, but no extrinsic

24 evidence.  You know what rule 613 is, so move forward.

25          MR. VILLA:  Well, I think, yeah, I'm not trying to
```

Redirect Examination – Terysa M. Welch

1   admit it, Your Honor.  I'm just trying to ask her if she said

2   something different in her deposition.

3           THE COURT:  You can ask her if she said something

4   different in her deposition.

5           MR. VILLA:  Can I ask her if what she said different

6   in her --

7           THE COURT:  If she remembers.  If she doesn't

8   remember, you can refresh her recollection with the item.

9       (Open court.)

10  Q.   (By Mr. Villa)  Ms. Welch, when you were asked in your

11  deposition "Did you ever experience discrimination by conduct

12  of Chief Schultz?" did you answer differently?

13  A.   Slightly differently.

14  Q.   Do you remember what your answer was?

15  A.   I said something like "Not directly."

16  Q.   Okay.  So you didn't say "No," you said "Not directly"?

17  A.   Yes.

18  Q.   With regard to your duties while you were in ROP, you

19  testified about resource allocation between Burglary and, say,

20  other violent crimes.  Who decided at the time you were in ROP

21  how resources would be allocated?

22  A.   The sergeant.

23  Q.   Who decided in terms of priority which cases took a higher

24  priority and which cases took a lower priority?

25  A.   The sergeant.

Redirect Examination - Terysa M. Welch

1    Q.    Did you get to have any say in that priority?

2    A.    No.

3    Q.    Did you get to have a say in the resource allocation?

4    A.    No.

5    Q.    You were asked about an overtime cap, and you told

6    Ms. Williams that there wasn't an overtime cap in ROP.  Was

7    there an overtime cap in Burglary?

8    A.    I have no idea.

9    Q.    I just wanted to clarify something when Ms. Williams was

10   asking you about the issue with Mr. Maes.  Was Rob Smith the

11   sergeant at ROP or lieutenant of SID at that time?

12   A.    He was the lieutenant.

13   Q.    So he wasn't your sergeant?

14   A.    No.

15   Q.    And the situation that you had when -- in the previous

16   relationship earlier in time -- I think it was -- Was it

17   Mr. Aragon?

18   A.    Yes.

19   Q.    Who came over to the house, the lieutenant or the

20   sergeant?

21   A.    His sergeant.

22   Q.    Not his lieutenant?

23   A.    No.

24   Q.    You were asked about your diary and taking notes, and

25   Ms. Williams asked you a question about taking notes on all

1    your coworkers.  Did you take notes on all your coworkers?

2    A.    No.

3    Q.    Why did you take notes?

4    A.    So that I could remember.

5    Q.    And did you take notes on things just concerning

6    coworkers?

7    A.    No.  I took notes on arrestees, I took notes on personal

8    appointments, I took notes on things you would keep in a

9    calendar.

10   Q.    Did you write down everything that happened in it every

11   day?

12   A.    No.

13   Q.    Would you tell me -- There was a discussion about your

14   counselor had violated the law so that you stopped seeing the

15   counselor.  What was it that your counselor did?

16   A.    She gave my phone number out to somebody that I didn't

17   give her permission to give my phone number out to.

18   Q.    How did you know that?

19   A.    Because that random person called me, and I asked her

20   "Where did you get my phone number?" and she said, "Dr. Scott

21   gave it to me."

22   Q.    Is that a -- Is that a legal violation?  Is that a

23   violation of the law?

24   A.    I'm not sure.

25   Q.    But you felt like it was?

1    A.    It just didn't feel like it was right, so I didn't go back

2    to the doctor.

3    Q.    So let me ask you now.  I'm going to talk about the memo,

4    the punctuality memo and the Team Expectations and Guidelines.

5    I'm showing you what's already been admitted as Defendant's

6    Exhibit B.  That's the Team Expectations and Guidelines memo,

7    correct?

8    A.    Correct.

9    Q.    And here's where -- Explain to the jury what this says

10   here in the Team Expectations and Guidelines memo.

11   A.    So in the sergeant's office is an arrest log, and in the

12   arrest log would be, if I can remember correctly, the date,

13   what the arrest was for, the subject's name, who was arrested,

14   the detective's name or the detective's call sign who was

15   responsible for the arrest, and how many priors the arrestee

16   had before.  And always before this memo came out, when we

17   would fill the log out, we would put "ROP team" under the

18   detective's name who was responsible for the arrest because the

19   ROP team all contributes to every arrest.  Nobody does anything

20   individually.

21   Q.    So you were asked about whether the things in this memo

22   were the rules that were already in place or standard operating

23   procedures.  Is there a standard operating procedure about how

24   to fill out the arrest log?

25   A.    No.

1   Q.   Is there a procedure that you know about before this -- a

2   written procedure that you knew about before this memo about

3   how to fill out the arrest log?

4   A.   No.

5   Q.   And this memo was given to -- excuse me -- on July 24,

6   2009, right?

7   A.   Right.

8   Q.   To the whole ROP team?

9   A.   Yes.

10  Q.   And Exhibit 46, the punctuality memo you received, was

11  given on what date?

12  A.   The same date, July 24th, 2009.

13  Q.   Do you know if anyone else got a punctuality memo on

14  July 24th?

15  A.   Nobody else got a punctuality memo.  Just me.

16  Q.   When you asked Sergeant Hubbard about the punctuality

17  memo, did you ask him why Exhibit B wasn't sufficient?

18  A.   I didn't ask him why it wasn't, but it's -- it contains

19  some of the same things.

20  Q.   Do you know why you were singled out for this memo?

21  A.   I'm not sure.

22         MS. WILLIAMS:  Objection.  Calls for speculation.

23         THE COURT:  Sustained.

24         So, I sustained the objection, ladies and gentlemen.

25  In my preliminary instructions, what I explained is what's

1  evidence, what is not evidence.  What is not evidence is the

2  information that I instruct you to disregard.  This is an

3  example of that, so I'll just instruct you to disregard the

4  answer to the last question.

5  Q.  (By Mr. Villa)  The time when you got the arrest packet

6  on July 29th, you indicated there were three detectives there

7  that day.

8  A.  At least that morning.

9  Q.  Do you know how many detectives were working that day?

10 A.  I don't know.

11 Q.  What was different about that time when Sergeant Hubbard

12 gave you the warrant packet than the previous times that he had

13 given you warrant packets?

14 A.  Every other warrant roundup I've ever worked, I've never

15 been given a packet by myself.  Ever.

16 Q.  The time when, I think it was August 3rd that you said you

17 called for backup and it took a while, what was different about

18 that time than in the past when you called for backup from the

19 ROP team?

20 A.  I had always gotten an immediate response every other time

21 I had called for backup.

22 Q.  A little while later, I think it was August 24th, you

23 filed your EEOC Complaint.  Did you complain about the whole

24 ROP team in that Complaint?

25 A.  No.

Redirect Examination - Terysa M. Welch

1    Q.   Who did you not complain about?

2    A.   Well, there were names in my Complaint, but it wasn't that

3    I was complaining about them.  They just were involved in

4    incidents.  For example, Danny Garcia was in my Complaint, but

5    it was just because he was involved in an accident with Rob

6    Smith who's name was in my Complaint.  I wasn't complaining

7    about him.

8    Q.   What about Mike Hill?

9    A.   I wasn't complaining about Detective Hill.

10   Q.   You testified on cross-examination that you talked with

11   Richard Campbell about the Complaint before you submitted it.

12   A.   That's right.

13   Q.   Who is Richard Campbell?

14   A.   Richard Campbell is the father of Michelle Campbell, who I

15   went through the Academy with, but he also retired as a deputy

16   chief of the Albuquerque Police Department and he retired as

17   the chief of the Roswell Police Department.  I respect his

18   opinion and I asked for his advice and explained what I had

19   been going through and I asked him what he thought I should do,

20   and he --

21   Q.   Let me ask you this.  Without telling me what he told you,

22   did you take his advice when you wrote the Complaint?

23   A.   Yes, I did.

24   Q.   Did you ask him for advice about all of the contents of

25   your Complaint?

1  A.  Yes, I did.

2  Q.  You were asked questions about Acting Sergeant, and

3  Ms. Williams was asking you questions about an upgrade.

4  A.  Yes.

5  Q.  I think you said it had to be more than eight hours.

6  A.  Correct.

7  Q.  I want to the clarify.  We're talking about an upgrade in

8  pay, right?

9  A.  Yes.

10 Q.  So you get a higher hourly rate when you're acting as

11 sergeant for more than eight hours?

12 A.  That's correct.

13 Q.  When Sergeant Hubbard and Lieutenant Smith returned to ROP

14 in, I guess it was the fall or early winter of 2009, do you

15 know if the EEOC investigation was still ongoing?

16 A.  It was still ongoing.

17 Q.  Do you know if -- And I'm talking about the federal EEOC.

18 Are you aware of whether the City conducted its own internal

19 EEOC investigation?

20 A.  Not that I'm aware of.

21 Q.  You were asked questions about your knowledge of the IA

22 process.  Do you remember that?

23 A.  Yes.

24 Q.  And receiving a target letter.  Is that right?

25 A.  Yes.

Redirect Examination - Terysa M. Welch

1  Q.   So for certain violations do you always receive a target

2  letter?

3  A.   You can receive a witness letter as opposed to a target

4  letter.

5  Q.   Let me ask you this.  I'm showing you what's already been

6  admitted as Exhibit 21.  That's the policy you were accused of

7  violating, right?

8  A.   Correct.

9  Q.   And it has the level 6 designation?

10  A.   Correct.

11  Q.   With respect to a level 6 designation, do you know whether

12  in the IA process a target letter has to be issued?

13  A.    It wouldn't.  I mean if it was investigated by your

14  immediate chain of command, you wouldn't receive a target

15  letter for that.

16  Q.   When can your immediate chain of command investigate a

17  violation?

18       MS. WILLIAMS:  Objection.  Lack of foundation.

19  Q.   (By Mr. Villa)  Have you been trained about when the

20  chain of command can investigate certain violation levels?

21  A.   Yes.

22  Q.   Were you trained about that as a sergeant?

23  A.   Yes.

24  Q.   Were you trained about that as a lieutenant?

25  A.   Yes.

1    Q.    Did you learn about that even before you became a

2    sergeant?

3    A.    Yes.

4    Q.    When can an immediate supervisor investigate a certain

5    level violation?

6    A.    Lower-level sanctions such as a sanction 6, a sanction 7.

7    Q.    What does that mean if an officer has a sanction 6

8    violation?  What does the supervising officer -- what can he

9    do?

10   A.    The sergeant would call the officer into the office and

11   conduct an investigation, find out what had happened, gather

12   the facts, and if the sergeant sustained the allegation, then

13   the sergeant would write a memo outlining the facts of the

14   case, send it up to the lieutenant that he sustained the

15   charges based on whatever the facts of the case were, and then

16   that would go on through the direct chain of command, and in

17   this case it would be a letter of reprimand.  Then that would

18   be sent through the -- now it would be sent through the IA

19   process to document that a letter of reprimand was issued to

20   the detective or the officer on the employee card, and that

21   would be documented in that fashion.

22   Q.    Would there have to be -- At the time you received your

23   discipline, do you know if there had to be an IA process like

24   you went through or what you just described with the direct

25   supervisor?

1   A.   No.  You would -- You would be investigated by your direct

2   supervisor.

3   Q.   Do you know if you had agreed to accept a written

4   reprimand with your direct supervisor whether that would be

5   allowed in that circumstance?

6        MS. WILLIAMS:  Objection, Your Honor.  Lack of

7   foundation for the time frame.

8        THE COURT:  I agree.  Just establish the foundation

9   for that, Mr. Villa.

10  Q.   (By Mr. Villa)  This process that we're talking about

11  with going through the Internal Affairs target letter process

12  as opposed to the direct supervisor, was that in place when

13  you were investigated for transporting alcohol?

14  A.   It was not a normal way of handling a low-level sanction.

15  Q.   What wasn't normal?

16  A.   To send it to Internal Affairs.

17  Q.   What was normal at that time?

18  A.   That lower-level sanctions are handled through the chain

19  of command.

20  Q.   Okay.  And do you know what the process would be if the

21  person accused of violating the policy had said they would

22  admit to it or said they would --

23       MS. WILLIAMS:  Objection.

24  Q.   (By Mr. Villa)  It's just a "yes" or "no" question.  Do

25  you know what the process would be if somebody said they would

1    accept the written reprimand?

2              THE COURT:  Hold on.  What's your objection.

3              MS. WILLIAMS:  Objection, Your Honor.  Leading, and

4    lack of foundation for the time frame.

5              THE COURT:  Okay.  Rephrase the question, Mr. Villa.

6    Q.   (By Mr. Villa)  What would the policy -- What would the

7    process be -- Strike that.

8              What was your knowledge of the process at the time

9    you went through this clearing process about whether somebody

10   could -- a direct supervisor could accept their subordinate's

11   agreement to take the written reprimand?

12   A.   That that was a possibility and was possible through my

13   direct chain of command.

14   Q.   Okay.  Now, you went through the Internal Affairs process

15   and you were asked about having your turn there.  Right?

16   A.   Yes.

17   Q.   Was your attorney allowed to ask any questions during your

18   IA interview?

19   A.   No.

20   Q.   What about the union representative?

21   A.   He was warned not to interrupt.

22   Q.   Do you know whether the union representative is allowed to

23   ask questions in the IA interview?

24   A.   I've been in interviews where they were.

25   Q.   What about attorneys?  Do you know if attorneys are

1    allowed to ask questions in the IA interview?

2             MS. WILLIAMS:  Objection, Your Honor.  Lacks

3    foundation.

4             MR. VILLA:  It's just a "yes" or "no" if she knows.

5             THE COURT:  Well, you can ask if she knows.  So I'll

6    allow the question and you can take it from there.

7    Q.   (By Mr. Villa)  Do you know whether attorneys are allowed

8    to ask questions?

9    A.   I believe it depends on the interviewer.

10   Q.   What about argument?  Are attorneys allowed to make

11   argument?

12   A.   No, they're not.

13   Q.   Do you know whether attorneys are allowed to object to

14   questions?

15   A.   They are not.

16   Q.   During your IA interview, were you asked if you recall

17   going to the Walgreen's at issue in the last few weeks?

18   A.   Can you repeat it?

19   Q.   Sure.  At the time of your IA interview by Sergeant Knox,

20   the first IA interview in October of 2009, were you asked if

21   you recalled going to this particular Walgreen's in the last

22   few weeks?

23   A.   Yes, I was asked that.

24   Q.   What was your answer?

25   A.   I didn't recall specifically if I had gone.

1   Q.   Did you indicate anything about the frequency with which

2   you went to that Walgreen's?

3   A.   Yes, I had indicated that I often go to that Walgreen's.

4   Q.   Were you asked by Sergeant Knox if you remembered anything

5   that you did on October 12, 2010?

6   A.   I did not remember anything on that specific date.

7   Q.   Do you remember the exact answer that you gave Sergeant

8   Knox?

9   A.   No.

10  Q.   If you looked at a report of his investigation, would that

11  refresh your recollection?

12  A.   Possibly.

13       (A conference was held between Ms. Williams and

14       Mr. Villa.)

15           MR. VILLA:  May I approach?

16           THE COURT:  You may.

17  Q.   (By Mr. Villa)  Ms. Welch, I'm showing you an

18  investigative report of Cecil Knox of October 12, 2010.  Would

19  you just read this to yourself.  Don't testify from it.  If it

20  refreshes your recollection, just hand it back to me and I'll

21  ask you some questions.

22           Does that refresh your recollection?

23  A.   Yes.

24  Q.   So when you were asked if you remembered anything on

25  October 12, 2010, what did you tell Sergeant Knox?

Redirect Examination - Terysa M. Welch

1   A.   I told him I was not denying anything and I wasn't trying

2   to be difficult, that I didn't remember anything specific to

3   that date.

4   Q.   When you said you weren't denying anything, what did you

5   mean?

6   A.   I meant that I wasn't denying that I bought the alcohol on

7   that date.

8   Q.   Were you asked a question by Sergeant Knox if you were at

9   Walgreen's on that date and if you remember buying beer at any

10  time within the last month?

11            MS. WILLIAMS:  Objection.  Asked and answered.

12            THE COURT:  I think this is a different question.

13  You may ask the question, Mr. Villa.

14  Q.   (By Mr. Villa)  Were you asked that question by Sergeant

15  Knox?

16  A.   One more time.

17  Q.   Sure.  If you were at the Walgreen's on October 12, 2010,

18  and if you remembered buying beer at any time within the last

19  month.  Were you asked that question?

20  A.   I believe I was.

21  Q.   Do you remember the specific answer you gave to Sergeant

22  Knox?

23  A.   That I believe I had bought beer in the last month.

24  Q.   Okay.  Did you say anything -- Do you remember saying

25  anything at all about whether you were denying buying beer?

Redirect Examination - Terysa M. Welch

1    A.    I did not deny it.

2    Q.    Now, Ms. Williams asked you about applying that situation

3    to, say, a suspect, and if a suspect tells you that they are

4    not denying something but they don't remember it, do you

5    consider that a lie?

6    A.    I don't consider it a lie.  It would depend on the

7    situation.

8    Q.    Do you consider it that the suspect is interfering with

9    the investigation?

10   A.    No.

11   Q.    Let's talk about the discipline you actually received and

12   what was actually sustained in the IA investigation.

13          So showing you what's already been admitted as 153k,

14   the disciplinary status sheet, and it has findings here and

15   different numbers that I'm pointing to underneath CHARGES, do

16   you know what those numbers are?

17   A.    Those are SOP sections and subsections.

18   Q.    Okay.  So, for instance, it says here 1-04-7A.  That's an

19   SOP?

20   A.    Yes, it is.

21   Q.    Or a standard operating procedure?

22   A.    Yes.

23   Q.    Okay.  When you say SOP, does that also include -- I'm

24   showing you already admitted Exhibit 21, a general order?

25   A.    Correct.  The 1-4-7 would be what I'm referring to.

Redirect Examination - Terysa M. Welch

1    Q.    Okay.  So 1-4-7 is transporting alcohol in a City vehicle.

2    A.    Correct.

3    Q.    And that's 1-04-7A, sustained?

4    A.    Correct.

5    Q.    Was that ultimately sustained after review by Deputy Chief

6    Feist and Chief Schultz?

7    A.    Yes, it was.

8          MR. VILLA:  Your Honor, I've marked for

9    identification Plaintiff's Exhibit 153k-1.  It's the same

10   document as 153k, but I'm going to go -- I'm going to ask the

11   witness to write on it and then have it admitted as a different

12   exhibit.  I'll show it to Ms. Williams.

13         May I approach?

14         THE COURT:  You may.

15   Q.    (By Mr. Villa)  I've handed you what I've marked as

16   153k-1.  Do you have a pen?  Ms. Welch, is that the same

17   document as 153k?  I can give you the document if you need to

18   see it.

19   A.    I might be getting a little tired here, but it looks, just

20   looking at the bottom portion here, because I can't see the top

21   of the other one anymore, it looks to be the same, yes.

22   Q.    And I'll represent to you it's the same document, but if

23   you'd like to look at both.

24   A.    It looks the same, yes.

25   Q.    So the 1-04-7A transporting alcohol in a City vehicle,

Redirect Examination – Terysa M. Welch

1   that was sustained?

2   A.   Yes.

3   Q.   So next to where it says sustained, will you just put a

4   check mark on the document that you have.

5   A.   Okay.  (Witness complies.)

6   Q.   And for violating that particular policy, that sanction

7   calls for a 6, correct?

8   A.   Correct.

9   Q.   Which is on Plaintiff's Exhibit 21 that I've shown you.

10  Right?

11  A.   Yes.

12  Q.   And what's the sanction called for by a 6?

13  A.   Letter of recommendation.

14          MR. VILLA:  Your Honor, may I approach?

15          THE COURT:  You may.

16  Q.   (By Mr. Villa)  I'm showing you what's marked as

17  Plaintiff's Exhibit 75.  Have you seen that document before?

18  A.   Yes.

19  Q.   That's the document that has Deputy Chief Paul Feist's

20  findings regarding your Internal Affairs?

21  A.   Correct.

22          MR. VILLA:  Your Honor, I'd move to admit 75.

23          MS. WILLIAMS:   Your Honor, we object.  This was

24  subject to a motion in limine and held in abeyance as

25  preliminary documentation for the ruling.

Redirect Examination - Terysa M. Welch

```
 1          THE COURT:  Okay.  75, Mr. Villa.
 2          MR. VILLA:  Your Honor, it's a memorandum from --
 3          THE COURT:  Well, without telling me exactly what is
 4  in it, I'll ask that you just lay some more foundation with
 5  this witness as to what the document is, identifying it, and
 6  how she may be familiar with it.
 7  Q.  (By Mr. Villa)  Ms. Welch, without talking about the
 8  content, what is this document?
 9  A.   It's the final -- It's the final discipline between my
10  deputy chief and my chief.
11  Q.   And does the document, without -- again without talking
12  about the results identified in there, does it review the same
13  policy violations listed in 153k?
14  A.   No.
15  Q.   Well, does it review all -- Hang on just a second.  Does
16  it review all of the five policy violations that are listed in
17  153k?  Does it review them all?
18  A.   It reviews them all.
19  Q.   And does it provide -- Without telling me what the
20  findings are, does it provide a finding from Deputy Chief Paul
21  Feist regarding each one of these five?
22  A.   Yes.
23  Q.   Okay.  And is this a document that you received in the
24  course of the Internal Affairs process?
25  A.   Yes.
```

1           MR. VILLA:  Your Honor, based on that, I think the

2    foundation's been laid.  I ask that you admit 75.

3           THE COURT:  Ms. Williams.

4           MS. WILLIAMS:  Your Honor, this is subject to the

5    same objection.  It does not say it's addressed or cc'd to her.

6    There's no indication that she received it.  It was preliminary

7    to the final discipline.  It is not the final discipline.  It

8    includes much more than they have led you to believe without

9    looking at the --

10          MR. VILLA:  I'm happy to provide it to you, Your

11   Honor.  What has been admitted already without objection is

12   Exhibit 103, which is Chief Schultz's findings after reviewing

13   Exhibit 75.

14          THE COURT:  All right.  Exhibit 75 I'll admit.  The

15   witness has identified it, explained how she is familiar with

16   it.  As to the weight, I'll leave it to the jury to decide.

17          So you may proceed, Mr. Villa.

18      (Plaintiff's Exhibit 75 admitted into evidence.)

19   Q.   (By Mr. Villa)  Now, Ms. Welch, you said that 1-04-7A was

20   sustained, and I'm showing you 75, which is Paul Feist's memo

21   to Chief Schultz.  Correct?

22   A.   Yes.

23   Q.   And it lists here -- I'm pointing to the finding for

24   1-04-7A.  What was the finding?

25   A.   Sustained.

Redirect Examination – Terysa M. Welch

1    Q.   Okay.  Now, the next one I'm going to talk about is right

2    here.  1-04-1E.  That says, according to Chief Feist's memo,

3    "Compliance with laws, rules, and regulations."  And what was

4    the finding of Chief Feist?

5    A.   Sustained.

6    Q.   And what was the law, rule, or regulation that you

7    violated?

8    A.   Can you put the other one back up?  I don't know what

9    the --

10             THE COURT:  Mr. Villa, would you please approach with

11   Ms. Williams.

12             MR. VILLA:  Sure.

13             THE COURT:  And in just a minute I'm going to call a

14   midafternoon break.

15        (Bench conference on the record.)

16             THE COURT:  Okay.  So it's in evidence.  It says what

17   it says.  You're going through what it says with the witness.

18   Is there a reason for that?

19             MR. VILLA:  Because in her cross-examination

20   Ms. Williams asked her if everything on that 153k had been

21   sustained, and this shows that it wasn't all sustained.

22   There's actually -- Once I get past the three that were

23   sustained, the others were not sustained.

24             THE COURT:  Well, do you need this witness to tell

25   the jury what is in this document if it says what it says or it

Redirect Examination - Terysa M. Welch

1    says things that are not consistent with what the prior

2    testimony was?  In other words, is this argument?

3            MR. VILLA:  Well, I think it's both.  I think it's

4    fair game to do both, Your Honor.  I mean, I could certainly go

5    through it a little faster.

6            THE COURT:  Well, I'm inclined to rule it's

7    cumulative --

8            MR. VILLA:  Okay.

9            THE COURT:  -- in that you already have it in

10   evidence.  There's no point going through it with the witness.

11   You can use it in closing.

12           MR. VILLA:  Okay.

13           THE COURT:  So let's move along.

14           MR. VILLA:  Okay.

15           MS. WILLIAMS:  Thank you, Your Honor.

16       (Open court.)

17   Q.  (By Mr. Villa)  You were asked on cross-examination about

18   153k, whether all five of these were ultimately sustained.

19   And with respect to what actually happened when Deputy Chief

20   Feist reviewed it documented in Exhibit 75, were all five of

21   these sustained?

22   A.  I don't believe so.

23   Q.  Do you know which ones were not sustained?

24   A.  I don't -- I don't know the corresponding regulation to

25   just -- I don't have these numbers memorized, so, no, I can't

Redirect Examination - Terysa M. Welch

1   just tell by looking at the SOP number.

2   Q.   Okay.  But your testimony with respect to 153k on

3   cross-examination that they were all sustained is not what's in

4   Exhibit 75?

5   A.   No.

6           THE COURT:  All right.  So at this time we'll take an

7   afternoon break.  Please be ready, let's be ready to convene,

8   restart in 15 minutes' time.

9           Please rise for the jury.

10      (Jury out at 2:50 p.m.)

11          THE COURT:  All right.  Ms. Welch, you may step down

12  for the time being.  Please do not discuss your testimony.

13          Mr. Villa, with Ms. Welch, about how long do you

14  anticipate?

15          MR. VILLA:  I was just about done, Your Honor.

16          THE COURT:  Okay.  Well, and then the plan for after

17  we reconvene after you wrap up with Ms. Welch?

18          MR. VILLA:  Dr. Foote.

19          THE COURT:  Okay.  And then after that?

20          MR. VILLA:  Well, depending on the time --

21          MS. WILLIAMS:  Rob Smith's been here two days.

22  Hudson's got to leave tomorrow.

23      (A conference was held between Ms. Williams and Mr.

24      Villa.)

25          MS. WIGGINS:  Your Honor, in the meantime, may I ask

1    if there's any way to cool the courtroom off down here?

2              MS. WILLIAMS:  It's probably hotter up there.

3              THE COURT:  It's hotter up here, considering what I'm

4    wearing.

5              MS. WIGGINS:  I appreciate that.

6              THE COURT:  But we'll see what we can do.

7              MS. WIGGINS:  I so appreciate that.  Thank you.

8         (A conference was held between Ms. Williams and

9         Mr. Villa.)

10             THE COURT:  Whatever the plan is, Mr. Villa, just

11   ensure it's enough evidence to present for the remainder of the

12   trial day.  We'll be in recess.

13             MR. VILLA:  Okay.

14        (Court stood in recess at 2:52 p.m. and resumed at

15        3:13 p.m.s follows:)

16             THE COURT:  Please be seated.  Just before we call

17   the jury in, let me explain.  So based on, I think, the

18   interactions between Court staff and the jury, it's noted that

19   they may have been confused about whether or to what extent

20   they may talk about the case before all the evidence is in.

21   And as I read my recess instruction, particularly what I read

22   to them yesterday, let me just read it to you.  And it comes

23   from New Mexico rules annotated.

24             This is 13-201, a recess instruction.  This is what

25   I've utilized.  But it says to the effect, just to remind you,

Redirect Examination - Terysa M. Welch

1    "During recess, do not discuss this case with anyone other than

2    yourselves and then only in the jury room when all of you are

3    present, period.  Do not attempt to decide the outcome of the

4    case before you begin final deliberations."  And then it

5    continues on from there.

6           If they may have been confused about whether they can

7    talk about this before the evidence is in, I think this is the

8    reason, it's because of this instruction.  My intent is that

9    the jurors not discuss the case at all even before

10   deliberations begin.  So that's my intent.  I will express that

11   intent a little bit more clearly with the jury -- when they

12   come back after this break.

13          Mr. Villa, anything about that?

14          MR. VILLA:  I think that's fine, Your Honor.

15          THE COURT:  Okay.  Ms. Wiggins, Ms. Williams.

16          MS. WIGGINS:  No objections, Your Honor.

17          THE COURT:  Okay.  All right.  Let's do that.  Let's

18   call the jury in.  Please rise.

19       (Jury in at 3:15 p.m.)

20          THE COURT:  Okay.  Please be seated.  All right.

21   Before we resume, let me just address what may be some

22   confusion on the jury's part or at least among some members.

23          You will recall, I gave you a jury recess

24   instruction, I read that to you yesterday, and then during some

25   breaks I reminded you about the importance of not discussing

Redirect Examination - Terysa M. Welch

1    the case.  So the jury instruction I read to you yesterday does

2    say, and I'll just read it to you.  "During recess, do not

3    discuss the case with anyone other than yourselves, and then

4    only in the jury room when all of you are present."  And then

5    it continues on:  "Do not attempt to decide the outcome of the

6    case before you begin final deliberations."

7            So there's more to this instruction.  Let me make

8    clear, notwithstanding what this says and what I may have

9    uttered, is that my intent is that you not discuss the case

10   before all of the evidence is in, and so at that point you may

11   discuss the case, and then when the case is in your hands after

12   all the arguments and I give you all the final instructions,

13   you may discuss the case to the extent necessary while you are

14   deliberating, and that you consider the verdict in the case.

15   So that's my intent.  To the extent, hopefully, there was

16   confusion, hopefully that will clarify the confusion.

17           All right.  So, Mr. Villa.

18           MR. VILLA:  Thank you, Your Honor.

19   Q.   (By Mr. Villa)  Ms. Welch I just wanted to button up this

20   issue with regard to your discipline.  The issues that

21   Sergeant Feist did not sustain are listed on the second page

22   and third page of Exhibit 75.  Is that right?

23   A.   Yes.

24   Q.   And did Chief Schultz, Exhibit 103 that's already been

25   admitted, agree or disagree with Deputy Chief Feist's

Redirect Examination - Terysa M. Welch

1   determinations?

2   A.   He agreed with Deputy Chief Feist's determination.

3   Q.   You were asked by Ms. Williams about the hallway incident

4   with Lieutenant Smith.

5   A.   Correct.

6   Q.   And she asked you if you talked to him about it and you

7   said no.  Why not?

8   A.   Because at that point I was afraid of Lieutenant Smith.

9   Q.   And you testified about the EEOC training.  How -- In

10  relationship in time to the Smith hallway incident and the EEOC

11  training, what was that, how far apart were those?

12  A.   Days apart.

13  Q.   And you were asked about a reference you made to

14  Ms. Neal's language offending older ladies.  Why were you

15  referring to older ladies?

16  A.   There were older ladies that were sitting in the training.

17  Q.   Now, the training was for all of SID?

18  A.   Correct.

19  Q.   Who were the older ladies?

20  A.   They were administrative staff that worked at SID.

21  Q.   And what was your feeling about Ms. Neal's language with

22  regard to that administrative staff?

23       MS. WILLIAMS:  Objection, Your Honor.  Asked and

24  answered.  Cumulative and --

25       THE COURT:  Mr. Villa.

Redirect Examination - Terysa M. Welch

1            MR. VILLA:  Well, I don't think I asked this

2    question, Your Honor, and it wasn't asked by Ms. Williams.

3            THE COURT:  Well, I'll rule that it's irrelevant, the

4    effect on the other listeners in the EEOC session.  So it's

5    sustained.

6    Q.   (By Mr. Villa)  After the hallway incident with Smith,

7    you talked to Elizabeth Paiz?

8    A.   Yes.

9    Q.   Did you talk to her after the EEOC training?

10   A.   Yes.

11   Q.   And you were asked about an e-mail that your father sent

12   to Elizabeth Paiz.  Were you speaking to your father about --

13   at this time?

14   A.   I kept in touch with my father, yes.

15   Q.   Did you ever learn why he sent an e-mail to Elizabeth

16   Paiz?

17   A.   He was concerned and he thought Deputy Chief Paiz was

18   going to help me.

19   Q.   You were asked about just in -- in December you move over

20   to Burglary and there was a meeting requested that you

21   testified was canceled.  Do you remember why that meeting was

22   canceled?

23   A.   They were not happy with my attorney being present at the

24   meeting.

25   Q.   At what point in time did you decide that you couldn't

Redirect Examination – Terysa M. Welch

1   make it back to ROP?

2   A.   At the point that I was forced to decide in ten days, and

3   no changes had been made at ROP, and I was given a deadline of

4   ten days to make a choice.

5   Q.   That was in the spring 2011 exchange we saw with Deputy

6   Chief Feist?

7   A.   Correct.

8           MR. VILLA:  May I have just a moment?

9           THE COURT:  You may.

10          MR. VILLA:  That's all the questions I have, Your

11  Honor.

12          THE COURT:  Okay.  Ms. Welch, you may step down.

13          Mr. Villa, you may call your next witness.

14          MR. VILLA:  It will be Ms. Anderson, Your Honor.

15          THE COURT:  Ms. Anderson, you may call your next

16  witness.

17          MS. ANDERSON:  Thank you, Your Honor.  We call

18  Mr. William Foote.

19          THE COURT:  All right.  Mr. Foote if you may enter

20  the witness stand.  Please raise your right hand to be sworn.

21      (Witness sworn.)

22          MS. HALL:  Okay.  Please state your name, and spell

23  your first and last name.

24          THE WITNESS:  My name is William Gene Foote.

25  F-O-O-T-E.

1              PLAINTIFF'S WITNESS WILLIAM GENE FOOTE,

2         after having been first duly sworn under oath,

3         was questioned and testified as follows:

4                        DIRECT EXAMINATION

5    BY MS. ANDERSON:

6    Q.    And it's Dr. Foote, isn't it?

7    A.    Yes, it is.

8    Q.    Okay.  Sorry about that.  And how are you currently

9    employed, Dr. Foote?

10   A.    I'm a forensic psychologist in private practice.

11   Q.    And what is a forensic psychologist?

12   A.    A forensic psychologist is a psychologist -- I was

13   originally trained as a clinical psychologist.  It's a clinical

14   psychologist, in my particular case, who takes his training in

15   doing evaluation of -- of analyzing mental illness and how that

16   interacts with stress and many other things and brings it into

17   legal contexts.

18   Q.    And how long have you been in private practice as a

19   forensic psychologist?

20   A.    Since June 1979.

21   Q.    Well, let's back up and talk a little bit about what

22   allows you to be a forensic psychologist.  Where did you go to

23   college?

24   A.    I got all of my degrees at the University of New Mexico.

25   Q.    And what was your undergraduate degree?

Direct Examination - William Gene Foote

1   A.   In psychology.  I got that in 1969.

2   Q.   And what was your next degree in?

3   A.   My Master's of Arts degree was in 1974 in psychology.

4   Q.   Okay.  And I'm assuming you continued.  What was your next

5   degree?

6   A.   My Ph.D. was in clinical psychology in 1978.

7   Q.   And what did you do after getting your Ph.D.?

8   A.   I worked for a year -- Well, actually, I was working at

9   the time I got my Ph.D. for the Division of Vocational

10  Rehabilitation.  Then I started my private practice after I got

11  licensed in June of '79, and -- and then about five years, six

12  years after that I got Board certified in forensic psychology.

13  Q.   And are you still Board certified in forensic psychology?

14  A.   Oh, yes, ma'am.

15  Q.   And about when did you -- or how long were you a clinical

16  psychologist?

17  A.   I'm still a clinical psychologist.

18  Q.   All right.  And where are you licensed?

19  A.   I'm licensed in New Mexico.

20  Q.   Are you licensed outside the state?

21  A.   I have been in the past.  I've been licensed in two

22  provinces in Canada.

23  Q.   And have you also authored certain publications?

24  A.   Yes.

25  Q.   I'm sorry?

1   A.   Yes, I have.  I seem to have killed it.  I don't know.

2        MR. VILLA:  I think we might have lost the

3   microphone.

4        THE COURT:  All right.  Just one moment.

5        All right.  Let's try that.

6        THE WITNESS:  I think we're in business.  Thank you.

7        THE COURT:  Okay.

8   A.   I'm sorry, can you please repeat the question?

9   Q.   (By Ms. Anderson)  Sure.  I just want to talk about some

10  of your publications that you've authored.

11  A.   Okay.

12  Q.   About how many total publications over the course of your

13  career?

14  A.   Well, I've coauthored two books, about 20 book chapters,

15  and about 25 articles in journals other publications.

16  Q.   And what's been the focus or do you have a specialty as

17  far as those publications?

18  A.   Well, I published across a number of different areas, a

19  lot of ethics, but most of it has been about applications of

20  clinical psychology in either personal injury or -- or in

21  employment cases.

22  Q.   Have you published on the topic of sexual harassment?

23  A.   Yes, ma'am.

24  Q.   And about how many of your total publications deal with

25  the issue of sexual harassment?

1   A.   I published about 25 articles, 20 book chapters, two

2   books.  Both of the books have to do with sexual harassment.

3   The first book was a 2005 volume published by the American

4   Psychological Association.  The 2001 volume was published by

5   Oxford.  It was a more general book on employment

6   discrimination.

7   Q.   And did those books -- or did one of those books ever

8   receive an award?

9   A.   Yes.

10  Q.   And which one was that?

11  A.   The 2005 book won an award from the American Psychology

12  Law Society for scholarly merit in 2006.

13  Q.   And of these total publications, were some of these to

14  peer-reviewed journals?

15  A.   Yes.  I think about half of my journal articles were

16  from -- were from peer-reviewed journals.

17  Q.   And what is a peer-reviewed journal?

18  A.   That means that when you submit an article to a journal,

19  that there are independent reviewers who don't know who the

20  authors are who review that article to determine whether it's

21  publishable or not or to make suggestions about what should be

22  done with it.  I've been a reviewer for -- I've been a reviewer

23  for I think four different journals now.

24  Q.   And you mentioned book chapters.

25  A.   Yes.

1    Q.   Were those chapters in a textbook?

2    A.   Some of them were textbooks.  Most of them have been used

3    as text at various times.

4    Q.   Would these be texts for higher education?

5    A.   Yes, they're texts for people who have been trained as

6    forensic psychologists mostly.  Some of them -- Some of the

7    chapters have been for undergraduate texts, talking about what

8    do psychologists do in society, and describing particular kinds

9    of evaluations.  For example, I did one book chapter on doing

10   evaluations for Social Security cases, for example.

11   Q.   Now, through the course of your career, have you received

12   special awards or acknowledgment?

13   A.   Yes.

14   Q.   In what type of acknowledgments?

15   A.   I've gotten several.  But one of them was a lifetime

16   achievement award from the New Mexico Psychological

17   Association.  Again, our book got an award.  We received

18   several other awards from the American Psychological

19   Association.

20   Q.   And do you -- In the course of your practice currently,

21   are you a consultant?

22   A.   Yes.

23   Q.   Who do you consult with?

24   A.   I'm a consultant to the City of Albuquerque and to the

25   New Mexico Police Academy.  I have also been a consultant to

1    the CIA and the NSA, to the State Police Department, to

2    Bernalillo County Sheriff's Department, and various other

3    organizations.  I've been a consultant to a national group that

4    did threat assessment in the workplace.

5    Q.   In what type of consulting work do you do or what topics

6    do you consult on?

7    A.   Well, for the City of Albuquerque, I do fitness-for-duty

8    evaluations for police officers.  I've done fitness-for-duties

9    for Sandia Corporation for their scientists, for people who

10   worked in the Fire Department there.  And I've done

11   fitness-for-duties for people in Los Alamos, as well.

12   Q.   And the City of Albuquerque and these other industries,

13   they pay you for your work?

14   A.   I'm sorry?

15   Q.   They pay you for your work?

16   A.   Yes.

17   Q.   Okay.  And about how much do you charge for your work?

18   A.   I charge $250 an hour for time spent doing most things,

19   but $400 an hour for being in court.

20   Q.   And you were hired in this case, correct?

21   A.   Absolutely.

22   Q.   All right.  And about how much, do you know, are you

23   charging for this case?

24   A.   I'm charging my usual fees.  I think I've billed I think

25   for the initial evaluation and report, which required a lot,

1  many, many hours, I billed around $8,000, and then I'll

2  probably be billing around $6,000 for the preparation for this

3  testimony today and for the testimony, for the time spent at

4  testimony.

5  Q.   And you've also done expert witness work in criminal

6  cases; is that correct?

7  A.   Oh, yes.

8  Q.   Okay.  And on the defense side?

9  A.   Yes, ma'am.  I've done an occasional testimony for the

10  prosecution, as well.

11  Q.   Okay.  And then also in civil cases, have you testified as

12  an expert for the defense and for plaintiffs like Ms. Welch?

13  A.   Yes.  I split my time about evenly between defense,

14  working for defense counsel and working for plaintiff's

15  counsel.

16       MS. ANDERSON:  Your Honor, at this time I would like

17  to tender Dr. Foote as an expert in the field of forensic

18  psychology.

19       THE COURT:  Ms. Williams?  Ms. Wiggins?

20       MS. WILLIAMS:  No objection, Your Honor.

21       THE COURT:  You may proceed.

22  Q.   (By Ms. Anderson)  Dr. Foote, did there become a point in

23  your involvement in this case that you reached a diagnosis

24  with regards to Lieutenant Welch?

25  A.   Yes.

1   Q.   And what did you diagnose Lieutenant Welch with?

2          MS. WILLIAMS:  Objection, Your Honor.  May we

3   approach?

4          THE COURT:  You may come forward.

5      (Bench conference on the record.)

6          MS. WILLIAMS:  In his report, we didn't depose him

7   because he said she has no evidence of a diagnosable condition

8   that would interfere with her functioning as a police officer.

9   So for them to have a diagnosis on the stand is troubling to

10  us.

11         THE COURT:  What is the expected answer to the

12  question?

13         MS. ANDERSON:  I think it's an anxiety disorder,

14  generalized anxiety.  This is subject for cross-examination.

15         THE COURT:  Well, what is in the report as far as

16  what he diagnosed, if anything?

17         MS. ANDERSON:  I think he talks about anxiety and her

18  generalized anxiety disorder.

19         THE COURT:  Did he diagnose that himself.

20         MS. ANDERSON:  I think he relied on interviews with

21  members of her family and also the depositions that were taken

22  in the case.  He had a four-and-a-half or four-and-three-

23  quarters hour interview with Ms. Welch as well as doing a

24  series of tests.

25         THE COURT:  All right.  The question was, what did he

1    diagnose.  So what did he, himself, diagnose and how is that

2    diagnosis made and how is it documented in his report?

3            MS. ANDERSON:  I think -- Can I have a minute?

4            THE COURT:  You may.

5        (A conference was held between Ms. Anderson and

6        Mr. Villa.)

7            MS. ANDERSON:  So, Your Honor, I'll move on and I'll

8    just get into the testing that was conducted and her results on

9    those tests.

10           THE COURT:  Her results on the tests?

11           MS. ANDERSON:  Yes.

12           THE COURT:  And what will be the results on the

13   tests?

14           MS. ANDERSON:  I think his testimony is going to be

15   that she did experience anxiety and it was an anxiety disorder.

16           THE COURT:  That was his finding?

17           MS. ANDERSON:  Yes.

18           THE COURT:  Is that finding in his report?

19           MS. ANDERSON:  I believe that it is.

20           THE COURT:  Okay.

21           MS. WILLIAMS:  Can you show me, Richelle, because I

22   don't think that there's a diagnosis.  She has heightened

23   scales, but that's not a diagnosis.

24       (Open court.)

25           THE COURT:  All right.  Ladies and gentlemen, we're

 1  going to take a recess.  So I'll just ask you to remain

 2  patient.  We'll try to keep it very, very brief, and then we'll

 3  call you back into the courtroom.

 4           Please rise for the jury.

 5      (Jury out at 3:22 p.m.)

 6           THE COURT:  Okay.  Ms. Williams --

 7           MS. WILLIAMS:  Yes, sir.

 8           THE COURT:  -- as to what you heard so far as to what

 9  the anticipated testimony would be and any opinion from the

10  witness.

11           MS. WILLIAMS:  Your Honor, we believe that he can

12  testify to that which was provided in his report, and he did

13  some testing and there were some test results.  We have no

14  problem with him testifying about that, but he did not make a

15  diagnosis.  In fact, he specifically says there is not a

16  diagnosable condition.  And so we object to him testifying

17  about things that are not in the report.

18           THE COURT:  All right.  Ms. Anderson, that's what I

19  understood the objection to be.  Ms. Anderson, can you address

20  that?

21           MS. ANDERSON:  Yes, Your Honor.  In Dr. Foote's

22  report, he does not lay out a specific diagnosis, but he does

23  thoroughly discuss what tests were administered to Ms. Welch

24  and also his reliance on the deposition testimony that he

25  reviewed, interviews that he did one-on-one with members of her

1    family and her friends, and specifically with regards to her

2    test results, these are detailed extensively on pages 11, 12,

3    and I believe 13, or at least 11 and 12, with regards to the

4    fact she had depression and she had anxiety and she was

5    manifesting physical symptoms because of this.

6              THE COURT:  These are the results of the tests that

7    he ran and these are conclusions that he made --

8              MS. ANDERSON:  Yes, Your Honor.

9              THE COURT:  -- based on those tests?

10             And this is all documented in the report?

11             MS. ANDERSON:  Yes.

12             THE COURT:  Once again, what page is this?

13             MS. ANDERSON:  This is going to be 11 through 12.  So

14   it's the bottom of 11 where it says "Psychological Testing," is

15   the heading.

16             THE COURT:  All right.  I'm going to recess five

17   minutes to allow counsel to work this out between themselves.

18   To the extent there's still disagreement, you can raise it when

19   we reconvene.

20             Dr. Foote, you may remain right there.  We may just

21   be right back with you.

22             THE WITNESS:  Thank you.

23        (Court stood in recess at 3:35 p.m. and resumed at

24        3:40 p.m. as follows:)

25             THE COURT:  Okay.  You may be seated.

1          Ms. Anderson, Ms. Williams, where are we on this?

2          MS. ANDERSON:  Judge, I think we've clarified,

3  Ms. Williams and Dr. Foote have the same report.  Mine's a

4  little bit older.  But he's going to be testifying from the

5  report that Ms. Williams has.

6          MS. WILLIAMS:  And the report has not been identified

7  as an exhibit, so we don't think that that's going to become a

8  problem, because it will be testimony evidence that he produces

9  for us.

10          THE COURT:  Okay.  Just so we're all on the same

11  page, what is the date of the report from which the doctor is

12  going to be testifying?

13          MS. WILLIAMS:  November 12th, 2013.

14          THE COURT:  Okay.  And your older version,

15  Ms. Anderson?

16          MS. ANDERSON:  It's going to September 27th, 2013.

17          THE COURT:  Okay.  And the scope of your examination

18  will be restricted to the later report, right?

19          MS. ANDERSON:  Yeah.  Well, Ms. Williams will

20  technically have the latest report.  I anticipate the

21  testimony's going to be pretty much the same, and we're going

22  to work off of his testimony just concerning the evaluations

23  that were done way in advance of both of these dates.

24          THE COURT:  Okay.  Both reports were disclosed to

25  Ms. Williams, however?

Direct Examination - William Gene Foote

```
 1            MS. WILLIAMS:  No, Your Honor.  I don't think we've

 2  seen that report before.

 3            MS. ANDERSON:  I'm happy to provide a copy.

 4            THE COURT:  Well, you may do that.  But it's only the

 5  later report that's been disclosed, Ms. Williams, correct?

 6            MS. ANDERSON:  Yes, Your Honor.  I understand.

 7            THE COURT:  And the examination will be within the

 8  scope of the later report?

 9            MS. ANDERSON:  Yes, Your Honor.

10            THE COURT:  And not to the early report?

11            MS. ANDERSON:  No.  As far as I know, Judge, no.

12            THE COURT:  Okay.  That's the limitation.

13            MS. ANDERSON:  Sure.

14            THE COURT:  So as long as you limit your examination

15  to what has been disclosed to opposing counsel, Dr. Foote's

16  tests, his conclusions as a result of those tests, you may

17  proceed.

18            MS. ANDERSON:  Okay.

19            THE COURT:  Okay.

20            MS. ANDERSON:  I understand.  Thank you.

21            THE COURT:  Okay.  With that understanding,

22  Ms. Williams, any objection or any concerns?

23            MS. WILLIAMS:  Well, Your Honor, we'll see how the

24  evidence unfolds.  The problem I was having at the beginning

25  was the psychological testing is on different pages.  And I
```

1  have no objection to Dr. Foote testifying about scores on the

2  psychological tests, but not diagnoses that are not disclosed

3  in the report.

4          THE COURT:  Well, that's where I say your examination

5  is to the scope of the report that's been disclosed.

6          MS. ANDERSON:  Well, Judge, what I anticipate we'll

7  use is, instead of the term "diagnosis," we'll just ask

8  Dr. Foote regarding his conclusions, his opinion about

9  Ms. Welch based on all of this information available.

10         THE COURT:  That's in the subsequent, the later

11 report?

12         MS. ANDERSON:  Yes, Your Honor.

13         THE COURT:  Okay.  With that understanding, then

14 we'll go forward.

15         MS. WILLIAMS:  Your Honor, there are conclusions

16 specifically about the ultimate fact, discrimination and sexual

17 harassment, which I do not believe he's qualified to make.

18 When I say that, I have no objection to him being a forensic

19 psychologist expert.

20         THE COURT:  Okay.  There's an opinion -- Okay.

21 Please say that again.

22         MS. WILLIAMS:  There are opinions where he ties

23 reports to -- I don't mind him testifying about the

24 psychological opinion, but not to the ultimate fact that this

25 jury is impaneled to decide.

1          THE COURT:  A determination as to whether Ms. Welch

2    was discriminated --

3          MS. WILLIAMS:  Yes, sir.

4          THE COURT:  -- or sexually harassed?

5          MS. WILLIAMS:  Yes, sir.

6          THE COURT:  Ms. Anderson, do you expect to examine

7    Dr. Foote as to those kinds of opinions?

8          MS. ANDERSON:  No, Judge, not to causation as far as

9    did harassment, in your opinion -- and I won't be able to say

10   "in your opinion," did harassment cause this symptom or this

11   anxiety disorder, no.

12         THE COURT:  Okay.  All right.  I think that's fair.

13   What I don't want to -- Well, just to be clear, are you going

14   to ask the doctor if Ms. Welch was discriminated against or

15   sexually harassed?

16         MS. ANDERSON:  No, Judge.  I believe the testimony

17   that I intend to elicit is going to be:  Did you evaluate

18   Ms. Welch?  What was disclosed to you?  What did you do with

19   that information?  How did that factor into your conclusion?

20         THE COURT:  And the conclusion being?

21         MS. ANDERSON:  That she had an anxiety disorder.

22         THE COURT:  Okay.  All right.  Anything more than

23   that, we'll just have to monitor.  Okay.

24      (Jury in at 3:45 p.m.)

25         THE COURT:  All right.  Please be seated.

1            Ms. Anderson.

2            MS. ANDERSON:  Thank you, Your Honor.

3    Q.  (By Ms. Anderson)  Dr. Foote, did you evaluate Lieutenant

4    Welch?

5    A.  I conducted a psychological evaluation with her, yes.

6    Q.  Okay.  And what did you learn during your psychological

7    evaluation of Ms. Welch?

8    A.  That she reported a number of experiences that she had had

9    on the job with APD, and it was her perception that those

10   experiences caused a great deal of stress for her.

11   Q.  Did you review anybody else to corroborate her evaluation

12   or her statement during her evaluation?

13   A.  Yeah, I did a lot of stuff.  I reviewed her -- I talked

14   with her for about five hours.  And my evaluation with her was

15   back in 2013, in January and February of 2013.  And I spoke

16   with her for about, oh, five hours; and I also spoke with her

17   boyfriend, Jason Bowie, with her dad, with her dad Tom Welch,

18   and her brother Jacob; and I also spoke with -- with Officer

19   Campbell, who was a friend of hers, Michelle Campbell, I guess;

20   and I reviewed a number of records, I reviewed her personnel

21   file, a whole bunch of statements, and things like that that

22   were taken over the course of her career with APD.

23   Q.  Did you review depositions involved in this case?

24   A.  I didn't review those in preparation for the report that I

25   tendered in November of 2013, but I did -- I have reviewed

Direct Examination - William Gene Foote

1    those -- I have reviewed two depositions since then.  Hers and

2    Nurse Conry's deposition.

3    Q.    Okay.  And did you also review records from Terysa's

4    psychological counseling?

5    A.    Yes, and that was Nurse Conry.

6    Q.    And did you administer any type of psychological tests to

7    Ms. Welch?

8    A.    Yes.  I administered a standard battery of tests.  These

9    are tests that I've used for almost everybody that comes into

10   my office.  I use them in fitness-for-duty evaluations I do

11   with APD officers and for other people.  It includes -- They

12   include two kinds of tests.  One group of tests are tests to

13   look at how a person is thinking.  And these are called

14   cognitive tests.  And they include two measures.  One is a

15   Wechsler Adult Intelligence Scale.  The other is a Wechsler

16   Memory Scale.  Both of those look at thinking processes.  And

17   we're concerned about whether perhaps anxiety or depression are

18   getting in the way of their thinking process.

19          Then we have what are called personality tests.

20   These are actually tests that are administered by computer.  We

21   use two of those.  One of those is the Minnesota Multiphasic

22   Personality Inventory, the second edition of that.  It's a

23   567-item true/false test.  It's been around since the 1940's in

24   various versions, and it's used for the person to be able to

25   tell us through these tests what their symptoms or problems

1    are, and these tests allow us to compare a person's -- some

2    kinds of problems to the other kinds of problems within that

3    individual, but also to give us populations of people.  So

4    we're able to compare her to other people in the general

5    population.

6              Personality Assessment Inventory is the other

7    personality test, and that has a bunch of the same functions.

8    It's structured a little differently, but it will allow us also

9    to determine whether the person is talking about symptoms or

10   problems that may reflect certain kinds of mental disorders or

11   diseases.

12   Q.   Now, Dr. Foote, how do you know that the responses that

13   people give during these four tests that you mentioned are

14   accurate?

15   A.   Well, first of all, I don't -- you know, the business I'm

16   in is a forensic psychologist.  Everybody has something at

17   stake who walks in the door of my office.  So if it's a

18   criminal case, the person may either want to look a lot worse

19   than they really are or a lot better.  A fitness-for-duty case,

20   the person usually wants to look a lot better than they really

21   are.  And that's something that forensic psychologists

22   recognize as a common problem for everybody that has a forensic

23   evaluation.

24             So the tests we use have built in to them measures of

25   exaggeration; that is, people making their problems seem worse

1    than they really are.  It measures minimization; that is,

2    people making themselves look better off than they are.  It's

3    also called fake-bad and fake-good.

4           And, so we have these built into the tests.  So, for

5    example, in the cognitive battery, we have some very easy tests

6    that look very hard, so if somebody is trying to do poorly on

7    the tests, we can tell if they fail those very easy tests that

8    they probably aren't giving us their full effort.

9           On the MMPI and PAI, the Personality Assessment

10   Inventory and the Minnesota Multiphasic Personality Inventory,

11   we have built into those both measures of exaggeration and

12   minimization.  Again, people have their agendas when they come

13   into the office.

14          In Ms. Welch's case, both -- all the testing was

15   perfectly clean.  We saw no evidence of exaggeration or

16   minimization.  And in other words, we didn't see an attempt on

17   her part to make her problems seem better than they were or

18   worse than they were.

19   Q.   Now, is it fair to say that these features in these tests

20   give you an objective standard to look at?

21   A.   Well, it's a more objective standard.  I mean, it all

22   comes from what the person is telling us about themselves, but

23   it is objective in terms of us being able to compare that

24   person to the populations and to have norms that we work from

25   so that we're able to have standards that we're able to

1   evaluate their problems on the basis of those standards.

2   Q.   Now, can you kind of maybe elaborate on Ms. Welch -- or

3   Lieutenant Welch's -- excuse me -- her performance on these

4   tests as a total?

5   A.   Well, the tests indicate -- on the cognitive tests we

6   didn't really see any evidence of her having serious problems

7   from -- in terms of her thinking processes.  Sometimes we see

8   people who are really, really anxious and they're just not able

9   to think clearly or remember things over the short-term, they

10  forget things right away.  And her memory and her problem

11  solving seemed to be quite fine in terms of those measures.

12       And the two measures of the Personality Assessment

13  Inventory and the MMPI, both of those -- the MMPI had scales

14  that were elevated above the -- Well, we have norms for these

15  tests, which -- and basically we have lines and we state, if

16  the scores are above these lines, then that person is not in

17  the normal range anymore.  There's a normal range.  If a person

18  has a score above that, then the person's out of the normal

19  range.  And she had two scales that she had elevations above

20  the norm on the Minnesota Multiphasic Personality Inventory.

21  Q.   And, Dr. Foote, what were those two indicators that were

22  outside of the range with regards to Lieutenant Welch?

23  A.   One of them picked up, it's called the hypochondriasis

24  scale, but what it actually picks up is a person having

25  physical problems; that is, sometimes when people have

1   emotional problems, they will say, "Oh, golly, I'm really

2   anxious, I'm really upset," and everybody could tell they're

3   really anxious and upset.  Other people tend to reflect their

4   emotional disorders, especially anxiety, through physical

5   problems.  So --

6   Q.   Dr. Foote, let me just stop you really quickly so we kind

7   of can break it down a little bit so that we can understand.

8   What type of physical problems do you see in somebody who's

9   suffering from anxiety?

10  A.    We see -- It depends on the individual, but in Ms. Welch's

11  case, for example, she has a problem with migraine headaches.

12  She has a problem with -- she has bowel problems, which are

13  very typically anxiety symptoms.  She has -- She has sleep

14  problems, which can be either problems that reflect anxiety or

15  depression.  She's a sleepwalker, which again can be an

16  anxiety-based symptom.

17          So, in her case, and the tests picked this up for us,

18  she has a lot of those physical symptoms which in her case are

19  indicative of anxiety.

20          Then she had a second elevation that was on the

21  depression scale, and that just picks up depression, it picks

22  up a person feeling sad and not feeling good.  And again,

23  people often will express depression symptoms through physical

24  means, too.  So both of these elevations were not high, they

25  weren't up in the range where, you know, I would tell

1   Ms. Welch, "You have to go to the hospital now because I'm
2   worried about you," but they were in the range that would --
3   that would be in what would be the clinical range and would
4   have us say, this person's got a problem here, and it probably
5   needs to be addressed through treatment or through some other
6   remedy.
7   Q.   And what year did you run these tests on Lieutenant Welch?
8   A.   In early 2013.
9   Q.   And when you talk about depression kind of manifesting
10   itself in physical symptoms, what types of physical symptoms of
11   depression, if any, did you see in Lieutenant Welch?
12   A.   As I described earlier, she has problem with migraines,
13   she has bowel problems, she has sleep issues.  She had --
14           MS. WILLIAMS:  Asked and answered.  Objection.
15           MS. ANDERSON:  Your Honor, this is specific with
16   regards to depression.  Not anxiety.
17           THE COURT:  All right.  You may continue.  Overruled.
18   A.   I'm sorry, one symptom I did not mention was that she
19   had -- it was historical for her, because I think her way to
20   come back up, but during the time when she was experiencing the
21   most stress, which was back in 2010 and 2009, she was -- she
22   lost a lot of weight.  She lost about 20 pounds.  And that's a
23   symptom that's among the nine symptoms of major degressive
24   disorder.
25   Q.   (By Ms. Anderson)  Now, how did you tie the symptoms that

1    she had for anxiety and depression in 2013 back to any

2    specific incidents or a time frame?

3    A.   Well, several ways.  One by her own report.  And I didn't

4    see any evidence that she was -- like I said, that she was

5    exaggerating or trying to make things seem worse.

6          Second, in my discussions with her boyfriend, who was

7    her boyfriend at the time and her -- now her husband, and her

8    brother and her father, both of them talked about her showing

9    evidence of these very same symptoms.  And when I talked to

10   them by telephone, I didn't say, "Oh, did you notice a sleep

11   problem?"  I asked, "Did you notice any changes?"  And they

12   were able -- "Did you see her reacting to what was going on on

13   the job with any kind of problems or symptoms?"  And they

14   spontaneously came up with theses symptoms and problems as

15   changes that they observed.  And these are independent.  Her

16   father up in Montana and her brother here and her boyfriend

17   here all talked about almost exactly the same symptoms that

18   she'd talked about with me.

19   Q.   Did you have any indication that this depression and

20   anxiety had existed before this time with regards to the

21   incident with Ms. Welch's -- excuse me -- Lieutenant Welch's

22   fiancé?

23   A.   I'm sorry, are you talking -- you said her fiancé, you

24   need to clarify that.

25   Q.   I'll ask another question.

Direct Examination - William Gene Foote

1    A.    Yes.

2    Q.    Did Ms. Welch report to you or during your evaluation tell

3    you about an incident with her former fiancé David Maes?

4    A.    Yes.

5    Q.    Did she report this was a stressful incident?

6    A.    Yes.

7    Q.    How do you know, based on your experience as a forensic

8    psychologist, that her symptoms in 2013 were tied to 2009 and

9    not her prior incident with her fiancé -- former fiancé?

10   A.    Part of it -- I mean, certainly that was -- that was a

11   stressful incident, as she described it as such, but it was

12   pretty much over with and done.  And the symptoms that she had

13   and was describing are stress symptoms that the research tells

14   us that we often see in individuals who are under stress from

15   things going on in their lives, things going on in the

16   workplace.  And so, for example, these are very typical kinds

17   of symptoms we see in people who are under -- who are in a

18   hostile work environment or suffering from -- from things

19   happening in the work that are stressful.  For example, sexual

20   harassment and things of that sort.

21           And, you know, if you look at research, the physical

22   symptoms are among the most common symptoms that people

23   experience.

24   Q.    And based on the research, what are common symptoms that

25   people tend to see in these environments?

1   A.   Well, just these kinds of things.  And people often, you

2   know, don't want to go to work; they find that just going into

3   the office or going into the job, for example, is stressful.

4   They become kind of suspicious and paranoid about what's going

5   on around them because people that they need to trust don't

6   seem to be trustworthy.  They react to things in the workplace

7   perhaps with an exaggerated reaction because their stress level

8   is up.

9   Q.   Now, in speaking to terms of, perhaps, productivity, what

10  are some signs that you would expect to see?

11  A.   Well, I mean, I don't think we saw these in Ms. -- In

12  Lieutenant Welch's case, but you -- What we do see generally in

13  the workplace is that people call in sick more often; that when

14  they're on the job, they're kind of not on the job, they're

15  kind of checked out, and that they, you know, don't like to

16  commit to the job that they would normally do.  I didn't see

17  that in Ms. Welch's case.  I think she really overtly attempted

18  to maintain her performance on the job because she took great

19  pride in her work.

20  Q.   Now, did you perform a second evaluation or interview of

21  Ms. Welch after 2013?

22  A.   Yes.

23  Q.   And when was that?

24  A.   That was about a month ago.

25  Q.   And was that a full evaluation?

Cross-Examination – William Gene Foote

1    A.    No.  It was very brief.

2    Q.    Okay.  And did anything that you learned in 2018 change

3    anything from 2013?

4    A.    No.

5              MS. ANDERSON:  Your Honor, may I have a moment?

6              THE COURT:  You may.

7              MS. ANDERSON:   Your Honor, I pass the witness.

8              THE COURT:  All right.  Ms. Williams.

9              MS. WILLIAMS:  Thank you, Your Honor.

10                       CROSS-EXAMINATION

11   BY MS. WILLIAMS:

12   Q.    Good afternoon, Dr. Foote.

13   A.    Good afternoon, Ms. Williams.  How are you?

14   Q.    Why, fine.

15              You know I represent the City of Albuquerque?

16   A.    Yes, ma'am.

17   Q.    Okay.  And you know the City of Albuquerque is a defendant

18   in this case?

19   A.    Yes, ma'am.

20   Q.    Along with Chief Schultz?

21   A.    Yes.

22   Q.    And you testified that you are a consultant for the City

23   of Albuquerque on occasion.

24   A.    Yes, ma'am.

25   Q.    As a forensic or clinical psychologist, do you see any

1   conflict of interest there?

2   A.   Not really, no.

3   Q.   You don't?

4   A.   No.  I don't have a contract with the City.  I'm hired

5   ad hoc.

6   Q.   All right.  And at present what percentage of your

7   practice is dedicated to participating in litigation?

8   A.   That's a good question.  I guess -- Well, it depends on

9   how broadly you define litigation.  I mean, in terms of civil

10  litigation?  Is that the question?

11  Q.   No.  I'm going to divide out civil and criminal because I

12  do want to focus on the criminal finally, but --

13  A.   Oh, I guess probably maybe 80 percent.  I don't know.  I

14  haven't really looked back through the cases I've done.

15  Q.   Of civil litigation?

16  A.   No.  I mean of both criminal and civil cases.

17  Q.   Thank you.  I appreciate that clarification.

18          And what percentage of your litigation work focuses

19  on criminal litigation?

20  A.   About half.

21  Q.   So half of your 80 percent is civil litigation?

22  A.   Yes, ma'am.

23  Q.   And in all of your civil litigation cases since 2006, you

24  were retained to testify by the plaintiff, by the person who's

25  suing someone as opposed to a defendant, correct?

Cross-Examination – William Gene Foote

1   A.   No, that's not true.

2   Q.   Did you give us an expert witness experience list?

3   A.   Yes.

4   Q.   And I noted on that the only case in which you were

5   retained by the plaintiff -- the defendants was Coldwell versus

6   Johnson.  Would you like to see your list?

7   A.   Oh, I know the list, but that -- that -- that's a listing

8   of times I've testified.  But the actual cases I've been hired

9   for and have submitted reports for is about equally balanced

10  between defense counsel and plaintiffs' counsel.

11  Q.   So, I'm sorry if I misunderstood the list, but in the

12  times that you have been hired and testified in the case,

13  you've only testified in one case for a civil defendant since

14  2006 in Coldwell versus Johnson.

15  A.   I guess that's probably true.

16  Q.   Okay.  And you administered tests to Dr. Welch, correct?

17  A.   To Lieutenant Welch.

18  Q.   Sorry.

19  A.   I'm the doctor.

20  Q.   You are the doctor.  You are a doctor who always says

21  that.

22        You administered tests to Lieutenant Welch in 2013.

23  A.   Yes, sir.

24  Q.   And your list shows that those were about $2,000 worth of

25  testing?

Cross-Examination - William Gene Foote

1    A.    Yes, ma'am.

2    Q.    And you billed in this case about $15,000 to date, 14, 15

3    thousand?

4    A.    It's about that ballpark.  I haven't billed for the work

5    I've done this year so far, but that's a good estimate for what

6    the total bill will be.

7    Q.    I want to talk with you about that, Dr. Foote.  What work

8    have you done after you did your report on November 12th, 2013?

9    A.    I reviewed -- As the date of trial was coming you up, I

10   started reviewing material in the case, and then I met with

11   Ms. Welch for I think about an hour, hour and a half about a

12   month ago, I gave her the MMPI again.  And that was pretty much

13   it.

14   Q.    And you said you reviewed depositions that were taken in

15   this case?

16   A.    Yes, just two.

17   Q.    Did you update the document review list and the work that

18   you did in this case for your attorneys?

19   A.    No, I didn't go back all the way back through that stuff

20   again, no.

21   Q.    But did you provide an update to your attorneys that hired

22   you on what additional research you had done since the report

23   was done?

24   A.    No.

25   Q.    Okay.  Are you aware that they did not share that with us,

Cross-Examination – William Gene Foote

1    the additional work you did?

2    A.    I don't know exactly what they did and did not do.

3    Q.    And your hourly rate to be here today is about $400?

4    A.    To be testifying in court, yes.  I consider it combat pay.

5    Q.    I understand.  They do, too.

6          You spent less than five hours with Dr. Welch [sic]

7    five years ago before you prepared your opinion.

8    A.    Five hours face-to-face in interview with her, but she was

9    in my office for two days.

10   Q.    Correct.  And you spent -- you didn't sit with her while

11   she took the testing.  She was in your office.

12   A.    No.  She was working with my testing assistant.

13   Q.    You didn't investigate whether, in fact, Lieutenant

14   Welch's perceptions were correct, about whether -- about her

15   complaints about the City of Albuquerque, correct?

16   A.    That's what these folks are here to do.

17   Q.    That is absolutely correct.

18   A.    That is not my job.

19   Q.    Okay.  And you didn't ever treat Dr. Welch.

20   A.    Oh, no, you don't.  You don't treat somebody you -- You

21   don't -- Ms. Welch -- Lieutenant Welch.

22   Q.    Lieutenant Welch.

23   A.    We'll get it.

24          All right.  You don't -- I don't treat the people I

25   evaluate forensically.

1  Q.   In order to do your report, you take as a given that

2  something happened to Lieutenant Welch that caused her to

3  believe that she was the subject of the problems that she

4  complains about in this lawsuit.

5  A.   I don't think so.  I think I talked about it throughout

6  the report as alleged harassment or alleged discrimination.

7  Q.   Okay.

8  A.   I think all I do is say what her perceptions were and what

9  I observed.  Again, in some of these cases, some of these

10  instances that she complained about, it was only her and one

11  other person who were involved, and so I don't -- I don't

12  necessarily make an assumption on whether what she observed and

13  what she said happened, happened.

14  Q.   And you ultimately determined that Lieutenant Welch had no

15  diagnosable psychological condition?

16  A.   I think what I said specifically in my report was that she

17  didn't have a diagnosable condition that would interfere with

18  her functioning as a police officer.  And there's a difference

19  between those two -- those two statements.

20  Q.   And that's something I want to talk with you about.  You

21  didn't do a fitness-for-duty evaluation for Lieutenant Welch

22  for purposes of serving as an APD officer?

23  A.   No.  No.

24  Q.   That was not what you were hired to do in this case?

25  A.   No.  No.  And there was no -- no, there was no -- the

Cross-Examination - William Gene Foote

1    whole procedure for that, you know, when the person walks in

2    the door, I tell them, "You know you're here for a

3    fitness-for-duty and basically could lose your job if --"

4    Well, yeah.

5    Q.   And in this case Lieutenant Welch hired you to prepare to

6    testify in this case?

7    A.   Yes.  But I will tell you that if at the end of the

8    elevation I had serious concerns about her ability to function

9    safely as a police officer, I would have spoken very seriously

10   to her about withdrawing herself.

11   Q.   And luckily, you did not see anything that indicated that

12   she was not fit for duty?

13   A.   No, I didn't see -- No, in fact I specifically said in the

14   report that there's no condition that would interfere with her

15   functioning as an officer.

16   Q.   And you're not a medical doctor?

17   A.   Oh, no.

18   Q.   And you didn't refer her to a medical doctor for

19   evaluation and treatment based on your evaluation?

20   A.   Well, she had seen a nurse practitioner, Nurse Conry

21   before, but I did not refer her -- I referred her for

22   counseling when I saw her, but I did not refer her specifically

23   for medical treatment.

24   Q.   But for her hypochondriasis you did not find a medical

25   problem that you needed to refer her to a medical doctor?

1   A.   Well, she was seeing a medical doctor for her medical

2   condition.  She had a doctor to treat and she was being

3   provided with medication that was working pretty well for her

4   migraine headaches and she was also being treated for the bowel

5   problem that she had.  She by the time I saw her in 2013, she

6   had gained back a bunch of the weight that she had lost during

7   the more stressful time in 2009 and 2010.

8   Q.   And you're not qualified to diagnosis medical conditions?

9   A.   No, ma'am.

10  Q.   Just psychological --

11  A.   I think the medical board would be on my case if I did.

12         THE COURT:  Let me just remind everyone just to speak

13  one at a time.

14         MS. WILLIAMS:  Thank you.

15         THE WITNESS:  Thank you, Your Honor.

16  Q.   (By Ms. Williams)  You took a personal history of

17  Lieutenant Welch?

18  A.   Yes, ma'am.

19  Q.   She described ROP to you as an elite unit, didn't she?

20  A.   Yes.

21  Q.   You mentioned it four or five times in your report, don't

22  you?

23  A.   Yes, ma'am.

24  Q.   Do you know why she perceived ROP as an elite assignment?

25  A.   I don't -- I don't know -- I don't know why she did, but

Cross-Examination - William Gene Foote

1    she certainly did.

2    Q.    Did that have any psychological significance to you?

3    A.    Yes, ma'am.

4    Q.    And what is that?

5    A.    And that was that she had always in the course -- the way

6    she described her life and the course of her work as a police

7    officer was that she had always worked to excel in everything

8    that she did and was working toward kind of higher-level

9    functioning within the Department and doing the very best work

10   and the highest-level work that she could do, and she saw this

11   particular unit as being one that required all the skills that

12   she took many years to develop.

13   Q.    And are you aware that the job description for every

14   detective in APD is the same based on your work as a

15   consultant?

16   A.    Yes, ma'am.

17   Q.    And it is the same?

18   A.    Yes, ma'am.

19   Q.    Regardless of what unit you're in?

20   A.    Right.

21   Q.    Interpersonal history.  She told you that she was a

22   teenage bride?

23   A.    Yes, at age 19.

24   Q.    And that her father insisted that she get married because

25   he disapproved of her cohabitating with a man out of wedlock?

Cross-Examination - William Gene Foote

1   A.   That's right.

2   Q.   She divorced at age 25 in 2000.

3   A.   Yes.

4   Q.   She was engaged three times after she was divorced?

5   A.   Yes.

6   Q.   She broke off her first engage in 2004 and it took her a

7   year or so to get back on her feet after that relationship

8   failed, correct?

9   A.   I don't remember that exactly.

10  Q.   Will your report refresh your recollection?

11  A.   That will be nice, yes.  I have a copy here.

12  Q.   Well, I think I'm supposed to carry it over there.

13  A.   You have to show me yours.  You can just tell me the page

14  maybe.

15  Q.   It's page 3.

16  A.   Save some time here.  Yeah.

17         THE COURT:  Let's stick to the report that

18  Ms. Williams has, Dr. Foote.

19         THE WITNESS:  I'm sorry, Your Honor.

20         THE COURT:  Let's stick to the report that

21  Ms. Williams has.

22         THE WITNESS:  Yes, Your Honor.

23  Q.   (By Ms. Williams)  Just let me know when your memory, sir,

24  is refreshed.

25  A.   Right.  Right.  That's correct.

Cross-Examination – William Gene Foote

1    Q.    So is your memory refreshed?

2    A.    Yes, ma'am.  Thank you.

3    Q.    And she took a year or so to get back on her feet after

4    her engagement was broken off?

5    A.    Yes.

6    Q.    Her second engagement ended in 2007 when her fiancé was

7    arrested for raping someone?

8    A.    That was the latest case, correct.

9    Q.    Were you involved in any way in the Maes case?

10   A.    I don't think so.  I've done -- I've done some prisoner-

11   mistreatment cases in the past on the plaintiffs' side, but I

12   don't think that was one of them.

13   Q.    And Lieutenant Welch described the experience of

14   discovering that the man she loved was a rapist caused her

15   turmoil and was understandably quite disruptive to her.

16   A.    Well, it was even more disruptive to her that her

17   lieutenant had known that this fellow had been -- had that

18   problem but allowed her to live with him for five days before

19   telling her what was going on.

20   Q.    That is not in your report, is it?

21   A.    No, I think it is in the report.  Is it not?

22   Q.    Please show me.  I can bring you your report.

23   A.    Just a second here.  I guess you're right.  I didn't talk

24   about that in the report.

25   Q.    Thank you.

Cross-Examination – William Gene Foote

1        MS. WILLIAMS:  We would ask that answer be stricken,

2   Your Honor, and the jury disregard.

3        THE COURT:  Well, what Ms. Williams means is that --

4   The Court will instruct the jury to disregard the answer to the

5   question about the supervisor knowing anything about the

6   relationship being broken off and any accusation against that

7   individual.

8        Ms. Williams, anything else about that?

9        MS. WILLIAMS:  No thank you, Your Honor.

10  Q.   (By Ms. Williams)  She told you that she experienced

11  embarrassment from that relationship?

12  A.   Yes, ma'am.

13  Q.   And how long would you expect that kind of event to affect

14  a woman?

15  A.   Well, it depends on -- it depends on how they classify the

16  relationship.  She -- She was clearly upset because she didn't

17  know there was anything wrong and then this guy she liked and

18  intended to marry turned out to be a pretty bad guy.

19  Q.   And you know that they were living together?

20  A.   Right.

21  Q.   They had shared their life together?

22  A.   Right.

23  Q.   And that kind of betrayal can be psychologically

24  disruptive.

25  A.   It can be.

1  Q.    And you didn't find that that was psychologically

2  disruptive to Lieutenant Welch?

3  A.    I think it was, I think it was, but it was -- yeah, I

4  think it was to a point, but in a way it was different, I

5  think, from the things that were going on with her in the

6  workplace which were affecting her in different ways.

7  Q.    That kind of experience, having a betrayal of a person you

8  love in a criminal kind of context can cause a woman to lose

9  trust in men, can't it?

10 A.    It can, yeah, sure.

11 Q.    Have you seen that?

12 A.    Well, yes, sure.

13 Q.    This kind of betrayal by a male police officer that

14 Lieutenant Welch trusted could create negative connotations for

15 Lieutenant Welch related to other male police officers,

16 couldn't it?

17 A.    I don't think it did.

18 Q.    It could, though?

19 A.    Yeah, anything could happen, but I don't think it did.

20 Q.    Did you examine that issue --

21 A.    Yes.

22 Q.    -- relating to the Maes issue?

23 A.    Yes.

24 Q.    And she didn't seek counseling at that time, did she?

25 A.    No, she didn't seek counseling until the on-the-job events

Cross-Examination - William Gene Foote

1  happened, what, three years later.

2  Q.   Right.  And you said at that time it was over and done

3  with so you didn't look at it in your earlier testimony.

4  A.   I've -- I've looked at it as being -- you know, the thing

5  is that what happens is that people -- Ms. Welch is a pretty

6  resilient person, and I -- and she's been through some other

7  relationships that have happened and then didn't happen anymore

8  before that, so this wasn't a unique experience for her to that

9  extent, of having a broken-up relationship.

10        So in my mind I think that it was something that was

11  pretty well done.  This was in 2007 when the Maes incident

12  occurred.  And it was -- where the stuff started happening with

13  her on the job was in 2009 and 2010, so it was --

14  Q.   And based on that reasoning, Doctor, those things that

15  happened to her in 2010 and 2018 as we stand here today should

16  be over and done with, right?

17  A.   To a point.  It just -- It depends upon, you know -- What

18  happens with people when they're reacting to stressful job

19  situations, especially a sexually hostile work environment or

20  a --

21  Q.   I'm going to stop you right there, Doctor.  There's not a

22  question pending and --

23  A.   I'm sorry.  I was answering your question, ma'am.

24        MS. WILLIAMS:  My question was answered, Your Honor.

25  I don't know if you want to look.

Cross-Examination - William Gene Foote

1    THE COURT:  All right.  Move on.

2    Q.   (By Ms. Williams)  Without addressing that issue,

3    betrayal of her fiancé, was she experiencing lasting

4    psychological effects that could bleed over into other areas

5    of her life?

6    A.   I don't think they did, no.

7    Q.   Okay.  You've noted that prior stressors, in your book,

8    prior life stressors and concurrent life stressors must be

9    considered in an evaluation.

10   A.   Of course.

11   Q.   Such as a failed marriage or failed relationship.

12   A.   Yes, ma'am.

13   Q.   Okay.  These are stressors that must be processed in order

14   to heal.

15   A.   That's correct.

16   Q.   And is it your job as the evaluator to determine whether

17   any other factors account for adjustment difficulties or

18   symptom patterns?

19   A.   Yes, ma'am, and I did that.

20   Q.   She reported nothing stressful in her job until 2009 or

21   2010?

22   A.   No.  She reported having stress on the job from the time

23   she started with the ROP unit, especially in 2004.

24   Q.   And the David Maes incident was smack-dab in the middle

25   between the 2004 and 2009 period, correct?

Cross-Examination – William Gene Foote

1  A.   Yes, ma'am.

2  Q.   And you don't think that had anything to do with her

3  psychological problem?

4  A.   Well, the fact is that she -- What she reported was a

5  number -- was experiencing hostile work environment prior to

6  that time, and so this thing happened in the midst of all this

7  already a stressful time for her.

8  Q.   You've written that prior and concurrent factors are

9  critical in reaching conclusions, correct?

10  A.   Yes, ma'am.

11  Q.   She moved in with her boyfriend Jason Bowie in July 2012.

12  Were you aware of that?

13  A.   Yes.

14  Q.   That's what she told you.  And she married him in 2013?

15  A.   Yes, ma'am.

16  Q.   Lieutenant Welch reported in her personal history she

17  drank socially, about three times a month, and only rarely got

18  drunk?

19  A.   That's correct.

20  Q.   And she only reported in her health history to you in 2013

21  that she was having about three migraines a year?

22  A.   That's -- At that time, she was.  There were times earlier

23  when she -- when she was under much more stress where she was

24  having them much more frequently, often as many times as six or

25  seven times a week.

Cross-Examination - William Gene Foote

1    Q.   Otherwise she had few health issues?

2    A.   At the time I saw her, she was still having -- yeah, she

3    was looking pretty good, although, again, she had elevations on

4    those somatic scales, the body scales, on the testing, yeah.

5    Q.   She told you that she couldn't buy the respect of the ROP

6    team.

7    A.   That's what she told me, yes.

8    Q.   She told you things began to deteriorate between her and

9    her team members after she complained that some of the team

10   members were not fit enough to chase down an offender, right?

11   A.   That's correct.

12   Q.   She felt her overweight teammates put her in danger and

13   she demanded that they be required to get into shape.

14   A.   I think she made a request of her supervisor that -- that

15   the -- that the out-of-shape team member be held to the same

16   standard that she and the other members were.

17   Q.   Lieutenant Welch told you that she never had a bad paper,

18   didn't she?

19   A.   Yes, ma'am.

20   Q.   She didn't get into trouble, she didn't get complaints,

21   she came to work early, stayed late, rarely took a lunch hour,

22   and did everything right, didn't she?

23   A.   That's her perception, yes, ma'am.

24   Q.   She reported to you that things that were ostensibly put

25   into place to help her turned out to be punishment in her view,

Cross-Examination - William Gene Foote

1  correct?

2  A.   Yes.

3  Q.   She told you that things got significantly better when she

4  moved to Burglary.

5  A.   Well, in that she was out of the stressful environment of

6  the -- of the -- of the ROP unit which -- where she felt like

7  she was being -- experiencing a lot of gender-based harassment.

8  But she also experienced the -- going to the Burglary as a

9  demotion, really, because in terms of status --

10  Q.   Did you write that in the report?

11  A.   Yes, I think I talked about it in the report as being

12  something that she thought of as experiencing loss of status in

13  relation to that.

14  Q.   She told you that while she was at Burglary she had no

15  work to do.

16  A.   Basically so.

17  Q.   She told you she thought she was being followed by her

18  team members.

19  A.   Yes.

20  Q.   She told you she thought her team members were putting

21  tracking devices on her vehicles, right?

22  A.   She had worried about that.

23  Q.   She told you that she thought her team members were

24  tapping her phone.

25  A.   That she was concerned about -- about being under

Cross-Examination – William Gene Foote

1 surveillance because of events that --

2 Q.    She -- Excuse me?

3 A.    There had been events that had occurred which had caused

4 her to become suspicious about such things.

5 Q.    And you accepted her assertions at face value, didn't you?

6 A.    That she -- That she thought those things were happening?

7 Q.    Yes.

8 A.    I think -- I mean that she had those fears and concerns, I

9 took those seriously.  Whether or not she was actually under

10 surveillance, I have no way of knowing.

11 Q.    Yeah, because she didn't provide any of proof of those

12 allegations to you.

13 A.    No.

14 Q.    And you didn't investigate those statements yourself?

15 A.    I have no way of doing that.

16 Q.    Okay.  She told you that she didn't talk to anyone on the

17 phone because she thought that they would be listening to her,

18 didn't she?

19 A.    There was a period of time -- There was a period of time

20 when she was very -- had become very hypervigilant, and that

21 was after the whole business about her -- the job, actually,

22 that she had in relation to the purchase of the beer.

23 Q.    Did you consider these reports that people were following

24 her and tracking her and tapping her phone might be indicative

25 of a diagnosis that they were not based in reality?

Cross-Examination – William Gene Foote

1   A.   Well, you mean during that period of time?

2   Q.   At any time.  If you had found --

3   A.   Well, I mean, they're pretty overtly paranoid systems or

4   hypervigilant symptoms.

5   Q.   And she told you that she was in Burglary for a couple

6   years and then decided to go back to the field.

7   A.   Yes, ma'am.

8   Q.   Her father told you that he feared she would kill herself

9   and suggested that she see a psychologist.

10   A.   Yes.

11   Q.   Did you take that seriously?

12   A.   I took that seriously and inquired about a suicide

13   potential, but she expressed no desire.  I didn't think she was

14   a suicide risk.

15   Q.   Because you have an obligation to make sure a patient's

16   not a danger to themselves or others?

17   A.   Of course.

18   Q.   You determined that she was not a danger to herself or

19   others?

20   A.   Of course.

21   Q.   She saw a nurse practitioner -- a psychiatric nurse, I'm

22   sorry, about three times?

23   A.   Yes, beginning in 2010 through early 2011.

24   Q.   She saw a therapist a couple times?

25   A.   A couple times.  That relationship didn't work out.

1    Q.   Right.  And that therapist was a woman, correct?

2    A.   Yes.  Dr. Scott.

3    Q.   And Dr. Welch told you she quit there because she got no

4    support from the therapist?

5    A.   Well, there were other issues with the therapist.  The

6    therapist had some -- had some personal issues that she brought

7    into the therapy which were inappropriate?

8    Q.   And that's what Dr. -- I mean Lieutenant Welch reported to

9    you, correct?

10   A.   Yes.

11   Q.   She told you that the therapist started having boundary

12   issues with her.

13   A.   Yes.

14   Q.   Did you know the therapist?

15   A.   Yes.

16   Q.   Did you explore that issue with her professionally?

17   A.   No, because I didn't see the issues to be that serious,

18   but they were ones that, given that -- the trust issues that

19   Ms. -- that Lieutenant Welch had at the time, I think they

20   proved to be very difficult for her.

21   Q.   Because you have an obligation if another practitioner in

22   your licensed field is malpracticing to do something about it,

23   don't you?

24   A.   Right.

25   Q.   And you didn't determine that Lieutenant Welch's therapist

Cross-Examination - William Gene Foote

1  had malpracticed?

2  A.   No.  I think she made some bad judgment, but I didn't

3  think it rose to that level.

4  Q.   Okay.  You're aware that the City provides counseling at

5  no cost to police officers?

6  A.   Yes.

7  Q.   In two different programs, correct?

8  A.   Yes.

9  Q.   Are you aware of whether Lieutenant Welch ever took

10  advantage of that counseling offered to her?

11  A.   I don't think she did.

12  Q.   Okay.  She reported that she drinks about four nights a

13  week, one to four beers to relax in her personal history,

14  correct?

15  A.   I don't think she said she drank that much.  Maybe I --

16  Maybe you can remind me.

17  Q.   I will bring this over to show you.

18          MS. ANDERSON:  Patti, can I see it?

19          MS. WILLIAMS:  Oh, I'm so sorry, Richelle.

20          May I approach, Your Honor?

21          THE COURT:  You may.

22  Q.   (By Ms. Williams)  Let me know when your memory's

23  refreshed, Doctor?

24  A.   That's correct.  Well, can you please repeat the question?

25  Q.   I will be happy to.

Cross-Examination - William Gene Foote

1   A.   Thank you.

2   Q.   In her personal history to you, Dr. Foote, she reported

3   that she probably had one beer four times a week?

4   A.   Yes, ma'am.

5   Q.   And then she said, "The most I have is three or at most

6   four beers"?

7   A.   That's correct.

8   Q.   Okay.  And you're confident in your testing --

9   A.   Yes, ma'am.

10  Q.   -- the standardized testing that you give?

11  A.   Yes.

12  Q.   And you gave Lieutenant Welch an IQ test?

13  A.   Yes, ma'am.

14  Q.   And her full scale IQ is 98, correct?

15  A.   Yes, ma'am.

16  Q.   And that's just very average --

17  A.   Average IQ for the whole world is 100.

18          THE COURT:  Okay.  Just again, one at a time, please.

19          THE WITNESS:  Thank you, Your Honor.

20  Q.   (By Ms. Williams)  You found that she had low verbal

21  comprehension, in the 32 percentile, correct?

22  A.   Yes, ma'am.

23  Q.   Does that mean she's not good at comprehending verbal

24  instructions?

25  A.   No.  And, in fact, her ability to process and remember

Cross-Examination - William Gene Foote

1    verbal instructions is quite high, better than average.  It's
2    measured through the other tests.
3          Her -- It's -- That's more like reading and
4    processing stuff that -- excuse me -- that she -- other kinds
5    of things that she processed verbally.  For example, you know,
6    given a verbal puzzle, that kind of thing.
7    Q.    But it wouldn't have any effect on her comprehension in
8    jobs-related situations?
9    A.    I don't think so, no.
10   Q.    Okay.  And she had a conceptual -- a perceptual reasoning
11   score in the 30th percentile.  What does that mean?
12   A.    That means that's like putting together blocks of
13   patterns, puzzles, things of that sort.
14   Q.    And how does that score manifest in the workplace?
15   A.    It wouldn't.  If she were assembling widgets in a factory,
16   it would be a big deal, but it really wouldn't affect her
17   ability, for example, to operate a firearm or to perceive
18   situations in the field.
19   Q.    Would it affect her ability to put together pieces of a
20   puzzle to solve a case?
21   A.    If -- If they were actual physical pieces like a jigsaw
22   puzzle, yes, but in terms of conceptualizing a case, no.
23   Q.    Okay.  So does this manifest in any way in interpersonal
24   relationships?
25   A.    I don't think so, no.

Cross-Examination - William Gene Foote

1  Q.    Okay.  The scores on the Wechsler Memory Scale indicate

2  that she has an excellent memory, correct?

3  A.    That's correct.

4  Q.    And that doesn't appear to be adversely affected by stress

5  from job-related situations?

6  A.    That's correct.

7  Q.    So you would expect her memory to be better than average?

8  A.    Yes, sir -- Yes, ma'am, for both verbally -- stuff that

9  she reads and sees and stuff that she hears, as well.

10 Q.    How about stuff that she does or happened a week ago or

11 two weeks ago or yesterday?

12 A.    Well, you know, we don't -- we don't measure over that

13 long period of time, but we didn't really see any impaired

14 memory function in the long -- for -- for big chunks of

15 information, for example, a long story, we told her a long

16 story and then asked her a questions about that a half-hour

17 later, and she was able to answer it very well.

18 Q.    With those scores, you would expect her to remember facts

19 and incidents in her life and in the workplace better than

20 average persons?

21 A.    Yes, ma'am.

22 Q.    Your tests also showed that she has a high level of

23 self-confidence?

24 A.    Yes, ma'am.

25 Q.    And that she has a tendency for stimulation-seeking.

278
Cross-Examination - William Gene Foote

1   A.    Yes.

2   Q.    What does that mean?

3   A.    Well, when she said that she -- one of the things she

4   liked about working on the ROP unit was basically driving the

5   trucks and being able to apprehend criminals, that kind of

6   thing is one of the things that she enjoyed, and an officer who

7   has -- and that that level of stimulation-seeking was very low.

8   It was just barely and -- noticeable.  But that would be the

9   kind of thing that she would like about police work.

10  Q.    And you also had your tests indicate that she has an

11  aggressive attitude.

12  A.    She has, yes, in that she is somebody who's willing to

13  express an aggressive attitude.

14  Q.    And as you've seen -- said, there's no evidence of a

15  diagnosable condition that would affect her ability to do her

16  job?

17  A.    That's correct.

18  Q.    You agree that hurt feelings, anger, and frustration are

19  part of life as a psychologist.  You see that all the time.

20  A.    Yes, I would assume so, yes.

21  Q.    You saw a clinical elevation on a scale related to PTSD.

22  A.    Yes, ma'am.

23  Q.    But you didn't diagnosis Lieutenant Welch as having PTSD,

24  did you?

25  A.    No, I didn't see the rest of the symptoms that would fall

Cross-Examination - William Gene Foote

1    into that category.  I think what it was, was picking up that

2    she would have some incidents which had made her afraid and

3    that she still thinks about.

4    Q.   Okay.  You said she had two elevated indicators on one of

5    tests you gave.  One was the hypochondriasis indicator?

6    A.   Yes, ma'am.

7    Q.   Do you see male police officers with elevated test

8    indicators based on their job duties?

9    A.   Yes, ma'am.

10   Q.   And on the depression scale, you said it was elevated,

11   correct?

12   A.   Yes, ma'am.

13   Q.   And you see male police officers at APD with elevated

14   depression scales based on their job duties and experiences.

15   A.   Yes, ma'am.  It's a tough job.

16   Q.   It's a very tough job, isn't it?

17   A.   Yes, ma'am.

18   Q.   And so these are not unusual symptoms for an officer who

19   is not female?

20   A.   That's correct.

21   Q.   Okay.  You wouldn't expect a clinical elevation on a scale

22   related to PTSD to stay high if she got distance from the

23   environment and the stressors she perceived?

24   A.   Not necessarily.  That's what PTSD is about, is that even

25   when you're out of the situation you still have memories that

Cross-Examination - William Gene Foote

1  come back to you and cause you problems.

2  Q.   And that's why I don't really understand why we can say

3  she can get over the David Maes incident, this horrible

4  betrayal, when PTSD does keep biting at people.

5  A.   Yeah, but she didn't talk about that as being traumatic in

6  that respect.

7  Q.   Okay.

8  A.   She talked -- She talked -- Yeah.  She talked about it as

9  a failed relationship and a disappointment.  She didn't talk

10  about it as, you know, the same kind of trauma that we talk

11  about for PTSD.

12  Q.   Okay.  Wouldn't you expect the clinical elevation on the

13  scale related to PTSD to become lower if she did the work in

14  counseling?

15  A.   Yes, ma'am.

16  Q.   And would you expect that Ms. Lieutenant Welch's delay in

17  seeking treatment may have caused her to become more

18  symptomatic?

19  A.   Well, I think she sought treatment right in the middle of

20  the stuff that was bothering her in 2010.  She -- In fact, with

21  days -- within days of some of the on-the-job incidents she was

22  in Nurse Conry's office seeking treatment because she was

23  acutely symptomatic.  So I think she definitely sought

24  treatment when the symptoms were most severe.

25  Q.   And will three sessions ameliorate an issue?

Cross-Examination – William Gene Foote

1    A.   Well, what -- what -- what she got from Nurse Conry, Nurse

2    Conry really wasn't a psychotherapist.  She was -- She was a

3    prescribing nurse.  She was prescribed Citalopram, which is a

4    very common antidepressant initially, but she had a bunch of

5    bad side effects with that, and when she came back with those

6    bad side effects, Nurse Conry prescribed Wellbutrin, which is

7    another antidepressant, which had a much better side effect

8    profile for her, and the second drug seemed to have helped

9    relieve some of the acute symptoms that she was experiencing

10   during the acute stress she had at that time.

11   Q.   And you suggested none of those medications worked for

12   Dr. Welch?

13   A.   No.  I think the Wellbutrin worked fine.

14   Q.   It worked fine?

15   A.   Yeah.

16   Q.   Would you expect her to continue to be on a successful

17   medication today?

18   A.   If -- If she was still experiencing the same high level of

19   stress that she was experiencing during that interval, but

20   apparently she's not experiencing the same level of stress now.

21   Q.   You suggested future counseling in 2013, correct, Doctor?

22   A.   Yes, ma'am.

23   Q.   And you're aware that Lieutenant Welch has not sought

24   counseling since 2013?

25   A.   Yes, ma'am.

Cross-Examination - William Gene Foote

1  Q.   Did she tell you she couldn't afford counseling?

2  A.   No.  She told me that she didn't feel like that her going

3  back to treatment would -- Well, she felt like her -- that her

4  therapist would be called in to testify in a trial and that she

5  would lose her privacy, and she didn't want to lose her

6  privacy.

7  Q.   Do you feel people can fix themselves after they suffer an

8  emotionally trying event over the passage of time?

9  A.   I'm sorry.  Can fix themselves?

10  Q.   Can fix themselves after they suffer an emotionally

11  stressful situation given just by the passage of time.

12  A.   Well, I think reasonably well -- people who have had good

13  childhoods, and she had a good childhood.  People who have good

14  emotional support, and she's had plenty of that.  And people

15  who are resilient, and she is.  All those things bode well for

16  being able to work through stressful situations and even very

17  bad job-related situations once she's out of them and not to

18  carry those things too much.

19  Q.   You've heard the adage time heals all, and it sounds like

20  if you have good --

21  A.   Well, to a point.  I mean, it doesn't heal trauma

22  necessarily, because trauma can stick around for a long time

23  for people.  And also if you're back in the situation where

24  you're being reminded again of the bad times that were over and

25  reminded again of those things, symptoms can kick up again, and

1    they often do.

2    Q.   In your experience as a psychologist, do you find that a

3    person if they become miserable enough will seek counseling?

4    A.   Well, if they're afraid -- If they're afraid that every

5    word that they tell the counselor is going to be used against

6    them in court, they'll often avoid counseling even when they

7    really need it.

8            MS. WILLIAMS:  May I have a moment?

9            Thanks, Dr. Foote.  It appreciate it.  That's all the

10   questions.

11           THE COURT:  Any redirect, Ms. Anderson?

12           MS. ANDERSON:  Yes, Your Honor.

13                       REDIRECT EXAMINATION

14   BY MS. ANDERSON:

15   Q.   Dr. Foote, why wouldn't there be a conflict of interest in

16   this case for you to testify?

17   A.   I mean, it's two different -- two different things.  First

18   of all, I have -- I'm hired -- I don't have a contract with the

19   City for one thing, and I don't see any -- any relationship.

20   I'm not working with anybody in the system who is involved in

21   in this case.  Had it -- I mean, had it turned out that that

22   was a conflict, I would have never taken the case in the first

23   place.

24   Q.   And you were asked during cross-examination about the

25   Coldwell case.  And that's a case in which you testified as a

1    defense expert?

2    A.   Yes.

3    Q.   Now, do you have any control about whether or not you

4    testify?

5    A.   No.

6    Q.   Now, is five hours, is that a common amount of time that

7    you generally spend with a subject you're evaluating?

8    A.   Actually, that's that a long interview.  My interviews

9    vary from an hour and a half to three hours, usually.

10   Q.   And would you agree with me that there can be a difference

11   between what's on a job description and what somebody actually

12   does in the field?

13   A.   Yes.

14   Q.   Now, you were trying to explain on cross-examination how

15   job stress or stress emanating from a job situation can be

16   different than stress from a -- excuse me -- from a romantic

17   relationship.  Can you elaborate on that for us?

18   A.   Yes.  Well, I guess -- You know, what she was complaining

19   about and the pattern that I saw that she was describing that

20   occurred with her once she was hired on to ROP unit was a

21   pattern that we often see in individuals who find themselves in

22   a hostile work environment, and it's -- the pattern that she

23   experienced was being able to tolerate things at first and

24   being able to cope with it and police officers, female police

25   officers have tough skins and are able to tolerate a lot of the

Redirect Examination - William Gene Foote

1   sorts of things like the dirty jokes and the -- and the

2   language and stuff like that, that perhaps in an office

3   environment would never be tolerated.

4          And -- But what happens over time is, is I call it a

5   war of attrition.  It's like the symptoms that -- it's

6   something that goes on day in and day out, and it starts to

7   wear away on people, and in many cases, as in her case, she

8   started to develop more and more of these physical symptoms.

9   The sleep problems got worse, the migraines became more

10  frequent, the problems with her digestive tract, her weight

11  loss became more severe over the years that she worked.  It was

12  a slow, gradual kind of wearing away process so that by the

13  time things came to a head in 2010 she had -- had really -- was

14  showing just a real classic pattern of somebody who had been

15  under this kind of stress that people go through when they're

16  in a sexually hostile work environment.

17         Now, there were other things happening as well in

18  here life, including this business with her boyfriend who --

19  and that was certainly an additional stressor that would have

20  affected her on top of these other things that were going on.

21  So -- And as the earlier questioning indicated, certainly that

22  would pop up as a stressor, but it would have occurred for

23  somebody who -- whose coping abilities perhaps had been reduced

24  because of having to deal with the day-in-and-day-out stuff

25  that she had to deal with.

Redirect Examination - William Gene Foote

1   Q.   And when you evaluated Lieutenant Welch back in 2013,

2   would you say that she had, I think you said, tough skin or

3   thick skin?

4   A.   Yes, sir -- Yes, ma'am.

5   Q.   And Lieutenant Welch in 2013, you said she had probably, a

6   test indicated, a better memory than most people?

7   A.   I'm sorry.  Yes.

8   Q.   About her memory.

9   A.   Yes.

10  Q.   Now, would that memory, what's called her ability -- her

11  ability to memorize things, would that apply to situations that

12  were routine for her?  Would she remember her actions in a

13  routine day more than an average person?

14  A.   The thing is that when people are under stressful

15  situations -- and again, my office wasn't stressful, at least

16  we try not to make it stressful -- they may account act

17  differently, they may have more trouble.  In fact, people do

18  routinely have trouble with memory when they're under more

19  stress or when they're trying to recall stressful or traumatic

20  events.

21  Q.   So I guess my question might be, just because she scored

22  high on this memory test, she wouldn't necessarily remember

23  every drive home.  Is that correct?

24  A.   Oh, no.  No.

25  Q.   Now, what were some of the reasons -- And you kind of

Redirect Examination - William Gene Foote

1  talked about the potential trial being one of the reasons

2  Ms. Welch didn't seek counseling.  Are there other reasons that

3  you know of that people don't always seek counseling?

4  A.   Well, sometimes people just don't want to talk about

5  unpleasant stuff.

6  Q.   And why is that?

7  A.   Who wants to talk about unpleasant stuff?  I mean -- And

8  for people who feel like they're kind of doing okay with it and

9  even if they objectively are not going okay with it, you know,

10  they often don't feel like talking about things that's going to

11  make them better.

12          And a lot of the police officers aren't talkers.  I

13  mean, they don't talk through stuff.  They're doers.  They deal

14  with stuff physically.  And again, she's not a person who copes

15  with things by processing them verbally.  She processes with

16  them by storing things up in her body.

17  Q.   Now, you had mentioned that you found Lieutenant Welch to

18  be resilient.  Can you elaborate on that?

19  A.   Well, like I said, she had all the factors that go into

20  resilient.  She had a good childhood.  She had good support,

21  good parents, had a very successful career up to a point.  She

22  had some issues with relationships, these kind of men in her

23  life that didn't work out.  But -- But I think as people go,

24  she would -- she would be pretty high on that -- on that

25  dimension.

Redirect Examination – William Gene Foote

1          MS. ANDERSON:  Your Honor, may I have a moment?

2          THE COURT:  You may.

3          MS. ANDERSON:  No other questions.

4          THE COURT:  Okay.  Ms. Williams, Ms. Anderson please

5   come forward.

6      (Bench conference on the record.)

7          THE COURT:  Ms. Williams, do you want to be heard on

8   anything?

9          MS. WILLIAMS:  On this, yes, I do.  There was some

10  testimony that went past and invaded the purview of the jury,

11  and I think that that should be stricken from the record.  He

12  talked about not just that she perceived a sexually harassing

13  environment, but she was in a sexually harassing environment

14  and her symptoms were consistent.  It was not in the report.

15  That is not something that we dealt with.

16          The other thing is, we did not get any addendum that

17  said he reviewed more stuff, developed more opinions, and had a

18  second interview with her.

19          MS. ANDERSON:  His testimony was that he didn't

20  provide that to us.  His testimony was that he did not provide

21  that to the Court.  The answer to defense's question, Did you

22  create an addendum and provide that was no.

23          MS. WILLIAMS:  Well, at some point we asked the

24  interrogatory of "What is your expert -- you know, what went on

25  with your experts and supplement, and they did not supplement,

Redirect Examination - William Gene Foote

1    and they obviously knew because she asked questions about it.

2    That creates a problem for us.

3            THE COURT:  Okay.

4            MS. ANDERSON:  It didn't change anything in his

5    report.

6            THE COURT:  Well, okay.

7            MS. ANDERSON:  And the testimony was that he didn't

8    provide anything extra that we did not receive an addendum.

9            THE COURT:  What I heard, Ms. Anderson, was -- and it

10   was in the narrative.  I don't think you prompted him, but I

11   think in the question -- in responding to his question, he did

12   touch on the stressors that she would experience or that she

13   experienced because of what she experienced in a hostile work

14   environment.

15           MS. ANDERSON:  Well, Judge, two things -- two things

16   I think that -- with regards to the first issue that defense

17   raised.  And number one, he's an expert.  He can opine on

18   things.  And I understand their argument that it's the ultimate

19   issue, but you can opine on an ultimate issue in a civil case.

20           And the second one is that I think defense elicited

21   way more during cross-examination than I did on redirect or

22   direct.

23           THE COURT:  What I'm thinking about is causation and

24   whether or to what extent that was in the report that was

25   disclosed to Ms. Williams and Ms. Wiggins, and I think what I

1  heard is that it was not as to causation.  What she experienced

2  at the Albuquerque Police Department and what she is

3  experiencing now in the way of symptoms -- or since 2009 or

4  2010.  What I heard, and we'll go to the transcript, is his use

5  of the word "stressors" and that it would have been resulting

6  from what she experienced at the Albuquerque Police Department.

7           Just one moment.

8           MS. ANDERSON:  Sure.

9           THE COURT:  Okay.  So I'm reading here from the

10  transcript.  "And as the earlier questioning indicated,

11  certainly that would pop up as a stressor, but it would have

12  occurred for somebody who -- whose coping abilities perhaps had

13  been reduced because of having to deal with the

14  day-in-and-day-out stuff that she had to deal with."

15           MS. WILLIAMS:  Uh-huh.

16           THE COURT:  So that's touching on what she

17  experienced at the Albuquerque Police Department and what is

18  manifesting -- or arguably manifesting now in the way of

19  stressors.  So I think that's the connection that the jury can

20  make based on this testimony.  So it's the causation that I

21  think he's establishing in his opinion.  Now, I don't want to

22  make any arguments for you, but what I think I heard is that

23  that kind of testimony or opinion is not disclosed in the

24  report.  Is that true?

25           MS. WILLIAMS:  That is true.

1            THE COURT:  Ms. Anderson.

2            MS. ANDERSON:  I think it is disclosed in the

3  report --

4            THE COURT:  Okay.

5            MS. WILLIAMS:  -- that he was -- that he -- there was

6  not disclosed in the report that he would be giving causation

7  testimony.

8            MS. ANDERSON:  But he didn't -- He was talking about

9  what is consistent, what he consistently sees in somebody who

10  is going through this situation.

11            THE COURT:  Okay.  I'll continue from the -- I'll

12  continue in the transcript.

13            "It was a slow, gradual kind of wearing away process

14  so that by the time things came to a head in 2010, she had --

15  had really -- was showing just a real classic pattern of

16  somebody who had been under this kind of stress that people go

17  through when they're in a sexually hostile work environment."

18            MS. ANDERSON:  I think in that situation, Judge, he

19  was distinguishing what was the Maes stress and the stress that

20  somebody who was in a situation that Ms. Welch would have been

21  experiencing.

22            THE COURT:  I'm not sure I see a difference.

23            MS. ANDERSON:  Well, because it's -- defense is

24  trying to conflate the two, that the status of her stress was

25  tied to the Maes incident and it wasn't necessarily tied to

Redirect Examination - William Gene Foote

1    anything she's enduring on the job.

2              THE COURT:  He said "hostile work environment."

3              MS. WILLIAMS:  He did.

4              THE COURT:  So I think with what I've heard, and I

5    want to be fair to you, too, in your case, and your client, is

6    any condition she is experiencing, he can establish that, and

7    he did, based on the tests that he performed, that's his

8    conclusion, she's experiencing some problems.

9              Now, whether he could connect those problems to what

10   she experienced while in the ROP or after her time in the ROP,

11   that's a different question.

12             MS. ANDERSON:  And I understand where we are going

13   with this, Judge, but he did not say ROP one time during my

14   direct or redirect.

15             MS. WILLIAMS:  My problem, Your Honor, is he said

16   "hostile work environment," which was worse.

17             MR. VILLA:  He didn't say there was hostile work

18   environment.  He talked about what was told to him, and he

19   could not say whether or not it was true.  He didn't make the

20   causation opinion, that this is consistent with what we see.

21             THE COURT:  All right.  What I'm inclined to do is to

22   instruct the jury to disregard any opinion that the witness may

23   have given as to a causation opinion; that is, testimony that

24   would -- that -- where he concluded that any symptoms she has

25   experienced, that had been as a result of a hostile work

Redirect Examination - William Gene Foote

1    environment.

2             Ms. Williams.

3             MS. WILLIAMS:  Yes.  Thank you.  I think that he said

4    he was not doing that, but then ultimately he tried to do that.

5             THE COURT:  It came close enough, but it didn't go

6    over the line.  I think a limiting instruction to just

7    disregard that part of his testimony.

8             MS. ANDERSON:  I understand.

9             THE COURT:  Okay.  So we'll get along.

10            MS. WILLIAMS:  Thank you, Your Honor.

11            THE COURT:  It's ten to 5:00.  What's the plan?

12            MR. VILLA:  I can call Rob Smith.  He's here.

13            THE COURT:  How long will he take?

14            MR. VILLA:  Definitely more than ten minutes.

15            THE COURT:  Do you have somebody who would be a

16   shorter period of time?

17            MR. VILLA:  Mr. Bowie, but I don't know that he'll be

18   ten minutes.

19            MS. ANDERSON:  Thirty.

20            THE COURT:  Thirty minutes for direct?

21            MR. VILLA:  No, no.  I think the cross of Dr. Foote

22   was much longer than the direct.  I don't know what the cross

23   will be, but the direct will be 15 minutes.

24            MS. WILLIAMS:  I don't think we can finish anyone in

25   ten.  I don't know if you want to start Rob and come back.

```
 1              THE COURT:  Fifteen, 20, even 30 minutes to get done
 2   with a witness.
 3              MR. VILLA:  It depends on cross.
 4              MS. WILLIAMS:  Everything will take longer, I think.
 5   Can you --
 6              THE COURT:  All right.
 7              MS. WILLIAMS:  Can you pass Rob in ten minutes?
 8              MS. ANDERSON:  I think --
 9              MR. VILLA:  Maybe 15.
10              MS. ANDERSON:  -- 15, 20.
11              THE COURT:  Who is that?
12              MR. VILLA:  Jason Bowie, her husband.
13              THE COURT:  Let me leave it to the jury.
14              MS. WILLIAMS:  Okay.  Thank you.  Thank you, Your
15   Honor.
16        (Open court.)
17              THE COURT:  Okay.  At this time, counsel, may the
18   witness step down?  Ms. Anderson?
19              MS. ANDERSON:  Sorry.  May?
20              THE COURT:  May the witness be excused?
21              MS. ANDERSON:  Yes, sir.
22              THE COURT:  All right.  Dr. Foote, you may step down.
23   You are excused.
24              THE WITNESS:  Thank you, Your Honor.
25              THE COURT:  Okay.  Ten minutes till 5:00.  I'm
```

1   inclined to let you go for the rest of the day, but before we

2   get to this point, ladies and gentlemen, this is another

3   example of where I will instruct the jury to disregard certain

4   testimony that you may have heard, so the testimony from

5   Dr. Foote, as best as I can reflect and describe from the

6   transcript, is an opinion that whatever symptoms Ms. Welch is

7   experiencing would be caused by her experience in a hostile

8   work environment.  So that part of his testimony I will

9   instruct you to disregard.  There are other opinions that the

10  doctor articulated.  All of that, it's up to you as the jury to

11  determine whatever weight to place on those opinions.

12          All right.  Now, there is a witness that the

13  plaintiff is prepared to put on at this time.  I'm told the

14  witness with direct and cross-examination and redirect may take

15  about 30 minutes.  It's ten minutes till five.  Let me just ask

16  you -- I know it's been a long day and you've heard a lot of

17  testimony already.  I'm inclined to release you for the day at

18  this time if that's what you would like to do.  If you'd like

19  to push on through that one more witness, we can do that, as

20  well.

21          So, I guess by show of hands, majority vote I think

22  would carry here, who would want to push on?

23          Okay.  There's enough here, and, like I said, I know

24  it's been a long day, but let's see if we can get one more

25  witness wrapped up before the end of the day.

Direct Examination – Jason Bowie

```
 1              All right, sir, please approach and step into the
 2     witness stand to my right and raise your right hand to be
 3     sworn.
 4          (Witness sworn.)
 5              MS. HALL:  Please state your name, and spell your
 6     first and last name.
 7              THE WITNESS:  Jason Bowie.  First name J-A-S-O-N.
 8     Last name B-O-W-I-E.
 9              THE COURT:  You may be seated.
10              Ms. Anderson.
11                  PLAINTIFF'S WITNESS JASON BOWIE,
12          after having been first duly sworn under oath,
13          was questioned and testified as follows:
14                        DIRECT EXAMINATION
15     BY MS. ANDERSON:
16     Q.   Good afternoon, Captain Bowie.  How are you?
17     A.   Doing well, thank you.
18     Q.   Okay.  Thank you.  How are employed?
19     A.   I'm employed with the Rio Rancho Police Department.
20     Q.   And what's your position with the Rio Rancho Police
21     Department?
22     A.   I'm a captain.
23     Q.   How do you know Lieutenant Welch?
24     A.   She's my wife.
25     Q.   And jumping back to your involvement with Rio Rancho
```

Direct Examination - Jason Bowie

1    Police Department, how long have you been employed through the

2    Department?

3    A.   I've been employed with the Rio Rancho Police Department

4    since 1994.

5    Q.   And as a captain can you generally tell us what some of

6    your responsibilities are?

7    A.   I'm currently assigned as captain over Criminal

8    Investigations Division.

9    Q.   And how long have you been a captain at Rio Rancho Police

10   Department?

11   A.   Since 2014.

12   Q.   Now, when did you meet Lieutenant Welch?

13   A.   In 2002.

14   Q.   And how did you come into contact with her?

15   A.   I met her through a mutual acquaintance, friend.

16   Q.   Now, you might want to move a little bit closer to the

17   mic, I think.  We want to get everything on the record.

18        Now, do you recall the friend that you met her

19   through?

20   A.   Yes.  I met her through Michelle Campbell.

21   Q.   Michelle Campbell, was she also with APD?

22   A.   She is.

23   Q.   Did you work with Terysa -- or, I'm sorry -- Lieutenant

24   Welch?

25   A.   I did work with her later on, not in 2002, but I had

Direct Examination – Jason Bowie

1    occasion to work with her after 2005.

2    Q.    Okay.  And when you worked with her, what was –– what was

3    that situation like or under what circumstances did you work

4    with Lieutenant Welch?

5    A.    Certainly.  In 2005, I was promoted to the rank of

6    sergeant within the Rio Rancho Police Department.  I was tasked

7    with creating a new unit for the Department.  They wanted a

8    proactive unit for the Department to take care of the issues we

9    had going on within the City, and I started a unit called the

10   Special Services Unit.  It was at that time that within those

11   first initial years of starting the unit that I sought out

12   other agencies and received guidance for the way that they are

13   with operating their plain-clothes units, and I came into

14   contact with members of the ROP team at that time.  Terysa was

15   part of that.

16   Q.    What was the unit called in Rio Rancho?  I'm sorry.

17   A.    In Rio Rancho it was called the Special Services Unit.

18   Q.    And you were in charge of the Special Services Unit?

19   A.    That's correct.

20   Q.    And during the time that you were in charge of the Special

21   Services you sought out other, you called them, plain clothes

22   units?

23   A.    Correct, so the Special Services Unit for Rio Rancho was a

24   plain-close unit.  The only plain-clothes operation that we had

25   up until that point was our narcotics officers, which I had

Direct Examination - Jason Bowie

1    performed those duties in the past.  This was a new unit that

2    was going to have five members that were going to be impacting

3    our biggest crime problems in the city and finding violent

4    offenders and such.  So the Special Services Unit was that

5    plain-clothes unit.

6    Q.   During that time, did you reach out to APD's Repeat

7    Offender Project for advice on how to run a unit?

8    A.   I did.  Terysa was not my point of contact, but I reached

9    out to one of the members, Ray DeFrates.

10   Q.   Why did you go to the ROP unit as far as instruction on

11   how to get this new project developed?

12   A.   We had been -- Again, in the beginning of 2005, it was

13   largely underfunded in my department.  So we were operating

14   with very little and I was just looking to reach out to other

15   agencies to see kind of how they were operating their

16   plain-clothes units, what their standards and procedures were,

17   kind of their daily practices for apprehending violent

18   offenders and whatnot.

19        Ray DeFrates was a person I knew through my years on

20   SWAT and it was a person I was comfortable with, so I reached

21   out to him to seek guidance.

22   Q.   Now ROP officers, did they have any special skills that

23   you wanted to bring over to Rio Rancho at that time?

24   A.   Working in plain clothes is a lot different than any kind

25   of uniform capacity, and so yes, working in this capacity,

1    plain clothes, blending with the general public and, of course,

2    surveillance, countersurveillance, all those things would be

3    required in order to successfully apprehend violent offenders,

4    and those were the skills that were sought after by the unit

5    that I was heading up.

6    Q.    Did you work with Lieutenant Welch during this time?

7    A.    I did.  Not initially, but after some years, yes.

8    Q.    Okay.  And when did you, I guess, develop a romantic

9    relationship with Lieutenant Welch?

10   A.    So again, I knew that she was part of the unit from 2005

11   on.  She became, I'd say, a point of contact that I would

12   regularly deconflict people that we were looking for.  If we

13   were heading into Albuquerque, I would call her, and vice versa

14   if she had business in Rio Rancho.  I was a point of contact

15   for her.  She was -- We started becoming romantically involved

16   in 2009.

17   Q.    And can you just tell us a little bit more?  What does

18   deconflict mean?

19   A.    Absolutely.  So as you guys can imagine, criminals are

20   people who have lived that lifestyle.  They don't necessarily

21   restrict themselves to one jurisdiction, so people who commit

22   crimes in Rio Rancho will also commit crimes in the city of

23   Albuquerque.

24          As we started looking for those offenders across

25   jurisdictional lines, if we were following our leads into the

Direct Examination - Jason Bowie

1  Albuquerque area, as a courtesy, of course, we would contact

2  other agencies and let them know that we were in their

3  jurisdiction looking for offenders, so if we ended up at the

4  same location there would not be a confusion of who was police,

5  what we call blue-on-blue situation.

6  Q.   Now, did Lieutenant Welch at this point, did you recognize

7  that she had a specific skill set that she developed in ROP?

8  A.   Absolutely.  I mean, she was definitely a valued member.

9  She seemed very competent in what she did, and I looked to her

10 guidance as much as some of the other members.

11 Q.   Now, as you got to know her personally, what did you find

12 out or what did you learn about her, I guess, professional

13 goals within the Albuquerque Police Department?

14 A.   During that time frame, of course -- When I knew her

15 personally -- Kind of two answers.  I knew her personally

16 before being romantically involved with her.  I knew her, of

17 course, as a person in ROP.  After becoming romantically

18 involved, of course I started becoming more aware of her

19 aspirations.  If that answers your question.

20 Q.   Yes.  What were those aspirations?  Did she communicate

21 those with you?

22 A.   When we became romantically involved, of course she was in

23 conflict within the Department, so her aspirations at that

24 particular time was to get through that conflict and to be

25 successful within the ROP unit.  It was sometime later when

Direct Examination - Jason Bowie

1   that was no longer possible we started looking for other

2   avenues within the Albuquerque Police Department for her to be

3   successful.

4   Q.   And about this time was this when she did -- excuse me --

5   Lieutenant Welch did what's called a TDY to Burglary?

6   A.   TDY, temporary duty assignment.  She took a temporary

7   assignment in Burglary, yes.

8   Q.   Now, do you know how long that temporary assignment

9   lasted?

10  A.   I believe she was on temporary assignment somewhere

11  between 14 months, year and a half.

12  Q.   Now, did her goals or responsibilities change between when

13  she was on ROP and when she was assigned to Burglary?

14  A.   Absolutely.

15  Q.   Now, I guess which of those two did she see her career

16  path going down before she encountered any problems with ROP?

17  A.   So prior to her having problems with in the ROP unit, of

18  course her focus was within the Special Investigations

19  Division.  Her focus was to be a good ROP member, a good team

20  member.

21       It was after she developed problems with the

22  Albuquerque Police Department and she went to the Burglary unit

23  that her job was not as fulfilling.  She was within the unit

24  for a long period of time and she started -- she didn't have

25  very much job satisfaction.  So at that particular time I

Direct Examination - Jason Bowie

1    started encouraging her to look for other possibilities while

2    these problems were being worked out for her while she was

3    working through these problems with the Department.

4    Q.   Okay.  And now I want to talk to you about kind of

5    Lieutenant Welch's mental health in 2009.  What did you observe

6    with regards to that issue when you were involved with

7    Lieutenant Welch?

8    A.   Absolutely.  If I could go back slightly before that, she

9    was very competent and confident in her performance and in her

10   job.  It was in 2009 when I started seeing a decline in that.

11   Q.   Okay.  And what areas did you see a decline in as far as

12   mental health?

13   A.   She, again, was very confident, very secure, not only in

14   dealings within the Albuquerque Police Department when I saw

15   her in performance of her duties, but also during her time off.

16   In 2009 when she started experiencing problems within the

17   Department, she started having a certain amount of anxiety, as

18   I could see it.

19   Q.   Okay.  And did that anxiety, did that affect your

20   relationship?

21   A.   It certainly did.

22   Q.   In what ways?

23   A.   For a long -- Not just 2009, I'll say 2009 was the

24   inception of that, 2009, 2010, 2011, you know, she had a

25   certain amount of anxiety, of course, related to the stresses

1   and things that were going on in the Department.  Sometimes

2   frustration at home, sometimes even I would say anger and

3   whatnot.  And so yes, it did affect our relationship.

4   Q.   Did you observe any physical changes to Lieutenant Welch

5   during this time period?

6   A.   Absolutely.  Again, from the time that I knew her,

7   particularly when she was in ROP and at the beginning when we

8   were working together, she was very strong, very muscular, very

9   built for a young lady, and as the stress increased, her body

10  physique started to change.  She started losing weight and had

11  difficulty putting on muscle mass.  I know it sounds weird.

12  Most ladies worry about their weight.  For Terysa it was very

13  important for her to be strong and competent in what she was

14  doing, and I saw a change in that.

15  Q.   In addition to the weight loss, did you observe other

16  physical issues that you associated with this?

17  A.   Yes.  She had a lot of migraines, was tired, I would have

18  to a lot of times help her through those times when she would

19  have migraines early in the morning.  And I noted particularly

20  most of those, if you want to call them medical issues or

21  concerns when she is was in the ROP unit.

22  Q.   Now, what, if any, issues did Lieutenant Welch have with

23  sleep?

24  A.   She had trouble going to sleep.  She was afraid to go to

25  sleep.  She would have difficulty staying asleep, and then once

Direct Examination - Jason Bowie

1    she would be asleep, sometimes she would wake up and be

2    fearful.

3    Q.    Did Lieutenant Welch ever sleepwalk?

4    A.    Yes.

5    Q.    About how frequently?

6    A.    So, it was a long period of time, so I have to kind of

7    break it down to different time frames.  I never experienced it

8    when we first started becoming involved.  Of course our visits

9    weren't as frequent together.  As our visits increased

10   together, I noted that as the more stressed she became at work

11   and this thing drug on, that she had difficulty with sleeping

12   as I had described.

13           And so the bulk or the majority of those observations

14   were, again, 2009, 2010, 2011 time frame, and there would be

15   times where several times a week she would get up in the middle

16   of night, and I would be confused, because either I would be

17   trying to sleep, as well, or trying to get some rest, or she

18   would sit up in bed or she would just be staring at different

19   things in the room and she was afraid of -- she got anxiety

20   from looking at things in the room, like a smoke detector or a

21   little light on the DVD or on the TV, and feel she was being

22   recorded.

23   Q.    Now, did Lieutenant Welch seek counseling?

24   A.    I believe she did.

25   Q.    Do you know if she had any issues with medications?

Direct Examination - Jason Bowie

1  A.   I know she was taking different medications for her

2  migraines.  I don't believe she's taking medications for

3  anything else and I don't really delve into that too much.  I

4  know she had received care from a -- counseling from Dr. Foote

5  but that's the only counseling that I'm aware of.

6  Q.   Now, did Lieutenant Welch change or did her social circle

7  change during this time you knew her from 2009 to 2010?

8  A.   Yes.

9  Q.   What were some of those changes?

10 A.   There was a -- There was more people that would be in

11 contact with her, I would say, more frequent text messages,

12 people calling, conversations about work.  Not that I was

13 involved with most of those conversations, but you can hear

14 them going on in the household, and there were social events

15 that we would meet up with people from Albuquerque Police

16 Department and whatnot, and I would feel that really declined.

17 The more she was exposed and involved in all this, the more she

18 relied on immediate family and just kind of stayed restricted

19 to that.

20 Q.   Now, was there a point in time when you were in Rio Rancho

21 Police Department that you were questioned about Lieutenant

22 Welch lying during her Internal Affairs investigation?

23 A.   Yes, I was.

24         MS. ANDERSON:  Your Honor, may I have a moment?

25         THE COURT:  You may.

1   Q.   (By Ms. Anderson)  And, Captain Bowie, who questioned you

2   about Lieutenant Welch's evaluation?

3   A.   My boss.

4          MS. WILLIAMS:  Objection, Your Honor.  This is

5   hearsay.

6          THE COURT:  Well, I don't think we've gotten into

7   that yet.  You may ask the question.

8   A.   My boss.

9   Q.   (By Ms. Anderson)  And who is your boss?

10  A.   My boss was Deputy Chief Gary Wiseman.

11         MS. ANDERSON:  No further questions.

12         THE COURT:  Okay.  Ms. Williams.

13         MS. WILLIAMS:  Excuse me.

14         THE COURT:  You may proceed.

15         MS. WILLIAMS:  Thank you, Your Honor.

16                 CROSS-EXAMINATION

17  BY MS. WILLIAMS:

18  Q.   Good afternoon, Captain Bowie.

19  A.   Good afternoon.

20  Q.   You met Lieutenant Welch in 2002 through Michelle

21  Campbell, correct?

22  A.   Correct.

23  Q.   Before 2009, you didn't socialize with Lieutenant Welch?

24  A.   Yes, I did.

25  Q.   Do you remember having your deposition taken in this case?

Cross-Examination - Jason Bowie

1    A.    Yes, I do.

2    Q.    Do you remember -- Let me find it.  That was on

3    October 20th, 2017, correct?

4    A.    I believe so.

5    Q.    Do you remember me asking you the question:  "You didn't

6    socialize with her before the 2009 period?"  Do you remember

7    that question?

8    A.    I don't remember that question.

9    Q.    Can I show you your deposition and have you refresh your

10   memory?

11   A.    You certainly may.  You certainly may.

12           MS. WILLIAMS:  May I approach, Your Honor?

13           MS. ANDERSON:  Patti --

14       (A conference was held between Ms. Williams and

15       Ms. Anderson.)

16           MS. WILLIAMS:  May I approach, Your Honor?

17           THE COURT:  You may.

18       (A discussion was held between the witness and

19       Ms. Williams.)

20   A.    Which section are you referring to, ma'am.

21           It doesn't say that I didn't.

22           THE COURT:  Well, hold on, please.  Just read the

23   item.

24           Ms. Williams.

25   Q.    (By Ms. Williams)  Captain Bowie, do you remember, after

Cross-Examination - Jason Bowie

1    having your memory refreshed, that I asked you a question,

2    "You didn't socialize with her before the 2009 period?"  Do

3    you remember that question now that I've -- you've had your

4    memory refreshed?

5    A.   That's not the way I read it, ma'am.  It says, "Contact

6    would be rare."

7    Q.   No.  The question --

8         MS. WILLIAMS:  Your Honor, can I just read the

9    question?

10        THE COURT:  Well --

11   A.   I was reading --

12        THE COURT:  I'm not sure it's been established he

13   doesn't completely remember the question that was asked.  Can

14   you just clarify that?

15        MS. WILLIAMS:  May I show him the exact question?  He

16   read around that.

17        THE COURT:  You may.

18   A.   Please.

19   Q.   (By Ms. Williams)  Captain Bowie, there's the question

20   and the answer.

21   A.   I see it.

22   Q.   Okay.  Let me ask you again, do you recall me asking the

23   question "You didn't socialize with her before the 2009

24   period?"

25   A.   I do.

Cross-Examination - Jason Bowie

1   Q.   And your answer is "No.  I mean, again, at some common

2   events if she was there."  And then you have a long answer

3   about how you thought she was attractive.  But your answer was

4   no, wasn't it?

5   A.   I have to disagree with you there.  There's more than that

6   "No."  Initially it says "No."  Then it goes onto explain that

7   my contact with her was rare, and taken out of context --

8            THE COURT:  All right.  Mr. Bowie, you get a chance

9   to explain on redirect.

10           MS. WILLIAMS:  Thank you, Your Honor.

11           THE COURT:  Ms. Williams, you can move on.

12   Q.   (By Ms. Williams)  You started dating Lieutenant Welch in

13   2009?

14   A.   Correct.

15   Q.   You started living with her in 2011, right?

16   A.   Yes, ma'am.

17   Q.   You married her in August of 2013?

18   A.   Correct.

19   Q.   You're happily married to Lieutenant Welch?

20   A.   I am.

21   Q.   As Lieutenant Welch's husband, you're her confidante?

22   A.   Yes, I would say that's fair.

23   Q.   You're testifying here today as her husband and

24   confidante?

25   A.   I'm testifying here today as Jason Bowie, her husband,

Cross-Examination - Jason Bowie

1   correct.

2   Q.   Thank you.  You only know your wife's perception of most

3   of the events in this -- that are subject of this lawsuit,

4   correct?

5   A.   Correct.  I answered correct.

6   Q.   Oh, thank you.

7   A.   Sorry.

8   Q.   I didn't hear you.  I'm sorry.

9          You have no personal knowledge of most of the events?

10  A.   I don't have personal knowledge of most of the events,

11  correct.

12  Q.   You haven't done any independent investigation?

13  A.   I have not.

14  Q.   You haven't talked to others to corroborate facts as an

15  investigator?

16  A.   I have not.

17  Q.   Rio Rancho Police Department has about 130 officers now,

18  correct?

19  A.   About 135, yes, ma'am.

20  Q.   And about 15 percent are women?

21  A.   I don't know the percentage, but that sounds fairly

22  accurate.

23  Q.   Okay.  You've never had a female officer in your Special

24  Services Unit, have you?

25          MS. ANDERSON:  Objection, Your Honor.  Relevance.

Cross-Examination - Jason Bowie

1          MS. WILLIAMS:   Your Honor, he asked -- They asked

2    him about the Special Services Unit, and it's the ROP

3    equivalent.  I think it's fair.

4          THE COURT: All right.  You may continue.  Overruled.

5    Q.   (By Ms. Williams)  There hasn't ever been a female

6    officer in the Rio Rancho Police Department Special Services

7    Unit, correct?

8    A.   Since the inception in 2005, no.

9    Q.   To date?

10   A.   To date, correct.

11   Q.   There hasn't been a female in SWAT, Rio Rancho SWAT,

12   correct, sir?

13   A.   That's correct.

14   Q.   Do you have sexual harassment training at Rio Rancho

15   Police Department?

16   A.   We do.

17   Q.   But you don't remember that training very well, do you?

18   A.   It's --

19          MS. ANDERSON:  Objection, Your Honor.  Relevance.

20          THE COURT:  Okay.  I'll sustain the objection.

21          MS. WILLIAMS:  All right.

22   Q.   (By Ms. Williams)  You have no personal knowledge about

23   the event where your wife was investigated for purchasing

24   alcohol at Walgreen's and transporting it in a City vehicle,

25   correct?

Cross-Examination - Jason Bowie

1      MS. ANDERSON:  Objection.  Outside the scope and

2  asked and answered.

3      THE COURT:  Well, it could only be one or the other.

4  No, it's going to be -- I think it's outside the scope, as

5  well.

6      MS. WILLIAMS:  All right.

7  Q.   (By Ms. Williams)  You have observed that your wife has

8  had migraines since before you started dating, correct?

9  A.   Correct.

10  Q.   And you've observed that when Ms. Lieutenant Welch's

11  stress increases, her communication decreases?

12  A.   In the home when her stress is increased, the

13  communication has decreased.  I believe that was in my

14  deposition.

15  Q.   Yes.  Have you ever suggested couples counseling for

16  interpersonal issues with Ms. Lieutenant Welch?

17  A.   No.

18  Q.   You've never suggested that she seek counseling?

19  A.   Not that I recall.

20  Q.   When your wife becomes distant and standoffish, it's

21  obvious to someone who knows her like you, correct?

22  A.   I know when my wife is standoffish.

23  Q.   Her coworkers at ROP would know her pretty well too?

24  A.   I can't speak to that.

25  Q.   Okay.  Do you know people on your teams pretty well?

1   A.   Yes.

2   Q.   Can you tell if there's a change in their demeanor?

3   A.   Sure.

4   Q.   Personality conflicts happen in law enforcement units,

5   don't they?

6   A.   I believe they happen everywhere in the world.

7   Q.   As a supervisor in law enforcement, have you ever gotten a

8   letter from the parent of an officer asking you to intervene?

9   A.   No.

10  Q.   Have you ever issued a corrective action memo that was not

11  disciplinary?

12  A.   Yes.  Many.

13  Q.   And does that give direction and an opportunity for the

14  officer to perform better in the workplace?

15          MS. ANDERSON:  Objection, Your Honor.  This is all

16  outside the scope.

17          THE COURT:  Sustained.

18          MS. WILLIAMS:  All right.

19  Q.   (By Ms. Williams)  You talked about the testing procedure

20  that your wife went through, the sergeant's testing, that you

21  encouraged her to do that.

22  A.   I did.

23  Q.   Did she want to test?

24  A.   Not initially, no.

25  Q.   And she has since taken -- Were you there for the first

1  time she took the sergeant's test?

2  A.    I've helped her through all of her -- all of her testing.

3  Q.    And there were three sergeant's test?

4  A.    Three tests and one lieutenant.

5  Q.    And she was promoted to sergeant and since promoted

6  lieutenant, correct?

7  A.    Correct.

8  Q.    Did she take pride in that?

9  A.    I would think so.

10 Q.    Takes a lot of work to prepare her for the advancement and

11 the taking of those tests, right?

12 A.    It does take a lot of work.

13 Q.    And testing is stressful?

14 A.    Yes, it is.

15 Q.    And as far as you know, does your wife take

16 antidepressants or anxiety medication now?

17 A.    No, she does not.

18 Q.    Thank you.

19        MS. WILLIAMS:  No further questions.

20        THE COURT:  All right.  Any redirect, Ms. Anderson?

21        MS. ANDERSON:  No, Judge.

22        THE COURT:  All right.  May Mr. Bowie, then, be

23 excused?

24        MS. ANDERSON:  Yes, Your Honor.

25        THE COURT:  All right, sir, you may step down.

Cross-Examination - Jason Bowie

1    Mr. Bowie, I'm going to instruct you, though, obviously, except

2    for your wife, do not discuss your testimony outside of the

3    courtroom.  All right?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  All right.  All right.  Ladies and

6    gentlemen, that concludes the evidence for today.  I'll

7    instruct you, though, just as before, maybe with a little more

8    clarity, do not discuss the case at any time during recess.

9    Otherwise have a good evening.  And if you can be back in the

10   jury deliberation room as this morning, as close to 8:30 as

11   possible, we'll get started promptly.  All right.  Good night.

12       (Jury out at 5:19 p.m.)

13             THE COURT:  All right.  Please be seated.

14             All right.  Mr. Villa, the plan for tomorrow morning?

15             MR. VILLA:  Your Honor, I believe we're first going

16   to call Joseph Hudson because the agreement we have regarding

17   that motion to quash is we'd get him out of here Thursday

18   morning.  They're going to call Robert Smith, who,

19   unfortunately, had to be on standby, and I suspect that should

20   take the bulk of the morning.  We're also going to have Deputy

21   Chief Feist here tomorrow afternoon.  We may or may not get to

22   Deputy Chief -- Retired Deputy Chief Beth Paiz.  We also have a

23   couple of shorter witnesses who have been subpoenaed, Gene

24   Marquez and Nick Laskar, so if we have time, we'll put those

25   on.  These are the officers who have also been disciplined for

1   alcohol.

2          I think that should get us through the end of the

3   day.  If it doesn't, we have the depositions we can play for

4   the jury.  The agreement I think for Thursday is Chief Schultz

5   and David Hubbard.  Lieutenant Roseman, who's going to testify,

6   is also available on Thursday.

7          THE COURT:  All right.  And will Mr. Schultz, former

8   Chief Schultz be here?  I thought he wouldn't be here until

9   Friday.

10          MS. WILLIAMS:  I've talked with him, and he will be

11   here on Thursday.  We took your admonition that they have

12   three-and-a-half days, and we wanted to make him available in

13   their case-in-chief.

14          THE COURT:  Okay.  Okay.

15          MR. VILLA:  So I think that I may have missed one or

16   two.  And Maureen O'Brien, who is also available, and Danny

17   Garcia.  And those are -- The last one, he's available both

18   days, Mike Hill.

19          THE COURT:  All right.  And some of these folks are

20   on the defense list?

21          MS. WILLIAMS:  Yes, Your Honor.  There's a few that

22   we were -- we will do and finish.  For sure -- For sure Deputy

23   Chief Paiz and Chief Schultz.

24          THE COURT:  Okay.  All right.  Now, somewhere

25   sometime we have to get to jury instructions.  What I intend to

```
 1   do is --

 2            Chris, do we have at least a version of any of the

 3   six or seven instructions at this point?

 4            MS. BACA:  They're just in dirty form, Judge.

 5            THE COURT:  Yeah, maybe we're not ready.  So I think

 6   sometime tomorrow I'll put at least some of the jury

 7   instructions in your hands.  What we may have to do is try to

 8   get some of those done after they're done with their witnesses

 9   tomorrow evening.  So we'll have to get those done at some

10   point.  I think it will be after the day is over with the

11   witnesses.  So as early as tomorrow, we'll try to have some in

12   your hands as early as tomorrow.

13            Okay.  That's the plan that I can give you.  Is there

14   anything else, then, today, Mr. Villa?

15            MR. VILLA:  I don't have anything else, sir.

16            THE COURT:  Okay.  Ms. Williams?

17            MS. WILLIAMS:  No, Your Honor, we have nothing.

18            THE COURT:  Okay.  We'll see you tomorrow morning as

19   early as 8:30.  Good night.

20            MR. VILLA:  Good night, Your Honor.  Thank you.

21         (Court stood in recess at 5:23 p.m.)

22

23

24

25
```

```
1                        I N D E X

2      EXAMINATION                              PAGE

3        Cross-Examination by Ms. Williams            6
         Redirect Examination by Mr. Villa          187
4
    PLAINTIFF'S WITNESS WILLIAM GENE FOOTE
5
         Direct Examination by Ms. Anderson        228
6        Cross-Examination by Ms. Williams         253
         Redirect Examination by Ms. Anderson      283
7
    PLAINTIFF'S WITNESS JASON BOWIE
8
         Direct Examination by Ms. Anderson        296
9        Cross-Examination by Ms. Williams         307

10

11
    EXHIBITS                          IDENTIFIED/ADMITTED
12
    Defendant's Exhibit B admitted                   74
13  Plaintiff's Exhibit 13 admitted                 118
    Plaintiff's Exhibit 13a admitted                127
14  Plaintiff's Exhibit 75 admitted                 218
    Plaintiff's Exhibit 86 admitted                 162
15  Plaintiff's Exhibit 153k admitted               123

16

17

18

19

20

21

22

23

24

25
```

320

```
 1                    C-E-R-T-I-F-I-C-A-T-E

 2   UNITED STATES OF AMERICA

 3   DISTRICT OF NEW MEXICO

 4

 5        I, Danna Schutte Everett, RPR, CCR, CRR, Official

 6   Court Reporter for the State of New Mexico, do hereby

 7   certify that the foregoing pages constitute a true

 8   transcript of proceedings had before the said Court held

 9   in the city of Albuquerque, New Mexico, in the matter

10   therein stated.

11        In testimony whereof, I have hereunto set my hand on

12   this 22nd day of June, 2018.

13

14                    _____

                      DANNA SCHUTTE EVERETT
15                    Registered Professional Reporter
                      Registered Merit Reporter
16                    Certified Realtime Reporter
                      NM Certified Court Reporter #139
17                    100 Church Street
                      Las Cruces, New Mexico  88001
18                    Phone:  (575) 528-1656
                      Fax:  (575) 528-1645
19                    dannadawn@comcast.net

20

21

22   May 15, 2018, Welch vs. City of Albuquerque

23

24

25
```