1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3

TERYSA M. WELCH,
4
                    PLAINTIFF,
5
            vs.                    NO:  CIV-11-0700 KG/SCY
6
CITY OF ALBUQUERQUE, a New Mexico
7 Municipality, et al.,

8                    DEFENDANTS.

9

10

11         TRANSCRIPT OF TRIAL PROCEEDINGS - VOLUME VII

12          BEFORE THE HONORABLE KENNETH J. GONZALES

13            TUESDAY, MAY 22, 2018; 8:31 A.M.

14               ALBUQUERQUE, NEW MEXICO

15

16

17      Proceedings recorded by mechanical stenography;
   transcript produced by computer.
18

19

20

21

22

23 Reported By:  Danna Schutte Everett, CRR, RPR, RMR, CCR 139
                United States Court Reporter
24              100 N. Church Street, Las Cruces, NM  88001
                Phone:  (575) 528-1656  Fax: (575) 528-1645
25              dannadawn@comcast.net

```
1    FOR THE PLAINTIFF:

2         THE LAW OFFICE OF RYAN J. VILLA
          2501 Rio Grande Boulevard, Northwest, Suite A
3         Albuquerque, New Mexico  87104
          BY:  MR. RYAN J. VILLA and
4              MS. RICHELLE ANDERSON

5    FOR THE DEFENDANTS:

6         WIGGINS, WILLIAMS & WIGGINS
          1803 Rio Grande Boulevard, Northwest
7         Albuquerque, New Mexico  87104
          BY:  MS. PATRICIA WILLIAMS and
8              MS. LORNA M. WIGGINS

9    Also Present:  Ms. Terysa M. Welch
                    Ms. Trish Hernandez
10                  Mr. Trevor Wiggins
                    Ms. Mary Scott
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  All right.  Good morning, everyone.  All

2    right.  Please be seated.

3          Okay.  Back on the record.  By now I think you have

4    the latest, most recent, and as close to final draft of the

5    jury instructions and the verdict form.

6          Let me point to you at least a few of the changes

7    that we made last night after we recessed.  First, let me take

8    up the issue about -- that was raised relating to including the

9    transfer from ROP as an action by the City and whether that was

10   raised at any point before, including in the Pretrial Order.

11   That language we've incorporated into the jury instructions,

12   and I'm reflecting back on the Pretrial Order.  This is

13   document 422, where it's referred -- or referenced in multiple

14   places, including on page 7.  It's subsection capital B, Facts

15   Relevant to Sex Discrimination, and it relates to when the City

16   and her supervisors disciplined her and generally I think

17   referring to what actions the City took.  There are specific

18   references to facts relevant to retaliation.  That's in

19   subsection C, also on page 7, including language relating to

20   the City retaliated against her by disciplining her and forcing

21   her to transfer out of ROP.  Retaliation being relevant to the

22   claim of discrimination.  And also on page 8, subsection

23   capital D, Facts Relevant to the HRA Claims, and including

24   language, third line, that reflects transferred her from ROP.

25          So based on those references in the Pretrial Order,

1   noting the objections from defendant, but nevertheless finding

2   it instructive and helpful to the jury to include, based on

3   what's been alleged or claimed, to including those —— those ——

4   well, that language in the jury instructions.

5           Ms. Williams, anything as to that argument or that

6   issue?

7           MS. WILLIAMS:  Your Honor, if the —— if the transfer

8   is going to be specifically mentioned, we would ask that our

9   proposed adverse employment action that goes directly to

10  transfer should also be included on one of our blank pages.  I

11  don't know if that's happened or not.

12          THE COURT:  Yes, let me take that up next.  So

13  instead of incorporating it into a blank page as a whole

14  separate instruction, let me point you to what you have in

15  front of you in the instructions as Number 11.

16          First, let me just tell you, in the second paragraph,

17  we've inserted, you'll notice, "An employee is free to

18  discipline" —— excuse me —— "An employer is free to discipline

19  or to transfer an employee for any nondiscriminatory reason."

20  So the phrase "or to transfer an employee" was added.  It was

21  also added at the end of that same paragraph, last sentence,

22  beginning with the phrase "used in consideration in deciding to

23  discipline her or to transfer her from ROP."  So those phrases

24  were added.

25          Let me also call your attention to page 16, the first

1  full paragraph, that is new, and it includes language from the

2  Tenth Circuit.  If you need the citation, I can provide that to

3  you.  That was offered, though, I think in defendant's proposed

4  jury instructions.  I'll just read it to you and into the

5  record.

6          "An involuntary transfer, without more, does not

7  constitute an adverse employment action if it does not involve

8  any significant changes to an employee's conditions of

9  employment.  For example, an involuntary transfer does not

10 constitute an adverse employment action if salary and benefits

11 remain the same and duties are substantially the same."

12          Again, that's taken directly from the Tenth Circuit.

13          Now, Ms. Williams, as to your concerns, does that

14 address it at least in part, if not entirely?

15          MS. WILLIAMS:  Yes.  Yes, Your Honor.  Thank you.

16          THE COURT:  Okay.  Mr. Villa, anything about that

17 that you'd like to note at this point?

18          MR. VILLA:  I think we would just stand on the

19 response we filed, Your Honor, that this isn't necessary and it

20 is encompassed in the rest of the jury instruction, but I

21 understand the Court's ruling.

22          THE COURT:  Yes, sir.  All right.  Let me point you

23 to what is really just a typographical correction.  Page 4,

24 last paragraph, I guess the fourth line from the bottom begins

25 with "conditions of her employment."  I think we just removed

1    an "s," so that was corrected.

2            I'll call your attention also to Jury

3    Instruction No. 12.  It's on page 17.  We tried to remove

4    references last night to failure to promote, and so this one

5    slipped in or we didn't catch that, so we just removed the

6    phrase in the third line "or it fails to promote."  That's,

7    again, to be consistent.

8            Then, let's see.  If I could draw your attention to

9    number 36, page 41, the second and third paragraphs, in that

10   second paragraph it includes the line "overtime wages,

11   emotional distress, damage to reputation within the APD, and

12   loss of enjoyment of life."  That's also to remain consistent

13   with what we had added last night.  That third paragraph,

14   second line begins "damages for lost overtime wages, emotional

15   distress, damage to reputation within the APD, and loss of

16   enjoyment of life."

17           All right.  Ms. Williams, again, that's just to

18   remain consistent, noting your objection.

19           MS. WILLIAMS:  Yes.  I understand, Your Honor.  Thank

20   you.

21           THE COURT:  All right.  Mr. Villa, anything about

22   that?

23           MR. VILLA:  No, Your Honor.

24           THE COURT:  Okay.  Let me just -- Adding the same

25   language, page 42, that's the fourth line from the bottom,

1  again where it begins "reputation within the APD."

2       Okay.  So those are the changes that were made.  They

3  are reflected in your final copy.

4       All right.  Then I have to ask, we had Exhibit

5  Number 43 that was offered yesterday.  I think I provisionally

6  admitted it for the limited purpose of explaining why

7  Mr. Potter did what he did; in other words, why he went to his

8  supervisor.  I think it was Hubbard.  So it's provisionally

9  admitted, but it's not entirely admitted, so the entire

10  document is not in evidence.

11       What is your position as to whether the entire

12  exhibit should be in evidence, Mr. Villa?

13       MR. VILLA:  I think it should, Your Honor.  I think

14  that rather than provisional, I understood the Court's ruling

15  to be it was offered for the limited purpose of showing the

16  effect on Mr. Potter and why he went to Commander Hudson, and

17  so I think the entire document is admissible for that purpose.

18  I think the Court appropriately instructed the jury on what its

19  limited purpose was, and in closing argument we are limited, as

20  well.

21       THE COURT:  All right.  Ms. Williams.

22       MS. WILLIAMS:  Your Honor, we believe that there was

23  testimony elicited on the very subject that Mr. Villa's talking

24  about now that he wanted the exhibit to stimulate, and that

25  happened.  The exhibit is replete with hearsay.  It's lengthy

1    for the purpose of having him prompted to go to a supervisor.

2    He's testified that he did based on looking at a document.  So

3    we don't believe that this needs to go back to the jury.

4            THE COURT:  Okay.  So Exhibit 43 is excluded.  It was

5    published to the jury on the ELMO or the projector.  It was

6    utilized by plaintiff's counsel to refresh recollection to

7    explain why Mr. Potter did what he did.  I would note it's at

8    least a two-page document.  It's a memo that was prepared.  It

9    includes plaintiff's statements, which if admitted, were

10   offered by plaintiff would I think circumvent the statement by

11   party-opponent exception to the hearsay rule, and so the item

12   itself, Exhibit 43 is excluded, but, Mr. Villa, you may refer

13   to it as you need to in your argument to explain whatever

14   Mr. Potter did as a result of that report by plaintiff to the

15   supervisors.

16           Okay.  So, all right.  Before we do anything else, is

17   there anything I should take up, Mr. Villa?

18           MR. VILLA:  No, Your Honor.  I was just thinking,

19   because I think it will take a minute to read the instructions,

20   if I could just have a quick, five-minute break to set up

21   after, and that way if the jurors need to use the restroom or

22   anything after you read the instructions, we just take a quick,

23   five-minute break.

24           THE COURT:  Sure.  I think that's reasonable.  All

25   right.  Anything from you, Ms. Williams?

1          MS. WILLIAMS:  No, Your Honor.

2          THE COURT:  Okay.  Let see.  We have an hour and 15

3   minutes, so 75 minutes each.  I'll be timing, as will Ms. Hall,

4   and so whatever balance you have, we'll make that known to you

5   as you begin.

6          MR. VILLA:  Yes, Your Honor.

7          THE COURT:  Or, rather, as you end.

8          Okay.  Let's take a quick recess, and we'll be back

9   in session shortly.

10      (Court stood in recess at 8:43 a.m. and resumed at

11      8:46 a.m. as follows:)

12          THE COURT:  All right.  Please remain standing for

13   the jury.

14      (Jury in at 8:47 a.m.)

15          THE COURT:  Okay.  Good morning, everyone.  Please be

16   seated.

17          All right.  When we recessed last night, I mentioned

18   to you what the plan is for today.  I'm going to begin by

19   instructing you on the law, and then after I am completed with

20   that, then each party will have an opportunity to make their

21   closing arguments.  Now, the instructions I'm going to give to

22   you, you'll each have a copy for your deliberations.  For now,

23   you may refer to the screens in front of you.  Our staff

24   attorney will be leafing through these instructions as we go

25   along so you can listen and then you can read for yourself.

1           All right.  Ladies and gentlemen, members of the

2     jury, you have now heard all of the evidence in the case.  It

3     becomes my duty, therefore, to instruct you on the laws --

4     excuse me -- on the rules of law that you must follow and apply

5     in arriving at your decision in the case.

6           In any jury trial, there are, in effect, two judges.

7     I am one of the judges.  The other is the jury.  It is my duty

8     to preside over the trial and to determine what evidence is

9     relevant under the law for your consideration.  It is also my

10    duty at the end of the trial to instruct you on the law

11    applicable to the case.

12          Number 1.  You, as jurors, are the judges of the

13    facts.  But in determining what actually happened in this

14    case -- that is, in reaching your decision as to the facts --

15    it is your sworn duty to follow the law I am now in the process

16    of defining for you.

17          And you must follow all of my instructions as a

18    whole.  You have no right to disregard or give special

19    attention to any one instruction, or to question the wisdom or

20    correctness of any rule I may state to you.  That is, you must

21    not substitute or follow your own idea or opinion as to what

22    the law is or ought to be.  It is your duty to apply the law as

23    I give it to you, regardless of the consequences.

24          By the same token, it is also your duty to base your

25    verdict solely upon the evidence in the case, without prejudice

1    or sympathy.

2          Number 2.  This case should be considered and decided

3    by you as an action between persons of equal standing in the

4    community, of equal worth, and holding the same or similar

5    stations in life.  All persons stand equally before the law and

6    are to be dealt with as equals in a court of justice.

7          Number 3.  In this lawsuit, plaintiff, Terysa Welch,

8    seeks compensation from the defendant City of Albuquerque for

9    damages which Ms. Welch claims were proximately caused by the

10   City's violation of Title VII of the Civil Rights Act of 1964

11   and the New Mexico Human Rights Act.  Ms. Welch specifically

12   claims that the City violated Title VII and the New Mexico

13   Human Rights Act by engaging in sexual harassment and sex

14   discrimination.

15         Plaintiff claims that the sexual harassment by the

16   City occurred between May 2004 and 2012; and that the sex

17   discrimination by the City occurred between October 24th, 2008,

18   and 2012.

19         With respect to her Title VII claims, Ms. Welch

20   expressly seeks compensation for lost overtime wages, damage

21   she suffered to her reputation within the Albuquerque Police

22   Department, emotional distress, and loss of enjoyment of life.

23   With respect to her New Mexico Human Rights Act claims,

24   Ms. Welch seeks compensation for lost overtime wages, damage

25   she suffered to her reputation within APD, emotional distress,

1    and loss of enjoyment of life.

2            To establish a Title VII sexual harassment claim

3    against the City, Ms. Welch has the burden of proving that she

4    was intentionally subjected to unwelcome harassment by either

5    her supervisors or coworkers; that the harassment was based on

6    her sex; and that a reasonable person would find the harassment

7    hostile or abusive, and Ms. Welch perceived it to be so.

8    Ms. Welch must also show that the harassment was sufficiently

9    severe or pervasive as to alter the conditions of her

10   employment and create an abusive working environment.  With

11   respect to sexual harassment by coworkers, Ms. Welch has the

12   burden of proving that the City or its management either knew

13   or should have known of the harassment, and failed to take

14   prompt and appropriate remedial action.

15           To establish a Title VII sex discrimination claim

16   against the City, Ms. Welch has the burden of proving that her

17   sex was a motivating factor in the City's decision to

18   discipline her or to transfer her from the Repeat Offender

19   Project, referred to here as ROP.

20           To establish a New Mexico Human Rights Act sexual

21   harassment claim against the City, Ms. Welch has the burden of

22   proving that the harassment was based on sex; she was subjected

23   to a hostile environment in which the offensive conduct had the

24   purpose or effect of unreasonably interfering with her work

25   performance or creating an intimidating, hostile, or offensive

1  working environment, and that the work environment was one that

2  a reasonable person would find hostile or abusive and one that

3  Ms. Welch perceived as being hostile or abusive.

4         To establish New Mexico Human Rights Act sex

5  discrimination claims against the City, Ms. Welch has the

6  burden of proving that she was otherwise qualified in December

7  2009 to be a detective in the ROP unit.  Ms. Welch also has the

8  burden of proving that the City did one or more of the

9  following:  A) disciplined her; B) transferred her from ROP;

10  or, C) discriminated in matters of compensation, terms,

11  conditions, or privileges of employment against her.  Ms. Welch

12  further has the burden to prove that sex was a motivating

13  factor in the City's decision to take the above actions.

14         Ms. Welch has the burden of proving her Title VII and

15  New Mexico Human Rights Act claims by a preponderance of the

16  evidence and that the Title VII and New Mexico Human Rights Act

17  violations were the proximate cause of her damages.

18         Number 4.  The City denies what Ms. Welch says about

19  sexual harassment and sex discrimination and argues it will

20  show the following by a preponderance of the evidence:  One,

21  the City did not subject Ms. Welch to unwelcome harassment;

22  two, the City did not impose severe or pervasive conditions on

23  Ms. Welch's employment because of her sex; three, after the

24  City learned about Ms. Welch's complaints about her coworkers,

25  the City responded to her allegations promptly and took

1    appropriate remedial action; four, Ms. Welch's statements

2    regarding alleged discrimination were not sufficient to convey

3    to the City that Ms. Welch believed the City was acting in an

4    unlawful discriminatory manner within the meaning of the

5    New Mexico Human Rights Act; five, the City had a legitimate

6    nondiscriminatory business purpose or reason for every action

7    they took regarding Ms. Welch; six, the City did not take any

8    adverse employment action against Ms. Welch, and she has been

9    promoted twice since this lawsuit was filed; seven, not a

10   single term or condition of Ms. Welch's employment changed for

11   the worse during her employment; eight, the conditions placed

12   on Ms. Welch's employment, if any, were the result of

13   legitimate, nondiscriminatory reasons, not her sex; nine,

14   Ms. Welch's sex was not a motivating factor in any decision the

15   City made; and, ten, Ms. Welch cannot prove under either

16   Title VII or the New Mexico Human Rights Act that she is

17   entitled to damages proximately caused by the City's

18   impermissibly made employment decisions based on her sex.

19            Number 5.  It is a general rule in civil cases that a

20   party seeking a recovery or a party relying on a defense has

21   the burden of proving every essential element of its claim or

22   defense by a preponderance of the evidence.

23            Now, to prove by a preponderance of the evidence

24   means to establish that something is more likely true than not

25   true.  When I say in these instructions that a party has the

1    burden of proof, I mean that you must be persuaded that what is

2    sought to be proved is more probably true than not true.

3    Evenly balanced evidence is not sufficient.

4              Number 6.  This page is intentionally left blank.

5              Number 7.  Ms. Welch's first claim against the City

6    is for sexual harassment by the City itself or its supervisors

7    in violation of Title VII.  To succeed on this claim, Ms. Welch

8    must prove by a preponderance of the evidence all four of the

9    following factors:  First, that, between May 2004 and 2012, she

10   was intentionally subjected to unwelcome harassment by the

11   employer or by her supervisor; second, that the harassment was

12   based upon her sex; third, that the harassment was both

13   objectively and subjectively offensive, such that a reasonable

14   person would find it hostile or abusive, and Ms. Welch in fact

15   did perceive it to be so; and, fourth, that the harassment was

16   sufficiently severe or pervasive so as to alter the conditions

17   of her employment and create an abusive working environment.

18             Unwelcome harassment means conduct that is uninvited

19   and offensive or unwarranted -- excuse me -- unwanted.  On

20   whether the conduct was objectively offensive, you may

21   consider, among other things, the frequency of the conduct, its

22   severity, whether it was physically threatening or humiliating,

23   or whether it was a mere offensive utterance, whether it

24   unreasonably interfered with an employee's work performance,

25   and its effect on the employee's psychological well-being.

1          Liability on this claim requires more than mere

2     utterance of an offensive remark.  It does not, however,

3     require tangible psychological injury.  There is no

4     mathematical precise test for determining whether words and

5     gestures meet the standard.  Instead, you must consider the

6     evidence as a whole and the totality of the circumstances, such

7     as the nature of the conduct and the context in which it

8     occurred.  Discriminatory intimidation, ridicule, and insult

9     can be sufficiently severe or pervasive in their accumulated

10    effect to alter the conditions of employment and create an

11    abusive working environment.  The conduct or actions do not

12    have to be overtly sexual, but conduct that results from

13    genuine but innocuous differences in the way men and women

14    routinely interact with members of the same sex and of the

15    opposite sex is not illegal.  Offhand comments, rudeness,

16    occasionally teasing and isolated incidents are not alone

17    sufficient.  This is not a general civility code for the

18    workplace.

19          Number 8.  The term "sex" as used to Title VII and

20    the New Mexico Human Rights Act is a synonym for the term

21    "gender" and refers to the quality of being male or female.

22          Number 9.  Ms. Welch's second claim against the City

23    is for permitting sexual harassment by coworkers in violation

24    of Title VII.  To succeed on this claim, Ms. Welch must prove

25    by a preponderance of the evidence all six of the following

1  factors:  First, that, between May 2004 and 2012, she was
2  subjected to unwelcome harassment; second, that the harassment
3  was based upon her sex; third, that the harassment was both
4  objectively and subjectively offensive, such that a reasonable
5  person would find it hostile or abusive and Ms. Welch in fact
6  did perceive it to be so; fourth, that the harassment was
7  sufficiently severe or pervasive so as to alter the conditions
8  of her employment and create an abusive working environment;
9  fifth, the City or management-level employees of the City
10 either knew or should have known of the harassment; and, sixth,
11 the City and management-level employees of the City failed to
12 take prompt and appropriate remedial action.

13         Unwelcome harassment means conduct that is uninvited
14 and offensive or unwanted.  On whether the conduct was
15 objectively offensive, you may consider, among other things,
16 the frequency of the conduct, its severity, whether it was
17 physically threatening or humiliating, or whether it was a mere
18 offensive utterance, and whether it unreasonably interfered
19 with an employee's work performance, and its effect on the
20 employee's psychological well-being.

21         Liability on this claim requires more than mere
22 utterance or -- excuse me -- mere utterance of an offensive
23 remark.  It does not, however, require a tangible psychological
24 injury.  There is no mathematical precise test for determining
25 whether words and gestures meet the standard.  Instead, you

1  must consider the evidence as a whole and the totality of the

2  circumstances, such as the nature of the conduct and the

3  context in which it occurred.  Discriminatory intimidation,

4  ridicule, and insult can be sufficiently severe or pervasive in

5  their accumulated effect to alter the conditions of employment

6  and create an abusive working environment.  The conduct or

7  actions do not have to be overtly sexual.  But conduct that

8  results from genuine but innocuous differences in the way men

9  and women routinely interact with members of the same sex and

10  with the opposite sex is not illegal.  Offhand comments,

11  rudeness, occasional teasing and isolated incidents are not

12  alone sufficient.  Once again, this is not a general civility

13  code for the workplace.

14        Number 10.  If Ms. Welch satisfies all of the

15  requirements I have listed for sexual harassment by coworkers

16  under Title VII, then you shall consider the City's affirmative

17  defense.  To prevail on its affirmative defense, the City must

18  prove by a preponderance of the evidence both of the following:

19  First, that it exercised reasonable care to prevent and correct

20  promptly sexually harassing behavior; second, that Ms. Welch

21  unreasonably failed to take advantage of any preventive or

22  corrective opportunities the City provided.

23        If you find that the City has proven both of these by

24  a preponderance of the evidence, your verdict on the Title VII

25  coworker sexual harassment claim must be for the City on this

1   claim.

2          If you find that the City has not met its burden of

3   proof on the Title VII coworker sexual harassment claim, your

4   verdict will be for Ms. Welch on that claim.

5          Number 11.  Ms. Welch's third claim against the City

6   is for sex discrimination in violation of Title VII.

7   Specifically, Ms. Welch claims that the City took adverse

8   employment action against her because of sex discrimination.

9   To succeed on this claim, Ms. Welch must prove by a

10   preponderance of the evidence that her sex was a motivating

11   factor in the City's decision to discipline her or to transfer

12   her from ROP, and that the discipline or transfer from ROP

13   occurred between October 24th, 2008, and 2012.

14          An employer is free to discipline or to transfer an

15   employee for any nondiscriminatory reason even if its business

16   judgment seemed objectively unwise.  But you may consider the

17   believability of an explanation in determining whether it is a

18   coverup or pretext for discrimination.  To prove that the sex

19   was -- Let me begin that again.  To prove that sex was a

20   motivating factor, Ms. Welch must show that the City used that

21   consideration in deciding to discipline her or to transfer her

22   from ROP.

23          Ms. Welch need not show that sex discrimination was

24   the only reason the City disciplined her or transferred her

25   from ROP.  But she must show that the City relied upon sex

1    discrimination in making its decision to discipline Ms. Welch

2    or to transfer her from ROP.

3           Ms. Welch is not required to produce direct evidence

4    of unlawful motive.  You may infer knowledge and/or motive as a

5    matter of reason and common sense from the existence of other

6    evidence -- for example, explanations that you find were really

7    pretextual.  Pretextual means false or, though true, not the

8    real reason for the action taken.

9           An adverse employment action by a supervisor is an

10   action of the employer.

11          An adverse employment action is one that, standing

12   alone, actually causes damage, tangible or intangible, to an

13   employee.  The fact that an employee is unhappy with something

14   his or her employer did or failed to do is not enough to make

15   the act or omission an adverse employment action.

16          An employer takes adverse action against an employee

17   only if it, one, takes something of consequence away from the

18   employee, for example, by discharging or demoting the employee,

19   reducing his or her salary, or taking away significant

20   responsibilities; or, two, fails to give the employee something

21   that is customary -- that is a customary benefit of the

22   employee relationship; for example, by failing to follow a

23   customary practice of considering the employee for promotion

24   after a particular period of service.

25          An involuntary transfer, without more, does not

1  constitute an adverse employment action if it does not involve

2  any significant changes to an employee's conditions of

3  employment.  For example, an involuntary transfer does not

4  constitute an adverse employment action if salary and benefits

5  remain the same and duties are substantially the same.

6       If you find that Ms. Welch has not proven by a

7  preponderance of the evidence that the City used Ms. Welch's

8  sex in deciding to discipline her or to transfer her from ROP,

9  your verdict must be for the City.

10       But if you find that Ms. Welch has proven by a

11  preponderance of the evidence that her sex was a motivating

12  factor in the City's decision to discipline her or to transfer

13  her from ROP, then the burden of proof shifts to the City to

14  prove by a preponderance of the evidence that it would

15  nevertheless have taken the same action if it had not

16  considered Ms. Welch's sex.

17       If you find that the City has not met its burden of

18  proof, your verdict will be for Ms. Welch and you will proceed

19  to consider damages as I will describe them.  But if you find

20  that the City has proven that it would not have taken the same

21  actions -- excuse me.  But if you find that the City has proven

22  that it would have taken the same action regardless of

23  Ms. Welch's sex, you will not consider damages for this claim.

24       I have prepared a Special Verdict Form to assist you

25  in addressing these issues.

1          Number 12.  In this case, you must also determine

2    whether the City violated a statute known as the New Mexico

3    Human Rights Act.  An employer violates the New Mexico Human

4    Rights Act if sexual harassment occurs, or discriminates in

5    matters of compensation terms, conditions, or privileges of

6    employment against an otherwise qualified person based on sex.

7          Number 13.  A person is otherwise qualified if she is

8    able to do the job in spite of her sex.

9          14.  This page is intentionally left blank.

10         15.  Ms. Welch's fourth claim against the City is for

11   sexual harassment under the New Mexico Human Rights Act.

12   Ms. Welch must prove by a preponderance of the evidence that,

13   first, that the harassment, which occurred between May 2004 and

14   2012, was based on sex; second, Ms. Welch was subjected to a

15   hostile environment in which the offensive conduct has the

16   purpose or effect of unreasonably interfering with her work

17   performance or creating an intimidating, hostile, or offensive

18   working environment; and, third, the work environment was both

19   objectively and subjectively hostile; one that a reasonable

20   person would find hostile or abusive and one that Ms. Welch did

21   perceive as being hostile or abusive.

22         When determining whether a work environment was

23   hostile or abusive, you look at the totality of the

24   circumstances, including the frequency of the discriminatory

25   conduct; its severity; whether it is physically threatening or

1    humiliating, or a mere offensive utterance; and whether it

2    unreasonably interferes with an employee's work performance.

3            Simple teasing, offhand comments, and isolated

4    incidents, unless extremely serious, will not amount to

5    discriminatory changes in the terms and conditions of

6    employment.  Ordinary socializing in the workplace, such as

7    intersexual flirtation, should not be mistaken for

8    discriminatory conditions of employment.

9            Number 16.  Ms. Welch's fifth claim against the City

10   is for sex discrimination under the New Mexico Human Rights

11   Act.  To establish under the New Mexico Human Rights Act that

12   between October 24, 2008, and 2012 the City discriminated

13   against Ms. Welch based on her sex, Ms. Welch has the burden of

14   proving by a preponderance of the evidence the following:

15   First, that Ms. Welch was otherwise qualified to be a detective

16   in ROP from December 11, 2009, to 2012; second, that the City

17   did one or more of the following:  A, disciplined Ms. Welch; B,

18   transferred Ms. Welch from ROP; or, C, discriminated in matters

19   of compensation, terms, conditions, or privileges of employment

20   against Ms. Welch.  Third, that Ms. Welch's sex was a

21   motivating factor in the City's actions as described in

22   paragraphs A through C of the second element, above.

23           If you disbelieve the reasons the City has given for

24   the actions described in paragraphs A through C of the second

25   element, above, you may infer that the City took these actions

1   because of Ms. Welch's sex.

2        Number 17.  An unlawful employment practice is

3   established under the New Mexico Human Rights Act when the

4   complaining party demonstrates that sex was a motivating factor

5   for the employment practice, even though other factors also

6   motivated the practice.

7        Number 18.  A municipality, like the City, can act

8   only through its officers and employees.  Any act or omission

9   of an officer or an employee of a municipality, within the

10  course -- within the scope or course of his or her employment,

11  is the act or omission of the municipality.

12       Number 19.  The defendant in this case is a

13  municipality.  A municipality is entitled to the same fair and

14  unprejudiced treatment as an individual, and you should decide

15  the case with the same impartiality as you would use in

16  deciding a case between individuals.

17       Number 20.  As stated earlier, it is your duty to

18  determine the facts, and in doing so you must consider only the

19  evidence I have admitted in the case.  The term "evidence"

20  includes the sworn testimony of the witnesses and the exhibits

21  admitted in the record.

22       Remember that any statements, objections, or

23  arguments made by the lawyers are not evidence in the case.

24  The function of the lawyers is to point out those things that

25  are most significant or helpful to their side of the case, and

1   in doing so, to call your attention to certain facts or

2   inferences that might otherwise escape your notice.  In the

3   final analysis, however, it is your own recollection and

4   interpretation of the evidence that controls in the case.

5   Whatever the lawyers say is not binding upon you.

6          So, while you should consider only the evidence in

7   the case, you are permitted to draw such reasonable inferences

8   from the testimony and exhibits as you feel are justified in

9   the light of common experience.  In other words, you may make

10  deductions and reach conclusions which reason and common sense

11  lead you to draw from the facts which have been established by

12  the testimony and evidence in the case.

13         Number 21.  You may consider either direct or

14  circumstantial evidence.  Direct evidence is testimony of one

15  who asserts actual knowledge of a fact, such as an eyewitness.

16  Circumstantial evidence consists of proof of facts or

17  circumstances which give rise to a reasonable inference of the

18  truth of the fact sought to be proved.  The law makes no

19  distinction between the weight to be given to either direct or

20  circumstantial evidence.

21         Number 22.  Now, as I have said, that you must

22  consider all of the evidence.  This does not mean, however,

23  that you must accept all of the evidence as true or accurate.

24         You are the sole judges of the credibility or

25  believability of each witness and the weight to be given to the

1  witness's testimony.  In weighing the testimony of a witness,

2  you should consider the witness's relationship to the plaintiff

3  or to the defendant; the witness's interest, if anything, in

4  the outcome of the case; manner of testifying, opportunity to

5  observe or acquire knowledge concerning the facts about which

6  the witness testified; candor, fairness and intelligence; and

7  the extent to which the witness has been supported or

8  contradicted by other credible evidence or previous statements

9  inconsistent with the witness's present testimony.  You may, in

10  short, accept or reject the testimony of any witness in whole

11  or in part.

12       Also, the weight of the evidence is not necessarily

13  determined by the number of witnesses testifying as to the

14  existence or nonexistence of any fact.  You may find that the

15  testimony of a smaller number of witnesses as to any fact is

16  more credible than the testimony of a larger number of

17  witnesses to the contrary.

18       Number 23.  A witness may be discredited or impeached

19  by contradictory evidence or inconsistent conduct, or by

20  evidence that at other times the witness has made material

21  statements, under oath or otherwise, which are inconsistent

22  with the present testimony of the witness.

23       If you believe that any witness has been impeached or

24  discredited, it is your exclusive province to give the

25  testimony of that witness only such credit as you may think it

1    deserves.

2              Number 24.  An expert witness is permitted to state

3    an opinion based upon a question which, for the purposes of

4    trial, assumes as true certain facts which may or may not be

5    true.

6              It will be for you in your deliberations, however, to

7    determine from all of the evidence whether or not the facts

8    assumed have been proved to be true.

9              The Rules of Evidence provide that if scientific,

10   technical, or other specialized knowledge might assist you in

11   understanding the evidence or in determining a fact in issue, a

12   witness qualified as an expert by knowledge, skill, experience,

13   training, or education, may testify and state an expert opinion

14   concerning such matters.

15             You should consider each expert opinion received in

16   evidence in this case and give it such weight as you may think

17   it deserves.  If you should decide that the opinion of an

18   expert witness is not based upon sufficient education and

19   experience, or if you should conclude that the reasons given in

20   support of the opinion are not sound, or that the opinion is

21   outweighed by other evidence, then you may disregard the

22   opinion entirely.

23             Number 25.  This page is intentionally left blank.

24             Number 26.  Some evidence is admitted for a limited

25   purpose only.  When I instruct you that an item of evidence has

1   been admitted for a limited purpose, you must consider it only

2   for that limited purpose and for no other.

3        Number 27.  Deposition testimony is testimony that

4   was taken under oath before trial and has been preserved in

5   writing.  This testimony is entitled to the same consideration

6   that you give any other testimony at this trial.

7        Number 28.  This page is intentionally left blank.

8        Number 29.  An attorney has the right to interview a

9   witness for the purpose of learning what testimony the witness

10   will give.  The fact that the witness has talked to an attorney

11   does not reflect adversely on the truth of such testimony.

12        Number 30.  Any notes that you have taken during this

13   trial are only aids to your memory.  If your memory differs

14   from your notes, you should rely on your memory and not on your

15   notes.  Your notes are only to refresh your recollection.  The

16   notes are not evidence.  If you have not taken notes, you

17   should rely on your independent recollection of the evidence

18   and should not be influenced by the notes of other jurors.

19   Notes are not entitled to any greater weight than the

20   recollection or impression of each juror about the testimony.

21        Number 31.  An act is a cause of harm if it

22   contributes to bringing about the harm, and if the harm would

23   not have occurred without it.  It need not be the only

24   explanation for the harm, nor the reason that is nearest in

25   time or place.  It is sufficient if it occurs in combination

1   with some other cause to produce the result.  To be a cause,

2   the act, nonetheless, must be reasonably connected as a

3   significant link to the harm.

4         Number 32.  You are not to engage in any discussion

5   of damages unless you first determined -- unless you have first

6   determined that there is liability, as elsewhere covered in

7   these instructions.

8         The fact that you are given instructions on damages

9   is not to be taken as an indication as to whether the Court

10  thinks damages should or should not be awarded.

11        Number 33.  Damages must be reasonable.  If you

12  should find that the plaintiff is entitled to a verdict, you

13  may award only those damages which will reasonably compensate

14  the plaintiff for the injuries that the plaintiff has sustained

15  as a result of the defendant's wrongful conduct.  You are not

16  permitted to award speculative damages.  So, you are not to

17  include in any verdict compensation for any prospective loss,

18  which, although possible, is not reasonably certain to occur in

19  the future.

20        Number 34.  You must not award compensatory damages

21  more than once for the same injury.  For example, if a

22  plaintiff prevails on more than one of the plaintiff's claims

23  and establishes a dollar amount for the plaintiff's injuries,

24  you must not award the plaintiff any additional compensatory

25  damages on each claim.  The plaintiff is only entitled to be

1   made whole once, and may not recover more than the plaintiff

2   has lost.  Of course, if injuries -- Excuse me.  Of course, if

3   different injuries are attributable to the separate claims,

4   then you must compensate the plaintiff fully for all injuries.

5           Number 35.  Intentionally left blank.

6           Number 36.  Now, once again, the fact that I instruct

7   you on damages does not represent any view by me that you

8   should or should not find the City liable.

9           Now, with respect to her Title VII claims, Ms. Welch

10  seeks to recover damages for lost overtime wages, emotional

11  distress, damage to reputation within APD, and loss of

12  enjoyment of life.

13          With respect to her New Mexico Human Rights Act

14  claims, Ms. Welch seeks to recover damages for lost overtime

15  wages, emotional distress, damage to reputation within APD, and

16  loss of enjoyment of life.

17          Distress arising from this lawsuit, or legal expenses

18  incurred in this lawsuit must not be included in these damages.

19  You must determine, instead, what other loss, if any, Ms. Welch

20  has suffered caused by any sexual harassment or sex

21  discrimination in violation of Title VII or the New Mexico

22  Human Rights Act that you find the City has committed under the

23  instructions I have given you.  We call these compensatory

24  damages.

25          You may award compensatory damages for lost overtime

1    wages, any damage to reputation suffered by Ms. Welch within

2    APD, emotional distress, or loss of enjoyment of life if you

3    determine that Ms. Welch has proven by a preponderance of the

4    evidence that she has experienced any of these consequences as

5    a result of sexual harassment or sex discrimination in

6    violation of Title VII.

7            You may award compensatory damages for lost overtime

8    damages, any damages to reputation suffered by Ms. Welch within

9    APD, emotional distress, or loss of enjoyment of life if you

10   determine that Ms. Welch has proven by a preponderance of the

11   evidence that she has experienced any of these consequences as

12   a result of any sexual harassment or sex discrimination in

13   violation of the New Mexico Human Rights Act.

14           No evidence of the monetary volume of intangible

15   things like emotional distress, loss of enjoyment of life, and

16   damage to reputation is available and there is no standard I

17   can give you for fixing any compensation to be awarded for

18   these injuries.  Even though it is obviously difficult to

19   establish a standard of measurement for these damages, that

20   difficulty is not grounds for denying a recovery on this

21   element of damages.  You must, therefore, make the best and

22   most reasonable estimate you can, not from a personal point of

23   view, but from a fair and impartial point of view, of the

24   amount of emotional distress, loss of enjoyment of life, or

25   damage to reputation within the APD, you find that Ms. Welch

1    has undergone as a result of the City's conduct.  You must

2    place a money value on this.  Attempting to come to a

3    conclusion that you -- a conclusion that will be fair and just

4    to both of the parties.  This will be difficult for you to

5    measure in terms of dollars and cents, but there is no other

6    rule that I can give you for assessing this element of damages.

7            Number 37.  In fixing the amount of money which will

8    reasonably and fairly compensate a plaintiff, you should

9    consider that one who is damaged must exercise ordinary care in

10   minimizing existing damages and to prevent further damages.  A

11   plaintiff may not recover for losses which could have been

12   prevented by reasonable efforts by the plaintiff.

13           The burden of proof with respect to this issue is on

14   the defendant.

15           All right.  I'm up to number 38.  I'm going to

16   reserve 38, 39, and 40 for the point when the parties have

17   concluded their arguments, and so for that we will begin with

18   Mr. Villa, but as we start, we're going to take just a

19   five-minute break.

20           All right.  For that, please rise for the jury.

21       (Jury out at 9:29 a.m.)

22           THE COURT:  Okay.  Mr. Villa, do you want to set up?

23           MR. VILLA:  Yes, Your Honor.  Thank you.

24           THE COURT:  Okay.  You're welcome.  All right.  We'll

25   just be in recess, back in about five minutes.

```
 1          (Court stood in recess at 9:29 a.m. and resumed at

 2      9:38 a.m. as follows:)

 3          MS. WILLIAMS:   Your Honor, will we be having a

 4  midmorning break between Mr. Villa and myself?

 5          THE COURT:  Is that what you'd like?

 6          MS. WILLIAMS:  I think so.

 7          THE COURT:  Okay.  Let's do that.

 8          MS. WILLIAMS:  Thank you.

 9          THE COURT:  You're welcome.

10          I think we had jurors running to the restroom while

11  they're standing in line, so that's what's going on.

12          Okay.  Let's go.

13          (Jury in at 9:38 a.m.)

14          THE COURT:  Okay.  Please be seated.

15          Ladies and gentlemen, for closing arguments,

16  summations, because the plaintiff has the burden of proof, the

17  plaintiff goes first.

18          Mr. Villa.

19          MR. VILLA:  Thank you, Your Honor.  May it please the

20  Court, counsel, Ms. Welch.

21          Ladies and gentlemen, on behalf of Ms. Welch,

22  Ms. Anderson, and myself, we want to thank you for your time.

23  We appreciate that you all have been here, you've sacrificed,

24  given up time away from your lives and businesses and paid

25  close attention to the evidence in this case.  So we're now at
```

1  the end, and I'm going to take just a little bit more of your

2  time before you get to decide the case.  So what we are going

3  to ask you to do at the end of this closing argument is to go

4  back into the jury room and deliberate on Ms. Welch's claims of

5  sexual harassment discrimination and find in her favor and fix

6  the appropriate amount of damages to fully compensate her for

7  those claims.

8         Now, sexual harassment, as you saw from the jury

9  instructions, comes in two forms:  By supervisors and by

10  coworkers.  But the evidence that you saw in this trial is that

11  the sexual harassment came in a little different form for

12  Terysa Welch.  You have what came from Rob Smith, which we'll

13  get into in detail that you've heard a lot about, which I would

14  call sort of the true form of sexual harassment, the note that

15  he wrote on her physical assessment, telling her he wanted to

16  have children with her, the constant commenting to her about

17  her clothing, her looks, his behavior and attitude, which you

18  got to see a flavor of when he testified.  And those other

19  things that you also saw a little bit from J.R. Potter.  He

20  joked and laughed with Robert Smith in front of Terysa Welch

21  about his genitals.  He admitted that he did that on the stand.

22  That is the classic form of sexual harassment.

23         And then there's the hostile work environment form of

24  sexual harassment, the things that Terysa Welch experienced

25  from the beginning of ROP and throughout her time, not from

1  everybody, but from folks like Kevin Gagne, who commented when

2  Terysa came into ROP that "We got F'd.  We had to take a

3  skirt."  Some of the newer -- or the old guard folks in ROP.

4  One in particular, Dan Wolfe who stood up, according to Danny

5  Garcia, and said, you know, "There's no chicks that are going

6  to be in ROP," and the attitudes and behavior that Ms. Welch

7  experienced throughout her time in ROP as from the time period

8  as the judge instructed you, 2004 to 2012.

9          Not everybody was sexually harassing to her.  That

10  was primarily Rob Smith.  But a lot of the evidence you saw

11  came in the form of hostility.  And what we ask you to evaluate

12  is what damage did that sexual harassment cause Ms. Welch.

13  Well, it caused her to transfer, caused her to lose what she so

14  loved in the ROP unit.  Remember her testimony from the time

15  she got to the Academy and the ROP guys came in, that's what

16  she wanted to do.  And a lot of people wanted to do that.

17  Heck, even Kevin Gagne said that's what he wanted to do.  And

18  you heard that that's one of the great benefits of being in the

19  law enforcement profession.  You can gravitate to different

20  areas and do what you love.  And that was taken away from

21  Terysa because of sexual harassment.

22          You had heard about the buildup of events, the chain

23  of events that happened that led to that transfer.  Did she say

24  "Yes, I want to be transferred"?  Absolutely.  Did she have a

25  choice?  Absolutely not.  She had finally had it come July when

1   she received that punctuality memo for what she felt was an

2   improper reason, missing a training when she was told the day

3   before by Kevin Gagne to go to the station.  Mike Hill

4   testified that was what the order that was given by the Acting

5   Sergeant Kevin Gagne.  And when there was this confusion,

6   Sergeant Hubbard didn't try to talk to Mike Hill, he didn't try

7   to talk to Kevin Gagne, he just sent her a punctuality memo and

8   claimed that he had issues with her performance.  But you saw

9   the evidence.

10          There was no issues with her performance.  Her

11  performance evaluation, which I'll show you here in a minute,

12  showed clearly that through the year 2009 there weren't any

13  issues.  So why is it Sergeant Hubbard and later Lieutenant

14  Smith and Commander Hudson are all talking about Terysa Welch's

15  performance when nothing else is going on?  Why do they come in

16  and say that to you?  Because, ladies and gentlemen, that's

17  just a pretext for their conduct.  It's a pretext for the real

18  reasons they did what they did.  And so that transfer was

19  because of the sexual harassment.

20          Remember the testimony from Beth Paiz and the notes

21  that you have in evidence, Exhibit 4, which I'm going to show

22  you a little bit more.  She was asking Terysa, "Do you feel

23  safe at work?  Are you going to be okay?  Can you wait until

24  January?  We'll do this temporary transfer to the Academy,

25  we'll sort this situation out, and we'll get you back."

1          But Terysa had to go on December 11th, 2009, right

2    after the Rob Smith incident in the hallway where in a hallway

3    as large as this area between the jury box and the chairs he

4    made it so Terysa Welch had to get out of the way and go up

5    against the wall.

6          She had received a blank transfer form in her inbox.

7    She was complained about by Kevin Gagne and J.R. Potter, two

8    people who she named in her EEOC Complaint, to Commander

9    Hudson.  He wrote her a memo, made her respond to that memo.

10   She knew what was going on.  This was a buildup that these

11   individuals were partaking in to get rid of her, and they were

12   doing it, they were being hostile towards her and harassing

13   towards her, and sex was a motivating factor.

14         You saw the jury instructions.  It doesn't have to be

15   the only factors.  It has to be a motivating factor.  This is a

16   woman, the only woman in ROP who's complaining about behavior

17   because she's a woman, and this is how these individuals

18   reacted to it and caused her that transfer.

19         And then we get to the discipline.  And you heard

20   about how the discipline came about.  Who initiated it?  Kevin

21   Gagne.  Kevin Gagne just two months after he was interviewed by

22   the EEOC investigator asking him about whether he was hostile

23   to her because she was a woman, calls and reports her for what

24   is otherwise a fairly minor violation, that you heard from two

25   men how it was handled in their situation, and she gets run

through the wringer by the very same individuals that were
involved in this.

Who investigated the original Complaint?  Doug West.
Who was the individual that ordered Terysa's alcohol violation
to go through the Internal Affairs process?  Doug West.  Who is
the individual that recommended her termination because of what
he perceived to be false statements?  Clearly that was a
pretext.  Doug West.  And, granted, Chief Feist reviewed that
and said he didn't sustain anything related to false
statements.  He only sustained things related to alcohol.

Chief Schultz didn't impose the recommended
discipline for an alcohol violation, which is a written
reprimand.  He imposed discipline that he said was 40 hours,
and that was his threshold policy for reporting things to the
New Mexico Law Enforcement Academy, but we'll show you here in
a minute the discipline he imposed was actually a 16-hour
suspension and 24 held in abeyance, yet that discipline then
gets reported to the New Mexico Law Enforcement Academy.  And
in the letter which you all saw to the New Mexico Law
Enforcement Academy she was accused of much more severe things
than she was actually have found to have been done that ended
up creating a letter in her file that's there forever.

And you have to ask yourself, was that -- what was
the reason that was done.  Everybody involved knew that she
complained.  Chief Schultz knew from the beginning that she had

1    complained about this, that these issues were at the boiling

2    point in ROP based on Terysa Welch's Complaint, a woman who's

3    complaining about being mistreated as a woman.

4         And then what was the final outcome of Chief

5    Schultz's discipline?  It was not consistent with what other

6    men who have done the same things had received.  And it was

7    much, much more severe.  And that's hostility, ladies and

8    gentlemen, and it's hostility based, at least a motivating

9    factor is sex.  And so the transfer and the discipline and the

10   results of the transfer and discipline and the damage Terysa

11   Welch suffered was because of sexual harassment.

12        It was also discrimination.  And discrimination is,

13   again, is sex a motivating factor.  Well, let's look at the

14   transfer.  What happened?  She made her Complaint, and they

15   moved out two males, Lieutenant Smith and Sergeant Hubbard.

16   They didn't move out Kevin Gagne or J.R. Potter.  And then they

17   quickly moved them back in just a couple of months.  And the

18   hostility didn't stop.  It resumed, it increased, it got worse.

19   It got to the point where Lieutenant Smith was trying to bull

20   her over in the hallway.  People were putting blank transfer

21   forms in her box.  J.R. Potter and Kevin Gagne are accusing her

22   of things that are very serious:  Failing to cover, dropping a

23   surveillance, things that Terysa has never, ever been accused

24   of before in her life, things that are damaging to her -- to

25   her reputation.  And they don't move out these individuals,

1   they don't address these individuals, they don't sit down with

2   these individuals and say "Why are you doing this?  We need to

3   stop this behavior, we need to get this better."  No, it gets

4   to the point where Terysa, a woman, gets moved so that the men

5   get to stay and the woman gets moved.  That's discrimination.

6   The transfer was discrimination, ladies and gentlemen.

7        And she didn't get to be moved back with these guys

8   being moved out.  They got to stay.  Commander Hudson got to

9   stay and retire in the summer of 2010.  Rob Smith got to stay

10  and retire in the summer of 2010.  Sergeant Hubbard got to stay

11  and retired in the fall of 2010.  Kevin Gagne got to stay and

12  retired at the end of 2011.  So they all got to stay.  They all

13  got to stay in ROP, the job that they loved, that they wanted

14  to do, and Terysa Welch didn't.

15       And the discipline, as I've talked about, that's

16  discrimination, too.  You heard two examples, males who got --

17  one got verbal counseling, and one got a written reprimand.  So

18  why did Terysa Welch not get the same treatment?  Did you see

19  any evidence that this was really different?  You know they

20  accused her of lying in Internal Affairs.  And all the evidence

21  is she admitted she went to the Walgreen's all the time.  She

22  admitted that she'd used her City vehicle to transfer alcohol

23  home before.  She admitted that she was there on that day when

24  she saw the video and the receipts, and all she'd said was she

25  couldn't remember that day.  And that's the excuse they used to

1    try to treat her differently.  Well, you get to decide whether

2    that's a legitimate excuse or not, whether that's not pretext

3    or something else, and whether her sex is a motivating factor.

4    And I think we've established that it is.

5           Now, when it comes to fixing the damages, you saw the

6    judge's instruction for the nonspecific damages or the

7    nonmonetary damages.  There's no set formula.  So we have the

8    loss of overtime.  And that shows you right there, ladies and

9    gentlemen, a clear difference between the benefits that are

10   available in ROP and those that are available in Burglary.  You

11   also heard about the differences in the two units.  ROP is

12   clearly more prestigious, it's looked up to, it furthers one's

13   career and reputation much more than in the Burglary unit.  But

14   it's undisputed that Terysa Welch made less overtime.

15          Brian McDonald reviewed her pay stubs from '08 and

16   '09 and then compared 2010, '11, and '12 and conclusively saw

17   that she lost overtime.  And that is a benefit of being in the

18   ROP unit.  That amount is fixed.  That's easy for you to

19   decide.  Twenty-seven thousand six hundred and I believe it was

20   thirty-nine dollars.

21          But the other damages, the emotional distress, the

22   damage to reputation, and the loss of enjoyment of life, all

23   damages that are allowed by law, that are there to fully

24   compensate somebody when they suffer harassment, discrimination

25   are not specific, and it's a difficult thing to decide.

1          But what I would say to you is a couple of things.

2     If you fully compensate Terysa Welch, it doesn't just

3     compensate her for what she lost, but it also makes it clear

4     that this type of behavior isn't going to be tolerated; that

5     we're not going to put up with it; that you as the deciders of

6     this, the voice of the community are saying, we're not going to

7     allow these things to happen, and when it does, we're going to

8     fully compensate people for it.

9          And when you try to evaluate how you do it, we've got

10    different time frames.  You know, they're -- unfortunately,

11    they don't teach us this in law school.  Lots of people

12    disagree about how to do it.  You could take a daily amount.

13    You could take a monthly amount, a yearly amount, a weekly

14    amount.  It's difficult.  I'm going to suggest some things to

15    you-all as we go through.

16          I've got a little death by PowerPoint for you, but

17    you get to decide.  You can agree with me or disagree with me.

18    You can say what I'm asking for is too much or too little, and

19    you are ultimately the voice of the community, but I want you

20    to think about what it means to have emotional distress, to

21    suffer damage to your reputation within the Police Department,

22    to lose that enjoyment of life that we get from our jobs and

23    our careers, and decide that fully compensating Terysa Welch

24    would be the best way not only to give her back what she lost,

25    but to send a message.

1             So let me show you this.  I'll switch over to the

2    HDMI.  So when people show you who they are, believe them.  And

3    I think that that makes sense in this case, because you got to

4    see a lot of who people were on the witness stand.  It's kind

5    of amazing how when a witness is on the stand some of their

6    true colors come out.  Okay.  So think about the day and a half

7    Terysa Welch was on the stand and how you evaluated her and

8    what that told you about her character, her up there telling

9    you what happened, what she went through, dealing with

10   cross-examination from Ms. Williams, and compare that to some

11   of the other witnesses who also showed you who their true

12   colors were on the stand.  Rob Smith, J.R. Potter, Kevin Gagne.

13   What did you evaluate about their credibility when you got to

14   see them?  You can rely on your common sense, you can rely on

15   your instinct and your gut about how you saw what went down

16   there.

17             So, of course, just to reiterate, the APD and ROP

18   unit in 2009, Chief Schultz is the chief; there's two different

19   deputy chiefs, Paiz and Feist, over this period of time.  They

20   command larger divisions, but they also cover the Special

21   Investigations Division.  And the Special Investigations

22   Division was overseen by Commander Joseph Hudson during this

23   time period, and later Doug West, when he was reviewing the

24   Internal Affairs thing.  The lieutenant at the time in 2009 is

25   Robert Smith, and Sergeant Dave Hubbard is in the unit and is

1   the sergeant of the unit.  And the detectives that were in

2   there, who most of whom you heard from, Danny Garcia, Mike

3   Hill, Kevin Gagne, J.R. Potter, Terysa Welch, one individual

4   who we didn't get to hear from who was in the unit for a little

5   while, Ron Baca, but you got to see all of those individuals

6   testify.  Mike Hill, Danny Garcia, those individuals were

7   sincere, genuine, legitimate.  You saw their testimony.  You

8   get to decide that.  And then compare their testimony with the

9   testimony of the others and the differences in terms of their

10  credibility, whether they made statements that were different

11  in their depositions, and some of the things they said.

12          So let's talk about Lieutenant Rob Smith.  There's

13  Exhibit 166, the personal fitness evaluation and wanting to

14  have children with you.  Think about something when it comes to

15  sexual harassment.  There's a famous Supreme Court case -- of

16  course, as a lawyer, those are the things that we think

17  about -- from 1964, the same time as the Title VII Civil Rights

18  Act, where the justices were looking at pornography and trying

19  to decide what's covered by the First Amendment and what's not,

20  and Justice Potter Stewart sort of had this famous saying.  He

21  said, "I can't define it, but I know it when I see it."  And I

22  think that holds true in some regards to sexual harassment.

23  There's some things that you know it when you see.  And this,

24  ladies and gentlemen, on this personal fitness evaluation, this

25  is sexual harassment.  You know it when you see it.  He wants

1   to have children with you.

2          And think about how the City tried to deal with that.

3   They said, "Oh, Rob Smith said to everybody 'I want to have

4   your baby.'"  That was his way of complimenting people, his

5   unusual way of complimenting people.  Well, if it was just

6   that, if he just said to everybody, "I want to have your baby,"

7   right, he's a man, he can't have babies, maybe that's in that

8   gray area, maybe that's not something that you know it when you

9   see it, but when he tells a woman "I want to have children with

10  you," that crosses the line.

11         And you heard differing testimony.  I mean, I even

12  asked Commander Hudson his -- Rob Smith's good friend, "Did he

13  ever say he wanted you to have his baby?"  He said, "No, he

14  didn't tell me that."  Right?  J.R. Potter, the same thing.

15  "Did he ever say to you he wanted you to have his baby?"  "No,

16  he didn't tell me that."

17         So, whether they were told that or not by Rob Smith,

18  it clearly never went the other way, but it did go the other

19  way with Terysa, and in the relationship between Rob Smith and

20  Terysa Welch, there's only one person that can have a baby, and

21  that's Terysa Welch.  And this crosses the line.

22         But it's not just this, ladies and gentlemen.  You

23  heard Terysa's testimony that this was all the time, he talked

24  about his genitals, he talked about his penis looking like a

25  tuna can.  He came up to her when she was alone all the time

1    and said things like "Um, um, looking good," mentioned wanting

2    to have children with her, had this Viking story that he liked

3    to tell, that he told you about it, you got to have a flavor of

4    that, and said many times to her he would be pursuing her if

5    she wasn't married.  You didn't hear him say that to any of his

6    male colleagues whatsoever.

7           And the David Maes incident.  If you think about how

8    that happened, that's not supporting your colleague.  That's

9    not trying to help somebody through a crisis incident.  That is

10   Rob Smith taking advantage of Terysa in a very, very vulnerable

11   time in her life and saying things during that exchange, like,

12   "If I wasn't married, I'd be pursuing you," and "Let me take

13   you home" and being extremely inappropriate.  That gives you an

14   idea of what Rob Smith was like.

15          And I suppose the City's going to say, well, Terysa

16   Welch was supposed to do something about that.  Well, from 2004

17   to 2006 or '7 Rob Smith is the sergeant.  He's running the

18   place.  He's an up-and-comer.  He's looked up to.  He's the one

19   that advocates for Terysa to come into the unit, and she's

20   supposed to take him on.  He's got the clout to then become the

21   lieutenant of that unit.  And according to Commander Hudson,

22   when Terysa went to talk to him, he was next in line to be

23   commander.  This is the person Terysa's supposed to take on.

24   And she wants to keep her job in ROP?

25          We've got the Sip and Shop note.  This is just

1    another example of something that Rob Smith did.  And it's

2    interesting that his best friend, who he considers a brother,

3    came in here yesterday and said, "Oh, Terysa made copies of

4    this and Terysa asked for this autograph."  And that was the

5    first time that anybody had said that.  And this evidence was

6    available from the beginning of the case.  Not a single person

7    came in here, not even Rob Smith, and said Terysa made copies

8    of this and Terysa asked for this autograph.  But J.R. Potter

9    did.  What does that tell you about J.R. Potter's credibility

10   and whose side he's on?

11        When we talk about whether this was -- whether it

12   altered Terysa's work environment, what did she talk about?

13   She tried to avoid him.  She tried to be with someone else when

14   Rob Smith was around because he wouldn't do it when she was

15   with other people.  She even went in a different direction.

16        In commenting on these baby comments, I asked

17   Sergeant Hubbard -- well, I asked Kevin Gagne about his

18   behavior, and he said, "Well, you know, I didn't think it was

19   funny, it wasn't appropriate."  I asked David Hubbard if he

20   said to people "Good job, I want you to have my baby," and

21   Hubbard's response on the stand was, "Well, I didn't cross that

22   line because that's a line you don't cross," because even

23   Sergeant Hubbard recognized that that's inappropriate.

24        And again, I think we have to question what's going

25   on when the City is trying to tell you that, oh, that's just

1    the way Rob Smith is, that's the way he compliments people,

2    that's how he is.  We've got to question that when you talk

3    about Danny Garcia.  Danny Garcia went to the Academy with him.

4    Danny Garcia was his workout partner.  Danny Garcia got up

5    there on the stand and said Rob was a go-getter, he was a good

6    sergeant, if I needed a helicopter, he would get me a

7    helicopter.  He didn't get up there and disparage Rob Smith

8    when it came to his job as a police officer, but he said, "He

9    never said that to me, he never made those comments to me:

10   'Good job, Danny, I want to have your baby.'"  Right?  I mean,

11   that's his friend up there telling you the truth.  That's

12   something I think you need to think about when you're

13   considering what really went on in this workplace.

14          So then we get to this punctuality memo.  And like I

15   told you in opening statement, the punctuality memo I think was

16   really the straw that broke the camel's back for Terysa.  She'd

17   had enough, she'd put up with this long enough.  Now things

18   were going to get put into her file that could, as Sergeant

19   Hubbard admitted, be a basis for discipline.

20          And again, the type of hostility that Sergeant

21   Hubbard, Kevin Gagne, and these individuals were expressing

22   toward Terysa were not sexually overt like Rob Smith.  It was

23   more subtle.  They were more hostile to her.  They were more

24   hostile.

25          Think about what Terysa and Kevin Gagne told you

1    happened with the whole pink shirt thing.  Right?  Terysa was

2    trying to get Kevin Gagne to lighten up; so she wore a pink

3    shirt.  Why did she do that?  Because it's feminine.  Kevin

4    Gagne said that.  She was doing that because she recognized

5    that Kevin Gagne had a problem with her throughout the time

6    that they were in ROP, and she knew that it was related to her

7    being a woman, so she wore a pink shirt and tried to lighten

8    the guy up.

9          This is the same type of hostility that Terysa's

10   experiencing now from Sergeant Hubbard when she gets a memo for

11   missing this training day.  Mike Hill doesn't, even though

12   she's with Mike Hill and Mike Hill calls Kevin Gagne when

13   they're at the station and says, you know, "We're here, we

14   thought we were supposed to be here," and Sergeant Hubbard

15   doesn't bother to look into the situation, talk to Mike Hill,

16   talk to Kevin Gagne.

17         In fact, Kevin Gagne even got up here and said,

18   "Well, I'm an acting sergeant; acting sergeants can't give

19   orders."

20         I mean, does that make sense at all, that Kevin Gagne

21   would come up here and tell you acting sergeants can't give an

22   order and right after that J.R. Potter says, "Yeah, they can

23   give orders"?  What's Kevin afraid of.  He knows that this is

24   an issue, this issue with whether he told Mike Hill and Terysa

25   to be at the station or be at the range, and yet he's up here

1   denying that he was even able to give an order.

2          And I find it interesting as David Hubbard gets up

3   here and says when he gives the memo to Terysa, she's screaming

4   and she's yelling, and she's irate, "I couldn't even understand

5   some of things that she said," but he didn't document that.  He

6   documents that she missed a training and missed a briefing, he

7   doesn't bother to investigate whether she was comp'd out for

8   the briefing, and then gets up here and tells you that she's

9   screaming, yelling, and irate to her sergeant in this

10   paramilitary organization, and he didn't think it was important

11   to document this.

12          Now, again, I talked to you about performance.  And

13   performance, it's clear from the evidence that performance was

14   just a pretext.  All of this talk about performance, the

15   suggestion that this is why they're not happy with Terysa or

16   this is why there's problems is her lack of performance.

17   That's a pretext, ladies and gentlemen.  If performance was an

18   issue, they could document performance.  They could write her a

19   memo saying "We need you to make more arrests, we need you to

20   do a better job developing informants, we need you to create

21   more cases, we need this and we need that."  And this is the

22   most recent performance evaluation through 2009.  And on

23   expectations, "Detective will be self-motivated and demonstrate

24   initiative in locating and apprehending repeat offenders.

25   Expectation met."  Right?  "Conduct complete and professional

1  investigations," that's met.  Professional working

2  relationships is met, conform to the Department rules is met.

3  And where is the comments and recommendations from her

4  supervisor?  You all can use your common sense.  These

5  performance evaluations are there for a reason.  Hey, your

6  expectations are met, but in here, in these comments and

7  recommendations, you know, I'd like to see a little bit more of

8  this, that, and the other.  That would be in there if that's

9  what really happened, and it's not in there.

10         So I just want to run down this timeline that we have

11  here.  In 2004, that's when Terysa gets into ROP.  July 24th,

12  2009, is the punctuality memo.  And it builds from there.  She

13  meets with Lieutenant Rob Smith, and what does he say?  "You

14  can't file an EEOC Complaint.  I won't let you."  He sits back

15  in his chair, put his arms behind his head, and said, "I sure

16  hope I'm getting some loyalty here."  You saw Rob Smith.  You

17  can picture that happening.  What would he be worrying about?

18  Why would he care if she files an EEOC Complaint?  Well,

19  because of what he had been doing to her that whole time.

20         She gets the warrant package July 29th after she's

21  complaining to Sergeant Hubbard and then to the lieutenant

22  about it and says that Hubbard gives her the packet on her own.

23  Well, she had received dozens of these in the past.  There was

24  clearly a difference this time.  You know, the City's trying to

25  make you believe that this was something made up or she could

1    simply just call for backup, but Hubbard's communication with

2    her at the time that he provided this warrant packet made clear

3    the way he felt, and Terysa saw that and experienced that and

4    testified to you about that.

5              Well, then she goes to see Commander Hudson, Smith's

6    still friend, and he says "Don't file an EEOC Complaint, just

7    apologize to Smith, fall on the sword, he's next in line to be

8    the commander, you're just going to have to go along, get

9    along."

10             You have the August 3rd incident.  And again, ladies

11   and gentlemen, Terysa Welch had called for backup many, many

12   times.  There had been delay in the past.  But this time it was

13   different, and she told you why it was different and how it was

14   different.  These individuals, Sergeant Hubbard, Kevin Gagne,

15   they were being hostile towards her.  They were not going to

16   help her out.  And this isn't a situation where Terysa was in

17   danger, somebody was attacking her.  She was surveilling a

18   person that she wanted to arrest, and she was asking for help,

19   and it didn't come, and it was different this time.

20             She then files her EEOC Complaint.  And don't forget

21   in between that time, the meeting on August 20th, that maybe

22   Kevin Gagne called, maybe J.R. Potter called, depending on

23   whose story you listen to, J.R. Potter's or Kevin Gagne's, it

24   got angry, got heated, Kevin Gagne slammed the door.  Terysa

25   Welch told you that that -- that meeting was not a meeting

1   about folks trying to resolve their differences.  It was Kevin

2   Gagne and Potter mining her for information, trying to find out

3   what's going on, continuing the hostility towards her.

4          After the EEOC Complaint is filed, Hubbard and Smith

5   are briefly removed and then they come back.  They come back in

6   October, the end of October, beginning of November, and Hubbard

7   has the meeting where he says, and nobody disagrees with this,

8   "It was hard on me.  It's going to be harder on you."  And he

9   talked about some of these rules that he was starting to

10  enforce that were going to stay in place, that got issued

11  July 24th, some of them, especially the change to the arrest

12  log.

13         And Danny Garcia told you about that arrest log.  He

14  told you how it was going to affect Terysa.  The same way

15  Terysa told you it would affect her.  It didn't have anything

16  to do with performance.  It was a way to push Terysa out.

17  Right?  The arrest log used to be ROP team, ROP team got this

18  guy, ROP team got that guy, but now it was going to change and

19  so it would just be the primary and the secondary detective.

20  And Danny Garcia explained to you in detail how that would be

21  different for a guy like him, who's getting all of his warrants

22  because he's liaison with Probation and Parole versus Terysa,

23  who's liaison with Burglary.  It's just much, much different,

24  and it wasn't the team anymore.  It's, Let's target Terysa.

25         And what did Danny Garcia tell you about that?  He

1    said to these guys, "We don't want to do these rules; these

2    rules are no good.  They need to change."  And he was told the

3    rules stay in place until she leaves.  There's your evidence of

4    why those rules were put in place.

5              Then you have the EEOC training on December 10th,

6    2010, with Sue Neal, and that's the training that by then Rob

7    Smith had already attended it, so the City wants to get up here

8    and say, "Well, we heard about the Complaint, we addressed the

9    issue, we took care of it, everything was fine, we had a

10   training."  Well, one day later Rob Smith is trying to bull

11   Terysa over in the hallway.  So how well did that EEOC training

12   really work?  It was the only EEOC training of its kind.  You

13   heard Sue Neal say she'd never given that training before.  Her

14   job was primarily dealing with civilians.  Her job was not

15   looking at EEOC issues with the sworn law enforcement

16   personnel, but she's asked to do this training, and supposedly

17   that fixed the problem.

18             And you heard from Terysa Welch that she told -- she

19   told everybody at SID that the EEOC training was punitive.  She

20   hadn't done one like this.  That wasn't her job.  And why,

21   ladies and gentlemen, would Maureen O'Brien go to that

22   training, Maureen O'Brien, who had also filed that Complaint in

23   SID and felt mortified.  We asked her "Is that how you felt?"

24   She said "Yes."  If the training was everything was fine,

25   everything okay, what about it would make Maureen O'Brien feel

1    mortified?

2          And that's clearly not what happened.  Even Sue Neal

3    got up here and said the feedback was great and everybody was

4    fine and they were attentive and they were interactive and, you

5    know, It wasn't to cover our butt, like Hudson said; it wasn't

6    to inflame the situation like Hudson said.  Everything went

7    perfectly well.  That was her testimony to you guys.

8          And then I showed her this, her e-mail to Beth Paiz

9    talking about Thursday's class, the December 10th class, the

10   one that Terysa went to, and said, "From what I heard and I

11   observed, it seems she's in a group full of hypocrites.  It's

12   probably best that she leave, but those guys have issues that

13   her transfer won't fix."

14         Is that consistent at all with anything Sue Neal

15   tried to tell you in her direct examination about how that

16   class went?  I mean, this is her examination of it.  And when

17   Ms. Williams got back up and asked, "Well, what did you mean by

18   a group full of hypocrites?" Sue Neal could only come up with

19   one individual, not a group, that came up to her and said --

20   and bragged about not having to do the physical fitness.  And,

21   you know, he looked out of shape.  That was Sue Neal's

22   explanation for a group full of hypocrites.  She cited to you

23   one guy that came up to her.  That was not what she was

24   observing at the time she sent this e-mail.

25         And nobody ever asked her, "Well, what did you mean

1   by those guys have issues her transfer won't fix?"  The City

2   just left that transfer unanswered.  You-all can figure it out;

3   you can use your common sense.

4          She did this training, and these are the observations

5   that she made to Elizabeth Paiz just a couple of days later

6   about the SID individuals that Terysa Welch was having to deal

7   with.  A group full of hypocrites, and they have issues that

8   her transfer is not going to fix.

9          We talked about the Rob Smith hallway incident in

10  December 11, 2009.  I'll show you in just a minute she

11  immediately contacted Deputy Paiz and told her about it.  Paiz

12  was concerned about her safety, immediately told Terysa not to

13  go working that night, and then, remarkably, Elizabeth Paiz

14  said now that she didn't believe that incident even happened.

15  She said she thought, well, Smith was on his way out, it's a

16  Friday night, yet she's telling Terysa don't go to work that

17  night because she knew there was some operation going on.

18         And so I asked Beth Paiz, well, you know, you must

19  have looked into this to determine it didn't happen or it was

20  made up.  Well, she didn't ask Rob Smith about the incident,

21  didn't ask anybody else was Rob Smith there that night, didn't

22  check his time sheets, and just assumed that it didn't happen.

23  That was her feeling now when she testified about it.

24         And these are the notes that were actually taken at

25  the time that this was going on.  December 4th when she first

1   talks to Terysa and Terysa says right here, "She told me she

2   was not having a good time and she hated to go," hated to leave

3   the ROP unit.  That was Terysa's feelings on December 4th.

4          On December 7th, she was considering a TDY, a

5   temporary move because, hoping that this thing would be worked

6   out.

7          December 11th, she reports what happened in the EEOC

8   training.  And don't forget the meeting that Sue Neal had with

9   Joe Hudson in which Joe Hudson was hostile -- excuse me-- that

10  Paiz had with Joe Hudson in which Joe Hudson was hostile to

11  Beth Paiz, was rude to her, was rolling his eyes.  And these

12  are the things that you have in Exhibit 4 that shows you

13  exactly what was going on at the time.

14         Again, just a month later after she moves her out of

15  ROP for her safety, she's talking about Joe Hudson and Hudson's

16  still not happy.  She meets with the ROP team February 1st,

17  2010, Gagne, Wyckoff, Potter, Hill, Hubbard, Stephensen, and

18  Smith, at the ROP office.  That's what she wrote in her notes

19  and said they were uncomfortable about her returning to work.

20  Well, remember Wyckoff and Stephensen were new.  They just came

21  to the unit.  How are these guys uncomfortable about Terysa

22  Welch being there if they hadn't been told something by the

23  other individuals?  It just doesn't make sense.  They wouldn't

24  have any reason to be uncomfortable.

25         And then nothing happens until July 9th, 2010, where

1    the issues have still not been addressed within the ROP unit.

2           So, ladies and gentlemen, this is an involuntary

3    transfer, and, as I told you earlier, the transfer was

4    discriminatory and the transfer was caused by the sexual

5    harassment.  And why was it an adverse employment action, which

6    is required for discrimination, it's not a requirement of the

7    sexual harassment claim, but it was an adverse employment

8    action because she lost wages.  Burglary was different.  It was

9    slower paced.  Although Terysa did a good job in Burglary, she

10   expressed her desire to go back to ROP, and ROP clearly has

11   more overtime hours.  The evidence was undisputed as to that.

12   It's more prestigious, there's flexible hours, you get

13   specialized weapons, it's looked up to by everybody in the

14   Department.

15          Danny Garcia was telling you, when the SWAT guys and

16   Homicide guys say they want to be like you, you know that's

17   something special.  And it's in the Special Investigations

18   Division, which is different than all the other divisions, and

19   Burglary's not.  That transfer was an adverse employment

20   action.

21          We talked about Kevin Gagne.  I won't go back over

22   this at length, but again, his hostility towards Terysa Welch

23   was never really contradicted, and you got an idea about what

24   Kevin Gagne's character was like from his testimony and the

25   things that he said.

1          Now, I want to talk to you briefly about this memo

2     that Kevin Gagne got.  Remember, it came up in Exhibit C.  He

3     gets a memo August 17th, 2009, about punctuality.  Well, this

4     is right after Terysa had complained all the way up to the

5     chain of command.  So do you think Sergeant Hubbard is sending

6     this memo to Kevin Gagne because he wants Kevin Gagne to get

7     his act together or he wants to cover himself?

8          We talked about J.R. Potter and his credibility, and

9     you-all got to see his credibility yesterday, but he said

10    things like -- about this fake boob job, about these pictures

11    that Terysa supposedly was showing him, about her looking on

12    the computer for lingerie.  Did anybody else come in here and

13    testify to that?  Did anybody support J.R. Potter's story?

14    None at all.  If that was the case, if that really happened, if

15    that's the way Terysa really was, you would have expected to

16    have heard that.  Not a single other person said anything, save

17    Rob Smith, about Terysa in any way reciprocating this behavior

18    to J.R. Potter or Rob Smith.

19          Now, the discipline, we talked about this at length,

20    but I want you to keep in mind, August 2010, these guys are all

21    interviewed by the EEOC, both Kevin Gagne and Doug West, and

22    just two months later Kevin Gagne's the one who reports Terysa,

23    and Doug West orders the IA and then later recommends her

24    termination.  You've got the evidence right in there.

25          Chief Feist looks at this and says, "Well, yeah, I'll

1   sustain that there were these three violations all related to

2   transporting alcohol, but I'm not sustaining this other stuff,"

3   and he reviewed the interviews in the IA, he reviewed what

4   Terysa said, and that was his conclusion.  She didn't lie; she

5   wasn't hiding anything.

6          Now, the City's going to say, well, Mr. Marquez and

7   Mr. Laskar, who got much less discipline, they only had one

8   policy violation.  But the three policy violations that are

9   sustained in here are all for the same thing:  Transporting

10  alcohol.  You can't transport alcohol, can't violate the rules,

11  can't use your take-home car to transport alcohol.  It's all

12  the same thing.  And just because Mr. Laskar and Mr. Marquez

13  didn't get that same treatment doesn't mean that somehow this

14  is different.  They went after Terysa with more than one

15  violation because they were out to get her.

16         And Chief Schultz's recommendation, which I told you

17  about, that's Exhibit 103, he gives a suspension for 16 hours.

18  He doesn't give a 40-hour suspension.  It's 16 hours, and 24 is

19  held in abeyance.  That's the final discipline.  And all he

20  sustains is that she violated the transporting alcohol.  He

21  doesn't sustain that she lied or interfered with an

22  investigation or did anything like that.  And he knew that his

23  policy was a 40-hour suspension and you get reported to NMLEA,

24  yet he only gave her a 16-hour suspension.  He got to decide

25  what the final punishment was.

```
1              He didn't follow the chart of sanctions.  The chart
2     of sanctions was clear that it's a written reprimand, it's not
3     an 16-hour suspension, but that's what he imposed, and that's
4     plain and simple, different than what Nick Laskar and Gene
5     Marquez got.  You have to ask yourself, why would Terysa Welch
6     get a different punishment than Nick Laskar and Gene Marquez?
7     What's the main difference?  She complained about her treatment
8     as a female, she was a female, and this is what happened to
9     her.  These other guys, Nick Laskar and Gene Marquez, they
10    didn't have that situation going on, and that's the only
11    difference, ladies and gentlemen.
12             And then they send her to NMLEA.  You know, Chief
13    Schultz, he's a smart guy.  He's obviously not going to follow
14    Doug West's recommendation for termination.  He knows how that
15    looks.  So he limits the discipline, yet this letter still gets
16    sent to NMLEA because the NMLEA could revoke Terysa's license.
17    Now, it's not up to Chief Schultz if they revoke the license,
18    but that's what could happen.  And in there they accuse her of
19    this first one, personnel shall obey and to the best of their
20    abilities protect the rights of the people as provided in the
21    Constitution.  And that was never even an issue in any of her
22    Internal Affairs investigation.  So why would they accuse her
23    of that if it's not true?  Why would they send that to the
24    NMLEA?  They also said that she -- personnel shall not
25    knowingly interfere with an investigation.  Yet Chief Feist
```

1    didn't sustain that, and neither did Chief Schultz, but this

2    got sent anyway to the NMLEA.  Why would that happen?  Why

3    would they do that?  It clearly would damage the reputation of

4    Terysa Welch.

5            This is the law enforcement board that holds her

6    certification.  What's the -- What's the only reason that you

7    can think of that they would do that?  Because of who Terysa

8    Welch was, because she's a female, because she's complaining

9    about her treatment as a female.  There's no other explanation

10   for this, ladies and gentlemen.  There's no other reasonable

11   explanation for it.

12           So I want to talk to you about the damages.  And

13   again, this is my suggestion to you.  There isn't a

14   mathematically precise formula.  But there is associated with

15   this discipline and the process that she went to -- went

16   through, emotional distress, loss of enjoyment of life, and

17   damage to reputation.  And so I've suggested $50,000 associated

18   with that whole disciplinary process for these nonspecific

19   damages.  And again, this can also be considered part of the

20   harassment as well as sex discrimination damages.

21           And then the damage to reputation, which I think is

22   really different from emotional distress and loss of enjoyment

23   of life.  And what is that damage to reputation that she was

24   experiencing?  Well, the NMLEA has a permanent letter in her

25   file.  That's in evidence.  Jason Bowie, her husband, gets

1   asked by his own chain of command "Did she lie in the IA?"

2   That's how far the damage to representation spread, ladies and

3   gentlemen.  And I think that that is worth in and of itself the

4   additional monetary amount of $50,000.  Now, remember, you are

5   the voice of the community.  You get to decide.  These are my

6   suggestions to you.

7           And then there's the damages that clearly are

8   associated only with sexual harassment.  The time period from

9   when Rob Smith is the sergeant, 2004 to 2006, he's with her

10  every day, it's the most intense period of time where she's

11  experiencing his sexual harassment and behavior, and so we take

12  a two-year period and suggest $25,000 per year for that

13  two-year period to $50,000.

14          Now, in 2007 to 2009, he's a lieutenant, and so he's

15  not around as much.  It's still happening.  We have the David

16  Maes incident, and so for that two-year period, because I think

17  of the David Maes incident, we're talking about the same dollar

18  amount, $50,000.

19          And then in 2009, of course you have the transfer and

20  everything that happened during that really intense time

21  period, and that's where you heard about the testimony of her

22  emotional distress.  She suffered weight loss, she had sleep

23  problems, her migraines increased dramatically.  And

24  Dr. Foote's testing that he did of her demonstrated that she

25  was suffering from these psychological problems.

1          So, we add up the total amount.  We have the lost

2     overtime.  $27,693 is what Dr. Brian McDonald testified about.

3          So break it down in this fashion.  We come up with

4     the $150,000 for sexual harassment, $100,000 associated with

5     the discrimination.  Although keep in mind that there's

6     crossover between harassment and discrimination.  The lost

7     overtime gets you to a total of $277,693.

8          Again, we trust this to you, ladies and gentlemen,

9     and what I would ask you guys to do when this trial is over, is

10    look at the elements of sexual harassment.  Remember that there

11    are two that you have to examine:  Supervisor and coworker.

12    The City's defense that it properly -- when it found out about

13    the coworker harassment, it addressed it, is only for

14    coworkers.  Not supervisors.  They don't get that defense for

15    supervisors.

16         And then discrimination.  Find that the City is

17    liable for all three, and then fix an amount of damages.  And

18    the Special Verdict Form that you-all are going to get will

19    help you break out the damages for each amount, emotional

20    distress, loss of enjoyment of life, damage to reputation and

21    that sort of thing, and reach a verdict in favor of Terysa

22    Welch.

23         Thank you.

24         THE COURT:  All right.  Thank you, Mr. Villa.

25         Ms. Williams -- And before we get started with

 1   Ms. Williams, we will take another break.  So please rise for

 2   the jury.

 3        (Jury out at 10:29 a.m.)

 4             THE COURT:  All right.  Mr. Villa, of your 75

 5   minutes, you have 25 more minutes.

 6             MR. VILLA:  Yes, Your Honor.

 7             THE COURT:  Okay.  Everybody has equal time.

 8             All right.  We'll be in recess.

 9        (Court stood in recess at 10:30 a.m. and resumed at be

10        10:40 a.m. as follows:)

11             THE COURT:  Please remain standing.

12             Mr. Villa, can you roll through your rebuttal --

13             MR. VILLA:  Yes, Your Honor.

14             THE COURT:  -- after Ms. Williams without having to

15   take a break?

16             MR. VILLA:  Yes, Your Honor.

17             THE COURT:  Are you ready?

18        (Jury in at 10:40 a.m.)

19             THE COURT:  Okay.  Please be seated.

20             Ms. Williams.

21             MS. WILLIAMS:  Thank you, Your Honor.  May it please

22   the Court?

23             THE COURT:  Counsel.

24             MS. WILLIAMS:  Ladies and gentlemen of the jury, we

25   know you all had other obligations during your time that you've

1   been here.  The City of Albuquerque appreciates your service.

2   Ms. Wiggins, Mary Scott, Beth Paiz, and I also appreciate your

3   service.

4            When you were impaneled, you each raised your right

5   hand and swore that you would render a true verdict in

6   accordance with the law and evidence submitted.  In the past

7   six days, you've heard evidence and you were instructed by the

8   law -- by Judge Gonzales on the law this morning.  You've been

9   charged with an important task, and you have the power to

10  ensure that justice is served in this case.  The City trusts

11  you will do the right thing.

12           Plaintiff's counsel are effective advocates, they're

13  fighting hard for Lieutenant Welch.  They don't really want me

14  to talk to you.  This is my one and only chance to talk to you

15  before you deliberate.  Mr. Villa gets another chance, and I

16  will not be able to correct any exaggerations or misstatements

17  as I have been doing in the course of the trial through

18  objections.  I'm asking you to be the guardians of the facts

19  and evidence during rebuttal.  You heard all the evidence, and

20  you can interpret it yourselves.

21           The issue you are here to decide is whether the City

22  sexually harassed or sexually discriminated against Lieutenant

23  Welch because she's a female.

24           Let's start with something clear-cut.  It's

25  undisputed that Lieutenant Welch filed this lawsuit; that since

1   she's filed this lawsuit, that the City has promoted her two

2   times.  It's undisputed that she has not lost a cent in her

3   wages or benefits.  The losses that they're saying that she has

4   are strictly and narrowly put into an overtime category.  It's

5   undisputed that she has the burden of proving that it's more

6   likely than not that the City created a hostile work

7   environment for her because she's a woman.  This is simply not

8   true.

9           Not a single witness on that stand ever said they

10  observed her being harassed or discriminated against because

11  she was a woman in the workplace.  You heard every single

12  witness.

13          Now, Terysa Welch joined ROP in 2004.  That's the

14  date of the physical assessment note, as well.  That note does

15  not come to light for five years.  In July of 2009, with her

16  pen and her silence, Lieutenant Welch began to undermine the

17  ROP team's values.  She started writing comments, notes on her

18  coworkers, who was late, who was not on time, who wasn't where

19  they were supposed to be, and other things that she perceived

20  to be shortcomings of her coworkers.

21          She created an atmosphere of mistrust and animosity

22  among her team by keeping those notes on her teammates and

23  refusing to communicate with them.  They noted she was taking

24  notes.  It disturbed them.  They asked her to talk to them

25  about what was prompting that change in behavior for her, and

1   she told them "None of your business."  That response in this

2   atmosphere creates a danger to everyone on the team, including

3   Lieutenant Welch.  So it's not something that they could

4   tolerate, and it's not because she's a woman.  It's because of

5   her behavior and because of a change in behavior.  We don't see

6   notes like this from 2004 or 2005 or 2006 or 2007 or 2008.  The

7   problems in the team start when she starts documenting

8   shortcomings of her coworkers.

9        Her psychologist said that could create mistrust

10  among a team.  She's not willing to admit that that could

11  create mistrust and a different atmosphere among your

12  coworkers.

13       You've seen excerpts of this book.  It's Exhibit A,

14  which will go back to you in your exhibits.  And they include

15  her criticisms.  Yet she didn't talk to these detectives about

16  her perceived deficiencies that she chose to document.

17       She stopped greeting certain people.  She shut down

18  communication with teammates.  You heard from several witnesses

19  that ROP had a philosophy of -- consistent with APD culture, of

20  trying to resolve differences at the lowest possible level.

21  And that's at the team level, where you go to the person and

22  you say, "Why didn't -- Why are you doing that?" whatever it is

23  that's bothering you, and hopefully that can get done.

24       After about a month of this note-taking behavior,

25  Potter and Gagne and Hill had a meeting with her, and we just

1  talked about that, to see if they can work through her problems

2  and communication problems that they saw developing.  It was a

3  short meeting.  It was a frustrating meeting.

4        Terysa Welch would not open up to her team.  She

5  maintained her silence, widening the breach of trust between

6  her and her teammates.  It had nothing to do with her gender.

7  It had to do with her pen and her silence.

8        At this point, she's creating doubt in the minds of

9  her teammates on whether they could operate safely and protect

10  each other.  J.R. Potter told her, "Are you going to be able to

11  cover me if we can't communicate?"  And that issue was not

12  resolved at that meeting.  Because, after all, these team

13  members each hold each other's lives in their hands.  Good

14  communication is an officer-safety issue, and no one was

15  feeling safe in the midst of the silent treatment and

16  note-taking.  Not a single officer, regardless of gender, felt

17  that this was a safe environment in July of 2009.

18        Terysa Welch testified she didn't believe documenting

19  her colleagues' comings and goings and shortcomings could be

20  perceived as eroding their trust, but the others felt that.

21  They said it did.  And that's for you to decide.

22        She testified that she openly criticized her

23  teammates' weight and insisted that they get into shape or be

24  transferred regardless of their value to the ROP team.  She was

25  proven that there were serious personality conflicts in the ROP

1    team and that she was not interested in working through those

2    conflicts.  She had some people she liked to work with.  You

3    heard the formation of some cliques, and that is a destructive

4    team environment, whether it's a football team or whether it's

5    a police team.

6         Lieutenant Welch wanted a homogenous group of fit

7    people to work plain clothes with her.  You heard Rob Smith and

8    Dave Hubbard testify that you need all sizes and shapes to work

9    effectively in a plain-clothes unit that sometimes goes

10   undercover.  You need people that repeat offenders will not be

11   alerted to.  You need the people of Walmart, and as one of

12   them, we can't all run very fast.

13        She's proven that her workplace felt hostile to her

14   because her coworkers did not respect her abilities as a

15   detective and this change in behavior.  She did not prove that

16   this change was due to her gender.  She testified she could not

17   buy respect in ROP.  She told her psychological forensic

18   psychologist that.  We all know that you don't buy respect.

19   You earn it regardless of gender.

20        You heard that she was reliable backup, that she came

21   on callouts.  You did not hear that she was a go-getter.  In

22   fact, Danny Garcia said she was not a go-getter.  You did not

23   hear that she developed confidential informants and

24   apprehension techniques, that she gathered intelligence to

25   locate repeat offenders, that she built her own cases or made

1   arrests in her own cases.  She was good backup.

2          She's proven that she worked in a high-stress

3   environment in which her coworkers and their use of dark and

4   sometimes rough humor was used to alleviate the tremendous

5   stress they all worked under.

6          The testimony was that she was a willing participant,

7   that she had jokes, that she joined in.  She never told

8   coworkers that they had gone too far with the jokes or comments

9   and that they needed to stop.

10          You heard Sue Neal describe in the EEOC training

11   something called crucial confrontation, where someone who feels

12   that they're being harassed has an obligation to confront,

13   plan, initiate, negotiate, and evaluate so the behavior stops,

14   stops in its tracks, and she never did that with anyone

15   regarding any of the things that she perceived as sexual

16   harassment and that others might have perceived as jokes,

17   however tasteless, however rude they perceived them as jokes.

18          Lieutenant Welch had a catalog of things she

19   perceived as sexual harassment.  You saw it on Mr. Villa's

20   list.  He just recounted them.  The first is the thing that he

21   opened with her in his opening argument, Exhibit 166, the 2004

22   assessment.  You've seen it with almost every witness.  There's

23   a note on that that has been discussed.  Rob Smith said he

24   thought it was a joke.  This was before she was on the ROP

25   team.  So it is interesting to me how if that happened before

1  she was on the ROP team, why she came to the ROP team and did

2  not address it and shut that down immediately.  That assessment

3  is what it is.  You've heard testimony from everyone about Rob

4  Smith's comments and joking humor, and a way that he

5  complimented somebody was saying "I want to have your baby" or

6  things like that.  Maybe tasteless.  Never was told it was

7  sexual harassment, because he was unaware that this was a

8  problem for five years before it came to light.

9          The other is Exhibit 167, the Sip and Shop fundraiser

10  for domestic-violence victims article in which Rob Smith was a

11  model in a fashion show tea.  You've heard testimony that when

12  he said "T - Thanks for the memories heart Rob" he was joking,

13  that he was autographing an article that was in her cubicle and

14  that had been scattered around the SID offices.  Some people

15  testified that Terysa Welch and Mike Hill put those up, and

16  some people did not know.  Rob Smith did not know.  But even

17  Terysa Welch said that these two notes somewhat crossed the

18  line.  She wasn't even prepared in her examination to say that

19  she considered them to have crossed the line.

20          So we have two notes.  You have to decide if these

21  were gender-based sexual harassment or jokes that didn't hit

22  the mark.  Were they meant to harass Lieutenant Welch or were

23  they jokes or compliments among team members?

24          Lieutenant Welch testified that she heard three or

25  four penis jokes between Rob Smith and J.R. Potter in the nine

1  years that they worked together.  They admitted that they told

2  those kind of jokes three or four times in nine years.  She did

3  not testify that they were directed toward her.  They testified

4  that they were not directed toward her, and they might have

5  been said within her hearing.  What is important is she did not

6  confront them, set expectations, and tell them to stop.

7          It appears that they were not unwelcome, these things

8  that have happened that she is complaining about today and

9  calling sexual harassment or sexual discrimination.

10          You heard Sue Neal explain the expectation in APD for

11  a person who feels harassed, that they have an obligation to

12  stop that.  Now, if they can't do that, there's also a safety

13  valve.  They can go to anyone in APD or in the City.  The City

14  HRD, the APD HR department, up her chain of command, the City's

15  EEOC internal office, the -- She has a multitude of options

16  within the City that she does not take advantage of.

17          She then says -- So we have two notes, we have three

18  to four penis jokes, and she says that when Rob Smith informed

19  her that her fiancé was arrested for rape, that he hugged her

20  too tightly, that he held her hand when he was telling her that

21  awful news, and he offered to take her home to get her animals

22  and her things, and that he called her daily to see how she was

23  doing when she decided that she needed to go to Montana.  She

24  describes these things to be harassing and she describes them

25  to be sexual in nature.

1    She describes his calls as a sergeant checking up on

2    her because she has experienced something devastating to be

3    creepy.  And you saw Rob Smith.  He may be juvenile.  You've

4    seen his jokes.  But he is not creepy.  It's up to you to

5    decide if these efforts to comfort one of his subordinates was

6    gender-based harassment or a concerned sergeant looking out for

7    the well-being of one of his subordinates.

8    I understand the lens that Lieutenant Welch was

9    viewing this through.  She'd been betrayed by the man that she

10   was going to marry.  Her paid forensic psychologist, Dr. Foote,

11   agreed that this kind of betrayal could cause a woman to begin

12   to mistrust men.  It could cause a woman to mistrust male

13   police officers.  This may be the genesis of the trust issues

14   with her teammates and Lieutenant Welch.

15   Lieutenant Welch also said Rob Smith joked that he

16   would be interested in pursuing her if he was not married.  She

17   would reply "Next life."  There is no indication that she

18   didn't welcome that kind of back-and-forth banter between her

19   teammate Rob Smith and herself.  She didn't tell him to stop

20   that, that she didn't appreciate that; that it was something

21   that she considered to be sexual in nature instead of kidding

22   around.  She knew he was happily married and never told him to

23   stop that.

24   The harassment has to be unwelcome.  If you

25   participate, if you do not object, if you seem to be engaged,

1    the person that you think is harassing you does not have a

2    message that you think it's inappropriate and needs to stop.

3    And under the law, unwelcomed harassment is not illegal.

4            You have to decide if that would lead him to believe

5    that he was interested in her sexually or if they had a running

6    joke.

7            It's undisputed that she never told Rob Smith she was

8    offended by anything he said.  She never told him to stop.

9            She also describes his Viking story as something that

10   she thought was harassing.  You heard the story.  She

11   participated in the exchange.  You have to decide if he was

12   kidding, if he was entertaining, or if he thought that he

13   wanted her to be breeding stock to have a bigger family line.

14   If his wife is small, Lieutenant Welch is tiny.  If he had that

15   conversation with me, I'm a big girl, we may have talked about,

16   you know, breeding up a line, but this has to be kidding

17   because the thing wasn't true.  There was no way that his

18   great-great-grandfather Viking was going to get taller

19   great-great-great-grandkids if he bred with someone tiny.  It

20   had to be a family history, something to pass the time, and she

21   played along.  She said, "If we had had kids, they'd be bigger

22   and better looking."  And he brought that on and decided, okay,

23   that's -- that's her opinion about that.  "I opened that door,

24   and I'm willing to accept her opinion on that."

25           You need to decide if that was a proposition for sex

1   or not.  We submit it is not.  The circumstances are not

2   sexual.  It's on the -- It's at the Academy.  There's plenty of

3   people around.  It's not a sexual comment.  It's a family

4   history kidding around, entertaining exercise.

5          Lieutenant Welch said she did not report the incident

6   because she didn't want to hurt Rob Smith's tiny wife Shannon.

7   Rob Smith testified that he calls his tiny wife Shannon a

8   munchkin, a midget, a pygmy, all kinds of things, that that's

9   part of their loving, joking-around relationship.  And I think

10  that he thought that that was the kind of relationship he had

11  with his coworker for the past several years through Northeast

12  Impact and through ROP, that he could kid around with

13  Lieutenant Welch because they were comfortable in that

14  relationship.

15         How is he to know that she was going to be offended

16  by the recounting of a family story?

17         So those are the things that we have that he's

18  described as sexual harassment.  Two notes, three or four

19  off-color jokes, comforting her when her fiancé was arrested,

20  and a Viking story.  Six things, seven things if you add "I --

21  I think you look good; if I wasn't married, I would think about

22  going out with you."  Seven things.  We're looking at a time

23  frame of nine years.  We have less than a comment a year that

24  she's finding offensive, and in that period of time she reports

25  none of those until after she gets the punctuality memo.

1          Judge Gonzales instructed you that the harassment has
2    to be unwelcome.  If a woman joins in the exchange, it
3    indicates the exchange is not unwelcome.  If a woman does not
4    set a boundary and say "stop," her coworkers can surmise she's
5    not offended and is a participant in the joking and horsing
6    around.
7          Lieutenant Welch has to prove that these seven
8    instances of sexual harassment that she's described to you were
9    severe and pervasive.  We all know what severe means.  It means
10   extreme.  Right?  A severe headache is an extreme headache;
11   severe weather is severe weather.  Pervasive is a little more
12   less dictionary definition.  And the way I look at it is if --
13   have any of you ever been in an area where a skunk has been
14   frightened?  That pervasive means that it's present everywhere,
15   like that skunk smell, if you've had a skunk be frightened, is
16   in the area, you cannot escape it.  You cannot leave this
17   pervasive, all-encompassing harassment.  We do not believe that
18   she has proven that there was an extremely bad harassment
19   problem everywhere in her workplace through any other witness,
20   including herself.
21          The law given to you by Judge Gonzales is that an
22   offhand comment or rudeness or teasing or an isolated event is
23   sufficient to constitute sexual harassment.  Seven events, nine
24   years is not pervasive or severe.
25          Severe also goes to did the person grab you, did the

78

1    person kiss you, did the person touch you.  And those are in

2    the instructions as well, and I'm sure you'll look at those

3    carefully as you paid attention through the course of this

4    trial.

5           Lieutenant Welch was treated like the other

6    teammates.  They discussed workouts, they discussed diets, they

7    discussed whether they were working or not, the diets and

8    workouts, what results they were getting, are you getting

9    better arms, are you getting better abs, those kind of things.

10   Danny Garcia said they talked about that all the time, he and

11   Rob Smith; that Rob Smith would compliment him, compliment his

12   body parts, "Your arms are looking good, Mr. Garcia."  So he

13   was given the same type of conversations because they were

14   common in ROP.  There's a culture of fitness for some of those

15   people, and diet, exercise, and body are important when you're

16   talking about fitness.

17          They also complimented each other's clothes because

18   they work together all the time.  I don't know about you, but

19   if Ms. Wiggins gets a new shirt, I know it, and I will tell her

20   that I like it or not, and I don't -- I don't believe that's

21   sexual harassment.  It not pervasive, it not severe.  It's

22   offhand, and it's not sexual.

23          You've heard she joked about boob jobs, that she

24   sought advice from J.R. Potter regarding Victoria's Secret

25   purchases, and she showed a naked photo of someone on her

```
 1   phone.  He didn't see that as sexual.  They've worked together
 2   for years, more than eight years on the ROP team.  They worked
 3   together for years at Northeast Impact.  He was the person she
 4   called when she needed someone to have her back, when she was
 5   breaking up with her boyfriend Abel Aragon, and he came and was
 6   present for her.  They were close friends, the kind of friend
 7   that you would say "Would this look good on me?"  The kind of
 8   friend that you would ask "Here are my pictures from my Vegas
 9   trip."  And that doesn't mean that their interactions were
10   sexual.
11          What we have evidence of is that she was right in the
12   middle of the smokin' and jokin'; that she was not someone who
13   needed to be treated differently or with kid gloves.  They
14   treated her like one of the team.
15          Now, we're going to back up because the problem with
16   the -- the problems all come out in July of 2009.  In 2004 when
17   Lieutenant Welch came to the ROP team, she was the only female.
18   She was the only female who tried to get on the ROP team.  She
19   wasn't the only female that had ever been on the ROP team.
20   There had been at least two before.  But she highlighted her
21   gender to her teammates.  Rob Smith wanted a woman on the team.
22   He had seen how effective having a woman on a plain-clothes
23   team, where you're trying to arrest people and get close to
24   them without them startling and alarming, that a woman was a
25   huge asset in being able to do that.  He explained, if you see
```

1   a gang of fit-looking guys walk into a park, bad guys go on

2   alert.  If you see a couple walk into a park, bad guys go about

3   doing what they're doing, whether it's a barbecue that you're

4   trying to get close to them and arrest them during or whatever.

5        And she was selected for that job.  Rob Smith wanted

6   her in that job.  And it was underlined in there.  He did not

7   want her as a sexual partner.  There's no evidence of that.  He

8   wanted her because he thought she was an effective asset to

9   that team that he was trying to build to match his vision of

10  what the ROP team could be when he became the sergeant.

11       She was obviously proud of being a woman in a man's

12  world, and that's okay.  She should be proud of that.  It's an

13  accomplishment.

14       She had a pink lunch box, she had pink shirt, made

15  with the noose emblem on it, and she heard Rob Smith tell some

16  grumbly person, she testified, that she'd earned her spot, that

17  she was going to be there, and that if that person didn't want

18  to stay, they could leave.

19       We have two comments that go back to this 2004 time

20  even though they were not disclosed until 2009.  One of them is

21  that Dan Wolfe, who was a person who retired about a month

22  after Lieutenant Welch joined the ROP team, said there's no

23  chicks in ROP.  And he was gone because there was going to be a

24  woman in ROP.  Rob Smith wanted a woman in ROP.  Rob Smith's

25  vision of how the team was going to work needed a woman in ROP.

1          The other is a comment that is hotly disputed.

2    Lieutenant Welch said she learned that in 2009 someone, John

3    Sullivan, a sergeant in Burglary, told her -- this is how

4    hearsay works.  John Sullivan told her that Kevin Gagne had

5    told him that he got F'd and he didn't want to a skirt in ROP.

6    He says that never happened.  You can -- You don't get to judge

7    the credibility of John Sullivan because he wasn't here to tell

8    you what he heard, the context or when he heard that.  But you

9    did get to see Kevin Gagne, and Kevin Gagne flatly denied that

10   he said that.  He said he wanted a woman in ROP.  He just

11   didn't want this woman.  He had someone else that he thought

12   was a better candidate.  The problem for him, he's a detective,

13   he doesn't get to choose.  And when Terysa Welch and Mike Hill

14   were the people that were chosen in ROP, he said he was

15   welcoming to them.  He described incidents where he gave her

16   equipment that she did not have and that he helped her out with

17   a radio frequency so that the other team members didn't give

18   her a hard time.  He describes that he was welcoming to her and

19   tried to help her find her way there.

20          Something you need to probe is why did she wait five

21   years to complain about the note on her physical assessment?

22   Why did she bring up the "We don't want a skirt" comment five

23   years after it apparently was made, and that she brought up the

24   "We don't want chicks in ROP" comment five years after they

25   were made?  That's a long delay.  It's not weeks.  It's not

1   days.  It not months.  It's years, half a decade.  That's a

2   long time.

3            Why did she wait five years to complain about those

4   things?  Why did she let it fester if it bothered her, and it

5   did not bother her until she got the punctuality memo and she

6   had it in her pocket to use it offensively?

7            Rob Smith absolutely supported her selection in ROP.

8   He made it clear that a woman detective was going to be in that

9   unit and that it was going to be this woman.

10           The evidence was that Lieutenant Welch eventually

11  developed personality conflicts with several ROP team members.

12  She never liked Gagne.  She said he never liked her.  The

13  evidence was he tried to help her out.  She didn't like J.R.

14  Potter because he was fat.  She was unhappy with Detective Hill

15  because of his relationship with her sister-in-law.  She didn't

16  like Hubbard or Smith because they didn't follow the rules.  So

17  she was developing personality conflicts, and it's your job to

18  decide whether Lieutenant Welch's sex had anything to do with

19  the development of those personality conflicts in the unit or

20  in her work environment, those decisions that were made

21  regarding her assignments to Burglary and ROP and whether she

22  was moved, TDY'd because of her gender instead of because of

23  personality conflicts or behaviors or because she requested it.

24           You heard Beth Paiz describe a call that she got from

25  Lieutenant Welch that said she didn't feel safe in the unit.

1    She had been probing that issue.  She asked her a couple times

2    "Did you feel safe?"  And when she said she didn't, she asked

3    her "What do you need?"

4            Now, Beth Paiz eventually testified that she made the

5    determination that the hallway event didn't happen the way that

6    Lieutenant Welch described it.  Sergeant Smith doesn't even

7    remember that, passing her in the hallway.  In fact, he thinks

8    he didn't pass her in the hallway because he had been ordered

9    to avoid her.  But what's important is Beth Paiz assumed the

10   incident did happen and took the action that Terysa Welch asked

11   her to take, which was to move her TDY up two weeks so that she

12   could be out of ROP.  That's what's important.  Paiz acted as

13   if the incident happened and reacted appropriately, to move

14   Lieutenant Welch, who she believes perceived the incident the

15   way she described it.

16           Beth Paiz has notes, Exhibit 4 in your book, that

17   you've been over them.  You can look and see.  She documented,

18   because she knew that Terysa Welch was documenting things and

19   that she would need her notes in case something like this trial

20   happened.  So she kept notes at the same time.  And you can see

21   if the notes overlap or they're accurate between them.

22           Lieutenant Welch is claiming she was discriminated

23   against when she was not appointed Acting Sergeant.  She had

24   less seniority than the other people who were upgraded.  The

25   testimony's undisputed about that.  Gagne, Hill, and sometimes

1  Potter.  Gagne had more seniority in the unit and on the force.

2  Hill had been a lieutenant in Carlsbad before he came to APD,

3  and Potter had more seniority on the force, and she had more

4  seniority in the unit.  She's not proven a connection between

5  her sex and being appointed or not as Acting Sergeant, and

6  that's for you to decide.  Was it the sergeant's feeling that

7  some other person could do a better job or he didn't appoint

8  her because he didn't want a girl in charge?

9          Danny Garcia is also a male, and he testified he was

10  never appointed Acting Sergeant either.  It's not a

11  gender-based decision.  There were other factors.  And you

12  heard Hubbard and the others testify that they appointed who

13  they thought could take charge and do what they needed to have

14  done.

15          Lieutenant Welch took the sergeant's process to be

16  promoted.  She testified that she failed it the first two

17  times.  The time that becomes critical for us is not the first

18  time she took it, but the second time she took it.  She's

19  claiming that it was discriminatory for her to have to write a

20  letter for exemption because she had discipline within the

21  period of time in which there was described to be no

22  discipline, but you could get a letter from the Chief if you

23  wrote a letter to him to get permission to take the exam.  She

24  did that.  He allowed her to take the exam.  Unfortunately, she

25  didn't pass the written portion of the exam.  And the testimony

1   was that there was no ability for anyone in her chain of

2   command, from the sergeant through the Chief of Police, to

3   manipulate the process and affect the outcome of that exam and

4   make it so that Lieutenant Welch failed that exam.  That simply

5   didn't happen.  Bad luck.  She, for whatever reason, didn't get

6   a high enough score to go on to the Assessment Center.

7   Luckily, she did the next time, and she was promoted to

8   sergeant since this lawsuit was filed.

9          She then took the lieutenant's exam, and she has

10  since been promoted to be a lieutenant.  Both of those issues

11  go directly to one of the elements of damages that's before

12  you.

13         You are to consider whether there was a loss of

14  reputation in the Department, in APD specifically, based on her

15  gender and based on the fact that she was transferred because

16  of her gender.  So you have to have like a two-part analysis.

17  Was she transferred because of her gender, and then did she

18  lose reputation in the Department because of her gender?  The

19  fact that she's promoted twice since she was transferred is

20  evidence, clear evidence that her reputation in the Department

21  did not suffer; that she was highly thought of; that she was

22  promoted to sergeant, she was promoted to lieutenant where she

23  sits today.

24         You also note for loss of reputation, you didn't hear

25  a single witness, not one, tell you "I used to think really

1   highly of Lieutenant Welch, but after she got transferred to

2   Burglary, that really changed my opinion.  I thought less of

3   her."  No one said that because no one had their opinion change

4   because she TDY'd to Burglary or any other thing that she's

5   claiming the City of Albuquerque did to her.  She has not

6   suffered a loss of reputation.  You can't compensate her for

7   the loss of reputation.  Didn't happen.

8           Now, she also says that she was disciplined because

9   of her gender.  She was disciplined because she transported

10  alcohol in a City vehicle, was observed by someone else, and

11  went to the IA investigation and said she could not remember

12  doing that.  That is a completely different scenario than the

13  other two gentlemen who came in here.  Gene Marquez was in

14  Field Services.  He did testify that he didn't know how things

15  were done in SID regarding discipline, but he said, "The minute

16  my sergeant said 'Did you buy alcohol and take it in your

17  car?'" he said, "Yes, I did," and that was the end of that.

18  His sergeant said, "Don't do that again."  He said, "Yes, sir."

19  And that was the end of that investigation into his purchasing

20  of alcohol and transporting it in a car.

21          Nick Laskar also purchased alcohol and transported it

22  in a City vehicle.  He also, when he heard from his sergeant

23  that he had been reported, immediately said "I did.  Here are

24  the texts.  I bought it as a Christmas present.  I'm taking it

25  to my friend.  I am sorry, I will not do it again," he

1  confessed immediately.  He submitted to the discipline.  He

2  didn't beat around the bush and say, "Well, I'm not sure."  And

3  he was still sent to IA.  The difference is, when he goes to

4  IA, he says, "Yes, I did it.  You do not have to do an

5  investigation; you do not have to go get the receipts for the

6  alcohol, the tapes from the parking lot.  Here's the text why I

7  bought the alcohol.  It was not for me.  I was not drinking in

8  my car."  That doesn't matter.  It's a matter of if the alcohol

9  is in your car or not.  And he had that violation sustained.

10       There is a huge difference, and you heard about that

11  from a couple of different people.  The Internal Affairs

12  investigator's job is to self-police police.  Sworn officers

13  investigate sworn officers.  And if you do not cooperate in

14  that investigation, it affects the integrity of the Department.

15       And it is undisputed that Lieutenant Welch went to

16  three interviews.  Now, she said, "I told them I did that all

17  the time, so I can't remember this particular incident, just

18  give me a written reprimand and I'll be fine with it."

19       I think it was Chief Schultz said, "I can't, when I

20  was a patrol person, stop a car for speeding and have them say,

21  'I wasn't speeding this time, I don't think, but I sped last

22  month,' and give them a ticket for that."  That's not how due

23  process works in the United States.  It's case by case,

24  specific by specific by specific.  And Cecil Knox, who

25  unfortunately we weren't able to put on the stand because he's

1    passed away in the course of this litigation, did the

2    investigation and he called Lieutenant Knox [sic] back three

3    times, he gave her three chances to tell him "I have thought

4    about it and now that you've shown me the receipt and now that

5    you've shown me a picture of me carrying beer out of the store,

6    I remember now that on October 20th," or the date it was, "I

7    purchased alcohol and I violated the SOP."  She never did that.

8    She brought her own representative, which she has every right

9    to do, and she brought a lawyer that she hired, which she has

10   every right to do, to three different interviews.  That does

11   not indicate that she was willing to admit that she had done

12   something wrong and take a written reprimand, which is what

13   Laskar and Marquez both did.  They fell on their swords.

14        Her situation was different.  Her discipline was

15   different.  You heard people say, and I think you probably

16   experience this in your everyday life, if you steal a cookie

17   from the cookie jar and that's -- you can get in trouble, but

18   if you lie about it, in my house that was way worse than

19   actually taking the cookie.  And that's the situation that

20   Lieutenant Welch found herself in and that's the situation the

21   investigator found himself in and that's the situation that the

22   people in her chain of command had to deal with.

23        Cecil Knox recommended termination.  He was sure she

24   had lied to him.  Went up the next click in the chain of the

25   command.  Feist said, and it's actually the same standard that

1    the judge instructed you on today, preponderance of evidence is

2    what they use in Internal Affairs.  Is it more likely than not

3    that the offense occurred, that the SOP violation occurred?

4    Feist said, "I could tell, weighing it like this, that several

5    of the violations occurred.  The evidence was there."

6    Circumstantial evidence, direct evidence.  But for lying, he

7    said it was 50/50.  And if it's 50/50, the tie goes to the

8    runner.  We all know that from our playground days.  And in

9    this case the City is the runner.  If in your deliberations you

10   find that the evidence is 50/50 on whether there was

11   discrimination or harassment or just horsing around and bad

12   jokes, then you cannot find for Lieutenant Welch.  You need to

13   find for the City.  Preponderance of the evidence, 50/50, just

14   like Feist gave her the benefit of the doubt, you would give

15   the City the benefit of the doubt under the same standard.

16          He recommended an 80-hour suspension.  It went to

17   Chief Schultz.  Chief Schultz imposed a 40-hour suspension, but

18   he gave her a chance, kind of -- I think she said it's kind of

19   like probation or parole, that you serve some amount of time

20   but they reserve some other time, and if you don't have an

21   offense within six months, then that goes away, but if you do

22   have an offense in that period of time, you get the whole

23   passel of hours dropped on you.

24          And that's what happened here.  It was a 40-hour

25   suspension.  There's no question.  You can look at the

1    documentation.  But some was held in abeyance to help her out,

2    see if she'd learned her lesson, and that was never imposed

3    because she rode out the abeyance.  He reported her name to the

4    New Mexico Law Enforcement Academy, not because she was a

5    woman, but because she had a 40-hour suspension, and he

6    reported everyone with a 40-hour suspension or in the -- or

7    above to the New Mexico Law Enforcement Academy regardless of

8    gender.  That's what you have to decide.  I would submit that

9    he made it clear that it was a disciplinary level, not a gender

10   issue for reporting officers to NMLEA.  So that was not

11   discriminatory.

12          The punctuality memo.  Let's look at the fact.  The

13   punctuality memo is not discipline, it's not an adverse

14   employment action.  It was notification that Hubbard expected,

15   saw a pattern developing -- you heard him say that -- saw a

16   pattern developing and wanted to nip it in the bud.  "Hey,

17   Detective Welch, can you let me know where you are and can you

18   be where you're supposed to be on time?"  Within a month, he

19   gave that same memo to Gagne.  The same day he expressed those

20   same expectations to everyone on the team, because he didn't

21   want things getting lax.  He was seeing a pattern, and he

22   didn't like it.  And he has every right as a supervisor to say,

23   "Ah, I think we need to remind each other that we need to be

24   where we're supposed to be on time."  That's a reasonable

25   expectation in the workplace.  Or call.

```
1              Terysa Welch says that she and Mike Hill are exactly
2    the same, and that's a factor in discrimination.  The male has
3    to be similarly situated, he has to be in the same exact
4    position.  That is not the case here.  They both missed the
5    range training that day, but as people who have worked places
6    and people who have had employees, there is a huge difference
7    between the employee who calls and says "I've got a flat tire,"
8    I'm on a foot chase, I can't be there at the time I said I was
9    going to be there," and the one who's a no-call, no-show.
10   There's a huge difference.  Those two people do not get treated
11   the same in an employment environment.  A no-call, no-show in
12   the fast-food business can be fired.  Someone who's called, you
13   might give them a break depending on their history, but they
14   are not similarly situated male and female so that the only
15   difference, as Mr. Villa seemed to imply, between how they were
16   treated was based on their gender.  You heard the testimony.
17   He called.  He called twice.  She didn't call at all.  That's
18   why they received different treatment by their supervisor.
19             Everyone was reminded that you need to be on time,
20   you need to be where you're supposed to be, and she just got a
21   personalized memo along with Gagne on August 17th.  Not
22   discipline, not an adverse employment action, not something
23   that you could grieve under the union contract.
24             The next thing I want to talk about is the transfer.
25   I would submit that the evidence is clear that Lieutenant Welch
```

1    asked for a transfer.  You can look at Exhibit 4 where Beth

2    Paiz wrote down what Lieutenant Welch reported to her when she

3    called and she asked to get out.  And she asked to get out.

4    She first asked to get out to the Academy.  Previous to that,

5    actually, she'd asked West in the IA investigation if she could

6    be transferred to Intel during the course of the investigation,

7    so she'd asked -- she made it clear that she was willing to

8    move around, and he didn't have the ability to do that.  But

9    Chief Paiz did, and Chief Paiz asked her where she wanted to

10   go.  She said the Academy.  She set that over the weekend, and

11   then the next week Lieutenant Welch called and said, "You're

12   going to kill me.  I went to Burglary, I liked it, I'm happy to

13   go there," and she went there.

14           Now, I think that's a voluntary -- voluntary means

15   that you volunteered to do that, transfer -- as opposed to an

16   involuntary transfer, where you are forced to go someplace in

17   the workplace that you don't want to go to.  The law is really

18   clear, and you have an instruction on it.  It's in Jury

19   Instruction 11.  And Jury Instruction 11 imparts as an

20   involuntary transfer, you give her the benefit of the doubt

21   that the transfer wasn't involuntary, without more does not

22   constitute an adverse employment action if it does not involve

23   any significant change in the employee's conditions of

24   employment.  It has been very clear that she made the same

25   money, had the same benefits, had the same job duties with a

1  different focus.  When she was transferred, they didn't collect

2  her ROP equipment.  She continued to have the same ROP

3  equipment that she had.  And so this instruction goes on and it

4  says, "For example, an involuntary transfer does not constitute

5  an adverse employment action if salary and benefits remain the

6  same and duties are substantially the same."  Lieutenant Welch

7  will argue that her duties were changed drastically, but you

8  heard what the detective's description is.  It is to develop

9  cases.  It's to develop confidential informants.  It's to write

10  arrest warrants.  It's to capture bad guys.  That was her job

11  at ROP.  That was her job at Burglary.  And they had the same

12  pay and benefits attached to them.

13       You heard about the investigation that was done, and

14  Doug West did that investigation, and Doug West did that

15  investigation as an IA officer because Lieutenant Welch, after

16  she filed her Complaint with the EEOC, which she had every

17  right to do, she walked her Complaint over to Internal Affairs

18  and handed it to Doug West, and he was a veteran detective who

19  thoroughly and impartially investigated the two issues related

20  to the Complaint that Lieutenant Welch brought him and found he

21  couldn't substantiate discrimination, retaliation, or sexual

22  harassment after he interviewed the people that he interviewed.

23       He did substantiate two issues that he found that

24  were brought out in the Complaint.  He substantiated that there

25  was a parking lot bump between Danny Garcia and Sergeant Smith.

1    And this is one time where you -- of numerous times where you

2    heard that Lieutenant Welch weaponized information against her

3    teammate.  She took this piece of information that she got from

4    Danny Garcia regarding a bump in the parking lot where he said

5    he was venting to her about it.  He didn't report that.  And

6    years later she had that in her packet and she reported it in

7    her EEOC Complaint.

8         She also took Sergeant Smith's act of comforting her

9    in a devastating personal situation and sexualized those acts,

10   a hug, a hand call, an offer to take her home to get her pets

11   and her clothes and then calls to make sure that she was okay.

12   You have to decide if that's comforting behavior or sexualized

13   behavior.  You've seen everyone involved in that.

14        She never had a crucial confrontation, so he doesn't

15   know that bothered her.  Who knows if she knew it bothered her

16   at the time.  She took a jokingly complimentary remark made by

17   a man she knew was happily married, on a physical assessment,

18   and silently kept that for five years.  She admitted she did

19   not tell him or anyone else that she found the joke to be

20   harassing or offensive.  Five years later, after she was

21   criticized, she pulled the note out and used it to make a case

22   that she was in a hostile work environment because of her

23   gender.  She never had a critical confrontation about that

24   issue either.

25        Lieutenant Welch admitted that she told Detective

1   Hill that she knew he was having an affair with her brother's

2   wife, her baby brother who it was very clear she loves, but she

3   told him she wouldn't tell her brother, kept that in her

4   pocket.  She then files a complaint that Hill should have been

5   punished for missing the same practice at the range that she

6   missed and that he should have received a punctuality memo as

7   well.  She didn't let anyone know that she thought that was

8   discriminatory.

9          Lieutenant Welch complimented J.P. Potter for

10  slimming down, and when he continued the banter, he alleges

11  that she -- he propositioned her to have a threesome with him

12  and his wife.  He didn't tell -- She didn't tell her [sic] that

13  that wasn't just a joke and that it offended her and that she

14  thought that was harassing.

15         She heard three for four penis jokes between two

16  coworkers over nine years working with them.  She testified she

17  walked out.  She never testified that she told them to stop

18  until she got the punctuality memo.

19         Even if you believe -- I have a time limit, so I have

20  to check.

21         Even if you believe every word that Lieutenant Welch

22  says, the City can't do anything about a situation that it

23  doesn't know about.  Lieutenant Welch admitted that after she

24  filed her first Complaint the City required the entire division

25  to attend an EEOC discrimination refresher course.  But then

1    she claims that that refresher course was punitive.  So if the

2    City hadn't have had the course, it would have been a problem;

3    if the City did have the course, it was a problem for her.

4           She claims that the City put three separate trainings

5    that involved over 70 people for four hours apiece, they put

6    that on to punish her.  She doesn't see this as an appropriate

7    remedial action but as punishment for her.  Is this the most

8    logical explanation of how the City reacted when they saw a

9    need for training, or is it more logical that once the City was

10   aware, tried to stop the problem she perceived by educating

11   people she worked with on the law?

12          The City can defend against claims of sexual

13   harassment by proving to you, which I think we did, that it

14   exercised reasonable care to prevent and promptly correct

15   sexually harassing behavior.

16          The City proved that when it learned of the alleged

17   harassment it took eight remedial actions.  You heard about

18   each of them.  The City had the Internal Affairs Department

19   fully and independently investigate Lieutenant Welch's claims

20   and take action on SOP violations that were sustained.

21          Second, the City removed David Hubbard and Rob Smith

22   from the work environment until the Internal Affairs

23   investigation was done.  The City has no control about when the

24   EEOC investigation might be done.  They can take years to

25   finish those.  So you can't just wait that -- You have to do

1    your own investigation, take action on what you know as a

2    governmental entity, and the City did that.

3              Third, the City implemented the EEOC refresher course

4    which we just talked about.

5              Fourth, Deputy Chief Paiz takes the initiative to

6    call Lieutenant Welch when she hears from a mutual friend that

7    she's unhappy and wants out of ROP to see if she can help her

8    achieve that goal.  She calls Lieutenant Welch on her first

9    week of being deputy chief because she's trying to help her

10   out, and when she reaches out to her, she asks Lieutenant Welch

11   what she wants to do and she tries to make that happen.

12             The best proof of this is the e-mail from Lieutenant

13   Welch's father, it's Exhibit 4f in the book that you're going

14   to get, and he says to Deputy Chief Paiz after his daughter is

15   moved, "You've saved my daughter's life.  I am very grateful."

16   So they're trying to take appropriate remedial actions to make

17   Lieutenant Welch happier in her workplace and to create a

18   better environment for her to work.

19             Fifth, the City ensured enforcement of existing rules

20   with zero tolerance of shenanigans and banter.  You heard about

21   that.  David Hubbard put those rules in effect, and then they

22   were complained about.  He was under orders to put those rules

23   in effect.  He did not put those rules in effect to punish

24   Lieutenant Welch.  He put those rules in effect to keep himself

25   from getting into trouble because he had let his team get lax

1    with the rules.  He was giving them a lot of freedom because he
2    had a lot of respect for them, and he knew they worked hard and
3    he was letting them come and go, and it ended up getting him in
4    trouble, and he was disciplined for that.
5           Sixth, the City changed Lieutenant Welch's reporting
6    structure as soon as the City became aware of her EEOC
7    Complaint.  Commander Hudson became her direct supervisor.  She
8    skipped over the sergeant and lieutenant positions, and she
9    could take it directly to him, any problems that she had in her
10   day-to-day or any problems that she had based on her
11   perceptions of how things were working in the unit at that
12   time.
13          Seventh, the City ordered Rob Smith not to interact
14   with her at all.  When he returned to the unit, he didn't talk
15   with her, he didn't supervise her, he didn't visit with her, he
16   didn't joke with her.  He was ordered to have no contact with
17   her because she perceived -- and finally in 2009 had let the
18   City know that she considered him to be a problem in her
19   worklife.
20          And eighth, the City checked out their offices and
21   facilities for inappropriate photos, pictures.  Anything that
22   could be perceived as sexual in nature, harassing or
23   discriminating was scrubbed from that environment.  So the City
24   has also proven that it took appropriate remedial actions when
25   it became aware of the problem.  The City's also proven that

1    Lieutenant Welch failed to take advantage of protective,

2    preventive, corrective opportunities that the City provided.

3    She didn't go to APD HR.  She didn't go to the City HR.  She

4    didn't go to the City's Equal Employment Office.  She didn't go

5    to the command staff outside of her immediate command.  She

6    didn't go anywhere.  She made a formal Complaint to the EEOC,

7    which she had every right to do, without utilizing the City

8    procedures to help them become aware of her problem and fix

9    that problem at the lowest possible level.

10            So we think we've proved our affirmative defense.

11            Let's talk about Rob Smith a little.  You saw him.

12   You've seen Terysa Welch.  You've seen everybody.  Some people

13   are friends with some people and some people are friends with

14   other people, but they all had to work together for these years

15   that we're talking about.

16            Terysa Welch claims she had no issues with Rob Smith

17   when he was the sergeant at Northeast Impact; that he was a

18   jokey gentleman; that she -- she and he got along fine.  But

19   before she even goes to ROP, the date on the physical

20   assessment is before she goes to ROP, she immediately claims

21   she experienced sexual harassment from him.  Have you ever

22   heard the proverb a leopard can't change its spots?  It's from

23   a Bible verse, Jeremiah 13:23, and it means that a leopard is

24   always showing you its true nature; it can't change from being

25   a spotted cat into something else.  And if you believe Terysa

1    Welch, she's saying that he changed from a -- he changed into a

2    sexual predator, harassing person after years and years of

3    behavior that was inconsistent with that nature.  That doesn't

4    make sense.

5              I want to talk a little bit about damages.  You were

6    instructed not to consider the issue of damages until or unless

7    you determine that the City sexually harassed or sexually

8    discriminated against Lieutenant Welch.  We don't think that

9    you will be considering damages based on the facts, but if you

10   do, she claims four different kind of damages.  We've talked

11   about loss of reputation, and so I'm not going to go over that

12   again.

13             The other three kinds of damages are lost overtime,

14   and she had an expert witness testify -- Remember the guy on

15   the screen?  He was our first deposition witness.  And

16   Dr. McDonald testified -- this is an easy one -- that

17   Lieutenant Welch worked less overtime after she was transferred

18   from ROP.  That's a fact.  That is not a measure of her

19   damages, however.  Dr. McDonald assumed Lieutenant Welch had

20   less overtime opportunities after she left ROP.  He also

21   testified that if that assumption is wrong that she had less

22   overtime opportunity, then his calculation of $27,638 is wrong.

23   You-all heard Chief Paiz, Chief Schultz, Commander Hudson,

24   Deputy Chief Prudencio, Hubbard, Roseman, virtually everyone in

25   the rank of sergeant above says that there were plenty of

1 overtime opportunities at APD during these years that we're

2 talking about.  You also heard that Brian McDonald said if she

3 could have transferred back to ROP at any time before she was

4 promoted, that that cut off her claim to overtime.  And you-all

5 know that 45 days after she was transferred to Burglary she had

6 an opportunity to return to ROP, on February 1st, 2010.  She

7 chose not to exercise that option.  That cuts off her claims to

8 overtime.  Both of the assumptions that he thought of have been

9 proven wrong in this case, and so she's not entitled to any

10 overtime damages.

11        You've heard her say that she experienced emotional

12 distress.  Both she and her husband testified about that.

13 They're happily married.  They haven't sought counseling.

14 She's had some stomach issues.  She tried some medications.

15 She has continued to do, as she described, very well in her

16 job.  She's not acting -- She had counselors for a little

17 while; didn't think that they helped her.  So you've got to see

18 if she has truly suffered emotional distress because she was

19 transferred.

20        Loss of enjoyment of life is in that same category.

21 During this time period, she courted her husband, she married

22 her husband, she's mothering a stepson, she testifies that she

23 does her job well, and she has pride in her work.  What has the

24 City deprived her of based on the things that she's complaining

25 about?  She's not identified any activities that she's unable

1  to do because of sexual harassment or sexual discrimination,

2  that she claims ended in 2012 anyway, so we don't believe that

3  any of these categories of damages can be awarded to her even

4  if you find that there's harassment or discrimination.

5          The question you have to answer is whether her

6  coworkers and supervisors had issues with Lieutenant Welch

7  because of her gender or because of her actions and behaviors.

8          We will tell you that she was never subjected to any

9  negative evaluations, she was never demoted, she never had a

10  pay decrease.  Her duties as a detective were never stripped

11  from her, she was never pushed out of the police force.  She

12  has not been the victim of sexual harassment or discrimination,

13  but suffered and is suffering the interpersonal consequences of

14  her pen and her silence.

15          We count on you to be the guardian of the facts you

16  have heard and render a verdict in the City's favor.

17          Thank you.

18          THE COURT:  All right.  Thank you, Ms. Williams.

19          Ladies and gentlemen, when we convened this morning

20  with the attorneys, I allocated equal time to each party.

21  Because the plaintiff has the burden of proof on the claims,

22  plaintiff has the final say, and Mr. Villa reserved part of his

23  time for his rebuttal.  We're pushing into the noon hour.  I'll

24  just ask for your indulgence as we continue on and wrap up.

25          Mr. Villa.

1          MR. VILLA:  Thank you, Your Honor.

2          Ladies and gentlemen, let's just get one thing

3    straight.  Terysa Welch is a lieutenant today not because of

4    anything the City did, but because of her resilience.  It's

5    that same resilience that caused her to help struggle through

6    this for all those years, and, as Ms. Williams tried to

7    suggest, didn't point things out until 2009.

8          Remember the testimony, that for a sergeant you do a

9    test and you go through a process, and once you've established

10   that, you've passed the test and you go through the process,

11   you get on a list, and then they just go down the list and fill

12   the spots as they become open.  The same process is true for

13   lieutenant.  You take a test, you go through a process, and

14   then you get on a list, and you stay on that list until they

15   fill you.

16         And Terysa Welch became a sergeant and became a

17   lieutenant not because of the City, but but for the City's

18   actions.  She did it because of her resilience.  Beyond

19   lieutenant, she cannot promote any higher unless she's

20   selected.  It becomes political at that point.  The Chief or,

21   as you heard with Beth Paiz's situation, perhaps the mayor can

22   make a recommendation, and that's where her career has stopped

23   since all this happened.  You heard her testify that if she had

24   her druthers she'd like to go back to SID, but SID is an

25   invitation-only kind of place.  She's not been invited since

1    any of this happened.

2              So she's in the position that she's in because of her

3    resilience, ladies and gentlemen.

4              Now let's talk about the claim that somehow her

5    taking notes on teammates is what caused this.  Well, you heard

6    all the evidence.  What was the evidence that she was taking

7    notes on her teammates?  You've got one exhibit, Exhibit A, the

8    defendant's exhibit which is four pages of Terysa Welch's

9    notebook from July 9th until August 2nd.  You get to look at it

10   when you go into the back, but here it is.  There's a note on

11   the first page about Kevin Gagne.  There's not a single note

12   about anybody else.  There's a note on the second page talking

13   again about Kevin Gagne and a little bit mention here of a time

14   when he was Acting Sergeant, and not a single note on anybody

15   else.

16             The third page, again, lots of notes about things

17   that she did, activities that day that she testified she wrote

18   down all the time to try to remember when she was doing her

19   time sheets.  So this third page is essentially all notes about

20   different things that happened, with the exception of here, I

21   think -- Well, no, sorry.  So this entire page is things she's

22   doing as a ROP detective.

23             And then the last page does have notes concerning

24   meeting with Sergeant Hubbard, Mike Hill not getting the memo;

25   then the next day she goes to the range, July 29th, her meeting

105

1   with Lieutenant Smith, which she wrote down, as you heard, so

2   she could remember these things.  The next day her meeting with

3   Captain Commander Hudson, and the rest of this is personal

4   items, items that happened throughout the course of the day so

5   she could remember what she was doing for time sheets and

6   things like that.  And that's it.

7          So Ms. Williams says this has to do with her taking

8   notes on her teammates.  Well, that's all you've got.  This

9   isn't about notes that she took on her teammates.  This is

10  about what she endured and what she experienced from 2004 and

11  through 2012.  And it wasn't caused because she wrote notes on

12  her teammates.  And you need to think about if that's what the

13  City's position is, if that's why they say all this happened

14  and all these issues occurred is because of Terysa and because

15  she's taking notes on her teammates, why is this all the

16  evidence we have?

17         You get to use something in this trial.  You didn't

18  see it in the instructions.  You walked in here with it, and

19  it's your common sense.  And when you're evaluating this

20  evidence and what it means and what you think happened, you get

21  to use your common sense.  So I think you can use your common

22  sense about this defense that somehow this has to do with

23  Terysa taking notes.

24         Rob Smith.  Ms. Williams says Rob Smith didn't know

25  because Terysa never got to use crucial confrontation, she

1    didn't point out to him that these things were sexual

2    harassment.  Well, ladies and gentlemen, there's some things

3    that, you know, maybe it's not crystal clear, especially in an

4    environment where it's high stress and people joke and things

5    get talked about, and there are some things where it's great

6    and you don't know, and so I think you can say, "Hey, that's

7    off limits" or this is okay, but the things that Rob Smith was

8    doing, you don't have to be told, you don't have to be told

9    that it's not okay to tell your subordinate employee that you

10   want to have children with them.  You don't have to be told

11   that it's not okay to tell your subordinate employee who works

12   for you who you have power over that you would be pursuing them

13   if you weren't married.  You don't have to be told that you

14   can't go up to your subordinate employee when no one else is

15   around and go "Umm, umm, looking good today; oooh, that body's

16   tight as a drum."  You don't have to be told those sorts of

17   things.  You don't have to be confronted about those sorts of

18   things.

19        And here's something else I want you to think about

20   when it comes to crucial confrontation, because who in this

21   trial never asked a single question of Rob Smith?  The City.

22   Remember I called him, I put him on the stand, asked him

23   questions, and neither Ms. Williams or Ms. Wiggins asked him a

24   single question.  They didn't even confront him.  They didn't

25   even ask him anything.  They didn't call him back in their

1    case-in-chief.  Why didn't they confront him?  Why didn't they

2    ask him what he did?  Why didn't they get his side of the

3    story?  What were they worried about?  They want Ms. Welch to

4    do it, but they don't even do it themselves.  Think about that

5    for a minute.

6          Now, again let's think about Ms. Terysa Welch's

7    circumstances.  Ms. Williams said when she got up here she's

8    not going to get to correct embellishments or exaggerations by

9    me.  Analyze what she just told you.  She tried to tell you

10   that the personal fitness assessment evaluation happened before

11   she was in ROP.  And that part's true.  The May 24, 2004,

12   assessment that she took, she took that before she got into

13   ROP, but she told you when she got the note from Rob Smith on

14   it, she got it in her ROP cubicle after she had already gotten

15   into ROP, without any explanation as to why that was there or

16   how it got there.  So that did happen while she was in ROP.

17         And think about Terysa's situation.  She's supposed

18   to confront the head of the unit, the tip of the spear, the

19   alpha who wanted her there in ROP, there's no question.  I

20   don't doubt Rob Smith's motives at all for wanting her in

21   there.  He wanted her in there I think for two reasons.  One,

22   because he thought he saw it as a law enforcement tool; and,

23   two, he was in a position of power that he hadn't been in

24   before and he could take advantage of it with Terysa and treat

25   her the way he treated her.  Terysa knew that at the time.  She

1    didn't know he was going to change from the way he was in

2    Northeast Impact.  He didn't bring her into Northeast Impact.

3    He brought her into ROP.  So now he had the control.  He had

4    the power.

5           That old metaphor about a leopard changing their

6    spots, that doesn't address at all the power dynamic that

7    changed from Northeast Impact to ROP.  Because now Rob Smith

8    was in control.  Rob Smith, the guy who became the next

9    lieutenant; Rob Smith, the guy whose buddy from the Academy or

10   his buddy to this day Commander Hudson was running the whole

11   unit.  Who had the power in SID and ROP?  Rob Smith.  And

12   Terysa knew it and she knew it well, and she knew if she spoke

13   out on it what would happen.  And what did happen when she

14   spoke out?  How did that work out for Terysa?  Not so well.

15          Now, she gets this note, and Ms. Williams says she

16   kept it for all these years.  Well, do you think she would have

17   kept the note for all these years if that was the only thing

18   that happened, if Rob Smith had just given her this one note

19   and then everything was cool?  Do you think she would have hung

20   on to that?  No.  You get to use your common sense, ladies and

21   gentlemen.  She held on to it, and the behavior continued and

22   the behavior escalated and it didn't stop and it didn't stop

23   when he left and became a lieutenant.  He kept doing it.

24   That's why she kept it, because she knew some day this day

25   would come and she needed to be ready, and she knew she was

1   going to get attacked if all she had were her words versus

2   other words.  She needed proof.  She knew, she was a detective.

3   She wouldn't have held on to that if that didn't happen.

4          Ms. Williams tried to tell you there were seven

5   things that happened over the course of nine years.  That was

6   not the testimony.  You heard the testimony from Terysa Welch.

7   It was constant.  When he was a sergeant, he was there every

8   day.  It was any time that she was alone.  She avoided him

9   because of it.  He made comments about her all the time, and it

10  didn't stop when she was a lieutenant -- when he was a

11  lieutenant either.  The access was different, but it didn't

12  stop.  And it didn't stop even when she had an extremely

13  traumatic experience in her life with her fiancé David Maes

14  getting arrested.  You know, Rob Smith couldn't dial it back

15  for one day and say, you know, This is pretty bad, maybe I

16  should just help Terysa out.  No.  Because he keeps up the same

17  thing.  He grabs her, squeezes her, hadn't even told her what's

18  going on, tells her in that moment "I will be pursuing you if I

19  weren't married."  I mean, he can't dial it back for one day.

20  This is the person she's supposed to confront and say stop

21  this.  And then when she finally does, look what happens.

22          And notice Ms. Williams talked to you about the

23  defense, the sexual harassment defense, and she didn't

24  differentiate between coworkers and supervisors.  She got up

25  here and said that the City did the things they were supposed

1    to do, they addressed it, they took these eight different

2    steps.  Well, ladies and gentlemen, she didn't tell you that

3    only applies to coworkers.

4          You saw the instructions, and here they are.  Jury

5    Instruction No. 10, sexual harassment by coworkers.  If you

6    were to believe that the City did anything to promptly correct

7    the sexually harassing behavior, it only applies to coworkers.

8    It doesn't apply to supervisors.  The actions of the supervisor

9    are the actions of the City.  This defense has nothing to do

10   with Rob Smith's behavior or what he did.

11         Now, you can look at this defense when it comes to

12   coworker harassment and decide if the fact that they never,

13   ever tried to sit down with Kevin Gagne, J.R. Potter, Sergeant

14   Hubbard, Terysa Welch, or anyone else and say, "Let's figure

15   this out.  Let's mediate.  Let's talk," you can decide if the

16   fact that they never did that, that they briefly moved the guys

17   out and then moved them right back in, that then right after

18   that Smith tries to bull Terysa over in the hall, somebody

19   leaves a blank transfer form in her box, you can decide whether

20   you think the EEOC training really fixed these problems, but

21   you can only decide it with respect to coworkers.  Not

22   supervisors.  When Rob Smith was a supervisor and he acted, his

23   actions were the actions of the City.

24         I want to talk just a little bit about the

25   disciplinary process because Ms. Williams said that Laskar and

1   Marquez were different.  Well, both Laskar and Marquez were
2   told immediately after they bought alcohol what they had done,
3   and so of course they could remember it.  Terysa wasn't.  And
4   who got to pull that string?  It wasn't Terysa.  It was Doug
5   West.  Doug West who had just two months earlier gotten
6   interviewed by an EEOC investigator questioning him about the
7   propriety of the interview he did that Ms. Williams relied upon
8   as the City remediating this problem.  He gets questioned about
9   it.  Now he's the Commander of SID.  So ask yourselves whether
10  his Internal Affairs investigation was truly fair and impartial
11  when he goes from IA to now he's running SID.  And he gets to
12  make the call, and he gets to make the decision about whether
13  Terysa should be called and say, "Hey, did you just buy alcohol
14  in your vehicle?  Here's your written reprimand.  We'll sign
15  you up."  Or should we go through the IA process and not ask
16  her about it until 18 days later?  But when that did happen,
17  Terysa did the same thing that Laskar and Marquez did.  "Yeah,
18  I probably did that.  I'll sign my written reprimand."  And
19  Knox said, "No, that's not the way it works.  We're going to go
20  through these IA interviews."  And in the course of those IA
21  interviews, she admitted, "Yes, I was there," she admitted,
22  "Yes, that's me," she admitted she buys alcohol and transports
23  it in the vehicle, just like Danny Garcia told you happened all
24  the time.  And she admitted she had just gotten off work.  The
25  only thing that she wouldn't admit because she couldn't

1    remember is did it happen on this particular date.  And that is

2    the difference.  That makes her a liar.  That requires her to

3    serve a suspension instead of a written reprimand.  That

4    requires her name to get sent to the New Mexico Law Enforcement

5    Academy where they can take action on her license.  That just

6    doesn't make sense, ladies and gentlemen, and it tells -- shows

7    you the way the City has approached this thing.  This is their

8    mentality.  This is what Terysa is supposed to rely upon to go

9    complain about Rob Smith?  These are the folks she's supposed

10   to put her faith in?  It just doesn't make sense.  You can take

11   a step back.  You don't have to look at the policies anymore or

12   the chart of sanctions or anything like that.  Use what you

13   walked in here with, your common sense, and say "What is this

14   whole Walgreen's thing really about?  Why go through all this?

15   Does any of it make sense except for the fact that she's a

16   woman, she complained, and supposedly she's supposed to

17   complain earlier and that's going to help her, and now this is

18   what we're going to do to you for it?

19          The idea that it wasn't discrimination, that the

20   entire five years Terysa Welch is in ROP and has never made

21   Acting Sergeant is also something you can just take a step back

22   and look at.  It doesn't make any sense.  The argument is it's

23   a seniority thing.  Well, Potter got into the unit in 2008.  He

24   didn't have unit seniority.  Mike Hill got into the unit at the

25   same time as Terysa.  He didn't have unit seniority either.

1    Just because he was a lieutenant in Carlsbad before, that's the

2    reason why Terysa never gets to be an Acting Sergeant?

3            And all you have to determine when you're looking at

4    these things is, was gender a motivating factor?  It doesn't

5    have to be the only factor.  Just was it a motivating factor.

6            And there's a real appreciable loss that you heard

7    about.  If you're a sergeant for more than a certain period

8    amount of time, you get a higher pay.  It also helps you to

9    learn the roles and duties of a sergeant for future use.  And

10   Terysa Welch was never given those opportunities.

11           You heard that somehow she was upset with Detective

12   Mike Hill, and that never came out whatsoever.  Ms. Williams

13   said that she complained that Mike Hill should be getting a

14   memo too.  That's not what she complained about.  She

15   complained that she was getting a memo and Mike Hill didn't.

16   She wasn't saying Mike Hill should get a memo.  And all this

17   business about somehow she's angry with Mike Hill because of

18   the relationship he had with her sister-in-law, did you hear

19   any of that from Mike Hill or Terysa Welch?  They still

20   communicated afterwards.  They're still friends.  That didn't

21   have anything to do with this.  Why would that even be an issue

22   in this trial if you're not trying to be redirected and look at

23   something else that isn't there?

24           Ms. Williams talked to you about the sergeant exam.

25   And, yes, Terysa said "I shouldn't have had to write that

114

1    letter to Chief Schultz, the same guy who knew about my

2    complaint to the EEOC, the same guy that knew it was Kevin

3    Gagne who reported me and I had called on him in the EEOC, and

4    the same guy that imposed this discipline on me, that if he

5    hadn't imposed it on me, I wouldn't have to write this letter.

6    Yes, she complained about that, but she didn't complain that

7    her not passing the test had anything to do with anybody.

8        Ms. Williams just tried to suggest to you that there

9    was some claim by Terysa Welch that her failure of the test or

10   her not getting the sergeant right away was somehow the City's

11   fault.  She doesn't blame that on anybody.  She said she

12   shouldn't have to write that letter, but that was never an

13   issue brought up by Ms. Welch.

14       Now, she said there isn't any damage to her

15   reputation because of the -- because she's been promoted and

16   that shows that her reputation isn't damaged.  Well, again, the

17   sergeant and lieutenant process to get promoted is what she

18   earned, and anybody that becomes a sergeant and lieutenant gets

19   there because they've earned it.  But beyond that, going over

20   to SID, becoming a commander, those things, that's your

21   reputation, and those are the damages that she still feels

22   today.  She hasn't been invited back to SID and has not been

23   promoted in any way, shape, or form.

24       Now, on one hand Ms. Williams says to you that the

25   transfer from ROP to Burglary was voluntary, but on the other

1   she said Paiz moved her because she wasn't safe in the

2   workplace anymore and she did the right thing and got thanked

3   for it by her father.  She said that was the best evidence, the

4   e-mail from her father that says "You saved her, and I

5   appreciate it, thank you."

6           So how is that the best evidence of what that

7   transfer was and yet the transfer's voluntary?  Terysa didn't

8   have any choice.  Her safety was at issue.  That fancy EEOC

9   training that Terysa didn't say was punitive, Sue Neal and the

10  others in SID said it was punitive, it didn't stop Rob Smith

11  from trying to bull her over in the hallway, that order to Rob

12  Smith to stay away from Terysa didn't stop him from trying to

13  bull her over in the hallway.

14          She was not safe.  She had no choice but to leave.

15  Of course she agreed to the transfer.  She didn't have a

16  choice, and she hoped that the transfer was going to be

17  temporary.

18          Now, Ms. Williams said, "Well, she could have come

19  back in 45 days."  But you saw Beth Paiz's own notes.  Eight

20  days before she's due to come back, everybody in ROP, even the

21  new guys who didn't even know her were saying "We don't want

22  Terysa back."  She's supposed to go back to that atmosphere,

23  back to Sergeant Hubbard?

24          I thought, gosh, I thought if you confronted

25  Lieutenant Smith about his behavior that that would fix it,

1    that that would stop it, that somebody would do something about

2    it.  Well, it clearly didn't on December 11th when he tried to

3    bull her over in the hallway, and two months later she's

4    supposed to go back to that atmosphere, she's supposed to go

5    back to that supervision.

6            Clearly, she can't go back in those circumstances,

7    and she can't go back.  Nothing has been done.  They've never

8    tried to address these folks.  They did a four-hour sham EEOC

9    training in which Sue Neal couldn't even tell you, ladies and

10   gentlemen, if that crucial confrontation was only supposed to

11   be for coworkers or supervisors.  You still never got that

12   answer.  That's the person that Ms. Williams says, "Well, why

13   didn't she go to City HR?"  Sue Neal was City HR, APD HR.  This

14   is who she's supposed to put her faith in?

15           And don't forget, ladies and gentlemen, that through

16   all of 2010 and all of 2011 and 2012 the City had taken no

17   steps whatsoever to address these circumstances, to try and

18   remedy these circumstances, to make it a safer atmosphere in

19   any way, shape, or form for Terysa Welch to go back to ROP.  So

20   not only was her transfer involuntary, her ability to go back

21   to ROP was not voluntary.

22           And you heard the evidence about the difference.

23   Ms. Williams pointed out to you the jury instruction, that

24   involuntary transfer alone is not enough if there aren't

25   changes in benefits.  Well, we know she lost overtime.  It's

1   undisputed that the amount of overtime was less.  She did work

2   overtime.  Brian McDonald testified that she worked overtime in

3   Burglary.  It was just less than is available in ROP.

4           And you don't have to discard your common sense when

5   you're thinking about what's the difference to a detective in a

6   detective's career between ROP and Burglary.  It might be one

7   thing if you're in Burglary and you're working your way up.  It

8   might be another thing if you just want to stay in Burglary.

9   It's something completely different when you know what ROP's

10  really about, when ROP's where you want to be, ROP's the

11  prestigious unit, ROP is the unit where you want to be.  Not

12  only was there a loss of benefit in overtime, there was a loss

13  of prestige.  This is a much different situation than being in

14  Burglary.

15          So, ladies and gentlemen, my time is up.  I'm sure

16  you-all want to go back and get this thing rolling.  What I'm

17  asking you to do is just look at this with common sense.  You

18  heard all the evidence.  You've seen all the evidence.  We've

19  argued it until we're blue in the face.  Terysa Welch

20  experienced sexual harassment by her supervisor, she

21  experienced sexual harassment by her coworkers.  The City did

22  nothing to remediate the coworker sexual harassment, which is

23  all this defense applies to, and Terysa Welch was discriminated

24  against.  Those things caused her transfer, those things caused

25  her discipline, those things caused her emotional distress,

1  damage to reputation, and loss of enjoyment of life, and we ask

2  that you compensate her for those losses.

3          Thank you for your time.

4          THE COURT:  All right.  Thank you, counsel.

5          I mentioned to you that I have a few more

6  instructions for you.  Picking up where I left off, ladies and

7  gentlemen, faithful performance by you of your duties is vital

8  to the administration of justice.  Any verdict must represent

9  the considered judgment of each juror.  In order to return a

10  verdict, it is necessary that each juror agree to it.  In other

11  words, your verdict must be unanimous.

12          It is your duty, as jurors, to consult with one

13  another and to deliberate in an effort to reach an agreement if

14  you can do so without giving up your individual judgment.  Each

15  of you must decide the case for yourself, but only after an

16  impartial consideration of all the evidence in the case with

17  your fellow jurors.  In the course of your deliberations, do

18  not hesitate to re-examine your own views and change your

19  opinion if convinced it is erroneous.  But do not surrender

20  your honest conviction as to the weight or effect of the

21  evidence solely because of the opinion of your fellow jurors or

22  for the mere purpose of returning a verdict.

23          Remember at all times, you are not partisans.  You

24  are judges, judges of the facts.  Your sole interest is to seek

25  the truth from the evidence in the case.

119

1          Now, during your deliberations, you must not

2    communicate with or provide any information to anyone by any

3    means about this case.  You may not use any electronic device

4    or media, such as a telephone or cell phone, smartphone,

5    computer, the Internet, any text or instant messaging service,

6    blog, or any website, such as Facebook, LinkedIn, YouTube, or

7    Twitter, to communicate to anyone any information about this

8    case or to conduct any research about this case until I accept

9    your verdict.  In other words, you cannot talk to anyone on the

10   phone, correspond with anyone, or electronically communicate

11   with anyone about this case.  You can only discuss the case in

12   the jury room with your fellow jurors during deliberations.

13          You may not use electronic means to investigate or

14   communicate about the case, because it is important that you

15   decide this case based solely on the evidence presented in this

16   courtroom.  Information on the Internet or available through

17   social media may be wrong, incomplete, or inaccurate.  You are

18   permitted to discuss the case with only your fellow jurors

19   during deliberations because they have seen and heard the same

20   evidence you have.

21          In our judicial system, it is important that you are

22   not influenced by anything or anyone outside of this courtroom.

23   Otherwise, your decision may be based on information known only

24   by you and not your fellow jurors and the parties in this case.

25   This would unfairly and adversely impact the judicial process.

1          Now, upon retiring to the jury room, you should first

2    elect a foreperson who will preside over your deliberations and

3    will be your spokesperson here in court.

4          A form of verdict has been prepared for your

5    convenience.  And this is multiple pages.  I urge you to look

6    at it carefully, consider how it's structured, and I think

7    you'll see that it's logically organized so that you can

8    complete your verdict form.  You will take the verdict form to

9    the jury room, and when you have reached a unanimous agreement

10   as to your verdict, you will have your foreperson fill it in,

11   date it and sign it and then return to the courtroom.

12         If, during your deliberations, you should desire to

13   communicate with me, please put your message or question in

14   writing, signed by the foreperson, and pass the note to the

15   court security officer, who will then bring it to my attention.

16   I will then respond as promptly as possible, either in writing

17   or by having you return to the courtroom.  I caution you,

18   however, with regard to any message or question you might send,

19   that you should never state your numerical division.

20         All right, ladies and gentlemen, that completes

21   instructions to you.  At this time Ms. Hall will see to it that

22   you are provided lunch as soon as possible.  All the exhibits

23   will be assembled for you; they will be taken back to you.  As

24   I said, you will each receive a copy of the instructions.

25   Please do not begin your deliberations until you have all this

1    material, including the exhibits and the instructions, and you

2    may get started.

3           All right.  There being nothing else, then please

4    rise for the jury.

5        (Jury out to deliberate at 12:25 p.m.)

6           THE COURT:  Okay.  Counsel, so just make sure that

7    you have provided Ms. Hall or the Court staff with your cell

8    phone number.  Please remain within ten minutes of the

9    courthouse while the jury is deliberating.  That way if they do

10   have a note or anything, we can call you back and we can get

11   started as soon as possible.

12          All right.  Before we recess, is there anything to

13   take up, Mr. Villa?

14          MR. VILLA:  No, Your Honor.  Thank you.

15          THE COURT:  All right.

16          MS. WILLIAMS:   Your Honor, I have a question.  Are

17   we going to be able to talk to the jury after they deliver

18   their verdict or not?

19          THE COURT:  You know, it's normally my practice to

20   talk to the jury after the verdict.  I always ask them if they

21   are inclined.  It's not mandatory --

22          MS. WILLIAMS:  Sure.

23          THE COURT:  -- but that it's usually helpful to

24   counsel --

25          MS. WILLIAMS:  Yes.

1          THE COURT:  -- to have an opportunity to talk to the

2    jurors.  So it's usually up to them.  Some of them stay.  Some

3    of them don't.

4          MS. WILLIAMS:  I appreciate that.

5          THE COURT:  You bet.  Please remain.  Ms. Hall will

6    take an inventory of the exhibits, make sure they're all

7    assembled, and then they'll go back to the jury.

8          Okay.  Thanks, everyone.  Have a good lunch.

9       (Court stood in recess at 12:26 p.m. and resumed at

10       5:04 p.m. as follows:)

11         THE COURT:  Good afternoon.  You may be seated.

12         I wanted to visit with you just because of where we

13   are in the day.  It is just about five minutes after 5:00, and

14   what I propose to do, but I'll hear you on this, is to send a

15   note back to the jury, and the note would say something to the

16   effect as follows:  Given the time of day, 5:05 p.m., the Court

17   and parties want to know if you will prefer to continue

18   deliberating today.  Please respond yes or no.  If your answer

19   is yes, do you want to order dinner?  If your answer is no, I

20   will reconvene court shortly and we will recess for the day and

21   you will continue deliberating tomorrow morning.

22         MR. VILLA:  That seems fine, Your Honor.

23         THE COURT:  Okay.

24         MS. WILLIAMS:  No objection, Your Honor.

25         THE COURT:  Okay.  I will put that on a note for the

1    jury.  If you can just stand by, we'll wait for the answer, and

2    then we'll know what we're going to do this evening.

3           All right.  We'll be in recess just shortly.  I'll

4    prepare the note.

5       (Court stood in recess at 5:06 p.m. and resumed at

6       5:18 p.m. as follows:)

7           THE COURT:  Okay.  Please be seated.  So just for a

8    moment.  So, let me just read back to you the note that I sent

9    back and what was sent back to me.

10          So the note is as follows:  "Given the time of day,

11   5:10 p.m., the Court and parties want to know if you prefer to

12   continue to deliberate today.  Please respond yes or no only.

13   If your answer is yes, do you want to order dinner?  Yes or no.

14   If your answer is no, I will reconvene court shortly to recess

15   for the day.  You will continue deliberating tomorrow morning.

16   Judge Gonzales."

17          So they circled no of whether to deliberate --

18   continue deliberating today, so the response is no.  Okay.

19   With that, let's reconvene.

20       (Jury in at 5:19 p.m.)

21          THE COURT:  Okay.  Please be seated just for a

22   moment.

23          I received your response to the note that I sent back

24   to you asking whether you want to deliberate -- continue

25   deliberating this evening, and I received your response, and so

```
1    we will recess for the day.  It's 5:20 in the evening.  We will
2    reconvene tomorrow morning.  Please be back in the deliberation
3    room by 8:30, and I will reconvene court with you and then
4    excuse you back to the deliberation room to continue your
5    deliberations.  So that's the path forward.
6             Okay.  Now, you're deliberating.  My instructions to
7    you, as you have heard, is to deliberate but only in the
8    deliberation room when you are all assembled together.  If you
9    happen to be in the deliberation room tomorrow morning and one
10   of you or two of you or any of you are missing, please do not
11   continue to deliberate.  It will only be when you are all
12   assembled, all ten of you.
13            Okay.  So those are my instructions.  Thank you for
14   your work today.  We're in recess.  Have a good evening.
15            Please rise for the jury.
16        (Jury out at 5:20 p.m.)
17            THE COURT:  Okay.  So we're in recess.
18            Let me just note what I didn't note already.  All
19   counsel are present.
20            All right.  Anything, Mr. Villa?
21            MR. VILLA:  Was the note signed by anybody?
22            THE COURT:  It is not signed, but I will have the
23   note entered on to the record.
24            MR. VILLA:  Sure.
25            THE COURT:  That will be my instruction.  But no,
```

125

1    it's not signed.

2              MR. VILLA:  Based on the Court's instruction, you

3    want us here at 8:30, as well?

4              THE COURT:  Yes, sir.

5              MR. VILLA:  Yes.  We'll see you tomorrow.

6              THE COURT:  All right.  Have a good night.

7         (Court stood in recess at 5:21 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-E

2    UNITED STATES OF AMERICA

3    DISTRICT OF NEW MEXICO

4

5        I, Danna Schutte Everett, RPR, CCR, CRR, Official

6    Court Reporter for the State of New Mexico, do hereby

7    certify that the foregoing pages constitute a true

8    transcript of proceedings had before the said Court held

9    in the city of Albuquerque, New Mexico, in the matter

10   therein stated.

11       In testimony whereof, I have hereunto set my hand on

12   this 13th day of July, 2018.

13

14       _____
                DANNA SCHUTTE EVERETT
15              Registered Professional Reporter
                Registered Merit Reporter
16              Certified Realtime Reporter
                NM Certified Court Reporter #139
17              100 Church Street
                Las Cruces, New Mexico  88001
18              Phone:  (575) 528-1656
                Fax:  (575) 528-1645
19              dannadawn@comcast.net

20

21

22   May 22, 2018, Welch vs. City of Albuquerque

23

24

25